**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01707-KAS

KOSHER EATS LLC,
EMERALD CONSULTING PARTNERS LLC,
ABBSON LLC,
MSC COMPANIES, LLC, and
HOMEPEOPLE CORPORATION,

      Plaintiffs,

vs.

MESSNER REEVES LLP,
DANIEL CHARTRAW,
TODD OWEN, and
CLEARWATER PREMIERE PERPETUAL MASTER LLC,

      Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**REGARDING FUNDS ESCROWED WITH DEFENDANT MESSNER REEVES LLP**

---

Plaintiffs Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies LLC, and HomePeople Corporation respectfully move under Federal Rule of Civil Procedure 65 for a Preliminary Injunction Regarding Funds Escrowed with Defendant Messner Reeves LLP ("Messner").

**STATEMENT OF RELIEF REQUESTED**

Plaintiffs seek a preliminary injunction directing as follows:

1. Messner must deposit $329,540.77 into the Court registry, or into a neutral escrow account approved by the Court, because Messner transferred that amount from Messner's COLTAF trust account containing Plaintiffs' escrow deposits into another Messner account.

2. Messner must file a verified accounting for the $329,540.77 internal transfer, and the entirety of the $8,345,000 that Plaintiffs placed into escrow with Defendants,

including the date, account number, account owner, stated purpose, approving person, requesting person, recipient account, subsequent transfer, current location, and all documents supporting any basis for Messner to assert that it had the right to transfer Plaintiffs' escrow money to itself.

3. Messner must disclose whether any portion of Plaintiffs' $8,345,000 was ever returned, refunded, repaid, credited, reimbursed, reversed, clawed back, held pursuant to a joint venture involving Messner or otherwise received by Messner, any Messner account, any Messner affiliate, any Messner lawyer, any lawyer acting with Messner, or any person acting on Messner's behalf. Any such funds or proceeds must be preserved and deposited into the Court registry or a neutral escrow account.

If the Court determines that further evidence is needed before ordering Messner to provide an accounting or registry deposit, Plaintiffs request narrow and expedited discovery, oral argument, and an evidentiary hearing.

**FACTUAL BACKGROUND**

Plaintiffs are victims of an advance fee theft scheme perpetrated by the law firm, Messner, who fraudulently induced Plaintiffs to wire $8,345,000 into its trust account, transferred some of it away, lied about that, and is now trying to get away with having stolen Plaintiffs' money. The law firm drafted sham loan agreements for a shell Wyoming LLC named INBE Capital LLC ("INBE") that had no money to loan. Those loan documents consist of commercially nonsensical terms that no lender would ever accept, whereby the company with no assets agreed to loan $33 million to Plaintiffs' small businesses without a personal guaranty, without real estate collateral, without any repayment of principal for 10 years, with interest only at 6%, with expedited approvals and no credit check. Messner's loan agreement was essentially an offer to give away free money.

I.   **Messner Perpetrates an Advance Fee Fraud Scheme through a Phony Loan Agreement.**

The catch was that the borrowers had to deposit 25% of the loan amount into Messner's trust account for up to 90 days until the loans funded. Per the Business Expansion Line of Credit

2

("BELOC") agreements, the Interest Control Account ("ICA") deposits would remain in Messner's "sole possession and control" for up to 90 days pending funding of the loan. If the loan did not fund, the borrower received its ICA deposit back. And this was not supposed to be an issue because the agreement clearly provided that until the borrower received its loan funds, the ICA deposit was to remain in Messner's "sole possession and control." This was further hammered home in the extended FAQ 3.0 containing express guarantees regarding the safekeeping of the ICA funds during the 90-day pre-funding period, confirming that the escrow deposits were "fully insured" and that there was "no risk" of losing capital. In effect, Messner was really borrowing money from the would-be borrowers, the Plaintiffs, on an interest-free basis, ostensibly to be used as reserves, while still in Messner's "sole possession and control" to obtain credit elsewhere. Plaintiffs understood that the loans might not fund, but Plaintiffs otherwise trusted the sanctity of a fully insured COLTAF account at a 100 attorney law firm for 90 days.

## II.   Messner Engages in Concurrent Fraudulent Activities.

Plaintiffs did not know, as of the spring and summer 2023 when Plaintiffs collectively wired $8,345,000 to Messner, that Messner was engulfed in fraudulent conduct. Messner had been making representations and promoting fake documents relative to the phantom existence of billions of dollars in construction funding for a defunct project named "All Net" arena on the Las Vegas strip which essentially never broke ground and was being swarmed by creditors, including a paving company with a $17 million judgment. The All Net or "Dribble Dunk" project would need to show construction progress between November 2022 and November 2023, or the Las Vegas Zoning Commission would shut down the project. By early 2023, Messner's relationship with the convicted felon Daniel Chartraw, its client, was in full bloom. Messner used Chartraw's company, Clearwater Premiere Perpetual Master LLC ("Clearwater") and Chartraw's associate,

3

Todd Owen, both Defendants here, in a number of schemes and gambits intended to make it seem like Dribble Dunk had billions of dollars in construction financing, when in reality, it had none.

### III. Daniel Chartraw, the Convicted Felon and Advance Fee Fraud Specialist, is Messner's Co-Conspirator and Client.

Pursuant to an 18-count federal indictment for a stunning range of advance fee fraud schemes, Chartraw pled guilty to wire fraud and was sentenced to 57 months in federal prison in 2013 to run concurrently with his seven-year state prison sentence for other felonies including violating a restraining order and breaking a woman's nose by punching her in front of her four children. Chartraw's criminal history, including news articles, is prominently displayed upon a Google search, so Messner used an alias, referred to him as Leon Chartue, and did not inform Plaintiffs of his involvement until it was too late. Plaintiffs had no idea that Chartraw was involved or that he and his companies and insiders would receive Plaintiffs' still-missing escrow money. After he was released from prison, Chartraw promptly resumed his criminal conduct and he was indicted on November 21, 2024 on 12 counts of wire fraud for conduct which occurred before and during the events at issue in this case. On June 18, 2026, a week ago, a federal jury in Sacramento convicted Chartraw of all 12 counts of wire fraud and Chartraw, Messner's Co-Defendant and co-conspirator in this action awaits his September 28, 2026 sentencing. Exhibit 65 (trial minutes).

### IV. Messner's Ringleader(s) Fired, but Fraud is Known at the Highest Levels of the Firm.

Two of Messner's ringleaders are its President, Jim Smith, who signed two cryptic declarations regarding the whereabouts of Plaintiffs' money which raise more questions than they answer, and an attorney named Torben Welch, who has now been fired from the firm or otherwise let go. Messner's attorneys refused to answer the question of whether Smith is still employed by Messner. On June 11, 2026, just two weeks ago, the Securities and Exchange Commission charged Welch and Messner's client Charles Cole with securities fraud, and Cole was also indicted for the

4

same conduct. Exhibit 63 (complaint in *Securities and Exchange Commission v. Cole, et al.*, 1:26-cv-4945 (S.D.N.Y.)) and Exhibit 64 (indictment in *United States of America v. Cole*, 1:26-cr-00242 (S.D.N.Y.)). The conduct perpetrated by Welch and Cole matches the conduct that Welch engaged in with Chartraw and others in connection with this matter. On both occasions, Messner's lawyer and client fabricated banking documents to make it appear as though billions of dollars existed, when in fact, those funds were not real. The scam involved using the image of the nonexistent funds to obtain real money from others. That is exactly what Messner did with Dribble Dunk by using Plaintiffs' money as a "petty cash slush fund" along with representations of the existence of billions of dollars from Chartraw and Clearwater to attract investors. Messner even used an IOLTA account to effectuate that scheme just as it did with the Plaintiffs' money. As was the case here, in the Cole case, the Messner's "imprimatur" was "central" to the victim's decision to issue the fraudulently-obtained shares. When Messner disbursed the fraudulently-obtained $1 million, $200,000 of that went to a "crypto-asset platform to be converted to crypto assets and deposited into an account controlled by Thiess in the name of TiNB." Exhibit 63 at 14. That parallel scheme reinforces why Messner must disclose whether any portion of Plaintiffs' money was returned, repaid, credited, converted, or routed back to Messner or anyone acting with it. Messner has refused to provide an accounting despite more than 22 requests for an accounting. Chase Decl., ¶ 68.

V.  **Messner Repeatedly Lied About Plaintiffs' Missing Funds and is Still Trying to Frame INBE, its Former Client, for Messner's Theft.**

Messner told different lies to different people. While all the money had already been transferred out, Messner told these different sets of lies to Plaintiffs and INBE:

| Date | Messner's Statements to Plaintiffs | Messner's Statements to INBE |
|---|---|---|
| 8/18/2023 | Discussed with the bankers facilitating the move today - they have indicated that the initial messages have been sent for the | |

|  |  |  |
|---|---|---|
|  | final transfers and they will respond to each other Monday. |  |
| 8/23/2023 | INBE stands ready, willing and able to proceed with the financing. |  |
| 8/24/2023 | The bankers are still working through transfer protocols and clearance of the funds. I remain hopeful funds are cleared and deposited tomorrow. |  |
| 9/12/2023 |  | Just sent you an email - my partners are blocking all new BELOCs for deposit. I convinced them to keep the monetization side, but we will need to find another pathway on the loans. |
| 9/21/2023 |  | Jonathan from [Plaintiff] Emerald is hammering me on…[whether] funds are in escrow (this deposit was $700k)… There are now 3 that are on us constantly… We need to get some funds in to cover these |
| 10/26/2023 |  | (Transfers $514,900 to Chartraw, Owen, and Clearwater in the past month) |
| 11/3/2023 | The funds are under the Firm's possession and control. |  |
| 12/20/2023 |  | Current plan is to get the ICA deposits ready to return and get released. I am dependent on Dan [Chartraw] there and nothing yet in that front |
| 1/25/2024 | The funds remain part of the escrow under our control at Titan Financial, LLC. |  |
| 1/31/2024 |  | We have ledger funds blocked right now that is the entirety of the deposits. They are not yet ready to disburse… obviously that cannot happen without additional funds |
| 2/15/2024 | The funds continue to be under our control in a firm trust account at Titan Financial, LLC |  |
| 2/22/2024 | At no time have the funds at issue in the lawsuit disappeared or become lost. The legal requirements regarding the return of the funds have not been satisfied, and the firm is legally prohibited from releasing the money at issue. |  |

| | | Out of my hands - partners don't want to settle. The plan is to interplead funds and fight |
|---|---|---|
| 2/27/2024 | | |
| 3/11/2024 | We remain on schedule... I am awaiting final confirmation. | |
| 3/20/2024 | I have spoken with the national bank partner this morning that is handling the last path of the ICA deposits and they believe they will be in a position to deploy those this week yet. | |

Messner's representations to the tribunal, implying that INBE possesses the funds, are inaccurate.

| | Messner Statement to the Tribunal | Problem with Messner's Statement to the Tribunal |
|---|---|---|
| 2/21/2025 | The MR Firm did not convert or use the funds Plaintiffs wired to INBE for their own purposes or to benefit any of the individuals at the MR Firm. The MR Firm was merely a conduit for INBE. | This is not accurate. Plaintiffs did not wire any funds to INBE. INBE's sworn statements and the bank records prove this. Messner was not merely a conduit. INBE had no communications with the recipients. No written authorizations exist. |
| 2/21/2025 | Plaintiffs ask the Court to alter the status quo by ordering the MR Firm to deposit INBE's funds into the Court registry or to freeze those funds | The funds did not belong to INBE. The ICA deposits were being held in escrow. The funds belonged to Plaintiffs. |
| 2/21/2025 | The MR Firm transferred INBE's money at INBE's direction | Plaintiffs' ICA deposits were not "INBE's money" and the transfers were not "at INBE's direction." INBE was not even aware of the transfers. |
| 2/21/2025 | The MR Firm's duty ran to its client; not Plaintiffs | INBE asked for an accounting, and Messner refused to provide INBE with an accounting. |

**VI. The BELOC Agreement Clearly Provides that the ICA Funds are Held in Escrow Prior to Funding.**

Recital E provides that the ICA payment was intended for interest payments, confirming its intended purpose. Per Section 3.6, ICA funds remain refundable unless a loan advance occurs, which is something that never happened. Per Exhibit F, there is a 90-day escrow term, and it is

7

required that the funds be returned if no loan is funded. Exhibit F references "escrow" three times, refers to the ICA funds as a "Deposit," and unambiguously states that prior to loan funding, the ICA funds "shall be in Trustee's [Messner's] sole possession and control."

Messner may attempt to selectively cite Section 3.6 suggesting that ICA funds could be freely used before the loan has funded. The provision states that funds may only be used for interest payments on funded loans. Since no loan was funded, Messner had no authority to use the ICA deposits for any purpose. Similarly, any reliance on Section 7.4 is misplaced, as that provision permits ICA funds to be used only for interest payments on advances. Since no advances were made, the funds had to remain untouched.

Section 13.7(a) governs situations where no loan advance occurs, and it entitles Plaintiffs to a full refund upon submitting a termination letter. Plaintiffs followed this process, yet Messner failed to return the funds. As to Section 14.11, which states only that "No third Person shall have any rights hereunder." Messner has previously suggested that this provision shields third parties from obligations under the BELOC, despite the fact that the term obligation does not appear anywhere in the BELOC and is contradicted by Exhibit F. These provisions do nothing to shield Messner, Clearwater, or Dribble Dunk from liability for wrongful transfers. If Messner argues that the ICA deposit funds were never escrowed in the first place, that would be an admission that the loan agreement Messner drafted is a sham.

### VII. The Bank Records Show that Messner Almost Immediately Transferred Plaintiffs' Money Out of the Account and Has Not Been Candid with Plaintiffs, INBE, the Public, or the Courts.

| Total Received | Recipient | Notes |
|---|---|---|
| $1,800,000.00 | Sahara Las Vegas Corp. | Dribble Dunk Landlord in Las Vegas for Dribble Dunk's rent |
| $1,274,000.00 | Master Systems Integrators LLC | Ponzi Scheme - fake partial funding of BELOC loan |

| | | |
|---|---|---|
| $973,333.00 | HomePeople Corp. | Ponzi Scheme - fake partial funding of BELOC loan |
| $904,777.00 | Valley Bank of Nevada (CTS) | Payment/settlement of Dribble Dunk's creditor Construction Testing Service |
| $758,918.09 | Dribble Dunk LLC | Failed Developer of Las Vegas Stadium |
| $600,000.00 | Wyatt Aufdermaur LLC | Messner Reeves' co-counsel / accomplice, attorney for Martin Hale of Latham Funding |
| $538,998.99 | Daniel Chartraw | Convicted felon / advance fee fraud specialist |
| $500,000.00 | Harris Bank NA (Loan IQ) | Apparent loan repayment |
| $430,000.00 | Clearwater Premiere Perpetual Master LLC | Company operated by Chartraw and Owen |
| $430,000.00 | Todd Owen | Accomplice of Chartraw |
| $414,705.00 | Hoehn JLR Inc. | Car dealership |
| **$329,540.77** | **Internal Debit Transfer (01298687)** | |
| $250,000.00 | Travis Chatwin | Creditor |
| $175,000.00 | Brandon Knowldon | Creditor |
| $155,000.00 | Brownstein Hyatt Farber Schreck | Law firm likely to settle a Dribble Dunk debt |
| $125,000.00 | DKTOHOME, LLC | Affiliated with Chartraw |
| $120,000.00 | Lawrence Longo Trustee Aelina | House Rental |
| $100,000.00 | Whiskey Cowboys LLC | |
| $80,242.36 | Autonation Chrysler Dodge | Car dealership |
| $80,000.00 | Mountain Mines, LLC | |
| $70,000.00 | Danielle Martin | |
| $68,000.00 | Phoenix GC LLC | Broker for BELOC transactions |
| $60,000.00 | Keller North America, Inc. | Paid invoice |
| $56,722.00 | RBC Capital Markets | |
| $50,000.00 | Javier Reyna | Operator of Fides purported Mexican bank |
| $50,000.00 | World Buddhism Association | Dribble Dunk creditor |
| $45,250.00 | Private Passport Transfer to x0534 | |

**VIII. The Internal Transfers are a Serious Problem.**

The internal Messner transfers require immediate relief. On May 3, 2023, Messner transferred $300,590.77 from its COLTAF account to another Northern Trust account x-0534 in the name of *Messner Reeves LLC* (the former firm name). On June 27, 2023, Messner transferred another $28,950 to the same 0534 Northern Trust account in the name of Messner Reeves LLC. Together, those internal transfers total $329,540.77.

Messner later represented under oath twice that the funds were fully disbursed. But money transferred from Messner's COLTAF account to another Messner account was not disbursed. It remained within Messner's possession, custody, and control unless Messner later transferred it again. Messner should deposit those funds into the registry now and account for what happened.

The other transfers also require preservation and a returned-funds disclosure. Messner sent $538,998.99 directly to Chartraw. It sent $465,000 to Todd Owen. It sent $430,000 to Clearwater. It sent additional money to Clearwater-related accounts and creditors. It sent money to Dribble Dunk and Dribble Dunk's creditors, including $1.8 million to Dribble Dunk's landlord. It sent $500,000 to Harris Bank for an apparent loan repayment. It sent $904,777.00 to the attorney for Construction Testing Services and Fenagh Engineering to pay Dribble Dunk's debt. It sent money to car dealerships and other supposed BELOC participants as if it were a Ponzi scheme. This is not what Plaintiffs signed up for when their funds were to be returned after 90 days.

## ARGUMENT

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON CLAIMS SUPPORTING EQUITABLE RELIEF OVER ESCROW FUNDS AND TRACEABLE PROCEEDS.**

Plaintiffs are likely to succeed on their conversion and civil theft claims. Messner received Plaintiffs' deposits into its COLTAF account. The written documents called for the deposits to remain in Messner's sole possession and control until loan funding. Plaintiffs' loans did not fund,

the 90 day deadline passed, and Plaintiffs demanded the return of their money. In response, Messner told lies for years. Messner exercised control over Plaintiffs' property in a manner inconsistent with Plaintiffs' rights. Plaintiffs had the right to return of the deposits when the loans did not fund after 90 days. Messner deprived Plaintiffs of that right. Under Colorado law, money held in an attorney trust account "remains the separate property of the client" until an authorized withdrawal, and the attorney's misappropriation of those funds "constitutes conversion." *In re 3PL4PL, LLC*, 619 B.R. 441, 461 (Bankr. D. Colo. 2020). Plaintiffs' escrow deposits remained Plaintiffs' property and Messner's transfer of those funds was conversion.

Civil theft follows from the same facts, with additional proof of knowing control, intent, and concealment. Messner knew the deposits were in its COLTAF account. Messner knew the written documents required sole possession and control before funding. Messner knew the loans hadn't funded. Messner knew Plaintiffs wanted their deposits returned. Messner had already transferred the money away to insiders, accomplices, itself, construction creditors, and other unrelated parties. Instead of coming clean, Messner simultaneously lied to Plaintiffs by claiming the funds were in escrow at Titan Financial and deflected Plaintiffs to INBE for money that Messner knew had never gone to INBE.

Messner's president, Smith, falsely claimed that he attached "authorizations" from INBE to his October 29, 2025 declaration, but the documents attached to that document are not authorizations from anyone.  Exhibit 51 (Smith Decl. Oct. 29, 2025).

Plaintiffs are likely to succeed on their breach of fiduciary duty claims. Messner drafted the BELOC documents. Messner was the trustee attorney identified in the escrow instructions. Messner received the deposits into its COLTAF account. Messner promised sole possession and control before funding. An escrow holder or trustee attorney cannot transfer escrow deposits to

unrelated third parties without authorization or disclosure to the depositing party. The loans did not fund and Messner had no authority to transfer Plaintiffs' deposits away.

Plaintiffs are likely to succeed on unjust enrichment, accounting, constructive trust, and equitable lien. Messner received Plaintiffs' money. Messner kept or transferred the benefit of that money. Plaintiffs received no loans and no refunds. Equity does not permit Messner to retain the benefit of $8,345,000 in stolen escrow deposits.

A constructive trust is a remedy to compel a person who unfairly holds a property interest to convey that interest to the person to whom it justly belongs. *In re Marriage of Alle*n, 724 P.2d 651, 656-57 (Colo. 1986). A constructive trust may attach to proceeds and to property purchased with proceeds. *Id*. at 657. An equitable lien is a limited form of constructive trust and may be appropriate when part of the property or fund belongs in good conscience to another. *Id*. at 658. The Tenth Circuit recently reaffirmed these principles under Colorado law, holding that a constructive trust gives the beneficiary priority over other creditors and that a court of equity "has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder," absent a bona fide purchaser. *McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1099–1100 (10th Cir. 2023). An equitable lien "operates like the constructive trust in affording a preference over other creditors." *Id*. at 1108. Those principles reach the $329,540.77 Messner transferred to itself and the funds it transferred to the scheme participants, such as Chartraw, Owen, and Clearwater, none of whom is a bona fide purchaser. Messner's internal transfers alone justify injunctive relief and a deposit in the registry.

Messner may argue that Plaintiffs are seeking a "general asset freeze." That would not be an accurate characterization, as Plaintiffs seek control over a specific escrow res and its traceable proceeds. Plaintiffs also seek an accounting, preservation, registry deposit, and disclosure of

12

returned funds. This is equitable relief tied to specific property and property substitutes. It is not a free-floating freeze of Messner's general assets to secure a later money judgment. See *Lyons v. Jefferson Bank & Tr.*, 781 F. Supp. 1525, 1530-32 (D. Colo. 1992)

*Lyons* is the controlling practical model. There, the District of Colorado granted a preliminary injunction preserving funds subject to a constructive trust. *Lyons v. Jefferson Bank & Tr.*, 781 F. Supp. 1525, 1530-32 (D. Colo. 1992) (assets subject to a constructive trust may be frozen by preliminary injunction to preserve the corpus pending trial). That principle applies here.

## II.    PLAINTIFFS FACE AN IMMINENT RISK OF IRREPARABLE HARM.

Plaintiffs' businesses face imminent failure. The party declarations show that the missing deposits have progressively and increasingly damaged Plaintiffs' operations, access to capital, market position, vendor relationships, standing, and goodwill. Plaintiffs lost operating capacity, credibility, opportunities, and the ability to deploy capital. Several now face failure if the missing deposits are not returned or preserved. A threat to the viability of a plaintiff's business may also constitute irreparable harm. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc*., 805 F.2d 351, 356 (10th Cir. 1986). Independently, dissipation of the traceable res is itself irreparable harm. Where specifically identified funds may be spent or commingled, a later damages award is inadequate, because commingling can defeat the tracing required to impose a constructive trust and thereby destroy the equitable remedy. *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1256–57 (D. Utah 2009) (granting a preliminary injunction freezing specifically identified funds on this ground). Messner has already made one traceable internal transfer of $329,540.77. Further dispersal of the remaining escrow proceeds would defeat tracing and extinguish Plaintiffs' constructive-trust and equitable-lien remedies.

III.   **THE BALANCE OF EQUITIES AND PUBLIC INTEREST CONSIDERATIONS WEIGH STRONGLY IN FAVOR OF RELIEF.**

Plaintiffs seek preservation of money they deposited into a law firm trust account. Messner has no legitimate interest in stolen escrow deposits or traceable proceeds. Messner has no legitimate interest in withholding an accounting. Messner has no legitimate interest in refusing to identify returned funds. Nor does it have any legitimate interest in keeping the $329,540.77 it transferred to itself.

An injunction will require Messner to do what an honest escrow holder would already have done, which is to account, preserve, identify, and deposit traceable funds. Plaintiffs, meanwhile, face business failure, loss of goodwill, loss of financing access, destruction of market position, and continued loss of the res.

The public interest is clear, in that a law firm trust account should be sacrosanct. Members of the public should feel comfortable depositing their money in a law firm trust account. If a law firm can receive $8,345,000 into a COLTAF account, transfer it without disclosure to the depositor to insiders, creditors, car dealerships, fraud participants, and itself, then lie about it, and refuse to account for years, the system would indeed be broken.

The public has a strong interest in preventing perpetuation and concealment of egregious conduct. There is no basis for a law firm to cause $8,345,000 to disappear from its trust account. That is never supposed to happen. This law firm partnered up with a notorious advance fee specialist and repeat wire-fraud felon. The firm refuses to share its communications on the basis of its relationship with Chartraw. Messner engaged in similar conduct in the Cole matter for which an SEC action and an indictment were already handed down. For reasons unknown, this law firm remains obstinate and unrepentant. Plaintiffs' only hope is with the courts. The public interest factors weigh heavily in Plaintiffs' favor.

14

**CONCLUSION**

For the reasons discussed herein, Plaintiffs respectfully request that the Court grant this Motion and enter a preliminary injunction requiring Messner to deposit $329,540.77 into the Court registry or a neutral escrow account, account under oath for the internal Messner transfers, disclose and preserve any money or proceeds returned to Messner, preserve all traceable proceeds and related records, and post no security under Rule 65(c). If the Court determines that further evidence is needed before ordering registry deposit or a verified accounting, Plaintiffs request narrow expedited discovery, oral argument, and an evidentiary hearing.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:     */s/ Kenneth E. Chase*
Kenneth E. Chase
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Counsel for Plaintiffs*
*Kosher Eats LLC,*
*Emerald Consulting Partners LLC,*
*Abbson LLC,*
*MSC Companies LLC, and*
*HomePeople Corporation*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)

I certify that counsel for Plaintiffs conferred in good faith with counsel for Messner Reeves LLP regarding the relief requested in this Motion.

On June 2, 2026, I conferred by Zoom with Messner Reeves LLP's counsel, Troy Rackham and Hannah Brown Goehring, regarding Plaintiffs' request for preliminary injunctive relief, including accounting, preservation, registry deposit, and related relief. Plaintiffs also followed up by email regarding the requested relief. Messner Reeves LLP does not agree to the relief requested in this Motion.

Accordingly, the relief requested in this Motion is opposed.

By:     */s/ Kenneth E. Chase*
Kenneth E. Chase

## CERTIFICATE OF SERVICE

I, Kenneth E. Chase, hereby certify that I served the foregoing via CM/ECF on June 25, 2026, which automatically sends notice of an electronic filing to all counsel and registered users of record.

By:     */s/ Kenneth E. Chase*
Kenneth E. Chase