## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01707-KAS

KOSHER EATS LLC,
EMERALD CONSULTING PARTNERS LLC,
ABBSON LLC,
MSC COMPANIES, LLC, and
HOMEPEOPLE CORPORATION,

      Plaintiffs,

vs.

MESSNER REEVES LLP,
DANIEL CHARTRAW,
TODD OWEN, and
CLEARWATER PREMIERE PERPETUAL MASTER LLC,

      Defendants.

---

## DECLARATION OF KENNETH E. CHASE

---

I, Kenneth E. Chase, declare as follows:

1.     My name is Kenneth E. Chase and being of lawful age and sound mind hereby depose and state as follows.

2.     I am an attorney licensed to practice in this Court and I am counsel of record for Plaintiffs in the above-captioned matter. I submit this declaration in support of Plaintiffs Motion for Preliminary Injunction.

3.     On June 2, 2026, I met and conferred with counsel for the opposing side, Troy Rackham and Hannah Brown Goehring, by Zoom call. The parties were not able to reach an agreement.

4. On June 4, 2026 and June 19, 2026, I sent additional correspondence to Defendant's counsel in an effort to reach a resolution. However, the parties were not able to come to a resolution.

5. Attached as **Exhibit 1** (composite) is a true and correct copy of a Daniel Chartraw's indictment and guilty plea to wire fraud per Count 9 of the indictment, for which Chartraw was sentenced to 57 months in federal prison and ordered to pay $2,830,698 in restitution. *United States v. Chartraw*, No. 2:12-cr-00184 (E.D. Cal.).

6. Attached as **Exhibit 2** is a true and correct copy of an August 2, 2022 Messner Reeves letter stating that Messner Reeves is bond counsel and bookrunner for Global Infrastructure Finance & Development Authority, Inc., Clearwater Premiere Perpetual Master Trust, Clearwater Premiere Perpetual Master, LLC, Todd Owen and Shah Mattias as the sponsor/issuers of the above-referenced Bonds.

7. Attached as **Exhibit 3** is a true and correct copy of an August 26, 2022 Messner Reeves letter referencing "Confirmation of Financing All Net Resort and Arena Project."

8. Attached as **Exhibit 4** is a true and correct copy of a September 8, 2022 "bond certificate" purporting to correspond to a $60,000,000,000,000.00 bond, later referenced on November 21, 2023 by Torben Welch as follows: "in November [2022] when we came, we presented some financing that was in place and through a variety of fraudulent things that happened of no consequence or no fault of All Net or its partner, that turned into something different." The Transcript page is attached as **Exhibit 5.**

9. Attached as **Exhibit 6** is a true and correct copy of a November 15, 2022 purported Five Billion United States Dollars ($5,000,000,000.00) funding commitment letter reflecting the company PG Asia Investment Bank, presented on November 16, 2022 by Messner Reeves as

"Dribble Dunk has received a funding commitment letter which is deemed legally binding from PG Asia Investment Bank, confirming funding in the amount of $5 billion dollars to Clearwater as required for the Dribble Dunk Project funding expectations. I wanna let the Board know that it's signed by the Financial Director of the bank. It's printed on bank letterhead and–uh-is as good as cash." The Transcript page is attached as **Exhibit 7.**

10.        Attached as **Exhibit 8** is a true and correct copy of the relevant portions of the November 16, 2022 transcript of the Las Vegas Zoning Commission hearing.

11.        Attached as **Exhibit 9** is a true and correct copy of a February 13, 2023 letter from Ameri Metro, Inc. to Daniel Chartraw on behalf of TDA Global Systems, LLC, Clearwater Premiere Perpetual Master Trust and Clearwater Premiere Perpetual Master, LLC.

12.        Attached as **Exhibit 10** is a true and correct copy of an August 23, 2023 letter from Messner Reeves, stating: "We serve as outside counsel to INBE Capital, LLC and its affiliates and partners ('INBE'). It is our understanding that you are exploring a potential business relationship with INBE for the receipt of a business expansion line of credit (a 'BELOC') from INBE. The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC."

13.        Attached as **Exhibit 11** is a true and correct copy of an August 24, 2023 email thread involving Torben Welch, during which time Welch stated, "The bankers are still working through transfer protocols and clearance of the funds. I remain hopeful funds are cleared and deposited tomorrow."

14.     Attached as **Exhibit 12** is a true and correct copy of an October 27, 2023 email from Plaintiff Emerald Consulting Partners, LLC to Torben Welch demanding the return of the ICA deposit.

15.     Attached as **Exhibit 13** is a true and correct copy of an October 30, 2023 email from Plaintiff Emerald to Welch stating as follows: "We are done chasing for answers and seeking clarity on what happened to our funds. Your immediate attention to this matter is requested. We are seeking clear and accurate communication as to the whereabouts of our interest reserve funds."

16.     Attached as **Exhibit 14** is a true and correct copy of the relevant portions of the November 21, 2023 transcript of the Las Vegas Zoning Commission hearing.

17.     Attached as **Exhibit 15** is a true and correct copy of a screenshot of Welch on November 21, 2023 transcript before the Las Vegas Zoning Commission discussing a purported $5 billion bank statement at Fides Bank in Mexico.

18.     Attached as **Exhibit 16** is a true and correct copy of a December 5, 2023 Messner Reeves letter regarding a purported $57 billion bond relative to FIDES Gestion Financiera.

19.     Attached as **Exhibit 17** is a true and correct copy of a December 26, 2023 Messner Reeves letter regarding representation of Titan Financial, LLC stating, "We can attest that the Account consists in excess of $10 billion in cash (the 'Funds')."

20.     Attached as **Exhibit 18** is a true and correct copy of a January 25, 2024 email from Torben Welch.

21.     Attached as **Exhibit 19** is a true and correct copy of the document attached to Welch's January 25, 2024 email.

22.     Attached as **Exhibit 20** is a true and correct copy of the February 15, 2024 letter from Messner Reeves, in which Welch stated, "As I believe all of you are aware, we have been

4

working toward release of the ICA funds to you in a timely manner as required under Agreement with INBE Capital, LLC. These funds have, and continue to be, under the control of our firm and are held in a firm trust account at the delivery institution, Titan Financial, LLC. Movement of the funds from Titan Financial, LLC requires use of a correspondent bank. We are working with JP Morgan Chase and the Chase Treasury Department to facilitate that aspect of the funds transfer, including the applicable access and confirmation codes. We should have that approved and funds moving very shortly."

23.     Attached as **Exhibit 21** is a true and correct copy of the February 22, 2024 statement released by Messner Reeves.

24.     Attached as **Exhibit 22** is a true and correct copy of the March 15, 2024 complaint filed in *Konala v. Messner Reeves, et al.*, D. Utah, Case No. 2:24-cv-00195.

25.     Attached as **Exhibit 23** is a true and correct copy of the emails between Plaintiffs' counsel and Defendants' prior counsel dated April 18, 2024 and June 12, 2024.

26.     Attached as **Exhibit 24** is a true and correct copy of the May 24, 2024 privilege log served by Messner Reeves in *Emerald v. Messner Reeves, et al.*, Orange County Superior Court, California, Case No. 30-2024-01378580-CU-BC-CJC.

27.     Attached as **Exhibit 25** is a true and correct copy of the emails between Plaintiffs' counsel and Defendants' prior counsel between May 13, 2024 and July 16, 2024.

28.     Attached as **Exhibit 26** (composite) is a true and correct copy of INBE's May 30, 2024 discovery responses in *Emerald v. Messner Reeves, et al.*, Orange County Superior Court, California, Case No. 30-2024-01378580-CU-BC-CJC, indicating that INBE never possessed Plaintiffs' escrow money and INBE believes that Messner Reeves possessed the escrow money.

29.    Attached as **Exhibit 27** is a true and correct copy of the September 19, 2024 indictment of Kris Roglieri, principal of Prime Capital Partners, LLC in connection with wire fraud for operating an advance fee scam through BELOC loan documents.

30.    Attached as **Exhibit 28** is a true and correct copy of a blackline compare showing the similarity of the terms between a Prime Capital BELOC and the BELOC provided to one of the Plaintiffs.

31.    Attached as **Exhibit 29** is a true and correct copy of the November 21, 2024 indictment of Daniel Chartraw for wire fraud. *United States v. Chartraw*, No. 2:24-cv-00311 (E.D. Cal.).

32.    Attached as **Exhibit 30** is a true and correct copy of the Los Angeles Times article published on January 23, 2025. Nathan Fenno, *An ex-NBA player's plan for a $5-billion Las Vegas arena is an empty pit. What went wrong?*, L.A. Times, Jan. 23, 2025.

33.    Attached as **Exhibit 31** is a true and correct copy of emails involving Torben Welch beginning on August 17, 2023

34.    Attached as **Exhibit 32** is a true and correct copy of an email from Torben Welch dated September 21, 2023.

35.    Attached as **Exhibit 33** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated December 19, 2023.

36.    Attached as **Exhibit 34** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated December 19, 2023.

37.    Attached as **Exhibit 35** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated December 20, 2023.

38.     Attached as **Exhibit 36** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated January 31, 2024.

39.     Attached as **Exhibit 37** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated February 20, 2024.

40.     Attached as **Exhibit 38** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated February 27, 2024.

41.     Attached as **Exhibit 39** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated March 22, 2024.

42.     Attached as **Exhibit 40** is a true and correct copy of text messages between Torben Welch of Messner Reeves and Craig Boddington of INBE dated in March 31, 2024.

43.     Attached as **Exhibit 41** is a true and correct copy of the Affidavit of Jim Smith dated February 20, 2025.

44.     Attached as **Exhibit 42** is a true and correct copy of the Capital Options FAQ 3.0 form accompanying the BELOC dated April 4, 2023.

45.     Attached as **Exhibit 43** is a true and correct copy of the Kosher Eats BELOC dated April 24, 2023.

46.     Attached as **Exhibit 44** is a true and correct copy of the Wyoming Secretary of State registration for Titan Financial LLC dated November 7, 2023.

47.     Attached as **Exhibit 45** is a true and correct copy of the Declaration of Craig Boddington dated October 16, 2025.

48.     Attached as **Exhibit 46** is a true and correct copy of text messages dated in 2023 and 2024 (tranche 1).

49.    Attached as **Exhibit 47** is a true and correct copy of text messages dated in 2023 and 2024 (tranche 2).

50.    Attached as **Exhibit 48** is a true and correct copy of the confession of judgment dated February 15, 2023 in favor of Construction Testing Services, LLC against Dribble Dunk, et al. A-18-771361-B in the amount of $1,147,000.

51.    Attached as **Exhibit 49** is a true and correct copy of records showing a $904,777 wire from the Messner Reeves Northern Trust COLTAF account which received Plaintiffs' money x-8494.

52.    Attached as **Exhibit 50** is a true and correct copy of the satisfaction of judgment dated June 6, 2023 relative to the confession of judgment recorded on February 15, 2023.

53.    Attached as **Exhibit 51** is a true and correct copy of the Affidavit of Jim Smith dated February 20, 2025.

54.    Attached as **Exhibit 52** is a true and correct copy of the privilege waiver by INBE Capital LLC dated November 3, 2025.

55.    Attached as **Exhibit 53** is a true and correct copy of a letter from Plaintiffs' counsel to Messner's counsel dated December 1, 2025.

56.    Attached as **Exhibit 54** is a true and correct copy of an email from Plaintiffs' counsel to Messner's counsel dated December 19, 2025.

57.    Attached as **Exhibit 55** is a true and correct copy of Request for Accounting by INBE to Messner February 20, 2025.

58.    Attached as **Exhibit 56** is a true and correct copy of an email from Plaintiffs' counsel to Messner's counsel dated December 19, 2025.

59.	Attached as **Exhibit 57** is a true and correct copy of a letter from Plaintiffs' counsel to Messner's counsel dated January 5, 2026.

60.	Attached as **Exhibit 58** is a true and correct copy of a letter from Plaintiffs' counsel to Messner's counsel regarding discovery dated January 5, 2026.

61.	Attached as **Exhibit 59** is a true and correct copy of Northern Trust bank statements for account x-8494 which received the wires from all Plaintiffs for the months April 2023, May 2023, June 2023, July 2023, and August 2023.

62.	Attached as **Exhibit 60** is a true and correct copy of the complaint in *Securities and Exchange Commission v. Mathias, et al.*, 1:25-cv-02313 (D.D.C.).

63.	Attached as **Exhibit 61** (composite) is a true and correct copy of the emails and letters reflecting Plaintiffs' request for an accounting to Messner on June 4, 2026 and June 5, 2026.

64.	Attached as **Exhibit 62** (composite) is a true and correct copy of the response from Messner to Plaintiffs' request for accounting dated June 9, 2026.

65.	Attached as **Exhibit 63** is a true and correct copy of the complaint in *Securities and Exchange Commission v. Cole, et al.*, 1:26-cv-4945 (S.D.N.Y.).

66.	Attached as **Exhibit 64** is a true and correct copy of the indictment in *United States of America v. Cole*, 1:26-cr-00242 (S.D.N.Y.).

67.	Attached as **Exhibit 65** is a true and correct copy of the criminal trial minutes reflecting a jury verdict of guilty as to Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 in *United States of America v. Chartraw*, 2:24-cr-00311 (E.D. Cal.).

68.	I have requested an accounting as to the escrow funds from Messner, through counsel, at least 22 times between February 23, 2024 and June 2, 2026. Messner has refused to cooperate every time a request for an accounting is made.

9

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: 6/25/2026


By:     */s/ Kenneth E. Chase*
Kenneth E. Chase

10

# EXHIBIT 1

BENJAMIN B. WAGNER
United States Attorney
MICHAEL D. ANDERSON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

**FILED**

MAY 17 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | 2 1 2 - CR - 0 1 8 4 WBS |
|---|---|
| Plaintiff, | CASE NO. |
| v. | VIOLATION: 18 U.S.C. § 1343 – WIRE FRAUD (18 COUNTS) |
| DANIEL CHARTRAW, | |
| Defendant, | |

## INDICTMENT

COUNTS ONE THROUGH EIGHTEEN:    [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges:

DANIEL CHARTRAW,

defendant herein, as follows:

## I. INTRODUCTION

At all times relevant to the indictment:

1.    Defendant DANIEL CHARTRAW is an individual with a primary residence in El Dorado County, California, until late 2010, at which time he moved to Monterey County.

2.    Geneva Capital Solutions, Grande Armi, LLC, Geneva Prestige Global Group, LLC, and Geneva Partners, LLC, are entities in which defendant CHARTRAW had an ownership and management interest that purport to deal in investments in mining, precious metals and other

1

investments. Geneva Capital Solutions has a Wells Fargo bank account located in El Dorado County, California. In fact, these entities appear to be shell companies with no employees and no assets.

3.      Defendant CHARTRAW maintained personal and/or business bank accounts with J.P. Morgan Chase, El Dorado Savings Bank, and Wells Fargo in the Eastern District of California.

4.      The Darwin Mine is a mine owned by J.S. that is located in California, near the Nevada border. The Darwin Mine was neither owned nor managed by defendant CHARTRAW.

5.      The Miller's Mill is a facility that refines mined minerals that is located in Nevada. J.S. had an option to purchase the Miller's Mill. The Miller's Mill was neither owned nor managed by defendant CHARTRAW.

6.      AZ Rock Holdings ("AZ Rock") is a mining company based in Arizona. AZ Rock was neither owned nor managed by defendant CHARTRAW or by L.G.

7.      Cascabel Bank is a shell company that is not licensed to operate as a financial institution of any kind.

## II. SCHEME TO DEFRAUD

8.      Beginning on a date unknown to the Grand Jury, but not later than on or about January 1, 2007, and continuing to and including on or about November 31, 2011, in the State and Eastern District of California and elsewhere, defendant knowingly devised, participated in, and executed a material scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and the concealment of material facts.

9.      The purpose of the scheme was to obtain money from individuals in the form of loans, investments and the purchase of various types of commodities. In all cases, defendant CHARTRAW had neither the intention, ability, expertise, or financial means to repay the loans or to perform on the promises that he made to prospective investors.

10.      Between in or about February 2007 and November 2011, CHARTRAW collected approximately $2.4 million from investors.

////

////

### III. MANNER AND MEANS

11.    The Darwin Mine Fraud

    a.    Between in or about late 2007 and in or about January 2008, defendant CHARTRAW approached an investment company located in San Francisco, California, seeking a $15 million loan.

    b.    In connection with the loan request, defendant CHARTRAW made the following false and fraudulent statements of material fact to T.F., a partner in the investment company:

        (1)    That he owned a company that had an ownership interest in the Darwin Mine;

        (2)    That he had an ownership interest in Miller's Mill;

        (3)    That he had a current net worth in excess of $75 million;

        (4)    That the purpose of the loan was to permit the Darwin Mine and Miller's Mill to resume operations;

        (5)    That he was pursuing financing for equipment to be used at the mine, that he intended to use the loan proceeds to make payments related to mining equipment, and that as security for the loan he intended to record liens on real property in favor of T.F.

    c.    Based on the foregoing representations, T.F. extended a $75,000 loan to defendant CHARTRAW, which defendant CHARTRAW used for his own personal expenses.

12.    The Oil Broker Fraud

    a.    In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 each from A.R. and P.W. by claiming that he could help them become brokers of oil and refined oil commodities.

    b.    In connection with this transaction, defendant CHARTRAW made the following false and fraudulent statements of material fact to A.R. and P.W.:

        (1)    That in return for $50,000, he would set up bank accounts in their names into which he would deposit $100 million so A.R. and P.W. could build credibility as high asset individuals;

3

(2)     That the $50,000 provided by A.R. and P.W. would be placed in segregated accounts that would not be drawn upon for any purpose;

(3)     That the $50,000 provided by A.R. and P.W. would be secured by a promissory note signed by S.L., when, in fact, S.L.'s signature was forged;

c.     Based on the foregoing representations, A.R. and P.W. each gave $25,000 to Geneva Capital Solutions, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

13.     **Fraud Involving Contract for Sale of "Concentrate"**

a.     In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 from M.H. and $75,000 from R.M. by entering into a contract to sell 180 barrels of "concentrate" to them that defendant Chartraw claimed contained precious metals.

b.     In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to M.H. and R.M.:

(1)     That his company, Geneva Prestige Global Group, LLC, owned the 180 barrels of concentrate;

(2)     That the concentrate was insured by a $20 million insurance policy with Lloyds of London that guaranteed the value of the solution;

(3)     That the assays he provided to M.H. and R.M. were true and correct and showed that the barrels were valuable;

(4)     That he would retain the money from M.H. and R.M. as a refundable deposit pending their testing of the viability of the concentrate;

c.     Based on the foregoing representations, M.H. and R.M. gave $25,000 and $75,000 respectively to Geneva Prestige Global Group, LLC, an entity controlled by defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

14.     **The Dairy Financing Fraud**

a.     In or about October 2009, defendant CHARTRAW fraudulently obtained $200,000 from W.V.B., an owner and operator of dairies who was in the process of raising financing for the development of new dairy properties to be sold to citizens of the Netherlands. Defendant

4

CHARTRAW offered to fund W.V.B. with $250 million from a bank that defendant CHARTRAW claimed he controlled, but required that W.V.B. first wire him $200,000 as an advanced fee.

b.    In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to W.V.B.:

(1)    That he owned a licensed and operational offshore bank;

(2)    That he had a genuine 1.5 billion Euro Certificate of Deposit from Cascabel Bank that would allow him to finance W.V.B.'s investment;

(3)    That the Certificate of Deposit could be placed with a bank in order to back a "trading program" that would generate sizable returns;

c.    Based on the foregoing representations, W.V.B. gave defendant CHARTRAW $200,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

15.    The Gold Refinery Financing Fraud

a.    In on or about November 2009, defendant CHARTRAW fraudulently obtained $100,000 from D.G. as an advanced fee for defendant CHARTRAW's promise that he would secure up to $10 million in funding from Cascabel Bank for D.G. to build a gold refinery.

b.    In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to D.G.:

(1)    That he owned an interest in Cascabel Bank, a licensed and operational offshore bank;

(2)    That he would use the $100,000 provided by D.G.to obtain funding for D.G;

(3)    That he owned a 50% interest in the AZ Rock Mine in Arizona;

c.    Based on the foregoing representations, D.G. gave defendant CHARTRAW $100,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

16.    The Dore Bar Fraud

a.    In or about November 2010 through in or about March 2011, defendant CHARTRAW and L.G., fraudulently obtained $1 million from J.F.C., in exchange for the purchase of "dore bars" from AZ Rock Holdings ("AZ Rock"), which defendant CHARTRAW claimed contained precious metals.

5

b.    In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to J.F.C.:

(1)    That he and L.G. were officers of AZ Rock with authority to act on behalf of that company;

(2)    That the $1 million provided by J.F.C. would be placed in an escrow account in the name of L.G., omitting to tell J.F.C. that that account was actually controlled by defendant CHARTRAW and L.G.;

(3)    That the $1 million provided by J.F.C. would be used to purchase "dore bars" from AZ Rock;

c.    To further induce J.F.C. to go forward with this investment, defendant CHARTRAW represented to J.F.C. that his money would be safely held in an escrow account at J.P. Morgan Chase Bank in the name of 1st National Title Insurance Agency (1st National). However, after the transfer of the J.F.C.'s funds to that account defendant CHARTRAW and L.G. provided, or caused to be provided, to 1st National a materially false and forged "Letter of Introduction and Mandate Authority" purporting to be from AZ Rock. This letter fraudulently listed defendant CHARTRAW as a "Principle/Partner" in AZ Rock and contained the defendant's signature and the forged signature of L.N., the true owner of AZ Rock. The letter also falsely purported to give L.G. authority to act on behalf of AZ Rock. In reliance on this letter, between on or about November 22, 2010, and on or about March 16, 2011, 1st National disbursed the funds from the escrow account to personal accounts controlled by defendant CHARTRAW and L.G., and to an attorney client trust account maintained by attorney J.H. on behalf of defendant CHARTRAW. Thereafter, defendant CHARTRAW and L.G. used these funds for their own personal expenses.

17.    The "Trading Platform" Fraud

a.    In or about February 2010, defendant CHARTRAW fraudulently obtained $113,258.30 from G.A. by fraudulently telling G.A. that he would invest the money on G.A.'s behalf in a "trading platform" at a bank where it would generate 15% interest every 30 days before being returned after 90 days.

6

b.      In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to G.A.:

(1)    That such "trading platforms" exist when in truth and in fact as defendant knew such investments do not exist;

(2)    That G.A.'s money would be added to a pool of money that defendant CHARTRAW already had invested in this "trading platform";

(3)    That G.A.'s money would remain available to him to withdraw at any time;

c.      Based on the foregoing representations, G.A. gave defendant CHARTRAW $113,258.30, which defendant CHARTRAW then proceeded to use for his own personal expenses.

18.    The Gold Refining Equipment Loan Fraud

a.      Between in or about April 2011 and in or about June 2011, defendant CHARTRAW, fraudulently obtained loans of $50,000 from J.K., $25,000 from J.C., and $75,000 from H.G.

b.      In connection with these loans, defendant CHARTRAW made the following material false and fraudulent statements of material fact to J.K., J.C., and H.G.:

(1)    That he was a wealthy individual who was asset rich, but cash poor;

(2)    That he owned a gold mine;

(3)    That he had a lease on a piece of gold refining equipment;

(4)    That he intended to use the borrowed money to make a lease payment on a piece of gold refining equipment:

(5)    That in return for the loans defendant CHARTRAW would transfer a quantity of gold to J.C. as collateral and repay the loan plus six percent interest within five days;

(6)    That he had actually shipped a quantity of gold to J.C. to act as collateral for J.C. and H.G.'s loans;

c.      In furtherance of the scheme to defraud, defendant CHARTRAW provided H.G. with a document purporting to be a Bill of Lading fraudulently representing that the defendant had shipped a quantity of gold to J.C. via Hellman Worldwide logistics.

d.    Based on the foregoing representations, J.K., J.C., and H.G. provided money to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

19.    The Movie Production Fraud

a.    In or about January 2010, defendant CHARTRAW fraudulently obtained $100,000 from S.F., a movie producer who was seeking financing for a movie. Defendant CHARTRAW offered to fund S.F.'s movie production in the initial amount of $500,000 with a further agreement to provide $350 million in funds; however, defendant CHARTRAW stated that he would need a $100,000 fee from S.F. in order to allow the use of a $100 million certificate of deposit in order to generate revenue for the financing.

b.    In connection with this transaction, defendant CHARTRAW made the following material false and fraudulent statements of material fact to S.F.:

(1)    That he had a genuine $100 million certificate of deposit with Cascabel Bank;

(2)    That he would use the $100,000 from S.F. for fees associated with the $100 million certificate of deposit;

(3)    That the certificate of deposit could be used in a "trading program" between banks;

(4)    That defendant CHARTRAW intended to return S.F.'s $100,000 on or about January 11, 2010

c.    Based on the foregoing representations, S.F. provided $100,000 to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

### III. USE OF INTERSTATE WIRES

20.    On or about the dates listed below, in the State and Eastern District of California, for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, the defendant, as more specifically set forth below, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds.

| COUNT | DATE OF WIRE | WIRE AMOUNT | VICTIM | SENDER ACCOUNT ENDING | RECEIVER ACCOUNT ENDING |
|---|---|---|---|---|---|
| 1 | December 20, 2007 | $50,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 2 | January 24, 2008 | $25,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 3 | March 3, 2009 | $25,000 | A.R. | CitiBank, NA -0593 | Wells Fargo Bank -5565 |
| 4 | March 3, 2009 | $25,000 | P.W. | RaboBank -6201 | Wells Fargo Bank -5565 |
| 5 | March 20, 2009 | $25,000 | M.H. | Ensign Federal Credit Union -2334 | Wells Fargo Bank -5565 |
| 6 | March 27, 2009 | $75,000 | R.M. | JP Morgan Chase Bank -7316 | Well Fargo Bank -5565 |
| 7 | November 6, 2009 | $200,000 | W.V.B | Rabobank -7242 | City National Bank -2036 |
| 8. | November 20, 2009 | $100,000 | D.G. | JP Morgan Chase Bank -1241 | JP Morgan Chase Bank -9335 |
| 9 | November 22, 2010 | $400,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9731 |
| 10 | December 23, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 11 | December 31, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 12 | January 14, 2011 | $10,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 13 | January 26, 2011 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 14 | March 16, 2011 | $8,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 15 | February 1, 2010 | $113,800 | G.A. | Wachovia Bank NA -5092 | JP Morgan Chase Bank -9335 |
| 16 | November 4, 2009 | $30,000 | S.F. | Wells Fargo Bank -2849 | Wells Fargo Bank -1519 |
| 17 | April 11, 2011 | $50,000 | J.K. | HSBC Bank -1220 | JP Morgan Chase Bank -9731 |
| 18 | June 7, 2011 | $75,000 | H.G. | TD Ameritrade -8855 | JP Morgan Chase Bank -9731 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL.

/s/ Signature on file w/AUSA

FOREPERSON

BENJAMIN B. WAGNER
United States Attorney

9

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA

*vs.*

DANIEL CHARTRAW

INDICTMENT

**VIOLATION:** 18 U.S.C. § 1343 - Wire Fraud (18 Counts)

*A true bill.*

_____/S/_____

*Foreman.*

*Filed in open court this* ___17TH___ *day*

*of* ___May___ , A.D. 20 12

___M. Caspu___

*Clerk*

*Bail, $* ___ **NO PROCESS NECESSARY**

GPO 863 525

212 - CR 0 1 8 4 WBS

PENALTY SLIP
**DANIEL CHARTRAW**

COUNTS 1-18:

VIOLATION: 18 U.S.C. § 1343 - Wire Fraud

PENALTY:    Not more than 20 Years Imprisonment,
            $250,000 Fine or both;
            3 Years TSR

PENALTY
ASSESSMENT:    $100 each count


212 - CR - 0 1 8 4 WBS

AO 245B-CAED (Rev. 09/2011)  Sheet 1 - Judgment in a Criminal Case

# United States District Court

## Eastern District of California

UNITED STATES OF AMERICA
v.
**DANIEL CHARTRAW**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: **2:12CR00184-01**

Benjamin Galloway, Assistant Federal Defender
Defendant's Attorney

## THE DEFENDANT:

[✔]    pleaded guilty to count: 9 of the Indictment.
[ ]    pleaded nolo contendere to counts(s) ___ which was accepted by the court.
[ ]    was found guilty on count(s) ___ after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 USC section 1343 | Wire Fraud (CLASS C FELONY) | 11/22/2010 | 9 |

The defendant is sentenced as provided in pages 2 through _7_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]    The defendant has been found not guilty on counts(s) ___ and is discharged as to such count(s).

[✔]    Counts 1-8 and 10-18 of the Indictment are dismissed on the motion of the United States.

[ ]    Indictment is to be dismissed by District Court on motion of the United States.

[✔]    Appeal rights given.                    [ ]    Appeal rights waived.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/29/2013
Date of Imposition of Judgment

Signature of Judicial Officer

**MORRISON C. ENGLAND, JR.**, United States District Judge
Name & Title of Judicial Officer

9/12/2013
Date

AO 245B-CAED (Rev. 09/2011)  Sheet 2 - Imprisonment

CASE NUMBER:        2:12CR00184-01                                    Judgment - Page 2  of  7
DEFENDANT:          DANIEL CHARTRAW

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 57 months.

[]        No TSR: Defendant shall cooperate in the collection of DNA.

[✔]       The court makes the following recommendations to the Bureau of Prisons:
          The court recommends that the defendant be incarcerated in the Sheridan, Oregon, facility, but only insofar as this accords with security classification and space availability.  The court recommends the defendant participate in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program.

[✔]       The defendant is remanded to the custody of the United States Marshal.

[ ]       The defendant shall surrender to the United States Marshal for this district.
          [ ]  at ___ on ___.
          [ ] as notified by the United States Marshal.

[ ]       The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
          [ ] before __ on ___.
          [ ] as notified by the United States Marshal.
          [ ] as notified by the Probation or Pretrial Services Officer.
          If no such institution has been designated, to the United States Marshal for this district.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

      Defendant delivered on_____ to _____

at _____ , with a certified copy of this judgment.


                                                    _____
                                                    UNITED STATES MARSHAL


                                          By    _____
                                                    Deputy U.S.  Marshal

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

CASE NUMBER:          2:12CR00184-01                                        Judgment - Page 3  of  7
DEFENDANT:            DANIEL CHARTRAW

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>36 months</u>.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]      The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

[✔]      The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

[✔]      The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

[ ]      The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.), as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  (Check, if applicable.)

[ ]      The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without permission of the court or probation officer;
2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)   the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)   the defendant shall support his or her dependants and meet other family responsibilities;
5)   the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)   the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)   the defendant shall refrain from excessive use of alcohol;
8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

CASE NUMBER:        2:12CR00184-01                                                    Judgment - Page 4  of  7
DEFENDANT:          DANIEL CHARTRAW

## SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant.  Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3.  The defendant shall provide the probation officer with access to any requested financial information.

4.  The defendant shall not open additional lines of credit without the approval of the probation officer.

5.  As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

6.  As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

7.  The defendant shall abstain from the use of alcoholic beverages and shall not frequent those places where alcohol is the chief item of sale.

8.  The defendant shall not work in a position of fiduciary responsibility without the prior approval of the court or the probation officer.

AO 245B-CAED (Rev. 09/2011)  Sheet 5 - Criminal Monetary Penalties

CASE NUMBER:        2:12CR00184-01                                        Judgment - Page 5 of 7
DEFENDANT:          DANIEL CHARTRAW

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

|        | Assessment | Fine    | Restitution      |
|--------|------------|---------|------------------|
| Totals: | $ 100.00   | $ 0.00  | $ 2,830,698.53   |

[ ]  The determination of restitution is deferred until ___ .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[✔]  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  | $113,800.00 | $113,800.00 |  |
|  | $200,000.00 | $200,000.00 |  |
|  | $25,000.00 | $25,000.00 |  |
|  | $1,000,000.00 | $1,000,000.00 |  |
|  | $70,000.00 | $70,000.00 |  |
|  | $100,000.00 | $100,000.00 |  |
|  | $100,000.00 | $100,000.00 |  |
|  | $99,999.00 | $99,999.00 |  |
|  | $100,000.00 | $100,000.00 |  |
|  | $100,000.00 | $100,000.00 |  |
|  | $75,000.00 | $75,000.00 |  |
|  | $75,000.00 | $75,000.00 |  |
|  | $25,000.00 | $25,000.00 |  |
|  | $2,747.63 | $2,747.63 |  |
|  | $50,000.00 | $50,000.00 |  |
|  | $45,000.00 | $45,000.00 |  |
|  | $41,250.00 | $41,250.00 |  |
|  | $2,450.90 | $2,450.90 |  |
|  | $125,000.00 | $125,000.00 |  |
|  | $75,000.00 | $75,000.00 |  |
|  | $35,000.00 | $35,000.00 |  |
|  | $80,000.00 | $80,000.00 |  |
|  | $55,000.00 | $55,000.00 |  |
|  | $80,000.00 | $80,000.00 |  |
|  | $25,000.00 | $25,000.00 |  |
|  | $35,451.00 | $35,451.00 |  |
|  | $70,000.00 | $70,000.00 |  |
|  | $25,000.00 | $25,000.00 |  |
| **TOTAL RESTITUTION** | **$2,830,698.53** | **$2,830,698.53** |  |

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011)  Sheet 5 - Criminal Monetary Penalties

CASE NUMBER:        2:12CR00184-01                                          Judgment - Page 6  of  7
 DEFENDANT:        DANIEL CHARTRAW

[]    Restitution amount ordered pursuant to plea agreement $ __

[ ]    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid
       in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment
       options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ✔]    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

       [✔]    The interest requirement is waived for the   [ ]  fine              [✔] restitution

       [ ]    The interest requirement for the        [ ] fine  [ ] restitution is modified as follows:

[ ]    If incarcerated, payment of the fine is due during imprisonment at the rate of not less than $25 per quarter
       and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

[✔]    If incarcerated, payment of restitution is due during imprisonment at the rate of not less than $25 per quarter
       and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

   ** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18
for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011)  Sheet 6 - Schedule of Payments

CASE NUMBER:          2:12CR00184-01                                           Judgment - Page 7  of  7
DEFENDANT:          DANIEL CHARTRAW

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

**A**   [ ] Lump sum payment of $ ___ due immediately, balance due

    [ ]       not later than ___ , or
    [ ]       in accordance with     [ ] C,   [ ] D,   [ ] E, or          [ ] F below; or

**B**   [✔]          Payment to begin immediately (may be combined with   [ ] C,          [ ] D, or  [ ] F below); or

**C**   [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**   [ ] Payment during the term of supervised release will commence within ___ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   [ ] Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:


[ ]   The defendant shall pay the cost of prosecution.

[ ]   The defendant shall pay the following court cost(s):

[ ]   The defendant shall forfeit the defendant's interest in the following property to the United States:

AO 245B-CAED (Rev. 09/2011)  Sheet 1 - Judgment in a Criminal Case

# United States District Court
## Eastern District of California

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>**DANIEL CHARTRAW** | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br>Case Number: **2:12CR00184-01**<br><br>Benjamin Galloway, Assistant Federal Defender<br>Defendant's Attorney |

**THE DEFENDANT:**

[✔]    pleaded guilty to count: 9 of the Indictment.
[ ]    pleaded nolo contendere to counts(s) ___ which was accepted by the court.
[ ]    was found guilty on count(s) ___ after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 USC section 1343 | Wire Fraud (CLASS C FELONY) | 11/22/2010 | 9 |

The defendant is sentenced as provided in pages 2 through  7  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]    The defendant has been found not guilty on counts(s)  ___ and is discharged as to such count(s).

[✔]    Counts 1-8 and 10-18 of the Indictment are dismissed on the motion of the United States.

[ ]    Indictment is to be dismissed by District Court on motion of the United States.

[✔]    Appeal rights given.                    [ ]    Appeal rights waived.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/29/2013
Date of Imposition of Judgment

Signature of Judicial Officer

**MORRISON C. ENGLAND, JR.**, United States District Judge
Name & Title of Judicial Officer

9/12/2013
Date

AO 245B-CAED (Rev. 09/2011)  Sheet 2 - Imprisonment

CASE NUMBER:          2:12CR00184-01                                     Judgment - Page 2  of  7
DEFENDANT:            DANIEL CHARTRAW

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 57 months.

[]          No TSR: Defendant shall cooperate in the collection of DNA.

[✔]         The court makes the following recommendations to the Bureau of Prisons:
            The court recommends that the defendant be incarcerated in the Sheridan, Oregon, facility, but only insofar as this accords with security classification and space availability.  The court recommends the defendant participate in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program.

[✔]         The defendant is remanded to the custody of the United States Marshal.

[ ]         The defendant shall surrender to the United States Marshal for this district.
            [ ]  at ____ on ____.
            [ ] as notified by the United States Marshal.

[ ]         The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
            [ ] before __ on ____.
            [ ] as notified by the United States Marshal.
            [ ] as notified by the Probation or Pretrial Services Officer.
            If no such institution has been designated, to the United States Marshal for this district.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

       Defendant delivered on_____ to _____

at _____ , with a certified copy of this judgment.


                                                        _____
                                                        UNITED STATES MARSHAL


                                            By _____
                                                        Deputy U.S.  Marshal

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

CASE NUMBER:        2:12CR00184-01                                    Judgment - Page 3  of  7
DEFENDANT:          DANIEL CHARTRAW

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>36 months</u>.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

[ ]        The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  (Check, if applicable.)

[✔]        The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  (Check, if applicable.)

[✔]        The defendant shall cooperate in the collection of DNA as directed by the probation officer.  (Check, if applicable.)

[ ]        The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.), as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  (Check, if applicable.)

[ ]        The defendant shall participate in an approved program for domestic violence.  (Check, if applicable.)

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without permission of the court or probation officer;
2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)   the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)   the defendant shall support his or her dependants and meet other family responsibilities;
5)   the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)   the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7)   the defendant shall refrain from excessive use of alcohol;
8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B-CAED (Rev. 09/2011)  Sheet 3 - Supervised Release

CASE NUMBER:        2:12CR00184-01                                             Judgment - Page 4 of 7
DEFENDANT:          DANIEL CHARTRAW

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant.  Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2. The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3. The defendant shall provide the probation officer with access to any requested financial information.

4. The defendant shall not open additional lines of credit without the approval of the probation officer.

5. As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

6. As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

7. The defendant shall abstain from the use of alcoholic beverages and shall not frequent those places where alcohol is the chief item of sale.

8. The defendant shall not work in a position of fiduciary responsibility without the prior approval of the court or the probation officer.

AO 245B-CAED (Rev. 09/2011) Sheet 5 - Criminal Monetary Penalties

CASE NUMBER:        2:12CR00184-01                                    Judgment - Page 5 of 7
DEFENDANT:        DANIEL CHARTRAW

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 100.00 | $ 0.00 | $ 2,830,698.53 |

[ ]    The determination of restitution is deferred until ___ .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[✔]    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| REDACTED | $113,800.00 | $113,800.00 | |
| REDACTED | $200,000.00 | $200,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $1,000,000.00 | $1,000,000.00 | |
| REDACTED | $70,000.00 | $70,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $99,999.00 | $99,999.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $100,000.00 | $100,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $2,747.63 | $2,747.63 | |
| REDACTED | $50,000.00 | $50,000.00 | |
| REDACTED | $45,000.00 | $45,000.00 | |
| REDACTED | $41,250.00 | $41,250.00 | |
| REDACTED | $2,450.90 | $2,450.90 | |
| REDACTED | $125,000.00 | $125,000.00 | |
| REDACTED | $75,000.00 | $75,000.00 | |
| REDACTED | $35,000.00 | $35,000.00 | |
| REDACTED | $80,000.00 | $80,000.00 | |
| REDACTED | $55,000.00 | $55,000.00 | |
| REDACTED | $80,000.00 | $80,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| REDACTED | $35,451.00 | $35,451.00 | |
| REDACTED | $70,000.00 | $70,000.00 | |
| REDACTED | $25,000.00 | $25,000.00 | |
| **TOTAL RESTITUTION** | **$2,830,698.53** | **$2,830,698.53** | |

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011)  Sheet 5 - Criminal Monetary Penalties

CASE NUMBER:          2:12CR00184-01                                          Judgment - Page 6  of  7
DEFENDANT:           DANIEL CHARTRAW

[]    Restitution amount ordered pursuant to plea agreement $ ___

[ ]   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid
      in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment
      options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ✔]      The court determined that the defendant does not have the ability to pay interest and it is ordered that:

      [✔]   The interest requirement is waived for the   [ ]   fine          [✔] restitution

      [ ]   The interest requirement for the       [ ] fine  [ ] restitution is modified as follows:

[ ]   If incarcerated, payment of the fine is due during imprisonment at the rate of not less than $25 per quarter
      and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

[✔]  If incarcerated, payment of restitution is due during imprisonment at the rate of not less than $25 per quarter
      and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

   ** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18
for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011)  Sheet 6 - Schedule of Payments

CASE NUMBER:        2:12CR00184-01                                    Judgment - Page 7 of 7
DEFENDANT:          DANIEL CHARTRAW

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

**A**    [ ] Lump sum payment of $ ___ due immediately, balance due

     [ ]        not later than ___ , or
     [ ]        in accordance with     [ ] C,   [ ] D,   [ ] E, or          [ ] F below; or

**B**    [✔]          Payment to begin immediately (may be combined with   [ ] C,          [ ] D, or  [ ] F below); or

**C**    [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after the date of this judgment; or

**D**    [ ] Payment in equal ___ (e.g., weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g., months or years), to commence ___ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**    [ ] Payment during the term of supervised release will commence within ___ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**    [ ] Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ]   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate:

[ ]   The defendant shall pay the cost of prosecution.

[ ]   The defendant shall pay the following court cost(s):

[ ]   The defendant shall forfeit the defendant's interest in the following property to the United States:

# EXHIBIT 2

# MESSNER REEVES LLP

DENVER, LAS VEGAS, ORANGE COUNTY, PHOENIX, SALT LAKE CITY, SILICON VALLEY, RENO, COLORADO SPRINGS, CHEYENNE, NEW YORK CITY

TORBEN M. WELCH
twelch@messner.com
Licensed in UT, CO & NY

DIRECT DIAL:
(801) 683-2021

August 2, 2022

CUSIP Global Services
45 Glover Avenue
Norwalk, Connecticut 06850

> Re:    Placement of Bonds Upon Issuance of CUSIP/ISIN
> Sponsor:  Global Infrastructure Finance & Development Authority, Inc.
> Master Trust Indenture:  MONTLIB-#209190
>
> Bond:                    Bond Series II-2022 – XII-2022
> Borrower:  Malibu Homes, Inc.
> Trustee:  HSRF Statutory Trust Amount:
> $60,000,0000,000.00

To Whom it May Concern:

We serve as bond counsel and bookrunner for Global Infrastructure Finance & Development Authority, Inc., Clearwater Premiere Perpetual Master Trust, Clearwater Premiere Perpetual Master, LLC, Todd Owen and Shah Mattias (collectively, the "Clients") as the sponsor/issuers of the above-referenced Bonds.

The purpose of this communication is to set forth our Opinion regarding that aforementioned Bonds that satisfy the requirements applicable for the issuance of CUSIP/ISIN numbers from CUSIP Global Services ("CGS") and other legal requirements for the transactions contemplated therein.

In our capacity as such counsel, in rendering the within opinions, we have examined the Investment Prospectus Offering Memoranda for the Bond and the Master Trust Indenture related thereto (the "Opinion Documents"), as well as information related to the respective issuers, sponsors, trustee and borrowers under the Bond. In such examination, we have assumed the genuineness of all signatures, the authenticity of all documents provided to us and the due authorization, execution and delivery of the same.

Based upon such review, and subject to the foregoing, we are of the opinion that the (a) the respective sponsor, issuer, trustee and borrower under the Bond is duly qualified to transact business and set forth therein; (b) the Opinion Documents are legal and valid documents and materially comply with the legal requirements necessary for issuance of CUSIP/ISIN numbers

65 East Wadsworth Park Drive | Suite 110 | Draper, UT 84020 | 303 623 1800 *main* | 303 623 0552 *fax*

from CGS; (c) upon issuance of such CUSIP/ISIN numbers the Bond shall be placed on the Bloomberg E-Bond System and platform ("Bloomberg Exchange") and materially satisfy all such legal requirements related thereto; and (d) the performance by the respective parties under the Bonds do not conflict or violate an other document, instrument, indenture or agreement by which any party thereto is bound and which we have been made aware.

Given the foregoing, we are of the opinion that CGS is in the position to authorize the CUSIP/ISIN number for the Bond in reliance on the foregoing.  We make no other opinion except as expressly stated herein.

Should you have any questions or concerns, please contact me directly to discuss.

Very truly yours,

MESSNER REEVES LLP

Torben M. Welch

65 East Wadsworth Park Drive | Suite 110 | Draper, UT 84020 | 303 623 1800 *main* | 303 623 0552 *fax*

# EXHIBIT 3

# MESSNER REEVES LLP

DENVER, LAS VEGAS, ORANGE COUNTY, PHOENIX, SALT LAKE CITY, SILICON VALLEY, RENO, COLORADO SPRINGS, CHEYENNE, NEW YORK CITY

TORBEN M. WELCH
twelch@messner.com
Licensed in UT, CO & NY

DIRECT DIAL:
(801) 683-2021

August 26, 2022

Clark County Board of Commissioners
Clark County Government Center
500 South Grand Central Parkway, 1st Floor
P.O. Box 551741
Las Vegas, Nevada 89155

Re:    Confirmation of Financing All Net Resort and Arena Project (the "Project")
       Developer: Dribble Dunk, LLC (the "Developer")

To Whom it May Concern:

We are writing on behalf of Global Infrastructure Finance & Development Authority, Inc., Clearwater Premiere Perpetual Master Trust, Clearwater Premiere Perpetual Master, LLC, Ameri-Metro, Inc. and Todd Owen (collectively, the "Lenders") who have entered into a line of credit agreement with the Developer for the construction of the above-mentioned Project. We serve as bond counsel for the Lenders.

It is our pleasure to confirm that on July 18, 2022, Lenders, through Clearwater Premiere Perpetual Master, LLC, entered into an agreement with Developer to provide a replenishing and revolving line of credit in the amount of $1.5 billion (the "Line of Credit") for the construction of the Project. The amount under the Line of Credit will be periodically replenished by the Lenders so at all times Developer has access to the principal amount of $1.5 billion for the total amount of the anticipated cost of the Project – which is in excess of $4.9 billion. The funds under the Line of Credit are available for any use whatsoever related to the Project, including, but not limited to, permitting, construction, marketing, bond costs, etc. In exchange for this, Developer has pledged fifteen percent (15%) of the proceeds of the Project to Lenders while the Line of Credit is outstanding.

The funds required for the Line of Credit come from proceeds related to certain U.S. government backed infrastructure bonds held by the Lenders. The Project satisfies any requirements necessary for the use of such proceeds. Bond information related thereto can be located under one such offering at CUSIP No. 37961UAA07, which is listed on the Bloomberg Exchange trading platform. Such bond is one of at least five (5) held by the Lenders to be utilized for this purpose. Additional information related to the Lenders and their holdings (including public filings    related    to    the    bonds)    can    be    found    in    the    public    records    at: https://sec.report/CIK/0001534155 (Ameri-Metro, Inc.) and https://sec.report/CIK/0001804425

65 East Wadsworth Park Drive  Suite 110  Draper, UT 84020  303 623 1800 *main*  303 623 0552 *fax*

(Global Infrastructure Finance & Development Authority, Inc.). Non-public information can be requested through our office.

Lenders are excited for the prospects related to this Project and are pleased to provide the funding related thereto. Accordingly, this communication is Lenders' confirmation that funds are available to complete the entirety of the Project in a timely manner in accordance with the issued permits and approvals.

Should you have any questions or concerns, please contact me directly to discuss.

Very truly yours,

MESSNER REEVES LLP

Torben M. Welch

65 East Wadsworth Park Drive  Suite 110  Draper, UT 84020  303 623 1800 *main*  303 623 0552 *fax*

# EXHIBIT 4

# Bond Certificate No.: 74252022UAA0UAA0710073719
## Dated: September 08th 2022

### Malibu Homes Master Trust Indenture MONTLIB-#209190



**CUSIP NUMBER:** 37961UAA0
**ISIN NUMBER:** US3761UAA07

### GLOBAL INFRASTRUCTURE FINANCE & DEVELOPMENT AUTHORITY, INC.
**As sponsor**
Incorporated under the laws of the state of Pennsylvania

BOND FACE VALUE: SIXTY BILLION DOLLAR USD ($60,000,000,000.00 USD)

THIS IS TO CERTIFY THAT Clearwater Premiere Perpetual Master LLC is the owner of
$60,000,000,000.00 USD Bond Certificate. **No.: 74252022UAA0UAA0710073719**

Standing in the name of Clearwater Premiere Perpetual Master LLC on the books of said Corporation and represented by Bond Certificate No. **74252022UAA0UAA0710073719** Dated September 08th 2022.

**CUSIP NUMBER:** 37961UAA0
**ISIN NUMBER:** US3761UAA07

DATE: September 8th, 2022

GLOBAL INFRASTRUCTURE FINANCE & DEVELOPMENT AUTHORITY, INC. (SEAL):

CEO Shah Mathias

HSRF Statutory Trust

as Trustee    Joseph Silbaugh Jr

Global Infrastructure
Finance & Development
Authority, Inc
Corporate Seal
Incorporated under
the laws of the
state of
Pennsylvania

HSRF Statutory Trust

Corporate Seal

Incorporated under
the laws the state
of Wyoming

# EXHIBIT 5

| | |
|---|---|
| SELEAGGIO | are removing any obstructions that need to be removed in order to do the grading. |
| KAEMPFER | Thank you. |
| GIBSON | Thank you. |
| SELEAGGIO | Thank you so much. Any questions? |
| KAEMPFER | Our next speaker, and I'll have them - anybody who's going to speak, I'll have them get a little closer here so we're not taking time. So, who's - Torben? Next up is Torben Welch. |
| TORBEN WELCH | Commissioners, good afternoon. My name is Torben Welch with Messner Reeves. Our firm serves as outside business council for the All Net project, primarily out of our Las Vegas office, which is headed up by Renee Finch and Jason Martinez. My role, I'm based in the Salt Lake City, Utah office. My role is financing and international financing side for the project and to help undertake that. And I know financing has been a big important part of this project and you've heard a lot about financing over the years, and in fact, in November when we came, we presented some financing that was in place and through a variety of fraudulent things that happened of no consequence or no fault of All Net or its partner, that turned into something different. So, the partners immediately pivoted and were able to secure financing for this project through assets that they had. That partner is Clearwater Premier Perpetual Master, LLC, and they're an equity partner in this project and they have secured financing on behalf of All Net and have provided $5 billion in an account, an offshore account for the purposes of building this project. |
| | For intents and purposes today, it's a collateral account, meaning that those funds can be utilized to collateralize projects and liens and loans. To fund this project, that is not a U.S.-based account simply because U.S. based accounts don't act as escrow agents and hold that kind of money, but we are in the process of opening up accounts through a tier one institution, HSBC U.S. Those accounts have been opened and HSBC U.K. is where that money will be stored as a collateral basis for a variety of other construction loans and construction lines of credit that we'll talk about a little bit later with some of the other partners that are here with McCann Commercial. |
| | So that financing is in place. It is available to be utilized to secure work on this project and this site, and that has been in place since September. Early September is when that account was funded, and we are working to get those mobilized and moved. That should happen, that will happen in advance of December 6th, so funds will be available to continue construction and get this project building. |
| | Now, that is just one part of the financing side. Like I said, there are additional construction loans and lines of credit that are on top of that. The purpose behind that is very important. Mister Robinson and the All Net team has been very clear that this is not to be a publicly financed project. There's not an ask for public financing here. The goal is to have this actually debt-free at the time that this project opens. So those funds that are in that account that will ultimately be utilized to satisfy a construction loan have been received, and approvals for that have been received that Mister Ed Perez will talk about here momentarily, so that when this project does |

# EXHIBIT 6



PG **Asia Investment Bank Ltd**
*A Pied Piper Group Global Company*

Licensed Labuan Investment Bank
Registration No. LL08568 / License No. 1201118



11/16/2022 BCC
#8 ET-22 404109(UC-0519-17)
#9 ET 22-400110(UC-0868-14)

November 15, 2022

**Dribble Dunk, LLC/All Net, LLC**
Attn: Jackie Robinson
3770 Howard Hughes Pkwy,
Suite 100
Las Vegas, NV 89169

Sir,

The undersigned bank officer, at your request, hereby confirms that we, PG Asia Investment Bank, LTD, located at 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, are Ready, Willing, and Able to issue a Letter of Credit to the order of **Clearwater Premiere Perpetual Master, LLC** for the total amount of Five Billion United States Dollars ($5,000,000,000.00) as required for the Dribble Dunk Project funding expectations. The term of such guarantee(s) will be for a minimum of one calendar year plus one calendar month. A new Letter of Credit containing the same or similar terms will be issued to replace each expiring Letter of Credit for an additional two (2) consecutive periods of one year and one month each. We also confirm that the the underlying capital assets supporting this Letter of Credit is free of any liens, encumbrances and/or restrictions and consists of clean, clear funds of non-criminal origin.

Upon receipt of your written request, we will verify the approved Letter of Credit via SWIFT MT760, sent to your indicated bank and corresponding account coordinates, communicated by the undersigned banking officer, Mr. William Murphy. We acknowledge that the approved Letter of Credit satisfies contractual terms and conditions for your mutual engagement with our client, functioning primarily as security and/or to satisfy periodic payments according to the projects requirements. A signed facsimile and/or email copy of this confirmation is deemed legally binding, with such delivery classified as an original correspondence.

For and on behalf of PG Asia Investment Bank, LTD of 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, executed Tuesday, November 01, 2022.

William Murphy (Nov 15, 2022 08:59 EST)

**William Murphy**
*Financial Director and CFO*
**PG Asia Investment Bank, LTD**
Email: wmurphy@pgaib.com
US Ph: +1 631 375 0701
URL: http://www.pgaib.com

Principal Office : Level 7(E)-2, Main Office Tower, 87000 Federal Territory of Labuan, Malaysia
Marketing Office : Level 22(E), UBN Tower, 10, Jalan P Ramlee 50250 Kuala Lumpur, Malaysia
U.S. Office : 233 S. Wacker Dr, 67th Floor, Chicago, IL 60606
DMCC Office : Bin Haidar Bldg, Ste. 217: Port Saeed Deira, Dubai UAE
Zurich Office : Freischutzgasse 3, 8004 Zurich, Switzerland

trade@piedpipergroup.com

+6 087 416160

+6 087 417160

# EXHIBIT 7

| | |
|---|---|
| KIRKPATRICK | Okay. |
| GIBSON | Any other questions? Thank you, sir. |
| MILLAGE | Thank you. |
| KAEMPFER | Um - finally in our presentation we have - uh – Jake – uh - Brigham. He will address the financial situation and confirm to you the availability of funds necessary to complete this project in a timely manner in accordance with all approved plans and permits. Mister Brigham. |
| JAKE BRIGHAM | Thanks. Good morning and - uh - may I please the Commission. Um - I wrote my notes down in handwriting, so please bear with me as I try to parse them out. Um - |
| GIBSON | Would you - would you state your name, please? And spell your last name for us. |
| BRIGHAM | Yes. My name is Jake Brigham. B-R-I-G-H-A-M and I'm an attorney with – uh - the law firm Messner Reeves and our firm is both bound counsel and book runner with respect to various infrastructure bonds which are sponsored by our client, Clearwater. And we are also project counsel for the Dribble Dunk - Dribble Dunk Project.

I'm here to convey to the Board that financing has been secured for the Dribble Dunk Project. The Board should have received a letter on November 7th from my colleague, Mister Torbin Welch, detailing the $1.5 billion-dollar revolving line of credit from Clearwater to Dribble Dunk for amounts up to $7 billion dollars. That letter of credit has been previously executed and remains, uh- effective and binding on both the lender, Clearwater, and the developer, Dribble Dunk.

Uh- the funds are available to complete the entirety of the project in a timely manner in accordance, uh- as Mister Kaempfer said with all the issued permits and approvals. Uh - additionally as of yesterday, Dribble Dunk has received a funding commitment letter which is deemed legally binding from PG Asia Investment Bank, confirming funding in the amount of $5 billion dollars to Clearwater as required for the Dribble Dunk Project funding expectations. I wanna let the Board know that it's signed by the Financial Director of the bank. It's printed on bank letterhead and – uh - is as good as cash.

So, in sum- uh- the Board can be assured that funds are secured and available for the commitment letter for the Dribble Dunk Project and I'm happy to answer any additional questions if there are any. |
| GIBSON | Sir, do you have any - uh - do you have in front of you or are you aware of what any kind of a drawdown schedule might be against these dollars? |
| BRIGHAM | Um - well between Clearwater and Dribble Dunk, it's the revolving line of credit and then between the PG uh- Asia Investment Bank, uh - and Clearwater, it's $5 billion dollars line of credit and that - those $5 billion dollars are specifically allocated for the Dribble Dunk Project. So, the agreements are in place. They've all been executed and – uh - bank accounts are currently active and open so |

# EXHIBIT 8

**Board of County Commissioners**

CLARK COUNTY, NEVADA

JAMES B. GIBSON
    Chair
JUSTIN JONES
    Vice Chair
MARILYN K. KIRKPATRICK
WILLIAM MCCURDY II
ROSS MILLER
MICHAEL NAFT
TICK SEGERBLOM

---

COMMISSION CHAMBERS, GOVERNMENT CENTER
500 SOUTH GRAND CENTRAL PARKWAY
LAS VEGAS, NEVADA 89106
WEDNESDAY, NOVEMBER 16, 2022

The Board of County Commissioners of Clark County, Nevada met in recessed regular session in full conformity with law and bylaws of said Board at the regular place of meeting in the Commission Chambers, Government Center, Las Vegas, Clark County, Nevada on Wednesday, the 16th day of November 2022 at the hour of 9:00 a.m. The meeting was called to order at 9:00 a.m. by Chair Gibson and on roll call, the following members were present, constituting a quorum of the members:

### CALL TO ORDER

CHAIR AND COMMISSIONERS:
Jim Gibson
Justin Jones
Marilyn K. Kirkpatrick
Ross Miller
Michael Naft
William McCurdy II
Tick Segerblom

Absent:
None

Also Present:
Robert Warhola, Deputy District Attorney
Nancy Amundsen, Director, Comprehensive Planning
Sami Real, Planning Manager
Antonio Papazian, Manager, Development Review
Jason Allswang, Senior Plan Checker
Tammy McMahan, Office Services Supervisor
Keri Miller, Deputy Clerk
Michelle Hinkson, Deputy Clerk

ACTION:                                   Deleted from the agenda (held to January 4, 2023, per applicant)

ITEM NO. 7 ET-22-400108 (UC-20-0288)-WTML WARM SPRINGS, LLC:
USE PERMIT FIRST EXTENSION OF TIME for a cannabis establishment (retail cannabis store).
DESIGN REVIEW for a retail building for a cannabis establishment on a portion of 1.0 acre in a C-1 (Local Business) (AE-60) Zone. Generally located on the south side of Warm Springs Road and the east side of Haven Street within Enterprise. MN/dd/syp (For possible action)

ACTION:                                   It was moved by Commissioner Justin Jones, and carried by unanimous vote, that the application be approved subject to staff conditions.

CONDITIONS OF APPROVAL -
Current Planning
- Until August 19, 2024 to obtain a valid business license for a retail cannabis store or the application will expire.
- Applicant is advised that ADR-20-900506 will expire December 02, 2022; the installation and use of cooling systems that consumptively use water will be prohibited; the County is currently rewriting Title 30 and future land use applications, including applications for extensions of time, will be reviewed for conformance with the regulations in place at the time of application; a substantial change in circumstances or regulations may warrant denial or added conditions to an extension of time; and that the extension of time may be denied if the project has not commenced or there has been no substantial work towards completion within the time specified.

Public Works - Development Review
- Compliance with previous conditions.

ITEM NO. 8 ET-22-400109 (UC-0519-17)-ALL NET LAND DEVELOPMENT, LLC:
USE PERMITS SECOND EXTENSION OF TIME to commence the following: 1) modifications to an approved High Impact Project (All Net Arena); and 2) proposed convention facilities/exposition halls.
WAIVERS OF DEVELOPMENT STANDARDS for the following: 1) reduced on-site parking; and 2) increased building height.
DESIGN REVIEWS for the following: 1) modifications to an approved High Impact Project; 2) hotel tower and associated low-rise and mid-rise buildings and structures; 3) convention center facilities; and 4) all other accessory and incidental buildings and structures on 27.0 acres in an H-1 (Limited Resort and Apartment) Zone. Generally located between Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue within Winchester. TS/sr/syp (For possible action)

AMUNDSEN                              Next are Items 8 and 9 which can be heard together.

                                      Item 8, ET-22-400109 (UC- 0519-17). Use permit, second extension of time to commence the following: Modifications to an approved high impact project, the All-Net Arena, proposed convenience or convention facilities, exposition halls. Waivers of development standards for the following: Reduced onsite parking, increased building height. Design reviews for the following: Modifications to an approved high impact project, hotel tower and associated low rise and midrise buildings and structures, convention center facilities and all other accessory and in- incidental buildings and structures on 27 acres in an H-1 limited resort and apartment zone generally located between Las Vegas Boulevard and Paradise Road, 900 feet south of Sahara Avenue within Winchester.

                                      Item 9. ET-22-400110 (UC-0568-14). Use permits, third extend of time to

**Clark County Board of Commissioners Zoning Minutes – 11/16/22**                    Page **7** of **116**

| | |
|---|---|
| AMUNDSEN | commence the following. A high impact project, a recreation facility, a multi-function events arena and incidental uses. Increase building height. Retail sales and services, restaurants, on-premise consumption of alcohol, alcohol sales, beer and wine, packaged only, alcohol sales, liquor, packaged only. Outdoor live entertainment, personal services, salon and spa, club, night club, food carts, booths, grocery store, kiosk information, outdoor, offices, theater, a cineplex, outside dining, drinking and cooking, farmer's markets, arcade and motion picture production studio.<br><br>Waivers of development standards for the following: Reduce setback to a parking structure from a residential use. Waive the required landscaping when adjacent to a less intensive use. Permit a variety of outdoor commercial retail uses not within a per- permitted enclosed building. Non-standard improvements: fences, walls, planters and landscaping within the future right of way of Las Vegas Boulevard South. Design reviews for the following: A recreation facility, a multi-function events arena with ancillary uses and structures and overall site design, hotel, retail establishments, theater, parking structures on 27 acres in an H-1 limited resort and apartment zone. |
| CHRIS KAEMPFER | Yes. Uh - good morning Mister - |
| GIBSON | Good morning, Mister Kaempfer. |
| KAEMPFER | Good morning, Mister Chairman, Commissioners. Uh - Chris Kaempfer. 1980 Festival Plaza Drive. Here on behalf of the applicant. In our brief presentation today you'll be hearing from me followed by Mister Steve, uh- Millage who will, uh- give you some construction timelines. Following Mister Millage will be, uh- Jake Brigham, uh- an attorney in Torbin Welch's office at Messner and Reeves who are bond counsel. Although Planning has made it consistently clear that financing is not a planning consideration, we do know that the financing of this project is of interest to others and Mister Brigham is here to address any issues or concerns you might have in that regard. Also in the audience today is Mister David Lauden and Mister Jackie Robinson, the applicant, who are here should you have any questions appropriate for their consideration.<br><br>First of all, as I like to do always, I want to thank staff for their recommendation of approval and for their efforts in working with us and sup- um- being supportive and helpful throughout this project. As I often say, we are extremely grateful for the great service that they provide, uh- to all of the public and we thank them again, uh- for their recommendation and for their help. We also received the unanimous recommendation of approval from the Town Board and until just a moment ago, we were on the routine action portion of the agenda which, by definition, means that we reviewed as routine.<br><br>Um- secondly, let me say; and I think, uh- for me personally it's important that I add this; that it's been my privilege to be involved in this project from its inception. It's been a long road and Mister Robinson never gave up. He possesses a determination and a will that you rarely see, but when you do see it, you appreciate it very much. And I do, uh- and I know you all appreciate everything that Mister Robinson has done. |

| | |
|---|---|
| KIRKPATRICK | Okay. |
| GIBSON | Any other questions? Thank you, sir. |
| MILLAGE | Thank you. |
| KAEMPFER | Um - finally in our presentation we have - uh – Jake – uh - Brigham. He will address the financial situation and confirm to you the availability of funds necessary to complete this project in a timely manner in accordance with all approved plans and permits. Mister Brigham. |
| JAKE BRIGHAM | Thanks. Good morning and - uh - may I please the Commission. Um - I wrote my notes down in handwriting, so please bear with me as I try to parse them out. Um - |
| GIBSON | Would you - would you state your name, please? And spell your last name for us. |
| BRIGHAM | Yes. My name is Jake Brigham. B-R-I-G-H-A-M and I'm an attorney with – uh - the law firm Messner Reeves and our firm is both bound counsel and book runner with respect to various infrastructure bonds which are sponsored by our client, Clearwater. And we are also project counsel for the Dribble Dunk - Dribble Dunk Project.

I'm here to convey to the Board that financing has been secured for the Dribble Dunk Project. The Board should have received a letter on November 7th from my colleague, Mister Torbin Welch, detailing the $1.5 billion-dollar revolving line of credit from Clearwater to Dribble Dunk for amounts up to $7 billion dollars. That letter of credit has been previously executed and remains, uh- effective and binding on both the lender, Clearwater, and the developer, Dribble Dunk.

Uh- the funds are available to complete the entirety of the project in a timely manner in accordance, uh- as Mister Kaempfer said with all the issued permits and approvals. Uh - additionally as of yesterday, Dribble Dunk has received a funding commitment letter which is deemed legally binding from PG Asia Investment Bank, confirming funding in the amount of $5 billion dollars to Clearwater as required for the Dribble Dunk Project funding expectations. I wanna let the Board know that it's signed by the Financial Director of the bank. It's printed on bank letterhead and – uh - is as good as cash.

So, in sum- uh- the Board can be assured that funds are secured and available for the commitment letter for the Dribble Dunk Project and I'm happy to answer any additional questions if there are any. |
| GIBSON | Sir, do you have any - uh - do you have in front of you or are you aware of what any kind of a drawdown schedule might be against these dollars? |
| BRIGHAM | Um - well between Clearwater and Dribble Dunk, it's the revolving line of credit and then between the PG uh- Asia Investment Bank, uh - and Clearwater, it's $5 billion dollars line of credit and that - those $5 billion dollars are specifically allocated for the Dribble Dunk Project. So, the agreements are in place. They've all been executed and – uh - bank accounts are currently active and open so |

| | |
|---|---|
| BRIGHAM | they're immediately available for the project. And – uh – I - I didn't print the – uh - commitment letter but I have it on my hard drive and I'm - I'm sure I can, uh-transfer that to the Board if they wanna review it or see it, so (inaudible) |
| GIBSON | Are there any other conditions that you're aware of that - uh - have to be met other than, for instance, our approval, before the dollars could be made available for use on the project? |
| BRIGHAM | No, sir. Not that I'm aware of. The asset - the bonds have been placed with PG Asia Investment and – uh - this might be more information that's necessary but my understanding is that because the asset is placed with PG Asia, they have trading platforms that that bond can then be monetized on and – uh - I think they do it through bullet trading on the, the secondary market and that can generate additional proceeds up to a 100% within three weeks. So - |
| GIBSON | Does y - does your firm have experience with those platform trades? |
| BRIGHAM | Um - PG's Asia Investment specifically or just trading on the - |
| GIBSON | Just - just the trading platforms. |
| BRIGHAM | Uh – yes, we do. Um - I think I would say Torbin Welch, my colleague, has more experience but I personally placed the bonds themselves on the Bloomberg Exchange Platform, so those bonds are veri - verifiable on the market. |
| GIBSON | Okay. Thank you. |
| BRIGHAM | Thank you. |
| MILLAGE | Commissioners, I just wanted to add again, Steve Millage, Owner's representative. Um - the lenders do have the drawdown schedule. The drawdown schedule has been put together based upon the construction schedule. So, I'm happy to go ahead and submit that to the Commissioners, uh- via email or drop them off as well if you would like. I just don't happen to have it with me, sir. |
| GIBSON | Thank you. |
| MILLAGE | Thank you. |
| GIBSON | Counsel, would you come back up? Would you come back up? Commissioner Jones, you have a question. |
| JONES | Um - thank you Mister Chair, um- and thanks Mis- Mister Brigham. I - I - I appreciate your representation here that the one-and-a-half-page letter from Mister Welch is as good as cash, but it's not and, and so I guess I'm trying to understand. Again, it – it (laughs) the applicant has come in here with funding sources that are different every single time and last time it was magic money from the Middle East and this time it's - uh- a one-and-a-half-page letter from – um - from a law firm. And I - I'm really trying to understand where the money is actually coming from. |

| JONES | For example, when I just Google Clearwater Premier, it doesn't even really show up in - in Google, for example. So, help me really understand where the money is coming from 'cause it would be ... It would give me a lot more comfort if there was actually $1.5 billion dollars sitting in an account than a lawyer's letter. |
| --- | --- |
| BRIGHAM | Yes, I will address that. |
| JONES | 'Cause I'm a lawyer, I write letters, but my letters aren't worth $1.5 billion dollars. |
| BRIGHAM | I - I may have mis-spoke. I didn't mean my - my colleague's letter was worth the cash. I meant the - the funding commitment letter from the bank itself. Um – the - the letter I - I wish I had printed it, I'm sorry. But it says it's legally binding. |
| JONES | Well, and to be clear, I asked for that information last week and what I got was Torbin Welch's letter. |
| BRIGHAM | Right, and - |
| JONES | And no disrespect from Torbin Welch. |
| BRIGHAM | (laughs) |
| JONES | I happen to serve my mission with him. Um - but that ain't money. |
| BRIGHAM | Correct, correct. And we didn't have the commitment letter from the bank. I mean, that's what we had been working on. We received it yesterday and so that's why we didn't have it last week. |
| JONES | (laughs) Well, maybe you shouldn't be here today if you just got your funding commitment today or yesterday. |
| BRIGHAM | Well, that's what- |
| KIRKPATRICK | (laughs) |
| BRIGHAM | We, we have it, so- |
| KIRKPATRICK | Uh- Mister Chairman- |
| BRIGHAM | - that's all I had to just- |
| KIRKPATRICK | - maybe we could print it for us to look at. |
| BRIGHAM | Yes, we'd be happy to. |
| KIRKPATRICK | We, we can do that right in the back. |
| GIBSON | Yeah, so just a f- a - since we brought you back up. So, one, one of the issues that we've encountered occasionally when dollars are, are committed from foreign sources, uh- uh- has to do with the, um- the challenges of bringing foreign money |

**Clark County Board of Commissioners Zoning Minutes – 11/16/22**                    Page **13** of **116**

| | |
|---|---|
| GIBSON | into this Country with all of the issues that currently exist. Um – what - what is the plan for overcoming those issues and getting those dollars into Mister Robinson's accounts? |
| BRIGHAM | That's a good question. I usually leave that to the bankers because in terms of – uh - international finance, I'm just not experienced enough to know how that exchange happens, so I can't really comment on that. |
| GIBSON | I think that we would like to have in our files something about that. |
| BRIGHAM | Okay. |
| GIBSON | We, we would like to know the process. Uh - you know, we're - nothing that anyone's saying here should be – uh - taken as a opposition to the project. We're as concerned about the applicant as we are the project. |
| BRIGHAM | Sure. |
| GIBSON | We just wanna make sure that the things that we're grounding our decisions on are doable, are real. |
| BRIGHAM | Right. |
| GIBSON | And – uh - occasionally we - this isn't the first, but occasionally we'll see a project where there are commitments for financing – um - and often they don't materialize. So, we're, we're very concerned about – um - reliance upon all of that. You've done more work or really the client has done more work or - I guess they're your client, right? |
| BRIGHAM | Correct. |
| GIBSON | They've done more work over there and we see that. Um- there's ... I have ... We have no question about whether or not they intend to build. We imagine they do. Uh- we're anxious for them to have the resources to be able to do it, because the more things that get done to that site (laughs) um- the more difficulty we have if, i- uh- something doesn't happen. I recognize you have, uh- someone from the Lauden family here today and they're interest is in, uh- securing whatever they can for this property and seeing it developed to the highest and best use and returning whatever the highest return can be. But we have some concerned that you could really help us with. (crosstalk) And I think if we could understand better, um- and have assurances about what the process will be, uh- in terms of bringing dollars into the United States and providing funding and making those dollars available for the work that remains ahead, that would be very, very useful to us. |
| BRIGHAM | Okay, understood. Thank, thank you. |
| GIBSON | If you could have the banks do something about that. |
| BRIGHAM | Okay. |

KAEMPFER          Mister Chairman, if I might -

GIBSON            Mister Kaempfer.

KAEMPFER          If I might just two c - two comments. One, if you wanna trail this, we can print out that letter and get a copy to each one of you today. Yeah, it's a short letter. Um - if that's not acceptable – um - you can hold it for two weeks if you want to and we can get that letter to, you know – the – I – I - I do wanna emphasize that the application before you today is whether or not we should extend to allow commencement and I think we have established pretty clearly that we have commenced the project. But if this is - uh - obviously it's a concern, so if you wanna trail it, we can get that letter. It's only, what? A page-and-a-half, Jake?

BRIGHAM           That's correct. Yup.

KAEMPFER          Yeah, it's a page-and-a-half letter. We can show it to you and if that gives you some comfort. If not, you, you wanna hold it for two weeks, we can, we can do that as well. We want you to be comfortable. Uh -

GIBSON            Well, I - I think at this point, Mister Kaempfer I - I'm not prepared to tell you what I think you need to do. I think we'll- we'll have further conversation here. Um - one of the things that is comforting is that we have assurances from lawyers we trust, people we know and know how competent you are that this financing is in place and that it is real, and these dollars are available to build this project out. And that gives a measure of comfort that is important to us.

                  Uh - but let us see the letter. Get - see what you can do to get us the letter. Maybe you can email the letter, and someone here can print it for us.

BRIGHAM           Yes, I can do that.

GIBSON            Alright. Let's do that.

BRIGHAM           Thank you.

GIBSON            And now let's continue with your - your presentation, Mister Kaempfer.

KAEMPFER          My - my prese - that concludes my presentation. I have nothing else to - to add, again, other than I think the concern was - this is it? Um - how do you wanna handle this? Do you want me to (laughs) give it to staff and they can make copies of it, or do you want? How do - how -

GIBSON            That's what we'll do. What's that?

UNIDENTIFIED      Where do we print it? Thanks (inaudible)

GIBSON            Alright. So – uh - we'll allow you to come back up in a, - in a few minutes if that's alright.

KAEMPFER          Sure. That'll be-

| | |
|---|---|
| AMUNDSEN | zoning that either makes sense because of the neighborhood or would make sense because of the um- construction that's occurring on the site. |
| | So, our request is for direction to be able to bring those forward, those that- that are deemed appropriate, forward for hard zoning. |
| JONES | Great. Any discussion from the Board? Thumbs up. All good. Okay. |
| **ACTION:** | Staff directed. |

**PUBLIC COMMENT:**

| | |
|---|---|
| AMUNDSEN | Okay, and then the last is public comments. |
| JONES | This is the second time set aside for public comment. Anyone wishing to provide public comment, please step forward to the microphone, state your name, and limit your comments to three minutes. Seeing none. We'll go ahead and close the public comment and we are adjourned. |
| AMUNDSEN | Thank you. |

There being no further business to come before the Board at this time, at the hour of 1:28 p.m., the meeting was adjourned.

APPROVED:

/s/ James B. Gibson
JAMES B. GIBSON, CHAIR

ATTEST:

/s/ Lynn Marie Goya
LYNN MARIE GOYA, COUNTY CLERK

# EXHIBIT 9

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

Date of Report (date of earliest event reported):

**February 14, 2023**

**AMERI METRO, INC.**
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 000-54546 | 45-1877342 |
|---|---|---|
| (State of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2575 Eastern Blvd., Suite 102, York, PA 17402**
(Address of principal executive offices)

**717-434-0668**
(Registrant's telephone number, including area code)

N/A
(Former Name or former address if changed from last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act: **None**

Securities registered pursuant to Section 12(g) of the Act: **Common stock**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.000001 par value per share | ARMT | N/A |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

<u>Item 7.01 Full Disclosure</u>

Letter of Notice in conjunction with the Internal Side Agreement between Ameri Metro Infrastructure Cryptocurrency Inc. and TDA Global Systems dated January 22, 2022 exhibit A was sent to Todd Owen on 11/21/2022 by email.

At this time after well over six (6) Months of non-performance with respect to the monetization, of the Bonds for the financing of the State Infrastructure project by Mr. Owen and his various corporate entities, we hereby are serving this Letter of Notice to exercise the Internal Side Agreement and bring our business relationship to a close effective immediately.

This above item supersedes any 8 K's previously filed disclosing any relationship with TDA Global Systems LLC or any of their affiliates worked on this bond etc.

All internal financial records will be reset back to last filed financial statements.

<u>Item 9.01 Financial Statements and Exhibits.</u>

| | |
|---|---|
| 99.1 | Internal Side Agreement |
| 99.2 | Letter of Notice to TDA |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

1

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

February 14, 2023

**Ameri Metro, Inc.**

/s/ Robert Todd Reynold

By:     Robert Todd Reynold
Title:   BOD / CRO

2

Exhibit 99.1

DocuSign Envelope ID: AC47F89F-46E0-49AF-8469-A773A523CB14

# TDA – AMERI METRO INTERNAL SIDE AGREEMENT

WHEREAS, the TDA – Ameri Metro Collaboration Agreement ("Agreement") was executed by and between the Parties on the date of January 22, 2022; and

WHEREAS, the TDA – Ameri Metro Collaboration Agreement Addendum ("Addendum") was executed by and between the Parties on the date of February 15, 2022; and

WHEREAS, the Parties agree that the anticipated timeline for first funding for the Collaboration, one or more of its projects and/or for an agreed upon disbursement to the Parties, shall occur no more than One Hundred (120) Days from the Effective Date of the Addendum thereto;

WHEREAS, the Parties wish to enter into this Internal Side Agreement ("ISA") and to agree to abide by the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the agreements herein contained, the Parties hereby agree as follows:

1.    The Parties to this ISA hereby expressly agree that the above-stated pre-amble clauses shall be incorporated into this ISA, as more fully agreed to by and between the Parties and shall be included herein and made a part hereof.

2.    The Parties hereby agree that the anticipated timeline for first funding for the Collaboration, one or more of its projects and/or for an agreed upon disbursement to the Parties, shall be One Hundred (120) Days from the Effective Date of the Addendum thereto.

3.    The Parties hereby further agree that, should first funding not occur within the 120 Day period after the Effective Date of the Addendum thereof, the Addendum and the Agreement it is attached to, shall be revisited by the Parties at that time.

4.    This ISA shall commence on the date of signing, and execution hereof, which shall be the Effective Date herein.

DocuSign Envelope ID: AC47F89F-46E0-49AF-8469-A773A523CB14

5.    This ISA shall constitute the entire understanding of the Parties hereof and cannot be changed, modified and/or terminated without the express, written and mutual consent of the Parties.

6.    This ISA may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute one and the same Agreement.

7.    It is hereby agreed that both an electronically mailed (email) copy as well as a facsimile copy of this ISA shall be valid, binding, legal and enforceable as if it were an original.

8.    Each Party to this ISA hereby expressly agrees that any disagreement of any kind that cannot be settled by and between the Parties, shall be submitted to binding arbitration in the State of Wyoming, in accordance with the rules of arbitration in the State of Wyoming and of the American Arbitration Association.

IN WITNESS WHEREOF, the Parties have caused this ISA to be executed by their duly authorized representatives on the respective dates set forth below.

Dated: February 15, 2022

TDA Global Systems, LLC

By:  Todd Owen
     C.E.O.

By:  Todd Reynold
     Witness

Ameri Metro Infrastructure Cryptocurrency, Inc.

By:  Shah Mathias
     C.E.O.

By:  Rosemary Hennessy
     Witness

Exhibit 99.2



**Ameri Metro, Inc.**

*"Changing The Way You Move"*

Affiliated Companies:

HSR PASSENGER SERVICES, INC.
HSR LOGISTICS, INC.
HSR TECHNOLOGIES, INC.
HSR FREIGHT LINE, INC.

February 13, 2023

TDA Global Systems, LLC
Clearwater Premiere Perpetual Master Trust
Clearwater Premiere Perpetual Master, LCC
30 N Gould St
Ste 22728
Sheridan, WY 82801

Att: Mr. Daniel L. Chartraw

Re: Letter of Notice

Dear Dan:

Please accept this formal Letter of Notice in direct response to your call to me of February 1, 2022, in which you and I specifically and expressly discussed the current state of bond monetization as per the efforts of Clearwater for well over a year now.

This Letter shall confirm that in this call, you expressly admitted that Clearwater would be unable to get the bonds monetized as agreed and that Clearwater could not and would not be able to procure an insurance wrap sufficient in size to be able to secure or assure any such monetization.

Further in this call, you expressly stated that the best that could be done, would be the possibility of Clearwater being able to secure up to a One Billion Dollar loan annually, against the first, Forty Billion Dollar Bond, which we both agreed would be insufficient to be able to fund those projects directly tied to the bond.

These frank and honest admissions on your part were and are well appreciated by me on behalf of all affected companies as follows:

PHONE: 717-434-0668                                        2575 EASTERN BLVD., YORK, PA 17402

HSR logistics, Inc.
HSR Freight Line Inc.
HSR Passenger Services, Inc.
HSR Technologies, Inc.
Global Infrastructure Finance & Development Authority, Inc.
Cape Horn Abstract Inc.
Cape Horn Abstracting
Susquehanna Mortgage Bankers Corp
Susquehanna Mortgage Bank Susquehanna mortgage, co.
Zurich Financial Guarantee and Security Company
Penn Venture Capital, Co.
Penn Insurance Services LLC
Atlantic Energy and Utilities, Inc.
Atlantic Energy & Utility Products, Inc.
KSJM International Airport, Inc.
Malibu Homes, Inc.
Ameri Cement, Inc.
Lord Chauffeurs LTD.
Eastern Development & Design, Inc.
Slater & West, Inc.
Platinum Media Inc.
Natural Resources LLC
Dutch East India Logistics Co.
Ann Charles International Airport, Inc.,
Hi Speed Rail Facilities, Inc.
Hi Speed Rail Facilities Provider, Inc
Ameri Metro Infrastructure Cryptocurrency, Inc.
Decentralized Autonomous Organization, LLC
Ledger Autonomous Organization Crypto Asset and Natural Resources Commodities Exchange, LLC
Crypto Asset and Natural Resources Commodities Exchange
Crypto Asset and Natural Resources Commodities Exchange DAO LLC
Global Infrastructure Stock Exchange LLC
Global Consumptive Use Token Exchange DAO LLC
Digital Asset Management and Clearinghouse LAO LLC
Digital Asset Depository Statutory Trust
Digital Asset Depository and Asset's custodian DAO LLC
Port of Ostia, Inc.
Port of De Claudius, Inc.

## Ameri Metro, Inc.

PHONE: 717-434-0668                                    2575 EASTERN BLVD., YORK, PA 17402

Additionally, the fact that you fully acknowledged, understood and agreed that, while a billion dollars is a lot of money, it was not even remotely close to sufficient funds necessary toward the goals of project funding that brought the bonds into existence in the first place, was and is also appreciated.

It was in the spirit of this conversation that I was required to go to the Board of each above-mentioned, affected company and to which I attended a Board meeting for each above mentioned, affected.

company thereto.

A formal Board vote for each above-mentioned, affected company was taken, considering the realities of Clearwater's inability to properly monetize the bonds, with the following results.

Due to the express and admitted inability to perform as agreed by TDA and Clearwater, through perhaps no fault of their own, but nonetheless, the Board of each affected company voted, as relevant to each, as follows:

1. The various Collaboration Agreements by and between TDA Global Systems, LLC and Ameri Metro Infrastructure Cryptocurrency, Inc., including all Addendums, are hereby irrevocably terminated.

2. Any and all Agreements by and between any and all of the above mentioned, affected companies and Clearwater Premiere Perpetual Master Trust and/or Clearwater Premiere Perpetual Master, LCC are hereby irrevocably terminated.

3. All bond assignments for bonds from Malibu Homes Inc., Atlantic Energy and Utility Products Inc., and HSR Freight Line Inc. / HSR Passenger Services Inc., are hereby irrevocably terminated.

4. TDA Global Systems, LLC, Clearwater Premiere Perpetual Master Trust and Clearwater Premiere Perpetual Master, LCC are all hereby expressly and irrevocably decommissioned from having any further authority on any and all of the bonds from Malibu Homes Inc., Atlantic Energy and Utility Products Inc., and HSR Freight Line Inc. / HSR Passenger Services Inc.

## Ameri Metro, Inc.

PHONE: 717-434-0668                          2575 EASTERN BLVD., YORK, PA 17402

5.   Any and all bond title page and appurtenant bond paperwork earlier forwarded to TDA Global Systems, LLC, Clearwater Premiere Perpetual Master Trust and Clearwater Premiere Perpetual Master, LCC, are hereby expressly rendered null and void, with no legal authority whatsoever.

6.   Any and all transfer agents, book runners, broker dealers and/or law firms appointed by TDA and/or Clearwater to act on their behalf with respect to any and all bonds from the above mentioned, affected companies hereto, are hereby expressly and irrevocably decommissioned from acting in any such capacity and have no legally recognized authority with respect to the bonds or the abovementioned, affected companies as a matter of law.

7.   Mr. Todd Owen has been formally removed as a shareholder by majority Board vote and approval, from each company Mr. Owen had received shares into, as per the officially filed 8K Filings, as filed in 2022 thereto.  As these shares were rendered to Mr. Owen in express consideration for his pending, represented ability to get each such company's bonds successfully monetized, which has not and cannot be done, the shares have been taken back and redistributed in accordance with previous ownership.

In conclusion, we wish you and Todd well in your other business endeavors, but once again, we reiterate that you both have been legally and irrevocably decommissioned from acting with any authority on any of the bonds, as any such authority has been permanently and irrevocably revoked.

Thank you for your time and attention to this matter.

Very sincerely yours,

Shah Mathias, CEO
Ameri   Metro,   Inc.   &
Signing  for  all  the  entities
listed  in  paragraph  four
above

**Ameri Metro, Inc.**

PHONE: 717-434-0668                                    2575 EASTERN BLVD., YORK, PA 17402

# EXHIBIT 10

# MESSNER REEVES LLP

DENVER, LAS VEGAS, ORANGE COUNTY, PHOENIX, SALT LAKE CITY, SILICON VALLEY, RENO, COLORADO SPRINGS, CHEYENNE, NEW YORK CITY

TORBEN M. WELCH
twelch@messner.com
Licensed in UT, CO & NY

DIRECT DIAL:
(801) 683-2021

August 23, 2023

Re:   *INBE CAPITAL, LLC and its affiliates ("INBE")*

To Whom It May Concern:

We serve as outside counsel to INBE Capital, LLC and its affiliates and partners ("INBE"). It is our understanding that you are exploring a potential business relationship with INBE for the receipt of a business expansion line of credit (a "BELOC") from INBE. The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC.

We look forward to proceeding with this transaction and working with you and your company moving forward.

Should you have any questions or concerns, please contact me directly to discuss.

Very truly yours,

MESSNER REEVES LLP

Torben M. Welch

65 East Wadsworth Park Drive | Suite 110 | Draper, UT 84020 | 303 623 1800 *main* | 303 623 0552 *fax*

# EXHIBIT 11

3/26/24, 11:30 AM

---

**Matthew Shatzkes** <matthew@bochner.law>                                    Wed, Aug 23, 2023 at 4:16 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday due to the 5 business day requirement
you mentioned to me when we initially spoke?

Sent from my iPhone

On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:

No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.
[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                         Wed, Aug 23, 2023 at 4:25 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.

Sent from my mobile device - please excuse any typos

On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday due to the 5 business day
requirement you mentioned to me when we initially spoke?
[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                    Wed, Aug 23, 2023 at 4:35 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this week; and (2) the first tranche will be
immediately forwarded to Kosher Eats that same day and will be accessible to Kosher Eats that same day. Is this correct?

I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communicated to Kosher Eats throughout this
delay.

Sent from my iPhone

On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:

That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.
[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                         Wed, Aug 23, 2023 at 4:46 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect funds this week once the bank
protocols process (they told us there was a five day process for that – but that has been over that time frame already) then they will be release as soon as available.

Here is where we are today – I will update tomorrow once I have more information.

Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimates only subject to bank procedures
and protocols.

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                    Wed, Aug 23, 2023 at 9:24 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?

Sent from my iPhone

---

On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>    Thu, Aug 24, 2023 at 4:47 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?
[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>    Thu, Aug 24, 2023 at 4:57 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>    Thu, Aug 24, 2023 at 9:04 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?

**BOCHNER** PLLC

**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉️ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

# EXHIBIT 12

Case No. 1:26-cv-01707-KAS   Document 28-1   filed 06/25/26   USDC Colorado   pg
76 of 833



**From:** Torben Welch
**Sent:** Friday, October 27, 2023 3:22 PM
**To:** Jonathan Fodera <jonathan@emeraldconsultingpartnersllc.com>
**Subject:** RE: ICA for Hard AF

Jonathan – I have received the request. As you know, we are the paymaster on this account. I will inform INBE of your formal notice and request for return of the deposit per the agreement. In the interim, specifics on this transaction are best addressed with INBE directly and not our office.

TORBEN M. WELCH
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** lwelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

**From:** Jonathan Fodera <jonathan@emeraldconsultingpartnersllc.com>
**Sent:** Friday, October 27, 2023 2:37 PM
**To:** Torben Welch <twelch@messner.com>
**Subject:** Re: ICA for Hard AF

[ EXTERNAL EMAIL ]

Torben,

Attached is the wiring information. Please confirm receipt

On Fri, Oct 27, 2023 at 3:04 PM Jonathan Fodera <jonathan@emeraldconsultingpartnersllc.com> wrote:

INBE000036

Hello Torben,

I am making a formal request for the funds held in the ICA to be returned immediately. InBe and Messner have not upheld their end of the agreement

Please send what we need in order for the funds to be returned immediately

Regards,

Jonathan Fodera

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**INBE000037**

# EXHIBIT 13



**Saleem Elmasri <saleem@titanadvisory.us>**

## InBe/Messner Demand for Resolution
1 message

**Jonathan Fodera** <jonathan@emeraldconsultingpartnersllc.com>                              Mon, Oct 30, 2023 at 3:00 PM
To: twelch@messner.com, "dreeves@messner.com" <dreeves@messner.com>, cmeyer@messner.com, tarik@romio.com, laskonoah@gmail.com,
marvinvangelderen@icloud.com, iboldyrev@abbson.com, jsmith@messner.com, saleem@titanadvisory.us

**To Mr. Meyer, Mr. Reeves, Mr. Welch,**

Between March and August 2023, 6 companies, including mine, collectively wired $8.7 million to your account at Northern Trust where Mr. Welch was to act as escrow agent and custodian for prepaid interest reserve accounts and paymaster of loan proceeds for loans originated by your client, INBE Group (https://theinbegroup.com/). INBE Group made representations that funds would remain in escrow until INBE Group funded the term loans and the funds would not be at risk. Since then, INBE Group has defaulted on the loan agreements, failed to provide sufficient communication to the companies, and Mr. Welch, as escrow agent, has commingled and transferred all escrowed funds out of an account that can be controlled by Mr. Welch or your firm, a clear violation of fiduciary responsibility. This was never supposed to happen since INBE Group stated and continues to advertise "We don't "pool" capital from "Investors" as most Lenders do. Instead, we only lend out our own Capital."

Members of the 6 companies and their counsel have been chasing the whereabouts of the funds, the timing of funding, and any additional relevant information to set us at ease since August.  We uncovered that the funds were directed out of your account and into the custody of Clearwater, also a client of yours. More specifically, the funds were put into an investment scheme to return investment proceeds without our knowledge, relevant risk disclosures and the like.

Further, Clearwater and Mr. Welch have employed the services of Mr. Martin Hale of Latham Funding to communicate to us on timing of funding of the loan proceeds and Mr. Hale has stated that funds would be available next week for the past 10 weeks. Mr. Welch, Clearwater, and INBE Group are shying from communication and using Mr. Hale as to not incriminate themselves or deal with the 6 angry companies, their management teams, their legal teams, etc. Specifically, INBE Group has not returned ANY communications from us in the past several months and all communications and the communications from Mr. Welch have not been satisfactory to address the concerns.

To compound the concerns, Mr. Hale brought Mr. Daniel Chartraw into the fold to give an update on behalf of Clearwater. Mr. Chartraw was previously convicted of a financial crime involving the theft of escrow funds and was incarcerated for 4 years for forging a letter to an escrow company to have escrow funds misappropriated (source: fbi.gov). Mr. Chartraw and Mr. Hale then spoke to a Company and their attorney to assure them an imminent resolution, which has yet to come to fruition.

We are done chasing for answers and seeking clarity on what happened to our funds. Your immediate attention to this matter is requested. We are seeking clear and accurate communication as to the whereabouts of our interest reserve funds and the timing of

funding of the term notes or we will have no choice but to conclude that the following has occurred: a financial crime has been committed and the funds have been stolen, the Companies' funds were used for investment purposes without necessary risk disclosures or awareness and were likely lost, and escrow agent fiduciary duties were violated for either the benefit of your firm or INBE Group. As a result of this conclusion, we will engage an experienced financial crime counsel and seek to perform the following:

1. File a formal claim with the FBI Financial Crimes.

2. Contacting the state bars in UT, NY, and CO

3. Filing a complaint with the State AG in UT and FL

4. Filing a complaint with the SEC.

5. Filing a report with the FTC.

6. File suit against all parties in federal court.

We expect a response immediately and will move forward on Tuesday morning if we have not heard anything.

Regards,
Jonathan Fodera

# EXHIBIT 14

**Board of County Commissioners**

CLARK COUNTY, NEVADA

JAMES B. GIBSON
     Chair
TICK SEGERBLOM
     Vice Chair
JUSTIN JONES
MARILYN K. KIRKPATRICK
WILLIAM MCCURDY II
ROSS MILLER
MICHAEL NAFT

COMMISSION CHAMBERS, GOVERNMENT CENTER
500 SOUTH GRAND CENTRAL PARKWAY
LAS VEGAS, NEVADA 89106
TUESDAY, NOVEMBER 21, 2023

The Board of County Commissioners of Clark County, Nevada met in recessed regular session in full conformity with law and bylaws of said Board at the regular place of meeting in the Commission Chambers, Government Center, Las Vegas, Clark County, Nevada on Tuesday, the 21st day of November 2023, at the hour of 1:00 p.m. The meeting was called to order at 1:03 p.m. by Chair Gibson, and on roll call, the following members were present, constituting all the members:

## CALL TO ORDER

CHAIR AND COMMISSIONERS:
Jim Gibson
Tick Segerblom
Justin Jones
Marilyn K. Kirkpatrick
William McCurdy II
Ross Miller
Michael Naft

Absent:
None

Also Present:
Lisa Logsdon, Deputy District Attorney
Sami Real, Director, Comprehensive Planning
Antonio Papazian, Manager, Development Review
JaWaan Dodson, Assistant Manager, Development Review
Tammy McMahan, Office Services Supervisor
Robin Delaney, Deputy Clerk

**ACTION:**                              Deleted from the agenda (held to January 17, 2024 per the applicant).

**ITEM NO. 24** VS-23-0666-WHTBX DECATUR, LLC:
VACATE AND ABANDON easements of interest to Clark County located between Decatur Boulevard and Cameron Street and between Post Road and Sobb Avenue, and a portion of right-of-way being Post Road between Decatur Boulevard and Cameron Street, and a portion of right-of-way being Decatur Boulevard between Sobb Avenue and Post Road within Paradise (description on file). MN/sd/syp (For possible action)

**ACTION:**                              Deleted from the agenda (held to January 17, 2024 per the applicant).

**ITEM NO. 25** ORD-23-900186: Conduct a public hearing on an ordinance to consider adoption of a Development Agreement with William Lyon Homes Inc. for a single-family residential development on 8.9 acres, generally located north of Shelbourne Avenue and west of Decatur Boulevard within Enterprise. JJ/jm (For possible action)

**ACTION:**                              It was moved by Commissioner Tick Segerblom, and carried by unanimous vote, that the recommendation (including the adoption of Ordinance No. 5084) be approved.

**ITEM NO. 26** ORD-23-900438 HOLDOVER: Conduct a public hearing on an ordinance to consider adoption of a Development Agreement with Jose Avila for a single-family residential development on 0.9 acres, generally located south of Levi Avenue and west of Haven Street within Enterprise. MN/jm (For possible action)

**ACTION:**                              It was moved by Commissioner Tick Segerblom, and carried by unanimous vote, that the recommendation (including the adoption of Ordinance No. 5085) be approved.

**ITEM NO. 27** ORD-23-900542: Conduct a public hearing on an ordinance to amend the official zoning map reclassifying certain properties as approved by the Board of County Commissioners through various zone change applications on August 16, 2023, September 6, 2023, September 20, 2023 and in Assessors Book 176. (For possible action)

**ACTION:**                              It was moved by Commissioner Tick Segerblom, and carried by unanimous vote, that the recommendation (including the adoption of Ordinance No. 5086) be approved.

**ITEM NO. 28** ET-23-400129 (UC-0568-14)-ALL NET LAND DEVELOPMENT, LLC:
HOLDOVER USE PERMITS FOURTH EXTENSION OF TIME to commence the following: 1) a High Impact Project; 2) a recreational facility (a multi-function events arena) and incidental uses; 3) increased building height; 4) retail sales and service; 5) restaurants; 6) on-premises consumption of alcohol; 7) alcohol sales, beer & wine - packaged only; 8) alcohol sales, liquor - packaged only; 9) outdoor live entertainment; 10) personal services (salon and spa); 11) club; 12) nightclub; 13) food carts/booths; 14) grocery store; 15) kiosks/information (outdoor); 16) offices; 17) theater (Cineplex); 18) outside dining, drinking, and cooking; 19) farmer's markets; 20) arcade; and 21) motion picture production/studio. WAIVERS OF DEVELOPMENT STANDARDS for the following: 1) reduced setback to a parking structure from a residential use; 2) waive the required landscaping when adjacent to a less intensive use; 3) permit a variety of outdoor commercial/retail uses not within a permanent enclosed building; and 4) non-standard improvements (fences/walls, planters, and landscaping) within the future right-of-way (Las Vegas Boulevard South).
DESIGN REVIEWS for the following: 1) a recreational facility (multi-function events arena) with ancillary uses and structures and overall site design; 2) hotel; 3) retail establishments; 4) theater (Cineplex); and 5) parking structures on 27.0 acres in an H-1 (Limited Resort and Apartment) Zone. Generally located between Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue within Winchester. TS/tpd/syp (For possible action) (held from

November 8, 2023)

REAL

Commissioners, next are Items 28 and 29. However, we recommend based on our understanding that there's going to be a lengthy presentation that we move 28 and 29 to the end of the agenda and then therefore proceed with item 30.

GIBSON

That's what we'll do. We'll hold 28 and 29 until the end of the agenda.

*ITEM NOS. 28 AND 29 WERE HEARD AFTER ITEM NO. 39*

REAL

Commissioners, this takes us back to items 28 and 29.

Item 28, ET-23-400129, holdover use permits, fourth extension of time to commence the following: a High Impact Project, a recreational facility, a multi-function events arena, and incidental uses. Increased building height, retail sales and service, restaurants, on-premise consumption of alcohol, alcohol sales, beer and wine package only alcohol sales, liquor package only, outdoor live entertainment, personal services, salon and spa, a club - nightclub, food carts and booths, grocery store, kiosks, information, outdoor offices, a theater, Cineplex, outdoor dining, drinking and cooking, farmer's markets, arcade and motion picture production studio. Waivers of development standards for the following: reduce setback to a parking structure from a residential use. Waive the required landscaping when adjacent to a less intensive use. Permit a variety of outdoor, commercial retail uses not within a permanent enclosed building, and non-standard improvements, fences, walls, planters and landscaping, within the future right-of-way of Las Vegas Boulevard South. Design reviews for the following: a recreational facility, a multifunction events arena with ancillary uses, structures and overall site design, hotel, retail establishments, theater cineplex and parking structure on 27 acres in an H-1 (Limited Resort and Apartment) Zone. Generally located between Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue within Winchester.

And then Item 29, ET-23-400128, holdover use permits third extension of time to commence the following: modifications to an approved high impact project, All Net arena and convention facilities, exposition halls. Waivers of development standards for the following: reduced on-site parking and increased building height. Design reviews for the following: modifications to an approved High Impact Project, hotel tower and associated low-rise and mid-rise buildings and structures. Convention center facilities and all other accessory and incidental buildings and structures on 27 acres in an H-1 (Limited Resort and Apartment) Zone. Generally located between Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue within Winchester.

GIBSON

Good afternoon, Mister Kaempfer.

CHRIS KAEMPFER

Good afternoon.

GIBSON

One thing I would note, don't know how many people will want to offer comment, but to the extent that the comments are redundant and have already been provided to us, it's very easy to say, "I agree with what he said." Give us your name and we'll make sure that the record reflects all of that.

| SELEAGGIO | are removing any obstructions that need to be removed in order to do the grading. |
|---|---|
| KAEMPFER | Thank you. |
| GIBSON | Thank you. |
| SELEAGGIO | Thank you so much. Any questions? |
| KAEMPFER | Our next speaker, and I'll have them - anybody who's going to speak, I'll have them get a little closer here so we're not taking time. So, who's - Torben? Next up is Torben Welch. |
| TORBEN WELCH | Commissioners, good afternoon. My name is Torben Welch with Messner Reeves. Our firm serves as outside business council for the All Net project, primarily out of our Las Vegas office, which is headed up by Renee Finch and Jason Martinez. My role, I'm based in the Salt Lake City, Utah office. My role is financing and international financing side for the project and to help undertake that. And I know financing has been a big important part of this project and you've heard a lot about financing over the years, and in fact, in November when we came, we presented some financing that was in place and through a variety of fraudulent things that happened of no consequence or no fault of All Net or its partner, that turned into something different. So, the partners immediately pivoted and were able to secure financing for this project through assets that they had. That partner is Clearwater Premier Perpetual Master, LLC, and they're an equity partner in this project and they have secured financing on behalf of All Net and have provided $5 billion in an account, an offshore account for the purposes of building this project. |
| | For intents and purposes today, it's a collateral account, meaning that those funds can be utilized to collateralize projects and liens and loans. To fund this project, that is not a U.S.-based account simply because U.S. based accounts don't act as escrow agents and hold that kind of money, but we are in the process of opening up accounts through a tier one institution, HSBC U.S. Those accounts have been opened and HSBC U.K. is where that money will be stored as a collateral basis for a variety of other construction loans and construction lines of credit that we'll talk about a little bit later with some of the other partners that are here with McCann Commercial. |
| | So that financing is in place. It is available to be utilized to secure work on this project and this site, and that has been in place since September. Early September is when that account was funded, and we are working to get those mobilized and moved. That should happen, that will happen in advance of December 6th, so funds will be available to continue construction and get this project building. |
| | Now, that is just one part of the financing side. Like I said, there are additional construction loans and lines of credit that are on top of that. The purpose behind that is very important. Mister Robinson and the All Net team has been very clear that this is not to be a publicly financed project. There's not an ask for public financing here. The goal is to have this actually debt-free at the time that this project opens. So those funds that are in that account that will ultimately be utilized to satisfy a construction loan have been received, and approvals for that have been received that Mister Ed Perez will talk about here momentarily, so that when this project does |

| | |
|---|---|
| WELCH | open, there will be no debt on the project. There will be no public financing utilized for the project, and it can be profitable and beneficial from day one. |
| GIBSON | We have a question for you. |
| MARILYN K. KIRKPATRICK | I just want to ask a couple of questions because you're the finance guy. |
| WELCH | Yep, I am. |
| KIRKPATRICK | One, so then are you telling me that all your current construction invoices outstanding are paid up in full? |
| WELCH | That they're in the process of being paid. On the construction side where we haven't, obviously there's a Las Vegas Paving debt. We know that that needs to be done and needs to be paid in full, and as soon as we have the ability to get these funds in, which will happen before December 6th to be able to pay those, it's going to be through the line of credit, again, collateralizing those funds that are there and then have them released, all obligations will be paid in full. |
| KIRKPATRICK | And then let me ask the other question. Being that you guys have a project labor agreement, and you have folks out there, is there certified payroll that shows that they're being paid to their project labor agreements? |
| WELCH | Everybody working on the site today has been prepaid for their work, so to speak. I mean they have been paid in advance for work that's happened- |
| KIRKPATRICK | Prepaid, I never heard of that rule. How do you do that with the Labor Commissioner? |
| WELCH | How do we do that? Well, they've been paid - that portion of the contract that they are working on today has been paid in full, so they're working on payments that have already been paid. So, there will be no debt to the people that are working on site today. Are you talking about the contractors or are you talking about someone else? |
| KIRKPATRICK | Well, honestly, you boast about having a project labor agreement but yet - and then you have outstanding debt that you've got to get paid. |
| WELCH | Correct. |
| KIRKPATRICK | And then so I'm asking, one, are you complying with your own project labor agreement for those people that are out there today? And you're saying no that these people have been prepaid and there'll be no debt at the end of the day. |
| WELCH | Yeah, I'm not going to talk to the project labor agreement. That's not my area of expertise on that one. |
| KIRKPATRICK | I know, but you pay the bill so you should know if it's certified public - |
| WELCH | I raise the financing, and the financing we have is in place today to have people working on the site today, and there will be no debt obligation when they're done. |

| | |
|---|---|
| KIRKPATRICK | Okay, thank you. |
| WELCH | No mechanic lien from that. |
| ED PEREZ | Mister Chairman, members of the Commission, good afternoon. Ed Perez representing McMahon Capital. I'm here today to, as a former Commissioner myself, and I do appreciate this dais and the work that you put into the programs throughout Las Vegas. My background does stem from commissioning budget and financing, 1.6 billion for the City of Anaheim, Planning Commission for the Kennedy Commission on Housing, sub-utility commissions for the City of Anaheim, redevelopment agencies I've worked with over the past. And now segue into the finance, commercial bond financing and platform markets, my understanding and appreciation comes with hard work in programs of this caliber. I understand the process, I understand the tenure and the involvements that it takes. But today, I'm here. I believe my colleague, Michael Lanza, is on call. I believe he's set up for the Zoom call in case we have additional questions. But we are here facilitating the line of credit with our investor partners. We use our relationships with family office private equity and hedge funds. Our investor partner alone, one has over 34 years of proven track record with over $500 billion under management. Through our process, we're able to provide proof of funds when we work with our clientele.

At this time, we are here to make the commitment to Mister Robinson, which has been approved for $5 billion in funding and also for a letter of credit based on the channels with the HBSC Bank of the U.K. We are working with that instrument in play. We're here to support and ensure, moving forward within our timelines, to provide the support that this team needs. Many of our investors are appreciating the program. Through our program, we do appreciate the fact that it meets the economic benefit for the jobs, the creation, and the overall expansion of this project. So, with that in mind, I don't know if Mister Lanza is on the line or call. If staff or someone could channel him, we would appreciate that. |
| MICHAEL LANZA | Can you hear me? |
| GIBSON | We can hear you. |
| LANZA | Okay. |
| GIBSON | Your name is - state your name please, for the record. |
| LANZA | My first name is Michael. The last name is Lanza, spelled L-A-N-Z-A. I'm also with McMahon Capital. Ed and I have both worked on this project. As Torben alluded to, the funds, the $5 billion are in an account under Triple Dunks Management in Mexico, in a bank in Monterrey, Mexico. And forgive me if I mispronounce this, but I believe it's Fides is the bank. We partnered with one of our investor partners to provide Mr. Robinson a $750 million line of credit. Because of the fact of where the funds are domiciled, they did require him to establish an account with a tier one bank. He chose to use HSBC London, which was in agreement with our investor partner. He is in the process of setting that account up. The line of credit has been approved. Once the account is open, we will provide the |

| | |
|---|---|
| LANZA | investor partner with the information to verify real time that the account is open. The only other condition is to verify real time that the funds are still where they were domiciled when they were originally represented. |
| | Once those two things are accomplished, Mister Robinson will be made available the first a $100 million of a $750 million credit line, which will allow him to take care of his existing Las Vegas paving bill, and I believe there are some other small bills, some site work and some approvals that need to be renewed or something. I apologize. I don't have documents in front of me right now. Once the funds are moved from the Fides account into his HSBC London account and blocked in favor of the lender, the investor group that we're working with, then he will be made available the full $750 million. At that point, it would be his to use as he will. |
| | Part of the reason for using the line of credit was the landowner, Mister David Lowden, is looking to do a 1031 exchange, and he has not as of yet set that up. So, we had to avail Mister Robinson of some flexibility in reference to those funds. That's why we chose a credit line. Part of the conditions of the credit line will be to pay off the land purchase. Once the land purchase is actually completed, then we can issue our commitment on the construction loan, which will allow him to begin construction at his pace based upon the funding of the actual construction loan. The credit line will remain in place for the next five years guaranteed by $1.5 billion, block in favor of the lender in HSBC London. He will have the opportunity at the end of those five years to renew and reuse the line of credit if he chooses to. Otherwise, he can just pay it off. |
| | That's basically where we stand as far as the financing of both the credit line and the construction loan. If there are any questions, I'm more than happy to answer them. |
| GIBSON | Thank you, sir. |
| ROSS MILLER | One question, Mister Chairman. Could you please spell the name of the bank in Monterey, Mexico? I wasn't clear on that pronunciation. |
| LANZA | F as in Frank, I as in indigo, D as in Dominic, E as in Edward, S as in Sam. |
| GIBSON | Thank you very much. |
| LANZA | The reasoning behind going to the HSBC London, just so you understand, is the bank that the funds are in were where the funds landed when the funds were generated, but unfortunately, it is more of a regional bank. It's not necessarily what you'd call a tier one bank, and the investor group we partnered with had asked us to make sure that it would be moved to a tier one bank. Of course, their preference was HSBC London, and Mister Robinson, as diligently as he can, is in the process of establishing that account. As I said, once the account is open and can be real time verified and once the funds are verified at the same time, he will be made available an initial outlay of $100 million. Once the funds, the $1.5 billion, lands in the HSBC account and are blocked in favor of our investor group that we're working with, then he will be made available to full $750 million, which then in turn will allow him to purchase the land at a purchase price of $416 million. |
| GIBSON | Thank you very much. And thank you sir. |

PEREZ                              Chairman, thank you.

GIBSON                            Now, Mister Kaempfer, as you can tell, I'm treating this as presentation so we need to be as direct and move through this as fast as we possibly can. We understand you need to be thorough because there's a record here, but -

KAEMPFER                          I appreciate that and I will. I understand we have another gentleman on the line who would like to speak. I would like to let Commissioner Kirkpatrick know that I confirmed that this is in fact a union contractor who's working under an appropriate union contract. So anyway, who is it? Don Wright. Are you on the line, Don?

GIBSON                            What's the name?

KAEMPFER                          Don Wright.

GIBSON                            Like W-R-I-G-H-T?

KAEMPFER                          Yes.

DON WRIGHT                        That is correct.

KAEMPFER                          Don?

WRIGHT                            Can you hear me?

GIBSON                            Yes.

KAEMPFER                          Yes.

WRIGHT                            Okay. Thank you, Commissioners. My name is Don Wright. I'm Chairman and CEO of SIS or Special Intelligence Service. I've known Jackie, or Mister Robinson, for over ten years. We were asked in the past to come in by the U.S. State Department to see if we could help Jackie in a number of different ways, which we do all the time. We provide different types of physical security, fund security, background checks, cybersecurity, and all of that. And so, what we've done is also on the phone with me is Mister Vega. He's my Executive Vice President. We basically go out and make sure the funds are real. They are where they say they are. They're fungible. They're clean. There's no cartel activity or terrorist activity, and that's what we've done. We found in doing that that the $5 billion aforementioned is real. It is where it's supposed to be. It is clean money. As a consequence to that, they have set up the account at HSBC. They have made myself and Luis the mandate so that we can confirm all of that, so that we can set up accounts and sign paperwork in regards to that. Right now, we're in the process of working with them to get the account set up, and I would say that the HSBC account in U.S. is just that. The one that's happening that we're putting together in London, is - it's not an approval process, it's just a process of getting. That's already been done in the U.S. of getting the other account set up. It took a little bit longer because of the problems with the Israeli and all of the different protests going on over there, which I'm sure you've all seen, but it's well on the way now. Everything is scheduled to be done in less than two weeks or so, and once that account's done, the money should move within 48 hours. Luis-

| | |
|---|---|
| GIBSON | Sir, you have – you have documentation available to you that demonstrates what you have just said? |
| WRIGHT | Yes, I believe we do. |
| GIBSON | Okay. |
| WRIGHT | Luis if I could, Mister Vega is on the line as well. I actually put him in touch with the people to go ahead and confirm the funds. Luis? |
| LUIS VEGA | This is Luis - |
| GIBSON | Wait. Excuse me. What we've done here is we've extended the time so that those proofs might be made available to us, not among people that we don't know about. That kind of leaves us where we were a year ago. You're telling us that the money is available, and it is in various banks subject to various banking instruments. We've heard that kind of thing, and it sounds like this is a bit different in terms of its structure, and I am not really sure that we understand what that structure is. We don't need to know that. <br><br> What we really had hoped for is that with the additional time there would be money in accounts that are available for the applicant to then begin to pay things, and we're still hearing that the money's out there, but it is not under his control. It is under the control of others subject to activities that need to happen, and they can all happen in a two-week period. So, that's my - I'm exposing some concerns that I have, but I don't think we need to have another witness who orally can present his view that the money is all available and it's where it needs to be. We've heard that. We have no reason to question that. It's just not what we were hoping to see. |
| WRIGHT | Mister Chair? |
| GIBSON | Do you have others who are going to offer testimony, Mister Kaempfer? |
| WRIGHT | I think Torben has that paperwork Mister Chairman. The attorney. |
| GIBSON | Alright. Well, we would've liked to have seen it. Sir? |
| OWEN JACKSON | Thank you, Mister Commissioner. Owen Jackson. I'm here on behalf of the project, Mister Robinson. I am the liaison between the Department of Commerce, Minority Business Development Agency and the project, Dribble Dunk All Net. What I wanted to just let the Commissioners know is that, basically, this project is not just here in Las Vegas. The federal government is a big part of this also. As a liaison, I travel from Washington D.C., twice a month to come out, check on the project, and report back to the Department of Commerce on the written progress of how things are going. |
| GIBSON | Excuse me. Do you act as the agent for the Department of Commerce or are you with Mister Robinson? |
| JACKSON | No, I'm the liaison. I used to, well - |

| | |
|---|---|
| JACKSON | Commission has seen it fit to give us the go ahead to get this project going, I will be then accepting a position here and moving to Las Vegas to work with the project directly. But right now, I am just the liaison going back and forth between the two organizations. Thank you. |
| GIBSON | Thank you. |
| KAEMPFER | Mister Chairman, one more thing. Mister Welch has found the documents that were attached as part of the justification letter that I submitted to the County at the time we made the request for the extension, and I - |
| GIBSON | All right. Thank you. |
| KAEMPFER | I would call Mister Welch up again. |
| WELCH | Bank statement - |
| GIBSON | We need you to speak into the microphone, Mister Welch. |
| WELCH | Sorry, Commissioner. This is a bank statement evidencing the account number 810523602 that is in the name of Dribble Dunk. This is an account that is controlled entirely by Dribble Dunk. Mister Robinson is the sole controller over it and it's $5 billion. This was funded by their partner, Clearwater, on 8/25, and as we sit here today, it remains at that amount, $5 billion. It includes one transfer. This is accurate as of, I looked at the account this morning on the flight over. |
| GIBSON | Did you have a question you want to ask? Okay. Do you have anything further, Mister Kaempfer? |
| KAEMPFER | No, I believe that concludes our presentation. Again, I would like to say that this extension of time request just goes to December 6th. If on December 6th we haven't done what the Commissioner wants, then you're free to take whatever action you feel necessary. But at this point in time, grading is commenced, and we offer that financial information for your consideration. |
| GIBSON | Thank you. Does that complete the presentation? |
| KAEMPFER | I believe Mister Robinson may want to say something. |
| JACKIE ROBINSON | Thank you, Commissioners. We greatly appreciate the time and your consideration. |
| | I've been in this town since I've been 18 years old, and I've been fortunate enough to have my mentors be Steve Wynn and Irwin Molasky and Tony Marnell. I got my construction license up under Tony Marnell, Irwin Molasky. As you've seen when we had our last, I guess the meeting we had talking about our partners, this whole entire family was there, because they're just like family, because I've grown up with them. This town has raised me. And then Steve Wynn, I've even talked to on several different things, because I learned development from Steve Wynn. |
| | I just want to say that we understand and take everything that you say very, very seriously. I've been taught through those gentlemen to take care of your business |

Clark County Water Reclamation District (CCWRD)
> • Applicant is advised that a Point of Connection (POC) request has been completed for this project; to email sewerlocation@cleanwaterteam.com and reference POC Tracking #0260-2023 to obtain your POC exhibit; and that flow contributions exceeding CCWRD estimates may require another POC analysis.

**PUBLIC COMMENTS**

| | |
|---|---|
| GIBSON | Thank you. This is the time for the final public comment. Anyone who wishes to make public comment, please, is invited to come forward, state your name. There being no one, the public comment period is closed, and this meeting stands adjourned. Thank you. |

There being no further business to come before the Board at this time, at the hour of 3:34 p.m., the meeting was adjourned.

APPROVED:          \_\_/s/ James B. Gibson_____
                           JAMES B. GIBSON, CHAIR

ATTEST:            \_\_/s/ Lynn Marie Goya_____
                           LYNN MARIE GOYA, COUNTY CLERK

# EXHIBIT 15







# EXHIBIT 16

# MESSNER REEVES LLP

Torben M. Welch
rwelch@messner.com

TELEPHONE
(801) 683-2021

Licensed in CO, UT and NY

December 5, 2023

Re:     **Clearwater Premier Perpetual Master, LLC**
**Confirmation of Client Funds at FIDES Gestion**
**Financiera, S.A.P.I. de C.V.**

To Whom It May Concern:

We represent Clearwater Premier Perpetual Master, LLC and its principal and member, Todd A. Owen (collectively, our "Client"). The purpose of this communication is to provide to you with information related to our Client's funds held in FIDES Gestion Financiera, S.A.P.I. de C.V. ("FIDES"), a private banking office in Monterrey, Mexico, as well as a brief history of the same and confirmation that the funds are good, clean and clear from non-criminal business activities, so that you may advise our Client on how to best utilize the funds and the account.

Presently, our Client is the owner of Account No. ███████ at FIDES (the "Account"), in which Client's funds total approximately $57 billion (the "Funds") currently. A screenshot of the account information and balance is being simultaneously provide herewith. These Funds are the proceeds from the sale of certain bonds and bond rights to OCHO L.B., S.A. de CV ("OCHO"), which was completed on or about July 11, 2023 by deposit of the Funds into the Account by its affiliate, RC Global Holdings, LLC, a United States entity formed and controlled by OCHO's Texas based attorney Carlos A. Ryerson, Esq., which utilizes accounts at FIDES as well and facilitated the transaction. This transaction was facilitated by Mr. James Fontenet of Integrated Transport Services, a U.S. Department of Homeland Security contractor with applicable high-level clearances.

Documents relevant to the transaction are attached hereto and include the following:

(a)     Transfer Agreement of the Bonds to Client from Global infrastructure Finance & Development Authority, Inc. dated March 29, 2022;

(b)     Executed Purchase Order REV-BONDS-00001 from OCHO dated June 22, 2023;

(c)     Executed (by both parties) Invoice No. CPPM-23-6-001 dated July 10, 2023 (accepted on July 11, 2023);

(d)     Transfer Confirmation of the Funds into the Client account.

Information regarding FIDES and their background and ownership can be found on their website at http://fides.com.mx/. Our client is direct with the owner of FIDES, Mr. Javier Reyna, and its Director of Compliance.

65 East Wadsworth Park Drive, Suite 300, Draper, Utah 84020 Telephone: 801-623-2021

Page 2

Based upon the foregoing, we can confirm that the Account is active and under the control of our Client and the Funds located therein are good, unencumbered, clean and clear from non-criminal business activities.

Thank you for your attention.

Very truly yours,
MESSNER REEVES LLP

Torben M Welch

# EXHIBIT 17

# MESSNER REEVES LLP

DENVER, LAS VEGAS, ORANGE COUNTY, PHOENIX, SALT LAKE CITY, SILICON VALLEY, RENO, COLORADO SPRINGS, CHEYENNE, NEW YORK CITY

TORBEN M. WELCH
twelch@messner.com
Licensed in UT, CO & NY

DIRECT DIAL:
(801) 683-2021

December 26, 2023

BANK OF AMERICA
Attn:  Tara Foreman
2918 Little Road
Trinity, Florida 34655

Re:  3FR, LLC and SUPERIOR PAYMENTS, LLC

To Whom It May Concern:

We represent Titan Financial, LLC, a private family office ("Titan") with its own private banking server.  This confirms that 3FR, LLC ("3FR") owns and controls Account Number ▮▮▮▮▮▮▮▮▮▮▮ at Titan (the "Account"), which contains on ledger bank accounts, assets and funds within the Family Officer Server System at Titan.  We can attest that the Account consists in excess of $10 billion in cash (the "Funds").

The Account was funded from 3FR's partners, Clearwater Premiere Perpetual Master, LLC ("CPPM" collectively with 3FR, the "Partners").  The Partners funds consist of approximately $92 billion in cash and approximately $1.545 trillion of M00 "gold-backed" funds (the "Asset Base").  A provenance of the cash funds from our office is attached hereto for your review.  As noted, the funds are good, clear and clear.

The purpose of this communication is to identify the present transaction in the amount of Three Billion Six Hundred Million USD ($3,600,000,000.00) from the Funds to be delivered to Superior Payments, LLC's accounts.

For information purposes, the Partners transferred a portion of Assets from their own on ledger funds at FIDES Gestion Financiera, S.A.P.I. de C.V. ("FIDES") via "Hard Copy MT-103 Format" through our office to Titan.  The document, which is attached, is signed by the FIDES bank officer, Mr. Javier Reyna, and the undersigned as counsel for FIDES.

The Funds have been credited to the 3FR Account and the funds are ready to move immediately.  The movement will follow the same "Hard Copy MT-103 Format" process with the Titan bank officer, Mr. Mark DeWitt, executing the same and delivering via digital email transmission followed by courier to 3FR's bank account.  We can confirm that the Funds are clear, good and free from criminal origin.

65 East Wadsworth Park Drive | Suite 110 | Draper, UT 84020 | 303 623 1800 *main* | 303 623 0552 *fax*

Additional documentation related to the Funds are attached here for reference.

If you have any questions, please contact me to discuss.

Very truly yours,

MESSNER REEVES LLP

Torben M. Welch

cc:  client

## SINGLE CUSTOMER CREDIT TRANSFER

**FROM:**

| | |
|---|---|
| INSTITUTION NAME | : TITAN FINANCIAL, LLC |
| BUSINESS ADDRESS | : 30 NORTH GOULD STREET, SUITE N, SHERIDAN, WYOMING 82801 USA |
| ACCOUNT NAME | : AVRANOC LLC |
| ACCOUNT NO. | ██████ |
| OFFICER NAME | : Mark DeWitt |
| PHONE | : +1 858-212-7054 |
| E-MAIL ADDRESS | : ████ @titanprivatebank.com |

**TO:**

| | |
|---|---|
| BANK NAME | : JP MORGAN CHASE BANK, N.A. |
| BANK ADDRESS | : 270 PARK AVENUE 31ST FLOOR, NEW YORK, NEW YORK 10017 |
| ACCOUNT NAME | : AVRANOC, LLC |
| ACCOUNT NUMBER | ██████ |
| SWIFT | : ██████ |
| BANK OFFICER NAME | : MICHAEL MARASCO |
| BANK OFFICER E-MAIL | : ██████ @CHASE.COM |
| BANK OFFICER PHONE | : 704-339-6847 |

------ MESSAGE TEXT ------

TRANSACTION CODE: ██████

DESCRIPTION: TRANSFER OF VALUE HELD AT TITAN FINANCIAL HOLDINGS, LLC, IN ACCOUNT OF AVRANOC, LLC.

WITH FULL FINANCIAL AND LEGAL RESPONSIBILITY, WE, TITAN FINANCIAL, LLC, AND AVRANOC, LLC WITH ACCOUNT NUMBER ██████ HEREBY PRESENT THIS UNCONDITIONAL, IRREVOCABLE, ASSIGNABLE, TRANSFERABLE AND CALLABLE SINGLE CUSTOMER CREDIT TRANSFER BACKED BY CASH. AS PER UNIFORM COMMERCIAL CODE OF TEXAS USA (APPLICABLE TO AVRANOC, LLC) AND AS PER ENGLISH COMMON LAW (CONSTITUTIONALLY DECLARED IN 1836 TO BE THE AUTHORITY IN THE REPUBLIC OF TEXAS, APPLICABLE TO AVRANOC, LLC) AND AS PER LAWS OF WYOMING (APPLICABLE TO TITAN FINANCIAL, LLC) AND AS PER UN UNCITRAL CONVENTION (APPLICABLE TO INTERNATIONAL TRADE), IN FAVOR OF JP MORGAN CHASE BANK, NA THE AMOUNT OF FOUR HUNDRED FIFTY MILLION ($450,000,000.00) UNITED STATES DOLLARS.

WE HEREBY CONFIRM WITH OUR FULL BANK AUTHORITY THAT THESE FUNDS ARE GOOD, CLEAN AND CLEAR, FREE OF ANY LEVY OR ENCUMBRANCES, AND LEGALLY OBTAINED BY NON-CRIMINAL BUSINESS ACTIVITY. THIS IRREVOCABLE SINGLE CUSTOMER CREDIT TRANSFER IS BINDING, AND PAYMENT IN CASH MAY BE DEMANDED IMMEDIATELY. WE CONFIRM THAT PAYMENT MUST BE RELEASED IMMEDIATELY, WITH SAME DAY CREDIT AND VALUE, THIS CREDIT TRANSFER IS VALID FOR PAYMENT ON THE SAME DAY OF DIGITAL RECEIPT, DELIVERED VIA BANK TO BANK DIGITAL DELIVERY (EMAIL), THE HARD COPY ORIGINAL WILL BE FORWARDED VIA BONDED COURIER ON THE SAME DAY OF DIGITAL DELIVERY.

THIS, MT103 IS AN OPERATIVE INSTRUMENT FOR TITAN FINANCIAL, LLC AND AVRANOC, LLC, PROVIDED WITH FULL LEGAL AND FINANCIAL RESPONSIBILITY BY TITAN FINANCIAL, LLC AND AVRANOC, LLC, SUBJECT TO INTERNATIONAL REMITTANCE REGULATIONS SUBORDINATE TO AND SUBJECT TO LAWS AS INDICATED HEREIN, WHICH OPERATIVE INSTRUMENT IS PROVIDED VIA NORMAL BANK TO BANK EMAIL TO THE RECEIVING BANK OFFICER, FROM THE SENDING BANK OFFICER AND FOLLOWED BY THE ORIGINAL HARD COPY SENT VIA REGISTERED BONDED COURIER SERVICE TO RECEIVING BANK OFFICER.

FUNDS ARE CLEAN AND OF NON-CRIMINAL ORIGIN AND ARE AVAILABLE FOR SAME DAY TRANSFER AND IMMEDIATE CREDIT.

NOTE: THE REMITTER (AVRANOC, LLC) IS KNOWN TO US AND IN GOOD STANDING. THE WITHIN TRANSACTION IS DONE WITH FULL BANKING RESPONSIBILITY AND TITAN FINANCIAL, LLC IS SATISFIED AS TO THE SOURCE OF FUNDS SENT TO IT.

PLEASE ADVISE THE BENEFICIARY OF THIS CASH TRANSFER OF FUNDS VIA MANUAL DEPOSIT MT103, AND IT IS VALID FOR PAYMENT UPON RECEIPT.

FOR AND ON BEHALF OF TITAN FINANCIAL, LLC AND AVRANOC, LLC:

AUTHORIZED SIGNATORY:
MARK DEWITT

TITAN FINANCIAL, LLC
OFFICER

AUTHORIZED SIGNATORY:
TORBEN M. WELCH, ESQ.

ATTORNEY AT LAW, UT Bar Reg. No. 16248

Date: December 26, 2023

## SINGLE CUSTOMER CREDIT TRANSFER

FROM:
INSTITUTION NAME     : FIDES GESTION FINANCIERA, S.A.P.I. DE C.V.
BUSINESS ADDRESS     : ANGEL MARTINEZ VILLARREAL #637, COLONIA CHEPEVERA, MONTERREY, NL. 64030, MEXICO
ACCOUNT NAME         : 3FR, LLC.
ACCOUNT NO.          : ███████
OFFICER NAME         : TORBEN M. WELCH, ESQ.
PHONE/FAX NO.        : +1 801-683-2021
E-MAIL ADDRESS       : TWELCH@MESSNER.COM


TO:
BANK NAME            . TITAN FINANCIAL HOLDINGS, LLC
BANK ADDRESS         . 30 NORTH GOULD STREET, SUITE N, SHERIDAN, WYOMING 82801 USA
ACCOUNT NAME         : 3F.R., LLC
ACCOUNT NUMBER       : ███████
SWIFT                : N/A
BANK OFFICER NAME    : MARK DEWITT
BANK OFFICER E-MAIL  : ███████@titanprivatebank.com
BANK OFFICER PHONE   : 858-212-7054

———————————————————————————— MESSAGE TEXT ————————————

TRANSACTION CODE: ███████████████
REFERENCE CODE: ████████████████
DESCRIPTION: TRANSFER OF VALUE HELD AT FIDES GESTION FINANCIERA, S.A.P.I. DE C.V., IN ACCOUNT OF 3FR, LLC

WITH FULL FINANCIAL AND LEGAL RESPONSIBILITY, WE, FIDES GESTION FINANCIERA, S.A.P.I. DE C.V., AND 3FR, LLC. WITH ACCOUNT NUMBER ███████ HEREBY PRESENT THIS UNCONDITIONAL, IRREVOCABLE, ASSIGNABLE, TRANSFERABLE AND CALLABLE SINGLE CUSTOMER CREDIT TRANSFER BACKED BY CASH, AS PER UNIFORM COMMERCIAL CODE OF TEXAS USA (APPLICABLE TO 3FR, LLC) AND AS PER ENGLISH COMMON LAW (CONSTITUTIONALLY DECLARED IN 1836 TO BE THE AUTHORITY IN THE REPUBLIC OF TEXAS, APPLICABLE TO 3FR, LLC) AND AS PER LAWS OF MEXICO (APPLICABLE TO FIDES GESTION FINANCIERA, S.A.P.I. DE C.V.) AND AS PER UN UNCITRAL CONVENTION (APPLICABLE TO INTERNATIONAL TRADE), IN FAVOR OF TITAN FINANCIAL HOLDINGS THE AMOUNT OF SIX HUNDRED FORTY-FIVE BILLION ($645,000,000,000.00) UNITED STATES DOLLARS.

WE HEREBY CONFIRM WITH OUR FULL BANK AUTHORITY THAT THESE FUNDS ARE GOOD, CLEAN AND CLEAR, FREE OF ANY LEVY OR ENCUMBRANCES, AND LEGALLY OBTAINED BY NON-CRIMINAL BUSINESS ACTIVITY. THIS IRREVOCABLE SINGLE CUSTOMER CREDIT TRANSFER IS BINDING, AND PAYMENT IN CASH MAY BE DEMANDED IMMEDIATELY. WE CONFIRM THAT PAYMENT MUST BE RELEASED IMMEDIATELY, WITH SAME DAY CREDIT AND VALUE, THIS CREDIT TRANSFER IS VALID FOR PAYMENT ON THE SAME DAY OF DIGITAL RECEIPT, DELIVERED VIA BANK TO BANK DIGITAL DELIVERY (EMAIL), THE HARD COPY ORIGINAL WILL BE FORWARDED VIA BONDED COURIER ON THE SAME DAY OF DIGITAL DELIVERY.

THIS, MT103 IS AN OPERATIVE INSTRUMENT FOR FIDES GESTION FINANCIERA S.A.P.I. DE C.V. AND 3FR LLC, PROVIDED WITH FULL LEGAL AND FINANCIAL RESPONSIBILITY BY FIDES GESTION FINANCIERA, S.A.P.I. DE C.V. AND BY RC GLOBAL HOLDINGS LLC., SUBJECT TO INTERNATIONAL REMITTANCE REGULATIONS SUBORDINATE TO AND SUBJECT TO LAWS AS INDICATED HEREIN, WHICH OPERATIVE INSTRUMENT IS PROVIDED VIA NORMAL BANK TO BANK EMAIL TO THE RECEIVING BANK OFFICER, FROM THE SENDING BANK OFFICER AND FOLLOWED BY THE ORIGINAL HARD COPY SENT VIA REGISTERED BONDED COURIER SERVICE TO RECEIVING BANK OFFICER.

PLEASE ADVISE THE BENEFICIARY OF THIS CASH TRANSFER OF FUNDS VIA MANUAL DEPOSIT MT103, AND IT IS VALID FOR PAYMENT UPON RECEIPT.

FOR AND ON BEHALF FIDES GESTION FINANCIERA S.A.P.I. DE C.V. AND 3FR, LLC.:

AUTHORIZED SIGNATORY:          AUTHORIZED SIGNATORY:
JAVIER REYNA LARA              TORBEN M. WELCH, ESQ.



FIDES GESTION FINANCIERA       ATTORNEY AT LAW, UT Bar Reg. No.        Date: December 13, 2023
S.A.P.I. DE C.V. OFFICER – 122870L



# EXHIBIT 18

| | |
|---|---|
| **From:** | Torben Welch |
| **To:** | Kenneth E. Chase |
| **Cc:** | Craig Boddington; Jason C Aufdermaur |
| **Subject:** | RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC |
| **Date:** | Thursday, January 25, 2024 5:24:18 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | MessnerReeves__01_25_2024-13_53[1].pdf |

Mr. Chase:

We have received your letter.  Please note that while we understand your client's timing, the timing is as noted under the contract.  That is not to say that the funds will not be released prior to the 90 day period, but there are some additional items to resolve as predicated by the contract.  This makes delivery under the deadline given not realistic, however, our clients are working to ensure a release of funds very quickly and will have more information on that tomorrow.  We'll reach out once that is received.  In the meantime, the funds remain part of the escrow under our control at Titan Financial, LLC – a copy of that statement evidencing the same is attached hereto as of today's date (please note that your clients $700k is co-mingled with other funds).

Thanks,


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020


**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Wednesday, January 24, 2024 11:28 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Jim Smith <jsmith@messner.com>; Craig Boddington <craig@theinbegroup.com>
**Subject:** RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC

**[ EXTERNAL EMAIL ]**

Please see attached.  As stated in the letter, please provide written confirmation and a Fed Reference number within one business day confirming the return of the $700,000.


**Kenneth E. Chase**
Chase Law & Associates, P.A.

t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, December 1, 2023 6:19 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>
**Cc:** Jim Smith <jsmith@messner.com>; Craig Boddington <craig@theinbegroup.com>
**Subject:** RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC

Mr. Chase – please see attached communication.  As the Firm is not a party to the agreement, there are pre-requisites required to return the ICA.  If INBE has not funded the BELOC (which is your first request), then please the attached for steps to take to begin the ICA return process.

Thanks,

**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Tuesday, November 21, 2023 1:04 PM
**To:** Torben Welch <twelch@messner.com>; Caleb Meyer <cmeyer@messner.com>; Jim Smith <jsmith@messner.com>; Max Harker <mharker@messner.com>
**Subject:** December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer,

LLC or Return $700,000 to Emerald Consulting Partners LLC

**[ EXTERNAL EMAIL ]**

---

November 21, 2023

Torben Welch, Caleb Meyer
Jim Smith, Max Harker
Messner Reeves LLP
65 East Wadsworth Park Drive, Suite 300
Draper, UT 84020

*Via Fedex and email to* [twelch@messner.com](mailto:twelch@messner.com), [cmeyer@messner.com](mailto:cmeyer@messner.com), [jsmith@messner.com](mailto:jsmith@messner.com), *and* [mharker@messner.com](mailto:mharker@messner.com)

> Re:    *December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 Litigation Hold Notice*

Dear Mr. Welsh, Mr. Meyer, Mr. Smith, and Mr. Harker:

I am counsel for Emerald Consulting Partners LLC. I understand that your firm is holding $700,000 of my client's funds ostensibly on behalf of your client, INBE Capital LLC and that the Business Expansion Line of Credit for Hard AF Seltzer, LLC has not funded. This is unacceptable.

### Final Demand for Prompt Funding of Business Expansion Line of Credit to Hard AF Seltzer, LLC or Return of $700,000 by December 1, 2023

By December 1, 2023, the Business Expansion Line of Credit to Hard AF Seltzer, LLC must fund or my client's $700,000 must be returned. In the absence of compliance, my client will file suit against your firm.

### Litigation Hold Notice

Each recipient of this letter is identified as a party likely to possess, control, or have access to discoverable evidence pursuant to forthcoming litigation. Parties likely to have discoverable evidence are under a legal duty to maintain, preserve, retain, protect, and not destroy any documents or data, both electronic and hard copy, that may be relevant to any claims in litigation. Any failure to preserve and retain the electronic data and evidence outlined in this notice may constitute spoliation of evidence which may have serious consequences. This notice applies to you, as well as any of your agents, employees, affiliates, or assigns. This litigation hold notice also pertains to documents or communications pursuant to which you, or your client, may later attempt to assert a privilege.

You should anticipate that certain electronically stored information ("ESI"), including but not limited to emails, text messages, spreadsheets and databases, will be sought in the native form or

forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, you must retain and preserve all electronic devices containing the ESI, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means. It is requested that you immediately identify and modify or suspend features of any information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. You must refrain from deleting any potentially relevant emails, text messages, or other communications. This letter applies to all electronic devices, including but not limited to office workstations and servers and any home or portable systems that may contain potentially relevant data, including smart phones, tablets, laptop computers, and desktop computers.

### **Demand for Certification of Compliance**

We intend to work with you for confirmation of acceptable protocols and procedures for forensically sound preservation and we can supply a suitable protocol if you furnish an inventory of the systems, electronic devices, and media to be preserved. Upon the commencement of discovery, we will request a prompt disclosure of the preservation protocols that you have employed. Please immediately certify in writing your intent to comply in return correspondence.

Very truly yours,

Kenneth E. Chase

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 19

01/25/2024 15:00                    Titan Private Bank Specific Account Report



**USER DETAILS**

| | |
|---|---|
| COMPANY NAME | Messner Reeves, LTD |
| USERNAME | Messner |
| FULL NAME | Messner Reeves LTD |
| MAILING ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |
| PHYSICAL ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |

**ACCOUNT DETAILS**

| | |
|---|---|
| NUMBER | ▇▇▇▇▇▇ |
| TYPE | IOLTA |
| CURRENCY | USD |
| AVAILABLE BALANCE | 10,300,000.00 |
| CURRENT BALANCE | 10,300,000.00 |
| STATUS | Active |

| Date | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| 01/25/2024 14:52 | 73 | TBU/Messner Reeves Account | 10,300,000.00 | 10,300,000.00 |

Titan Private Bank, LLC

# EXHIBIT 20

# MESSNER REEVES LLP

Torben M. Welch
twelch@messner.com

TELEPHONE
(801) 683-2021

Licensed in CO, UT and NY

February 15, 2024

RE: Status of release of funds related to INBE Capital, LLC obligations

Greetings all:

As I believe all of you are aware, we have been working toward release of the ICA funds to you in a timely manner as required under Agreement with INBE Capital, LLC.  These funds have, and continue to be, under the control of our firm and are held in a firm trust account at the delivery institution, Titan Financial, LLC.

Movement of the funds from Titan Financial, LLC requires use of a correspondent bank. We are working with JP Morgan Chase and the Chase Treasury Department to facilitate that aspect of the funds transfer, including the applicable access and confirmation codes.  We should have that approved and funds moving very shortly.

When received, the funds will be used solely for remittance under the Agreement.  We anticipate being able to clear up the INBE Capital ICA amounts within a couple days of access. We understand that many of you have been speaking with Martin Hale and Jason Aufdermaur on these matters. We are in regular communication with Jason, and he with Martin.  We will inform them immediately upon fund receipt and they can then inform each of you and we can begin the process of transferring funds accordingly.

Sincerely,

MESSNER REEVES LLP

Torben M Welch

65 East Wadsworth Park Drive, Suite 300, Draper, Utah 84020 Telephone:  801-623-2021

# EXHIBIT 21

Case No. 1:26-cv-01707-KAS   Document 28-1   filed 06/25/26   USDC Colorado   pg 117 of 833

11/19/24, 2:13 PM                Messner Reeves LLP Issues Statement Regarding Emerald Consulting Partners LLC Lawsuit - Messner Reeves LLP



# Messner Reeves LLP Issues Statement Regarding Emerald Consulting Partners LLC Lawsuit

Messner Reeves LLP
Feb 22nd, 2024
Announcements

DENVER, COLORADO, USA, February 22, 2024 /messner.com/ — Messner Reeves LLP is an award-winning business law firm with eleven locations across the United States. As premier business attorneys and litigators, the firm has supported its clients in various industries and capacities for nearly three decades.

Messner Reeves LLP deeply values its reputation for excellence and, therefore, issues this statement in response to the Emerald Consulting Partners LLC lawsuit. At no time have the funds at issue in the lawsuit disappeared or become lost. The legal requirements regarding the return of the funds have not been satisfied, and the firm is legally prohibited from releasing the money at issue. The Plaintiff is aware of these circumstances, yet has falsely alleged otherwise. Messner Reeves LLP is preparing a vigorous defense to the lawsuit and will pursue all available remedies allowed by law.

## Recent News

November 15, 2024 • Compliance Alert

### Corporate Transparency Act: Information and Deadlines Regarding BOI Reporting

November 12, 2024 • Announcements, Awards and Accolades

### Messner Reeves LLP Named in 2025 Edition of U.S. News – Best Lawyers® "Best Law Firms"

November 7, 2024 • Articles

Accessibility

# EXHIBIT 22

Alyson Foster (14877)
BJORKMAN DEMPSEY FOSTER PLLC
714 West State Street
Boise, ID 83702
Telephone: (208) 401-9533
Email: afoster@bdfcounsel.com

*Attorney for Plaintiff Konala LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| KONALA, LLC, an Idaho limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>MESSNER REEVES LLP, a Colorado limited liability partnership; and INBE CAPITAL LLC, a Wyoming limited liability company,<br><br>        Defendants. | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case No.: 2:24-cv-00195-HCN<br><br>District Judge Howard C. Nielson, Jr. |

Plaintiff Konala LLC ("Konala") brings this action against Defendants Messner Reeves LLP ("Messner") and INBE Capital LLC ("INBE"), stating as follows:

**PARTIES**

1. Plaintiff Konala LLC is an Idaho limited liability company with a principal place of business in Post Falls, Idaho. Konala LLC's sole member resides in Idaho.

2. Defendant Messner is a Colorado limited liability partnership of 129 attorneys. Messner has offices in Utah, Wyoming, Colorado, Nevada, California, Arizona, and New York. Messner's Utah office is located at 65 East Wadsworth Park Drive, Suite 110, Draper, Utah. Three Messner partners are licensed to practice in Utah and do practice in or out of the Utah

COMPLAINT – 1

office; and two of those partners reside in Utah. On information and belief, none of Messner's

partners resides in Idaho.

3.      Defendant INBE is a Wyoming limited liability company with a principal place of

business at 30 N. Gould Street, Sheridan, Wyoming. On information and belief, none of INBE's

members resides in Idaho.

## JURISDICTION AND VENUE

4.      Defendant Messner is subject to general personal jurisdiction in Utah because

Messner's contacts with this forum state, including the practice of law in Utah and operation of a

Draper, Utah law office, are continuous and pervasive such that it is fair to subject Messner to

personal jurisdiction in Utah for all purposes.

5.      Defendant INBE is subject to specific personal jurisdiction in Utah because, on

information and belief, INBE purposefully availed itself of the forum state's benefits and this

controversy is related to or arises out of INBE's contacts with the forum state as it relates to its

relationship with and actions involving Messner, and the exercise of personal jurisdiction over

INBE would comport with fair play and substantial justice.

6.      Diversity jurisdiction exists under 28 U.S.C. § 1332(a).

a.      The parties are citizens of different states. Plaintiff is an LLC with a single

member, who resides in and is a citizen of Idaho. Messner is a limited liability

partnership with 129 partners, none of whom, on information and belief, resides in or

otherwise is a citizen of Idaho. INBE is a limited liability company located and organized

in Wyoming. On information and belief, none of INBE's members resides in Idaho. Thus,

the parties' citizenship is diverse under 28 U.S.C. § 1332(a)(1).

b.      The amount in controversy exceeds $75,000.00.

COMPLAINT – 2

7.      Venue is appropriate in this court under 18 U.S.C. § 1391 because one of the attorneys involved in the underlying facts resides and practices in Utah and performed services in Utah that led to the claims in this case; and because one of the defendants is a resident and citizen of Utah doing business in Utah.

## FACTUAL ALLEGATIONS

8.      Plaintiff is a quick service restaurant (QSR) that offers healthy food through a convenient drive through-only model.

9.      Defendant Messner is a law firm with 129 attorneys with 20 practice groups in 11 offices, including banking and financial services from its Utah office.

10.      Defendant INBE is a venture capital lender and investor.

11.      In anticipation of the significant growth in the healthy QSR industry, Konala franchised its business model. In 2023, Konala was seeking funding to facilitate its franchising opportunities and support its growth.

12.      INBE offered Konala its business expansion line of credit ("BELOC") to open a new location.

13.      On July 31, 2023, Konala and INBE entered into the BELOC Agreement (the "Agreement"). As generally reflected in the Agreement, INBE agreed to provide Konala a business line of credit for the total amount of one million three hundred thousand dollars ($1,300,000.00), payable in three separate tranches over the course of two hundred and ten (210) days: the first tranche was payable in ninety (90) days; the second tranche was payable sixty (60) days thereafter; and the third tranche was payable sixty (60) days after the second tranche. The Agreement refers to these tranche disbursements as "Advances."

COMPLAINT – 3

14.     Pursuant to Exhibit C of the Agreement, the BELOC was secured by the assets of Konala.

15.     INBE expressly "represented and warranted" its ability to fund the BELOC per Section 10.12 of the Agreement, entitled "Lender's Ability to Fund": "Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC [line of credit] in the full amount of the Maximum Amount."

16.     INBE also confirmed that it "covenants and agrees that it shall fully and timely fund" the BELOC.

17.     In Exhibit F to the Agreement, INBE stated that Konala should expect regular communication with INBE and ongoing open access to its appointed INBE representatives.

18.     Prior to receipt of the Advances, pursuant to Section 3.6 and Exhibit F of the Agreement, Konala agreed to deposit three hundred thousand and twenty-five dollars ($325,000.00) to INBE's interest credit account ("ICA") through wire transfer to a financial account held by Messner, i.e., "Messner Reeves LLP – COLTAF Paymaster." (COLTAF refers to the Colorado Lawyer Trust Account Foundation, which administers Colorado's Interest on Lawyers' Trust Accounts (IOLTA) program.) Exhibit F contained Messner's bank account information at Northern Trust Company, with a specific account number, and confirmed that the ICA Payment was to be in "Trustee [Messner]'s sole possession and control." Such funds were not to be collateralized in any manner with any funds other than the ICA Payment.

19.     Messner was the "nominated Trustee (Attorney)" appointed by INBE to receive and hold the ICA Payment.

20.     By accepting the ICA Payment, Messner became an escrow holder.

COMPLAINT – 4

21.     Messner agreed to, consented to, approved, and ratified the escrow agreement, as applied to Plaintiff as discussed herein, and Messner undertook the duties and responsibilities of an escrow holder.

22.     As an agent to both INBE and Konala, Messner had a fiduciary duty to exercise reasonable skill and ordinary diligence in holding and disbursing funds which came into its hands by virtue of its status as escrow agent.

23.     A termination provision in Section 13.7 of the Agreement allowed Konala to terminate should INBE fail to make the Advances, at which point INBE would refund the ICA Payment in its entirety and release all security interests granted by Konala to INBE.

24.     Exhibit F to the Agreement likewise provided that if INBE was unable to fund the Advances under the Agreement, INBE contractually agreed to reimburse Konala the amount of the ICA Payment. Under Exhibit F, INBE was to use its best efforts, including legal efforts, to recover the ICA Payment should Messner fail to return the ICA Payment. However, Exhibit F further provided that should Messner fail to return the ICA Payment, INBE was to itself reimburse the full amount of the ICA Payment to Konala within 90 days.

25.     Konala moved forward with plans to expand its franchise and open a new location, relying on the Agreement and INBE's promise to provide the BELOC.

26.     On August 1, 2023, Konala directed its ICA Payment be wired to Messner, as INBE's Trustee, pursuant to Section 3.6 and Exhibit F of the Agreement. On August 3, 2023, INBE confirmed receipt of Konala's ICA Payment.

27.     Over the course of the following months, Konala met all other conditions precedent required by the Agreement to receive INBE's disbursement of the first Advance. Thus,

COMPLAINT – 5

according to Section 7.1 of the Agreement, INBE was obligated to pay the first Advance to Konala on or around November 1, 2023.

28.    In reliance on the Agreement and INBE's promises, Konala prepared to launch another location for its franchise. Among other things, Konala engaged architects, contractors, and other professionals to start the construction phase of its business expansion. Konala expended significant sums as it moved forward with the franchise launch. Konala anticipated this new location would generate revenue streams in excess of one-million dollars ($1,000,000) per year, similar to the revenue generation at its other locations.

29.    Notwithstanding its contractual obligations and promises, INBE never made the first Advance, or any other Advances, to Konala as required by the Agreement.

30.    INBE never responded to Konala's repeated requests for information or otherwise responded in any way to Konala's several attempts to communicate or correspond with it and has not communicated with Konala since at least November 1, 2023.

31.    On information and belief, at the time INBE made promises to Konala and entered the Agreement with Konala, INBE did not have—and still does not have—the financial ability or wherewithal to fund any part, much less the entire amount, of Konala's line of credit as required by Section 10.12 of the Agreement. Yet INBE made representations and warranties to Konala that INBE did have the financial ability to fund the BELOC; Konala did not know, and had no reason to believe, that INBE actually lacked such financial wherewithal.

32.    Contrary to its representations in Exhibit F, INBO has failed to provide Konala with regular communication with INBE and ongoing open access to its appointed INBE representatives.

COMPLAINT – 6

33.     Due to INBE's breaches and ongoing silence, and to hedge against any further loss, Konala had no choice but to terminate the Agreement. On December 8, 2023, Konala delivered to INBE written notice of termination in the form and manner required by Section 13.7 and Exhibit E of the Agreement. INBE received the notarized termination letter on December 11, 2023.

34.     Pursuant to the termination clause of Section 13.7, INBE had ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Konala. Likewise, under Exhibit F, INBE had ninety (90) calendar days to reimburse the full amount of the ICA Payment to Konala if Messner was unwilling or unable to return the funds.

35.     INBE thus had until March 10, 2024, to return the ICA Payment or otherwise reimburse the full amount of the ICA and release any security interests. As of the date of the filing of this Complaint, the ICA Payment has not been returned and INBE has failed to release its security interests in the property of Konala.

36.     On February 15, 2024, Konala made demand upon Messner for return of the ICA Payment that it was holding as Trustee. When Messner failed to respond, Konala continued to ask Messner for the return. Messner still has not responded to the demand or additional communications by Konala, and has not returned the ICA Payment.

37.     On information and belief, the ICA Payment is not being held in Messner's sole possession and control as represented and required. Rather, on information and belief, Messner transferred the ICA payment to another, unknown party and the ICA Payment has been improperly comingled with other funds.

COMPLAINT – 7

38.     Because of INBE's and Messner's breaches and failures, Konala was unable to open its planned new franchise location, has lost significant profits, and has incurred significant expenses.

39.     Messner and INBE continue in their failure to return Plaintiff's $325,000 in escrow which Messner received seven months ago.

40.     Messner and INBE are in default.

41.     Exhibit A (Promissory Note) of the Agreement provides that if "[Konala] or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between [Konala] and [INBE], then this Note shall be in default," for which the Default Rate of Interest is 24%. Furth4er, "[u]ntil cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed."

42.     Messner and INBE owe Plaintiff's attorney fees. The Agreement contains a fee shifting provision, which is bilaterally applied.

43.     Plaintiff has been forced to engage counsel and has agreed to pay them reasonable attorney fees.

## COUNT ONE – BREACH OF CONTRACT
### (Against INBE)

44.     Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

45.     A valid and binding contract between Plaintiff and INBE exists as set forth in the Business Expansion Line of Credit Agreement and its Exhibits, dated July 31, 2023.

COMPLAINT – 8

46.    Plaintiff fulfilled all conditions precedent for the funding of the BELOC, including making the ICA Payment to Messner.

47.    INBE failed to fund the BELOC, contrary to its agreement to do so and its warranties and representations that it has the financial ability and wherewithal to do so.

48.    Because INBE did not fund the BELOC and because Plaintiff delivered a Termination in the form and manner required by the Agreement, the Agreement required INBE to effectuate the return of the $325,000 ICA Payment to Plaintiff, to release all security interests by March 10, 2024, and to terminate any obligations that Plaintiff may owe.

49.    Moreover, INBE pledged that "in the event [INBE] is unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days."

50.    INBE has failed to effectuate the return of the ICA Payment, whether from Messner or through its own means.

51.    INBE pledged that it would provide regular communication with Konala and ongoing open access to Konala's appointed INBE representatives.

52.    INBE has failed to communicate with Konala since at least November 1, 2023.

53.    Plaintiff has performed all its contractual obligations.

54.    All conditions precedent occurred or have been waived.

55.    INBE breached the contract by failing to fund the BELOC.

56.    INBE breached the contract by failing to communicate with Konala.

57.    INBE breached the contract by failing to effectuate the return of the $325,000 ICA Payment within 90 days of its failure to fund the BELOC and/or within 90 days of the

COMPLAINT – 9

termination of the contract by Plaintiff for INBE's failure to fund the BELOC and/or after

Messner's failure to return the ICA Payment.

58.    INBE breached the contract by failing to release all security interests within 90

days of the termination of the contract by Plaintiff for INBE's failure to fund the BELOC and to

terminate any and all obligations that may be owed by Plaintiff under the BELOC.

59.    INBE's breach of contract caused the damages Plaintiff sustained.

60.    Plaintiff has sustained damages of $325,000.

61.    Plaintiff has also sustained incidental and consequential damages.

62.    Plaintiff is entitled to recover costs and prejudgment interest.

63.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825,

which governs fee-shifting in cases where the defense was without merit and not brought or

asserted in good faith.

64.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826,

which allows fee and cost-shifting to a prevailing party in an action based upon written contract

when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement

includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms

of, among other things, the BELOC.

### COUNT TWO – BREACH OF CONTRACT
**(Against Messner)**

65.    Plaintiff incorporates by reference all prior allegations of this Complaint as if

fully set out herein.

66.    A valid and binding contract between Plaintiff and Messner exists whereby

Messner is an escrow holder and Messner is obligated to comply with the instructions of the

parties privy to the escrow agreement.

COMPLAINT – 10

67.    An escrow holder's failure to comply with the escrow agreement renders the escrow holder liable to the parties for breach of contract.

68.    Upon the escrow holder's breach of an instruction that it has contracted to perform or an implied promise arising out of the agreement, the injured party acquires a cause of action for breach of contract.

69.    Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."

70.    The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."

71.    Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including to return the funds to Plaintiff should INBE be unable to fund the Advances.

72.    Plaintiff performed all its contractual obligations and all conditions precedent occurred or have been waived.

73.    Messner breached the contract by failing to hold Plaintiff's $325,000 ICA Payment it is sole possession and control. Instead of holding Plaintiff's $325,000 ICA Payment in its sole possession and control, on information and belief, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

74.    Messner breached the contract by failing to return Plaintiff's $325,000 ICA Payment to Plaintiff upon INBE's failure to fund the Advances and/or following Plaintiff's notice of termination under the Agreement.

75.    Messner's breach of contract caused the damages the Plaintiff sustained.

COMPLAINT – 11

76.    Plaintiff has sustained damages of $325,000.

77.    Plaintiff has also sustained incidental and consequential damages.

78.    Plaintiff is entitled to recover costs and prejudgment interest.

79.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

80.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826, which allows fee and cost-shifting to a prevailing party in an action based upon written contract when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms of, among other things, the BELOC.

81.    Plaintiff is also entitled to attorney fees incurred in pursuing its claims against the other Defendant, INBE, as consequential damages because it is reasonably foreseeable that Messner's breach of contract would cause Plaintiff to incur attorney fees through litigation with INBE.

## COUNT THREE – NEGLIGENCE
### (Against Messner)

82.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

83.    Escrow occurs when any express or implied agreement provides for one or more parties to deliver or entrust any money to another person, to be held, paid, or delivered in accordance with the terms and conditions prescribed in the agreement.

84.    An escrow agent assumes the role of the agent to both parties to the transaction, and as such, is a fiduciary held to a high standard of care in dealing with its principals. This

COMPLAINT – 12

fiduciary duty requires the escrow agent to act for the benefit of the principals on all matters within the scope of their relationship, owing the duties of good faith, loyalty, due care, and disclosure.

85. All assets or property received by an escrow agent in accordance with an escrow agreement shall be maintained in a manner which will reasonably preserve and protect the property from loss, theft, or damage, and which will otherwise comply with all duties and responsibilities of a fiduciary.

86. Konala directed its ICA Payment be deposited into escrow with Messner as the Agreement required. By accepting the money, Messner assumed a fiduciary duty to Konala to hold the ICA Payment and release it upon the conditions outlined in the Agreement.

87. As an escrow agent, Messner had a duty to exercise reasonable skill and ordinary diligence in disbursing funds which came into its hands by virtue of its status as escrow agent.

88. If the escrow holder negligently breaches its duty of care pursuant to the escrow agreement, the escrow holder is liable for any foreseeable loss arising from its negligence.

89. Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."

90. The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."

91. Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including returning the funds to Plaintiff should INBE be unable to fund the Advances and/or in the event Plaintiff provided notice of termination under the Agreement.

COMPLAINT – 13

92.    Messner negligently breached its duty of care by failing to hold Plaintiff's $325,000 ICA Payment it is sole possession and control. Instead of holding Plaintiff's $325,000 ICA Payment in its sole possession and control, On information and belief, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

93.    Messner negligently breached its duty of care by failing to disburse the funds in the manner required by the Agreement, in particular, by failing to return Plaintiff's $325,000 ICA Payment to Plaintiff upon INBE's failure to fund the Advances and/or following Plaintiff's notice of termination under the Agreement.

94.    Loss of Plaintiff's money was a foreseeable result of Messner's negligence.

95.    Messner's negligence caused the damages the Plaintiff sustained.

96.    Plaintiff has sustained damages of $325,000.

97.    Plaintiff has also sustained incidental and consequential damages.

98.    Plaintiff is entitled to recover costs and prejudgment interest.

99.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

100.    Plaintiff is also entitled to attorney fees incurred in pursuing its claims against the other Defendant, INBE, as consequential damages because it is reasonably foreseeable that Messner's breach of contract would cause Plaintiff to incur attorney fees through litigation with INBE.

## COUNT FOUR – BREACH OF FIDUCIARY DUTY
### (Against Messner)

101.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

COMPLAINT – 14

102.    Escrow occurs when any express or implied agreement provides for one or more parties to deliver or entrust any money to another person, to be held, paid, or delivered in accordance with the terms and conditions prescribed in the agreement.

103.    An escrow agent assumes the role of the agent to both parties to the transaction, and as such, is a fiduciary held to a high standard of care in dealing with its principals. This fiduciary duty requires the escrow agent to act for the benefit of the principals on all matters within the scope of their relationship, owing the duties of good faith, loyalty, due care, and disclosure.

104.    All assets or property received by an escrow agent in accordance with an escrow agreement shall be maintained in a manner which will reasonably preserve and protect the property from loss, theft, or damage, and which will otherwise comply with all duties and responsibilities of a fiduciary.

105.    Konala directed its ICA Payment be deposited into escrow with Messner as the Agreement required. By accepting the money, Messner became an escrow holder, attorney, and trustee with a fiduciary relationship to Konala.

106.    Messner knowingly assumed a fiduciary duty to Konala to hold the ICA Payment and release it upon the conditions outlined in the Agreement.

107.    Pursuant to this fiduciary relationship, Messner was bound by fiduciary duties of good faith, loyalty, due care, and disclosure.

108.    As a fiduciary, Messner is precluded from taking advantage of its acts relating to the interest of the Plaintiff without the Plaintiff's knowledge and consent.

109.    As an escrow agent, Messner had a duty to exercise reasonable skill and ordinary diligence in disbursing funds which came into its hands by virtue of its status as escrow agent.

COMPLAINT – 15

110.    The Agreement specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $325,000 ICA Payment was to be held in its "sole possession and control."

111.    Messner had a fiduciary duty of care to ensure that it adhered to the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."

112.    Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."

113.    Messner was required to hold Plaintiff's $325,000 as INBE's "Nominated Trustee (Attorney)."

114.    Pursuant to the Agreement, Messner was required to disburse the funds in a number of specific ways, including returning the funds to Plaintiff should INBE be unable to fund the Advances.

115.    Messner had a fiduciary duty to adhere to the instructions of the Agreement to return the funds to Plaintiff should INBE be unable to fund the Advances.

116.    Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to return the funds to Plaintiff should INBE be unable to fund the Advances.

117.    On information and belief, Messner had an interest in the transaction, and therefore, Messner was obligated to disclose that interest to Plaintiff before becoming an escrow agent for the parties.

118.    Messner violated its fiduciary duty by failing to adhere to the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."

COMPLAINT – 16

119.    Messner violated its fiduciary duty by failing to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $325,000 ICA Payment in Messner's "sole possession and control."

120.    Messner violated its fiduciary duty by failing to adhere to the instructions of the Agreement to return the funds to Plaintiff should INBE be unable to fund the Advances.

121.    Messner violated its fiduciary duty by failing to disclose to Plaintiff if Messner intended to deviate from the instruction to return the funds to Plaintiff should INBE be unable to fund the Advances.

122.    On information and belief, Messner violated its fiduciary duty by failing to disclose that it had an interest in the transaction.

123.    Messner's violation of its fiduciary duties arose from the duties created by the Agreement and is an independent tort.

124.    As a result of Messner's breaches of its fiduciary duties, Plaintiff sustained damages.

125.    Plaintiff has sustained damages of $325,000.

126.    Plaintiff has also sustained incidental and consequential damages.

127.    Plaintiff is entitled to recover costs and prejudgment interest.

128.    Plaintiff is entitled to recover attorneys' fees pursuant Utah Code § 78B-5-825.

129.    Plaintiff is entitled to recover attorneys' fees because "breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally," including a fiduciary duty tort claim arising from a contractual duty.

COMPLAINT – 17

## COUNT FIVE – ACTION FOR RESTITUTION BASED ON QUASI-CONTRACT AND UNJUST ENRICHMENT
### (Against both Defendants)

130.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

131.    This claim is pleaded in the alternative to the Breach of Contract claims pleaded against the Defendants.

132.    Plaintiff conferred benefits on Defendants INBE and Messner and Defendants had knowledge of those benefits. The benefits included, but were not limited to, the use, arrogation, and usurpation of Plaintiff's $325,000.

133.    Defendants voluntarily appreciated, accepted, and retained the benefits.

134.    The circumstances are such that it would be unjust for Defendants to retain the benefits at the expense of Plaintiff without paying the value thereof to Plaintiff.

135.    Plaintiff can recover in quasi-contract for restitution based on Defendants' unjust enrichment.

136.    The purpose of a quasi-contract claim is to restore Plaintiff, the aggrieved party, to its former position through the return of the wrongfully obtained property or equivalent in money.

137.    The unjust enrichment which Defendants obtained should be returned to Plaintiff.

138.    As a result of Defendants' unjust enrichment, Plaintiff sustained damages of $325,000, among other damages as may recoverable.

139.    Plaintiff is entitled to recover costs and prejudgment interest.

140.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

COMPLAINT – 18

## COUNT SIX – RECISSION
**(Against both Defendants)**

141.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

142.    This claim is pleaded in the alternative and is a claim for recission of any and all contractual agreements between Plaintiff and Defendants and a refund of all money, property, and value that Plaintiff conferred to Defendants.

143.    Any contractual agreements between Plaintiff and Defendants are subject to recission due to Defendants' failure to fulfill their obligations.

144.    Defendant INBE materially breached the contract by failing to fulfill its obligations to timely fund the BELOC and by failing to refund the ICA Payment when proper notice was provided by Plaintiff.

145.    Defendant Messner materially breached the contract by failing to discharge its obligations as an escrow agent (i) by failing to return the $325,000 ICA Payment upon INBE's failure to fund the BELOC and (ii) by failing to maintain the funds in its "sole possession and control."

146.    Plaintiff therefore seeks to restore the status quo by the return of its $325,000 ICA Payment, plus interest, which is being wrongfully retained by Defendants, and to recover additional damages that would not have been incurred but for Defendants' breaches and failures.

147.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

148.    Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-826, which allows fee and cost-shifting to a prevailing party in an action based upon written contract

COMPLAINT – 19

when the contract allows at least one party to recover attorney fees. Exhibit A of the Agreement includes a provision which allows for the recovery of attorney fees for INBE to enforce the terms of, among other things, the BELOC.

### COUNT SEVEN – CONSUMER PROTECTION
#### Utah Code § 13-11-1 to § 13-11-23
**(Against both Defendants)**

149.    Plaintiff incorporates by reference all prior allegations of this Complaint as if fully set out herein.

150.    The Agreement constituted a consumer transaction, as it was an agreement for the transfer of intangible property in the form of money, for a purpose that related to a business opportunity that required an expenditure of money by Konala.

151.    Defendants were suppliers, as they are entities who regularly solicit and engage in such consumer transactions.

152.    Defendant INBE committed deceptive acts in connection with a consumer transaction by knowingly and/or intentionally mispresenting and warranting its ability to fund the Advances; by, after receipt of the ICA Payment, failing to furnish the service of funding the Advances within the time represented and required by the Agreement; and, by failing to return and instead keeping the ICA Payment after Plaintiff provided proper notice.

153.    Defendant Messner committed deceptive acts in connection with a consumer transaction by knowingly and/or intentionally, after receipt of Konala's ICA Payment and after INBE was unable to fund the Advances, failing to fulfill its duties as an escrow holder by refunding Konala's ICA Payment within the time represented and required by the Agreement; and by failing to hold the ICA Payment within its "sole possession and control."

COMPLAINT – 20

154. Defendants knew or had reason to know that the deceptive acts were unconscionable under circumstances which Defendants knew or had reason to know.

155. In particular, Defendant INBE knew or had reason to know that, in reliance upon its representations that INBE was financially able to and would in fact fund the Advances, Konala would pay the ICA Payment to Messner, engage architects, contractors, and other professionals to start the construction phase of its business expansion, and otherwise expended significant sums as it moved forward with its franchise launch.

156. Defendant Messner knew or had reason to know that failing to hold the ICA Payment within its sole possession and control and failing to refund Konala's ICA Payment upon INBE's inability to fund the Advances and notice by Konala to terminate could cause Konala's ICA Payment to be lost and unavailable for return.

157. As a result of these unconscionable and deceptive acts, Plaintiff has suffered actual damages in the amount of the lost $325,000 ICA Payment as well as incidental and consequential damages.

158. These losses were caused by the unconscionable and deceptive acts of Defendants.

159. Plaintiff is entitled to recover attorneys' fees under Utah Code § 78B-5-825, which governs fee-shifting in cases where the defense was without merit and not brought or asserted in good faith.

160. Plaintiff is entitled to recover attorneys' fees under Utah Code § 13-11-19(5).

**ATTORNEYS' FEES**

161. Plaintiff seeks an award of attorney's fees under Utah Code §§ 78B-5-825, 78B-5-826, 13-11-19(5), other applicable law, including as set forth in each specific count, as well as

COMPLAINT – 21

pursuant to Federal Rule of Civil Procedure 54. Moreover, Plaintiffs' counsel affirms that they will not share any legal fee, as to any count, in violation of Utah Rule of Professional Conduct 5.4.

## **RESERVATION OF RIGHT TO REQUEST PUNITIVE DAMAGES**

162.    Plaintiff reserves the right to develop additional evidence supporting punitive damages, pursuant Utah Code § 78B-8-201, after compensatory or general damages are awarded, by establishing by clear and convincing evidence that the acts or omissions of Messner are the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## **DEMAND FOR JURY TRIAL**

163.    Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendants, jointly and severally, as follows:

1.    Money damages in an amount in excess of $325,000, and incidental and consequential damages;

2.    Costs and prejudgment interest;

3.    Attorneys' fees; and,

4.    Such other and further relief that the Court finds just and proper.

DATED this 15th day of March, 2024.

/s/ Alyson A. Foster
Alyson A. Foster
Bjorkman Dempsey Foster PLLC

COMPLAINT – 22

# EXHIBIT 23

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | Anastasia Osbrink |
| **Cc:** | Eric Deitz |
| **Subject:** | RE: Emerald v. Messner Reeves, et al. |
| **Date:** | Thursday, April 18, 2024 6:12:00 PM |
| **Attachments:** | image001.png |

Anastasia, it was good speaking with you.

You indicated that Clearwater Premier Perpetual Master, LLC is in possession of my client's money.

Your client intends to file a demurrer by asserting that Clearwater Premier Perpetual Master, LLC is an indispensable party.  I asked for evidence confirming that Clearwater Premier Perpetual Master, LLC is in possession of the money and I asked for the name of the banking or financial institution which contains the Clearwater account.

You indicated that my client does not have standing.  I disagree and I would like to examine the case law on which your client relies.

You stated that the breach of contract claim is not sufficiently pled.  I disagree and I would like to see the escrow agreement between your client and INBE.  You suggested that you have not seen that agreement.

I appreciate our amicable call today and I hope we can productively work through these questions going forward.

Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Miami Beach Office**

1141 71st Street

Miami Beach, FL 33141

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Thursday, April 18, 2024 5:29 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>
**Cc:** Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald v. Messner Reeves, et al.

Sounds good. Did you locate the money? Please let me know. Thank you.


**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Miami Beach Office**
1141 71st Street
Miami Beach, FL 33141

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Thursday, April 18, 2024 4:06 PM

**To:** Kenneth E. Chase <kchase@chaselaw.com>
**Cc:** Eric Deitz <edeitz@grsm.com>
**Subject:** Re: Emerald v. Messner Reeves, et al.

Thank you, I will call you at 2:30 today.

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Wednesday, April 17, 2024 7:40:40 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>
**Cc:** Eric Deitz <edeitz@grsm.com>
**Subject:** Re: Emerald v. Messner Reeves, et al.

Good evening Anastasia, received your voicemail. I was on a plane and just landed.

I would be happy to discuss the case, including any matters that you'd like to discuss. Tomorrow I'm available for a call any time between 12:00-3:00 pm PT.  Let me know what works best for you, and we can put it on the calendar.

For tomorrow's call, there are some matters which I'd like to discuss with you. I have asked these questions of your colleagues and I have not received an answer. As you are now the third different attorney at your firm connected to this case, will you be the primary attorney of record for Messner Reeves going forward?

The most important unanswered question is the location of my client's money.

If you could please provide the current location of my client's $700,000, including the bank name, account holder name, and account number, in advance of tomorrow's call, that would be appreciated. I have asked your colleagues this question multiple times and I have not received an answer.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street

Miami Beach, FL 33141

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

On Apr 17, 2024, at 8:25 PM, Anastasia Osbrink <aosbrink@grsm.com> wrote:

Ken,

This email serves to follow-up on the voicemail I left you today. Please let me know your available to meet and confer regarding our anticipated arguments for our demurrer to and motion to strike the complaint.

You can reach me on my cell phone: 858-349-3309.

Thank you,
Anastasia

---

**ANASTASIA F. OSBRINK** | Senior Counsel

**GORDON REES SCULLY MANSUKHANI | GRSM50**
**YOUR 50 STATE LAW FIRM™**
**CELEBRATING 50 YEARS OF EXCELLENCE**

101 W. Broadway, Suite 2000

San Diego, CA 92101

D: 619-544-7256 | aosbrink@grsm.com

www.grsm.com

vCard

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
**http://www.grsm.com**

**From:** Kenneth E. Chase
**Sent:** Wednesday, June 12, 2024 7:51 PM
**To:** Eric Deitz <edeitz@grsm.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Eric, I intend to log into our Zoom call as scheduled in 10 minutes, and I'll be happy to listen to whatever you have to say.  Clearwater does not have anything to do with whether your client will abide by its discovery obligations. Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Eric Deitz <edeitz@grsm.com>

**Sent:** Wednesday, June 12, 2024 7:37 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Kenneth E. Chase <kchase@chaselaw.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One
**Importance:** High

Ken,

After a discussion today with counsel for Clearwater Premier Perpetual Master, we need to confer with Messner Reeves and recommend postponing our call with you until Thursday afternoon or Friday. Please let me know your availability.

Thank you,

Eric

---

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Tuesday, June 11, 2024 9:43 AM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

This can be discussed during our call tomorrow, thank you.

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Tuesday, June 11, 2024 9:35 AM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Palmeri has been added.  Please reply to confirm receipt of my request that you respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses.  Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Tuesday, June 11, 2024 12:31 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman

<mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Please add John Palmeri to the zoom invite list. Thank you.

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Tuesday, June 11, 2024 9:30 AM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Just received your Teams invitation and have declined it given the Zoom invitation below. <mark>As previously requested, please respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses</mark>.  Thank you.

Here is a Zoom link: https://us02web.zoom.us/j/88902673281?pwd=3N6blaa1CHOQ1smD8QWcacmqdhvDus.1

Meeting ID: 889 0267 3281
Passcode: 718571

---

One tap mobile
+13052241968,,88902673281#,,,,*718571# US

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Tuesday, June 11, 2024 12:28 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Zoom link below has also been sent to you via Outlook notice.  <mark>As previously requested, please respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses</mark>.  Thank you.

Here is a Zoom link: https://us02web.zoom.us/j/88902673281?pwd=3N6blaa1CHOQ1smD8QWcacmqdhvDus.1

Meeting ID: 889 0267 3281

Passcode: 718571

---

One tap mobile

+13052241968,,88902673281#,,,,*718571# US

+16469313860,,88902673281#,,,,*718571# US

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>

**Sent:** Tuesday, June 11, 2024 12:24 PM

**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>

**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

5pm PDT tomorrow works for us, thank you. I will circulate a Teams invite.

> **From:** Kenneth E. Chase <kchase@chaselaw.com>
> **Sent:** Tuesday, June 11, 2024 9:18 AM
> **To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
> **Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One
>
> Yes, I am available for a call tomorrow afternoon. As you know, I left you a voicemail yesterday. I have not received a response from Eric. Please let me know if 5:00 pm PT tomorrow works for you.
>
> The 45-day motion to compel deadline is approaching, and I have met and conferred and followed up multiple times. Please update me via email in advance of tomorrow's call on whether your client will serve verified discovery responses.
>
> Also, again, please have your client serve verified discovery responses and please serve your client's document production.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Monday, June 10, 2024 8:42 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Ken,

Are you available for a call this Wednesday afternoon (Pacific time)?

Thank you,
Anastasia

---

**ANASTASIA F. OSBRINK** | Partner

**GORDON REES SCULLY MANSUKHANI | GRSM50**
**YOUR 50 STATE LAW FIRM™**
**CELEBRATING 50 YEARS OF EXCELLENCE**

101 W. Broadway, Suite 2000
San Diego, CA 92101
D: 619-544-7256 | C: 858-349-3309 | aosbrink@grsm.com

www.grsm.com
vCard

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Monday, June 10, 2024 9:22 AM
**To:** Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Dear Eric and Anastasia,

I am providing your client with every opportunity to meaningfully participate in the discovery process. I am following up once again on my previous communications, which include:

- My letter from May 13, 2024
- My follow-up email from May 15, 2024
- Our meet and confer call on May 16, 2024
- My follow-up email from May 31, 2024
- My emails from June 6 and June 7, 2024

I would appreciate a candid and substantive response regarding whether your client intends to provide any meaningful discovery responses.

On June 7, 2024, I requested your client's amended responses and document production by 5:00 PM PT today, June 10, 2024. As of now, I have not received any substantive response from either of you, nor any response at all from Anastasia.

Is there a specific reason why neither of you has responded substantively to my meet and confer communications?

Please let me know at your earliest convenience. Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Eric Deitz <edeitz@grsm.com>
**Sent:** Saturday, June 8, 2024 12:40 AM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Ken,

Receipt of the below is acknowledged, along with four additional emails received between 7:27 a.m. and 7:28 a.m., which are near duplicates of five emails sent between 7:11 a.m. and 7:12 a.m. today (all times Pacific). I will be in a mediation on Monday, but Anastasia or I will be in contact.

Eric

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Friday, June 7, 2024 7:27 AM
**To:** M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** FW: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Making sure this email is received.  Please confirm receipt.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Friday, June 7, 2024 10:10 AM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

**Urgent Follow-Up: Immediate Action Required on Outstanding Discovery Requests**

Dear Anastasia and Eric,

I am compelled to follow up yet again regarding my five previous communications, specifically my May 13, 2024 letter, my May 15, 2024 follow-up email, our May 16, 2024 meet and confer call, my May 31, 2024 follow-up email, and my June 6, 2024 follow up email per below. To date, your client has inexplicably failed to provide a single substantive, verified, or Rule-compliant discovery response, nor has a single document been produced. This ongoing neglect is unacceptable and unprofessional.

We have met and conferred, and we discussed the fact that your client's use of boilerplate and obstructive objections is utterly baseless and devoid of merit. Despite multiple opportunities to correct this behavior, your client remains noncompliant and you remain unresponsive.  This blatant disregard for the discovery process is not only frustrating but it is also a direct violation of your client's obligations and responsibilities.

Please be advised that if your client does not serve amended responses and produce the requested documents, we will be left with no choice but to take action with the Court. Our filing will likely be on an ex parte basis, and we reserve the right to seek sanctions and all other appropriate relief available under the circumstances. Your refusal to even communicate in any manner whatsoever for weeks, after serving completely meaningless discovery responses, is a violation of the Orange County Civility Guidelines, ¶ 2(a). The refusal to even communicate indicates a lack of good faith in this process.

This is the final opportunity to remedy this situation without the involvement of the Court. I expect to receive the amended responses and the complete document production no later than 5:00 pm on Monday, June 10, 2024. At a minimum, I expect a response to my communications. Failure to comply will result in a filing with the Court.

I urge you to impress upon your client the seriousness of this matter and the potential consequences of continued noncompliance. Thank you for your prompt attention to this urgent matter.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Wednesday, June 5, 2024 8:49 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

I am writing to follow up again on my May 13, 2024 letter, my May 15, 2024 follow up email, our May 16, 2024 meet and confer call, and my May 31, 2024 follow up email below. As of today, your client has not served a single substantive, verified, or Rule-compliant discovery response, nor has your client produced a single document. We have met and conferred, and the boilerplate, obstructive objections are baseless. Unless your client serves amended responses and produces the requested documents, we will be forced to file a motion to compel, likely on an ex parte basis, seeking sanctions and other relief. Your lack of cooperation also violates the Orange County Civility Guidelines, ¶ 2(a). We ask once again that your client serve amended responses and produce the requested documents. Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Friday, May 31, 2024 2:34 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

As a follow up, it was nice speaking with you during our May 16, 2024 meet and confer Zoom call. I am surprised that your client continues to refuse to serve any amended discovery responses despite our patience, the amount of time that has passed, and the length of our call. Your client's unverified discovery responses remain completely non-substantive, not Code-compliant, and meaningless. Additionally, the boilerplate objections are improper and non-compliant. Please advise when the amended responses will be served. Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Wednesday, May 15, 2024 5:11 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Following up on my email from Monday.  No response was received.  Your client's discovery responses are completely non-substantive and comprised solely of boilerplate objections.  As a second request, please let me know when you are available for a meet and confer call this week.  Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Miami Beach Office**

1141 71st Street

Miami Beach, FL 33141

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase

**Sent:** Monday, May 13, 2024 7:33 PM

**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>

**Subject:** Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Counsel, please see attached letter regarding your client's discovery responses. We request your availability this week for a meet-and-confer Zoom conference or telephone call to further discuss.

Thank you for your attention to this request.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Miami Office**

1141 71st Street

Miami Beach, FL 33141

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com

*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and*

*attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
http://www.grsm.com

# EXHIBIT 24

**Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al.**
Orange County Superior Court Case No.: 30-2024-01378580-CU-BC-CJC

| | Document Title | Description of Document | Author of Document | Date of Document | Email To | Email From | Email Date | Privilege Type |
|---|---|---|---|---|---|---|---|---|
| 1 | Joint Venture Partnership Agreement between Clearwater Premier Perpetual Master, LLC and INBE Capital, LLC | Draft joint venture partnership agreement with track changes | Messner Reeves | Apr-23 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information/Common Interest Doctrine |
| 2 | Memorandum of Understanding between Clearwater Premier Perpetual Master, LLC and INBE Capital, LLC | Memorandum of Understanding | Messner Reeves | 3/31/2023 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information/Common Interest Doctrine |
| 3 | Client information sheet for Clearwater Premier Perpetual Master, LLC | Draft of client information sheet | Messner Reeves | 6/2/2023 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |
| 4 | Client information sheet for Clearwater Premier Perpetual Master, LLC | Client information sheet | Messner Reeves | 5/9/2023 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |
| 5 | Operating Agreeemnt of INBE-CLEAR CAPITAL GROUP, LLC | Draft operating agreement | Messner Reeves | 4/18/2023 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |
| 6 | Operating Agreeemnt of INBE-CLEAR CAPITAL GROUP, LLC | Draft operating agreement | Messner Reeves | 6/23/2023 | N/A | N/A | N/A | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |
| 7 | INBE-CLEAR CAPITAL GROUP LLC EIN | EIN | IRS | 4/10/2023 | N/A | N/A | N/A | Private Financial Information |
| 8 | Email between Torben Welch and Jason Aufdermaur for Latham Funding | Email regarding letter from Kenneth Chase | N/A | N/A | Jason Aufdermaur | Torben Welch | 11/27/2023 | Attorney-Client Privilege/Common Interest Doctrine |
| 9 | Email from Torben Welch to Craig Boddington and Jonathan Wright with INBE | Email regarding letter from Kenneth Chase | N/A | N/A | Craig Boddington and Jonathan Wright; Cc Jim Smith and Leon Chartue | Torben Welch | 11/22/2023 | Attorney-Client Privilege/Common Interest Doctrine |
| 10 | Email from Torben Welch to Leon Chartue at Clearwater Premier Perptetual Master, LLC | Email regarding INBE | N/A | N/A | Leon Chartue | Torben Welch | 6/29/2023 | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |

1

| No. | Description | Document Type | Author | Date | To | From | Date | Privilege |
|---|---|---|---|---|---|---|---|---|
| 11 | Email from Torben Welch to Leon Chartue and Todd Owen at Clearwater Premier Perptetual Master, LLC | Email regarding INBE | N/A | N/A | | Leon Chartue and Todd Owen | Torben Welch | 7/5/2023 | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |
| 12 | Email from Torben Welch to Leon Chartue and Todd Owen at Clearwater Premier Perptetual Master, LLC | Email regarding lawsuit | N/A | N/A | | Leon Chartue and Todd Owen | Torben Welch | 2/12/2024 | Attorney-Client Privilege |
| 13 | Email from Torben Welch to Leon Chartue | Email regarding ICA for Hard AF | N/A | N/A | | Leon Chartue | Torben Welch | 10/27/2023 | Attorney-Client Privilege |
| 14 | Email between Torben Welch and Craig Boddington | Email regarding lawsuit | N/A | N/A | | Torben Welch | Craig Boddington | 2/22/2024 | Attorney-Client Privilege/Common Interest Doctrine |
| 15 | INBE/CLEARWATER BULLET POINTS | Draft bullet points | Messner Reeves | 4/19/2024 | N/A | N/A | N/A | | Attorney Work Product/Attorney-Client Privilege |
| 16 | Axos Bank Account Welcome Letter for INBE-Clear Capital Group, LLC | Bank Account Information | Axos Bank | 6/2/2023 | N/A | N/A | N/A | | Attorney-Client Privilege/Common Interest Doctrine/Private financial information |
| 17 | Email from Torben Welch to Leon Chartue | Email regarding ICA for Hard AF | N/A | N/A | | Leon Chartue | Torben Welch | 10/27/2023 | Attorney-Client Privilege |
| 18 | Email between Torben Welch and Jonathan Wright with INBE | Email regarding ICA for Hard AF | N/A | N/A | | Jonathan Wright | Torben Welch | 9/22/2023 | Attorney-Client Privilege/Common Interest Doctrine |
| 19 | Email from Torben Welch to Jonathan Wright with INBE | Email regarding ICA for Hard AF | N/A | N/A | | Jonathan Wright, Cc Leon Chartue | Torben Welch | 9/21/2023 | Attorny-client privilege/Common Interest Doctrine |
| 20 | Memorandum of Cooperation between Clearwater Premier Perpetual Master, LLC and INBE Capital, LLC | Memorandum of Cooperation | INBE | 3/22/2023 | N/A | N/A | N/A | | Attorney Work Product/Attorney-Client Privelege/Private Financial Information/Common Interest Doctrine |
| 21 | Comments on BELOC between INBE and HARD AF | BELOC comments | Messner Reeves | 4/20/2023 | N/A | N/A | N/A | | Attorney Work Product/Attroney-client privilege/Common Interest Doctrine |
| 22 | INBE-CLEAR CAPITAL GROUP LLC Manager Appointment Resolution | Manager appointment resolution | INBE-CLEAR CAPITAL GROUP LLC | 4/10/2023 | N/A | N/A | N/A | | Attorney Work Product/Attorney-Client Privelege/Private Financial Information |

2

# EXHIBIT 25

| From: | Kenneth E. Chase |
|---|---|
| To: | Eric Deitz; Anastasia Osbrink |
| Subject: | RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One |
| Date: | Tuesday, July 16, 2024 7:10:00 PM |
| Attachments: | civility_guidelines.pdf |
| | image001.png |
| | image002.png |

Eric and Anastasia,

Will your client be serving verified discovery responses?  Will your client be serving a document production?

We would appreciate forthright and candid answers.

**2. Counsel shall show civility during discovery.**
a. Work together to make discovery self-executing. Meet and confer in good faith to try to limit and expedite discovery – and to resolve disputes without motions. Cooperate to make discovery reasonably convenient: e.g., provide written discovery requests in electronic format, discuss search terms for electronic discovery in advance, produce written responses and responsive documents in a user-friendly manner. Avoid pursuing discovery only to harass adversaries or increase litigation costs. Respond forthrightly and timely to non-objectionable requests.

Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Thursday, June 20, 2024 1:33 PM
**To:** Eric Deitz <edeitz@grsm.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Following up again. That was the situation last week. It has now been an additional week since we spoke. Is anything being done by your client to comply with its discovery obligations? Will verified discovery responses be served? Will a document production be made?

Please provide an answer to these still-pending questions. Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Eric Deitz <edeitz@grsm.com>
**Sent:** Tuesday, June 18, 2024 4:48 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

We spoke with the client representatives, and now need to communicate further with counsel for Clearwater Premier Perpetual Master, LLC.

**ERIC R. DEITZ** (HE/HIM/HIS)  |  Partner

**GORDON REES SCULLY MANSUKHANI | GRSM50**
**YOUR 50 STATE LAW FIRM™**
**CELEBRATING 50 YEARS OF EXCELLENCE**

101 W. Broadway, Suite 2000, San Diego, CA 92101
633 West Fifth Street, 52nd Floor, Los Angeles, CA 90071

D: 619-230-7762  |  edeitz@grsm.com

www.grsm.com

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Monday, June 17, 2024 6:34 PM
**To:** Eric Deitz <edeitz@grsm.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Following up.  Please advise.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Thursday, June 13, 2024 6:13 PM
**To:** Eric Deitz <edeitz@grsm.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Eric and Anastasia,

It was nice speaking with you on our Zoom call last night.  We still have not received any verified discovery responses or documents from your client.  In advance of the call and during our call, per your email below, you asserted that Clearwater Premier Perpetual Master has not waived privilege and that you would like a further opportunity to speak with your client and then further discuss today or tomorrow.  I am available for such a discussion.

The majority of the discovery requests do not implicate privilege related to Clearwater.  The privilege log provided by your client, reflecting only 22 items, contains only eight items which are even alleged to be privileged as to Clearwater.  No other privileged materials are even identified.  If your client's contention is that a substantial amount of communications are privileged, those are not reflected on the privilege log.  Either the privilege log is drastically deficient or the assertion about privilege and Clearwater is immaterial.

The majority of the discovery requests do not whatsoever implicate privilege, and some do not even contain privilege as an objection.  Your client was not merely passive counsel on the sidelines, your client played a central and substantive role.  An attempt by your client to shirk all discovery obligations on grounds of privilege, without even identifying documents which could possibly support such a claim, is without basis in fact or law.

I have been asking as to whether your client will serve *any* verified discovery responses and I can't seem to get a substantive answer to that basic question.  Moreover, we have not received a single document.

**Per our discussion last night, you agreed to extend the motion to compel deadlines and this email memorializes that extension.  To be specific, this applies to all five sets of discovery requests and discovery responses that have been served.**

Please get back to me <u>as soon as possible</u> regarding answers to the matters we discussed.  And to be clear, <u>we request again</u> that your client serve amended, Rule-compliant, substantive, and verified discovery responses and that your client serve its document production.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Wednesday, June 12, 2024 7:51 PM
**To:** Eric Deitz <edeitz@grsm.com>; Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Eric, I intend to log into our Zoom call as scheduled in 10 minutes, and I'll be happy to listen to whatever you have to say. Clearwater does not have anything to do with whether your client will abide by its discovery obligations. Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Eric Deitz <edeitz@grsm.com>
**Sent:** Wednesday, June 12, 2024 7:37 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Kenneth E. Chase <kchase@chaselaw.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One
**Importance:** High

Ken,

After a discussion today with counsel for Clearwater Premier Perpetual Master, we need to confer with Messner Reeves and

recommend postponing our call with you until Thursday afternoon or Friday. Please let me know your availability.

Thank you,

Eric

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Tuesday, June 11, 2024 9:43 AM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

This can be discussed during our call tomorrow, thank you.

> **From:** Kenneth E. Chase <kchase@chaselaw.com>
> **Sent:** Tuesday, June 11, 2024 9:35 AM
> **To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
> **Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One
>
> Palmeri has been added.  Please reply to confirm receipt of my request that you respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses.  Thank you.
>
> **Kenneth E. Chase**
> Chase Law & Associates, P.A.
> t 305.402.9800
> kchase@chaselaw.com
>
> **Boca Raton Office**
> 2700 N. Military Trail, Suite 150
> Boca Raton, FL 33431
>
> FLORIDA | CALIFORNIA
> WASHINGTON, DC | NEW YORK
> MASSACHUSETTS | MARYLAND | TEXAS
>
> www.chaselaw.com
>
>
>
> *This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Tuesday, June 11, 2024 12:31 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Please add John Palmeri to the zoom invite list. Thank you.

> **From:** Kenneth E. Chase <kchase@chaselaw.com>
> **Sent:** Tuesday, June 11, 2024 9:30 AM

**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Just received your Teams invitation and have declined it given the Zoom invitation below. <mark>As previously requested, please respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses</mark>.  Thank you.

Here is a Zoom link: https://us02web.zoom.us/j/88902673281?pwd=3N6blaa1CHOQ1smD8QWcacmqdhvDus.1

Meeting ID: 889 0267 3281
Passcode: 718571

---

One tap mobile
+13052241968,,88902673281#,,,,*718571# US

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com
**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Tuesday, June 11, 2024 12:28 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Zoom link below has also been sent to you via Outlook notice.  <mark>As previously requested, please respond in writing in advance of tomorrow's call regarding whether your client will serve verified discovery responses</mark>.  Thank you.

Here is a Zoom link: https://us02web.zoom.us/j/88902673281?pwd=3N6blaa1CHOQ1smD8QWcacmqdhvDus.1

Meeting ID: 889 0267 3281
Passcode: 718571

---

One tap mobile
+13052241968,,88902673281#,,,,*718571# US
+16469313860,,88902673281#,,,,*718571# US

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Tuesday, June 11, 2024 12:24 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

5pm PDT tomorrow works for us, thank you. I will circulate a Teams invite.

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Tuesday, June 11, 2024 9:18 AM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Yes, I am available for a call tomorrow afternoon. As you know, I left you a voicemail yesterday. I have not received a response from Eric. Please let me know if 5:00 pm PT tomorrow works for you.

The 45-day motion to compel deadline is approaching, and I have met and conferred and followed up multiple times. Please update me via email in advance of tomorrow's call on whether your client will serve verified discovery responses.

Also, again, please have your client serve verified discovery responses and please serve your client's document production.

Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Anastasia Osbrink <aosbrink@grsm.com>
**Sent:** Monday, June 10, 2024 8:42 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Ken,

Are you available for a call this Wednesday afternoon (Pacific time)?

Thank you,
Anastasia

---

**ANASTASIA F. OSBRINK** | Partner

**GORDON REES SCULLY MANSUKHANI | GRSM50**
**YOUR 50 STATE LAW FIRM™**
**CELEBRATING 50 YEARS OF EXCELLENCE**

101 W. Broadway, Suite 2000
San Diego, CA 92101
D: 619-544-7256 | C: 858-349-3309 | aosbrink@grsm.com

www.grsm.com
vCard

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Monday, June 10, 2024 9:22 AM
**To:** Eric Deitz <edeitz@grsm.com>; M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Dear Eric and Anastasia,
I am providing your client with every opportunity to meaningfully participate in the discovery process. I am following up once again on my previous communications, which include:
- My letter from May 13, 2024
- My follow-up email from May 15, 2024

- Our meet and confer call on May 16, 2024
- My follow-up email from May 31, 2024
- My emails from June 6 and June 7, 2024

I would appreciate a candid and substantive response regarding whether your client intends to provide any meaningful discovery responses.

On June 7, 2024, I requested your client's amended responses and document production by 5:00 PM PT today, June 10, 2024. As of now, I have not received any substantive response from either of you, nor any response at all from Anastasia.

Is there a specific reason why neither of you has responded substantively to my meet and confer communications?

Please let me know at your earliest convenience. Thank you.


**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Eric Deitz <edeitz@grsm.com>
**Sent:** Saturday, June 8, 2024 12:40 AM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Ken,

Receipt of the below is acknowledged, along with four additional emails received between 7:27 a.m. and 7:28 a.m., which are near duplicates of five emails sent between 7:11 a.m. and 7:12 a.m. today (all times Pacific). I will be in a mediation on Monday, but Anastasia or I will be in contact.

Eric

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Friday, June 7, 2024 7:27 AM
**To:** M.A. Brookman <mbrookman@grsm.com>
**Cc:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** FW: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Making sure this email is received.  Please confirm receipt.

**Kenneth E. Chase**

Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Friday, June 7, 2024 10:10 AM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

**Urgent Follow-Up: Immediate Action Required on Outstanding Discovery Requests**

Dear Anastasia and Eric,

I am compelled to follow up yet again regarding my five previous communications, specifically my May 13, 2024 letter, my May 15, 2024 follow-up email, our May 16, 2024 meet and confer call, my May 31, 2024 follow-up email, and my June 6, 2024 follow up email per below. To date, your client has inexplicably failed to provide a single substantive, verified, or Rule-compliant discovery response, nor has a single document been produced. This ongoing neglect is unacceptable and unprofessional.

We have met and conferred, and we discussed the fact that your client's use of boilerplate and obstructive objections is utterly baseless and devoid of merit. Despite multiple opportunities to correct this behavior, your client remains noncompliant and you remain unresponsive.  This blatant disregard for the discovery process is not only frustrating but it is also a direct violation of your client's obligations and responsibilities.

Please be advised that if your client does not serve amended responses and produce the requested documents, we will be left with no choice but to take action with the Court. Our filing will likely be on an ex parte basis, and we reserve the right to seek sanctions and all other appropriate relief available under the circumstances. Your refusal to even communicate in any manner whatsoever for weeks, after serving completely meaningless discovery responses, is a violation of the Orange County Civility Guidelines, ¶ 2(a). The refusal to even communicate indicates a lack of good faith in this process.

This is the final opportunity to remedy this situation without the involvement of the Court. I expect to receive the amended responses and the complete document production no later than 5:00 pm on Monday, June 10, 2024. At a minimum, I expect a response to my communications. Failure to comply will result in a filing with the Court.

I urge you to impress upon your client the seriousness of this matter and the potential consequences of continued noncompliance. Thank you for your prompt attention to this urgent matter.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Wednesday, June 5, 2024 8:49 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

I am writing to follow up again on my May 13, 2024 letter, my May 15, 2024 follow up email, our May 16, 2024 meet and confer call, and my May 31, 2024 follow up email below. As of today, your client has not served a single substantive, verified, or Rule-compliant discovery response, nor has your client produced a single document. We have met and conferred, and the boilerplate, obstructive objections are baseless. Unless your client serves amended responses and produces the requested documents, we will be forced to file a motion to compel, likely on an ex parte basis, seeking sanctions and other relief. Your lack of cooperation also violates the Orange County Civility Guidelines, ¶ 2(a). We ask once again that your client serve amended responses and produce the requested documents. Thank you.

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

2700 N. Military Trail, Suite 150

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and*

*attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Friday, May 31, 2024 2:34 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

As a follow up, it was nice speaking with you during our May 16, 2024 meet and confer Zoom call. I am surprised that your client continues to refuse to serve any amended discovery responses despite our patience, the amount of time that has passed, and the length of our call. Your client's unverified discovery responses remain completely non-substantive, not Code-compliant, and meaningless. Additionally, the boilerplate objections are improper and non-compliant. Please advise when the amended responses will be served. Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Kenneth E. Chase
**Sent:** Wednesday, May 15, 2024 5:11 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** RE: Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Following up on my email from Monday.  No response was received.  Your client's discovery responses are completely non-substantive and comprised solely of boilerplate objections.  As a second request, please let me know when you are available for a meet and confer call this week.  Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Beach Office**
1141 71st Street
Miami Beach, FL 33141

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Monday, May 13, 2024 7:33 PM
**To:** Anastasia Osbrink <aosbrink@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Subject:** Emerald Consulting Partners, LLC v. Messner Reeves, LLP, et al., 30-2024-01378580-CU-BC-CJC, Meet and Confer, Spec Rogs, Set One

Counsel, please see attached letter regarding your client's discovery responses. We request your availability this week for a meet-and-confer Zoom conference or telephone call to further discuss.

Thank you for your attention to this request.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

**Boca Raton Office**
2700 N. Military Trail, Suite 150
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
[http://www.grsm.com](http://www.grsm.com)

# EXHIBIT 26

M. Candice Bryner, State Bar No. 192462
candice@brynerlaw.com
BRYNER CROSBY, APC
24361 El Toro Rd., Ste. 220
Laguna Hills, CA 92637
Telephone: (949) 371-9056

Attorneys for Defendant
INBE CAPITAL, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

CENTRAL JUSTICE CENTER

| | |
|---|---|
| EMERALD CONSULTING PARTNERS, a Florida limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>MESSNER REEVES, LLP, a Colorado limited liability partnership, and INBE CAPITAL LLC, a Wyoming limited liability company,<br><br>        Defendants. | CASE NO. 30-2024-01378580<br><br>[The Hon. Thomas S. McConville; Dept. C-28]<br><br>**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES (SET ONE)** |

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

**PROPOUNDING PARTY:**        **PLAINTIFF EMERALD CONSULTING PARTNERS**

**RESPONDING PARTY:**        **DEFENDANT INBE CAPITAL LLC**

**SET NO.:**        **ONE**

Pursuant California Code of Civil Procedure § 2030.010 et seq., Defendant INBE Capital, LLC ("Responding Party") hereby responds to Plaintiff Emerald Consulting Partners' Special Interrogatories as follows:

### PRELIMINARY STATEMENT

1.        Responding Party's responses to Propounding Party's special interrogatories are made to the best of its present knowledge, information and belief. Said responses are at all times subject to additional or different information that discovery or further investigation may disclose and, while based on this present state of Responding Party's recollection, are subject to refreshing of recollection with such additional knowledge or facts that may result from further discovery and investigation. Responding Party reserves the right to make any use of, or to introduce at any hearing and at trial, information responsive to Propounding Party's special interrogatories that is discovered subsequent to the date of these responses, including, but not limited to, any information obtained in discovery herein

2.        Responding Party reserves all objections or other questions as to the confidentiality, relevance, materiality, privilege or admissibility as evidence, in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, of these responses and any documents or things identified in these responses.

3.        Responding Party reserves the right to object on any ground at any time to such other or supplemental interrogatories as Propounding Party may at any time propound involving or relating to the subject matter of these special interrogatories.

4.        The information set forth in these responses to special interrogatories was obtained from persons currently in the employ of Responding Party or, in the alternative, was gathered by counsel for Responding Party on its behalf.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

1

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

## GENERAL OBJECTIONS

Responding Party makes the following general objections, whether or not separately set forth:

1.    Responding Party objects generally to the extent that any of the special interrogatories seek information protected by the attorney-client privilege and/or attorney-work product doctrine. Such information shall not be provided in the responses to Propounding Party's special interrogatories and any inadvertent disclosure thereof shall not be a waiver of any privilege with respect to such information or any attorney-work product doctrine which may attach thereto.

2.    Responding Party objects generally to the extent that any of the special interrogatories seek to require it to identify persons, entities, or events not known on the grounds that such instructions, definitions, or requests are overbroad and seek to require more of Responding Party than any obligation imposed by law, subject Responding Party to unreasonable and undue annoyance, oppression, burden and expense, and seek to impose upon Responding Party an obligation to investigate or discover information or material from third parties or sources which are equally accessible to the parties.

## SPECIAL INTERROGATORIES

**SPECIAL INTERROGATORY NO. 1:**

State the current location of the $700,000 ICA Payment, and if the funds are held in a bank account, identify the bank name, account name, and account number.

ANSWER: To the extent of INBE's knowledge, the ICA Payment is within the possession of Messner.

**SPECIAL INTERROGATORY NO. 2:**

State the reason(s) for INBE's failure to return the $700,000 ICA Payment to Plaintiff.

ANSWER: To the extent of INBE's knowledge, the ICA Payment is within the possession, custody, or control of Messner, not INBE.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

2

DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES

**SPECIAL INTERROGATORY NO. 3:**

Identify all bank accounts, by bank name, account name, and account number, which have contained all or part of the $700,000 ICA Payment, even if such possession was brief, temporary, or transitional in nature.

ANSWER: To the extent of INBE's knowledge, the ICA Payment is within the possession, custody, or control of Messner.

**SPECIAL INTERROGATORY NO. 4:**

State the full name of each person or legal entity (identifying the entity's full legal name and its state or country of incorporation) which has received any or all of the $700,000 ICA Payment (identify all such persons or entities who have received any or all of the $700,000 ICA Payment at any point in time, even if the $700,000 ICA Payment is not currently possessed by that person or entity, and even if that person or entity was an intermediary which only briefly or temporarily possessed the funds).

ANSWER: Other than Messner, INBE is without knowledge.

**SPECIAL INTERROGATORY NO. 5:**

In chronological order, by date, provide the exact path of the $700,000 ICA Payment by identifying the date, amount, sender information (i.e., bank name, account name, and account number) and recipient information (bank name, account name, and account number) for any and all transfers of some or all of the $700,000 ICA Payment (transfers include, but are not limited to wires, ACH transfers, negotiable instruments, transactions in cash, currency transactions, purchases or sales of securities, transactions in derivatives or options, ownership or membership in a corporate entity, fund, bond, or any investment of any kind).

ANSWER: INBE is without knowledge.

//

//

//

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

3

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 6:**

Corresponding to each transfer, by date, referenced in Special Interrogatory #5, identify the corresponding name of the person, persons, and/or legal entity or entities which made the decision to effectuate each transfer.

ANSWER: INBE is without knowledge.

**SPECIAL INTERROGATORY NO. 7:**

Corresponding to each transfer, by date, referenced in Special Interrogatory #5, identify the corresponding name of the person, persons, and/or legal entity or entities which carried out the orders to initiate and/or effectuate each transfer (for example, if a wire was sent, the Interrogatory calls for the name of the person who logged into a computer and clicked a mouse thereby placing the order online if the wire was effectuated online, the person who spoke on a telephone call if the wire was ordered via telephone call, or who appeared in the bank and substantively interacted with the bank staff if the wire was authorized in a bank. The Interrogatory includes identification of each person who delegated to another the effectuation of any transfer and the person who received instructions through delegation to effectuate any transfer. The Interrogatory does not call for the identification of bank staff or other persons who did not initiate a transfer).

ANSWER: INBE is without knowledge.

**SPECIAL INTERROGATORY NO. 8:**

Identify all securities, investments, or financial products of any kind which were purchased, transacted in, or invested in through the use of all or part of the $700,000 ICA Payment.

ANSWER: INBE is without knowledge.

//

//

4

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 9:**

State the name of each borrower other than Plaintiff and the date of execution of all BELOC agreements that INBE has executed with all borrowers other than Plaintiff with terms substantially similar to the terms of the BELOC attached to the Complaint as Ex. A.

ANSWER: INBE objects that the Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  INBE further objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

**SPECIAL INTERROGATORY NO. 10:**

Produce documents which indicate or relate to INBE's intentions or instructions regarding the $700,000 ICA Payment.

ANSWER: None other than the BELOC Agreement, attached to Plaintiff's Complaint.

**SPECIAL INTERROGATORY NO. 11:**

Produce documents which indicate or relate to Messner's intentions or instructions regarding the $700,000 ICA Payment.

ANSWER: None other than the BELOC Agreement, attached to Plaintiff's Complaint.

**SPECIAL INTERROGATORY NO. 12:**

State the total number of BELOC agreements which INBE has entered into with borrowers, or purported borrowers, or contract counterparties.

ANSWER: INBE objects that the Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  INBE further objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

**SPECIAL INTERROGATORY NO. 13:**

State the total number of loans that have been funded in whole or in part pursuant to BELOC agreements which INBE has entered into with borrowers, or purported borrowers, or contract counterparties.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

5

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

ANSWER: INBE objects that the Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  INBE further objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

**SPECIAL INTERROGATORY NO. 14:**

Identify INBE's intended or putative capital source(s) related to the funding of the BELOC attached as Ex. A to the Complaint.

ANSWER: INBE objects that the Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  INBE further objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

**SPECIAL INTERROGATORY NO. 15:**

Relative to the $700,000 ICA Payment, was INBE "unable to arrange for the issuance of funding as per this agreement?" (As referenced in Ex. F of the BELOC).

ANSWER: Yes.

**SPECIAL INTERROGATORY NO. 16:**

Given that INBE, per the BELOC, contracted to loan up to $2,800,000 at 6% interest, with payments in interest only for 10 years without any personal guarantee, what other benefit(s), upside, or consideration did INBE agree to receive, or expect to receive, related to the BELOC from anyone including non-parties to the BELOC, which was not specified in the text of the BELOC?

ANSWER: None.

**SPECIAL INTERROGATORY NO. 17:**

State the date on which Messner began representing INBE in an attorney-client relationship capacity, and if Messner no longer represents INBE, state the date on which the attorney-client relationship ended.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

6

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

ANSWER: Responding Party objects to this request on the grounds that it seeks or may seek information subject to the attorney-client privilege.

**SPECIAL INTERROGATORY NO. 18:**

Identify the material terms of contractual agreements that INBE entered into with Messner which relate to the $700,000 ICA Payment (even if such agreement or agreements were subsequently cancelled, rescinded, performed, mooted, placed on hold, lapsed, or modified).

ANSWER: Responding Party objects to this request on the grounds that it seeks or may seek information subject to the attorney-client privilege.  Subject to and notwithstanding these objections:

None other than the BELOC Agreement, attached to Plaintiff's Complaint.

**SPECIAL INTERROGATORY NO. 19:**

Identify the material terms of contractual agreements that INBE entered into with Clearwater which relate to the $700,000 ICA Payment (even if such agreement or agreements were subsequently cancelled, rescinded, performed, mooted, placed on hold, lapsed, or modified, or if the agreement involved other parties in addition).

ANSWER: None.

**SPECIAL INTERROGATORY NO. 20:**

Identify the material terms of contractual agreements that INBE entered into with Latham Funding which relate to the $700,000 ICA Payment (even if such agreement or agreements were subsequently cancelled, rescinded, performed, mooted, placed on hold, lapsed, or modified, or if the agreement involved other parties in addition).

ANSWER: None.

**SPECIAL INTERROGATORY NO. 21:**

If INBE did not receive the $700,000 ICA Payment, state the reasons why.

ANSWER: INBE is without knowledge as the ICA Payment is in Messner's possession, custody, or control.

//

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

7

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 22:**

State your understanding of the material terms of contractual agreements that Messner entered into with Clearwater which relate to the $700,000 ICA Payment (even if such agreement or agreements were subsequently cancelled, rescinded, performed, mooted, placed on hold, lapsed, or modified, or if the agreement involved other parties in addition).

ANSWER: INBE is without knowledge as to the contractual relationship, if any, between Messner and Clearwater.

**SPECIAL INTERROGATORY NO. 23:**

State your understanding of the material terms of contractual agreements that Messner entered into with Latham Funding which relate to the $700,000 ICA Payment (even if such agreement or agreements were subsequently cancelled, rescinded, performed, mooted, placed on hold, lapsed, or modified, or if the agreement involved other parties in addition).

ANSWER: INBE is without knowledge as to the contractual relationship, if any, between Messner and Latham.

**SPECIAL INTERROGATORY NO. 24:**

Describe what "work" INBE undertook to fund the BELOC.

ANSWER: INBE objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

**SPECIAL INTERROGATORY NO. 25:**

Identify the date on which the purported "work" INBE undertook to fund the BELOC commenced and the date on which the purported "work" ceased.

ANSWER: INBE objects that the Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. INBE further objects that the Interrogatory seeks information that is confidential, proprietary and protected by the right to financial privacy.

//

//

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

8

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 26:**

Identify the benefit(s) or the consideration that INBE, or Messner, or any other person or entity, received (or was supposed to receive) from Messner, or another person or entity, in exchange for, or as a quid pro quo for, the decision to allow Messner, or another person or entity, to remove the $700,000 ICA Payment from the Messner Escrow Account.

ANSWER: None as far as Responding Party is aware.

**SPECIAL INTERROGATORY NO. 27:**

Identify the names of all persons or entities with knowledge of the benefit(s) or the consideration that INBE, or Messner, or any other person or entity, received (or was supposed to receive) from Messner, or another person or entity, in exchange for, or as a quid pro quo for, the decision to allow Messner, or another person or entity, to remove the $700,000 ICA Payment from the Messner Escrow Account.

ANSWER: None as far as Responding Party is aware.

Dated: May 28, 2024             BRYNER CROSBY, APC

By: *M. Candice Bryner*
       M. Candice Bryner, Esq.
       Attorneys for Defendant INBE Capital, LLC

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

9

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

## PROOF OF SERVICE

STATE OF CALIFORNIA        )
                          )    Ss
COUNTY OF ORANGE          )

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 24361 El Toro Rd., Ste. 220, Laguna Hills, CA 92637.  My electronic email address is candice@brynerlaw.com

On May 28, 2024, I served the following document(s):

**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES (SET ONE)**

On the interested parties as follows:

Kenneth E. Chase, Esq.
CHASE LAW & ASSOCIATES, P.A.
1141 71st Street
Miami Beach, FL 33141
kchase@chaselaw.com

Eric R. Deitz, Esq.
Anastacia F. Osbrink, Esq.
GORDON SCULLY MANSUKHANI, LLP
633 W. Fifth Street, 52nd Floor
Los Angeles, CA 90071
edeitz@grsm.com
aosbrink@grsm.com

(X)    **BY ELECTRONIC MAIL.**          Based on a court order, and consent of the parties to accept service by electronic transmission pursuant to CRC 2.251(c)(3), I caused the above-referenced document(s) to be sent to the person(s) at the electronic address(es) listed above

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 28, 2024 at Laguna Hills, California.

*M. Candice Bryner*
M. CANDICE BRYNER

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

10

**DEFENDANT INBA CAPITAL, LLC'S RESPONSES TO SPECIAL INTERROGATORIES**

Zoho Sign Document ID: 2B0A4254-KJQGYS1WNRAME1_4AVM0J4_QOVXRUBN0ZF4PU6YTF2Q

## VERIFICATION OF RESPONSES TO SPECIAL INTERROGATORIES

I declare under penalty of perjury under the laws of the State of California that to the best of my knowledge, INBE's Answers to Plaintiff's Special Interrogatories are true and correct.

Executed this _____ day of _____ at _____.

May 30 2024 05:34 PDT

Craig Boddington

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBA CAPITAL, LLC'S MOTION TO COMPEL ARBITRATION**

M. Candice Bryner, State Bar No. 192462
candice@brynerlaw.com
BRYNER CROSBY, APC
24361 El Toro Rd., Ste. 220
Laguna Hills, CA 92637
Telephone: (949) 371-9056

Attorneys for Defendant
INBE CAPITAL, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

CENTRAL JUSTICE CENTER

EMERALD CONSULTING PARTNERS, a Florida limited liability company,

        Plaintiff,

    v.

MESSNER REEVES, LLP, a Colorado limited liability partnership, and INBE CAPITAL LLC, a Wyoming limited liability company,

        Defendants.

CASE NO. 30-2024-01378580

[The Hon. Thomas S. McConville; Dept. C-28]

**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS (SET ONE)**

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBE CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

PROPOUNDING PARTY:          **PLAINTIFF EMERALD CONSULTING PARTNERS**

RESPONDING PARTY:           **DEFENDANT INBE CAPITAL LLC**

SET NO.:                    **ONE**

Pursuant California Code of Civil Procedure § 2033.010 et seq., Defendant INBE Capital, LLC ("Responding Party") hereby responds to Plaintiff Emerald Consulting Partners' Request for Admissions as follows:

## PRELIMINARY STATEMENT

1.      Responding Party's responses to Propounding Party's request for admissions are made to the best of its present knowledge, information and belief. Said responses are at all times subject to additional or different information that discovery or further investigation may disclose and, while based on this present state of Responding Party's recollection, are subject to refreshing of recollection with such additional knowledge or facts that may result from further discovery and investigation. Responding Party reserves the right to make any use of, or to introduce at any hearing and at trial, information responsive to Propounding Party's request for admissions that is discovered subsequent to the date of these responses, including, but not limited to, any information obtained in discovery herein

2.      Responding Party reserves all objections or other questions as to the confidentiality, relevance, materiality, privilege or admissibility as evidence, in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, of these responses and any documents or things identified in these responses.

3.      Responding Party reserves the right to object on any ground at any time to such other or supplemental interrogatories as Propounding Party may at any time propound involving or relating to the subject matter of these request for admissions.

4.      The information set forth in these responses to the request for admissions was obtained from persons currently in the employ of Responding Party or, in the alternative, was gathered by counsel for Responding Party on its behalf.

## GENERAL OBJECTIONS

Responding Party makes the following general objections, whether or not separately set forth:

1.    Responding Party objects generally to the extent that any of the request for admissions seek information protected by the attorney-client privilege and/or attorney-work product doctrine. Such information shall not be provided in the responses to Propounding Party's request for admissions and any inadvertent disclosure thereof shall not be a waiver of any privilege with respect to such information or any attorney-work product doctrine which may attach thereto.

2.    Responding Party objects generally to the extent that any of the request for admissions seek to require it to identify persons, entities, or events not known on the grounds that such instructions, definitions, or requests are overbroad and seek to require more of Responding Party than any obligation imposed by law, subject Responding Party to unreasonable and undue annoyance, oppression, burden and expense, and seek to impose upon Responding Party an obligation to investigate or discover information or material from third parties or sources which are equally accessible to the parties.

## REQUESTS FOR ADMISSIONS

1.    Admit that the $700,000 ICA Payment was placed in escrow with Messner on June 13, 2023 in the Messner Escrow Account.

RESPONSE:   Admitted.

2.    Admit that when Messner accepted the $700,000 ICA Payment in the Messner Escrow Account, Messner agreed to act as an escrow agent relative to the $700,000 ICA Payment.

RESPONSE:   Admitted.

3.   Admit that Messner drafted all or part of the BELOC.

RESPONSE:   Admitted that Messner reviewed and edited the BELOC.

4.    Admit that, per Ex. F of the BELOC, the $700,000 ICA Payment "shall be in Trustee [Messner]'s sole possession and control."

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

2

DEFENDANT INBE CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS

RESPONSE:  Admitted.

5.    Admit that the $700,000 ICA Payment did not remain in Messner's sole possession and control.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

6.    Admit that Messner transferred the $700,000 ICA Payment outside of the Messner Escrow Account.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

7.    Admit that Plaintiff did not authorize Messner to transfer the $700,000 ICA Payment outside of the Messner Escrow Account.

RESPONSE:  Admitted.

8.    Admit that Plaintiff did not authorize INBE to transfer the $700,000 ICA Payment outside of the Messner Escrow Account.

RESPONSE:  Admitted.

9.    Admit that INBE did not authorize Messner to transfer the $700,000 ICA Payment outside of the Messner Escrow Account.

RESPONSE:  Admitted.

10.    Admit that INBE has never held possession of all or any portion of the $700,000 ICA Payment.

RESPONSE:  Admitted.

11.    Admit that INBE is not "ready, willing and able to proceed with the financing" pursuant to the BELOC.

RESPONSE:  Admitted.

12.    Admit that INBE has not been "ready, willing and able to proceed with the financing" pursuant to the BELOC at any time since June 13, 2023.

RESPONSE:  Denied.

13.    Admit that Hard AF did not authorize Messner to transfer the $700,000 ICA Payment outside of the Messner Escrow Account.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

14. Admit that all or part of the $700,000 ICA Payment was transferred to INBE.

RESPONSE:  Denied.

15.    Admit that all or part of the $700,000 ICA Payment was transferred to an entity containing the word Clearwater in its name or an affiliate of such entity.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

16.    Admit that all or part of the $700,000 ICA Payment was transferred to an entity containing the word Latham in its name or an affiliate of such entity.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

17.    Admit that all or part of the $700,000 ICA Payment was transferred to an entity containing the word Titan in its name or an affiliate of such entity.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

18.    Admit that all or part of the $700,000 ICA Payment was transferred to an account at Titan Financial, LLC.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

19.    Admit that all or part of the $700,000 ICA Payment was transferred to an account at Titan Private Bank, LLC.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

20.    Admit that on or about June 12, 2023, Plaintiff, INBE, and Hard AF entered into a Funding Directive Letter, pursuant to which the parties agreed that if the LOC is not funded, then

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

4

**DEFENDANT INBE CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

"INBE agrees to immediately forward and return the Deposit amount (i.e., US $700,000.00) to BRIDGE LENDER [Plaintiff] via wire transfer, without deduction of any kind [and] If INBE fails to forward and return the Deposit amount as required within one (1) business day of BORROWER [Hard AF]'s written request, INBE agrees that BORROWER [Hard AF] may, and is hereby authorized by INBE to, instruct Escrow Agent [Messner] to forward and refund the Deposit directly to BRIDGE LENDER [Plaintiff]."

RESPONSE:  Admitted.

21.    Admit that the Funding Directive Letter requires INBE to return the $700,000 ICA Payment to Plaintiff within one business day if INBE fails to fund any part of the loan to Hard AF within 90 days of tender of the $700,000 ICA Payment.

RESPONSE:  Denied.

22.    Admit that the Funding Directive Letter requires INBE to return the $700,000 ICA Payment to Plaintiff within one business day Ross Patterson, CEO of Hard AF, directs INBE to cease working on the BELOC.

RESPONSE:  Denied.

23.    Admit that INBE made a "determination" that the "LOC is Not Funded," per the Funding Directive Letter attached to the Complaint as Ex. C.

RESPONSE:  Denied.

24.    Admit that Ross Patterson, CEO of Hard AF, directed INBE to cease working on the BELOC.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

25.    Admit that INBE directed Messner to "forward and refund" the $700,000 ICA Payment directly to Plaintiff.

RESPONSE:  Admitted.

26.    Admit that Messner failed to remit the $700,000 ICA Payment to Plaintiff without justification.

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

27.    Admit that INBE failed to remit the $700,000 ICA Payment to Plaintiff without justification.

RESPONSE:  Denied.

28.    Admit that INBE lacks sufficient capital to tender the funds pursuant to the BELOC.

RESPONSE:  Denied.

29.    Admit that Messner made a false statement on February 22, 2024, when Messner stated "[a]t no time have the funds at issue in the lawsuit disappeared or become lost."

RESPONSE:  After a diligent search and a reasonable inquiry, INBE lacks sufficient information to admit or deny this Request.

30.    Admit that a quid pro quo existed whereby some benefit or consideration was provided, or promised, in exchange for the use of the $700,000 ICA Payment and/or the removal of the $700,000 ICA Payment from the Messner Escrow Account.

RESPONSE:  Denied.

Dated:  May 28, 2024                    BRYNER CROSBY, APC

By: *M. Candice Bryner*
     M. Candice Bryner, Esq.
     Attorneys for Defendant INBE Capital, LLC

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

6

**DEFENDANT INBE CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

## PROOF OF SERVICE

STATE OF CALIFORNIA            )
                               )    Ss
COUNTY OF ORANGE               )

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 24361 El Toro Rd., Ste. 220, Laguna Hills, CA 92637.  My electronic email address is candice@brynerlaw.com

On May 28, 2024, I served the following document(s):

**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS (SET ONE)**

On the interested parties as follows:

Kenneth E. Chase, Esq.
CHASE LAW & ASSOCIATES, P.A.
1141 71st Street
Miami Beach, FL 33141
kchase@chaselaw.com

Eric R. Deitz, Esq.
Anastacia F. Osbrink, Esq.
GORDON SCULLY MANSUKHANI, LLP
633 W. Fifth Street, 52nd Floor
Los Angeles, CA 90071
edeitz@grsm.com
aosbrink@grsm.com

(X)    **BY ELECTRONIC MAIL.**            Based on a court order, and consent of the parties to accept service by electronic transmission pursuant to CRC 2.251(c)(3), I caused the above-referenced document(s) to be sent to the person(s) at the electronic address(es) listed above

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 28, 2024 at Laguna Hills, California.

*M. Candice Bryner*
M. CANDICE BRYNER

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

7

**DEFENDANT INBE CAPITAL, LLC'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS**

## <u>VERIFICATION OF RESPONSES TO REQUEST FOR ADMISSIONS</u>

I declare under penalty of perjury under the laws of the State of California that to the best of my knowledge, INBE's Responses to Plaintiff's Request for Admissions are true and correct.

Executed this _____ day of _____ at _____.

May 30 2024 05:34 PDT

Craig Boddington

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBA CAPITAL, LLC'S MOTION TO COMPEL ARBITRATION**

M. Candice Bryner, State Bar No. 192462
candice@brynerlaw.com
BRYNER CROSBY, APC
24361 El Toro Rd., Ste. 220
Laguna Hills, CA 92637
Telephone: (949) 371-9056

Attorneys for Defendant
INBE CAPITAL, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

CENTRAL JUSTICE CENTER

EMERALD CONSULTING PARTNERS, a Florida limited liability company,

        Plaintiff,

        v.

MESSNER REEVES, LLP, a Colorado limited liability partnership, and INBE CAPITAL LLC, a Wyoming limited liability company,

        Defendants.

CASE NO. 30-2024-01378580

[The Hon. Thomas S. McConville; Dept. C-28]

**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

**PROPOUNDING PARTY:**      **PLAINTIFF EMERALD CONSULTING PARTNERS**

**RESPONDING PARTY:**       **DEFENDANT INBE CAPITAL LLC**

**SET NO.:**                **ONE**

Pursuant California Code of Civil Procedure § 2031.010 et seq., Defendant INBE Capital, LLC ("Responding Party") hereby responds to Plaintiff Emerald Consulting Partners' Request for Production of Documents as follows:

**PRELIMINARY STATEMENT**

1. Responding Party's responses to Request for Production of Documents are made to the best of its present knowledge, information and belief. Said responses are at all times subject to additional or different information that discovery or further investigation may disclose and, while based on the present state of Responding Party's recollection, are subject to refreshing of such recollection with such additional knowledge or facts that may result from further discovery or investigation.

2. Responding Party reserves its right to make any use of, or to introduce at any hearing and at trial, information responsive to Propounding Party's Request for Production of Documents that is discovered subsequent to the date of these responses, including, but not limited to, any information obtained and discovered herein.

3. Responding Party reserves all objections or other questions as to the confidentiality, relevance, materiality, privilege or admissibility as evidence, in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, of these responses and any documents or things identified in these responses.

4. Responding Party reserves the right to object on any ground at any time to such other or supplemental request for production of documents as Propounding Party may at any time propound involving or relating to the subject matter of these requests for production of documents.

5. The information set forth in the responses to these requests for production of documents was obtained from persons currently employed by Responding Party or, in the alternative, information gathered by counsel for Responding Party on its behalf.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

1

INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

## <u>GENERAL OBJECTIONS</u>

Responding Party makes the following general objections, whether or not separately set forth:

1.    Responding Party objects generally to the extent that any of the requests for production of documents seeks information protected NDA and third-party right of financial privacy.

2.    Such information shall not be provided in the responses to Propounding Party's request for production of documents and any inadvertent disclosure thereof shall not be deemed waiver of any privilege with respect to such information or any attorney work product privilege which may attach thereto.

3.    Responding Party objects generally to the extent that any of the requests for production of documents seeks to require Responding Party to identify persons, entities or events not known on the grounds that such instructions, definitions, or requests are overbroad and seek to require more of Responding Party than any obligation imposed by law, subject Responding Party to unreasonable and undue annoyance, oppression, burden and expense, and seek to impose upon Responding Party an obligation to investigate and discover information and materials from third parties or sources which are equally accessible to the parties.

4.    Responding Party objects generally to Propounding Party's use of prefatory definitions which seek information or documents protected by the attorney-client privilege and attorney work product privilege.

//

//

//

//

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

2

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Documents reflecting any transfer of the $700,000 ICA Payment out of the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

2.      Documents related to any transfer of the $700,000 ICA Payment out of the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

3.      Documents related to any transfer of the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

4.      Documents reflecting authorizations to transfer the $700,000 ICA Payment out of the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

5.      Documents related to any authorizations to transfer the $700,000 ICA Payment out of the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

6.      Documents related to any authorizations to transfer the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

7.	Communications with Messner regarding the $700,000 ICA Payment.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

8.	Communications with Torben Welch regarding the $700,000 ICA Payment.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

9.	Communications with Clearwater regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

10.	Communications with Latham Funding regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

11.	Communications with Todd Owen regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

12.	Communications with Daniel Chartraw regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

13.	Communications with Martin Hale regarding the $700,000 ICA Payment.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

4

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

14.    Communications with Craig Boddington regarding the $700,000 ICA Payment.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

15.    Communications with Jonathan Wright regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

16.    Communications with Emerald Capital Partners, LLC regarding the $700,000 ICA Payment.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

17.    Communications with Titan Private Bank regarding the $700,000 ICA Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

18.    Communications with any person or entity regarding the $700,000 ICA Payment.

RESPONSE Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy.

19.    Communications with Messner regarding the BELOC.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

5

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

(Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy. Notwithstanding, any non-privileged documents in INBE's possession, custody, or control will be produced.

20.     Communications with Torben Welch regarding the BELOC.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy. Notwithstanding, any non-privileged documents in INBE's possession, custody, or control will be produced.

21.     Communications with Clearwater regarding the BELOC Payment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

22.     Communications with Latham Funding regarding the BELOC.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

23.     Communications with Todd Owen regarding the BELOC.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy. Notwithstanding, any non-privileged documents in INBE's possession, custody, or control will be produced.

24.     Communications with Daniel Chartraw regarding the BELOC.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy. Notwithstanding, any non-privileged documents in INBE's possession, custody, or control will be produced.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

6

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

25.    Communications with Martin Hale regarding the BELOC.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

26.    Communications with Craig Boddington regarding the BELOC.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

27.    Communications with Jonathan Wright regarding the BELOC.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

28.    Communications with Emerald Capital Partners, LLC regarding the BELOC.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

29.    Communications with Titan Private Bank regarding the BELOC.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

30.    Communications with any person or entity regarding the BELOC.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy.

31.    Documents relating to the veracity or falsity of the portion of Messner's February 22, 2024 statement then Messner stated "[a]t no time have the funds at issue in the lawsuit disappeared or become lost."

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

32. Documents related to the Funding Directive Letter.

RESPONSE: Responding Party objects that the Request is overbroad, vague, ambiguous and fails to statement with reasonable particularity the documents being sought. Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Notwithstanding these objections:

All nonprivileged documents in INBE's possession, custody, or control will be produced.

33. Communications related to the Funding Directive Letter.

RESPONSE: This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy. Notwithstanding these objections:

All non-privileged responsive documents in INBE's possession, custody, or control will be produced.

34. Communications with Messner regarding the Funding Directive Letter.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

35. Documents relating to any reason(s) why the $700,000 ICA Payment has not been returned to Plaintiff.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

36. Communications relating to any reason(s) why the $700,000 ICA Payment has not been returned to Plaintiff.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

37. Documents relating to demand for the return of the $700,000 ICA Payment.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

38.    Your underwriting file pertaining to Hard AF.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

39.    Your underwriting file pertaining to the BELOC.

RESPONSE: All responsive documents in INBE's possession, custody, or control will be produced.

40.    Documents reflecting your underwriting guidelines pursuant to the BELOC.

RESPONSE: Responding Party objects that the Request is overbroad, vague, ambiguous and fails to state with reasonable particularity the documents being sought.  Responding Party further objects insofar as the documents are equally available to Propounding Party. Notwithstanding these objections:

Please refer to the FAQ on INBE's website.

41.    Documents relating to any reason why you did not request a personal guarantee or any real property as collateral from Hard AF in connection with the BELOC.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

42.    Licenses that you hold to issue loans in effect in 2023 or 2024.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

43.    Insurance policies in effect in 2023 or 2024 listing INBE as an insured, per California Code of Civil Procedure § 2017.210.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

44.    Contracts with Messner.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential, proprietary documents and documents protected by the right of financial privacy.

45.    Documents related to any contract with Messner.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and fails to state with reasonable particularity the documents being sought. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy.

46.     Engagement letters or engagement agreements with Messner.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome. This request seeks or may seek information subject to the attorney-client privilege, attorney work product doctrine, duty of confidentiality (Bus. & Prof. Code § 6068(e)(1)), and/or a right of financial privacy.

47.     Invoices from Messner.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

48.     Documents reflecting payments made to Messner.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

49.     Documents reflecting receipt of payments from Messner.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

50.     Documents reflecting payment of money, or receipt of money, to or from third-parties at the direction of Messner or in conjunction with actions taken by Messner.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

51.     Monthly bank statements for any account in INBE's name for the year 2023.

RESPONSE: Responding Party objects to this request on the grounds that it seeks documents protected by the right to financial privacy.

52.     Monthly bank statements for any account in INBE's name for the year 2024.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

10

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

RESPONSE: Responding Party objects to this request on the grounds that it seeks documents protected by the right to financial privacy.

53.    Produce each BELOC that INBE has entered into with a borrower other than Plaintiff, in which the BELOC contains terms substantially similar to the terms in the BELOC attached to the Complaint as Ex. A.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party objects to this request on the grounds that it seeks documents which are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

54.    For each BELOC that INBE has entered into with a borrower other than Plaintiff, in which the BELOC contains terms substantially similar to the terms in the BELOC attached to the Complaint as Ex. A, and for which the loan was not funded, produce documents reflecting the reasons why INBE failed to fund the loan.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and unduly burdensome.  Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party objects to this request on the grounds that it seeks documents which are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Responding Party objects to the extent the request seeks documents protected by the attorney-client privilege.

55.    Documents reflecting the reasons why the BELOC does not contain a personal guarantee.

RESPONSE: Responding Party objects to this request on the grounds that it is vague, ambiguous, overly broad, and fails to identify with reasonable particularity the documents being sought.  Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party objects to this request on the grounds that it seeks documents which are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Responding Party

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

11

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

objects to the extent the request seeks documents protected by the attorney-client privilege. Notwithstanding these objections: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

56.     Documents reflecting INBE's capitalization table.

RESPONSE: Responding Party objects that the request is vague and ambiguous. Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

57.     Documents reflecting capital contributions to INBE.

RESPONSE: Responding Party objects that the request is vague and ambiguous. Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

58.     Documents reflecting distributions to INBE's members.

RESPONSE: Responding Party objects that the request is vague and ambiguous. Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

59.     INBE's operating agreement and any amendments thereto.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

12

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

60.     Minutes from any member or management meeting among one or more members of INBE.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.

61.     INBE's corporate resolutions.

RESPONSE:  Responding Party objects that the request is vague and ambiguous. Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

62.     INBE's tax returns for the last three years.

RESPONSE:  Responding Party objects that the request seeks documents protected by the tax payer's privilege and the right of financial privacy.  Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

63.     INBE's balance sheets for the last three years.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

64.     INBE's income statements for the last three years.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Notwithstanding these objections:

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

13

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

65.     Documents reflecting obligations or debt owed by INBE.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

66.     Documents reflecting obligations or debt owed to INBE.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

67.     Contracts with Clearwater.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

68.     Documents relating to contracts with Clearwater.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

14

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

69.    Contracts with Latham Funding.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

70.    Documents relating to contracts with Clearwater.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

71.    Contracts with Titan Private Bank.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy. Responding Party further objects on the basis that the Request seeks documents that are

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

15

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

72.    Documents relating to contracts with Titan Private Bank.

RESPONSE: Responding Party objects to this request on the grounds that it seeks confidential and proprietary documents and documents protected by the right to financial privacy.  Responding Party further objects on the basis that the Request seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence: Notwithstanding these objections:

After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

73.    Communications regarding Titan Private Bank.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

74.    Documents reflecting any reason(s) why the $700,000 ICA Payment would purportedly be held in a Titan Private Bank account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

75.    Documents reflecting authorization to transfer the $700,000 ICA Payment to an account at Titan Private Bank account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

76.    Monthly bank statements for the Titan Private Bank account reflected in Ex. J.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

77.    Documents reflecting the contact information for any person(s) at Titan Private Bank.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

78.    Documents reflecting the benefit(s) or the consideration that INBE, or Messner, or any other person or entity, received (or was supposed to receive) from Messner, or another person or entity, in exchange for, or as a quid pro quo for, the decision to allow Messner, or another person or entity, to remove the $700,000 ICA Payment from the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

79.    Documents related to the benefit(s) or the consideration that INBE, or Messner, or any other person or entity, received (or was supposed to receive) from Messner, or another person or entity, in exchange for, or as a quid pro quo for, the decision to allow Messner, or another person or entity, to remove the $700,000 ICA Payment from the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

80.    Documents related to an acknowledgement of the risks, or knowledge of the risk, or awareness of the potential consequences, of the decision to remove the $700,000 ICA Payment from the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control because no such documents exist.

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

17

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

81.    Documents reflecting, or related to, a legal analysis by Messner or any other person or entity, of the risks, propriety, or potential consequences, that may result from the decision to remove the $700,000 ICA Payment from the Messner Escrow Account.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

82.    If the $700,000 ICA Payment was used pursuant to an investment, in a security or otherwise, produce all prospectuses, term sheets, white papers, slide decks, presentations, communications, or other descriptions of the nature and details of the investment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

83.    If the $700,000 ICA Payment was used pursuant to an investment, in a security or otherwise, produce all documents reflecting the nature and details of the investment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

84.    If the $700,000 ICA Payment was used pursuant to an investment, in a security or otherwise, produce all documents reflecting disclosures to Plaintiff or other parties regarding the nature and details of the investment.

RESPONSE: After a diligent search and a reasonable inquiry, INBE has no responsive documents in its possession, custody or control, and to the extents such documents exist, they are in the possession of Messner.

Dated:  May 28, 2024                    BRYNER CROSBY, APC


                                        By: *M. Candice Bryner*
                                            M. Candice Bryner, Esq.
                                            Attorneys for Defendant INBE Capital, LLC

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

18

**INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

## PROOF OF SERVICE

STATE OF CALIFORNIA              )
                                )    Ss
COUNTY OF ORANGE                 )

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 24361 El Toro Rd., Ste. 220, Laguna Hills, CA 92637.  My electronic email address is candice@brynerlaw.com

On May 28, 2024, I served the following document(s):

**DEFENDANT INBE CAPITAL LLC RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET ONE)**

On the interested parties as follows:

Kenneth E. Chase, Esq.
CHASE LAW & ASSOCIATES, P.A.
1141 71st Street
Miami Beach, FL 33141
kchase@chaselaw.com

Eric R. Deitz, Esq.
Anastacia F. Osbrink, Esq.
GORDON SCULLY MANSUKHANI, LLP
633 W. Fifth Street, 52nd Floor
Los Angeles, CA 90071
edeitz@grsm.com
aosbrink@grsm.com

(X)    **BY ELECTRONIC MAIL.**            Based on a court order, and consent of the parties to accept service by electronic transmission pursuant to CRC 2.251(c)(3), I caused the above-referenced document(s) to be sent to the person(s) at the electronic address(es) listed above

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 28, 2024 at Laguna Hills, California.

*M. Candice Bryner*
M. CANDICE BRYNER

INBE CAPITAL, LLC'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

Zoho Sign Document ID: 2B0A4254-KJQGYS1WNRAME1_4AVM0J4_QOVXRIJBN0ZF4PU6YTF2ZQ

## VERIFICATION OF RESPONSES TO REQUEST FOR PRODUCTION

I declare under penalty of perjury under the laws of the State of California that to the best of my knowledge, INBE's Responses to Plaintiff's Request for Production are true and correct.

Executed this _____ day of _____ at _____.

May 30 2024 05:34 PDT

Craig Boddington

BRYNER CROSBY
A PROFESSIONAL
LAW CORPORATION

**DEFENDANT INBA CAPITAL, LLC'S MOTION TO COMPEL ARBITRATION**

# EXHIBIT 27



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.    1:24-CR-392 (MAD) |
| | ) | |
| v. | ) | **Indictment** |
| | ) | |
| KRIS ROGLIERI, | ) | Violations:    18 U.S.C. § 1343 |
| | ) | [Wire Fraud] |
| **Defendant.** | ) | |
| | ) | Five Counts & Forfeiture Allegation |
| | ) | |
| | ) | County of Offenses:    Warren |

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

SEP 19 2024

AT _____ O'CLOCK

John M. Domurad, Clerk - Albany

**THE GRAND JURY CHARGES:**

**Background**

At all times relevant to this indictment:

1.      The defendant, **KRIS ROGLIERI**, resided in Warren County, New York.

2.      Prime Capital Ventures, LLC ("Prime Capital") and its affiliate, Prime Commercial Lending, LLC ("Prime Commercial"), were companies based in Albany, New York, holding themselves out to be involved in commercial lending.

3.      **ROGLIERI** was the Chief Executive Officer and sole member of both Prime Capital and Prime Commercial.

4.      Prime Capital maintained a bank account ending in 2233 (the "Prime Capital Bank Account") and Prime Commercial maintained a bank account ending in 4465 (the "Prime Commercial Bank Account") at KeyBank, N.A.

5.      **ROGLIERI** was the only signatory on the Prime Capital Bank Account and Prime Commercial Bank Account.

6.      1800 Park Avenue LLC ("1800 Park") was a Minnesota company that sought Prime Capital's assistance in obtaining a loan to build a commercial egg production facility.

### The Scheme to Defraud

7.     In or around December 2023, **ROGLIERI** fraudulently sought and obtained a $5,000,000 "Interest Credit Account Payment," or "ICA" payment, from 1800 Park. **ROGLIERI** did so under the false promise and representation that the funds would be kept in a "separate and distinct account" and would be "refundable" if Prime Commercial and 1800 Park did not enter into an agreement for an approximately $100 million line of credit. No such agreement was entered.

8.     **ROGLIERI** had no intention of maintaining 1800 Park's funds as promised. Instead, he used the funds for, among other things, Prime Capital's business expenses unrelated to 1800 Park and to fund his extravagant lifestyle.

9.     On or about December 22, 2023, 1800 Park transferred the $5,000,000 payment to the Prime Capital Bank Account. That same day, **ROGLIERI** transferred the $5,000,000 from the Prime Capital Bank Account to the Prime Commercial Bank Account. **ROGLIERI** then stole and fraudulently used the funds as follows:

a.     On or about December 22, 2023, $950,000 was transferred to Company-1, a Prime Capital client based on Saratoga County, New York, as partial loan funding for Company-1's real estate project.

b.     On or about December 22, 2023, $2,000,000 was transferred to a credit union account held by Company-2, a Virginia company.

c.     On or about December 26, 2023, $101,000 was paid to Company-3, which provided private jet services, for round-trip private air travel between Albany International Airport and Anguilla. The flight was for a family vacation taken by **ROGLIERI** from on or about December 29, 2023 to on or about January 5, 2024.

2

d.    On or about December 26, 2023, $84,000 was paid to Company-4, a company that sells high-end watches, to purchase a Rolex day-date yellow gold diamond bezel watch.

e.    On or about December 29, 2023, $400,000 was paid to Law Firm-1, which represented Prime Capital in several court proceedings.

## COUNTS 1-5
### [Wire Fraud]

10.    Paragraphs 1 through 9 are hereby realleged and incorporated as if fully set forth herein.

11.    From at least December 2023 until in or around January 2024, in Warren County in the Northern District of New York, and elsewhere, the defendant, **KRIS ROGLIERI**, devised and intended to device a scheme and artifice to defraud 1800 Park, and to obtain money and property from 1800 Park by means of materially false and fraudulent pretenses, representations, and promises.

12.    For the purpose of executing such scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, **ROGLIERI**, on or about the dates listed below, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, and signals, that is, wire transfer requests transmitted over the internet by **ROGLIERI** from his home in the Northern District of New York to KeyBank, N.A. computers in Ohio initiating wire transfers from the Prime Commercial Bank Account to the following recipients:

| Count | Approximate Date | Amount | Recipient of Wire Transfer |
|---|---|---|---|
| 1 | December 22, 2023 | $950,000 | Company-1 |
| 2 | December 22, 2023 | $2,000,000 | Company-2 |
| 3 | December 26, 2023 | $101,000 | Company-3 |
| 4 | December 26, 2023 | $84,000 | Company-4 |

3

| Count | Approximate Date | Amount | Recipient of Wire Transfer |
|-------|------------------|--------|----------------------------|
| 5 | December 29, 2023 | $400,000 | Law Firm-1 |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION

13. The allegations contained in Counts 1 through 5 of this indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

14. Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts 1 through 5 of this indictment, the defendant, **KRIS ROGLIERI**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

    a. a money judgment of $5,000,000;

    b. a Rolex day-date yellow gold diamond bezel watch bearing Serial No. 16JV1686;

    c. $223,365 in U.S. currency seized from the Thread Bank account with account number ending in 7554; and

    d. $467,810 in U.S. currency seized from the Thread Bank account with account number ending in 1832.

15. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

Dated:    September 19, 2024

A TRUE BILL

Grand Jury Foreperson

***Redacted

CARLA B. FREEDMAN
United States Attorney

By: _____
Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140

5

# EXHIBIT 28

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

~~PRIME CAPITAL VENTURES,~~ **- CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE -**

Among

**INBE Capital LLC**

as Lender

&

and

_____ _____ Hard AF Seltzer, LLC



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

~~as~~As Borrower

~~dated~~Dated as of

==[Month] [Day], [Year]==

## TABLE OF CONTENTS

Page

RECITALS — 1

ARTICLE 1 DEFINITIONS
Section 1.1. Certain Defined Terms — 2

ARTICLE 2 THE CREDIT
Section 2.1. Line of Credit Amount — 5
Section 2.2. Line of Credit Documents — 5

ARTICLE 3 TERM, INTEREST AND PAYMENTS

Section 3.1. Initial Term — 5May 05 2023

Section 3.2. Extended Term — 5
Section 3.3. Applicable Interest Period — 6
Section 3.4. Interest Rate Calculations — 6
Section 3.5. Interest Payments — 6
Section 3.6. Reserves — 6
Section 3.7. Intentionally Omitted — 6
Section 3.8 Prepayment — 7
Section 3.9. Interest Credit Account — 7
Section 3.10. LOC Fee — 7
Section 3.11. Line of Credit Extension Fees — 7
Section 3.12. Legal and Incidental Fees, Charges and Costs — 7
Section 3.13. Line of Credit Disbursement Account — 8
Section 3.14. Taxes — 8



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

**ARTICLE 4 CONDITIONS TO CLOSING AND DISBURSEMENT**
Section 4.1. Delivery of the LOC Documents .......... 8
Section 4.2. Authority .......... 9
Section 4.3. Liens .......... 9
Section 4.4. Litigation .......... 9
Section 4.5. Events of Default .......... 9
Section 4.6. Purchase and Agreement Contracts .......... 9
Section 4.7. Compliance with Certain Requirements .......... 9
Section 4.8. Evidence of Insurance .......... 9
Section 4.9. Financial Statements .......... 10
Section 4.10. Business Pro Forma .......... 10
Section 4.11. Management Plan .......... 10
Section 4.12. Material Change .......... 10
Section 4.13. Non-Subordination .......... 10
Section 4.14. Borrower Governing Agreement .......... 10
Section 4.15. Securitization .......... 11

**ARTICLE 5 USE OF LINE OF CREDIT PROCEEDS**
Section 5.1. Business Expansion Costs .......... 11

**ARTICLE 6 INSPECTIONS**
Section 6.1. Project Inspection .......... 11
Section 6.2. Books and Records .......... 11
Section 6.3. Force Majeure Event Inspection Right .......... 11

**ARTICLE 7 ADVANCE OF FUNDS**
Section 7.1. Timing and Advances to Payee .......... 12
Section 7.2. Conditions Precedent to Advance of Funds .......... 12
Section 7.3. Unpaid Lien Claims .......... 12
Section 7.4. Mandatory Advances .......... 12

**ARTICLE 8 BORROWER'S AFFIRMATIVE COVENANTS**
Section 8.1. Project .......... 13
Section 8.2. Compliance with Laws .......... 13
Section 8.3. Compliance with Documents .......... 13
Section 8.4. Books and Records .......... 13
Section 8.5. Payment of Obligations .......... 13
Section 8.6. Financial Reports .......... 13
Section 8.7. Notification to Lender .......... 13
Section 8.8. Partnership/Corporate Existence .......... 14

**ARTICLE 9 BORROWER'S NEGATIVE COVENANTS**
Section 9.1. Liquidation, Merger and Sale of Assets .......... 14
Section 9.2. Liens .......... 14
Section 9.3. Indebtedness .......... 14
Section 9.4. Investments, Loans and Guaranties .......... 14
Section 9.5. Acquisitions .......... 14
Section 9.6. Organizational Documents .......... 15
Section 9.7. Project and Project Documents .......... 15

**ARTICLE 10 REPRESENTATIONS AND WARRANTIES** .......... 15
Section 10.1. Validity of Agreement .......... 15
Section 10.2. Existing Defaults .......... 16
Section 10.3. No Default in Other Agreements .......... 16
Section 10.4. No Consents .......... 16
Section 10.5. Litigation .......... 16
Section 10.6. Financial Statements .......... 16



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 10.7. Legal Requirements — 16
Section 10.8. Taxes — 17
Section 10.9. Organization and Good Standing — 17
Section 10.10. Insurance — 17
Section 10.11. Accurate and Complete Statements — 17
Section 10.12 Lender's Ability to Fund — 17
Section 10.13 Timing of Lender Funding — 17

ARTICLE 11 NATURE OF REPRESENTATIONS AND WARRANTIES
Section 11.1. Generally — 18

ARTICLE 12 EVENTS OF DEFAULT
Section 12.1. Nonpayment — 18
Section 12.2. Other Covenants and Agreements — 18
Section 12.3. Representations and Warranties — 18
Section 12.4. Security — 18
Section 12.5. Validity of LOC Documents — 19
Section 12.6. Petition for Bankruptcy, Insolvency — 19
Section 12.7. Material Litigation — 19

ARTICLE 13 REMEDIES
Section 13.1. General — 19
Section 13.2. Right to Acquire — 20
Section 13.3. Curing of Defaults by Advances — 21
Section 13.4. Remedies Are Cumulative — 21
Section 13.5. Offsets — 21
Section 13.6. Collateral — 22
Section 13.7. Default by Lender — 22
Section 13.8. Binding Arbitration — 24

ARTICLE 14 GENERAL PROVISIONS
Section 14.1. Disclaimer of Liability — 24
Section 14.2. Publicity — 25
Section 14.3. Confidentiality — 25
Section 14.4. Responsibility for Application of Funds — 25
Section 14.5. Notices — 25
Section 14.6. Applicable Law — 26
Section 14.7. Successors and Assigns — 26
Section 14.8. Severability — 26
Section 14.9. Amendments — 26
Section 14.10. Headings; Attachments — 26
Section 14.11. No Third-Party Rights — 26
Section 14.12. Indemnification — 26
Section 14.13. General Limitation of Liability — 27
Section 14.14. Entire Agreement — 27
Section 14.15. Execution in Counterparts — 27
Section 14.16. Legal Representation of the Parties — 27
Section 14.17. JURY TRIAL WAIVER — 28
Signatures — 29

EXHIBITS:
A.      PROMISSORY NOTE
B.      TRANCHE SCHEDULE
C.      PROJECT COSTS
D.      THE PROJECT
E.      THE PROPERTY
F.      SECURITY AGREEMENT

. 4



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

G.     FORM TERMINATION LETTER



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, ~~restated or otherwise modified, this "Agreement") is made and entered as of~~ the /___/ day of [MONTH], [YEAR], ~~between PRIME CAPITAL VENTURES, LLC., a Delaware Limited Liability Company (the "Lender"), _____ _____ LLC, a NEVADA limited liability company ("Borrower").~~
restated or otherwise modified, this "Agreement") is made and entered as of   May 05 2023
between INBE Capital LLC (the "Lender")

, and   INBE Capital, LLC
a   Wymoning                                                          Company ("Borrower").

## RECITALS

A.   ~~A.~~   The Borrower desires to obtain from Lender an asset backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.   ~~B.~~   The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion ~~of _____ Pharmacy and the build out of a sterile compound clean room~~ (as more fully described on Exhibit ~~D~~I attached hereto the (~~"~~"Project~~"), located on that parcel of real property legally~~").

**Commented [LT1]:**

C.   Secured assets will be described on Exhibit ~~E~~C attached hereto (the "Property").

~~C.~~

D.   The Borrower has agreed to pay a ~~total contribution of~~   N/A Waived ~~twenty percent (20%) of~~ loan application fee of
to the ~~Project LOC Amount to Lender, by establishing the Interest Reserve (the "Interest Reserve") and the ICA, collectively, (the "Interest Reserve Account)~~Lender, within ~~one business banking day or 24 hours~~fourteen (14) Calendar days after the Lender receives the Borrower's fully executed counterparts of the LOC Documents ~~are received by Lender.~~.

E.   ~~D.~~   The Borrower has agreed to pay, pursuant to Section 3.6 hereof, ~~the aggregate amount of FOUR MILLION Dollars ($4,000,000.00), (~~of
two million seven hundred forty-seven thousand two hundred fifty-two dollars and seventy-five cents        $2,747,252.75
.(the "ICA Payment"), by bank wire to Lender. ~~(See Addendum A for ICA payment schedule.)~~ An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

F.   ~~E.~~   Lender has agreed to make the LOC to Borrower in an aggregate amount, according to Exhibit ~~B, amount~~I. not to exceed the Maximum Amount for the purposes set forth in these recitals and in the Promissory Note (as hereinafter defined) and upon the terms and subject to the conditions hereinafter set forth.

**INBECAPITAL**

. 6

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ARTICLE 1

## - DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

"Advance(s)" means any loan advance made by Lender in accordance with the terms and conditions of ~~this Agreement.~~
this Agreement.

"Applicable Interest Rate" means the fixed interest rate specified in the Promissory Note.

"Borrower" means that term as defined in the first paragraph of this Agreement.

"Business Expansion" means any transaction that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"Closing Date" means the last date of signed execution of this Agreement by Lender and Borrower.

"Collateral" means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

"Event of Default" means any event or condition that shall constitute an event of default as described in ~~Article 12 of this Agreement.~~
Article 12 of this Agreement.

"ICA" means the ~~definition given in Recital D.~~ Interest Control Account.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"ICA Payment" means the amount remitted pursuant to Recital ~~D~~B of this Agreement.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"Interest Reserve" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a or on behalf of the Borrower or its affiliate (e.g., JV Partner), received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"Interest Reserve Account" means funds retained to cover the definition given in Recital C. contractual payment obligations. "Lender" means that term as defined in the first paragraph of this Agreement.

"LOC" means that termthe Line of Credit provided to the Borrower by the Lender as defined in Recital AExhibit I of this Agreement.

"LOC Disbursement Account" means that term as defined in Section 3.12 hereof.

"LOC Document(s)" means, collectively, this Agreement, the Promissory Note and each     Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"Maximum Amount" means TWENTY–ONE MILLION Dollars ($21,000,000.00). The Maximum Amount isan amount equal to the Project LOC Amount plus all fees, costs and expenses, which are the Borrower's responsibility to pay.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulationsRegulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"Project" means that term as defined in Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"Project Costs" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation and/or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project ),., as more specifically set forth in the Projectproject budget set forth on Exhibit CB attached hereto ).

"Project LOC Amount" means ~~TWENTY MILLION Dollars ($20,000,000.00).~~

as defined in Exhibit I attached hereto. "Property" means that term as defined

in ~~Recital B~~Exhibit C of this Agreement.

"Promissory Note" means the Promissory Note, in the form attached hereto as Exhibit A.

"Security Agreement" means that certain Security Agreement, dated as of the Closing Date, executed by ~~the Borrower in favor of Lender, in the form attached hereto as~~ **Exhibit F**.
the Borrower in favor of Lender, in the form attached hereto as Exhibit D.

"Security Document" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each ~~U.C.C. Financing Statement or similar~~ filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"Scheduled Maturity Date" means the _____ year anniversary of the Closing Date, as the ~~fifth (5th)~~ 10
same ~~may~~ be extended pursuant to Section 3.2 hereof.

"Subsidiary" means any other entity in which the Company controls, directly or indirectly, at least 50% of the equity or which is under the direct control or management of the Company or Company's owners.

"Taxes" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United



. ~~12~~

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"Term Sheet" means that document(s) ~~dated~~attached hereto as ~~of 5th day of May, 2022 between Borrower and Lender~~Exhibit I, setting forth a general summary of the ~~terms of agreement memorialized more fully herein in final form.~~

terms of agreement memorialized more fully herein in final form.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"Tranche Schedule" means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto ~~as~~in the Term Sheet: Exhibit **B**I; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the ~~Maximum~~Project LOC Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

## ARTICLE 2
# - THE CREDIT

Section 2.1.— Line of Credit Amount. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

Section 2.2.— Line of Credit Documents. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and ~~its~~it's counsel. ~~The LOC Documents consist of the following:~~

                    ——a.—____Promissory Note~~;~~.

———————————b. a.   this Agreement;

                    ~~c.  Governing Agreement/an Amended~~ and ~~Restated Governing Agreement; and~~

                    ~~c.~~ a.   each Security Document.

## ARTICLE 3
# - TERM, INTEREST AND PAYMENTS

Section 3.1. Initial Term. The initial term of the LOC is   ten          I0          years and shall commence on the Closing Date ~~and~~. This Agreement will initially expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest ~~thereon, and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower~~and fees shall be payable in full on the Scheduled Maturity Date.

Section 3.2.— Extended Term. ~~At~~As of the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions

**INBECAPITAL**

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twelve (12twenty four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "Extended Term"; collectively, the "Extended Terms"). In connection with Lender's granting of each Extended Term, (a)



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(a) Borrower shall execute all documents, which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees.

Section 3.3. Applicable Interest Period. The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full; provided, however, that, no interest period may end later than the Scheduled Maturity Date.

Section 3.4. Interest Rate Calculation. Interest shall be calculated on the basis of a 365-day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate, which the Borrower may contract to pay under applicable law (the "Maximum Interest Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to fees or other amounts due to lender, then to the unpaid principal balance outstanding under the Promissory Note or, then, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. Interest Payments. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. Reserves. Following the signing of this Agreement, the Borrower shall remit two million seven hundred forty-seven thousand two hundred fifty-two dollars and seventy-five cents $2,747,252.75 as the ICA Payment, in accordance with the terms and the time period set forth in Recital DExhibit I. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not become non-refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable. The ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender.

Section 3.7. Intentionally Omitted

Section 3.8. Prepayment. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC upon no less than thirty (30) days' prior written notice to Lender. . Upon a

. 16



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

full prepayment of all outstanding principal of the LOC, Lender must, within ninety (90) calendar days from the date of that full prepayment, pay Borrower an amount equal to any credit balance of the ICA.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 3.~~9.~~ 8. Interest Credit Account. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which ~~notice~~ shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit ~~into~~in the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable. Where the Lender has agreed to a payment holiday, as specified within Exhibit I, the interest payments shall first be drawn from the ICA for the duration of the payment holiday, thereafter the Borrower shall make interest payments monthly.

Section 3.~~10.~~ 9. Fees. LOC Establishment Fee. ~~At Closing and out~~Out of the initial Advance, the Borrower shall pay Lender a ~~nonrefundable~~non-refundable fee for the LOC in an aggregate amount equal to ~~FIVE percent (5%) multiplied by~~ _____ 9% _____ % of

the ~~Project LOC Amount, which is equal to ONE MILLION Dollars ($1,000,000.00)~~ Loan Value, being:    nine hundred eighty-nine thousand ten dollars and ninety-nine cents    $989,010.99

(the "~~LOC~~Establishment Fee"). The ~~LOC~~Establishment Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

_____ Section 3.~~11.~~ 10. Line of Credit Extension Fees. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a ~~nonrefundable~~non-refundable LOC extension fee for each extension in an aggregate amount equal to ~~one~~six percent (~~1~~6%) multiplied by the ~~Maximum~~Project LOC Amount.

_____ Section 3.~~12.~~ 11. Legal and Incidental Fees~~,~~. Charges and Costs. Borrower shall pay all reasonable out of pocket legal, recording and filing fees, documentary stamps, taxes, service charges, credit reports, ~~U.C.C.~~reasonable search costs, title company and escrow fees and costs, third- party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or an adversary proceeding) or judicial or non-judicial proceeding~~.~~, through appeal. Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC;

. 18



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or ~~willful~~wilful misconduct.

Section 3.~~13.~~ 12. Line of Credit Disbursement Account. The proceeds of each Advance under the LOC shall be advanced into the ~~LOC Disbursement Account~~account with Lender to be used by Borrower for payment of the Borrower's Project Costs~~.~~ (the "LOC Disbursement Account"), solely for the purposes and in the manner set forth in this Agreement.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights ~~and interest in and~~ to the LOC Disbursement Account.

Section 3.~~14.~~ 13. Taxes.

a. ~~(a)~~ All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

b. ~~(b)~~ Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

c. ~~(c)~~ The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4
# - CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing~~:~~ (the same to be considered representations of Borrower upon Closing):

Section 4.1. Delivery of the LOC Documents.

a. ~~(a)~~ As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

b.     ~~(b)~~ The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Deposit Account and Security Account (as each term is defined in the Security Agreement) maintained by the Borrower.

~~(c)     Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a first priority lien and security interest in and to the Property (the "Security Instrument"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the escrow services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance with respect to the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to Borrower to fund pre-acquisition costs.~~



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 4.2.— Authority. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, and (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

Section 4.3.— Liens. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of Uniform Commercial Code liensecurity searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) Uniform Commercial Code or other liensecurity termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender, such permission not to be unreasonably withheld.

Section 4.4.— Litigation. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects  Borrower's ability to perform all of the terms and provisions of this Agreement.

Section 4.5.— Events of Default. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

Section 4.6. Purchase and Agreement Contracts. Lender  shall receive  copies  of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

Section 4.7.— Compliance with Certain Requirements. Lender shall receive  evidence reasonably satisfactory to Lender that the business  is in material compliance  with all applicable  local, state, federal and international laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) underand all local, state, federal, and international laws, procedures, statutes, regulations and, ordinances, conditions, reservations and restrictions applicable to the Project and the Property.



22

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 4.8.— Evidence of Insurance.

a. ——(a)——For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders 'loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of the size and character of the business of the Borrower, and shall furnish Lender with the satisfactory evidence of such insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project. and the Property.

——(b)——

b. Borrower shall always maintain a life insurance policy on the life of- N/A Waived Sima Koegel (the "Key Man"),

. as permitted under applicable local, state, federal and/or international law in an amount agreed to by Lender. The Borrower shall have provided to Lender (directly or through the issuer of such life insurance policy) an assignment of each such life insurance policy, in form and substance satisfactory to Lender, on or before the date of the funding of the first Advance under the Tranche Schedule. In connection with such policy(ies), the Borrower shall cause the insurer to agree to provide in writing to Lender any notice of cancellation or non-renewal at least thirty (30) days prior to such event. In the event- N/A Waived that the Key Man cannot qualify for a key mankeyman policy, Borrower shall submit proof of application and denial of coverage. Upon submission of proof of denial, Lender may thereafter waive thisthe requirement in writing.

——Section 4.9.—— Financial Statements. Lender shall have received all financial reports required by Section 8.6 hereof.

Section 4.10. Business Pro Forma. Lender shall receive a pro forma income and expense statement annuallyquarterly in connection with the Project.

——Section 4.11.—— Management Plan. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

——Section 4.12.—— Material Change. Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and

23



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.



. 24

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 4.13. Non–Subordination. Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position ~~to~~ subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

~~Section 4.14. Borrower Governing Agreements. On or before the date of the funding of the first Advance under the Tranche Schedule, the Borrower shall deliver to the Lender all Borrowers fully executed Organizational Documents, in form and substance satisfactory to the Lender, together with any such other agreements or documentation, in form and substance satisfactory to the Lender, necessary or desired to complete the transactions contemplated thereby. Borrower's failure to timely provide all fully executed Organizational Documents may delay disbursement of the first Advance, and any such delay shall not constitute a breach by Lender of this Agreement or any of the LOC Documents or the transactions contemplated hereunder and thereunder.~~

~~Section 4.15.~~Section 4.14. Securitization. Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or due diligence required by the insurer in a timely manner.

## ARTICLE 5
# - USE OF LINE OF CREDIT PROCEEDS

Section 5.1. Business Expansion Costs.

a. ~~(a)~~ Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached Exhibit ~~C~~B, updated yearly by Borrower.

b. ~~(b)~~ The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
# - INSPECTIONS

Section 6.1. Project Inspection. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon ~~five (5) days 'prior~~fifteen



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(15)  days 'prior written notice to Borrower to enter on-site offices of the Project construction site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to oncetwice per quarteryear absent the occurrence of an Event of Default.

Section 6.2.  Books and Records. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 6.3. Force Majeure Event Inspection Right. In the event of a Force Majeure Event which actually interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project for a period of time beyond ninety (90) days, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project. ~~Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by Lender in Lender's sole discretion, that the Borrower has ability to perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.~~

## ARTICLE 7
## - ADVANCE OF FUNDS

Section 7.1. Timing and Advances to Payee. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than ninety (90) ~~banking business~~calendar days (inclusive of underwriting period) following confirmation of receipt by the ~~opening~~Lender of the ICA Payment.

Section 7.2. Conditions Precedent to Advance of Funds. Lender's obligation to make Advances hereunder
shall be conditioned upon ~~fulfillment~~fulfilment of the terms set forth in Article 4 hereof~~.~~ to Lender's satisfaction.

Section 7.3. Unpaid Lien Claims. If Lender receives notice of ~~nonpayment~~non-payment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred fifty percent (~~100~~150%) of the lien amount claimed from future ~~Advances~~advances .

Section 7.4. Mandatory Advances. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ARTICLE 8

## - BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing: (such consent to be withheld in Lender's sole discretion):

Section 8.1. Project. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project. Borrower shall submit and update its business plan which shall include the scope of the Project. Lender agrees that all affiliates, joint venture partners and subsidiaries described in the business plan are a part of the Project and the Project LOC Amount may be used within such entities. This Section 8.1 prevails over Section 5.1(b), and additional approval from Lender is not required.

Section 8.2. Compliance with Laws. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local, federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. Compliance with Documents. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. Books and Records. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. Payment of Obligations. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. Financial Reports. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within thirty (30) calendar fifteen (15) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) calendar sixty (60) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender.

Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 8.7. Notification to Lender. Promptly after learning thereof, notify Lender of: (a)

a. the details of any material action, proceeding, investigation or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

Section 8.8. Partnership/Corporate Existence. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

## ARTICLE 9
# BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion) Borrower shall not:

Section 9.1. Liquidation, Merger and Sale of Assets. Liquidate, merge, or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

Section 9.2. Liens. Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material–men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such Liens, shall not be increased).

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 9.3. Indebtedness. Create, incur or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by Lender (and any extension, renewal or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

Section 9.3. Intentionally Omitted.

**INBE CAPITAL**

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 9.4. Investments, Loans and Guaranties. ~~(a) Create, acquire or hold any subsidiary, (b) make or hold any investment in any stocks, bonds or securities of any kind (c~~(a) be or become a party to any joint venture or other partnership, ~~(d) make or keep outstanding any advance or loan to any Person, or (e)~~ or (b) be or become a guarantor of any kind, without prior written approval of the Lender.

Section 9.5. Acquisitions. ~~Enter~~Without prior written approval of the Lender the Borrower may not enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person,

(b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

Section 9.6. Organizational Documents. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

Section 9.7. Project and Project Documents.

(a) Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project~~, if~~. If the same would (i) be a Major Decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

a. ~~(b) Terminate~~terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

b. ~~(c) Sell~~sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related ~~to~~ the development, construction, operation, and maintenance of the Project.

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Borrower represents and warrants to Lender that:

Section 10.1. Validity of Agreement. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms.

The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than ~~Liens~~as permitted ~~under Section 9.2 hereof~~by this document) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. Existing Defaults. As of the date of execution of ~~this Agreement~~the LOC Documents, Borrower ~~(or any subsidiary of Borrower)~~ is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower ~~(or any subsidiary of Borrower)~~ is a party or by which it, or any of its properties~~, subsidiaries, partners or other related entities~~, may be bound.

Section 10.3. No Default in Other Agreements. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a
party or by which it or any of its properties~~, subsidiaries, partners, or other related entities~~ may be bound~~,~~ or result in the violation by it of any law, order, rule~~, ordinance~~, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties~~, subsidiaries, partners, or other related entities~~.

Section 10.4. No Consents. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. Litigation. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to ~~Borrower's~~its knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 10.6. Financial Statements.  Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

Section 10.7. Legal Requirements. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning, and equal employment practices.

Section 10.8. Taxes. The Borrower has filed all tax returns and reports required of it, has paid all ~~taxes~~Taxes which are due and payable, and has provided adequate reserves for payment of any ~~tax~~Tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of ~~taxes~~Taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any ~~taxes~~Taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. Organization ~~and Good Standing~~. The Borrower is a duly formed or organized, and validly existing ~~and in good standing~~ under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement~~, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located~~.

Section 10.10. Insurance. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. Accurate and Complete Statements. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

~~Lender represents to Borrower:~~
Section 10.12. Lender's Ability to Fund. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by Borrower of the requirements of Article 4 hereof with respect to each Advance.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section ~~Section 10.13. Timing of Lender Funding. Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests set forth in this Section, Lender shall fund Advances in accordance with the Tranche Schedule, but in no event anymore frequently than every sixty (60) days, unless otherwise consented to in writing by Lender. Borrower must deliver Advance requests to Lender no less than ten (10) business banking days prior to the week represented on the Tranche Schedule for which Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from Borrower, Lender has a thirty (30) international business banking day window based on the Tranche Schedule (with the exception of first Advance according to Section 7.1) to deposit the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, in accordance with the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.~~

10.13. Timing of Lender Funding. Lender will provide Advances as defined in the Payment Schedule within Exhibit I.

## ARTICLE 11
## - NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. Generally. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for ~~any~~an representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## - EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

Section 12.1. ~~Nonpayment~~ Non-payment. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of ~~fifteen (15~~thirty (30) days after notice of such default is sent by Lender to Borrower~~.~~ (such thirty (30) day notice to be given once during each twelve (120 month period of the Term; thereafter, no such notice is required).

Section 12.2. Other Covenants and Agreements. Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected within ~~thirty (30) days after notice of such default is sent by Lender to Borrower.~~twenty

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. Representations and Warranties. If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

Section 12.4. Security. If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event no more than five (5) business within thirty (30) calendar days from the date such change in the lien status occurs, appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateralcollateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event no more than five (5) business days from the date such change in the lien status occurs, appropriate documents to correct such matters. within three (3) calendar days

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

from the date of such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. Validity of LOC Documents. If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. Petition for Bankruptcy, Insolvency. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; commencement of a sale for the benefit of creditors; or any such proceedings shall have been, voluntarily or involuntarily instituted, against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

Section 12.7. Material Litigation. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any such Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project, and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project, of the disclosed Litigationlitigation.

## ARTICLE 13
## - REMEDIES

Section 13.1. General. Following the occurrence of one or more Events of Default, Lender at its option, may (a)



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b)



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13.

If an Event of Default referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Section 13.2.   Right to Acquire.

(a)        UponSection 13.2. Right of Remedial Action. At the sole direction of Lender should the Lender assess and deem it necessary due to negative trending performance or upon the occurrence of an Event of Default hereunder, Borrower shall place the Project and business into a late state incubator operated by the Lender or by agent for the purposes of providing remedial management and guidance.

Furthermore, upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC Documents, to enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in so doing, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(b)        For the purpose of allowing the Lender to exercise its rights and remedies provided hereunder following the occurrence of an Event of Default, the Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

a.    (i)      to enter and endorse all agreements, instruments, and documents in connection therewith.

b.    (ii)      to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(iii)



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

c.   to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

d.   (iv) to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

e.   (v) to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

f.   (vi) to execute applications and certificates in the name of the Borrower, which reasonably may be required, by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

g.   (vii) to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

h.   (viii) to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B)
(A) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C)
(B) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. Curing of Defaults by Advances. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right (but not the obligation) to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 13.4. Remedies Are Cumulative. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Section 13.5. Offsets. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC Documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all deposit (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

Section 13.6. Collateral. The Lender shall at all times have the rights and remedies of a secured party under the Uniform Commercial Code, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC DocumentsDocument executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC Documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC ~~Documents~~Document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC Documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than ~~ten (10)~~seven (7) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made.

The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such ~~Collateral~~collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC Documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC Documents, the cost of which shall be paid by Borrower.

<u>Section 13.7. Default by Lender and Borrower's Sole Remedy</u>.

a. ~~Provided Borrower has fully satisfied complied with all conditions to Advance, if~~If Lender fails to provide the first (1st) Advance when due, pursuant to the Payment Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit ~~"G" (the "Termination Letter"),~~E, to Lender by certified mail. Upon receipt of such notice, Lender shall have ~~thirty (30) international business banking~~ninety (90) calendar days from the date of receipt ~~("Refund Period")~~ within which to return the ICA Payment to Borrower.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(a)

b.    If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Within thirty (30) international business banking ninety (90) calendar days from the date of receipt of such notice by Lender, Borrower shall be entitled to the Lender must (b)    (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of terminate Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC Documents.

c.    Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC Documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances.; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

~~(e)~~ Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. ~~The cure periods provided for in subparts (a) and~~ The cure periods provided for in subparts (a) and~~(b) above shall be tolled during the pendency of a Force Majeure Event. In the event of force Majeure where all the draws have not been taken and lender cannot fulfill remaining draws the ICA account shall refund the proportional amount of the funds to the borrower that are not necessary to service the interest of that portion of the LOC.~~
<u>(b) above shall be tolled during the pendency of a Force Majeure Event.</u>


<u>Section 13.8 Binding Arbitration</u>. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in ~~ALBANY, NY~~<u>the State of Wyoming USA</u>, before ~~one~~<u>a single</u> arbitrator~~. The arbitration shall be administered by~~ <u>using the current</u> JAMS ~~pursuant to its~~ Comprehensive Arbitration Rules and Procedures ~~or by ADR Services pursuant to its~~ (“Arbitration Rules~~, at the election of the party initiating~~”). <u>The parties consent and required that</u> the ~~arbitration.~~ <u>JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply.</u>

The Party initiating a demand for ~~arbitration~~<u>Arbitration</u> shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) ~~banking business~~<u>calendar</u> days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the ~~JAMS or ADR Services arbitration selection protocol.~~<u>Arbitration Rules.</u> Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty–five (25) and shall be limited to documents relevant to the issues to ~~be~~<u>being</u> arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, ~~attorneys' fees~~<u>attorneys 'fees</u>, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of ~~New York~~<u>Wyoming USA</u>. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ARTICLE 14
## - GENERAL PROVISIONS

Section 14.1. Disclaimer of Liability. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 14.2. Publicity. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and ~~its~~it's financing in such form as mutually approved ~~in writing~~ by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

Section 14.3. Confidentiality. Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC Documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place~~.~~ except to any officers or shareholders in the Borrower or the Borrower's advisors or as required by law. Borrower's disclosure of ~~a~~ confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

Section 14.4. Responsibility for Application of Funds. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses~~,~~ which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or ~~willful~~wilful misconduct (in each case as determined by ~~binding arbitration pursuant to Section 13.8~~a court of competent jurisdiction in a final and non- appealable decision).

Section 14.5. Notices. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the Lenders portal using the Borrower's Portal account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ~~forty eight (48~~ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or ~~the next business day~~two calendar days if sent by pre-paid nationally recognized overnight courier service, sent to the ~~party~~Party at its address set forth below, or such other address as a ~~party~~Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:            Hard AF Seltzer, CEO
9221 Highway 290 West
Austin, TX 78736

To Lender:            INBE Capital LLC
Attention:            Chief Funding Officer



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

~~With a copy to:~~ _____

_____ ~~Attention:~~ _____

_____

_____

_____

~~To Lender:~~ _____

~~With a copy to:~~ _____

30 N Gould St Sheridan, WY 82801



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 14.6. Applicable Law. This Agreement and, unless otherwise specifically provided for therein, each other LOC Document,  shall  be governed  by and construed  in accordance  with the laws of the State of ~~New York and the United States.~~ Wyoming.

Section 14.7. Successors and Assigns. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted  under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.8. Severability. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance~~,~~ which was the subject of that condition.

Section 14.9. Amendments. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

Section 14.10. Headings; Attachments. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule  or exhibit  attached to this Agreement  shall  be incorporated  herein  and shall be deemed  to be a part hereof.

Section 14.11. No Third-Party Rights. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest  (including any participants).  No third Person shall have any rights hereunder.

Section 14.12. ~~Mutual~~ Indemnification.
The ~~both parties agree~~Borrower agrees to defend, indemnify and hold harmless the ~~other party~~Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including ~~attorneys ' fees~~attorneys 'fees), or disbursements  of any kind or nature whatsoever  that may be imposed on, incurred by or asserted against  the ~~other party~~Lender in connection  with any investigative,  administrative  or judicial proceeding  (whether  or not the ~~other party~~Lender  shall  be designated  a party thereto) or any other claim  by any Person  relating  to or arising out of the Project, the LOC Documents  or any actual or proposed use of proceeds  of the Advances,  or any activities of ~~either party~~the Borrower or its affiliates; provided that ~~either party~~the Lender shall not have the right to be indemnified under this Section 14.~~11~~12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable  decision  in ~~Arbitration~~arbitration  as for any ~~disputes~~dispute  between  the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.~~11~~12 shall survive any termination of this Agreement. ~~Both parties~~



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

The Borrower hereby agrees to indemnify, defend and hold harmless the ~~other party~~Lender, the Manager of ~~LENDER LLC~~Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable ~~attorneys'~~attorneys' fees and costs) that they may incur by reason of ~~either party's~~Borrower's failure to ~~fulfill~~fulfil all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents ~~either party~~the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including ~~attorneys'~~attorneys' fees and costs) incurred by ~~either party~~Lender, the managing member of Lender ~~LLC~~, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents ~~either party has furnished in connection with this transaction~~the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Lender's default of its obligations under this Agreement.

Section 14.13. General Limitation of Liability. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; or the making or administration of the Advances, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability theories," or any covenants, agreements, duties or obligations set forth in the Loan Documents, (or any actions or omissions of any of the Lender Parties and/or the Lenders' Affiliates in connection with the initiation or continuing exercise of any right or remedy contained in the Loan Documents or at law or in equity, or lost profits, or loss of business opportunity, or increased financing costs, or increased legal or other administrative fees, or damages to business reputation. ; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage.

Section 14.14. Entire Agreement. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Section 14.15. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

Section 14.16. Legal Representation of the Parties. The LOC Documents were negotiated by the ~~Parties~~parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.17. JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

*Signatures Follow on Next Page*



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

**[Remainder of page intentionally left blank; Signatures follow]**



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

IN WITNESS WHEREOF, the ~~Parties~~parties have executed this Agreement as of the day and year first written above.

**LENDER:** ~~PRIME CAPITAL VENTURES,~~ INBE Capital LLC~~, a Delaware Limited Liability Company~~

~~By:~~ _____

By:

INBECAPITAL

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Name: _____

Title: _____

~~BORROWER: _____ _____ LLC, a Nevada Limited Liability Company~~

BORROWER:

By: _____

Name: _____

Title: _____



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Jonathan  Wright

By:

Chief Funding Officer

Name:

Title:

Hard AF Seltzer,



Ross Patterson

CEO

**IINBECAPITAL**

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## EXHIBIT A

## : PROMISSORY NOTE

$21,000,000.00   Maximum Principal Amount                                              [DATE]

_____

**ten million nine hundred eighty-nine thousand ten dollars and ninety-nine cents**          **$10,989,010.99**

FOR VALUE RECEIVED,   Hard AF Seltzer, LLC

_____

_____ LLC, a NEVADA Limited Liability Company , a   USA corporation (the ""Maker"),."),

hereby promises to pay to PrimeINBE Capital Ventures, LLC, a Delaware Limited Liability Company or any subsequent holder of this Master Promissory Note (the "

"Payee")."), at such place as Payee may designate, the principal sum of TWENTY ONE MILLION  and 00/100 Dollars ($21,000,000.00)

**ten million nine hundred eighty-nine thousand ten dollars and ninety-nine cents**          **$10,989,010.99**

or the aggregate unpaid principal amount of all Advances, as defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is less, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below,  payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning  given  such term in the LOC Agreement;  and

   a.   Maker shall  make payments  under this Master  Promissory Note (as the same  may from time to time be amended, restated or otherwise modified, this "Note") as follows: (i)

      i.   simple interest payments on the outstanding principal amount of the Advances, at a fixed-rate equal to FIVE ;

      • **six** percent          ( **6%**          **%** )  per annum, which interest for years one to ten (1–10). (5%)

(a)     Interest payments  shall be due and payable to Payee quarterlymonthly in arrears, on the first (1st) day of each January, April, June and Septembermonth of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

   (b)  a.     Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part,



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

as provided in the LOC Agreement.

a.   All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker  shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(c)     All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank. ~~Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance.  The aggregate unpaid amount of Advances and similar information with respect to the LOC set forth on the records of Payee shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to Payee.~~

~~(d)~~d.     Maker shall pay all amounts due under this Note to ~~Prime~~INBE Capital ~~Ventures,~~ LLC, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

d.   All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the ~~(e)~~ "Obligation" of Maker.

In addition, the following provisions shall govern this Note:

1.   LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS. This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the ~~that certain Development~~document entitled "Business Expansion Line of Credit Agreement ~~of even~~" dated on or about the date ~~herewith~~of this Note between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "LOC Agreement"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.   LATE CHARGES. ~~I~~f any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the "Late Charges") shall be added to the delinquent payment in an amount equal to ~~five~~ten percent (~~5~~10.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges__ are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

DEFAULT, CROSS-DEFAULT AND ACCELERATION. Time is of the essence. If Maker fails to make any



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

~~3.~~   Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, then this Note shall be in default. Upon default, Payee shall provide written notice to Maker specifying the nature of the default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon default, the interest rate provided for in this Note shall immediately increase to ~~eighteen~~twenty four percent (~~18~~24%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in ~~_____ _____ LLC and the Project to PRIME CAPITAL VENTURES, LLC.~~Hard AF Seltzer, LLC and the project –  Hard AF Seltzer, To INBE Capital LLC.

~~4.~~3.   COSTS, FEES AND COMPENSATION.~~–~~ Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

~~5.~~4.   WAIVER. Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

~~6.~~5.   SUCCESSOR AND ASSIGNS. The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

~~7.~~6.   CUMULATIVE REMEDIES. Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

~~8.~~7.   GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY. ~~This Note shall be governed by and construed in accordance with the laws of the State of New York and the United States.~~



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

This Note
shall be governed by and construed in accordance with the laws of the State of Wyoming, United
States of America.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

BINDING ARBITRATION: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in ~~Albany County, New York~~the State of Wyoming, before ~~one~~a single arbitrator~~. The arbitration shall be administered by~~ using the current JAMS ~~pursuant to its~~ Comprehensive Arbitration Rules and Procedures ~~or by ADR Services pursuant to its~~ ("Arbitration Rules~~, at the election of the party initiating~~"). The parties consent and required that the ~~arbitration.~~JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 ~~herein.~~of the LOC Agreement. Within three (3) banking ~~business~~Calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an

arbitrator, then the arbitration shall be selected pursuant to the ~~JAMS or ADR Services arbitration selection protocol~~Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, ~~attorneys 'fees~~attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of ~~the State of New York~~Western Australia. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

~~9.~~8.   AUTHORIZATION. To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

of the following representations and warranties in entering into this Note:



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(a)a. That the undersigned is the authorized representative of Maker and has the authority to bind Maker.

(b)b.    That Maker is duly organized and validly existing ~~and in good standing~~ under the laws of the State of its formation, and duly qualified to transact business ~~and in good standing in any United States state~~ where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

(c)c. That upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

10.9. ATTORNEY FEES AND COSTS OF COLLECTION. Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

11.10.    MISCELLANEOUS PROVISIONS.

(a)a. No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)b.    The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)c. This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(d)d.       This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)e. Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

**[Remainder of page intentionally left blank; Signature page follows]**



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Master Promissory Note as of the date first set forth above.

**MAKER:**

LLC

By:

Name:

Title:

Address:

 

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

Hard AF Seltzer, LLC

Ross Patterson

Ross Patterson

CEO

9221 Highway 290 West
Austin, TX 78736

**PAYEE:**        INBE Capital LLC

By:        Jonathan Wright

Name:        Jonathan  Wright

Title:        Chief Funding Officer

Address:        30N Gould St, Sheriden, WY 82801, USA

PROMISSORY NOTE    PAGE 14



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

EXHIBIT B
TRANCHE SCHEDULE

| Source & Use of Funds: | Draw 1 | Draw 2 | Draw 3 | Draw 4 |
|---|---|---|---|---|
| – | – | – | – | – |
| Line of Credit | $20,000,000 | – | – | – |
| | | | | |
| | $10,800,000 | $3,000,000 | $4,700,000 | $1,500,000 |



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ~~EXHIBIT C~~

# : PROJECT COSTS

| ~~Source & Use of Funds:~~ | ~~Prime LOC~~ |
|---|---|
| ~~Line of Credit~~ | ~~$20,000,000~~ |
| ~~-~~ | ~~-~~ |
| ~~Uses of Funds:~~ | ~~-~~ |
| | ~~$3,100,000~~ |
| | ~~$1,600,000~~ |
| | ~~$450,000~~ |
| | ~~$150,000~~ |
| | ~~$150,000~~ |
| | ~~$300,000~~ |
| | ~~$200,000~~ |
| | ~~$1,690,000~~ |
| | ~~$1,200,000~~ |
| | ~~$1,100,000~~ |
| | ~~$991,000~~ |
| | ~~$1,684,500~~ |
| | ~~$1,693,358~~ |
| | ~~$919,915~~ |
| | ~~$2,000,000~~ |
| | ~~$1,400,000~~ |
| | ~~$530,000~~ |
| | ~~$750,000~~ |
| | ~~$155,000~~ |
| | ~~$93,000~~ |
| | ~~$385,812~~ |
| | ~~$24,697~~ |
| | ~~$20,567,282~~ |
| | |



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ~~EXHIBIT D~~
## ~~THE PROJECT~~

~~Purpose / Benefit~~

- ~~Please provide a few sentences of what the requested funds are for and how the business will benefit from the transaction should be written (inventory, working capital, equipment, etc.). Please be specific.~~

~~_____ is currently licensed under the FDA's 503A designation and fills prescriptions for **individual** patients referred by over 400 healthcare organizations and physicians. _____ has identified additional growth opportunities to expand the business by selling its compounded formulations **in bulk** to Hospitals, Nursing Homes, Physician offices and other healthcare providers, this can be accomplished with a 503B manufacturing outsourcing facility which is an FDA licensed facility to sell compounded drugs in bulk form.~~

~~This spinoff expansion of _____, LLC in Nevada from _____ will be a combination of 503A and 503B designations. _____will also be a WO/MOB (Women Owned/Minority Owned Business); SBA 8A designation capturing all the federal mandated business. Currently there are no WO/MOB in _____ manufacturing companies.~~

~~Prospective 503B customers have signaled pinned up demand for purchasing 's formulations in bulk. In addition, there are many opportunities to export these medications to other countries. The FDA certification is the "Gold Standard" throughout the world.~~

~~_____will also repatriate some of the current _____ manufacturing back to the USA. For many years more and more _____s have been manufactured abroad in countries like China. If we have learned anything in the last couple of years as a country, it is vital to have our own _____ manufacturing capabilities within our borders. This Loan would let us construct outfit/equip and start production of these medications that sometimes are in very short supply.~~



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

## ~~EXHIBIT E~~

This loan agreement pertains to the direct funding for  Hard AF Seltzer, LLC

which is set out in the Term Sheet attached herein Exhibit I and executed by INBE Capital LLC and

 Hard AF Seltzer, LLC

This agreement pertains to the loan of  ten million nine hundred eighty-nine thousand ten dollars and ninety-nine cents
$10,989,010.99



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

# EXHIBIT C: THE PROPERTY – SECURED ASSETS

Address: Leased space located at

EXHIBIT F
SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of [MONTH DAY], 20[__] (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this ("**Agreement**"), is made by _____ LLC, a NEVADA Limited Liability Company (the "**Grantor**"), in favor of PRIME CAPITAL VENTURES, LLC, a Delaware Limited Liability Company (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain business expansion line of credit, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "LOC Agreement").



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"Collateral" has the meaning set forth in Section 2 hereof.

"Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and (b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Deposit Account**" means a deposit account, as that term is defined in the UCC.

"**Event of Default**" has the meaning set forth in the LOC Agreement.

"First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"Secured Obligations" has the meaning set forth in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

TO SECURE THE PAYMENT OF THE BUSINESS EXPANSION LOC AND ALL OTHER OBLIGATIONS OF BORROWER TO LENDER, ITS SUCCESSORS AND ASSIGNS, HOWEVER CREATED, WHETHER DIRECT OR INDIRECT, ABSOLUTE OR CONTINGENT, OR NOW OR LATER EXISTING, BORROWER GRANTS TO LENDER A SECURITY INTEREST IN THE



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

FOLLOWING PROPERTY AND ANY REPLACEMENTS THEREOF:

(a)a. all fixtures and ~~personal~~Company property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims ~~described on Schedule 1 hereof~~ as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)b.      all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c.    all plant and equipment

d.    all computer equipment and electronic data stored therein

e.    all Intellectual Property rights

f.    all inventory

g.    all motor vehicles

h.    all goodwill

i.    all brand names

j.    all real estate and land

k.    all accessories, parts, and equipment now or later affixed to the same

l.    to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

# EXHIBIT D: SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of  May 05 2023
(as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by  Hard AF Seltzer, LLC
(the "Grantor"), in favor of INBE Capital LLC (the "Secured Party").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "LOC Agreement").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. For purposes of this Agreement, the following terms shall have the following meanings:

"Collateral" has the meaning set forth in Section 2 hereof.

"Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and (b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"Deposit Account" means a deposit account. "Event of Default" has the meaning set forth in the LOC Agreement.

"First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

"Proceeds" means all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

"Secured Obligations" has the meaning set forth in Section 3 hereof.

"Securities Account" means a securities account.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired and any replacements thereof (collectively, the "Collateral"):

a.    all fixtures and property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b.    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c.    all plant and equipment

d.    all computer equipment and electronic data stored therein

e.    all Intellectual Property rights

f.    all inventory

g.    all motor vehicles

h.    all goodwill

i.    all brand names

j.    all real estate and land

k.    all accessories, parts, and equipment now or later affixed to the same

l.    to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

3.   Secured Obligations. The Collateral secures the due and prompt payment and performance of:

a.   the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, ~~this Agreement and the other LOC Documents; and

~~(a)~~

~~(b)~~b.      all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "Secured Obligations").

4.   Perfection of Security Interest and Further Assurances.

~~(a)~~a. The Grantor shall, from time to time, as may be required by the Secured Party with~~-~~ respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained ~~within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable~~, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party~~.~~, including filing of a UCC-1 statement. All the foregoing shall be at the sole cost and expense of the Grantor.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(b)b.    The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by ~~Article 9 of the UCC~~applicable law of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

c.    The Grantor hereby further authorizes the Secured Party to file with ~~the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States~~relevant governmental authorities or ~~in any other country)~~agencies this Agreement and other documents for the purpose of perfecting, confirming,~~-~~

(e)d.continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

~~(d)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.~~

(e)e. If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)f. If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)g.    The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

5.    <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a)    (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement.

(b)a. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statuteslaw and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(c)b.At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)c. The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)d.Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

(f)e. Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

f.    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(g)

(h)g.    The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)h. The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC.applicable law. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)i. Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Deposit Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or Securities Intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

j.    Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

(k)

6.    Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Grantor covenants as follows:

7.

(a)a. The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

(b)b.        The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)c. The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)d.        The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)e. The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

(f)f. The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

g.    The Grantor will continue to operate its business in compliance with all applicable provisions of ~~the federal Fair Labor Standards Act, as amended, and with all~~ applicable ~~provisions of federal, state and local statutes and ordinances~~law dealing with the control, shipment, storage or disposal of hazardous materials or substances.

~~(g)~~

(h)h.        The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Deposit Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Deposit Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

i.     The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within ~~ten (10~~thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

j.     At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.   Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

9. <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. <u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

~~11.    Remedies Upon Default~~.

11.    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under ~~the UCC or other~~ applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

~~(a)~~

~~(b)~~a. If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

~~(c)~~b. If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

13. SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:-

a. any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

b. any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

c. any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

d. any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

e. any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

f. any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

g. any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

15. Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16. Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. ~~ ~~Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. GOVERNING LAW. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of  the State of ~~New York and the~~Wyoming, United States of America.

19. Binding Arbitration. ~~Any~~Except for any rights to self-help or possession of the collateral under state law. any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in ~~Albany County, New York~~the State of Wyoming, before ~~one~~a single arbitrator~~. The arbitration shall be administered by~~ using  the current JAMS ~~pursuant to its~~ Comprehensive Arbitration Rules and Procedures ~~or by ADR Services pursuant to its~~ ("Arbitration Rules~~, at the election of the party initiating~~").  The parties consent and required that the  ~~arbitration.~~JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.  The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) ~~banking ~~business days of service of any demand for arbitration, the Parties



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the ~~JAMS or ADR Services arbitration selection protocol.~~ Arbitration Rules.



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

19. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections.  No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'feesattorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of New YorkWyoming, United States of America. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20. JURY TRIAL WAIVER.- EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.-

20.

21. Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all

38

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

39

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

**[Remainder of page intentionally left blank; Signature page follows]**

40

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

IN WITNESS WHEREOF, the ~~Parties~~Grantor hereto ~~have~~has executed this Security Agreement as of the date first set forth above.



**GRANTOR:**

_____ _____ LLC

By: ——————————————————————

Name—————————————————————

Title_____

Signature Page to
Security Agreement

SCHEDULE
1

SCHEDULE 2

43

SCHEDULE 3

Hard AF Seltzer,

Ross Patterson

Ross Patterson

CEO

SECURED PARTY: INBE Capital LLC

44

By:          *Jonathan Wright*

Name:          Jonathan Wright

Title:          Chief Funding Officer

45

EXHIBIT ~~G~~

# E: FORM TERMINATION LETTER

~~TERMINATION LETTER~~

~~PRIME CAPITAL VENTURES,~~INBE Capital LLC

ATTENTION: _____Craig Boddington

~~_____~~
~~_____~~

~~Re: (LOC PROJECT NAME)~~ _____

30 N Gould Street,
Sheridan, Wyoming, 82801

Re:    Hard AF Seltzer, LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated~~ _____.~~  May 05 2023

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

~~_____~~BORROWER~~_____:~~

~~_____~~By: _____
~~_____~~By:

Name:
~~_____~~

Title:

By:

Name:

Title:

46

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of _____, 20__.

_____    _____

_____

_____day: NOTARY PUBLIC

_____In and for the State of New York

_____

_____

_____My

Commission Expires:

47

# EXHIBIT F: WIRE & JOINT INSTRUCTIONS

I instruct the BORROWER to fund the sum of $2,747,252.75

(the "ICA"),

to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit). The Trustee will be nominated and confirmed via electronic communication during final underwriting. Best efforts are made to select The Trustee based on a suitably negotiated escrow holding term per funding cycle. Typically, a 90 day escrow term applies. However, upon successful negotiation of a shorter escrow term, we're then able to facilitate tranche 1 delivery faster than our standard 90 day allowance. Whilst this cannot be guaranteed, we will always apply best efforts to shorten the overall payment schedule so we consistently deliver your funding quickly and seamlessly. Expect regular communication as we move through the remaining stages of the process. As well as ongoing open access to your appointed INBE representatives.

**Contractual Guarantee on ICA Advance Fee:**

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

**WIRE INSTRUCTIONS:**

| | |
|---|---|
| Account Name: | Messner Reeves, LLP – COLTAF Paymaster |
| Bank Name: | The Northern Trust Company |
| Account Address: | 50 S LaSalle, Chicago, IL |
| Account No.: | 3813128494 |
| ACH Transfers: | N/A |
| ABA: | 071000152 |
| Swift (US Currency): | CNORUS44 |
| Swift (Foreign Currency) | |
| Payment Reference: | INBE CAP |

Mandatory KYC/AML Required Message on all wire transfers:
All transfer instructions shall state: **"Funds are clean and clear of non-criminal origin and are for immediate credit – same day value / instant cash upon receipt."**

**IMPORTANT: All transfers must be accompanied by proof of wire to frb@inbe.capital**

**Re: Joint Instructions regarding Deposit Amount**

The purpose of these joint instructions ("Instructions") is to document the agreement of the parties regarding the Deposit Amount described below.

As background, (The Borrower) has obtained a loan commitment from INBE Capital LLC for the total amount of:

(the "Loan Amount") from INBE Capital LLC ("The Lender") To fund their proposed project and business activities as further set forth in Exhibit B, Exhibit H, & Exhibit I.

In connection with the Proposed Transaction, INBE Capital LLC, requires the borrower remit to INBE Capital LLC the Interest Credit Deposit Amount of:

(the "Deposit Amount"), which Lender requires as a deposit for the funding of the Proposed Loan, care of the "WIRE INSTRUCTIONS" stipulated within this Exhibit – Exhibit F (the "Escrow Account").

These  Instructions are provided to clarify what happens with the Deposit Amount and when the Deposit Amount may be returned to The Borrower. Specifically:

- The administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan specified in Exhibit I.
- If the Proposed Transaction does not complete pursuant to the execution of definitive agreements and the payment of the BELOC Loan to The Borrower, then INBE Capital LLC or one of it's nominated agents will wire return the Deposit Amount to The Borrower promptly.
- If Lender cancels the Proposed Loan pursuant to the terms of the Business Expansion Line of Credit to be entered into between The Borrower and Lender, or if the Proposed Loan commitment expires, then INBE Capital LLC will promptly wire return the Deposit Amount to The Borrower.

All signers of these Instructions agree to strictly comply with the terms hereof.

INBE Capital LLC may update or supplement these Instructions at any time in writing signed by all parties. If there is a conflict between these Instructions and the Proposed Loan, these Instructions control.

The parties agree to the use of email for the purpose of delivering notices under these Instructions, as follows:

If these Instructions are acceptable, please acknowledge below.

**The Borrower**                                                    **INBE Capital LLC**

*Ross Patterson*                                    *Jonathan Wright*

49

# EXHIBIT G: KYC & AML

In order to satisfy Know Your Customer (KYC) and Anti Money Laundering compliance all clients must complete the following Client Information Form and upload verification information:

## STEP 1 - COMPLETE KYC & AML FORM

### GO HERE - Link to online Client information form

or Scan QR Code:



## STEP 2 - DECLARATION

We may take up such references and make such enquiries about your company as we consider necessary, and we may use credit scoring and may search the files of credit reference agencies. The fact a search had been made will be recorded by each credit reference agency used and the data supplied will be available to other lenders and others authorized to search the credit reference agencies files, for purpose such as credit assessment of your company and occasionally for debtor tracing and fraud prevention. If your application for finance is accepted then details about your company and the conduct of your account may be passed to credit reference agencies and these details will be used for similar purposes.

We may also disclose information about your company and the conduct of your account to credit industry fraud avoidance networks and to tracing and debt collection agencies and our solicitors.

Data Protection Your company information will be treated as confidential and will only be disclosed:
a) at your request;
b) to our agents in connection with running accounts;
c) in the public interest; or
d) to prevent fraud or legal compulsion; or
e) taking up of references.

The Data Protection Act gives you a right to a copy of your company records held on our files on payment of a fee.

*Signatures Follow on Next Page*

————————————————————————

51

Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

**1. Signatures(s)** ......*Ross Patterson*................................................... **Date: .** .....May 05 2023................

**Name .** ...........Ross Patterson.....................................................

**2. Signatures(s)** .................................................................. **Date: ..** .......................................

**Name .** ...................................................................................

**3. Signatures(s)** ................................................................. **Date: .** .....................................

**Name** ...........................................................................................



Zoho Sign Document ID: 2B0A4254-UPE8XVXHG69FKZH2S7QPRHDSDM0WI5OONCGVMJLDBKS

# EXHIBIT H: TERM SHEET

[intentionally left blank; Executed Term Sheet follows]

# EXHIBIT I: THE PROJECT

The Borrower desires to obtain the LOC from Lender for the purposes detailed below;

[intentionally left blank; Project Summary follows Term Sheet]



# EXHIBIT 29

PHILLIP A. TALBERT
United States Attorney
JESSICA DELANEY
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

**FILED**

**Nov 21, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

<span style="color:red">**SEALED**</span>

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL CHARTRAW,<br><br>Defendant. | CASE NO. 2:24-cr-0311 TLN<br><br>18 U.S.C. § 1343 – Wire Fraud (12 Counts); 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

## INDICTMENT

<u>COUNTS ONE THROUGH TWELVE:</u> [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges: T H A T

DANIEL CHARTRAW,

defendant herein, as follows:

## INTRODUCTION AND BACKGROUND

At all relevant times:

*People and Entities*

1.   DANIEL CHARTRAW was a resident of Placer County, California, who also spent substantial time in San Joaquin County, California. CHARTRAW represented to others that his business interests were located within San Joaquin County.

2.   Person 1 was an associate of CHARTRAW, who assisted CHARTRAW with marketing

INDICTMENT

1

and other tasks.

3. Person 2 was a relative of CHARTRAW who resided in San Joaquin County, California. CHARTRAW used Person 2's residence and locations around the residence to conduct business activities related to the fraud scheme charged herein.

4. Person 3 was an associate of CHARTRAW and a start up company related investor, who assisted CHARTRAW in his business activities.

5. TDA Global was an entity controlled in whole or in part by CHARTRAW. CHARTRAW began using the name TDA Global in or about the summer of 2021. TDA Global was first incorporated as a limited liability company in the state of Wyoming in August 2021, using the name of Person 1. TDA Global was registered as a foreign limited liability company in the state of California in or about November 2021.

6. At times, CHARTRAW and his associates represented in PowerPoint slides and investor pitches that TDA Global was a parent company that oversaw several smaller companies, including a company called Crypto-Pal, LLC.

7. Crypto-Pal, LLC ("Crypto-Pal") was a limited liability company incorporated in the state of Wyoming in or about March 2021. Person 1, Person 2, and Person 3 appeared on the Crypto-Pal incorporation documents. Crypto-Pal was controlled in whole or in part by CHARTRAW. On its website and in investor pitches, Crypto-Pal purported to be a web-based company that assisted with cryptocurrency investments. Crypto-Pal was registered as a foreign limited liability company in the state of California in or about April 2021. The address listed on the Crypto-Pal business banking account was in San Joaquin County, California.

*Background Regarding Cryptocurrency*

8. Bitcoin was one form of cryptocurrency. Cryptocurrency was a digital asset which could be transferred over the Internet as a form of value. Cryptocurrency was not issued by a bank, government, or other company, but instead was controlled through computer software operating via cryptographic technology and a large, decentralized, peer-to-peer network.

9. A cryptocurrency exchange was a business engaged in the purchasing, selling, or trading of cryptocurrency, including for other forms of value such as conventional fiat money (U.S. dollars). A

INDICTMENT

2

cryptocurrency wallet, also known as a digital wallet, was an application that allowed cryptocurrency users to store and retrieve their digital assets. Digital wallets could hold multiple cryptocurrencies. Each digital wallet had a unique cryptographic address which was used to facilitate transactions.

10. Cryptocurrency trading could be managed through bot technology. A bot was an autonomous program on the Internet. A cryptocurrency bot could use algorithms to automatically perform cryptocurrency trades without an individual having to access the account and perform the trades.

## SCHEME TO DEFRAUD

11. Beginning sometime before March 2, 2021, and continuing through in or about February, 2022, within the State and Eastern District of California and elsewhere, defendant CHARTRAW knowingly devised, intended to devise, and participated in, a material scheme and artifice to defraud investor-victims of money and property, and to obtain money and property from investor-victims by means of materially false and fraudulent pretenses, representations, and promises.

12. The purpose of the scheme and artifice to defraud was to obtain money in the form of either traditional bank transfers or cryptocurrency transfers from investor-victims. In some instances, CHARTRAW led investor-victims to believe that their money would be invested into the company of Crypto-Pal, which he asserted could result in equity in the company. In other instances, CHARTRAW led investor-victims to believe that he would invest their funds into cryptocurrency trading platforms using Crypto-Pal's algorithm to manage the investments. In all cases, CHARTRAW had the intention to convert the investments to his own personal use rather than for the purposes promised to the investor-victims.

## MANNER AND MEANS

In furtherance of the fraud, CHARTRAW employed the following manner and means, among others:

13. In furtherance of the scheme, CHARTRAW and those working with him or at his direction took steps to create TDA Global and Crypto-Pal. Although CHARTRAW effectively controlled the entities and represented to investors that he controlled them, the entities were listed in public filings with the names of Persons 1, 2, and 3.

INDICTMENT

3

14.    CHARTRAW and others working with him and at his direction, also took steps to create the appearance that TDA Global and Crypto-Pal were legitimate companies. For example, they established a business email account for TDA Global. In another example, CHARTRAW and others working with him and at his direction, developed informative materials which described the companies' purported relationship, purpose, organization, and investment model.

15.    CHARTRAW and others working with him and at his direction opened business bank accounts for TDA Global and Crypto-Pal over which CHARTRAW exercised control.

*Startup investor-victims*

16.    In furtherance of his scheme to defraud, CHARTRAW and others working with him and at his direction solicited business contacts to join Crypto-Pal as initial start-up investors. CHARTRAW communicated with these start-up investor-victims through phone calls and meetings using web-based meeting platforms such as Microsoft Teams and Zoom, as well as through his personal email account.

17.    As part of the investment pitch to prospective start-up investors, CHARTRAW and others represented that Crypto-Pal was working with a brilliant expatriate who had developed a proprietary algorithm capable of making short, medium, and long trades on cryptocurrency trading platforms.

18.    As part of the investment pitch, promotional materials were provided to prospective start-up investors describing the cryptocurrency market and the basic methodology Crypto-Pal employed to obtain high-yield returns on cryptocurrency investments.

19.    In furtherance of the scheme, CHARTRAW made and caused others to make the following materially false and fraudulent statements, among others, to at least some of the start-up investor-victims regarding Crypto-Pal:

    a.  That if they invested money into the Crypto-Pal company itself, they could receive equity in the company.

    b.  That, if the Crypto-Pal company did not grow as expected, they were guaranteed a return of their investment.

    c.  That their investment would be used solely to develop additional technology and to further the business of Crypto-Pal and not for the purchase of real property or personal,

INDICTMENT

4

family, or household purposes.

20.    When start-up investor-victims decided to invest money, they were directed by Crypto-Pal principals to transfer the money, via wire transfer, to the Crypto-Pal business bank account.

21.    In fact, CHARTRAW and the Crypto-Pal principals did not use the money invested into the business bank account to further the business of Crypto-Pal or to assist in the development of cryptocurrency algorithm bots. Instead, CHARTRAW converted the money to his own use and the use of his associates. He did this by means that included cash withdrawals, debit card purchases, personal and cashier's checks, and transfers to other bank accounts. The money was then used for, among other uses, travel, dining, and other personal expenses of CHARTRAW and his associates.

*Cryptocurrency trading victims*

22.    It was further a part of CHARTRAW's scheme that CHARTRAW solicited new crypto investor-victims to invest money to purportedly be traded by Crypto-Pal using advanced cryptocurrency algorithms.

23.    CHARTRAW solicited this second type of investor-victim through existing contacts, including a business contact and a family friend.

24.    CHARTRAW communicated with investor-victims through phone calls and meetings using web-based meeting platforms such as Microsoft Teams and Zoom. CHARTRAW met with at least one potential investor to discuss Crypto-Pal investments at a law office located in Lodi, California. CHARTRAW also communicated with investor-victims through email, using both his personal email account and the TDA Global business email account.

25.    In his interactions with crypto investor-victims, CHARTRAW encouraged crypto investor-victims to recruit others to also invest their money using Crypto-Pal's cryptocurrency algorithm.

26.    As part of the investment pitch, CHARTRAW and associates provided potential investors with the same promotional materials previously provided to potential start-up investors.

27.    CHARTRAW made and caused others to make the following material false and fraudulent statements, among others, to at least some of the investor-victims about Crypto-Pal's cryptocurrency trading platform:

INDICTMENT

5

a.  Investor principal would be maintained in a bank account that was not subject to any risk.

b.  Only profits generated would be subject to loss risk.

c.  The proprietary algorithm would result in significant gains for investors without risk to investment principal.

d.  Crypto-Pal had a Friends and Family account which allowed investors to pool investments to result in greater gains.

e.  Investor money would be used solely for cryptocurrency trading.

f.  Crypto-Pal would provide regular statements of investment value to the crypto investor-victims.

28.    When a crypto investor-victim made the decision to invest using the cryptocurrency algorithm, CHARTRAW and others directed investor-victims to either transfer money, often by wire transfer, to the Crypto-Pal bank account, or to transfer cryptocurrency to a cryptocurrency wallet that was under CHARTRAW's control. Because crypto investor-victims were directed to wire transfer funds to the Crypto-Pal bank account, those investments were commingled with the funds wired by the start-up investor-victims.

29.    Instead of investing the crypto investor-victims' money as promised, CHARTRAW transferred funds to his bank account, bank cards under his control, or the bank accounts of his friends and family members. He spent investor-victims' money on his own personal expenses, including travel, food, hotels, gas, and airline tickets, among other personal expenses, and on the personal expenses of other members of Crypto-Pal.

30.    In furtherance of the scheme, CHARTRAW made, or caused to be made, materially false and fraudulent lulling statements to both start-up and crypto investor-victims. Among the false lulling statements made by CHARTRAW to investor-victims were statements that their principal had grown in value, that meetings with board members were needed prior to withdrawing funds, that funds were located overseas which delayed their return, and that investor-victims would be able to withdraw money in the future.

31.    These lulling statements were designed to make it appear as though the investments were successful, that CHARTRAW was engaged in a lawful and legitimate business, and that their

INDICTMENT

6

investments had not been stolen and converted to CHARTRAW's personal use. This was an integral part of the scheme because it helped CHARTRAW continue the scheme and raise additional funds, as well as helped to prevent or delay investor-victims from reporting suspected fraud to law enforcement authorities.

32.     In total, CHARTRAW and those working at his direction stole at least approximately $400,000 in investor funds and converted them to their own use.

## WIRE TRANSFERS

33.     On or about the dates set forth below, in the State and Eastern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, CHARTRAW did knowingly cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, and sounds:

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

INDICTMENT

7

| Count | On or About Date | Description of Wire |
|---|---|---|
| 1 | May 7, 2021 | $23,978.61 sent from Investor-Victim-1's Servisfirst Bank Account to Crypto-Pal Bank of America Account ending in 4562 |
| 2 | May 12, 2021 | $80,541.64 sent from Investor-Victim-2's Pinnacle Bank Account to Crypto-Pal Bank of America Account ending in 4562 |
| 3 | May 28, 2021 | $44,000 sent from Investor-Victim-3's Navy Federal Credit Union Business Account to Crypto-Pal Bank of America Account ending in 4562 |
| 4 | June 30, 2021 | $125,000 sent from Investor-Victim-3's Navy Federal Credit Union Account to Crypto-Pal Bank of America Account ending in 4562 |
| 5 | July 6, 2021 | $25,000 sent from Investor-Victim-4's JP Morgan Chase Bank account to Crypto-Pal Bank of America Account ending in 4562 |
| 6 | September 17, 2021 | Email from symbiglobal.com account to Investor-Victim-3 |
| 7 | October 26, 2021 | Email from TDA Global Systems and Docusign to Investor-Victim-5 |
| 8 | October 27, 2021 | Transfer of Bitcoin from Investor-Victim-5's crypto.com wallet to Coinbase wallet ending in fWWm |
| 9 | October 27, 2021 | Transfer of Bitcoin from Investor-Victim-5's crypto.com wallet to Coinbase wallet ending in fWWm |
| 10 | November 3, 2021 | Transfer of Bitcoin from Investor-Victim-5's crypto.com wallet to Coinbase wallet ending in fWWm |
| 11 | November 24, 2021 | Transfer of Bitcoin from Investor-Victim-5's crypto.com wallet to Coinbase wallet ending in Cpa6 |
| 12 | November 24, 2021 | Transfer of Bitcoin from Investor-Victim-5's crypto.com wallet to Coinbase wallet ending in Cpa6 |

All in violation of Title 18, United States Code, Sections 2 and 1343.

FORFEITURE ALLEGATION: [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.     Upon conviction of one or more of the offenses alleged in Counts One through Twelve of this Indictment, defendant DANIEL CHARTRAW shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

a.     A sum of money equal to the total amount of proceeds traceable to such offenses, for which defendant is convicted.

INDICTMENT

8

2.      If any property subject to forfeiture, as a result of the offenses alleged in Counts One through Twelve of this Indictment, for which defendant is convicted:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

A TRUE BILL.

**/s/ Signature on file w/AUSA**

_____
FOREPERSON

_____
PHILLIP A. TALBERT
United States Attorney

INDICTMENT

9

No. ___2:24-cr-0311 TLN___

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA

*vs.*

DANIEL CHARTRAW

INDICTMENT

VIOLATION(S): 18 U.S.C. § 1343– Wire Fraud (12 Counts);
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill.*

## /s/ Signature on file w/AUSA

_____
*Foreman.*

Filed in open court this __21st__ day

of __November__, A.D. 20 _24_

/s/Jenny Wood
_____
*Clerk.*

Bail, $ **No Bail Warrant Pending Hearing**

_____
CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

GPO 863 525

2:24-cr-0311 TLN

<div align="center">

**United States v. Daniel Chartraw**
**Penalties for Indictment**

</div>

**COUNTS 1 through 12:**

VIOLATION:        18 U.S.C. § 1343 – Wire Fraud

PENALTIES:        Maximum of 20 years in prison;
Fine of up to $250,000 or twice the gross gains or loss; and
Supervised release of 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:**

VIOLATION:        18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:        As stated in the charging document

# EXHIBIT 30

Los Angeles Times

**WORLD & NATION**

# An ex-NBA player's plan for a $5-billion Las Vegas arena is an empty pit. What went wrong?



(Matt Rota / For The Times)

**By Nathan Fenno**
Staff Writer
Illustrations by **Matt Rota**

Jan. 23, 2025 6:43 AM PT

FOR SUBSCRIBERS

- Former NBA player Jackie Lee Robinson promised to transform a vacant lot on the Strip into a world-class arena and resort.
- The project was never built. Investors are suing to recover millions.

LAS VEGAS — Even in a city accustomed to outlandish projects and long-shot bets, Jackie Lee Robinson's $5-billion vision for Las Vegas stood out.

The NBA champion proposed building an arena — sheathed in giant LED screens and crowned with a retractable roof — to anchor an enormous development without a casino in a less-visited part of the Strip.

At a celebratory news conference in October 2022, a promotional video promised to transform 27 acres of barren land into a world-class destination. Robinson called it the All Net Resort and Arena, using basketball slang for a shot so perfect the ball passes through the net without touching the rim.

A member of the powerful Clark County Commission seated next to Robinson praised "the faith, the belief, the moxie to dream outside the box," while Nevada's then-lieutenant governor gushed that the privately financed project "truly is incredible." Small-time investors had faith in Robinson, too, and had poured millions into the undertaking.



But the land between the Sahara and Fontainebleau hotel-casinos remains empty. A Times investigation has found that Robinson and his companies have left a trail of jilted financial backers, questionable spending and broken promises.

Robinson claimed to have secured billions to build the arena-resort — and told the news conference he also had the resources to bid for an NBA franchise to play there. But the jackpots never materialized.

He acknowledged in a deposition that the mortgage for his home in a Las Vegas country club was paid by a bank account for his company developing the project. Bank statements for the company show purchases at luxury retailers in Beverly Hills and wire transfers to Robinson's wife.

Days after telling investors in a letter that the project had run out of money, he received a $50,000 check from his company. The memo line read, "MERRY CHRISTMAS." In a deposition, Robinson said the company he formed paid himself and others for work done.

Standing 6-feet-6, Robinson at 69 still exudes the commanding presence he did on the basketball court. He has a serious face, sincere voice, and projects a sense of urgency in emails and text messages — pleading, encouraging, reassuring.

For years, such assurances won the project local government approvals and private investment. More than $65 million had been raised, one Robinson attorney told a county government meeting in 2023, from "people who believe in this development." Internal project records list dozens of investors from Southern California, Nevada and beyond. They include physicians, real estate agents and a military pilot.

The All Net saga — with Robinson playing the central role — unfolded over more than a decade. It spanned the globe, reaching Malaysia and Mexico, Switzerland and Qatar, but always returned to the desolate lot in Sin City that's about the size of 250 basketball courts.



CALIFORNIA

**With more gambling cases likely, Ohtani debacle is a lesson to MLB**

Sept. 15, 2024

Robinson did not respond to numerous interview requests and detailed written questions from The Times. Five lawsuits against the businessman, his companies involved in the arena-resort, or both, seek more than $30 million. Accusations include civil fraud and borrowing money with no intention of repaying it. His companies face at least $17 million in civil court judgments.

The lot where Robinson's plan was to become reality is a painful reminder to investors who believed in his vision, even as projected opening dates came and went. Some asked that their names not be published because of deep embarrassment and fear of damaging their professional reputations.

"This is our hidden secret," the pilot's wife said. The couple invested six figures. "Nobody in our friend circle knows. Nobody in our family knows. We thought when the money started flowing in we'd be able to bless people."



**Las Vegas: Big ambitions, big debts**

Almost half a century ago, Robinson was one of the country's most sought-after high school basketball players, a standout at Inglewood's Morningside High School described by The Times as a "man among boys, built like Dr. J after a summer at Muscle Beach." Robinson thought Las Vegas would be the last place he would attend college, but after he and his deeply religious mother visited on a recruiting trip, she raved about the kindness of residents.

"I was surprised she said, 'Son, this is where you need to go to school,'" Robinson told the news conference in 2022.

At the University of Nevada, Las Vegas, he became an integral part of the powerhouse teams coached by the legendary Jerry Tarkanian. The UNLV media guide called Robinson a "very popular player" in "a town full of celebrities."

In Tarkanian's autobiography, Robinson is quoted as saying his college career delivered benefits in Las Vegas that extended beyond basketball: "The thing is that when you play at UNLV and if you're a good person, the community is there to give you a chance in business."

After college, Robinson played in 22 regular season games across three seasons and was with the Seattle SuperSonics when they won the NBA title in 1979.

"I'm not a quitter, I'm stubborn, and if I feel I belong, I'll try again, until my last breath," Robinson told The Times in 1980.

He seemed to bring the same tenacity to his post-basketball ventures. They included airport shops, a firm that owned Pizza Huts in Southern California, and an unsuccessful effort to build a hotel and casino on a different part of the Strip. He was inducted into UNLV's Athletics Hall of Fame, the state's higher education board named him a Distinguished Nevadan, and a company biography hailed his "distinguished role in the history of Las Vegas."

But Robinson also encountered legal problems. He faced at least five lawsuits filed between 2007 and 2011 on matters not connected to All Net, which was incorporated in 2013. They accused Robinson, his companies, or both of not paying debts, including a loan for a Corvette. In four of the cases, the bills were eventually paid or the suits dismissed, but financial problems appeared to mount.

In January 2013, a court entered a $1.6-million judgment against Robinson and a partner — it is still active — in a breach of contract lawsuit by a Las Vegas shopping mall after they defaulted on a clothing store lease. An attorney for Robinson wrote in a court filing six months later that his client was "primarily indigent."



**SPORTS**

**The desperate hours: a pro baseball pitcher's fentanyl overdose**

**June 27, 2024**

According to court records, the bank holding the loan for the couple's home alleged that they were 22 months delinquent on payments.

But in December 2013, five months after the claim of indigence, Robinson announced plans for the All Net Resort and Arena. He leased the lot on the Strip with an option to buy and told the Las Vegas Sun that "we have proper financing in place" for the project then estimated to cost $1.3 billion. A news release suggested the arena-resort could open in three years.

Nine months later, as Robinson pitched the Clark County zoning commission on the project, he recounted playing for UNLV and winning a championship with the SuperSonics, then told a story about bumping into Sammy Davis Jr. in the 1980s. The entertainer said he hoped to see a fellow Black person own a hotel on the Strip.

"I'm asking the commission to give me the opportunity to give back to the community that gave me everything," Robinson said.

"I'm sure that not only Sammy Davis, but your mom is smiling down on you today," responded Steve Sisolak, a commissioner who would become Nevada's governor.

In late 2014, a festive groundbreaking ceremony was held at the lot, with Robinson, politicians and former pro basketball players posing for photos with shovels and hard hats.

"It's like the 'Field of Dreams.' Build it, and the NBA will come," former NBA player Spencer Haywood told the Las Vegas Review-Journal.

**Qatar: Money promised. And lost.**

The defining feature of the lot is a vast pit excavated for the project. Storms filled it with greenish water, spawning online quips about the "All Net Arena swamp" and prompting health officials to survey for mosquitoes. In an email to the county, a man whose condo overlooks the pit called it "lake malaria."

The pit was the result of a meeting in February 2017, according to a deposition, when Robinson told a construction company, Las Vegas Paving, that financing was in progress. The company excavated about 15 feet deep, then stopped work several months later when it wasn't paid.

"We heard everything — that the money was sitting in a bank in San Francisco, there was problems with it being domesticated," Las Vegas Paving general counsel Jim Barker said in the deposition. "That it was being tied up by Homeland Security, that financing had fallen through, had to look for somebody else, any number of instances."

Las Vegas Paving placed a $12.6-million lien on the property in September 2017. That same month, Robinson signed a contract in a hotel conference room in Zurich, Switzerland, to borrow 2.3 billion euros (about $2.6 billion) from an entity referred to

variously in loan documents and depositions as the International Bank of Qatar
Invest, IBQ Invest and IBQ Invest Holding AG.

It was the latest in a series of byzantine plans to finance the arena-resort through
entities scattered across the world.

A few weeks later, Robinson told a Las Vegas television station: "We have 100% of the
money."

A memo to Robinson from a consultant, later included in a court filing, claimed IBQ
Invest was a unit of the International Bank of Qatar. The memo said IBQ Invest
managed "the personal wealth of the Royal Family of Qatar and their network of
associates and friends."

A stamp used on project loan documents for "IBQ Invest Holding AG" listed the
company's locations as "Qatar - Zurich - Berlin." The Times did not find any record of
it, and Robinson did not respond to questions about IBQ Invest.



By May 2019, the money hadn't appeared when Robinson addressed county commissioners. He told them the delay "with the International Bank of Qatar" was due to the difficulty of moving so much money from Qatar to the U.S. through Switzerland. The next month, he assured commissioners the windfall would soon arrive and be used for construction: "We have 100%, which is $2.6 billion, that has been transferred … to our accounts."

But two former executives at the International Bank of Qatar, speaking on condition of anonymity to discuss the bank's dealings, said it had no connection to IBQ Invest or the arena-resort.

"I never heard of this project," one former executive wrote in an email, "nor did we ever offer any commitment to finance it."

## Southern California: Unpaid loans

Kent Limson still has a photo from the first time he toured the lot with Robinson several years ago. Blue skies. Smiles. Acres of potential for the All Net Resort and Arena.

A partner with a Torrance accounting and law firm called TACSIS, Limson remembered the walls in a construction trailer covered with line-by-line accounting of how each dollar would be spent.

A memo from Robinson assured Limson in November 2018 that the project had executed a multibillion-dollar loan with the International Bank of Qatar Invest via a Swiss bank and a $300-million loan agreement with two South Korean firms. But the money, the memo acknowledged, hadn't arrived.

Later that month, Limson and TACSIS made the first of seven loans to one of Robinson's companies, All Net LLC, that eventually totaled $2.2 million. Limson said in a declaration that he received a signed contract to become Robinson's financial director when the arena-resort opened and "truly believed" in the undertaking, at least early on.

"Due to the rushed need for the money," Limson's declaration said, "I was not able to confirm certain details until after the loans were given and found that some of the information I was given was either false or misleading in order to get me on board to lend."

The same month the TACSIS cash started flowing, Mark Vakili, president of Newport Beach-based MMV Investments, pleaded with Robinson to repay millions the company had lent several years earlier. MMV alleged in a court filing that the loans totaled $12.1 million.

In an email later attached to a court filing, Vakili reminded Robinson that he had "supported you from day one," adding, "I expect to hear from you with a written plan ASAP."

MMV sued to collect the debt, but a judge dismissed the case because the statute of limitations had expired. The company appealed and a ruling is pending.

TACSIS sued, too, after All Net didn't repay the seven loans as agreed. A judge recently found Robinson and All Net in default, citing a technical reason — because they didn't retain counsel after their previous attorneys had pulled out of the case.

Another loan came from the pilot and his wife. They agreed to lend All Net six figures in exchange for a small stake in the project, according to a contract reviewed by The Times. To raise the money, the pilot said, he reenlisted and used part of his bonus for the investment.

"We were a little hesitant, but we saw Clark County records and approvals and news coverage, and it really made it appealing," the wife said.

Their contract specified the loan would be repaid in a year with 10% interest. The couple said it didn't happen.

**Las Vegas: 'Obviously, I'm the highest'**

As the lot on the Strip remained empty, Robinson lived in a 5,200-square-foot home deep inside the Canyon Gate Country Club, which has views of the Red Rock Canyon National Conservation Area.

Partial bank statements reviewed by The Times show monthly payments from a business account for Dribble Dunk LLC — Robinson's company developing the project — for his mortgage. When an attorney asked Robinson during a deposition if

such payments were operating expenses, Robinson replied, "Well, if I can't live in a house, how can I be able to operate and build and do the work I need to do?"

The project was his lone source of income, Robinson said in the deposition, and he received a monthly stipend, as did several project consultants. Payment size was based on the level of outside investment.

"Obviously, I'm the highest," he testified.

In a different deposition, Robinson said he took a stipend "whenever there's funds available" and that the stipend was "not compensation," but for "things I might need to do for home … or, you know, any type of bills that need to be paid."

Another Dribble Dunk statement shows a $60,000 wire transfer to Robinson's wife in November 2018. He said in a deposition that the payment to Maria Robinson was made because "we hadn't gotten a stipend for several months and so that one stipend was for that and everyone was also paid a stipend at the same time." She didn't respond to requests for comment.

The following month, Maria Robinson received a check from a Dribble Dunk account for $40,000. The memo line read: "MERRY CHRISTMAS."

The statement for a different Dribble Dunk account several months later shows payments to Gucci ($1,938) and Louis Vuitton ($1,740) in Beverly Hills, Hanging with Mr. Cooper Custom Clothiers in Newport Beach ($5,535), along with more than $10,000 spent at hotels in Beverly Hills and Huntington Beach.

Robinson continued to ask for more money. An email to investors in December 2020 sought $300,000 to $500,000: "A project of this size and magnitude has numerous monthly expenses and we have exhausted our current funds."

Eight days later, Robinson received a check from a project account for $50,000. Again, the memo line read, "MERRY CHRISTMAS." The following month, Maria Robinson got a check for $25,000.

When a company associated with a Las Vegas oncologist lent $4.5 million for the project in February 2021, statements from a Dribble Dunk bank account show that a wave of transfers followed. A million dollars was wired to a wealth management firm "For Further Credit To: Jackie Robinson And Maria Robinson."

Maria Robinson received a $200,000 wire transfer from the account the same day, while a combined $200,000 was transferred to Jaquelyn Robinson — the name of the couple's daughter — and Jackie Robinson.

The same company later lent an additional $3 million. Some of the subsequent Dribble Dunk expenses appear related to the project. For example, more than $1 million was paid to an architecture firm, the lot's owner, lawyers, and consultants. Bank records also show a $350,000 wire transfer from the account to Maria Robinson, as well as $200,000 in transfers to the wealth management firm in the name of the Robinsons.

As money flowed in, some investors got upbeat, minute-long video updates every week or two from a Las Vegas physician named Loring Jacobs. An All Net website identified Jacobs, who called Robinson "my best friend for 50 years" in a video, as a company board member. He did not respond to requests for comment.

Videos from Jacobs in 2021 praised Robinson's morals ("He's never smoked, he's never used drugs, he's never drank" ). Tried to lift spirits ("He's trying to make everybody financially independent here"). Touted the imminent start of construction ("You'll see bulldozers out there at the end of the summer"). Predicted investors would soon be made whole ("You guys should have your money back by the end of the year for sure").

All Net's website offered more hope that fall: "Scheduled to open in 2024."

## Las Vegas: More promises

Of all the plans to pay for the arena-resort, perhaps none attracted as much attention as the news conference in October 2022 to announce financing had finally been secured.

The project would cost an estimated $4.9 billion, Robinson told the audience, but that wasn't all.

"Do we have the assets and resources to put in a bid for a [NBA] team?" Robinson said. "The answer is yes."

Joining Robinson at the front table were Lisa Cano Burkhead, then Nevada's lieutenant governor, and Clark County Commissioner Tick Segerblom.



A day later, campaign finance records show, Dribble Dunk contributed $4,000 to the lieutenant governor's campaign. This wasn't unusual. Since 2018, Robinson and Dribble Dunk have given state and local elected officials at least $62,000. Segerblom has received $15,000.

"I can't say how proud I am to be part of this fantastic project," Segerblom told the news conference.

Torben Welch beamed at the end of the table. The attorney with Messner Reeves, a law firm with offices across the country, said it had worked with Robinson for more than a year and that "when this project is developed, there will be very little, if any, debt."

*"Do we have the assets and resources to put in a bid for a [NBA] team?" Robinson said. "The answer is yes."*

The supposed funding source sat between Welch and Robinson. Todd Owen, who is a former Navy SEAL and California Highway Patrol officer, represented the Clearwater Premiere Perpetual Master Trust. The company had been registered as an LLC almost five months earlier. Welch told The Times that Owen owns 100% of Clearwater. Owen declined to comment through the attorney and never responded to later requests for comment from The Times.

"I can't say enough about my team here sitting up here in the front row," Owen told the news conference. "We jumped in with both feet and fell in love with Jackie and his project."

**Malaysia: A 'fraud alert'**

Even in the weeks after the news conference, skepticism was growing among some county commissioners.

"Last time, it was magic money from the Middle East," Commissioner Justin Jones said during a public meeting in November 2022. "I'm really trying to understand where the money is actually coming from."

In response, an attorney with the project produced a letter from PG Asia Investment Bank Ltd. in Malaysia. The letter confirmed a $5-billion letter of credit to Clearwater to fund the arena-resort. The commissioners granted a one-year extension to start construction.

But the bank added a notice to its website in 2023 under the heading "ATTEMPTED FRAUD ALERT NOTICE" that said it "is not in any way associated or involved in the

financing" of the project. According to the notice, the bank's logo and email had "been used by unauthorised third parties without our prior knowledge nor approval."

Welch, the attorney, said Robinson's companies — All Net and Dribble Dunk — were the actual "victim of the fraud."

Less than a week after the presentation to the commissioners, the owner of a large parking lot near the arena-resort site sued Robinson and Dribble Dunk. They had leased the lot, the landlord alleged, but four of Dribble Dunk's checks bounced, including the security deposit, and the company defaulted on the agreement. The landlord eventually won a $4.9-million judgment. It hasn't been paid.

The All Net website remained optimistic: "Scheduled to open in 2025."

**Mexico: '100% of the cash'**

As another deadline to start construction loomed, an attorney told the county in an August 2023 letter that the project had once again secured funding. An attached receipt showed a $5-billion transfer from Clearwater to Dribble Dunk through a company called Fides Gestion Financiera in Monterrey, Mexico. The receipt offered a simple explanation: "to be used in a deal in Las Vegas."

Addressing the Winchester town advisory board that November — the lot is in unincorporated Clark County — Robinson said, "We have 100% of the cash" to build the arena-resort.

The money still hadn't arrived when he appeared before county commissioners a week later seeking a fourth extension of time to commence construction. He told commissioners "this town has raised me" and recalled Tarkanian recruiting him to play at UNLV.

A project attorney said more than $14 million had been spent on "construction and administrative fees and costs" over the last three years.

Robinson said the long-standing Las Vegas Paving debt would be paid shortly. He emphasized that the "$5 billion is totally under my control."

But Segerblom, the commissioner who backed the project for years, finally had enough.

"We've followed the money everywhere around the world and, truthfully, it hasn't happened," Segerblom said. Though it "breaks my heart to do it," he voted against an extension. So did the other six commissioners.



**CALIFORNIA**

**Inside the gambling ring linked to Ohtani — as told by two bettors themselves**

**April 5, 2024**

"The truth is I tried to give him every chance possible," Segerblom later told The Times. "He seemed like such a nice guy. ... I take partial responsibility, but honestly this is what politicians do. We promote things. I have no regrets, as far as I know. It was 'local boy makes good.'"

In a video update after the vote, Jacobs, the longtime Robinson friend, still sounded optimistic: "I just got off the phone with Jackie. He's not the slightest bit worried. ... Jackie wanted you to know that your money is safe because he has $5 billion in Mexico and that just needs to be monetized and moved to the states."

By January 2024, however, another developer wanting to pursue its own project quietly finalized an agreement with the owner of the lot. Robinson isn't involved.

Two months later, the landowner sued Robinson and his companies, alleging they owe more than $17 million after the landowner paid Robinson's old Las Vegas Paving debt to prevent the firm from foreclosing on the property.

That didn't dissuade Jacobs from sending another video to some investors in April: "Whatever you're hearing out there about Jackie and the project, it's exactly the opposite. … Cheer up. It's a big home run. It's gigantic."

Nine days later, the new developer, LVXP, unveiled plans for a "transformational" development on the lot that would include an arena, casino and hotels.

In May, Messner Reeves stopped representing Robinson and his companies in two cases. A court filing cited "substantial" delinquent amounts owed to the firm. Messner Reeves later filed to pull out of two other cases. Welch and the firm didn't respond to questions about whether they still represent Robinson.

> *"Whatever you're hearing out there about Jackie and the project, it's exactly the opposite … Cheer up. It's a big home run. It's gigantic."*

But the businessman's glossy vision remained alive on the All Net website. It showcased an animated video of the proposed development, as guests enjoyed the pools and the arena's roof slid open. The website offered a prediction: "Scheduled to open in 2026."

Then, the website vanished in September and All Net was dissolved with the Nevada Secretary of State.

A lawsuit by the company associated with the oncologist — he died in 2023 — alleged that All Net and Dribble Dunk "misled and defrauded" it. The company secured a

default judgment against All Net and Dribble Dunk in November for more than $12 million.

In December, TACSIS accused Robinson and several others of civil racketeering in a lawsuit filed in Las Vegas federal court. The complaint alleged Robinson was the center of a "fraudulent scheme" in which he "lured individuals into loaning funds to his entity for the project with the promise of high interest, quick repayment and foolproof lending." He hasn't responded.

In the last year, the area around the site where Robinson promised an "iconic" development collected all manner of debris — a purple negligee, discount cards for a strip club, cardboard boxes flattened into a makeshift bed, a soiled diaper. The area has been largely cleaned up, but the pit that once held "lake malaria" remains, though dry.

Some investors received correspondence from Dribble Dunk as winter approached pledging repayment. The money, one of them told the The Times, still hasn't arrived.

## More to Read

### A local LGBTQ+ nightclub was denied COVID-19 aid. Its owner is fighting back

Oct. 29, 2024



### Inside Bruno Mars' opening-night gig at Inglewood's new Intuit Dome

Aug. 16, 2024



### Jill Schary Robinson, writer who was part of a rich Hollywood lineage, dies at 88

July 23, 2024



 **Nathan Fenno**

Nathan Fenno is an investigative reporter for the Los Angeles Times.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 31

 Gmail

<span style="color:gray">Noah Lasko &lt;laskonoah@gmail.com&gt;</span>

## Evidence of ICA funds
35 messages

**Matthew Shatzkes** <matthew@bochner.law>                    Wed, Aug 16, 2023 at 4:47 PM
To: "twelch@messner.com" <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt



**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

**Matthew Shatzkes** <matthew@bochner.law>                    Wed, Aug 16, 2023 at 9:12 PM
To: "twelch@messner.com" <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Thank you for taking the time to speak with me earlier. Following our call, I want to confirm you will provide us with written confirmation of the following:

- Written updates from you when the funds have cleared the international banking system and are being deposited/accessible to the US bank accounts. From our discussion, I understand that you anticipate that day to be tomorrow but please confirm;

- Confirmation that the funds will hit my client's account 5 business days after the funds are deposited/accessible to your client's US bank accounts; and

- Confirmation that tranches 2 and 3 will both be paid with tranche 1.

We look forward to receiving that written confirmation.

Gmail - Evidence of ICA funds                                                                        3/26/24, 11:30 AM

Thanks,

Matt

**Matthew Shatzkes**

**BOCHNER** PLLC

📞 646.971.0685   📱 917.355.1397   🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

_____

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                      Thu, Aug 17, 2023 at 12:24 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Matt – thanks for chatting yesterday.  Some clarification here as it does deviate from our discussion a bit:

1. I will keep you informed as to status on the funds as the clear into the US accounts.  As I mentioned, this is and has been the hiccup here given the size and process.  I anticipate to have more information today from the relative banks (there are three working on this side) – when I spoke to the banks yesterday they had hoped that the funds would be in clearance process today or tomorrow – as I explained to you, if that occurs, then funds would be deployable be the end of next week.  I have another discussion with all of the bankers this afternoon for a status update.
2. This is correct.
3. I am discussion with INBE on the accelerated tranche schedule.  As I mentioned, there was discussion as to a new tranche schedule to push up 2 and 3 in advance of the prior schedule – while the funds may be available, the schedule itself will be with Craig and Jonathan.  I'll confirm and revert.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

_____

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 16, 2023 7:12 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

_____

Gmail - Evidence of ICA funds                                                                                    3/26/24, 11:30 AM

[Quoted text hidden]

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

---

**Matthew Shatzkes** <matthew@bochner.law>                                              Thu, Aug 17, 2023 at 12:44 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Thank you Torben. Appreciate the feedback.

Please do keep us updated on point 1. If possible can you send us an update by EOD today.

Thank you for confirming point 2.

With regards to point 3, can you please confirm the schedule with Craig and Jonathan and provide us with a firm date for when tranches 2 and 3 will be paid out? Our understanding is that they would be paid out the same time as tranche 1 and we have communications from INBE confirming the same. Please advise ASAP.

Thanks,
Matt

Sent from my iPhone

On Aug 17, 2023, at 12:25 PM, Torben Welch <twelch@messner.com> wrote:

**CAUTION:** This email originated from outside of the organization. Do not click the links or open attachments unless you recognize the sender and know the content is safe.

[Quoted text hidden]

**Matthew Shatzkes**

<image001.png>

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Wednesday, August 16, 2023 4:47 PM
**To:** twelch@messner.com
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; 'Jason Steinmetz' <jasonasteinmetz@gmail.com>
**Subject:** Evidence of ICA funds

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise

Gmail – Evidence of ICA funds                                                                                          3/26/24, 11:30 AM

update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt

**Matthew Shatzkes**

<image001.png>

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

[Quoted text hidden]

---

**7 attachments**

 **image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

 **image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                                   Thu, Aug 17, 2023 at 4:30 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Any updates?

Thanks,

Matt

**Matthew Shatzkes**

📞 646.971.0685   📱 917.355.1397   🌐 www.bochner.law

✉ matthew@bochner.law

📍 1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

> On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Any updates?

Thanks,

Matt

**Matt**

📞 6

✉ m

📍 1



*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

**7 attachments**

 **image001.png**
32K

 **image002.png**
1K

**image003.png**
1K

 **image004.png**
1K

**image005.png**
1K

**image006.png**
1K

**image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                                      Fri, Aug 18, 2023 at 1:41 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,
Matt

Sent from my iPhone

> On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:
>
> Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.
>
> Sent from my mobile device - please excuse any typos

On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Any updates?

Thanks,

Matt

**Matthew Shatzkes**



<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

[Quoted text hidden]

<image007.png>

[Quoted text hidden]

---

**7 attachments**


**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

---

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Discussed with the bankers facilitating the move today - they have indicated that the initial messages have been sent for the final transfers and they will respond to each other Monday - then movem

Sent from my mobile device - please excuse any typos

On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

Torben:

Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,
Matt

Sent from my iPhone

On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Any updates?

Thanks,

Matt



*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

**7 attachments**


**image001.png**
32K


**image002.png**
1K


**image003.png**
1K

 **image004.png**
1K

**image005.png**
1K

**image006.png**
1K

**image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                                            Fri, Aug 18, 2023 at 1:53 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next week, correct? Also, what about an update on tranches 2 and 3?

Sent from my iPhone

> On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:

> Discussed with the bankers facilitating the move today - they have indicated that the initial messages have been sent for the final transfers and they will respond to each other Monday - then movement will happen. On pace for end of next week per their status update today.

Sent from my mobile device - please excuse any typos

>> On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

>> Torben:

Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,
Matt

Sent from my iPhone

>>> On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

>>> Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

>>>> On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Any updates?

Thanks,

Matt

### Matthew Shatzkes

<image001.png>

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

[Quoted text hidden]

<image007.png>

[Quoted text hidden]

**7 attachments**



**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

---

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know, but none are anticipated.

I will follow up on 2 and 3 and touch base when I have info from the client.

Sent from my mobile device - please excuse any typos

> On Aug 18, 2023, at 11:54 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next week, correct? Also, what about an update on tranches 2 and 3?

Sent from my iPhone

>> On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:

Discussed with the bankers facilitating the move today - they have indicated that the initial messages have been sent for the final transfers and they will respond to each other Monday

Sent from my mobile device - please excuse any typos

>>> On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

Torben:

Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,
Matt

Sent from my iPhone

>>>> On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

>>>>> On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Gmail - Evidence of ICA funds

3/26/24, 11:30 AM

Any updates?

Thanks,

Matt



*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

**7 attachments**

  **image001.png**
32K

  **image002.png**
1K

  **image003.png**
1K

  **image004.png**
1K

  **image005.png**
1K

  **image006.png**
1K

**image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                    Fri, Aug 18, 2023 at 1:57 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Apologies for the auto correct. I meant Friday of next week.

Sent from my iPhone

On Aug 18, 2023, at 1:54 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next week, correct? Also, what about an update on tranches 2 and 3?

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date of end of this week) and the timings for payment of tranches 2 and 3.

Thanks,

Matt



**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 18, 2023 1:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** Re: Evidence of ICA funds

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know, but none are anticipated.

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]



*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                      Tue, Aug 22, 2023 at 10:24 AM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangement and it is actively in breach of numerous agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please also provide an update on tranches 2 and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt



**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinr

Matt - we remain on track as discussed Thursday and Friday.  This is subject just to banking procedures and time frames but the estimate given last week and relayed to you (funds available the end
we have completed everything on our side.

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranche  rather than a refund of the ICA deposit), my clients will make the second
after the 2nd.

Torben Welch

Sent from my mobile device - please excuse any typos

On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangement and it is actively in breach of numerous agreements due to INBE's delay in
Please also provide an update on tranches 2 and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt





**Matth

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

**From:** Matthew Shatzkes
**Sent:** Monday, August 21, 2023 12:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jas

**Subject:** RE: Evidence of ICA funds

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date of end of this week) and the timings for payment of tranches 2 and 3.

Thanks,

Matt

**Matthew Shatzkes**

<image001.png>

<image002.png>
 646.971.0685
<image003.png>
 917.355.1397
<image004.png>
 www.bochner.law

<image005.png>
 matthew@bochner.law

<image006.png>
 1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

**Matthew Shatzkes**

<image001.png>

<image002.png>
 646.971.0685
<image003.png>
 917.355.1397
<image004.png>
 www.bochner.law

<image005.png>
 matthew@bochner.law

<image006.png>
 1040 6th Avenue, 15th Fl. New York, NY 10018

3/26/24, 11:30 AM

[Quoted text hidden]

<image007.png>

[Quoted text hidden]

---

**7 attachments**



**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                                                    Tue, Aug 22, 2023 at 3:32 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.

I confirmed that Kosher Eats' desire is to accept the tranches and move forward with the timings you laid out in your email (although because of the delays can thee second tranche be funded
within 7 days after the first  tranche?), assuming the first funding occurs this Friday. When will you know if payment of the first tranche will fund for sure this Friday? Based on our prior
discussions, wouldn't the funds have already had to be deposited and be available domestically for that to happen? Has something changed in terms of the 5 business day time frame?

Again, let me know if it is easier to discuss on a call.

Thanks,
Matt

Sent from my iPhone

> On Aug 22, 2023, at 11:14 AM, Torben Welch <twelch@messner.com> wrote:

>  Matt - we remain on track as discussed Thursday and Friday.  This is subject just to banking procedures and time frames but the estimate given last week and relayed to you
> (funds available the end of this week) remains correct.  I will inform you if this changes - but we have completed everything on our side.

> As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranche  rather than a refund of the ICA deposit), my clients will
> make the second tranche will be available 15 days after that and the third 30 days after the 2nd.

> Torben Welch

> Sent from my mobile device - please excuse any typos

>> On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

>> **[ EXTERNAL EMAIL ]**

---

>> Torben:

>> Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangement and it is actively in breach of numerous
>> agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please also provide an update on tranches 2 and 3 (it's been over a week
>> already since you were going to discuss with Craig and Jonathan).

>> Thanks,

>> Matt

Gmail - Evidence of ICA funds

### Matthew Shatzkes



&lt;image002.png&gt;
646.971.0685
&lt;image003.png&gt;
917.355.1397
&lt;image004.png&gt;
www.bochner.law

&lt;image005.png&gt;
matthew@bochner.law

&lt;image006.png&gt;
1040 6th Avenue, 15th Fl. New York, NY 10018

[Quoted text hidden]

&lt;image007.png&gt;

[Quoted text hidden]

---

**7 attachments**



**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

---

**Matthew Shatzkes** <matthew@bochner.law>                                    Wed, Aug 23, 2023 at 3:57 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Checking in for an update.

Given that it is already Wednesday (and based on your email from yesterday) we are assuming the first trench well fund on Friday.

Please also provide responses to the remaining questions below.

Thanks,
Matt

Sent from my iPhone

> On Aug 22, 2023, at 3:32 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

> Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.
> [Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                    Wed, Aug 23, 2023 at 4:12 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.

Sent from my mobile device - please excuse any typos

> On Aug 23, 2023, at 1:57 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

> Torben:
> [Quoted text hidden]

---

Gmail - Evidence of ICA funds

3/26/24, 11:30 AM

---

**Matthew Shatzkes** <matthew@bochner.law>                                      Wed, Aug 23, 2023 at 4:16 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday due to the 5 business day requirement
you mentioned to me when we initially spoke?

Sent from my iPhone

On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:

No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.
[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                            Wed, Aug 23, 2023 at 4:25 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.

Sent from my mobile device - please excuse any typos

On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday due to the 5 business day
requirement you mentioned to me when we initially spoke?
[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                      Wed, Aug 23, 2023 at 4:35 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this week; and (2) the first tranche will be
immediately forwarded to Kosher Eats that same day and will be accessible to Kosher Eats that same day. Is this correct?

I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communicated to Kosher Eats throughout this
delay.

Sent from my iPhone

On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:

That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.
[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                            Wed, Aug 23, 2023 at 4:46 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect funds this week once the bank
protocols process (they told us there was a five day process for that – but that has been over that time frame already) then they will be release as soon as available.

Here is where we are today – I will update tomorrow once I have more information.

Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimates only subject to bank procedures
and protocols.

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                      Wed, Aug 23, 2023 at 9:24 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?

Sent from my iPhone

---

3/26/24, 11:30 AM

On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                    Thu, Aug 24, 2023 at 4:47 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?

[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                    Thu, Aug 24, 2023 at 4:57 PM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason
Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                    Thu, Aug 24, 2023 at 9:04 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?



**Matthew Shatzkes**

📞 646.971.0685   📱 917.355.1397   🌐 www.bochner.law
✉️ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

Gmail - Evidence of ICA funds

3/26/24, 11:30 AM

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>                                          Fri, Aug 25, 2023 at 1:17 PM
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Torben:

Please provide an update.

Thanks,
Matt

Sent from my iPhone

On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?

**Matthew Shatzkes**

<image001.png>

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

[Quoted text hidden]

<image007.png>

[Quoted text hidden]

---

**7 attachments**


**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

Gmail - Evidence of ICA funds

3/26/24, 11:30 AM

---

**Noah Lasko** <laskonoah@gmail.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Torben Welch <twelch@messner.com>

Fri, Aug 25, 2023 at 4:42 PM

Torben,

Will we be getting an update on when we will be funded? Is there a way to get an answer about when an exact funding date will be? Why are we waiting 15 days and then 30 days for tranches 2 and 3? Today is day 119 when we were supposed to funded on day 90. Please advise.

Thanks

[Quoted text hidden]

--
Noah Lasko laskonoah@gmail.com (954)298-5944

---

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Matt - the  funds are still in process into the INBE account for disbursement.  It did not happen today.  The financial parties are coordinating on Monday to see if we can get a clear pathway.

Torben

Sent from my mobile device - please excuse any typos

> On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Please provide an update.

Thanks,
Matt

Sent from my iPhone

> On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?



---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

[Quoted text hidden]

**7 attachments**


**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

**Matthew Shatzkes** <matthew@bochner.law>
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinn

Torben:

Please provide an update ASAP. In addition, can we schedule an all hands call today with each of our respective clients on the line along with the bankers so we can get an exact understanding of th

Thanks,

Matt



**Matthew Shatzkes**

📞 646.971.0685     📱 917.355.1397     🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 25, 2023 5:08 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** Re: Evidence of ICA funds

Matt - the funds are still in process into the INBE account for disbursement. It did not happen today. The financial parties are coordinating on Monday to see if we can get a clear pathway.

Gmail - Evidence of ICA funds                                                    3/26/24, 11:30 AM

Torben

Sent from my mobile device - please excuse any typos


On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:


**[ EXTERNAL EMAIL ]**

---

Torben:


Please provide an update.


Thanks,

Matt

Sent from my iPhone


On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:


Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?



---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*


[Quoted text hidden]

---

**Torben Welch** <twelch@messner.com>                                Mon, Aug 28, 2023 at 11:00 AM
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason
Steinmetz <jasonasteinmetz@gmail.com>

I will provide a update as soon as I receive one.  We can plan a call tomorrow with clients if you would like, but I will update accordingly. No bankers will be on a call. I think the options have been laid out already – we will continue to finalize receipt of disbursement funds and will notify when they are received.

I am available tomorrow from 3-5 EST if necessary.

[Quoted text hidden]

---

**Matthew Shatzkes** <matthew@bochner.law>
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Torben:

3 PM tomorrow works. Can you please send an invite?

Why can't bankers be on the call? My clients continue to wait for payment with no realistic timeframe or information, while you and your clients continue to hide behind these "banking" issues and ma clients to be in breach of various contracts and obligations and the only "recourse" you are offering is to send a termination notice and then they will still need to wait to receive their ICA funds back b IOLA account. On top of all that, your clients have disappeared despite "priding themselves on communications." Needless to say this entire process has been extremely frustrating, unprofessional a

**BOCHNER**
PLLC

**Matthew Shatzkes**

📞 646.971.0685   📱 917.355.1397   🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

---

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Monday, August 28, 2023 11:00 AM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** RE: Evidence of ICA funds

I will provide a update as soon as I receive one.  We can plan a call tomorrow with clients if you would like, but I will update accordingly. No bankers will be on a call. I think th funds and will notify when they are received.

I am available tomorrow from 3-5 EST if necessary.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Monday, August 28, 2023 8:25 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update ASAP. In addition, can we schedule an all hands call today with each of our respective clients on the line along with the bankers so we can get an exact understanding of th

Thanks,

Matt

**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 25, 2023 5:08 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** Re: Evidence of ICA funds

Matt - the funds are still in process into the INBE account for disbursement. It did not happen today. The financial parties are coordinating on Monday to see if we can get a clear pathway.

Torben

Sent from my mobile device - please excuse any typos

On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update.

3/26/24, 11:30 AM

Thanks,

Matt

Sent from my iPhone


On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:


Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?



*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*


**From:** Torben Welch <twelch@messner.com>
**Sent:** Thursday, August 24, 2023 4:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** RE: Evidence of ICA funds


The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.


**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

3/26/24, 11:30 AM

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

> On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?
>
> Sent from my iPhone

>> On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect funds this we
>> day process for that – but that has been over that time frame already) then they will be release as soon as available.
>>
>> Here is where we are today – I will update tomorrow once I have more information.
>>
>> Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimates only subjec
>>
>>
>> **TORBEN M. WELCH**
>>
>> Partner
>>
>> *Licensed in UT, NY, and CO*
>>
>> **Messner Reeves LLP**
>>
>> **D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
>>
>> 65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020
>>
>>
>> **From:** Matthew Shatzkes <matthew@bochner.law>
>> **Sent:** Wednesday, August 23, 2023 2:36 PM
>> **To:** Torben Welch <twelch@messner.com>
>> **Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskono
>> **Subject:** Re: Evidence of ICA funds
>>
>> Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this week; and (2) the
>> and will be accessible to Kosher Eats that same day. Is this correct?
>>
>> I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communicated to Koshe
>>
>> Sent from my iPhone

>>> On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:
>>>
>>> That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.
>>>
>>> Sent from my mobile device - please excuse any typos

On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday du when we initially spoke?

Sent from my iPhone

On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:

No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.

Sent from my mobile device - please excuse any typos

On Aug 23, 2023, at 1:57 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Torben:

Checking in for an update.

Given that it is already Wednesday (and based on your email from yesterday) we are assuming the first trench well fund on Friday.

Please also provide responses to the remaining questions below.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 3:32 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.

I confirmed that Kosher Eats' desire is to accept the tranches and move forward with the timings you laid out in your email (although be tranche be funded within 7 days after the first  tranche?), assuming the first funding occurs this Friday. When will you know if payment o Friday? Based on our prior discussions, wouldn't the funds have already had to be deposited and be available domestically for that to h terms of the 5 business day time frame?

Again, let me know if it is easier to discuss on a call.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 11:14 AM, Torben Welch <twelch@messner.com> wrote:

Matt - we remain on track as discussed Thursday and Friday.  This is subject just to banking procedures and time frames but th relayed to you (funds available the end of this week) remains correct.  I will inform you if this changes - but we have completed e

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranche  rat deposit), my clients will make the second tranche will be available 15 days after that and the third 30 days after the 2nd.

Torben Welch

Sent from my mobile device - please excuse any typos

On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangement and
numerous agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please also provide
and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt

## Matthew Shatzkes

<image001.png>

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly*

<image007.png>

**From:** Matthew Shatzkes
**Sent:** Monday, August 21, 2023 12:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date of end of this
for payment of tranches 2 and 3.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>          <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 18, 2023 1:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know, but none are a

I will follow up on 2 and 3 and touch base when I have info from the client.

Sent from my mobile device - please excuse any typos

> On Aug 18, 2023, at 11:54 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next week, c
> what about an update on tranches 2 and 3?
>
> Sent from my iPhone

>> On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> Discussed with the bankers facilitating the move today - they have indicated that the initial messages have
>> for the final transfers and they will respond to each other Monday - then movement will happen. On pace fo
>> next week per their status update today.
>>
>> Sent from my mobile device - please excuse any typos

>>> On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>>
>>> Torben:
>>>
>>> Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,

Matt

Sent from my iPhone

On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

 Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Any updates?

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>

<image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

3/26/24, 11:30 AM

---

**From:** Matthew Shatzkes
**Sent:** Thursday, August 17, 2023 12:44 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright
<jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason
Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

Thank you Torben. Appreciate the feedback.

Please do keep us updated on point 1. If possible can you send us an
update by EOD today.

Thank you for confirming point 2.

With regards to point 3, can you please confirm the schedule with Craig and
Jonathan and provide us with a firm date for when tranches 2 and 3 will be
paid out? Our understanding is that they would be paid out the same time
as tranche 1 and we have communications from INBE confirming the same.
Please advise ASAP.

Thanks,

Matt

Sent from my iPhone

> On Aug 17, 2023, at 12:25 PM, Torben Welch
> <twelch@messner.com> wrote:

> **CAUTION:** This email originated from outside of the
> organization. Do not click the links or open attachments
> unless you recognize the sender and know the content is
> safe.

> Matt – thanks for chatting yesterday.  Some
> clarification here as it does deviate from our discussion
> a bit:

> 1. I will keep you informed as to status on the funds
>    as the clear into the US accounts.  As I
>    mentioned, this is and has been the hiccup here
>    given the size and process.  I anticipate to have
>    more information today from the relative banks
>    (there are three working on this side) – when I
>    spoke to the banks yesterday they had hoped that
>    the funds would be in clearance process today or
>    tomorrow – as I explained to you, if that occurs,
>    then funds would be deployable be the end of
>    next week.  I have another discussion with all of
>    the bankers this afternoon for a status update.
> 2. This is correct.
> 3. I am discussion with INBE on the accelerated
>    tranche schedule.  As I mentioned, there was
>    discussion as to a new tranche schedule to push
>    up 2 and 3 in advance of the prior schedule –
>    while the funds may be available, the schedule
>    itself will be with Craig and Jonathan.  I'll
>    confirm and revert.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 16, 2023 7:12 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Thank you for taking the time to speak with me earlier. Following our call, I want to confirm you will provide us with written confirmation of the following:

1. Written updates from you when the funds have cleared the international banking system and are being deposited/accessible to the US bank accounts. From our discussion, I understand that you anticipate that day to be tomorrow but please confirm;

2. Confirmation that the funds will hit my client's account 5 business days after the funds are deposited/accessible to your client's US bank accounts; and

3. Confirmation that tranches 2 and 3 will both be paid with tranche 1.

We look forward to receiving that written confirmation.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image004.png>

<image001.png>

www.bochner.law

3/26/24, 11:30 AM

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Wednesday, August 16, 2023 4:47 PM
**To:** twelch@messner.com
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; 'Jason Steinmetz' <jasonasteinmetz@gmail.com>
**Subject:** Evidence of ICA funds

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>   <image004.png>

www.bochner.law

Gmail – Evidence of ICA funds

3/26/24, 11:30 AM

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

---

**Matthew Shatzkes** <matthew@bochner.law>
To: Torben Welch <twelch@messner.com>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Torben:

Following up, please advise why the bankers cannot be on the call?

In addition, I understand from my client that your client believes that the $2M ICA funds are still in your firm's control account. This is different than what you told me (i.e., that the funds are in the leve

Thanks,

Matt



**Matthew Shatzkes**

 646.971.0685    917.355.1397    www.bochner.law
matthew@bochner.law
1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Matthew Shatzkes
**Sent:** Monday, August 28, 2023 11:18 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** RE: Evidence of ICA funds

Torben:

3 PM tomorrow works. Can you please send an invite?

Why can't bankers be on the call? My clients continue to wait for payment with no realistic timeframe or information, while you and your clients continue to hide behind these "banking" issues and ma
clients to be in breach of various contracts and obligations and the only "recourse" you are offering is to send a termination notice and then they will still need to wait to receive their ICA funds back b
IOLA account. On top of all that, your clients have disappeared despite "priding themselves on communications." Needless to say this entire process has been extremely frustrating, unprofessional a



### Matthew Shatzkes

☎ 646.971.0685   ☐ 917.355.1397   🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Monday, August 28, 2023 11:00 AM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** RE: Evidence of ICA funds

I will provide a update as soon as I receive one.  We can plan a call tomorrow with clients if you would like, but I will update accordingly. No bankers will be on a call. I think th
funds and will notify when they are received.

I am available tomorrow from 3-5 EST if necessary.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

3/26/24, 11:30 AM

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Monday, August 28, 2023 8:25 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update ASAP. In addition, can we schedule an all hands call today with each of our respective clients on the line along with the bankers so we can get an exact understanding of th

Thanks,

Matt

**Matthew Shatzkes**

📞 646.971.0685    📱 917.355.1397    🌐 www.bochner.law
✉ matthew@bochner.law
📍 1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 25, 2023 5:08 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Stei
**Subject:** Re: Evidence of ICA funds

Matt - the  funds are still in process into the INBE account for disbursement.  It did not happen today.  The financial parties are coordinating on Monday to see if we can get a clear pathway.

Torben

Sent from my mobile device - please excuse any typos

> On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update.

Thanks,

Matt

Sent from my iPhone


On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:


Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?




*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*


**From:** Torben Welch <twelch@messner.com>
**Sent:** Thursday, August 24, 2023 4:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** RE: Evidence of ICA funds


The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.


**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

3/26/24, 11:30 AM

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

> On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?
>
> Sent from my iPhone

>> On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect funds this we
>> day process for that – but that has been over that time frame already) then they will be release as soon as available.
>>
>> Here is where we are today – I will update tomorrow once I have more information.
>>
>> Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimates only subjec

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 23, 2023 2:36 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskono
**Subject:** Re: Evidence of ICA funds

Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this week; and (2) the
and will be accessible to Kosher Eats that same day. Is this correct?

I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communicated to Koshe

Sent from my iPhone

> On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:
>
> That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.
>
> Sent from my mobile device - please excuse any typos

3/26/24, 11:30 AM

On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Friday du
when we initially spoke?

Sent from my iPhone

On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:

No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.

Sent from my mobile device - please excuse any typos

On Aug 23, 2023, at 1:57 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Torben:

Checking in for an update.

Given that it is already Wednesday (and based on your email from yesterday) we are assuming the first trench well fund on Friday.

Please also provide responses to the remaining questions below.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 3:32 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.

I confirmed that Kosher Eats' desire is to accept the tranches and move forward with the timings you laid out in your email (although be
tranche be funded within 7 days after the first tranche?), assuming the first funding occurs this Friday. When will you know if payment c
Friday? Based on our prior discussions, wouldn't the funds have already had to be deposited and be available domestically for that to h
terms of the 5 business day time frame?

Again, let me know if it is easier to discuss on a call.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 11:14 AM, Torben Welch <twelch@messner.com> wrote:

Matt - we remain on track as discussed Thursday and Friday. This is subject just to banking procedures and time frames but th
relayed to you (funds available the end of this week) remains correct. I will inform you if this changes - but we have completed e

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranche rat
deposit), my clients will make the second tranche will be available 15 days after that and the third 30 days after the 2nd.

Torben Welch

Sent from my mobile device - please excuse any typos

On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

3/26/24, 11:30 AM

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangement and numerous agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please also provide and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt

### Matthew Shatzkes

<image001.png>

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingl*

<image007.png>

**From:** Matthew Shatzkes
**Sent:** Monday, August 21, 2023 12:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date of end of this for payment of tranches 2 and 3.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>          <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 18, 2023 1:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know, but none are

I will follow up on 2 and 3 and touch base when I have info from the client.

Sent from my mobile device - please excuse any typos

> On Aug 18, 2023, at 11:54 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next week,
> what about an update on tranches 2 and 3?
>
> Sent from my iPhone

>> On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> Discussed with the bankers facilitating the move today - they have indicated that the initial messages have
>> for the final transfers and they will respond to each other Monday - then movement will happen. On pace fo
>> next week per their status update today.
>>
>> Sent from my mobile device - please excuse any typos

>>> On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>>
>>> Torben:
>>>
>>> Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,

Matt

Sent from my iPhone

On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

Bankers are waiting for additional approvals. We submitted another set of AML documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Any updates?

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>        <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

Gmail - Evidence of ICA funds                                                                    3/26/24, 11:30 AM

**From:** Matthew Shatzkes
**Sent:** Thursday, August 17, 2023 12:44 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright
<jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason
Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

Thank you Torben. Appreciate the feedback.

Please do keep us updated on point 1. If possible can you send us an
update by EOD today.

Thank you for confirming point 2.

With regards to point 3, can you please confirm the schedule with Craig and
Jonathan and provide us with a firm date for when tranches 2 and 3 will be
paid out? Our understanding is that they would be paid out the same time
as tranche 1 and we have communications from INBE confirming the same.
Please advise ASAP.

Thanks,

Matt

Sent from my iPhone

> On Aug 17, 2023, at 12:25 PM, Torben Welch
> <twelch@messner.com> wrote:

> **CAUTION:** This email originated from outside of the
> organization. Do not click the links or open attachments
> unless you recognize the sender and know the content is
> safe.

> Matt – thanks for chatting yesterday.  Some
> clarification here as it does deviate from our discussion
> a bit:

> 1. I will keep you informed as to status on the funds
>    as the clear into the US accounts.  As I
>    mentioned, this is and has been the hiccup here
>    given the size and process.  I anticipate to have
>    more information today from the relative banks
>    (there are three working on this side) – when I
>    spoke to the banks yesterday they had hoped that
>    the funds would be in clearance process today or
>    tomorrow – as I explained to you, if that occurs,
>    then funds would be deployable be the end of
>    next week.  I have another discussion with all of
>    the bankers this afternoon for a status update.
> 2. This is correct.
> 3. I am discussion with INBE on the accelerated
>    tranche schedule.  As I mentioned, there was
>    discussion as to a new tranche schedule to push
>    up 2 and 3 in advance of the prior schedule –
>    while the funds may be available, the schedule
>    itself will be with Craig and Jonathan.  I'll
>    confirm and revert.

> **TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 16, 2023 7:12 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan
Wright <jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko
<laskonoah@gmail.com>; Jason Steinmetz
<jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Thank you for taking the time to speak with me earlier.
Following our call, I want to confirm you will provide us with
written confirmation of the following:

1. Written updates from you when the funds have cleared
   the international banking system and are being
   deposited/accessible to the US bank accounts. From
   our discussion, I understand that you anticipate that
   day to be tomorrow but please confirm;

2. Confirmation that the funds will hit my client's account
   5 business days after the funds are
   deposited/accessible to your client's US bank
   accounts; and

3. Confirmation that tranches 2 and 3 will both be paid
   with tranche 1.

We look forward to receiving that written confirmation.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>    <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Wednesday, August 16, 2023 4:47 PM
**To:** twelch@messner.com
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; 'Jason Steinmetz' <jasonasteinmetz@gmail.com>
**Subject:** Evidence of ICA funds

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>     <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

Gmail – Evidence of ICA funds                                                      3/26/24, 11:30 AM

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

The bankers will not be on the call.

As I mentioned to you the funds have been moved to aggregate into a larger amount for memorization. We remain in control of those funds (which are being moved).

Sent from my mobile device - please excuse any typos

On Aug 28, 2023, at 1:35 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Following up, please advise why the bankers cannot be on the call?

In addition, I understand from my client that your client believes that the $2M ICA funds are still in your firm's control account. This is different than what you told me (i.e., that the funds are in t

Thanks,

Matt

**Matt**

 6

✉ m

Gmail - Evidence of ICA funds                                                                                          3/26/24, 11:30 AM

# BOCHNER
## PLLC

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

**From:** Matthew Shatzkes
**Sent:** Monday, August 28, 2023 11:18 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jas
**Subject:** RE: Evidence of ICA funds

Torben:

3 PM tomorrow works. Can you please send an invite?

Why can't bankers be on the call? My clients continue to wait for payment with no realistic timeframe or information, while you and your clients continue to hide behind these "banking" issues a clients to be in breach of various contracts and obligations and the only "recourse" you are offering is to send a termination notice and then they will still need to wait to receive their ICA funds IOLA account. On top of all that, your clients have disappeared despite "priding themselves on communications." Needless to say this entire process has been extremely frustrating, unprofess

**Matthew Shatzkes**

<image001.png>

<image002.png>
  646.971.0685
<image003.png>
  917.355.1397
<image004.png>
  www.bochner.law

<image005.png>
  matthew@bochner.law

<image006.png>
  1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

\<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Monday, August 28, 2023 11:00 AM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jas
**Subject:** RE: Evidence of ICA funds

I will provide a update as soon as I receive one.  We can plan a call tomorrow with clients if you would like, but I will update accordingly. No bankers will be on a call. I t
funds and will notify when they are received.

I am available tomorrow from 3-5 EST if necessary.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Monday, August 28, 2023 8:25 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jas
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Please provide an update ASAP. In addition, can we schedule an all hands call today with each of our respective clients on the line along with the bankers so we can get an exact understandi

Thanks,

Matt

**Matthew Shatzkes**

\<image001.png>

\<image002.png>
646.971.0685
\<image003.png>
917.355.1397
\<image004.png>
www.bochner.law

\<image005.png>
matthew@bochner.law

\<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

_____

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

_____

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 25, 2023 5:08 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jas
**Subject:** Re: Evidence of ICA funds

Matt - the  funds are still in process into the INBE account for disbursement.  It did not happen today.  The financial parties are coordinating on Monday to see if we can get a clear pathway.

Torben

Sent from my mobile device - please excuse any typos

> On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

_____

Torben:

Please provide an update.

Thanks,

Matt

Sent from my iPhone

> On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?

**Matthew Shatzkes**

<image001.png>

<image002.png>
 646.971.0685
<image003.png>
 917.355.1397
<image004.png>
 www.bochner.law

<image005.png>
 matthew@bochner.law

<image006.png>
 1040 6th Avenue, 15th Fl. New York, NY 10018

Gmail - Evidence of ICA funds                                                                            3/26/24, 11:30 AM

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Thursday, August 24, 2023 4:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gm
**Subject:** RE: Evidence of ICA funds

The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gm
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

> On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
>  Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?
>
> Sent from my iPhone

>> On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:

No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect funds t
day process for that – but that has been over that time frame already) then they will be release as soon as available.

Here is where we are today – I will update tomorrow once I have more information.

---

3/26/24, 11:30 AM

Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimates only

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 23, 2023 2:36 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <la
**Subject:** Re: Evidence of ICA funds

Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this week; and (
and will be accessible to Kosher Eats that same day. Is this correct?

I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communicated to

Sent from my iPhone

> On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:
>
> That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 EDT.
>
> Sent from my mobile device - please excuse any typos

>> On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>
>> Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by this Fr
>> when we initially spoke?
>>
>> Sent from my iPhone

>>> On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:
>>>
>>> No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.
>>>
>>> Sent from my mobile device - please excuse any typos

>>>> On Aug 23, 2023, at 1:57 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>>>
>>>> Torben:
>>>>
>>>> Checking in for an update.
>>>>
>>>> Given that it is already Wednesday (and based on your email from yesterday) we are assuming the first trench well fund on Friday.
>>>>
>>>> Please also provide responses to the remaining questions below.
>>>>
>>>> Thanks,
>>>>
>>>> Matt

3/26/24, 11:30 AM

Sent from my iPhone

On Aug 22, 2023, at 3:32 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.

I confirmed that Kosher Eats' desire is to accept the tranches and move forward with the timings you laid out in your email (altho
tranche be funded within 7 days after the first  tranche?), assuming the first funding occurs this Friday. When will you know if pay
Friday? Based on our prior discussions, wouldn't the funds have already had to be deposited and be available domestically for t
terms of the 5 business day time frame?

Again, let me know if it is easier to discuss on a call.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 11:14 AM, Torben Welch <twelch@messner.com> wrote:

Matt - we remain on track as discussed Thursday and Friday.  This is subject just to banking procedures and time frame
relayed to you (funds available the end of this week) remains correct.  I will inform you if this changes - but we have comp

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept the tranc
deposit), my clients will make the second tranche will be available 15 days after that and the third 30 days after the 2nd.

Torben Welch

Sent from my mobile device - please excuse any typos

On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arrangeme
numerous agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please also p
and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>          <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update acco*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Monday, August 21, 2023 12:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Can <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.co
**Subject:** RE: Evidence of ICA funds

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date of end for payment of tranches 2 and 3.

Thanks,

Matt

### Matthew Shatzkes

<image001.png>

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update acco*

3/26/24, 11:30 AM

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 18, 2023 1:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Can
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.co
**Subject:** Re: Evidence of ICA funds

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know, but nor

I will follow up on 2 and 3 and touch base when I have info from the client.

Sent from my mobile device - please excuse any typos

> On Aug 18, 2023, at 11:54 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Thank you Torben. So based on your email Kosher Eats should have money in its account by freight next
> what about an update on tranches 2 and 3?
>
> Sent from my iPhone

>> On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> Discussed with the bankers facilitating the move today - they have indicated that the initial message
>> for the final transfers and they will respond to each other Monday - then movement will happen. On
>> next week per their status update today.
>>
>> Sent from my mobile device - please excuse any typos

>>> On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>>
>>> Torben:
>>>
>>> Any update? If not, what alternative options exist for the first tranche to be paid?
>>>
>>> Thanks,
>>>
>>> Matt
>>>
>>> Sent from my iPhone

>>>> On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:
>>>>
>>>> Bankers are waiting for additional approvals. We submitted another set of AML
>>>> documents today. All remains routine but i anticipate additional news tomorrow.
>>>>
>>>> Sent from my mobile device - please excuse any typos

>>>>> On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.law>
>>>>> wrote:
>>>>>
>>>>> **[ EXTERNAL EMAIL ]**
>>>>>
>>>>> ---
>>>>>
>>>>> Torben:
>>>>>
>>>>> Any updates?
>>>>>
>>>>> Thanks,
>>>>>
>>>>> Matt

3/26/24, 11:30 AM

**Matthew Shatzkes**

<image001.png>

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

***Please note, our new email addresses, firm name, and mailing
address! Please be sure to update accordingly.***

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Thursday, August 17, 2023 12:44 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright
<jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason
Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

Thank you Torben. Appreciate the feedback.

Please do keep us updated on point 1. If possible can you send us an
update by EOD today.

Thank you for confirming point 2.

With regards to point 3, can you please confirm the schedule with Craig and
Jonathan and provide us with a firm date for when tranches 2 and 3 will be
paid out? Our understanding is that they would be paid out the same time
as tranche 1 and we have communications from INBE confirming the same.
Please advise ASAP.

Thanks,

Matt

Sent from my iPhone

On Aug 17, 2023, at 12:25 PM, Torben Welch
<twelch@messner.com> wrote:

**CAUTION:** This email originated from outside of the
organization. Do not click the links or open attachments
unless you recognize the sender and know the content is
safe.

Matt – thanks for chatting yesterday.  Some
clarification here as it does deviate from our discussion
a bit:

1. I will keep you informed as to status on the funds
   as the clear into the US accounts.  As I
   mentioned, this is and has been the hiccup here
   given the size and process.  I anticipate to have
   more information today from the relative banks
   (there are three working on this side) – when I
   spoke to the banks yesterday they had hoped that
   the funds would be in clearance process today or
   tomorrow – as I explained to you, if that occurs,
   then funds would be deployable be the end of
   next week.  I have another discussion with all of
   the bankers this afternoon for a status update.
2. This is correct.
3. I am discussion with INBE on the accelerated
   tranche schedule.  As I mentioned, there was
   discussion as to a new tranche schedule to push
   up 2 and 3 in advance of the prior schedule –
   while the funds may be available, the schedule
   itself will be with Craig and Jonathan.  I'll
   confirm and revert.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 16, 2023 7:12 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan
Wright <jonathan@theinbegroup.com>; Steven Cannata
<steven@titanadvisory.us>; Noah Lasko
<laskonoah@gmail.com>; Jason Steinmetz
<jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Thank you for taking the time to speak with me earlier.
Following our call, I want to confirm you will provide us with
written confirmation of the following:

3/26/24, 11:30 AM

1. Written updates from you when the funds have cleared the international banking system and are being deposited/accessible to the US bank accounts. From our discussion, I understand that you anticipate that day to be tomorrow but please confirm;

2. Confirmation that the funds will hit my client's account 5 business days after the funds are deposited/accessible to your client's US bank accounts; and

3. Confirmation that tranches 2 and 3 will both be paid with tranche 1.

We look forward to receiving that written confirmation.

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>     <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**From:** Matthew Shatzkes
**Sent:** Wednesday, August 16, 2023 4:47 PM
**To:** twelch@messner.com
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; 'Jason Steinmetz' <jasonasteinmetz@gmail.com>
**Subject:** Evidence of ICA funds

3/26/24, 11:30 AM

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>    <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer**

and **more useful** place for your human generated data.
Specializing in; Security, archiving and compliance. To find out
more Click Here.

**7 attachments**


**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

---

**Torben Welch** <twelch@messner.com>
To: Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Steven Cannata <steven@titanadvisory.us>, Noah Lasko <laskonoah@gmail.com>, Jason Steinm

Should read "monetization" not memorization.

Sent from my mobile device - please excuse any typos

On Aug 28, 2023, at 1:39 PM, Torben Welch <twelch@messner.com> wrote:

The bankers will not be on the call.

As I mentioned to you the funds have been moved to aggregate into a larger amount for memorization. We remain in control of those funds (which are being moved).

Sent from my mobile device - please excuse any typos

On Aug 28, 2023, at 1:35 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Following up, please advise why the bankers cannot be on the call?

In addition, I understand from my client that your client believes that the $2M ICA funds are still in your firm's control account. This is different than what you told me (i.e., that the funds

Thanks,

Matt

# BOCHNER
## PLLC

---

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

---

**From:** Matthew Shatzkes
**Sent:** Monday, August 28, 2023 11:18 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** RE: Evidence of ICA funds

Torben:

3 PM tomorrow works. Can you please send an invite?

Why can't bankers be on the call? My clients continue to wait for payment with no realistic timeframe or information, while you and your clients continue to hide behind these "banking" i
clients to be in breach of various contracts and obligations and the only "recourse" you are offering is to send a termination notice and then they will still need to wait to receive their ICA
IOLA account. On top of all that, your clients have disappeared despite "priding themselves on communications." Needless to say this entire process has been extremely frustrating, un

### Matthew Shatzkes

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image001.png>

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

---

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

3/26/24, 11:30 AM

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Monday, August 28, 2023 11:00 AM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** RE: Evidence of ICA funds

I will provide a update as soon as I receive one.  We can plan a call tomorrow with clients if you would like, but I will update accordingly. No bankers will be on a c
funds and will notify when they are received.

I am available tomorrow from 3-5 EST if necessary.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Monday, August 28, 2023 8:25 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Please provide an update ASAP. In addition, can we schedule an all hands call today with each of our respective clients on the line along with the bankers so we can get an exact unde

Thanks,

Matt

### Matthew Shatzkes

<image002.png>
  646.971.0685
<image003.png>
  917.355.1397
<image004.png>
  www.bochner.law

<image001.png>

<image005.png>
  matthew@bochner.law

<image006.png>
  1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 25, 2023 5:08 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com
**Subject:** Re: Evidence of ICA funds

Matt - the funds are still in process into the INBE account for disbursement. It did not happen today. The financial parties are coordinating on Monday to see if we can get a clear path

Torben

Sent from my mobile device - please excuse any typos

> On Aug 25, 2023, at 11:17 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

---

Torben:

Please provide an update.

Thanks,

Matt

Sent from my iPhone

> On Aug 24, 2023, at 9:04 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Ok. Can you please provide us with an update as soon as possible tomorrow (and in any event prior to the 2 PM ET cutoff for funding to Kosher Eats)?

**Matthew Shatzkes**

<image002.png>
646.971.0685
<image003.png>
917.355.1397
<image004.png>
www.bochner.law

<image001.png>

<image005.png>
matthew@bochner.law

<image006.png>
1040 6th Avenue, 15th Fl. New York, NY 10018

---

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Torben Welch <twelch@messner.com>
**Sent:** Thursday, August 24, 2023 4:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskona
**Subject:** RE: Evidence of ICA funds

The bankers are still working through transfer protocols and clearance of the funds.  I remain hopeful funds are cleared and deposited tomorrow.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Thursday, August 24, 2023 2:48 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskona
**Subject:** Re: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

Torben: any further update? Are we still on track for funding tomorrow?

Sent from my iPhone

> On Aug 23, 2023, at 9:24 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>
> Understood. Are you receiving the bank information directly from the bank(s) or from somewhere/someone else?
>
> Sent from my iPhone

>> On Aug 23, 2023, at 4:48 PM, Torben Welch <twelch@messner.com> wrote:
>>
>> No, not correct.  These are all estimates that I am getting and simply passing along.  This is exactly as we discussed last week – we expect f
>> day process for that – but that has been over that time frame already) then they will be release as soon as available.
>>
>> Here is where we are today – I will update tomorrow once I have more information.

3/26/24, 11:30 AM

Funds anticipated to be in by Friday – they may be available same day or Monday depending on when they land.  Again, these are estimate:

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 23, 2023 2:36 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah La
**Subject:** Re: Evidence of ICA funds

Just to be clear, the timeframe now is as follows: (1) funds will be transferred from the international accounts to the domestic accounts by Friday of this wee and will be accessible to Kosher Eats that same day. Is this correct?

I don't mean to be difficult, but this is significantly different than what you previously communicated to me, and it certainly different than what was communic

Sent from my iPhone

> On Aug 23, 2023, at 4:25 PM, Torben Welch <twelch@messner.com> wrote:
>
> That was the time frame given from the. And based upon initially estimates.  Once funds hit they should be available same day if received before 2 E
>
> Sent from my mobile device - please excuse any typos

>> On Aug 23, 2023, at 2:16 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>
>> Thanks Torben. If there is no confirmation of the funds being domestic as of yet, isn't it impossible for the funds to hit Kosher Eats' account by when we initially spoke?
>>
>> Sent from my iPhone

>>> On Aug 23, 2023, at 4:12 PM, Torben Welch <twelch@messner.com> wrote:
>>>
>>> No new update today - we remain awaiting confirmation from the banks. I will provide an update once I receive it.
>>>
>>> Sent from my mobile device - please excuse any typos

>>>> On Aug 23, 2023, at 1:57 PM, Matthew Shatzkes <matthew@bochner.law> wrote:
>>>>
>>>> Torben:
>>>>
>>>> Checking in for an update.
>>>>
>>>> Given that it is already Wednesday (and based on your email from yesterday) we are assuming the first trench well fund on Frid
>>>>
>>>> Please also provide responses to the remaining questions below.
>>>>
>>>> Thanks,
>>>>
>>>> Matt

3/26/24, 11:30 AM

Sent from my iPhone

On Aug 22, 2023, at 3:32 PM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. I tried you earlier but got your voicemail. Please call me if it is easier to discuss.

I confirmed that Kosher Eats' desire is to accept the tranches and move forward with the timings you laid out in your ema
tranche be funded within 7 days after the first  tranche?), assuming the first funding occurs this Friday. When will you kno
Friday? Based on our prior discussions, wouldn't the funds have already had to be deposited and be available domestica
terms of the 5 business day time frame?

Again, let me know if it is easier to discuss on a call.

Thanks,

Matt

Sent from my iPhone

On Aug 22, 2023, at 11:14 AM, Torben Welch <twelch@messner.com> wrote:

Matt - we remain on track as discussed Thursday and Friday.  This is subject just to banking procedures and time
relayed to you (funds available the end of this week) remains correct.  I will inform you if this changes - but we hav

As for tranching the disbursements, once the first tranche is release (and assuming your client wishes to accept th
deposit), my clients will make the second tranche will be available 15 days after that and the third 30 days after the

Torben Welch

Sent from my mobile device - please excuse any typos

On Aug 22, 2023, at 8:24 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Please provide an update. As I mentioned when we spoke, all of Kosher Eats' liquidity is tied up in this arra
numerous agreements due to INBE's delay in funding. These continued delays cannot be tolerated. Please
and 3 (it's been over a week already since you were going to discuss with Craig and Jonathan).

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>          <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to updat*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Monday, August 21, 2023 12:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steve
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@g
**Subject:** RE: Evidence of ICA funds

Hi Torben:

Just checking in. Please let us know the status of the bank transfer (i.e., are we still on track for a fund date
for payment of tranches 2 and 3.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>        <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*\*Please note, our new email addresses, firm name, and mailing address! Please be sure to updat*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, August 18, 2023 1:57 PM
**To:** Matthew Shatzkes <matthew@bochner.law>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steve
<steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@g
**Subject:** Re: Evidence of ICA funds

That is current plan - if it changes (which would only be due to unforeseen bank delays) I will let you know,

I will follow up on 2 and 3 and touch base when I have info from the client.

Sent from my mobile device - please excuse any typos

On Aug 18, 2023, at 11:54 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

Thank you Torben. So based on your email Kosher Eats should have money in its account by freigh
what about an update on tranches 2 and 3?

Sent from my iPhone

On Aug 18, 2023, at 1:44 PM, Torben Welch <twelch@messner.com> wrote:

Discussed with the bankers facilitating the move today - they have indicated that the initial m
for the final transfers and they will respond to each other Monday - then movement will happe
next week per their status update today.

Sent from my mobile device - please excuse any typos

On Aug 18, 2023, at 11:41 AM, Matthew Shatzkes <matthew@bochner.law> wrote:

Torben:

Any update? If not, what alternative options exist for the first tranche to be paid?

Thanks,

Matt

Sent from my iPhone

On Aug 17, 2023, at 4:55 PM, Torben Welch <twelch@messner.com> wrote:

Bankers are waiting for additional approvals. We submitted another set of AML
documents today. All remains routine but i anticipate additional news tomorrow.

Sent from my mobile device - please excuse any typos

On Aug 17, 2023, at 2:30 PM, Matthew Shatzkes <matthew@bochner.la
wrote:

**[ EXTERNAL EMAIL ]**

Torben:

Any updates?

Thanks,

Matt

**Matthew Shatzkes**

<image001.png>

&lt;image002.png&gt;

646.971.0685

&lt;image003.png&gt;

917.355.1397

&lt;image004.png&gt;

www.bochner.law

&lt;image005.png&gt;

matthew@bochner.law

&lt;image006.png&gt;

1040 6th Avenue, 15th Fl. New York, NY 1(

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

&lt;image007.png&gt;

---

**From:** Matthew Shatzkes
**Sent:** Thursday, August 17, 2023 12:44 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jaso Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** Re: Evidence of ICA funds

Thank you Torben. Appreciate the feedback.

Please do keep us updated on point 1. If possible can you send us an update by EOD today.

Thank you for confirming point 2.

With regards to point 3, can you please confirm the schedule with Craig Jonathan and provide us with a firm date for when tranches 2 and 3 will paid out? Our understanding is that they would be paid out the same tim as tranche 1 and we have communications from INBE confirming the sa Please advise ASAP.

Thanks,

Matt

Sent from my iPhone

On Aug 17, 2023, at 12:25 PM, Torben Welch

<twelch@messner.com> wrote:

**CAUTION:** This email originated from outside of the organization. Do not click the links or open attachments unless you recognize the sender and know the content is safe.

Matt – thanks for chatting yesterday.  Some clarification here as it does deviate from our discussion a bit:

1. I will keep you informed as to status on the funds as the clear into the US accounts.  As I mentioned, this is and has been the hiccup here given the size and process.  I anticipate to have more information today from the relative banks (there are three working on this side) – when I spoke to the banks yesterday they had hoped that the funds would be in clearance process today or tomorrow – as I explained to you, if that occurs, then funds would be deployable be the end of next week.  I have another discussion with all of the bankers this afternoon for a status update.
2. This is correct.
3. I am discussion with INBE on the accelerated tranche schedule.  As I mentioned, there was discussion as to a new tranche schedule to push up 2 and 3 in advance of the prior schedule – while the funds may be available, the schedule itself will be with Craig and Jonathan.  I'll confirm and revert.

**TORBEN M. WELCH**

Partner

*Licensed in UT, NY, and CO*

**Messner Reeves LLP**

**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com

65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Matthew Shatzkes <matthew@bochner.law>
**Sent:** Wednesday, August 16, 2023 7:12 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; Jason Steinmetz <jasonasteinmetz@gmail.com>
**Subject:** RE: Evidence of ICA funds

**[ EXTERNAL EMAIL ]**

---

Torben:

Thank you for taking the time to speak with me earlier. Following our call, I want to confirm you will provide us with written confirmation of the following:

1. Written updates from you when the funds have cleared

the international banking system and are being deposited/accessible to the US bank accounts. From our discussion, I understand that you anticipate that day to be tomorrow but please confirm;

2. Confirmation that the funds will hit my client's account 5 business days after the funds are deposited/accessible to your client's US bank accounts; and

3. Confirmation that tranches 2 and 3 will both be paid with tranche 1.

We look forward to receiving that written confirmation.

Thanks,

Matt

### Matthew Shatzkes

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>    <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

---

**From:** Matthew Shatzkes
**Sent:** Wednesday, August 16, 2023 4:47 PM
**To:** twelch@messner.com
**Cc:** Craig Boddington <craig@theinbegroup.com>; Jonathan Wright <jonathan@theinbegroup.com>; Steven Cannata <steven@titanadvisory.us>; Noah Lasko <laskonoah@gmail.com>; 'Jason Steinmetz' <jasonasteinmetz@gmail.com>
**Subject:** Evidence of ICA funds

Torben:

Please provide us with evidence that the ICA funds deposited into and with your firms IOLA account are still present in the account. We are also requesting a clear and precise update from you as to the cause of the funding delay and firm date on when my client can expect to receive funding.

As you know we are extremely concerns about the lack of funding and even more concerned about the lack of communication we have received from you and your client on this matter.

If you fail to respond to this email and provide us with the evidence we are requesting within the next 24 hours, we will have no choice but to email your firm's leadership team (e.g., your Managing Partner and CEO, Caleb Meyer) for this information.

Thanks,

Matt

**Matthew Shatzkes**

<image002.png>

646.971.0685

<image003.png>

917.355.1397

<image001.png>     <image004.png>

www.bochner.law

<image005.png>

matthew@bochner.law

<image006.png>

1040 6th Avenue, 15th Fl. New York, NY 10018

---

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out

more Click Here.

**7 attachments**


**image001.png**
32K

 **image002.png**
1K

 **image003.png**
1K

 **image004.png**
1K

 **image005.png**
1K

 **image006.png**
1K

**image007.png**
1K

**Steven Cannata** <steven@titanadvisory.us>
To: Torben Welch <twelch@messner.com>, Matthew Shatzkes <matthew@bochner.law>
Cc: Craig Boddington <craig@theinbegroup.com>, Jonathan Wright <jonathan@theinbegroup.com>, Noah Lasko <laskonoah@gmail.com>, Jason Steinmetz <jasonasteinmetz@gmail.com>

Was an invite sent for tomorrow?


Thank you,
Steven



**From:** Torben Welch <twelch@messner.com>
**Sent:** Monday, August 28, 2023 3:41:25 PM
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

**[ EXTERNAL EMAIL ]**

3/26/24, 11:30 AM

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

*Please note, our new email addresses, firm name, and mailing address! Please be sure to update accordingly.*

<image007.png>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

Gmail - Evidence of ICA funds

3/26/24, 11:30 AM

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 32

| | |
|---|---|
| **From:** | "Torben Welch" <twelch@messner.com> |
| **Sent:** | Thu, 21 Sep 2023 22:18:23 +0000 |
| **To:** | "ELT" <elt@theinbegroup.com> |
| **Cc:** | "Leon Chartue" <leon@axegvcg.com> |
| **Subject:** | Hard AF |

Jonathan from Emerald is hammering me on Hard AF payment and if funds are in escrow (this deposit was $700k).

Jonathan – can you send me their agreement – I don't have it.  I need to review – this should be the new deposit agreement.

There are now 3 that are on us constantly – Kosher, T2 and now Hard AF – total due to them is about $14mm.

MSC T1 is due today and Abbson next week?  I don't have documents for any of these.

We need to get some funds in to cover these.

**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

www.messner.com



**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast**

**Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 33



**10:21**

**Torben Walch** ⊗

Tue, Dec 12

Tue, Dec 19

Torben
I am somewhat concerned about the complete lack of communication.
Please respond back with an update as professional courtesy

9:51 AM

Torben?   4:50 PM

Wed, Dec 20

Craig - got you messages but no update.  All parties are threatening litigation and/or arbitration against INbe, MESSNER and Clearwater. Current plan is to get the ICA deposits ready to return and get released.  I am dependent on Dan there and nothing yet in that front.   11:49 AM

Thank for the update

+    Message

# EXHIBIT 34

10:21

**Torben Walch** @

**Mon, Dec 11**

Hi Torben hope you are well? Would it be possible to get an update on the current situation, what actions have been taken & being planned/proposed.

Thanks

Craig

Happy to jump on a call at your convenience        6:49 PM

**Tue, Dec 12**

Hi Torben.. I appreciate you busy, would you please let me have an update as soon as possible. Thanks        1:33 PM

**Tue, Dec 19**

Torben
I am somewhat concerned about the complete lack of communication.

Message

# EXHIBIT 35



**10:21**

**Torben Walch** ⊗

update as professional courtesy

Tue, Dec 19    9:51 AM

Torben?    4:50 PM

Wed, Dec 20

Craig - got you messages but no update. All parties are threatening litigation and/or arbitration against INbe, MESSNER and Clearwater. Current plan is to get the ICA deposits ready to return and get released. I am dependent on Dan there and nothing yet in that front.    11:49 AM

Thank for the update
I believe Arbitration is their only legal process according to the contract.
We should ensure that there is a full release agreement in place once we either refund their ICA's or fund them    12:03 PM

Message

# EXHIBIT 36

**10:22**

**< Torben Walch @**

Wed, Jan 31

Hi

did the funds get sent in? and what is the current situation with the borrowers?   4:35 PM

We have ledger funds blocked right now that is the entirety of the deposits. They are not yet ready to disburse. The clients we are talking to do not want just the deposits back, they want the full funding – obviously that cannot happen with out additional funds. We are working that discussion as well.
4:39 PM

OK when you say the clients you are talking is that ALL of the clients with funds in IOLTA?   4:42 PM

Most of them. There is one that just wants the ICA back.   5:12 PM

+   Message

# EXHIBIT 37



**10:23**

**Torben Walch** @

~~Please call me back~~

Tue, Feb 20

▶ ||||||||||||||||||||||||||||||||||||

1:39 ●                          1:45 PM

Craig – how do you look tomorrow to chat?  I have been fighting with coverage counsel for a week now – but I think we are in good shape – despite the ridiculous saber rattling.  Todd/Dan will be in a position to refund ICA tomorrow I believe.

7:03 PM

Hi Torben
Tomorrow morning would work best for me say 10am EST?

7:04 PM

me
d

can do 12:30?                    7:06 PM

Totally understand, family first.
may be closing on a property

+    Message

# EXHIBIT 38



# EXHIBIT 39

**10:24**

**Torben Walch** @

Thu, Mar 21

Hi Torben

Please let me know when you would be available to have a quick chat

6:57 PM

Fri, Mar 22

Hi Torben

Can you please confirm the $10,300,000 ICA funds are still in Messner's Titan bank account? if not where is it currently?

2:33 PM

Mon, Mar 25

☏ Unanswered voice call · 5:15 PM

**Call Again**

Thu, Mar 28

Hi Torben
Did you get confirmation of th

Message

# EXHIBIT 40





# EXHIBIT 41

## AFFIDAVIT OF JIM SMITH

I, Jim Smith, being duly sworn, deposes and states as follows:

1.    I am over the age of eighteen years old and am competent to testify.

2.    I have personal knowledge of the information identified in this Affidavit.

3.    I am a 1989 Graduate of the University of Colorado Business School with an emphasis in Marketing and Real Estate. My professional background includes business development, operations, sales marketing, client retention, and real estate finance.

4.    Messner Reeves, LLP is a national full-service business law firm providing legal services to a diverse group of clients.

5.    I am the President of Messner Reeves, LLP and am familiar with its management and operations. I also have personal knowledge of the disbursements from Messner Reeves, LLP COLTAF account at INBE's direction pursuant to the agreements between INBE Capital Group, LLC and the borrowers who had agreements with INBE Capital Group, Inc.

6.    Between April 21, 2023 and August 1, 2023, a total of $10,070,000.00 was deposited into the Messner Reeves COLTAF account at INBE's.

7.    INBE provided authorizations to Messner Reeves to disburse funds at its direction and benefit on 4 separate occasions totaling $2,490.33 from the account holding its funds. INBE also authorized Clearwater to direct Messner Reeves to disburse finds from the account holding the funds. Messner Reeves complied with those authorizations and distributed the funds at INBE's request or at Clearwater's request after INBE authorized Clearwater to direct Messner Reeves's disbursement of the funds, resulting in the funds being fully disbursed. There were no funds remaining in the account held for INBE by July 25, 2024.

8.    With the exception of Torben Welch, none of the named partners or employed attorneys at Messner Reeves, LLP had any knowledge or involvement in any of the deposits any borrowers with INBE made or any disbursements from the INBE funds referenced in the paragraphs above. None of the INBE funds were disbursed to any individual partner or employee of Messner Reeves, LLP including Welch.

9.    If called to testify in court, I would testify as indicated above under oath.

_____
Jim Smith

STATE OF COLORADO    )
                     ) ss
CITY AND COUNTY OF DENVER    )

The foregoing instrument was acknowledged before me by Jim Smith, whose identity was personally known to me and verified by a valid state Driver's License on this 20th day of February, 2025.

_____
Notary Public

Witness my hand and official seal.

TANYA JO GRINNELL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044037181
MY COMMISSION EXPIRES OCTOBER 15, 2028

SaltLakeCity 7395771 1

# EXHIBIT 42

Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# BELOC 3.0 EXPANDED FAQ

## – CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE –

**FOR INFORMATIONAL PURPOSES ONLY**
**THIS IS NOT CONSTRUED TO BE A SOLICITATION NOR AN OFFER OF ADVICE NOR SECURITIES**

*– Version 030423 –*



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSYIFA4O6PBRE4HAKHWHLCETMKYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## Overview: What does Inbe Capital do?

We (INBE Capital LLC) provide unique capital solutions designed by entrepreneurs for entrepreneurs. This includes (but is not limited to) debt facilities (loans), equity investments, alternative investment strategies, capital strategies, and capital advisory/management.

This expanded FAQ covers our most popular product. Our business debt facility, "BELOC 3.0" (Business Expansion Line Of Credit - Version 3). An ideal facility for any/all business growth/expansion activities.
The advantage for the Borrower is that our Interest Rates are incredibly low. The Lending Multiple is high. And we remove the borrowers financial risk by insuring initial funds (providing protection). The borrower gets all the benefits of a great capital solution WITHOUT taking any of the usual risks.

We also do NOT ask for PGs (Personal Guarantees). We don't charge early payout penalties. And we DON'T assess or approve borrowing based on financials.
Our unique structure allows us to establish an acceptable risk profile. But more importantly, gives the BEST possible terms to the borrower. Yes, there's borrowing costs. And No, they're not cheap! BUT we challenge you to find better loan terms than ours. Especially in the current market/economic conditions!

We don't "pool" capital from "Investors" as most Lenders do. Instead, we only lend out our own Capital. And we don't operate as (or anything like) a Conventional, Commercial, or Retail Lender.

## What are the main features of BELOC Loan?

- 4-6% Interest-only rate! (APR)
- Funding Range USD $3,000,000.00+
- 10 Year Term (120 Months)
- Approvals in 48 Hours
- Funding within as little as 30 days (for large projects)
- NO CREDIT CHECKS
- NO PREPAYMENT PENALTIES
- NO PERSONAL GUARANTEES
- NOT purely based on revenues of business
- Previous bankruptcies allowed
- Cash wired directly into business bank account
- 2-3 year payment holiday
- After holiday period, interest is then due monthly

## What are the costs?

- 10-40% ICA Advance Cost (First 2-3 years of interest paid upfront + risk premium surplus amount retained as ICA prepayment credit)
- 9% Establishment Cost (paid out of loan principal one-time at closing for costs such as lending + legal + closing + custodian + broker commissions etc.)
- *15% Cost for Bridging ICA if required (15.00% of ICA Advance Cost paid out of loan principal one-time at closing)

    *Bridging NOT currently offered.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYCZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What types of economic projects can you lend to?

We can lend to most economic projects.

- Start-ups (pre-revenue/profit)
- Distressed businesses
- Late Stage businesses

*NOTE: Must be stable jurisdiction, free from sanctions.*
*For ICA Advance Cost; Only paid with funds that are clean and clear of non-criminal origin. And are payable in cash immediately upon receipt by beneficiary's bank.*
First we determine whether the business opportunity is good. Then if it is, we're open to any project type. Provided it isn't illegal or located in a "politically sensitive" jurisdiction.

## What do you use as securitization for the debt?

We have 2 methods of securitization built into the BELOC product.

1. ICA Advance Cost - (Interest Control Account / Interest Cost Advance):
   Which is the prepayment of interest (payment holiday period + risk premium). This is our primary securitization method. It gives optimal balance between risk management and the best possible loan terms. Contained within this charge is the first 2-3 years of interest payments. Plus an approved risk premium as surplus (ICA credit). In exchange for this upfront payment, the borrower gets a 2-3 year payment holiday at the beginning of the loan. After the holiday period, the ICA surplus is retained as credit. Which is returned to the borrower at final settlement. We're also able to drawdown from the leftover surplus if we need to recover losses. So if a default occurs, we'll do this before utilizing the company assets. See securitization method #2 below.

2. UCC1 Lien on ALL Company Assets - (Uniform Commercial Code - 1):
   Is a claim against all business assets until the loan is repaid. We keep first position over all company assets. So that in the event of default, we're able to use the company assets to recover our losses.

## What options do you offer if I can't come up with cash for my ICA cost?

From time to time, we offer *bridging for the ICA cost. Our bridging is unique since it's not charged upfront like traditional bridge loans. Instead our bridging is 15.00% of ICA Advance Cost paid out of loan principal one-time at closing. We did this to remain true to our "by entrepreneurs for entrepreneurs" approach. Because no entrepreneur likes upfront costs, so neither do we! Bridging isn't always available. When it's available, it's not offered to all projects. It must be a good business opportunity to qualify for access to our ICA bridging loans.

*\*Bridging NOT currently offered.*

## What happens if I can't pay back the loan?

We'd first drawdown the ICA (Interest Control Account). You'd assume the next step would be liquidating assets to recover remaining losses. But being entrepreneurs, we do our best to keep solutions creative. So before exercising the more extreme step, we'd look at all possible ways to achieve a turnaround. We may offer to take (strategic) control over the company. That way we can help rectify issues. And return the (project) to a state where serviceability is easy.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What advantages do I get by following the INBE process?

We have developed this product to give you robust risk mitigation on your capital. Complete peace of mind and the ability to move through all "compliance" requirements with relative ease.

We've spent many years perfecting our processes. Now, we can ensure you always get access to your funds with speed and efficiency.

Often we encounter prospects that think they have a "better way" of doing things. This causes unnecessary delays, and a greater chance of not getting the loan. Alternate methods won't meet the stringent requirements of our regulatory bodies and Insurers. The methods we offer to safeguard your money work. They cover (protect) your Initial Capital and adhere to our "Compliance" Process.

## Can terms be modified or customized?

They can, in some cases. Yet, we're integrated into banking industry protocols. So we need Procedures and Agreements to be congruent with those regulations. What may seem like a "simple change", can amount to compliance failure and then loan denial.

Our processes and protocols protect your interests. And get you through the system of checks and balances that keep you safe. Allowing us to do what we do best – helping with funding your next BIG project.

## What are the common uses of the funding?

- Acquisition finance
- Purchasing Inventory
- Renting, buying or leasing equipment
- Hiring additional staff
- Launching marketing campaigns
- Working and growth capital
- Real Estate & Developments
- Paying off large amounts of Venture Capital debt
- + More

## What is the "deposit" required for your products?

We only accept a (partially-refundable) cash deposit equal to the value of the ICA cost of the loan. This is usually anywhere from 25-35% of the loan principal amount (varies based on risk level). We may also refer to this as the "surety bond" or "collateral" amount.

## How is my deposit safeguarded prior to funding?

We nominate a third-party trustee (Attorney) to hold the funds. Funds remain with the Trustee until we've delivered the loan. We contractually agree to reimburse the Borrower the amount of their ICA Advance Cost. Because we keep insurance on all funds held by our trustees. In other words, we make sure we absorb all the financial risk. Leaving the only possible risk as "opportunity risk". Rather than having the risk of losing the capital itself.



# CAPITAL OPTIONS-EXPANDED- FAQ

## How do I get a 30 day turnaround on my funding?

The Smallest Initial Deposit for a 30-60 day funding turnaround is currently $20M USD.
We can accept Deposits that are under $20M USD.
Although, small deals must be "bundled" with other deals. That way, we can submit at least $20M USD in Loan Deals to Compliance at any one time.
Your funds are never "co-mingled" with anyone else in this process. Your Loan is completely separate from that of the other Clients with whom you are "bundled".
This is a Compliance need for the types of protection we utilise for the deposited capital.

## What's your minimum loan size?

Currently, our smallest loan size is $3M USD. Which requires at least $750K USD liquidity to cover upfront costs/deposit. But we aggregate smaller loans (below $20M USD ICA). Because of our above compliance/protection requirements.

## What's the time to capital (how long does it take to get funding)?

We run a standard payment schedule as follows:
- *Tranche Payment 1 = 33.33% Transferred 60-90 days post underwriting completion*
- *Tranche Payment 2 = 33.33% Transferred 30-60 days after Tranche 1*
- *Tranche Payment 3 = 33.33% Transferred 30-60 days after Tranche 2*

## What if I don't have cash available upfront can I use other collateral?

We may be able to help you monetize some near cash assets. Or find another solution to help you access the required cash. But this adds time and complexity to the process. We have to convert anything to cash first before it's used with our funding. First, get at least $750K USD in cash pledged to your project. Preferably, $20M USD or more. We'll then offer to loan you multiples of (up to 4x) those initial funds at very low fixed interest rates.

## I have $5M, can your product help me get $20M to buy land & develop?

Yes, as long as your project and our payment schedule align. Fund disbursement usually happens in ~120 days. So we need to make sure that will work with your project requirements. Otherwise, we need to have our funding begin 6-12 months before your purchase & start date. That way all the funds are available for immediate deployment as soon as you are ready to close on the deal.

## What are the different ways you can keep money protected/safe?

There's a very specific procedure we follow to ensure your money isn't subjected to risk. It also depends on the specific strategy. At all material times, your funds will remain secure. This can be in the Account of an Escrow/trustee Agent, or in your own Bank Account. This also may involve specific account controls and permissions.

## How long will my approval last?

Once conditionally approved, we expect the loan gets finalized within 7-10 days.
If it is not, we'll assume that the Borrower will not be proceeding, and we'll withdraw from the deal.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYCZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What happens during the final underwriting period?

Where ICA amounts are below our smallest compliance requirements, we'd first aggregate. Then we'd need to move through compliance. Aggregation & Compliance can take up to 45 days. Your initial funds remain in "safekeeping" from the beginning of the underwriting process. All the way through to successful delivery of the first funding tranche.

## What's the maximum funding amount?

It'll vary depending on capital commitments to projects which are already in the queue. For any facilities USD $1B+, best we spend the necessary time understanding what's possible and whether we're the best partner for your project. For very large capital requirements, work closely with us. We'll customise your facility to make sure it's suitable for your specific project requirements.

## What collateral will I need to provide for my loan?

We secure our loans SOLELY with the project we're lending to. We'll have a "GSA" (General Security Agreement) on the project. We don't need further collateral. We won't ask for personal or corporate guarantees, and will not attach any other unrelated assets. If you default on your loan, our claim is strictly against the project itself (we'd first drawdown the Interest Control Account).

## What position do you take on the company/project assets?

We take "First Position" on the loan. We may consider second position when there's already a loan with an Institutional Lender (demanding first position). Which is subject to individual review/approval. Otherwise, we expect first position as Creditor. Especially since we're usually lending at least 80% of the total capital requirements.

## What is the length of the loan term?

10 years (120 months) is our standard loan term. For large projects, we'll attempt to be flexible. A longer term may be critical to the success of the project. In which case we'd review the circumstances and see what's possible.

## Are there any penalties for early repayment?

No. You can repay any part of the principal any time, without penalty.

## If I reach conditional approval for a Loan, how do I Proceed?

If the Project is a good fit for our program, we'll prepare a conditionally approved "Term Sheet". Which outlines all terms of the loan. Any adjustments you need (if possible) will get completed during this Term Sheet step. If we reach the point where we're both happy to proceed, you sign the Term Sheet. We then countersign. You send your RWA proof of funds for your ICA cost. And then everything's submitted for final approval.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What is the process for the Final Loan Agreements?

Final approvals get completed within 48 hours of conditional offer acceptance and RWA proof of funds for ICA cost. Loan Documents are then generated and sent to the borrower.

## What's included in the loan documents?

- BELOC (Business Expansion Line Of Credit) Agreement
- Exhibit A: Promissory Note
- Exhibit B: Project Costs
- Exhibit C: Property (Secured Assets)
- Exhibit D: Security Agreement
- Exhibit E: Form Termination Letter
- Exhibit F: Wire & Joint Instructions
- Exhibit G: KYC & AML
- Exhibit H: Term Sheet
- Exhibit I: Project Summary

## How long do I have to complete the documents and wire the ICA funds?

Loan offers expire by the "Offer Valid Through To" date stated on the Term Sheet. Which means all borrower documents and wiring of ICA funds must be complete on or before the "Offer Valid Through To" date.

## Can I use your loan to refinance other loans with undesirable costs/terms?

Absolutely. And this happens often. We like to call our loans "good debt" since we wholeheartedly believe we've got unbeatable terms for entrepreneurs. It makes sense to consolidate debts/liabilities into a single instrument with optimized terms.

## How are your interest rates so low even during heavy downturn/inflation?

We offset our liability with a higher ICA cost. Yes, this increases initial cost of capital (majority portion of which is retained as credit then returned when the loan is settled). But it keeps the terms optimized for maximal cash flow. Your loan starts with a long payment holiday (2-3 years). Then transitions to very low fixed rates for the rest of the loan term (4-6% fixed APR).

## After my payment holiday, how often do I make payments?

Loans get paid monthly throughout the entire term. The ICA cost prepays the first 2-3 years (payment holiday). After the holiday period interest continues to get paid monthly. In other words, your prepayment period finishes after the payment holiday ends. So you must continue making monthly interest payments from this point until the term ends (e.g. months 25 - 120). Once the term ends (at the conclusion of Month 120), the principal is due.

## What does 'APR' stand for when you say "4-6% fixed APR"?

Annual Percentage Rate (the same as 'p.a.' AKA per annum).



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## So the ICA fee is the 1st 2 years of interest for the debt + other risks fees ?

Correct. Standard Interest is ~6% p.a. for years 1-2 (which we draw out of the Interest Control Account). The rest of the ICA portion is Risk Premium (risk fees). Which gets held against the loan as 'ICA Surplus' (an approved prepayment credit amount).

## Can I get an extension or refinance (either the entire amount or partially)?

Every loan comes with a default (optional) one-off extension period (24 months at a 6% extension cost). There's no limitations on refinancing which remains available at any stage. Alternatively, the ICA Surplus can be repurposed for additional lines of credit. (down the line & subject to additional T&Cs) Each instance/new facility will be subject to the (full) standard process. ICA cost, terms, approval, establishment cost etc.
i.e. each is a new loan.

## Why a 10 year term? Why not 5? And would this halve the ICA funds?

There's no prepayment penalties, so our standard term is a maximum of 10 years.
ICA remains the same in any case.

## Can I ever get my ICA payment back? How about when loan is fully paid?

The ICA is a securitization (interest advance). This includes a prepayment for the first 2 years plus the remaining 'ICA Surplus' (risk premium). The surplus portion can be returned at final settlement (plus you keep the prepayment amount as an asset on your balance sheet). The interest advance for the first 2 years isn't returned. Unless the entire facility gets paid during the first 2 years. I.e. entire principal paid during the payment holiday. When this happens, a pro-rata refund for the interest advance gets calculated and issued to the borrower.

## What are all my options as I approach the end of the loan term?

We're open to many approaches to settle the loan. We encourage the use of a method which best suits your individual project and business needs. Methods can include (but not limited to):

1. Maintaining the standard loan format
2. Debt and equity hybrid approach
3. Rolling into new loan terms/facilities
4. Building a 'fund of funds'
5. Short or long term mortgages

For best results, we'll create the long term plan with you before moving forward with any initial lending/funding.

## If this is so good and removes so much risk, why isn't everyone using it?

It's not good or bad. It's mathematically efficient. Everything has costs and risks. As much as we work to find the right balance with these, it's impossible to remove risk factors altogether. If you isolate our upfront costs, they're quite expensive when compared to many others. But we extract these costs from the loan principal (one-time at closing) so your out of pocket costs are negligible. Which keeps the terms mathematically (cash flow) efficient without causing us to take on intolerable risks.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What do you mean by 'opportunity risk' vs 'financial risk'?

We always remove all financial risk (protect/insure initial funds). But having zero financial risk, doesn't mean zero risk altogether. Opportunity risk remains at play. The risk when deploying capital in one opportunity results in missing out on another. Remember our process utilizes third-party trustees. We hold and protect your ICA funds until we've delivered your first funding tranche. So, what happens if we don't deliver your funding? Well, in the extremely unlikely event we can't fund your project, we'd return your ICA funds (every single dollar, no questions asked). So you'd have risked the opportunity of not having it deployed your capital elsewhere. We've never failed to fund anything to date. And even though the past may be the 'best' predictor for the future, it's not a 'perfect' predictor. Unforeseen events happen. It would be naive of us to ignore this potential risk altogether. No matter how unlikely it is to actually happen.

## Is there anything that could potentially interfere with receiving the loan?

If your funds are not from illicit sources and will clear compliance then you're good to go. Later once funding has started, if you breach the contract in some manner, it could cause the Loan to get delayed. Or stopped. Depending on the severity of the breach.

## What if the project fails or I want to exit?

Our loans have no personal attachments. You can sell the project with the debt or novate the loan to another entity. Best to discuss options with us if/when this is being considered. We'll always have many creative ways to help reach a beneficial outcome.

## What Currency can I use for my initial (ICA) funds?

We currently work with USD, Euro, or Sterling (GBP). With USD being our primary currency.

## Can't I just use or pledge other assets to establish my ICA?

No. "Near-Cash" instruments are not permitted. Any instrument that you have must be first turned into CASH. Then placed into a bank account, in your corporate name to serve as your initial ICA funds.

## Can you help me monetize BGs, DLCs, or SBLCs?

Sometimes. But most of these instruments turn out to be fraudulent. They end up wasting HUGE amounts of time and resources. We ONLY deal DIRECTLY with your issuing bank. To monetize an instrument with relative ease, that bank MUST be a "Top Tier" Bank. Located in a "Good Jurisdiction". If it is NOT, then we cannot guarantee you that your SBLC/BG will be of any value. The Monetizing Agent/Bank will discount the face value of the instrument. So it must be "grossed up to yield the ICA amount required for the loan amount you need. Any banking fees from your banking institution for these instruments will be your cost. Bank Instruments are becoming very difficult to work with, so they must be at least $20M USD.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRY6ZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## What do you need in order to verify a Banking Instrument?

We need to get the direct contact details from the issuing officer. Then call them (directly) to ensure the instrument is real. And have them confirm with us in writing that it is. Then we can determine if the issuer is reputable and we're able to deal with them to monetize.

## Can I pool funds to cover my ICA cost?

Yes, As long as none of the funds are not from illicit sources and will clear compliance without incident.

## What if I need to know the names of the Principals, their background, obtain a "Proof of Funds" to know that you can perform on the loan, visit your offices, talk to other clients etc?

This would be "traditional" due diligence. Which makes perfect sense in any traditional business deal. Where your capital gets subjected to "Risk", and your key concern of course, is the mitigation of risk.

The reality is that we do not "Audition" for your business.

In a normal arrangement, you would spend your money into your project. And look to us to lend you a sum that would also get digested by your project (50% loan is typical).

We would undoubtedly take collateral on every asset that we could locate. And expect guarantees from you both personally, and corporately.

Further, as is common in the industry, we would charge large, non-refundable upfront fees. For "submission", "due diligence", "travel/site visits" and more, which could be in the tens or hundreds of thousands of dollars (with no guarantee that we would accept the deal).

That is the standard business model when you are risking large money.

We would also expect that your capital gets wired to us for safekeeping. Instead of a third-party trustee.

The most important issue for us is the safety of your capital.

## How will I have certainty that my initial money won't disappear?

Within our format, we never control your funds, and we ensure that you are never exposed to any risk of loss, as we even pay for your money to be fully insured.

The most important issue for us is the safety of your capital.

And the complete mitigation of financial risk to you (and your investors) throughout your deal.



Zoho Sign Document ID: 2B0A4254-D4CB1V-RSTIFA4O6PBRE4HAKHWHLCETMRYGZMCC-SYQ

# CAPITAL OPTIONS-EXPANDED- FAQ

## Why do I have limited time to act once the Term Sheet has been issued?

Term Sheets have an "Expiry" (also known as the "valid through to" date). When we issue one, we must set our loan money aside, with the expectation the deal will close in a timely fashion. You'll need to reapply if you're not advancing your deal before the term sheet expires. When this happens, you may need to pay a "Resubmission Fee".

This Fee covers all our Costs incurred structuring your deal the first time around. Legal, Due Diligence, issuing Insurance (SKR), and time committed from the outset.

Our Resubmission Fee begins at $23,750.00 USD and can be higher based on the complexity of the deal. To be clear, if you meet the specified time frame required the first time around, there's no upfront fees.

## What are the steps we need to take to start a loan payment schedule?

If you do want to proceed with applying for a facility for your project;
Here's the 5 Phases & 14 steps required.

### Phase 1: Pre-approval

1. Borrower Signs Mutual Confidentiality
2. Borrower Submits Project Overview
3. Borrower Signs Expanded FAQ Doc
4. *Pre-approval Letter Issued (if ICA funds aren't yet available, otherwise move to #5)

### Phase 2: Conditional Approval

1. **Conditional Loan Offer Issued (Term Sheet with confirmed offer expiry)
2. Borrower Signs Conditional Offer (Term Sheet)
3. Borrower submits RWA Proof Of Funds For ICA Cost

### Phase 3: Final Approval

1. Final Approval Awarded (within 48 hours of signed terms + ICA proof of funds)
2. Loan Docs Issued
3. Borrower Signs Loan Docs

### Phase 4: ICA Wire

1. ***Borrower Wires ICA Funds (confirmed with proof of wire)
2. Final Underwriting Commences (underwriting Attorney receipt of funds)
3. ICA Sent To Third Party Trustee (Attorney) To Be Held/Protected

### Phase 5: Funding

1. Funding/Payment Schedule Executed (as per specified payment schedule)

*Lending process stops at (Phase 1) Step 4 if ICA funds aren't RWA.
(ready, willing & able)

**Loan offer is void if borrower fails to complete their steps within the agreed timeframes.
(resubmission fees apply from Phase 2 onward if borrower can't meet their obligations)

***Steps 1-11 typically happen within 7-10 calendar days.
(within standard loan offer expiry deadline)



# CAPITAL OPTIONS-EXPANDED- FAQ

## Acknowledgement of FAQ:

I, __Noah Lasko_____
    *(Authorized Representative)*

of, __Kosher Eats LLC_____
    *(Company Name)*

at, __2699 Stirling Rd A 306 Fort Lauderdale FL 33312___
    *(Registered Address)*

hereby confirm on this day, __Apr 04 2023_____

                                                *(Date)*

1.  That I have read this entire "INBE Capital Expanded FAQ" document, and fully understand both its contents and its implications, as relating to the overall Funding Processes, Requirements, and Protocols.

2.  I also confirm that by moving forward and completing any transaction with INBE Capital, that I also agree to abide by the processes and protocols that are outlined in this "FAQ".

3.  I will do my best to finish everything I need to do before any Loan Offer Expiry Date. If I don't, I know I'll have to pay extra to apply again.

4.  I know about the extra costs, rules, and conditions. I understand that these things might change, but you will tell me ahead of time.

_____
    *(Signature)*

INBE CAPITAL

# EXHIBIT 43

Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTV4TKZGGEGHTWYPAN9RS

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

## – CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE –

Among

**INBE Capital LLC**

as Lender

&

Kosher Eats LLC

As Borrower

Dated as of

Apr 24 2023



# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made and entered as of   Apr 24 2023

between INBE Capital LLC (the "Lender")

, and   INBE Capital, LLC

a   Wyoming                                                                    Company ("Borrower").

## RECITALS

A.   The Borrower desires to obtain from Lender an asset backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.   The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion (as more fully described on Exhibit I attached hereto the "Project").

C.   Secured assets will be described on Exhibit C attached hereto (the "Property").

D.   The Borrower has agreed to pay a loan application fee of   N/A Waived
to the Lender, within fourteen (14) Calendar days after the Lender receives the Borrower's fully executed counterparts of the LOC Documents.

E.   The Borrower has agreed to pay, pursuant to Section 3.6 hereof, of

   two million dollars                                                   $2,000,000

,(the "ICA Payment"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

F.   Lender has agreed to make the LOC to Borrower in an aggregate amount, according to Exhibit I, not to exceed the Maximum Amount for the purposes set forth in these recitals and in the Promissory Note (as hereinafter defined) and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTV4TKZGGEQHTWYYPAH9R5

# ARTICLE 1 - DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

"Advance(s)" means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"Applicable Interest Rate" means the fixed interest rate specified in the Promissory Note.

"Borrower" means that term as defined in the first paragraph of this Agreement.

"Business Expansion" means any transaction that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"Closing Date" means the last date of signed execution of this Agreement by Lender and Borrower.

"Collateral" means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

"Event of Default" means any event or condition that shall constitute an event of default as described in Article 12 of this Agreement.

"ICA" means the Interest Control Account.

"ICA Payment" means the amount remitted pursuant to Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-42ECFF0SCH2NDOBSZ02USJNTV4TKZ&QEGHTWYPAH9RS

"Interest Reserve" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from or on behalf of the Borrower, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"Interest Reserve Account" means funds retained to cover the contractual payment obligations.

"Lender" means that term as defined in the first paragraph of this Agreement.

"LOC" means the Line of Credit provided to the Borrower by the Lender as defined in Exhibit I of this Agreement.

"LOC Disbursement Account" means that term as defined in Section 3.12 hereof.

"LOC Document(s)" means, collectively, this Agreement, the Promissory Note and each   Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"Maximum Amount" means an amount equal to the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and Regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

"Project" means that term as defined in Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-42ECFPUSCH2NDOBSZU2USJNTV4TKZGGE@HTWYPAH9RS

"Project Costs" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project, as more specifically set forth in the project budget set forth on Exhibit B attached hereto).

"Project LOC Amount" means as defined in Exhibit I attached hereto.

"Property" means that term as defined in Exhibit C of this Agreement.

"Promissory Note" means the Promissory Note, in the form attached hereto as Exhibit A.

"Security Agreement" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as Exhibit D.

"Security Document" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"Scheduled Maturity Date" means the  10  year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"Subsidiary" means any other entity in which the Company controls, directly or indirectly, at least 50% of the equity or which is under the direct control or management of the Company or Company's owners.

"Taxes" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"Term Sheet" means that document(s) attached hereto as Exhibit I, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZ02U5JNTV4TKZGGEGHTWYIPAH9RS

"Tranche Schedule" means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto in the Term Sheet: Exhibit I; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Project LOC Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

# ARTICLE 2 - THE CREDIT

Section 2.1. Line of Credit Amount. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

Section 2.2. Line of Credit Documents. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and it's counsel.

    a.   Promissory Note.

    a.   this Agreement; and

    a.   each Security Document.

# ARTICLE 3 - TERM, INTEREST AND PAYMENTS

Section 3.1. Initial Term. The initial term of the LOC is ten years     10    years and shall commence on the Closing Date. This Agreement will initially expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full on the Scheduled Maturity Date.

Section 3.2. Extended Term. As of the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "Extended Term"; collectively, the "Extended Terms"). In connection with Lender's granting of each Extended Term,



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVVFTKZ&OE&HTWYFPAH9R5

(a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees.

Section 3.3. Applicable Interest Period. The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full; provided, however, that, no interest period may end later than the Scheduled Maturity Date.

Section 3.4. Interest Rate Calculation. Interest shall be calculated on the basis of a 365- day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "Maximum Interest Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to fees or other amounts due to lender, then to the unpaid principal balance outstanding under the Promissory Note, then, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. Interest Payments. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. Reserves. Following the signing of this Agreement, the Borrower shall remit

two million dollars                                                                      $2,000,000

as the ICA Payment, in accordance with the terms and time period set forth in Exhibit I. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and become non-refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable. The ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender.

Section 3.7. Prepayment. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC. Upon a full prepayment of all outstanding principal of the LOC, Lender must, within ninety (90) calendar days from the date of that full prepayment, pay Borrower an amount equal to any credit balance of the ICA.



Zoho Sign Document ID: 2B0A4254-42ECPFUSCH2NDOBSZU2USJNTVFTKZGOEGHTWYPAH9RS

<u>Section 3.8. Interest Credit Account</u>. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit in the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable. Where the Lender has agreed to a payment holiday, as specified within Exhibit I, the interest payments shall first be drawn from the ICA for the duration of the payment holiday, thereafter the Borrower shall make interest payments monthly.

<u>Section 3.9. Fees</u>. LOC Establishment Fee. Out of the initial Advance, the Borrower shall pay Lender a non-refundable fee for the LOC in an aggregate amount equal to        9%                              % of the Loan Value, being:   seven hundred twenty thousand dollars              $720,000

(the "Establishment Fee"). The Establishment Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

<u>Section 3.10. Line of Credit Extension Fees</u>. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a non-refundable LOC extension fee for each extension in an aggregate amount equal to six percent (6%) multiplied by the Project LOC Amount.

<u>Section 3.11. Legal and Incidental Fees</u>. Charges and Costs. Borrower shall pay all reasonable out of pocket legal, recording and filing fees, documentary stamps, taxes, service charges, credit reports, reasonable search costs, title company and escrow fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or an adversary proceeding) or judicial or non-judicial proceeding, through appeal. Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or wilful misconduct.

<u>Section 3.12. Line of Credit Disbursement Account</u>. The proceeds of each Advance under the LOC shall be advanced into the account with Lender to be used by Borrower for payment of the Borrower's Project Costs (the "LOC Disbursement Account"), solely for the purposes and in the manner set forth in this Agreement.



Zoho Sign Document ID: 2B0A4254-42ECFFU3CH2NDOBSZU2U5JNTV4TKZGGEGHTWYPAH9RS

The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights to the LOC Disbursement Account.

<u>Section 3.13. Taxes</u>.

a. All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

b. Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

c. The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4 - CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing (the same to be considered representations of Borrower upon Closing):

<u>Section 4.1. Delivery of the LOC Documents</u>.

a. As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

b. The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Deposit Account and Security Account (as each term is defined in the Security Agreement) maintained by the Borrower.



Section 4.2. Authority. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, and (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

Section 4.3. Liens. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of security searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) security termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender, such permission not to be unreasonably withheld.

Section 4.4. Litigation. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

Section 4.5. Events of Default. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

Section 4.6. Purchase and Agreement Contracts. Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

Section 4.7. Compliance with Certain Requirements. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable local, state, federal and international laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) and all local, state, federal and international laws, regulations, ordinances, conditions, reservations and restrictions applicable to the Project.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTV4TKZ&GEGHTWYIPAI9RS

<u>Section 4.8. Evidence of Insurance</u>.

    a.    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders 'loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of the size and character of the business of the Borrower, and shall furnish Lender with the satisfactory evidence of such insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

    b.    Borrower shall always maintain a life insurance policy on the life of  N/A Waived

, as permitted under applicable local, state, federal and international law in an amount agreed to by Lender. The Borrower shall have provided to Lender (directly or through the issuer of such life insurance policy) an assignment of each such life insurance policy, in form and substance satisfactory to Lender, on or before the date of the funding of the first Advance under the Tranche Schedule. In connection with such policy(ies), the Borrower shall cause the insurer to agree to provide in writing to Lender any notice of cancellation or non-renewal at least thirty (30) days prior to such event. In the event  N/A Waived
cannot qualify for a keyman policy, Borrower shall submit proof of application and denial of coverage. Upon submission of proof of denial, Lender may thereafter waive the requirement in writing.

<u>Section 4.9. Financial Statements</u>. Lender shall have received all financial reports  required by Section 8.6 hereof.

<u>Section 4.10. Business Pro Forma</u>. Lender shall receive a pro forma income and expense statement quarterly in connection with the Project.

<u>Section 4.11. Management Plan</u>. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of business.

<u>Section 4.12. Material Change</u>. Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U6JNTV4TKZ&GEGHTWYPAH9RS

Section 4.13. Non-Subordination. Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

Section 4.14. Securitization. Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or due diligence required by the insurer in a timely manner.

# ARTICLE 5 - USE OF LINE OF CREDIT PROCEEDS

Section 5.1. Business Expansion Costs.

   a.   Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached Exhibit B, updated yearly by Borrower.

   b.   The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

# ARTICLE 6 - INSPECTIONS

Section 6.1. Project Inspection. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days 'prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

Section 6.2. Books and Records. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project and the Borrower and to make extracts therefrom or copies thereof.



<u>Section 6.3. Force Majeure Event Inspection Right</u>. In the event of a Force Majeure Event which actually interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project for a period of time beyond ninety (90) days, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project.

# ARTICLE 7 - ADVANCE OF FUNDS

<u>Section 7.1. Timing and Advances to Payee</u>. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than ninety (90) calendar days (inclusive of underwriting period) following confirmation of receipt by the Lender of the ICA Payment.

<u>Section 7.2. Conditions Precedent to Advance of Funds</u>. Lender's obligation to make Advances hereunder shall be conditioned upon fulfilment of the terms set forth in Article 4 hereof to Lender's satisfaction.

<u>Section 7.3. Unpaid Lien Claims</u>. If Lender receives notice of non-payment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred fifty percent (150%) of the lien amount claimed from future advances .

<u>Section 7.4. Mandatory Advances</u>. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZ6GEGHTWYPAN9RS

# ARTICLE 8 - BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion):

Section 8.1. Project. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project. Borrower shall submit and update its business plan which shall include the scope of the Project. Lender agrees that all affiliates, joint venture partners and subsidiaries described in the business plan are a part of the Project and the Project LOC Amount may be used within such entities. This Section 8.1 prevails over Section 5.1(b), and additional approval from Lender is not required.

Section 8.2. Compliance with Laws. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. Compliance with Documents. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. Books and Records. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. Payment of Obligations. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. Financial Reports. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within fifteen (15) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within sixty (60) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.



Zoho Sign Document ID: 2B0A4254-42ECFFUSCH2NDOBSZU2USJNTVFTKZGGEGHTWYPAH9RS

<u>Section 8.7. Notification to Lender</u>. Promptly after learning thereof, notify Lender of:

a.   the details of any material action, proceeding, investigation or claim against or affecting the Borrower or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

<u>Section 8.8. Partnership/Corporate Existence</u>. Preserve and maintain its existence,  rights, franchises, and privileges in the jurisdiction of its formation.

# ARTICLE 9 - BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion) Borrower shall not:

<u>Section 9.1. Liquidation, Merger and Sale of Assets</u>. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

<u>Section 9.2. Liens</u>. Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion  thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such Liens, shall not be increased).

<u>Section 9.3</u>.     Intentionally Omitted.

INBECAPITAL

Zoho Sign Document ID: 2B0A4254-42ECFFOSCh2NDOBSZU2OSJNTVFTKZQEGHTWYPAH9RS

<u>Section 9.4. Investments, Loans and Guaranties</u>. (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind, without prior written approval of the Lender.

<u>Section 9.5. Acquisitions</u>. Without prior written approval of the Lender the Borrower may not enter into any transaction or series of related transactions for the  purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another  Person by a merger, amalgamation or consolidation or any other combination with such Person.

<u>Section 9.6. Organizational Documents</u>. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state,  province or other jurisdiction of organization, or its form of organization.

<u>Section 9.7. Project and Project Documents</u>. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a Major Decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

a.  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance  of a material obligation by any other Person under, any contracts or agreements (A) related to the    Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the  development, construction, operation and maintenance of the Project, in each case that would have    an adverse effect on the Lender; or

b.  sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project.

# ARTICLE 10 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

<u>Section 10.1. Validity of Agreement</u>. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents.



Zoho Sign Document ID: 2B0A4254-42ECFFO5CH2NDOBSZO2O5JNTVFTKZ6GEGHTWYPAH9R5

The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms.

The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than as permitted by this document) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. Existing Defaults. As of the date of execution of the LOC Documents, Borrower is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower is a party or by which it, or any of its properties, may be bound.

Section 10.3. No Default in Other Agreements. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a
party or by which it or any of its properties may be bound or result in the violation by it of any law, order, rule, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties.

Section 10.4. No Consents. No consent, approval, authorization, or other acknowledgment  of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. Litigation. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to its knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZQEGHTWYPAH9R5

Section 10.6. Financial Statements. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

Section 10.7. Legal Requirements. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

Section 10.8. Taxes. The Borrower has filed all tax returns and reports required of it, has paid all Taxes which are due and payable, and has provided adequate reserves for payment of any Tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of Taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any Taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. Organization. The Borrower is a duly formed or organized and validly existing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement.

Section 10.10. Insurance. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. Accurate and Complete Statements. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

Section 10.12 Lender's Ability to Fund. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by Borrower of the requirements of Article 4 hereof with respect to each Advance.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZ02OSJNTW4TKZGGEGHTWYFPAII9RS

Section 10.13. Timing of Lender Funding. Lender will provide Advances as defined in the Payment Schedule within Exhibit I.

## ARTICLE 11 - NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. Generally. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for an representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12 - EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

Section 12.1. Non-payment. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower (such thirty (30) day notice to be given once during each twelve (120 month period of the Term; thereafter, no such notice is required).

Section 12.2. Other Covenants and Agreements. Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not  have been fully corrected within twenty (20) days after notice of such default is sent by Lender to  Borrower.

Section 12.3. Representations and Warranties. If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

Section 12.4. Security. If any lien granted in this Agreement or any other LOC Document favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days

Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZQGEGHTWYPAH9RS

from the date of such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. Validity of LOC Documents. If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. Petition for Bankruptcy, Insolvency. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; commencement of a sale for the benefit of creditors; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

Section 12.7. Material Litigation. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, or the Project of the disclosed litigation.

# ARTICLE 13 - REMEDIES

Section 13.1. General. Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable;



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZQGEGHTWYFPXN9R5

(b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13.

If an Event of Default referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Section 13.2. Right of Remedial Action. At the sole direction of Lender should the Lender assess and deem it necessary due to negative trending performance or upon the occurrence of an Event of Default hereunder, Borrower shall place the Project and business into a late state incubator operated by the Lender or by agent for the purposes of providing remedial management and guidance.

Furthermore, upon the occurrence of an Event of Default hereunder Lender shall have the right,  in person or by agent, in addition to all other rights and remedies available to Lender hereunder or  under the LOC Documents, to enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender  in so doing, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured  by the LOC Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

For the purpose of allowing the Lender to exercise its rights and remedies provided hereunder following the occurrence of an Event of Default, the Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

a.   to enter and endorse all agreements, instruments, and documents in connection therewith.

b.   to use any unadvanced proceeds of the LOC for the purpose of completing,  operating, or maintaining the Project.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTV4TKZGGEGHTWYPAN9RS

c.     to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

d.     to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

e.     to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security  satisfactory to the Lender has been provided.

f.     to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

g.     to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

h.     to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable, (A) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (B) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. Curing of Defaults by Advances. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which  Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right (but not the obligation) to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTV4TKZ&GEGHTWYPXH9RS

Section 13.4. Remedies Are Cumulative. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Section 13.5. Offsets. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC Documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all deposit (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

Section 13.6. Collateral. The Lender shall at all times have the rights and remedies of a secured party, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Document executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC Documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTWTTKZGGEGHTWYPAH9RS

The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC Document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC Documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than seven (7) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC Documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC Documents, the cost of which shall be paid by Borrower.

Section 13.7. Default by Lender and Borrower's Sole Remedy.

a. If Lender fails to provide the first (1st) Advance when due, pursuant to the Payment Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Upon receipt of such notice, Lender shall have ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Borrower.



Zoho Sign Document ID: 2B0A4254-42ECFFOSCH2NDOBSZU2OSJNTVFTKZGGEGHTWYFPAH9RS

b. If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Within ninety (90) calendar days from the date of receipt of such notice by Lender, the Lender must (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) terminate Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC Documents.

c. Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC Documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTV9TKZQGEGHTWYPAH9RS

Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

Section 13.8 Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming USA, before a single arbitrator  using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the  JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.

The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming USA. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

# ARTICLE 14 - GENERAL PROVISIONS

Section 14.1. Disclaimer of Liability. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZ02U5JNTVFTKZQGEGHTWYPXH9R5

Section 14.2. Publicity. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and it's financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

Section 14.3. Confidentiality. Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC Documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place except to any officers or shareholders in the Borrower or the Borrower's advisors or as required by law. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

Section 14.4. Responsibility for Application of Funds. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or wilful misconduct (in each case as determined by a court of competent jurisdiction in a final and non- appealable decision).

Section 14.5. Notices. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the Lenders portal using the Borrower's Portal account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two calendar days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:      Kosher Eats LLC
                  Managing Member
                  2699 Stirling Rd A306 Fort Lauderdale, FL 33312

To Lender:        INBE Capital LLC
Attention:        Chief Funding Officer
                  30 N Gould St Sheridan, WY 82801



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U53JNTV4TKZGGEGHTWYPAH9RS

Section 14.6. Applicable Law. This Agreement and, unless otherwise specifically provided for therein, each other LOC Document, shall be governed by and construed in accordance with the laws of the State of Wyoming.

Section 14.7. Successors and Assigns. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.8. Severability. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition.

Section 14.9. Amendments. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

Section 14.10. Headings; Attachments. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 14.11. No Third-Party Rights. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

Section 14.12. Indemnification. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZGGEGHTWYPAN9R5

The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfil all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Lender's default of its obligations under this Agreement.

Section 14.13. General Limitation of Liability. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; or  the making or administration of the Advances, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability theories,"  or any covenants, agreements, duties or obligations set forth in the Loan Documents, (or any actions or omissions of any of the Lender Parties and/or the Lenders' Affiliates in connection with the initiation or continuing exercise of any right or remedy contained in the Loan Documents or at law or in equity, or  lost profits, or loss of business opportunity, or increased financing costs, or increased legal or other administrative fees, or damages to business reputation. ; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage.

Section 14.14. Entire Agreement. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZ02U5JNTV4TKZGGEGHTWYPAH9RS

Section 14.15. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

Section 14.16. Legal Representation of the Parties. The LOC Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.17. JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**[Remainder of page intentionally left blank; Signatures follow]**



IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:**          INBE Capital LLC

By:

Name:          Jonathan Wright

Title:          Chief Funding Officer

**BORROWER:**      Kosher Eats LLC

By:

Name:          Noah Lasko

Title:          Managing Member

By:

Name:

Title:



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZ&GE&HTWYPAH9R5

# EXHIBIT A: PROMISSORY NOTE

**eight million dollars**                                                    **$8,000,000**

FOR VALUE RECEIVED,   Kosher Eats LLC

, a   Florida, USA

corporation (the "Maker"),

hereby promises to pay to INBE Capital LLC or any subsequent holder of this Master Promissory Note (the "Payee"), at such place as Payee may designate, the principal sum of

eight million dollars                                                    $8,000,000

or the aggregate unpaid principal amount of all Advances, as defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is less, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below,  payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

   a.   Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "Note") as follows:

      i.   simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to;

      • six percent           ( 6%           % ) per annum for years one to ten (1-10).

Interest payments  shall be due and payable to Payee monthly in arrears, on the first (1st) day of each month of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

   a.   Except for the payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

   a.   All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.



Zoho Sign Document ID: 2B0A4284-42ECFF0SCH2NDOBSZ02OSJNTVFTKZ&GEQHTWYPAH9RS

All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.

d.    Maker shall pay all amounts due under this Note to INBE Capital LLC, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

d.    All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the "Obligation" of Maker.

In addition, the following provisions shall govern this Note:

1.    LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.  This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the document entitled "Business Expansion Line of Credit Agreement" dated on or about the date of this Note between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "LOC Agreement"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.    LATE CHARGES. If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the "Late Charges") shall be added to the delinquent payment in an amount equal to ten percent (10.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges   are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

DEFAULT, CROSS-DEFAULT AND ACCELERATION. Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTV9TTKZQGEQHTWYPAH9RS

Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, then this Note shall be in default. Upon default, Payee shall provide written notice to Maker specifying the nature of the default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon default, the interest rate provided for in this Note shall immediately increase to twenty four percent (24%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in
 Kosher Eats LLC
and the project –   Kosher Eats LLC
To INBE Capital LLC.

3.   COSTS, FEES AND COMPENSATION. Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

4.   WAIVER. Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

5.   SUCCESSOR AND ASSIGNS. The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

6.   CUMULATIVE REMEDIES. Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

7.   GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY. This Note shall be governed by and construed in accordance with the laws of the State of Wyoming, United States of America.



BINDING ARBITRATION: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules"). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-Calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of Western Australia. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

8.   AUTHORIZATION. To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:



Zoho Sign Document ID: 2B0A4254-42ECFF0SCH2NDOBSZU2U5JNTV9TKZGGEGHTWYPAH9RS

a.  That the undersigned is the authorized representative of Maker and has the authority to bind Maker.

b.  That Maker is duly organized and validly existing under the laws of the State of its formation, and duly qualified to transact business where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

c.  That upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

9.  ATTORNEY FEES AND COSTS OF COLLECTION. Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

10. MISCELLANEOUS PROVISIONS.

a.  No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

b.  The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

c.  This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.



Zoho Sign Document ID: 2B0A4254-42ECFFUSCH2NDOBSZU2USJNTVFTKZGGEGHTWYPAH9RS

d.  This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

e.  Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

**[Remainder of page intentionally left blank; Signature page follows]**



IN WITNESS WHEREOF, the Maker has duly executed and delivered this Master Promissory Note as of the date first set forth above.

**MAKER:**     Kosher Eats LLC

By:

Name:     Noah Lasko

Title:     Managing Member

Address:   2699 Stirling Rd A306
           Fort Lauderdale, Fl 33312

**PAYEE:**     INBE Capital LLC

By:

Name:     Jonathan Wright

Title:     Chief Funding Officer

Address:   30N Gould St, Sheriden, WY 82801, USA



# EXHIBIT B: PROJECT COSTS

This loan agreement pertains to the direct funding for  Kosher Eats LLC

which is set out in the Term Sheet attached herein Exhibit I and executed by INBE Capital LLC and
 Kosher Eats LLC

This agreement pertains to the loan of   eight million dollars

$8,000,000



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTV9TKZ&GEQHTWYFPXH9RS

# EXHIBIT C: THE PROPERTY – SECURED ASSETS

TO SECURE THE PAYMENT OF THE BUSINESS EXPANSION LOC AND ALL OTHER OBLIGATIONS OF BORROWER TO LENDER, ITS SUCCESSORS AND ASSIGNS, HOWEVER CREATED, WHETHER DIRECT OR INDIRECT, ABSOLUTE OR CONTINGENT, OR NOW OR LATER EXISTING, BORROWER GRANTS TO LENDER A SECURITY INTEREST IN THE FOLLOWING PROPERTY AND ANY REPLACEMENTS THEREOF:

a.   all fixtures and Company property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b.   all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c.   all plant and equipment

d.   all computer equipment and electronic data stored therein

e.   all Intellectual Property rights

f.   all inventory

g.   all motor vehicles

h.   all goodwill

i.   all brand names

j.   all real estate and land

k.   all accessories, parts, and equipment now or later affixed to the same

l.   to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZGGEGHTWYPAH9RS

# EXHIBIT D: SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of   Apr 24 2023
(as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by   Kosher Eats LLC
(the "Grantor"), in favor of INBE Capital LLC (the "Secured Party").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "LOC Agreement").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure  the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being  executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Definitions</u>. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. For purposes of this Agreement, the following terms shall have the following meanings:

    "Collateral" has the meaning set forth in Section 2 hereof.

    "Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and  (b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

    "Deposit Account" means a deposit account. "Event of Default" has the meaning set forth in the LOC Agreement.

    "First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

    "Proceeds" means all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTV9TKZ&GEGHTW9PXH9R5

"Secured Obligations" has the meaning set forth in Section 3 hereof.

"Securities Account" means a securities account.

2.   Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following,  wherever located, whether now existing or hereafter from time to time arising or acquired and any replacements thereof (collectively, the "Collateral"):

   a.   all fixtures and property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment),   documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

   b.   all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

   c.   all plant and equipment

   d.   all computer equipment and electronic data stored therein

   e.   all Intellectual Property rights

   f.   all inventory

   g.   all motor vehicles

   h.   all goodwill

   i.   all brand names

   j.   all real estate and land

   k.   all accessories, parts, and equipment now or later affixed to the same

   l.   to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



3. <u>Secured Obligations</u>. The Collateral secures the due and prompt payment and performance of:

    a.   the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

    b.   all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "Secured Obligations").

4. <u>Perfection of Security Interest and Further Assurances</u>.

    a.   The Grantor shall, from time to time, as may be required by the Secured Party with    respect to all Collateral, promptly take all actions as may be requested by the Secured Party  to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party, including filing of a UCC-1 statement. All the foregoing shall be at the sole cost and expense of the Grantor.



Zoho Sign Document ID: 2B0A4284-42ECFFU5CH2NDOBSZ02USJNTV9TTKZGGEGHTWYFPAH9RS

b.  The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by applicable law of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

c.  The Grantor hereby further authorizes the Secured Party to file with relevant governmental authorities or agencies this Agreement and other documents for the purpose of perfecting, confirming,

d.  continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

e.  If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

f.  If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

g.  The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.



5.   <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

   a.   (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable law and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

   b.   At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

   c.   The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

   d.   Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

   e.   Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

   f.   No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.



Zoho Sign Document ID: 2B0A4254-42ECFFU3CH2NDOBSZU2USJNTV4TKZ&GE&HTW1PXH9RS

g.    The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

h.    The Grantor has taken all action required on its part for control to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to applicable law. No person other than the Secured Party has control or possession of all or any part of the Collateral.

i.    Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Deposit Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or Securities Intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

j.    Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6.    Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Grantor covenants as follows:

a.    The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZ&GEqHTWYPAH9R5

b.    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

c.    The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

d.    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

e.    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

f.    The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

g.    The Grantor will continue to operate its business in compliance with all applicable provisions of applicable law dealing with the control, shipment, storage or disposal of hazardous materials or substances.

h.    The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Deposit Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Deposit Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.



Zoho Sign Document ID: 2B0A4254-42ECFFOSCH2NDOBSZO2USSJNTVFTKZ&GEGHTWYYPXH9RS

i. The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

j. At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8. <u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZGGEGHTWYIPAH9RS

9. <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. <u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. <u>Remedies Upon Default</u>. If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZGGEGHTWYPAH9RS

The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

a. If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

b. If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2U5JNTVFTKZCGEGHTWYPAH9RS

13. <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

a. any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

b. any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

c. any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

d. any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

e. any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

f. any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

g. any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.



Zoho Sign Document ID: 2B0A4254-42EFF0SCH2NDOBSZU2OSGJNTV9TIKZGGEGHTWYPXH9RS

15. <u>Addresses for Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16. <u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. <u>GOVERNING LAW</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of  the State of Wyoming, United States of America.

19. <u>Binding Arbitration</u>. Except for any rights to self-help or possession of the collateral under state law. any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the  JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.  The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules.



Zoho Sign Document ID: 2B0A4254-42ECFFUSCH2NDOBSZU2USJNTVFTKZGOEGHTWYPAH9RS

Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections.   No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming, United States of America. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20. <u>JURY TRIAL WAIVER</u>. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

21. <u>Counterparts</u>. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

**[Remainder of page intentionally left blank; Signature page follows]**



Zoho Sign Document ID: 2B0A4254-42ECFFU3CH2NDOBSZU2USJNTV4TKZGGEGHTWYPXH9RS

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR:**    Kosher Eats LLC

By:

Name:    Noah Lasko

Title:    Managing Member

**SECURED PARTY:** INBE Capital LLC

By:

Name:    Jonathan Wright

Title:    Chief Funding Officer



# EXHIBIT E: FORM TERMINATION LETTER

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801

Re:    Kosher Eats LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated    Apr 24 2023

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER:

By:

Name:

Title:


By:

Name:

Title:


SUBSCRIBED AND SWORN TO BEFORE ME on this day:

NOTARY PUBLIC
In and for the State of

My Commission Expires:



Zoho Sign Document ID: 2B0A4254-42ECFFUSCH2NDOBSZU2USJNTVFTKZGGEGHTWYPXH9RS

# EXHIBIT F: WIRE & JOINT INSTRUCTIONS

I instruct the BORROWER to fund the sum of  $2,000,000

(the "ICA"),

to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit). The Trustee will be nominated and confirmed via electronic communication during final underwriting. Best efforts are made to select The Trustee based on a suitably negotiated escrow holding term per funding cycle. Typically, a 90 day escrow term applies. However, upon successful negotiation of a shorter escrow term, we're then able to facilitate tranche 1 delivery faster than our standard 90 day allowance. Whilst this cannot be guaranteed, we will always apply best efforts to shorten the overall payment schedule so we consistently deliver your funding quickly and seamlessly. Expect regular communication as we move through the remaining stages of the process. As well as ongoing open access to your appointed INBE representatives.

**Contractual Guarantee on ICA Advance Fee:**

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

**WIRE INSTRUCTIONS:**

| | |
|---|---|
| Account Name: | Messner Reeves, LLP – COLTAF Paymaster |
| Bank Name: | The Northern Trust Company |
| Account Address: | 50 S LaSalle, Chicago, IL |
| Account No.: | 3813128494 |
| ACH Transfers: | N/A |
| ABA: | 071000152 |
| Swift (US Currency): | CNORUS44 |
| Swift (Foreign Currency) | |
| Payment Reference: | INBE CAP |

Mandatory KYC/AML Required Message on all wire transfers:

All transfer instructions shall state: **"Funds are clean and clear of non-criminal origin and are for immediate credit – same day value / instant cash upon receipt."**

**IMPORTANT: All transfers must be accompanied by proof of wire to frb@inbe.capital**



Zoho Sign Document ID: 2B0A4254-42ECFFU3CH2NDOBSZU2USJNTV4TKZQGEGHTWYYPXH9RS

**Re: Joint Instructions regarding Deposit Amount**

The purpose of these joint instructions ("Instructions") is to document the agreement of the parties regarding the Deposit Amount described below.

As background, (The Borrower) has obtained a loan commitment from INBE Capital LLC for the total amount of:

(the "Loan Amount") from INBE Capital LLC ("The Lender") To fund their proposed project and business activities as further set forth in Exhibit B, Exhibit H, & Exhibit I.

In connection with the Proposed Transaction, INBE Capital LLC, requires the borrower remit to INBE Capital LLC the Interest Credit Deposit Amount of:

(the "Deposit Amount"), which Lender requires as a deposit for the funding of the Proposed Loan, care of the "WIRE INSTRUCTIONS" stipulated within this Exhibit - Exhibit F (the "Escrow Account").

These Instructions are provided to clarify what happens with the Deposit Amount and when the Deposit Amount may be returned to The Borrower. Specifically:

- The administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan specified in Exhibit I.
- If the Proposed Transaction does not complete pursuant to the execution of definitive agreements and the payment of the BELOC Loan to The Borrower, then INBE Capital LLC or one of it's nominated agents will wire return the Deposit Amount to The Borrower promptly.
- If Lender cancels the Proposed Loan pursuant to the terms of the Business Expansion Line of Credit to be entered into between The Borrower and Lender, or if the Proposed Loan commitment expires, then INBE Capital LLC will promptly wire return the Deposit Amount to The Borrower.

All signers of these Instructions agree to strictly comply with the terms hereof.

INBE Capital LLC may update or supplement these Instructions at any time in writing signed by all parties. If there is a conflict between these Instructions and the Proposed Loan, these Instructions control.

The parties agree to the use of email for the purpose of delivering notices under these Instructions, as follows:

If these Instructions are acceptable, please acknowledge below.

**The Borrower**                                      **INBE Capital LLC**

_____                    _____



Zoho Sign Document ID: 2B0A4254-42ECFFU5CH2NDOBSZU2USJNTVFTKZGQEGHTWYPAH9RS

# EXHIBIT G: KYC & AML

In order to satisfy Know Your Customer (KYC) and Anti Money Laundering compliance all clients must complete the following Client Information Form and upload verification information:

## STEP 1 – COMPLETE KYC & AML FORM

### GO HERE – Link to online Client information form

or Scan QR Code:



## STEP 2 – DECLARATION

We may take up such references and make such enquiries about your company as we consider necessary, and we may use credit scoring and may search the files of credit reference agencies. The fact a search had been made will be recorded by each credit reference agency used and the data supplied will be available to other lenders and others authorized to search the credit reference agencies files, for purpose such as credit assessment of your company and occasionally for debtor tracing and fraud prevention. If your application for finance is accepted then details about your company and the conduct of your account may be passed to credit reference agencies and these details will be used for similar purposes.

We may also disclose information about your company and the conduct of your account to credit industry fraud avoidance networks and to tracing and debt collection agencies and our solicitors.

Data Protection Your company information will be treated as confidential and will only be disclosed:
a) at your request;
b) to our agents in connection with running accounts;
c) in the public interest; or
d) to prevent fraud or legal compulsion; or
e) taking up of references.

The Data Protection Act gives you a right to a copy of your company records held on our files on payment of a fee.

*Signatures Follow on Next Page*



Zoho Sign Document ID: 2B0A4254-42ECFFU3CH2NDOBSZU2U3JNTV4TKZGGEGHTWYPAH9RS

**1. Signatures(s)** ......................................................................    **Date:** . Apr 24 2023 ........................

**Name .**         Noah Lasko
................................................................

**2. Signatures(s)** ...........................................................    **Date:** .. ........................................

**Name .**         ................................................................

**3. Signatures(s)** ............................................................    **Date:** . .........................................

**Name**             ...................................................................................................



# EXHIBIT H: TERM SHEET

[intentionally left blank; Executed Term Sheet follows]

# EXHIBIT I: THE PROJECT

The Borrower desires to obtain the LOC from Lender for the purposes detailed below;

[intentionally left blank; Project Summary follows Term Sheet]



# EXHIBIT 44



**Secretary of State**

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: Nov 7 2023 4:25PM**
**Original ID: 2023-001357634**

# Limited Liability Company
## Articles of Organization

I.   **The name of the limited liability company is:**
Titan Financial, LLC

II.  **The name and physical address of the registered agent of the limited liability company is:**
Registered Agent Solutions, Inc.
1603 Capitol Ave Suite 310
Cheyenne, WY 82001

III. **The mailing address of the limited liability company is:**
30 North Gould Street
Suite N
Sheridan, WY 82801

IV.  **The principal office address of the limited liability company is:**
30 North Gould Street
Suite N
Sheridan, WY 82801

V.   **The organizer of the limited liability company is:**
Todd Owen
30 North Gould Street, Suite N, Sheridan WY 82801

Signature:   *Donna DeFalco*                          Date:   **11/07/2023**

Print Name:   **Donna DeFalco**

Title:   **Authorized Signer**

Email:   **ddefalco@messner.com**

Daytime Phone #:   **(801) 683-2022**

Page 1 of 4



Secretary of State

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

☑ I consent on behalf of the business entity to accept electronic service of process at the email address provided with Article IV, Principal Office Address, under the circumstances specified in W.S. 17-28-104(e).

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**    ☐ An Individual    ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator, organizer, or partner. The following individual is signing on behalf of all Organizers, Incorporators, or Partners.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:    *Donna DeFalco*                    Date:    11/07/2023

Print Name:    **Donna DeFalco**

Title:    **Authorized Signer**

Email:    **ddefalco@messner.com**

Daytime Phone #:    **(801) 683-2022**



Secretary of State

**Wyoming Secretary of State**

Herschler Bldg East, Ste.100 & 101

Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Registered Agent Solutions, Inc.**, whose registered office is located at **1603 Capitol Ave Suite 310, Cheyenne, WY 82001**, voluntarily consented to serve as the registered agent for **Titan Financial, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Donna DeFalco*                          Date: **11/07/2023**

Print Name: **Donna DeFalco**

Title: **Authorized Signer**

Email: **ddefalco@messner.com**

Daytime Phone #: **(801) 683-2022**

Page 3 of 4

## STATE OF WYOMING
## Office of the Secretary of State

I, CHUCK GRAY, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**Titan Financial, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **7th** day of **November, 2023** at **4:25 PM.**

Remainder intentionally left blank.



Filed Date: 11/07/2023



Secretary of State

Filed Online By:

Donna DeFalco

on 11/07/2023

# EXHIBIT 45

Docusign Envelope ID: BDC948FD-BFFA-4711-A159-31672214D518

# DECLARATION OF CRAIG BODDINGTON

## REGARDING FACTUAL BACKGROUND
## RELATING TO INBE CAPITAL LLC AND MESSNER REEVES LLP

I, Craig Boddington, declare as follows:

1.  I am an individual over the age of eighteen and make this declaration based upon my personal knowledge and review of relevant records. From 2022 through 2024, I was associated with INBE Capital LLC ("INBE") and served as an authorized representative in matters involving Messner Reeves LLP ("Messner") and attorney Torben Welch concerning the "Business Expansion Line of Credit" ("BELOC") program. If called as a witness, I could and would testify competently to the facts stated herein.

2.  This declaration is made voluntarily and solely for the purpose of providing factual clarification regarding INBE's role and involvement in connection with the BELOC program and certain borrower escrow deposits handled by Messner. I am not a party to the litigation, and this declaration should not be construed as taking any position for or against any party.

3.  To the best of my knowledge and belief, INBE never authorized Messner, Torben Welch, Clearwater Premiere Perpetual Master LLC, Daniel Chartraw, Todd Owen, or any other person or entity to disburse or transfer borrower escrow deposits held by Messner. No written, verbal, or implied authorization was ever issued by INBE or by me personally.

4.  My understanding was that Messner, as counsel and escrow trustee, was responsible for holding borrower deposits in its COLTAF/IOLTA trust account under the

Initial CB    10/16/2025

Docusign Envelope ID: BDC948FD-BFFA-4711-A159-31672214D518

BELOC program. The BELOC terms required that such funds remain under Messner's exclusive custody and control until either (a) a first tranche of loan funding occurred, or (b) ninety (90) days had elapsed, after which, upon receipt of a formal written request from the borrower, Messner was contractually obligated to return the borrower's deposit. The return of funds was therefore not automatic but triggered by a formal request following the 90-day period.

5. INBE never held or possessed the borrower deposits belonging to Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies LLC, or HomePeople Corporation.

6. INBE did not authorize Clearwater or any other third party to instruct Messner regarding the release or disbursement of those escrow funds, nor did INBE ever execute or issue any written instructions, emails, or verbal approvals permitting such transfers.

7. I communicated frequently with Torben Welch by email and other electronic means throughout 2023 and early 2024. When it became apparent that the loans were not funding, I repeatedly stated that the borrower deposits must be returned and inquired about the location of the funds. This declaration does not waive any attorney–client privilege or confidentiality that may attach to communications with legal counsel.

8. At no time did INBE have the ability to release, move, or refund any borrower funds because INBE did not hold them. All custody and control remained with Messner. INBE's role in the BELOC program was limited to administrative coordination and borrower interface; it had no authority to access or control any escrow or trust funds.

2

Initial
CB    10/16/2025

Docusign Envelope ID: BDC948FD-BFFA-4711-A159-31672214D518

9.      INBE did not authorize any entity named "Titan Financial LLC" to hold or manage borrower deposits. To my knowledge, Titan Financial LLC had no relationship with INBE.

10.     In mid-2023, discussions were held in Southern California with individuals affiliated with Clearwater, including Daniel Chartraw and Todd Owen, which Torben Welch attended in part. These discussions concerned pipeline projects for potential future funding only and did not constitute authorization to transfer any escrow deposits.

11.     INBE never received a formal engagement letter from Messner defining its role with INBE in these transactions. My understanding was that Messner acted as an independent escrow trustee and had a fiduciary duty to safeguard and return borrower funds if no loan occurred.

12.     INBE did not fund any loans under the BELOC program. If any borrowers received partial payments purporting to be loan fundings in 2023, those payments did not originate from INBE.

13.     To the best of my knowledge, the absence of borrower funds in Messner's trust account was the result of Messner's unauthorized disbursement of those funds. I am not aware of any other reason for their absence.

14.     This declaration is made voluntarily, based on my personal knowledge and recollection, and should not be construed as a waiver of any right, privilege, or confidentiality obligation of INBE Capital LLC or any other person or entity.

3

Initial

*CB*

10/16/2025

Docusign Envelope ID: BDC948FD-BFFA-4711-A159-31672214D518

I declare under penalty of perjury under the laws of the State of California and the

United States of America that the foregoing is true and correct.

Signed by:

Craig Boddington                                    10/16/2025
F277CDEA9CED408...

Craig Boddington
Managing Member, INBE Capital LLC

4

Initial

CB    10/16/2025

# EXHIBIT 46

# EXHIBIT 53















































































# EXHIBIT 47



















































**3:25**

**Torben Walch** ⊚

Govern **Aug 30, 2023** nts:

When the borrower sends their deposit (also referred as the Interest Control Account or ICA) to Messner Reeves LLP's IOLTA account, whom as a third party are an independent agent and paymaster. The deposit remains under the supervision of Messner Reeves LLP until the time that the contractual terms for the deployment of the loan by the lender are met. For example in the event that the loan does not get paid out, the Borrower simply notifies the Agent and the deposit is returned.

The Loan Agreement documents comprising; BELOC Loan Agreement (incorporating Security Agreement, Promisso note); Deposit Control

Message





**3:25**

**Torben Walch**

Aug 30, 2023

The Flow of Funds agreement documents the conditions (Flow of Funds) on how and when the deposit can be transferred over to the Lender. As third party agent Messner Reeves are bound by the terms of the Deposit Agreement which takes role of "Escrow Agreement" in the BELOC loan agreements.

I hope this explanation helps clarify the situation.    3:48 PM

Hi Torben... is the above ok?    5:13 PM

Craig – this works    7:05 PM

ok than**ks**

do you also have a draft of a Profit Share agreement we

Message































































# EXHIBIT 48

Inst #: 20230215-0001844
Fees: $42.00
02/15/2023 02:39:41 PM
Receipt #: 5221529
Requestor:
NATIONWIDE LEGAL LLC
Recorded By: ANI   Pgs: 8
Debbie Conway
CLARK COUNTY RECORDER
Src: FRONT COUNTER
Ofc: MAIN OFFICE

## RECORDING COVER PAGE

(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

APN# _____

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

### TITLE OF DOCUMENT
(DO NOT Abbreviate)

*Confession of Judgment
Pursuant to NRCP 17*

Document Title on cover page must appear EXACTLY as the first page of the document
to be recorded.

**RECORDING REQUESTED BY:**

Williams ❖ Starbuck

**RETURN TO: Name** Williams ❖ Starbuck

    **Address** 612 South Tenth Street

    **City/State/Zip** Las Vegas, Nevada 89101

**MAIL TAX STATEMENT TO:** (Applicable to documents transferring real property)

    Name _____

    Address _____

    City/State/Zip _____

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly, do not use page scaling.
Using this cover page does not exclude the document from assessing a noncompliance fee.
P:\Common\Forms & Notices\Cover Page Template Feb2014



Electronically Filed
10/19/2021 8:36 AM
Steven D. Grierson
CLERK OF THE COURT

**JUDG**
ARTHUR N. BORTZ (SBN 14035)
ROPERS MAJESKI, PC
3753 Howard Hughes Pkwy #200
Las Vegas, Nevada 89169
Phone:      (702) 954-8300
Facsimile: (213) 312-2001
Email:       arthur.bortz@ropers.com

Attorneys for Plaintiffs
CONSTRUCTION TESTING SERVICES, LLC and
FENAGH ENGINEERING & TESTING
SERVICES, LLC

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| CONSTRUCTION TESTING SERVICES, LLC, a Nevada Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> ALL NET DEVELOPMENT, INC., a Nevada company; ALL NET LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, a Nevada Limited Liability Company; SAHARA LAS VEGAS CORP., a Nevada corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company; SUBGALLAGHER INVESTMENT TRUST aka SUBGALLAGHER INVESTMENT TRUST and SUB-GALLAGHER INVESTMENT TRUST; P. MOORE as Trustee; JOSEPH R. BERLIN, an Individual Surety; and DOE and ROES I-X, inclusive, <br><br> Defendants. <br><br> And Related Actions. | CASE NO.: A-18-775348-C <br><br> NEW CASE NO. A-18-771361-B <br> DEPT. NO.: 11 <br><br> **CONFESSION OF JUDGMENT PURSUANT TO NRCP 17** |

<div align="center">Page 1 of 5</div>



Plaintiffs Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC (hereinafter "Plaintiffs") and Defendants All Net, LLC; All Net Development, Inc.; and Dribble Dunk, LLC (collectively the "Robinson Parties") hereby stipulate and agree to the following:

WHEREAS, This Court GRANTED Plaintiffs' Motion to Enforce Settlement Agreement (hereinafter "Motion") entitling Plaintiffs to a Judgment in the amount of $1,147,000.00;

WHEREAS, the Robinson Parties agree that Plaintiffs are entitled to a Judgment in the amount of $1,147,000.00 plus interest running from the May 7, 2021;

WHEREAS, the Robinson Parties have requested that Plaintiffs defer entering the Judgment until September 1, 2021;

WHEREAS, Plaintiffs are willing to defer entry of the Judgment until September 1, 2021;

## STIPULATION

1.    The Robinson Parties hereby agree that Plaintiffs are entitled to a Judgment in the amount of $1,147,000.00 plus interest accruing at the prime interest rate for the State of Nevada (3.25% plus 2%) for a total of 5.25%, beginning on May 7, 2021.

2.    Plaintiffs agree to defer entry of the Judgment until September 1, 2021.

3.    The Robinson Parties hereby agree to provide Plaintiffs with no less than two (2) weeks written notice prior to any Bankruptcy filing by any of the Robinson Parties. Plaintiffs are free to enter this Judgment at any time after receiving notice of intent to file Bankruptcy by any of the Robinson Parties.

4.    Plaintiffs can, at their option, extend to the Robinson Parties a single sixty (60) day extension of the deferred entry date from September 1, 2021 to November 1, 2021 in exchange for a payment of One Hundred Thousand Dollars ($100,000.00). If Plaintiffs elect to extend a sixty (60) day extension of the deferred entry date to the Robinson Parties, the funds must be wired and confirmed to have been successfully processed by Plaintiff's financial institution on or before August 27, 2021.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IT IS SO STIPULATED.

DATED this 24th day of June, 2021.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: /s/ Frank M. Flansburg
Frank M. Flansburg, III, Esq.
Nevada Bar No. 6974
Eric D. Walther, Esq.
Nevada Bar No. 13611

*Attorneys for All Net Development, Inc, All Net, LLC, Dribble Dunk, LLC, and Jackie L. Robinson*

DATED this 25th day of June, 2021.

**ROPERS, MAJESKI, KOHN & BENTLEY**

By: /s/
Arthur N. Bortz, Esq.
Nevada Bar No. 14035

*Attorneys for Construction Testing Services and Fenagh Engineering & Testing Services, LLC*

**[CONFESSION APPEARS ON FOLLOWING PAGE]**



## CONFESSSION OF JUDGMENT

The Robinson Parties, by and through their principal Jackie Robinson hereby agree and confess under oath and penalty of perjury of the laws of the state of Nevada that Plaintiffs Construction Testing Services, LLC and Fenagh LLC, dba Fenagh Engineering and Testing Services are entitled to a Judgment in their favor and against All Net, LLC, All Net Development, Inc., and Dribble Dunk, LLC in the amount of $1,147,000.00 plus plus interest accruing at the prime interest rate for the State of Nevada (3.25% plus 2%) for a total of 5.25%, beginning on May 7, 2021.

**JUDGMENT CONFESSED.**

Dated:

6/24/21

All Net, LLC

_Jackie L R_

Jackie Robinson, President and CEO of All Net, LLC

Dated:

6/24/21

All Net Development, Inc.

_Jackie L R_

Jackie Robinson, President and CEO of All Net Development, Inc.

Dated:

6/24/21

Dribble Dunk, LLC

_Jackie L R_

Jackie Robinson, President and CEO of Dribble Dunk, LLC

[NOTARY APPEARS ON FOLLOWING PAGE]

ROPERS MAJESKI | A Professional Corporation | Las Vegas

State of Nevada )

County of Clark )

On June 24 , 2021, before me, Alisa J. Steinhauer, Notary Public, personally appeared Jackie L. Robinson , personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of Nevada That the foregoing paragraph is true and correct.

Witness my hand and official seal.

SIGNATURE OF NOTARY



ALISA J. STEINHAUER
Notary Public, State of Nevada
Appointment No. 13-11996-1
My Appt. Expires Jul 6, 2021

Page 5 of 5



**CASE NAME:**    Las Vegas Paving Corporation v. All Net Development, Inc., et al.

**ACTION NO.:**    A-18-771361-C

### CERTIFICATE OF SERVICE

**METHOD OF SERVICE**

☐ First Class Mail          ☐ Facsimile          ☐ Messenger Service

☐ Overnight Delivery        ☒ E-Mail/Electronic Delivery

1. At the time of service I was over 18 years of age and not a party to this action and a Citizen of the United States.

2. My business address is 3753 Howard Hughes Parkway, Suite 200, Las Vegas, Nevada 89169, County of Clark.

3. On October 19, 2021 I served the following documents:

### CONFESSION OF JUDGMENT PURSUANT TO NRCP 17

4. I served the documents on the persons at the address below (along with their fax numbers and/or email addresses if service was by fax or email):

| | |
|---|---|
| Joseph Berlin<br>5353 Arlington Expressway, Suite 12C<br>Jacksonville, FL 32211 | Pro Se<br><br>Phone: (850) 443-4342<br>Phone: (702) 577-9319)<br>Facsimile: (702) 255-2858<br>Email:<br>josephberlin.vancapresources@gmail.com |
| Marquis Aurbach Coffing<br>Jack Chen Min Juan, Esq.<br>10001 Park Run Drive<br>Las Vegas, NV 89145 | Attorneys for Plaintiff<br>Las Vegas Paving Corporation<br><br>Phone: (708) 382-0711<br>Facsimile: (702) 382-5816<br>Email: jjuan@maclaw.com |
| Frank Flansburg, Esq<br>Adam K. Bult, Esq.<br>Eric Walther, Esq.<br>Brownstein Hyatt Farber and Schreck, LLC<br>100 North City Parkway, suite 1600<br>Las Vegas, NV 89106 | Attorneys for Defendants All Net Development, Inc. , All Net, LLC, and Dribble Dunk and Jackie Robinson<br><br>Phone: (702) 382-2101<br>Email: fflansburg@bhfs.com<br>abult@bhfs.com |
| Kevin M. Hanratty, Esq.<br>HANRATTY LAW GROUP<br>1815 Village Center Circle, Suite 140<br>Las Vegas, NV 89 134 | Attorneys for All Net Land Development LLC<br><br>Email: kevinh@hanrattylawgroup.com |

Proof of Service



Griffith H. Hayes, Esq.
LITCHFIELD CAVO LLP
3993 Howard Hughes Parkway, #100
Las Vegas, NV 89169

Attorneys for Subgallagher Investment
Trust and P/ Moore

Email: hayes@litchfieldcavo.com

Richard L. Peel, Esq.
Ronald J. Cox
PEEL BRIMLEY LLP
3333 E. Serene A venue, Suite 200
Henderson, NV 89074-6571

Attorneys for Sturgeon Electric Company,
Inc.

Email: rcox@peelbrimley.com

5. I served the documents by the following means:

a. ☐ By United States mail: I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses specified in item 4 and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at the address listed in Paragraph 2 above.

b. ☐ By overnight delivery: I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

c. ☐ By messenger: I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a messenger for service.

d. ☐ By fax transmission: Based on an agreement between the parties and in conformance with Fed. Rules Civ. Proc. rule 5, and/or as a courtesy, I faxed the documents to the persons at the fax numbers listed in item 4.

e. ☐ By email or electronic transmission: Based on an agreement between the parties and/or as a courtesy, I sent the documents to the persons at the email addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

f. ☒ By the Court's electronic filing and service system (Odyssey File & Serve): Pursuant to local rules, I sent the documents to all parties on the current service list.

I am employed in the office of a member of the bar of this court at whose direction the service was made. I certify under penalty of perjury that the foregoing is true and correct.

Date:    October 19, 2021

PEGGY KURILLA
Type Name

/s/ *Peggy Kurilla*
Signature

Proof of Service

# EXHIBIT 49

**From:** ████████████████████
**Sent:** Monday, May 15, 2023 2:16 PM
**To:** ████████████████████████
**Subject:** New INCOMING WIRE or SERVICE MSG notice.

The message below is from an external source. Please do not open unexpected attachments or links from an unknown or suspicious origin. Think before you click!

# VALLEY BANK OF NEVADA

 • North Las Vegas, NV 89031

### INCOMING WIRE NOTICE

| Received Date | 05/15/2023 02:10 PM PDT |
|---|---|
| Amount | 904,777.00 |
| Identifying Account | ████2243 |
| Business Function | CTP |

| Beneficiary | Originator |
|---|---|
| DXXXXX2243 <br><br> VALLEY BANK OF NEVADA | DXXXXXX8494 <br><br> COLORADO LAWYER TRUST ACCOUNT FOUND <br><br> COLTAF TRUST ACCOUNT <br><br> 1550 WEWATTA ST SUITE 710 <br><br> DENVER CO XXXXX6481 |

| Delivery Instructions | |
|---|---|
| Sender DI | ████ NORTHERN CHGO* |
| Receiver DI | 121042484PAC CO  BKR  BK  F* |
| Correspondent Service Provider | Pacific Coast Bankers' Bank, Walnut Creek, CA |

| Additional Information | |
|---|---|
| IMAD | ████████ |
| OMAD | ████████ |
| UETR | ████████ |
| Originator to Beneficiary Info | ████████ LAW OFFICES ████████ IOLTA TRUST*ACCOUNT , CTS ETTLEMENT* |
| FI to FI Info | |
| Beneficiary's Adv Info | |
| Beneficiary's FI | |
| Beneficiary's FI Info | |
| Originator's FI | |
| Instructing FI | |
| Intermediary FI | |
| Receiver's FI | |
| Sender Reference | XXXXXXXXXXXX1373* |

| Ref for Beneficiary | XXXXX0301* |
| --- | --- |
| Info to Beneficiary | |
| OFAC Compliance Verified (PCBB) | A  OF 05/15/23 02:10 PM PDT |

**2 attachments**



**image001.jpg**
830K



**image001.jpg**
8K

# EXHIBIT 50

Inst #: **20230606-0002029**
Fees: $42.00
06/06/2023 03:38:50 PM
Receipt #: 5309413
Requestor:
NATIONWIDE LEGAL LLC
Recorded By: RYUD   Pgs: 7

**Debbie Conway**
CLARK COUNTY RECORDER
Src: FRONT COUNTER
Ofc: MAIN OFFICE

## RECORDING COVER PAGE

(Must be typed or printed clearly in BLACK ink only
and avoid printing in the 1" margins of document)

**APN#** _____

(11 digit Assessor's Parcel Number may be obtained at:
http://redrock.co.clark.nv.us/assrrealprop/ownr.aspx)

### TITLE OF DOCUMENT
(DO NOT Abbreviate)

*Satisfaction of Judgment*

Document Title on cover page must appear **EXACTLY** as the first page of the document
to be recorded.

**RECORDING REQUESTED BY:**

Williams ❖ Starbuck

**RETURN TO: Name** _Williams ❖ Starbuck_

**Address** _612 South Tenth Street_

**City/State/Zip** _Las Vegas, Nevada 89101_

**MAIL TAX STATEMENT TO:** (Applicable to documents transferring real property)

Name _____

Address _____

City/State/Zip _____

This page provides additional information required by NRS 111.312 Sections 1-2.
An additional recording fee of $1.00 will apply.
To print this document properly, do not use page scaling.
Using this cover page does not exclude the document from assessing a noncompliance fee.
P:\Common\Forms & Notices\Cover Page Template Feb2014

**SATF**
DONALD H. WILLIAMS, ESQ.
Nevada Bar No. 5548
Dwilliams@dhwlawlv.com
DREW J. STARBUCK, ESQ.
Nevada Bar No. 13964
Dstarbuck@dhwlawlv.com
WILLIAMS ❖ STARBUCK
612 So. Tenth Street
Las Vegas, Nevada 89101
(702) 320-7755 (Phone)
(702) 320-7760 (Facsimile)
*Attorneys for Plaintiffs CONSTRUCTION TESTING*
 *SERVICES, LLC and FENAGH ENGINEERING AND TESTING SERVICES, LLC*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| LAS VEGAS PAVING CORPORATION, a Nevada Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALL NET DEVELOPMENT, INC., a Nevada company; ALL NET LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, a Nevada Limited Liability Company; SAHARA LAS VEGAS CORP., a Nevada corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company; SUBGALLAGHER INVESTMENT TRUST aka SUBGALLAGHER INVESTMENT TRUST and SUB-GALLAGHER INVESTMENT TRUST; P. MOORE as Trustee; JOSEPH R. BERLIN, an Individual Surety; and DOE and ROES I-X, inclusive,<br><br>Defendants.<br><br>ALL NET DEVELOPMENT, INC., a Nevada Corporation; ALL NET, LLC, a Nevada Limited Liability Company; | CASE NO: A-18-771361-B<br><br>Consolidated with Case No. A-18-775348-C and A-18-775346-C<br><br>Dept. 22 |

DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; JACKIE L. ROBINSON, an individual,

Counter-Claimants,

Vs.

LAS VEGAS PAVING CORPORATION, INC., a Nevada Corporation; and DOES and ROES 1-10,

Counter-Defendants.

ALL NET DEVELOPMENT, INC., a Nevada Corporation; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; JACKIE L. ROBINSON, an individual,

Cross-Claimants.

Vs.

SUBGALLAGHER INVESTMENT TRUST aka SUB GALLAGHER INVESTMENT TRUST and SUB-GALLAGHER INVESTMENT TRUST, a Wyoming Trust; PATRICIA MOORE, as Trustee; JOSEPH R. BERLIN, as Individual Surety; and DOES and ROES 1-10,

Cross-Defendants.

ALL NET DEVELOPMENT, INC., a Nevada corporation; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; JACKIE L. ROBINSON, an individual,

Third-Party Plaintiffs,

Vs.

LARRY WRIGHT, an individual; SHERRY SIMS, an individual; NICHOLAS SMITH,

2

an individual; SUBGALLAGHER, LLC, a limited liability company; and DOES and ROES 1-10,

Third-Party Defendants.

SUBGALLAGHER INVESTMENT TRUST; and P. MOORE, as Trustee,

Counter-Claimants,

Vs.

ALL NET DEVELOPMENT, INC., a Nevada company; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; JACKIE L. ROBINSON an individual; and ZOES 1-10,

Counter-Defendants.

STURGEON ELECTRIC COMPANY, INC., a Michigan corporation,

Plaintiff-in-Intervention,

Vs.

ALL NET LAND DEVELOPMENT, LLC, a Nevada limited liability company; DRIBBLE DUNK, LLC, a Nevada limited liability company; JOSEPH R. BERLIN, as Individual Surety; BOE BONDING COMPANYES I through X; DOES I through X; LOE LENDERS I through X; ROE CORPORATIONS I through X; TOE TENANTS I through X, inclusive,

Defendants.

SAHARA LAS VEGAS CORP., a Nevada Corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company,

3

Counter-Claimants,

Vs.

STURGEON ELECTRIC COMPANY, INC., a Michigan corporation,

Counter-Defendant.

FENAGH ENGINEERING AND TESTING SERVICES, LLC, a Nevada Limited Liability Company,

Plaintiff,

Vs.

ALL NET DEVELOPMENT, INC., a Nevada Company; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, a Nevada Limited Liability Company' SAHARA LAS VEGAS CORP., a Nevada Corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company; SUBGALLAGHER INVESTMENT TRUST aka SUBGALLAGHER INVESTMENT TRUST and SUB-GALLAGHER INVESTMENT TRUST; P. MOORE, as Trustee; JOSEPH R. BERLIN, an Individual Surety; and DOE and ROES I-X, inclusive,

Defendants.

SAHARA LAS VEGAS CORP., a Nevada Corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company,

Counter-Claimants,

Vs.

FENAGH ENGINEERING AND TESTING SERVICES, LLC, a Nevada Limited Liability Company,

Counter-Defendant.

4



SUBGALLAGHER INVESTMENT TRUST; and P. MOORE, as Trustee,

Cross-Claimants,

Vs.

DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; and MOES I-X, inclusive,

Cross-Defendants.

CONSTRUCTION TESTING SERVICES, LLC, a Nevada Limited Liability Company,

Plaintiff,

Vs.

ALL NET DEVELOPMENT, INC., a Nevada Company; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; SAHARA LAS VEGAS CORP., a Nevada Corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company; SUBGALLAGHER INVESTMENT TRUST aka SUBGALLAGHER INVESTMENT TRUST and SUB-GALLAGHER INVESTMENT TRUST; P. MOORE, as Trustee; JOSEPH R. BERLIN, an Individual Surety; and DOES and ROES I-X, inclusive,

Defendants.

SAHARA LAS VEGAS CORP., a Nevada Corporation; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company,

Counter-Claimants,

Vs.

CONSTRUCTION TESTING SERVICES, LLC, a Nevada Limited Liability Company,

5

Counter-Defendant.

## SATISFACTION OF JUDGMENT

FOR AND IN CONSIDERATION of payment received from Defendant, full satisfaction is hereby acknowledged on the Judgment entered in the above captioned action on October 19, 2021, and recorded with the Clark County Recorder on February 15, 2023, as Instrument Number 20230215-0001844, in favor of Plaintiff, CONSTRUCTION TESTING SERVICES, LLC and FENAGH ENGINEERING AND TESTING SERVICES, LLC.

I do hereby authorize and direct the clerk of the above-entitled Court to enter satisfaction of record of said Judgment.

DATED this ⎣⎭day of June, 2023.

WILLIAMS ✙ STARBUCK

DONALD H. WILLIAMS, ESQ
Nevada Bar No. 5548
DREW J. STARBUCK, ESQ.
Nevada Bar No. 13964
WILLIAMS ✙ STARBUCK
612 So. Tenth Street
Las Vegas, Nevada 89101
*Attorneys for CONSTRUCTION TESTING SERVICES, LLC and FENAGH ENGINEERING AND TESTING SERVICES, LLC*

6



# EXHIBIT 51

## DECLARATION OF JIM SMITH

I, Jim Smith, being duly sworn, declare and state as follows:

1. I am over the age of eighteen years old and am competent to testify.

2. I have personal knowledge of the information in this Declaration.

3. I am a 1989 graduate of the University of Colorado Business School with an emphasis in Marketing and Real Estate. My professional background includes business development, operations, sales marketing, client retention, and real estate finance.

4. Messner Reeves, LLP ("Messner") is a Colorado limited liability partnership with its principal office in Denver, Colorado.

5. I am President of Messner and am familiar with its management and operations. I also have personal knowledge of the disbursements from Messner's COLTAF account in accordance with INBE's agreements with the parties and its joint venture partner Clearwater Premier Perpetual Master, LLC ("Clearwater").

6. Between April 21, 2023 and June 29, 2023, Plaintiffs deposited a total of $8,345,000.00 into the Messner COLTAF account.

7. INBE provided authorizations to Messner, confirmed by Clearwater, to disburse funds at its direction and benefit totaling $2,490,333.00 from the account holding the funds. Those authorizations are attached. INBE also authorized Clearwater to direct Messner to disburse the balance of the funds from the account holding the funds at Clearwater's discretion. Messner complied with these authorizations and distributed the funds at INBE's request or at Clearwater's request (after Clearwater confirmed its authority from INBE to direct Messner's disbursement of the funds), resulting in the funds being fully

disbursed. As previously reported, there were no funds from the above-referenced

$8,345,000.00 deposits remaining in the account by August 2, 2023.

I declare under penalty of perjury under the laws of the state of Colorado that the foregoing is

true and correct.

Executed on: October 29, 2025                    _____

                                                              Jim Smith

## Torben Welch

**From:**    Jonathan Wright <jonathan@theinbegroup.com>
**Sent:**    Friday, June 23, 2023 10:59 AM
**To:**     Torben Welch
**Subject:**   Payout information for wires to be sent
**Attachments:**  Payout info  6.16.23 pay date v2.xlsx

**Follow Up Flag:**  Follow up
**Flag Status:**   Flagged

**[ EXTERNAL EMAIL ]**



**Jonathan Wright**
Chief Funding Officer

✉ jonathan@theinbegroup.com

🏢 theinbegroup.com

📞 1-8044757454

🌐 United States



***Unlock Free-Flowing Liquidity Events Throughout The Entrepreneurial Life-Cycle.***

*CONFIDENTIALITY NOTICE: This email is private and only for the person who should receive it. It has important information that should not be shared with anyone else. If you got this email by mistake, please tell the person who sent it and delete it. This email is not advice about how to spend money, what to invest in or how to make important decisions. Some of the information might not be accurate or up-to-date, and we can't guarantee it's correct. We don't take responsibility for any problems that might happen if you use the information in this email. We also don't control other websites that are linked in this email and we can't promise those websites are trustworthy or safe to use.*
*Some of the statements in this information are predictions about the future, but we can't be certain that they will happen. We use words like 'may' and 'could' to show that we're not sure. Even though we think our predictions are reasonable, many things could happen to change them. For example, new competitors might enter the market or unexpected changes in government policies could occur. We don't have to update this information, but we might do so if something important changes. Please note that no official endorsement has been made regarding the accuracy or reliability of the information presented.*

*© 2022 INBE Group LLC. All rights reserved.*



## Torben Welch

| | |
|---|---|
| **From:** | Jonathan Wright <jonathan@theinbegroup.com> |
| **Sent:** | Thursday, June 29, 2023 7:41 PM |
| **To:** | Torben Welch |
| **Subject:** | Fwd: Re: Brandon Knowles paperwork Hachi's 15X Program |
| **Attachments:** | BrandonKnowlden_IDback.jpeg; BrandonKnowlden_IDfront.jpeg; BrandonKnowlden_Passport.jpeg; Hachi Final Investor Agreement.pdf; Irrevocable Fee Agreement Hachi Capital.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**[ EXTERNAL EMAIL ]**



**Jonathan Wright**
Chief Funding Officer

✉ jonathan@theinbegroup.com

🏢 theinbegroup.com

📞 1-8044757454

🌐 United States



*Unlock Free-Flowing Liquidity Events Throughout The Entrepreneurial Life-Cycle.*

=========== Forwarded Message ============
From : chris@theinbegroup.com
To : jonathan@theinbegroup.com
Date : Thu, 29 Jun 2023 14:50:21 -0400
Subject : Fwd: Re: Hachi's 15X Program
=========== Forwarded Message ============

Brandon's Paperwork.

1



**Chris Penfold**
Chief Strategy Officer

chris@theinbegroup.com

theinbegroup.com

61-403900780

Sydney

*Unlock Free-Flowing Liquidity Events Throughout The Entrepreneurial Life-Cycle.*

============ Forwarded message ============
From: Brandon Knowlden <brandon@brandonknowlden.com>
To: "Chris Penfold"<chris.penfold@blackhousepe.com>
Cc: <craig.boddington@blackhousepe.com>
Date: Wed, 27 Jul 2022 12:26:38 -0700
Subject: Re: Hachi's 15X Program
============ Forwarded message ============

Chris/Craig,

Thanks for your patience, travel got in the way. Please ignore previous email attachments. Fresh files attached.

Please respond that I the opportunity is still available and that I am approved to send a wire transfer for $15,000.
—

—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

On Jul 27, 2022, at 5:38 AM, Brandon Knowlden <brandon@brandonknowlden.com> wrote:

ID attached.
—

2

&lt;BrandonKnowlden_IDback.jpeg&gt;&lt;BrandonKnowlden_IDfront.jpeg&gt;
—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

> On Jul 27, 2022, at 6:37 AM, Brandon Knowlden
> &lt;brandon@brandonknowlden.com&gt; wrote:
>
> Hey Chris,
>
> I have everything signed, I have my state issued ID, but Passport is not on
> my computer or in the cloud. I can get that to you once landed, but the
> contracts request the Passport Number, so not sure we're good to go yet.
>
> You tell me…
> —
>
> &lt;Hachi Final Investor Agreement.pdf&gt;
>
> &lt;Irrevocable Fee Agreement Hachi Capital.pdf&gt;
>
>
> —
> **Brandon Knowlden**
> SME Investor / Consultant
>
> linkedin.com/in/brandonleo
> brandon@brandonknowlden.com
> (312) 730-8146
>
> > On Jul 27, 2022, at 6:01 AM, Brandon Knowlden
> > &lt;brandon@brandonknowlden.com&gt; wrote:
> >
> > Got caught up last night, airport now, trying to complete before
> > flight.
> >
> > Sent from my iPhone
> >
> > > On Jul 27, 2022, at 12:41 AM, Chris Penfold
> > > &lt;chris.penfold@blackhousepe.com&gt; wrote:
> > >
> > >
> > > Hi Brandon,
> > >
> > > Did you find the zip file from the original email.
> > >
> > > We'll have to work fast to get it all done.
> > >
> > > Speak soon.
> > >
> > > Cheers,

3

<1656125156582000_652347473.png>

**Chris Penfold**
Senior Partner

> Sydney, AU

> blackhousepe.com
> +61491066645

<Black-House-Blue-Trans-2.png>

---- On Sun, 24 Jul 2022 07:21:00 +1000 **brandon@brandonknowlden.com** wrote ----

Hey Chris,

It looks interesting, but where is the disclosure regarding what company you're purchasing and financials? All this says is that there is a $60K guarantee to be split amongst the Funders, of which you've also not disclosed how many there are.

I'll need more info to properly consider this.
—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

> On Jul 23, 2022, at 3:37 PM, Chris Penfold <chris.penfold@blackhousepe.com> wrote:
>
> Hey Brandon,
>
> Thanks for your interest in our 15X program.
>
> Inside the Zip file you'll find:
>
> 1. Investor Agreement
> 2. Irrevocable Fee Agreement
> 3. Wire Instructions
>
> It's important to keep the timeline in mind if you want to participate.

4

This closes (Strictly) on the 27th of July.

The program is relatively infrequent so in case you're wondering - no I don't know when the next one will be :)

Here's how things will need to go if you want to participate:

- Complete the agreements ASAP via DocuSign (or equivalent) and get it back to me ASAP
- Include copies of your passport and drivers licence when you send the signed agreement
- Complete the wire (funds must be in attorney account before the 27th of July)
- Send copy of the proof of wire via a screenshot or receipt when you send the funds
- We'll track it and confirm once cleared and the amount

We have a hard deadline of Wed 27th July US time. That's to have the documents completed and funds wired and cleared on that date (US) at the latest.

I know I'm repeating the deadline.
But it's Intentional.
I don't want expectations to be misaligned.

Miss the deadline = Miss the opportunity.

Now that we have that out of the way...
We're looking forward to having you in the program!
<smile.png>

5

Which dates will you complete each component?
Let me know.
Then I can be ready to move swiftly helping get it all processed and finalised for you by the 27th.

Ask any questions you need to.
We're happy to answer all of them.

Chat soon.

Cheers,

<1656125156582000_652347473.png>

**Chris Penfold**
Senior Partner

> Sydney, AU

> blackhousepe.com

> +61491066645

<Black-House-Blue-Trans-2.png>

<Hachi 15X Inves Pack 230722.zip>

CONFIDENTIALITY NOTICE: This email is private and only for the person who should receive it. It has important information that should not be shared with anyone else. If you got this email by mistake, please tell the person who sent it and delete it. This email is not advice about how to spend money, what to invest in or how to make important decisions. Some of the information might not be accurate or up-to-date, and we can't guarantee it's correct. We don't take responsibility for any problems that might happen if you use the information in this email. We also don't control other websites that are linked in this email and we can't promise those websites are trustworthy or safe to use.

Some of the statements in this information are predictions about the future, but we can't be certain that they will happen. We use words like 'may' and 'could' to show that we're not sure. Even though we think our predictions are reasonable, many things could happen to change them. For example, new competitors might enter the market or unexpected changes in government policies could occur. We don't have to update this information, but we might do so if something important changes. Please note that no official endorsement has been made regarding the accuracy or reliability of the information presented.

© 2022 INBE Group LLC. All rights reserved.

*CONFIDENTIALITY NOTICE: This email is private and only for the person who should receive it. It has important information that should not be shared with anyone else. If you got this email by mistake, please tell the person who sent it and delete it. This email is not advice about how to spend money, what to invest in or how to make important decisions. Some of the information might not be accurate or up-to-date, and we can't guarantee it's correct. We don't take responsibility for any problems that might happen if you use the information in this email. We also don't control other websites that are linked in this email and we can't promise those websites are trustworthy or safe to use.*

*Some of the statements in this information are predictions about the future, but we can't be certain that they will happen. We use words like 'may' and 'could' to show that we're not sure. Even though we think our predictions are reasonable, many things could happen to change them. For example, new competitors might enter the market or unexpected changes in government policies could occur. We don't have to update this information, but we might do so if something important changes. Please note that no official endorsement has been made regarding the accuracy or reliability of the information presented.*

*© 2022 INBE Group LLC. All rights reserved.*

## Torben Welch

| | |
|---|---|
| **From:** | Brandon Knowlden <brandon@brandonknowlden.com> |
| **Sent:** | Tuesday, July 11, 2023 2:36 PM |
| **To:** | Torben Welch |
| **Cc:** | Chris Penfold |
| **Subject:** | Re: Status update – Paymaster for INBE Group / Hachi 15x... |
| **Attachments:** | BrandonKnowlden_Info.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

[ EXTERNAL EMAIL ]

Torben,

Thanks for your response. PDF attached with Routing/Account numbers (password: 61-403900780).

If your team needs a verbal verification, I can be reached at (312) 730-8146.

—


—

**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146


On Jul 11, 2023, at 3:31 PM, Torben Welch <twelch@messner.com> wrote:

Brandon – missed your prior message.  I'm out of the office today but will be back in an process this tomorrow.

Can you please resend to me your banking coordinates?  Our accounting team will need to do a verbal verification of those tomorrow morning when we shoot them out as well.

**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021
**E:** twelch@messner.com


**From:** Brandon Knowlden <brandon@brandonknowlden.com>
**Date:** Tuesday, July 11, 2023 at 8:06 AM
**To:** Torben Welch <twelch@messner.com>

1

**Cc:** Chris Penfold <chris@theinbegroup.com>
**Subject:** Re: Status update – Paymaster for INBE Group / Hachi 15x...

**[ EXTERNAL EMAIL ]**

Hi Torben,

I hope this email got to you as I have not seen a response.

Please update me as to the status of the pay out at your convenience.
—

**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

> On Jul 5, 2023, at 3:36 PM, Brandon Knowlden <brandon@brandonknowlden.com>
> wrote:
>
> Hey Torben,
>
> I hope this email finds you well. I'm a friend of Chris Penfold and investor in the Hachi
> 15x Program, through the INBE Group.
>
> Chris has mentioned that you were going to reach out late last week or early this week
> with payout information, but I hadn't heard from you.
>
> I was hoping you could let me know what the timeline is looking like as I have some
> upcoming opportunities I have these proceeds earmarked for.
>
> Thanks in advance.
> —
>
> **Brandon Knowlden**
> SME Investor / Consultant
>
> linkedin.com/in/brandonleo
> brandon@brandonknowlden.com
> (312) 730-8146

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast**

2

**Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more <u>Click Here</u>.

**Torben Welch**

| | |
|---|---|
| **From:** | Torben Welch |
| **Sent:** | Wednesday, July 12, 2023 5:16 PM |
| **To:** | Chris Penfold |
| **Cc:** | Leon Chartue |
| **Subject:** | FW: Paymaster Payment |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Chris - $175k went out to Brandon.  He asked our accountant "what about the $50k" – any idea what that is?

Spoke to Tim Douglass as well.

**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Greg Morrison <gmorrison@messner.com>
**Sent:** Wednesday, July 12, 2023 2:40 PM
**To:** Torben Welch <twelch@messner.com>; Jim Smith <jsmith@messner.com>
**Subject:** RE: Paymaster Payment

Torben – Brandon asked about a $50K reinvestment amount and whether it was a part of today's wire, would you mind reaching out to him about that piece and how it may be handled.  Outside of that we was good with the $175K wire for today.

Jim – the wire's been released for approval.

Thanks

**GREG MORRISON**
Accountant
**O:** 303.623.1800 **E:** gmorrison@messner.com
1430 Wynkoop Street, Suite 300 Denver, CO 80202



www.messner.com

**From:** Torben Welch <twelch@messner.com>
**Sent:** Wednesday, July 12, 2023 1:04 PM
**To:** Jim Smith <jsmith@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** RE: Paymaster Payment

Sorry – he sent it to me yesterday.

password: 61-403900780


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020


**From:** Jim Smith <jsmith@messner.com>
**Sent:** Wednesday, July 12, 2023 1:03 PM
**To:** Torben Welch <twelch@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** RE: Paymaster Payment

Need PW for the PDF instructions


**JIM SMITH**
President
**Messner Reeves LLP**
**O:** 303.623.1800 **E:** jsmith@messner.com
1550 Wewatta Street, Suite 710 Denver, CO 80202


**From:** Torben Welch <twelch@messner.com>
**Sent:** Wednesday, July 12, 2023 12:58 PM
**To:** Jim Smith <jsmith@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** Paymaster Payment

2

Another Payment out from the INBE Paymaster amounts:

Amount:  $175k
To:  Brandon Knowlden
Contact info:  312-730-8146

Instructions attached.


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

www.messner.com



3

## Torben Welch

**From:** Chris Penfold <chris@theinbegroup.com>
**Sent:** Wednesday, July 12, 2023 7:56 PM
**To:** Torben Welch
**Cc:** Leon Chartue
**Subject:** Re: FW: Paymaster Payment

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

<mark>**[ EXTERNAL EMAIL ]**</mark>

Thanks Torben.

I know what he's referring to.

But he told us a while back that he wanted to reinvest 50K.

Here's a screenshot of the email.

I have no further correspondence stating anything different so that's what we went off.



1



**Chris Penfold**
Chief Strategy Officer

✉ chris@theinbegroup.com

🏢 theinbegroup.com

📞 61-403900780

🌐 Sydney



*Unlock Free-Flowing Liquidity Events Throughout The Entrepreneurial Life-Cycle.*

---

---- On Wed, 12 Jul 2023 16:16:13 -0700 **Torben Welch <twelch@messner.com>** wrote ---

Chris - $175k went out to Brandon.  He asked our accountant "what about the $50k" – any idea what that is?

Spoke to Tim Douglass as well.


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Greg Morrison <gmorrison@messner.com>
**Sent:** Wednesday, July 12, 2023 2:40 PM
**To:** Torben Welch <twelch@messner.com>; Jim Smith <jsmith@messner.com>
**Subject:** RE: Paymaster Payment

Torben – Brandon asked about a $50K reinvestment amount and whether it was a part of today's wire, would you mind reaching out to him about that piece and how it may be handled.  Outside of that we was good with the $175K wire for today.

Jim – the wire's been released for approval.

Thanks


**GREG MORRISON**
Accountant

2

**O:** 303.623.1800 **E:** gmorrison@messner.com
1430 Wynkoop Street, Suite 300 Denver, CO 80202



**From:** Torben Welch <twelch@messner.com>
**Sent:** Wednesday, July 12, 2023 1:04 PM
**To:** Jim Smith <jsmith@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** RE: Paymaster Payment

Sorry – he sent it to me yesterday.

password: 61-403900780


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020


**From:** Jim Smith <jsmith@messner.com>
**Sent:** Wednesday, July 12, 2023 1:03 PM
**To:** Torben Welch <twelch@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** RE: Paymaster Payment

Need PW for the PDF instructions


**JIM SMITH**
President
**Messner Reeves LLP**
**O:** 303.623.1800 **E:** jsmith@messner.com
1550 Wewatta Street, Suite 710 Denver, CO 80202

3

**From:** Torben Welch <twelch@messner.com>
**Sent:** Wednesday, July 12, 2023 12:58 PM
**To:** Jim Smith <jsmith@messner.com>; Greg Morrison <gmorrison@messner.com>
**Subject:** Paymaster Payment

Another Payment out from the INBE Paymaster amounts:

Amount:  $175k
To:  Brandon Knowlden
Contact info:  312-730-8146

Instructions attached.


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020



www.messner.com

### Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.


*CONFIDENTIALITY NOTICE: This email is private and only for the person who should receive it. It has important information that should not be shared with anyone else. If you got this email by mistake, please tell the person who sent it and delete it. This email is not advice about how to spend money, what to invest in or how to make important decisions. Some of the information might not be*

4

*accurate or up-to-date, and we can't guarantee it's correct. We don't take responsibility for any problems that might happen if you use the information in this email. We also don't control other websites that are linked in this email and we can't promise those websites are trustworthy or safe to use.*

*Some of the statements in this information are predictions about the future, but we can't be certain that they will happen. We use words like 'may' and 'could' to show that we're not sure. Even though we think our predictions are reasonable, many things could happen to change them. For example, new competitors might enter the market or unexpected changes in government policies could occur. We don't have to update this information, but we might do so if something important changes. Please note that no official endorsement has been made regarding the accuracy or reliability of the information presented.*

*© 2022 INBE Group LLC. All rights reserved.*

## Torben Welch

| | |
|---|---|
| **From:** | Chris Penfold <chris@theinbegroup.com> |
| **Sent:** | Monday, July 17, 2023 5:06 PM |
| **To:** | Torben Welch |
| **Cc:** | Craig Boddington; Jonathan Wright |
| **Subject:** | Re: FW: Status update – Paymaster for INBE Group / Hachi 15x... |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**[ EXTERNAL EMAIL ]**

The statement really should come directly from INBE Capital, right?
(unless you disagree)

Copying in Craig and Jonathan here.

We discussed this earlier today on a call.

Jonathan will issue Brandon with a statement.

And we'll go from there.

Better we get it off your plate.

Thanks,



**Chris Penfold**
Chief Strategy Officer

✉ chris@theinbegroup.com

🏢 theinbegroup.com

📞 61-403900780

🌐 Sydney



*Unlock Free-Flowing Liquidity Events Throughout The Entrepreneurial Life-Cycle.*

1

---- On Mon, 17 Jul 2023 15:54:04 -0700 **Torben Welch <twelch@messner.com>** wrote ---

What do we need to tell him on this one?


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020

---

**From:** Brandon Knowlden <brandon@brandonknowlden.com>
**Sent:** Monday, July 17, 2023 3:13 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Donna DeFalco <DDeFalco@messner.com>
**Subject:** Re: Status update – Paymaster for INBE Group / Hachi 15x...

Hi Torben,

I hope you're traveling s going well. I wanted to follow up on my email below.
—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146


> On Jul 14, 2023, at 4:48 PM, Brandon Knowlden <brandon@brandonknowlden.com> wrote:
>
> Hi Torben,
>
> The $175k hit my account the other day after a call from your accounting team – thank you for that.
>
> The net proceeds were actually $225k and I was hoping to get some sort of an account statement for my CPA to prove the balance. Additionally, Chris has not yet identified a reinvestment strategy fro the $50k, so I may want to have the remainder disbursed to the same account until that time.
>
> Can you please advise on the account statement, as well as the potential disbursement process for the $50k balance?
> —
> **Brandon Knowlden**
> SME Investor / Consultant
>
> linkedin.com/in/brandonleo
> brandon@brandonknowlden.com
> (312) 730-8146


>> On Jul 12, 2023, at 1:09 PM, Torben Welch <twelch@messner.com> wrote:

It is in process with the accounting team. We have procedures that must be followed.  I assume you will get a call today to verify wire instructions.
Sent from my mobile device - please excuse any typos

On Jul 12, 2023, at 12:08 PM, Brandon Knowlden <brandon@brandonknowlden.com> wrote:

**[ EXTERNAL EMAIL ]**

Hi Torben,

Following up on yesterday's email and I've CC'ed your assistant just in case.

What is needed from me for the wire transfer?
—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

On Jul 11, 2023, at 3:38 PM, Torben Welch <twelch@messner.com> wrote:

Thank you Brandon.  My apologies again for missing the initial message – I've on city 2 of a three city tour this week.  Plan will be to verify and issue tomorrow.

**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021
**E:** twelch@messner.com

**From:** Brandon Knowlden <brandon@brandonknowlden.com>
**Date:** Tuesday, July 11, 2023 at 1:37 PM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Chris Penfold <chris@theinbegroup.com>
**Subject:** Re: Status update – Paymaster for INBE Group / Hachi 15x...

3

[ EXTERNAL EMAIL ]

---

Torben,

Thanks for your response. PDF attached with Routing/Account numbers (password: 61-403900780).

If your team needs a verbal verification, I can be reached at (312) 730-8146.

—

—

**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

> On Jul 11, 2023, at 3:31 PM, Torben Welch <twelch@messner.com> wrote:
>
> Brandon – missed your prior message.  I'm out of the office today but will be back in an process this tomorrow.
>
> Can you please resend to me your banking coordinates?  Our accounting team will need to do a verbal verification of those tomorrow morning when we shoot them out as well.
>
> **TORBEN M. WELCH**
> Partner
> *Licensed in UT, NY, and CO*
> **Messner Reeves LLP**
> **D:** 801.683.2021
> **E:** twelch@messner.com

---

**From:** Brandon Knowlden <brandon@brandonknowlden.com>
**Date:** Tuesday, July 11, 2023 at 8:06 AM

4

**To:** Torben Welch <twelch@messner.com>
**Cc:** Chris Penfold <chris@theinbegroup.com>
**Subject:** Re: Status update – Paymaster for INBE Group / Hachi 15x...

**[ EXTERNAL EMAIL ]**

---

Hi Torben,

I hope this email got to you as I have not seen a response.

Please update me as to the status of the pay out at your convenience.
—
**Brandon Knowlden**
SME Investor / Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.com
(312) 730-8146

> On Jul 5, 2023, at 3:36 PM, Brandon Knowlden <brandon@brandonknowlden.com> wrote:
>
> Hey Torben,
>
> I hope this email finds you well. I'm a friend of Chris Penfold and investor in the Hachi 15x Program, through the INBE Group.
>
> Chris has mentioned that you were going to reach out late last week or early this week with payout information, but I hadn't heard from you.
>
> I was hoping you could let me know what the timeline is looking like as I have some

5

upcoming
opportunities I have
these proceeds
earmarked for.

Thanks in advance.
—
**Brandon Knowlden**
SME Investor
/ Consultant

linkedin.com/in/brandonleo
brandon@brandonknowlden.
com
(312) 730-8146

## Disclaimer

The information contained in this
communication from the sender is
confidential. It is intended solely for use by
the recipient and others authorized to
receive it. If you are not the recipient, you
are hereby notified that any disclosure,
copying, distribution or taking action in
relation of the contents of this information is
strictly prohibited and may be unlawful.

This email has been scanned for viruses and
malware, and may have been automatically
archived by **Mimecast Ltd**, an innovator in
Software as a Service (SaaS) for business.
Providing a **safer** and **more useful** place
for your human generated data. Specializing
in; Security, archiving and compliance. To
find out more Click Here.

CONFIDENTIALITY NOTICE: This email is private and only for the person who should receive it. It has important information that
should not be shared with anyone else. If you got this email by mistake, please tell the person who sent it and delete it. This email is
not advice about how to spend money, what to invest in or how to make important decisions. Some of the information might not be
accurate or up-to-date, and we can't guarantee it's correct. We don't take responsibility for any problems that might happen if you
use the information in this email. We also don't control other websites that are linked in this email and we can't promise those
websites are trustworthy or safe to use.
Some of the statements in this information are predictions about the future, but we can't be certain that they will happen. We use
words like 'may' and 'could' to show that we're not sure. Even though we think our predictions are reasonable, many things could
happen to change them. For example, new competitors might enter the market or unexpected changes in government policies could
occur. We don't have to update this information, but we might do so if something important changes. Please note that no official
endorsement has been made regarding the accuracy or reliability of the information presented.

© 2022 INBE Group LLC. All rights reserved.

# EXHIBIT 52

Docusign Envelope ID: FF06D975-68AC-4CCA-80E8-27128219C2F9

# **DECLARATION OF CRAIG BODDINGTON**

### SUPPLEMENT REGARDING FACTUAL BACKGROUND
### RELATING TO INBE CAPITAL LLC AND MESSNER REEVES LLP

I, Craig Boddington, declare as follows:

1.     I am over the age of eighteen and competent to testify. I make this Supplemental Declaration based on my personal knowledge and review of relevant records. This declaration supplements and amends my Declaration dated October 16, 2025, which is incorporated by reference.

2.     To facilitate full and candid disclosure by Messner Reeves, LLP and any other parties regarding the handling of borrower escrow deposits—including those received by Messner between April 2023 and August 2023 in connection with the Business Expansion Line of Credit ("BELOC") program—I make the following statements:

3.     INBE Capital LLC hereby knowingly, intentionally, and voluntarily waives any and all attorney-client privilege, work product protection, or other confidentiality or privilege claims, for all purposes, as to the following:

- All documents, communications, and instructions relating to the escrowed funds held by Messner;

- All documents and communications between INBE and Messner;

- All documents and communications between or among INBE and Clearwater Premiere Perpetual Master LLC ("Clearwater");

- All documents, communications, authorizations, or instructions concerning the BELOC program, including but not limited to any that relate to escrow deposits made by or on behalf of Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies LLC, or HomePeople Corporation, and any similarly situated parties.

Docusign Envelope ID: FF06D975-68AC-4CCA-80E8-27128219C2F9

4.      This waiver applies broadly regardless of whether such materials were previously designated confidential or privileged, and it is intended to remove any basis for Messner, Clearwater, or any other party to withhold documents or communications relevant to the BELOC program or the subject escrow funds. All such materials should be produced without redaction or restriction.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Signed by:

*Craig Boddington*

F277CDEA9CED408...

11/3/2025

_____

Craig Boddington
Managing Member, INBE Capital LLC

2

# EXHIBIT 53



December 1, 2025

Eric Deitz
Gordon Rees Scully Mansukhani
101 W. Broadway, Suite 2000
San Diego, CA 92101

Kenneth E. Chase
Chase Law & Associates, P.A
951 Yamato Road, Suite 280
Boca Raton, Florida 33431
t 305.402.9800
kchase@chaselaw.com
www.chaselaw.com

*Via email to edeitz@grsm.com*

> Re:   *Ninth Demand for Accounting of Victims' Missing $8.3
> Million in Escrow Funds Taken from Messner Reeves,
> LLP's Trust Account*

Dear Mr. Deitz:

As you know, I represent Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies, LLC, and HomePeople Corp. ("Plaintiffs"). This letter follows my eight prior written requests to you dated July 31, 2025, August 5, 2025, August 13, 2025, August 26, 2025, October 9, 2025, October 23, 2025, November 4, 2025, and November 12, 2025. On each of these prior occasions and again here, I have asked you to have your client Messner Reeves LLP provide an accounting of the $8,345,000 in escrow funds that your client acknowledges receiving from my clients between April 21, 2023 and June 29, 2023. Inexplicably, we still have not received this accounting. My clients also demand the immediate return of these funds.

### I.   The October 29, 2025 Declaration of Jim Smith, Inclusive of its Attachments, Contains no "Disbursement Instructions" or Confirmation of the Location of the Missing Escrow Funds.

The president of Messner Reeves, LLP, Jim Smith, confirmed in his October 29, 2025 declaration that my clients wired a total of $8,345,000 in escrow deposits into Messner Reeves's COLTAF (IOLTA) account between April 21, 2023 and June 29, 2023. Smith now states, for the first time, that no funds from those deposits remained in the account by August 2, 2023.



Smith previously stated on February 20, 2025 that the funds were disbursed by July 31, 2024, not by August 2, 2023. Smith has never answered our demand for an accounting. Aside from the false statements about the missing money made by Torben Welch and others on his behalf, Messner Reeves has never actually stated where the funds were sent, why the funds were sent there, or when the deposits will be returned to the those from whom the money was taken.

Page 2

The BELOC agreement drafted by your client required the funds to remain in Messner's sole possession and control until funding occurred. Funding never occurred. INBE's CEO, Craig Boddington, provided a sworn statement attesting that INBE did not provide any authorizations to Messner Reeves for disbursement of my clients' $8,345,000 in escrow funds. Text messages between Boddington and Welch demonstrate the same absence of "disbursement instructions." In fact, Boddington's more recent communications, including his requests for an accounting, were ignored by Welch.

Smith states in his declaration that "INBE provided authorizations" for the disbursement of $2,490,333 and that the "disbursement authorizations are attached." This is false. First, per the BELOC that your client drafted and used to obtain the escrow deposits, in the absence of funding of the loans (which undisputedly occurred here), the only parties with authority to issue "disbursement authorizations" would be Plaintiffs. And Plaintiffs provided no such disbursement authorizations to Messner Reeves. In the absence of funding, the BELOC that Messner drafted prohibited Messner from removing the funds outside Messner's sole possession and control. Second, Smith's Declaration does not even address 70% of the missing escrow funds, as Smith references only $2,490,333 out of the $8,345,000 and Smith provides no explanation whatsoever for $5,854,667 of the missing $8,345,000. For obvious reasons, an accounting is overdue.



## II.   The Attachments to the October 29, 2025 Declaration of Jim Smith are Not Disbursement Instructions.

Page 3

The six attachments to Smith's declaration are as follows:

1. **June 23, 2023 email from Jonathan Wright to Torben Welch with no content in the body of the email.**  This is not a "disbursement authorization." There is no content in the body of the email. There appears to be a corresponding Excel spreadsheet entitled "Payout info 6.16.23 pay date v2.xls."  The spreadsheet printout reflects three transactions totaling $2,315,333.00 that we've previously identified as having been wired out on July 3, 2023: (1) $973,333 to HomePeople Corp, (2) $1,274,000 to Master Systems Integrators LLC, and (3) $68,000.00 to Phoenix GC LLC.  The spreadsheet further references $852,586 to Transphorm LLC, but it does not indicate whether those funds were sent.  The June 23, 2023 email from Wright with no content in the body of the message is not a "disbursement authorization."

2. **June 29, 2023 email from Wright to Welch with no content in the body of the email**.  The email appears to contain prior forwarded emails, including correspondence from approximately a year earlier on July 27, 2022 between a person named Brandon Knowlden and two individuals at BlackHousePE.  INBE was not even created until two months later on September 26, 2022.  In the correspondence, Knowlden references his willingness to "send a wire transfer for $15,000."  There is no confirmation of whether the $15,000 was sent in July 2022 by Knowlden. These forwarded messages are not a "disbursement authorization."

3. **July 11, 2023 email from Knowlden to Welch, copied to Chris Penfold of INBE**, where Knowlden references an attached PDF (which was not provided) with bank instructions.  The email appears to contain prior correspondence dating back to July 5, 2023 between Knowlden and Welch, whereby Knowlden introduces



Page 4

himself to Welch by email six days earlier on July 5, 2023. Welch did not respond to the email. Knowlden followed up on July 11, 2023 and exchanged one email before apparently providing banking instructions. There is no "disbursement authorization" here and no amount is specified.

4. **July 12, 2023 email from Welch to Penfold at 5:16 pm, copied to "Leon Chartue"** which is the alias for convicted felon and recidivist criminal fraudster Daniel Chartraw. The email contains prior correspondence among Welch and two other persons at Messner, Jim Smith (Messner president) and Greg Morrison (Messner accountant). The prior emails contain a July 12, 2023 email at 12:58 pm from Welch to Smith and Morrison directing them to make a "Payment" out from the "INBE Paymaster amounts" of $175,000 to Knowlden. The only "disbursement authorization" here is from Welch to two other people at the Messner firm. In the July 12, 2023 email from Welch at 5:16 pm, Welch states that "$175k went out to Brandon" and that Knowlden asked "what about the $50k," Welch asked "any idea what that is? There is no "disbursement authorization" here from anyone other than Welch.

5. **July 12, 2023 email from Penfold at 7:56 pm, replying to Welch and copied to "Leon Chartue,"** who is the felon Chartraw. In the email, Penfold stated that the "$50k" referenced by Knowlden is explained as "[b]ut he told us a while back that he wanted to reinvest 50K." The email contains apparent screenshots of correspondence between Knowlden and Penfold, copied to Boddington and Wright, on December 14, 2022, whereby Knowlden states, "[y]ou had initially requested $50k, so I'm happy to roll that back in and extract…" The remainder of the screen shot is cut off. This email contains no "disbursement authorization." It is only an explanation for why an additional $50,000 was not paid to Knowlden. This is not a "disbursement authorization."



Page 5

6. **July 17, 2023 email from Penfold to Welch, copied to Boddington and Wright,** whereby Penfold states that Wright will issue Knowlden a statement regarding the $50K that Knowlden referenced. The email contains prior correspondence among Welch, Knowlden and Welch's assistant, Donna DeFalco, whereby Knowlden confirms receipt of the $175k and inquires about the other $50k. The emails do not reflect any "disbursement authorization."

As set forth in detail above, the attachments to Smith's October 29, 2025 declaration contain no "disbursement authorizations" from INBE for any amount, let alone an amount totaling $2,490,333. The $2,490,333 figure appears to be the sum of three of four items in the 6.16.23 spreadsheet sent as an attachment by Wright to Welch in an email with no text in the body and $175,000 sent to Knowlden approximately a week later at Knowlden's own request. The attachments to Smith's October 29, 2025 declaration also contain no indication that "INBE also authorized Clearwater to direct Messner to disburse the balance of the funds from the account holding the funds at Clearwater's discretion."

## III.    Messner Failed to Acknowledge or Explain $3,542,594 in Known and Unauthorized Transfers.

| Recipient | Funds Transferred | Date |
|---|---|---|
| Payment of Dribble Dunk debt owed to engineers Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC, paid to counsel | $904,777 | 5/15/2023 |
| Daniel Chartraw, Citibank x-5062 | $853,898 | 5/1/2023 to 10/26/2023 |
| Dribble Dunk, JP Morgan Chase x-9738 | $758,918 | 4/28/2023 to 8/16/2023 |
| Clearwater, Bank of America x-2332 | $500,000 | 4/24/2023 to 10/26/2023 |



| | | 5/1/2023 to |
|---|---|---|
| Todd Owen, JP Morgan Chase x-6596 | $465,000 | 10/26/2023 |
| Clearwater, Axos Bank | $30,000 | 6/20/2023 |
| INBE-Clear Capital, LLC, Axos Bank | $30,000 | 6/20/2023 |
| **TOTAL** | **$3,542,594** | |

Page 6

None of the $3,542,594 in transfers above, or the $2,490,333 below, totaling $6,032,927, were authorized.

| Recipient | Funds Transferred | Date |
|---|---|---|
| Master Systems Integrators LLC (Wells Fargo) | $1,274,000 | 7/3/2023 |
| HomePeople Corp. (BOA) | $973,333 | 7/3/2023 |
| Phoenix GC, LLC (BOA) | $68,000 | 7/3/2023 |
| Brandon Knowlden | $175,000 | 7/12/2023 |
| **TOTAL** | **$2,490,333** | |

## IV.    Messner Reeves' Liability to Plaintiffs for the Missing $8,345,000 is Not Genuinely in Dispute.

Messner Reeves now attests that the full $8,345,000 was transferred out of the trust account by August 2, 2023. If this is true, then Messner undisputedly and repeatedly lied about the status of the escrow funds for months or years. Messner still has not disclosed where all the money was sent. Messner Reeves' liability for the loss of the full $8,345,000 is not genuinely or legitimately in dispute. Plaintiffs again demand for the ninth time that Messner Reeves address this matter with an accounting and the return the missing escrow funds without further delay. If you disagree with any points in this letter, I request that you provide a full explanation in writing within 14 days. Absent a full explanation, any failure to address this matter is properly treated as an admission.

Very truly yours,

Kenneth E. Chase

# EXHIBIT 54

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | Eric Deitz |
| **Cc:** | Darren D. Sturges; Hannah Brown Goehring |
| **Subject:** | Request for Accounting to Messner Reeves LLP, Torben Welch, Jim Smith, Caleb Meyer, and Michelle Harden |
| **Date:** | Friday, December 19, 2025 12:45:00 PM |
| **Attachments:** | image001.png<br>INBE Request for Accounting to Messner Reeves.pdf<br>Messner - Letter re Escrow Deposits 12.1.2025.pdf<br>Updated Smith affidavit.pdf<br>REGARDING FACTUAL BACKGROUND RELATING TO INBE CAPITAL LLC AND MESSNER REEVES LLP 10.16.2025.pdf<br>REGARDING FACTUAL BACKGROUND RELATING TO INBE CAPITAL LLC AND MESSNER REEVES LLP 10.30.2025.pdf<br>Torben Welch Text re Interplead the Funds.pdf |
| **Importance:** | High |

Mr. Deitz:

As you know, on 14 prior occasions dating back five months, I have repeatedly demanded an accounting of the unreturned $8.3 million in escrow deposit money on behalf of my clients, Kosher Eats, LLC, Emerald Consulting Partners LLC, MSC Companies, LLC, Abbson LLC, and Homepeople Corporation.

Not only has no accounting been provided, counsel for Messner Reeves LLP has not substantively acknowledged the consistent demands for an accounting or explained why an accounting has not been provided.  The dates of my prior requests to Mr. Deitz are as follows:

1. July 31, 2025,
2. August 5, 2025,
3. August 13, 2025,
4. August 26, 2025,
5. October 9, 2025,
6. October 23, 2025,
7. November 4, 2025,
8. November 12, 2025
9. December 1, 2025
10. December 2, 2025
11. December 5, 2025
12. December 15, 2025
13. December 17, 2025
14. December 18, 2025

This email is my 15th (fifteenth) request for an accounting to you made on behalf of my clients, who still have not received a truthful explanation for the disappearance of their $8.3 million in escrow money in Messner Reeves LLP's trust account.

Also attached is a request for an accounting from INBE Capital LLC to Messner Reeves LLP and its

leadership.  Please confirm that you have provided my demands on behalf of my clients for an accounting, and INBE's demand for an accounting, to Messner Reeves LLP, Torben Welch, Jim Smith, Caleb Meyer, and Michelle Harden.

Once again: kindly have your client provide a written accounting regarding the escrow deposits immediately and without delay.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

# EXHIBIT 55

Docusign Envelope ID: 7AC88334-F976-4C6F-97FC-72B3CB75E48B

# REQUEST FOR ACCOUNTING OF ESCROW DEPOSITS

**TO: MESSNER REEVES LLP; TORBEN WELCH; JIM SMITH (PRESIDENT); CALEB MEYER (CEO); MICHELLE HARDEN (COO)**

**FROM: INBE CAPITAL LLC**

Dear Messner Reeves LLP, Mr. Welch, Mr. Smith, Mr. Meyer, and Ms. Harden:

On behalf of INBE Capital LLC, I hereby request an accounting regarding the following escrow deposits:

| Date | Inbound Wire of Plaintiffs' Money into Messner Reeves' Trust Account | Sender |
|---|---|---|
| 4/20/2023 | $1,000,000.00 | Homepeople Corp. |
| 4/27/2023 | $2,000,000.00 | Kosher Eats, LLC |
| 6/13/2023 | $700,000.00 | Emerald Consulting Partners LLC |
| 6/22/2023 | $1,145,000.00 | MSC Companies, LLC |
| 6/29/2023 | $3,500,000.00 | Abbson LLC |
| | | |
| Total | $8,345,000.00 | |

Please provide a written accounting via email to craig.boddington@gmail.com and to counsel for the above-referenced senders, who I understand has also requested this information, without delay.

Signed by:

*Craig Boddington*
F277CDEA9CED408...

12/19/2025

Craig Boddington
Managing Member, INBE Capital LLC

# EXHIBIT 56

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | "Eric Deitz"; "Hannah Brown Goehring" |
| **Cc:** | Darren D. Sturges |
| **Subject:** | RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction |
| **Date:** | Friday, December 19, 2025 9:28:00 PM |
| **Attachments:** | image001.png |
| | Messner CA - Jim Smith Deposition Re-Notice 12.19.2025.pdf |

Eric,

Jim Smith failed to appear for his duly-noticed deposition today.  Now I must document again your client's misuse of the discovery process and the apparent lack of good faith.

I left a voicemail for you (again) today. I would appreciate a return call. I will point out for the record that I do not believe you have ever returned any of my calls when I have left you voicemails. Moreover, you have a habit of ignoring my meet and confer correspondence. As stated below, Mr. Smith's deposition notice was not withdrawn and the witness was not released from his obligation to appear for his deposition today.  His non-appearance, as well as your non-appearance, was unexcused and without good cause.

Per my voicemail to you today, please return my call so that we can meet and confer on my clients' forthcoming motion to compel Mr. Smith's appearance at his deposition.

As part of our continuing efforts to mitigate the prejudice caused by your client's misuse of the discovery process, I am serving a re-notice of Mr. Smith's deposition to occur on December 30, 2025 at 12:00 pm PST after Mr. Morrison's deposition. I still intend to move to compel Mr. Smith's deposition due to his failure to appear today.  If Mr. Smith appears for his deposition on December 30, 2025, I will consider withdrawing that motion.

We request and expect your cooperation.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you*

*received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Kenneth E. Chase
**Sent:** Thursday, December 18, 2025 4:20 PM
**To:** Eric Deitz <edeitz@grsm.com>; Hannah Brown Goehring <hbrown@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Eric and Hannah,

The deposition of Jim Smith was properly noticed and remains on calendar. Your email confirms that Smith will not appear.

Plaintiffs do not agree to withdraw or vacate the deposition. Plaintiffs expressly reserve all rights under Code of Civil Procedure § 2025.450, including the right to seek an order compelling Smith's attendance and appropriate sanctions.

Plaintiffs further note that Messner Reeves still has not served substantive responses to written discovery requests propounded in July 2025 and have not provided an accounting of the escrow funds at issue despite repeated requests.

Plaintiffs remain prepared to proceed with discovery and to meet and confer in good faith, but will seek court intervention as necessary to secure Defendant's compliance with its discovery obligations.

Thank you.


**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

---

**From:** Eric Deitz <edeitz@grsm.com>

**Sent:** Thursday, December 18, 2025 3:47 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Hannah Brown Goehring <hbrown@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Ken,

As I previously indicated, Jim Smith has a conflict tomorrow and is not available to be deposed. (See, email dated December 12, 2025, sent at 5:22 p.m. (Pacific), and objection e-served the same date. I also have a conflict tomorrow morning (Pacific). To reiterate, Mr. Smith will not appear for his deposition tomorrow.

In the email referenced above, I offered several alternative dates for Mr. Smith's deposition (January 27, 29 and 30). I also offered a declaration in lieu of the deposition of Greg Morrison, an offer you declined.

I understand Mr. Morrison is not available December 30, 2025. We will obtain a few alternative dates and provide the same.

---

**ERIC R. DEITZ** (He/Him/His)
Partner



**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE LAW FIRM™**
**D:** 619.230.7762
**E:** edeitz@grsm.com  |  grsm.com
101 W. Broadway, Suite 2000, San Diego, CA 92101
633 West Fifth Street, 52nd Floor, Los Angeles, CA 90071

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Thursday, December 18, 2025 11:59 AM
**To:** Hannah Brown Goehring <hbrown@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Hannah, as you know, Jim Smith's deposition is scheduled for tomorrow.  You're copied on all the emails (see attached).  Your co-counsel has become unresponsive about whether your witness will appear for his already-noticed deposition tomorrow.  You're representing that you're perfectly available tomorrow, and you're eager to talk.  So- can you please confirm that Jim Smith will be appearing for his deposition tomorrow.

Once we know the answer to that, we will be in a better position to discuss your request to meet and confer.

Also, and most importantly- will your client be returning my clients' money?  Please answer that question.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Hannah Brown Goehring <hbrown@grsm.com>
**Sent:** Thursday, December 18, 2025 2:50 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Happy to discuss tomorrow. Does anything in the proposed time below work for you?

Hannah

**HANNAH BROWN GOEHRING**
Partner



**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE LAW FIRM™**
**D:** 303.200.6874
**E:** hbrown@grsm.com  |  grsm.com  |  Bio

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Thursday, December 18, 2025 11:15 AM
**To:** Hannah Brown Goehring <hbrown@grsm.com>; Eric Deitz <edeitz@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>

**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

In the meantime, would you please be so kind as to answer my questions below about my clients' escrow money.  Will your client be returning the money to my clients?  What is the delay in providing an accounting and why are you avoiding it so intensely?

I would greatly appreciate a clear and candid "yes" or "no" answer to the question of whether your client will be returning my clients' money.  Will you please answer that question.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280
Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Hannah Brown Goehring <hbrown@grsm.com>
**Sent:** Thursday, December 18, 2025 1:08 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>; Eric Deitz <edeitz@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** RE: Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Ken, we would like to meet and confer on our forthcoming demurrer tomorrow. We can also discuss your meet and confer request below.
Does tomorrow between 12-3 PST work?

Hannah

**HANNAH BROWN GOEHRING**
Partner

**GORDON REES SCULLY MANSUKHANI**
**YOUR 50 STATE LAW FIRM™**
**D:** 303.200.6874
**E:** hbrown@grsm.com  |  grsm.com  |  Bio

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Wednesday, December 17, 2025 11:38 PM
**To:** Eric Deitz <edeitz@grsm.com>; Hannah Brown Goehring <hbrown@grsm.com>
**Cc:** Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** Kosher Eats, LLC, et al v. Messner Reeves, LLP, et al, 30-2025-01490036-CU-BT-CXC, Meet and Confer on Motion for Preliminary Injunction

Eric,

This email constitutes a meet-and-confer regarding Plaintiffs' forthcoming motion for a preliminary injunction seeking an accounting of the missing $8,345,000 in escrow funds and an order requiring your client to deposit any remaining escrow funds into the Court's registry.

As discussed in my December 1, 2025 letter, Jim Smith's October 29, 2025 declaration does not contain "disbursement authorizations" or an accounting.  Smith asserted that the funds were "fully disbursed" by August 2, 2023, but Smith failed to provide an accounting of the missing funds.

And yet, on February 27, 2024, Torben Welch texted Craig Boddington and stated: "out of my hands - partners don't want to settle. The plan is to interplead funds and fight."

If the funds were "fully disbursed" by August 2, 2023, as Smith asserted, why did Welch say to his client that the "plan is to interplead funds?" Funds cannot be interpleaded if the funds were already fully disbursed.

Because Plaintiffs have not received an accounting despite repeated requests, Plaintiffs intend to seek relief from the Court. Nonetheless, we would like to further meet and confer to ascertain whether this issue can be resolved without burdening the Court.

Please let me know what times you will be available tomorrow for a meet and confer discussion to occur tomorrow.

Thank you.

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Boca Raton Office**
951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for

the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

# EXHIBIT 57



January 5, 2026

Eric Deitz
Gordon Rees Scully Mansukhani
101 W. Broadway, Suite 2000
San Diego, CA 92101

*Via email to edeitz@grsm.com*

Kenneth E. Chase
Chase Law & Associates, P.A
951 Yamato Road, Suite 280
Boca Raton, Florida 33431
t 305.402.9800
kchase@chaselaw.com
www.chaselaw.com

      *Re:    Kosher Eats, LLC, et al. v. Messner Reeves, LLP*
              *30-2025-01490036-CU-BT-CXC*
              *Messner Reeves, LLP's Refusal to Provide Accounting of*
              *Escrow Funds, Failure to Respond in Good Faith*

Dear Mr. Deitz:

It has been 35 days since you received my December 1, 2025 letter. In that letter, Plaintiffs demanded, once again, an accounting of their $8,345,000 in missing escrow funds. No accounting has been received.

In my December 1, 2025 letter, I also asked you to provide a full explanation in writing within 14 days as to any disagreement with any points in my letter. I stated 35 days ago that absent a full explanation, any failure to address this matter is properly treated as an admission.

On December 1, 2025, you responded to my email with the letter as follows: "Received and will review." But you have not responded to my letter. I have sent you 21 emails since that time. You have ignored my letter and you continue to ignore my clients' requests for an accounting. Please let me know immediately if you have not conveyed my correspondence to your client.

Very truly yours,

Kenneth E. Chase

# EXHIBIT 58



January 5, 2026

Eric Deitz
Gordon Rees Scully Mansukhani
101 W. Broadway, Suite 2000
San Diego, CA 92101

Kenneth E. Chase
Chase Law & Associates, P.A
951 Yamato Road, Suite 280
Boca Raton, Florida 33431
t 305.402.9800
kchase@chaselaw.com
www.chaselaw.com

*Via email to edeitz@grsm.com*

> Re: *Kosher Eats, LLC, et al. v. Messner Reeves, LLP*
> *Orange County 30-2025-01490036-CU-BT-CXC*
> *Meet and Confer re Discovery Served July 31, 2025*
> *Amended Responses Served January 2, 2026*

Dear Mr. Deitz:

As you know, Kosher Eats served its First Sets of Special Interrogatories, Requests for Production, and Requests for Admissions on July 31, 2025, and your client's responses were due September 2, 2025. On that date, your office served unsworn "responses" consisting only of cross-references to the same boilerplate objections for every discovery request. On October 10, 2025, Judge Claster expressly held that such boilerplate objections by your client, asserted without regard to the specific discovery request, are improper and subject to sanctions. See also *The Rutter Group California Practice Guide: Civil Procedure Before Trial* ¶ 8:1071 (boilerplate objections are disfavored and may result in sanctions).

On January 2, 2026, approximately three months after the Court's ruling, your client served "Amended Responses" to all three sets of discovery. Those Amended Responses remain fundamentally non-compliant. They add new objections that are untimely, repeat the same global boilerplate objections Judge Claster has already rejected, and still do not provide straightforward, code-compliant answers. Your client still has not produced a single document, a privilege log, or a cogent explanation for the disappearance of Plaintiffs' money.



Pa e 2

Plaintiffs are entitled to clear answers as to what occurred with their escrow deposits in the summer of 2023: where the money went, when, on whose instructions, and what, if anything, is being done to return it. Your client admits that Plaintiffs wired a total of $8,345,000 into Messner's COLTAF account between April 21, 2023 and June 29, 2023, and that those funds were "fully disbursed" by August 2, 2023, supposedly pursuant to a authorization, now purported to be verbal on a Zoom call, from an unnamed representative at INBE on an unknown date. The story keeps changing. And Messner still refuses to (a) identify the transfers and recipients, (b) produce any purported "authorizations," or (c) produce complete trust-account records. Yet Messner improperly relies simultaneously on those unspecified "authorizations" and bank records, which have not been produced, as a core defense and in lieu of written answers.

Your client's Amended Responses are flagrantly evasive. Many responses assert privileges in sweeping, categorical fashion (including as to engagement agreements and purported "authorizations") without providing any privilege log and without stating whether non-privileged responsive material is being withheld. None of your client's responses to RFPs expressly indicate whether documents are being withheld pursuant to any objections. In other responses, Messner, five months after service, claims to "lack sufficient information" to answer even basic questions about transfers from its own trust account, while failing to attest that a diligent search was conducted or to explain why trust account records cannot be examined.

You previously represented that "disbursement authorizations" were attached to Jim Smith's October 29, 2025 declaration, but that declaration contains no such authorizations and none have been produced to date. Messner has also repeatedly stated that it would produce bank records in response to multiple requests, but no such records have been produced. Plaintiffs have received no documents at all including no communications of any kind (such as email, text, WhatsApp, Signal), no contracts, and no corroborating documents whatsoever from Messner showing who authorized the transfers, where the money went, or why.



Despite Messner's stonewalling, evasion, and misdirection, Plaintiffs have independently uncovered the following transfers, totaling $3,542,594, which Messner has not acknowledged or explained (other than confirming the Dribble Dunk transfers):

Pa e 3

| Recipient | Funds Transferred | Date |
|---|---|---|
| Payment of Dribble Dunk debt owed to engineers Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC, paid to counsel | $904,777 | 5/15/2023 |
| Daniel Chartraw, Citibank x-5062 | $853,898 | 5/1/2023 to 10/26/2023 |
| Dribble Dunk, JP Morgan Chase x-9738 | $758,918 | 4/28/2023 to 8/16/2023 |
| Clearwater, Bank of America x-2332 | $500,000 | 4/24/2023 to 10/26/2023 |
| Todd Owen, JP Morgan Chase x-6596 | $465,000 | 5/1/2023 to 10/26/2023 |
| Clearwater, Axos Bank | $30,000 | 6/20/2023 |
| INBE-Clear Capital, LLC, Axos Bank | $30,000 | 6/20/2023 |
| **TOTAL** | **$3,542,594** | |

In addition, Plaintiffs identified the following transfers, totaling $2,490,333:

| Recipient | Funds Transferred | Date |
|---|---|---|
| Master Systems Integrators LLC (Wells Fargo) | $1,274,000 | 7/3/2023 |
| HomePeople Corp. (BOA) | $973,333 | 7/3/2023 |
| Phoenix GC, LLC (BOA) | $68,000 | 7/3/2023 |
| Brandon Knowlden | $175,000 | 7/12/2023 |
| **TOTAL** | **$2,490,333** | |



Taken together, these tables reflect $6,032,927 in transfers for which Messner has offered no coherent or logical explanation and no documentation, and which were not authorized by Plaintiffs. Messner nonetheless asserts that "Plaintiffs approved the transfers," while refusing even to identify which transfers it contends were approved, by whom, when, and under what written authority.

Pa e 4

Messner now attests in its Amended Responses that the full $8,345,000 was gone from the trust account by August 2, 2023. If that is Messner's position, then Messner's repeated statements to Plaintiffs through late 2023 and into 2024 that the funds remained "in escrow," "under our control," or "awaiting deployment," and that Messner was "legally prohibited" from releasing the money, were false when made. Messner still has not disclosed the path of the funds or the present location of any portion of Plaintiffs' money.

Plaintiffs again demand, as they have done repeatedly, that Messner:

- Immediately produce all responsive documents, including complete trust account bank statements, wire confirmations, ledgers, and other banking records for all accounts in which any portion of Plaintiffs' deposits were ever held or from which they were disbursed.

- Produce all communications, contracts, and other documents reflecting any purported authorization for the transfers, including all communications with INBE, Clearwater, Dribble Dunk, Daniel Chartraw, Todd Owen, Martin Hale, Jason Aufdermaur, Titan Financial, Fides, and any other recipient or intermediary.

- Serve a complete privilege log identifying each document withheld on the basis of any privilege or protection.

- Withdraw the untimely and boilerplate objections and serve code-compliant amended responses that clearly answer each discovery request and candidly state whether documents are being withheld under any remaining objection.



The deficiencies highlighted in this letter are not the entirety of the deficiencies in Messner's discovery responses. Moreover, Messner's evasive and obstructionist actions in discovery further demonstrate Messner's liability for the loss of the full $8,345,000. That liability is not genuinely disputable on the current record, particularly given Messner's admission that it fully disbursed the funds by August 2, 2023, its ensuing lack of candor, and its failure to identify any valid legal impediment to returning Plaintiffs' deposits. Plaintiffs demand that Messner immediately provide a full accounting and immediately return the missing escrow funds.

Pa e 5

If you disagree with any point in this letter, please provide a detailed written explanation, with citations to specific discovery responses and documents, within 14 days. Absent a full, timely response, Plaintiffs will treat Messner's silence as further support for enhanced sanctions, including monetary sanctions, issue sanctions, and evidentiary sanctions under Code of Civil Procedure section 2023.030, and, if necessary, terminating sanctions.

Very truly yours,

Kenneth E. Chase

# EXHIBIT 59

 NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

**Statement of Account**

Page 1 of 2

Please refer statement inquiries to:
**888-289-6542**
outside US & Canada 312-444-4454
or
For other banking services
**William B Howard
303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period
04/01/23 through 04/30/23**

| Interest Checking | Account Number: ▓▓▓3494 |
|---|---|

| | |
|---|---|
| Beginning Balance on April 1, 2023 | 13,262.65 |
| Deposits and Credits | 3,719,020.00 |
| Interest Credited | 83.88 |
| Checks and Other Items Paid | (979,027.60  ) |
| Ending Balance on April 30, 2023 | 2,753,338.93 |
| Average Collected Balance | 524,269.00 |

### Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 04-03 | Domestic Wire Recvd | WIRE IN #01274475 BY FWR# ORG=RELAW APC | 19,020.00 |
| 04-21 | Domestic Wire Recvd | WIRE IN #01106632 BY FWR#000480 ORG= BYRD CAMPBELL PA | 1,000,000.00 |
| 04-26 | Domestic Wire Recvd | WIRE IN #01030256 BY FWR#010966 ORG= DONNA DUGAN , FOR MASTER SYSTEMS IN | 700,000.00 |
| 04-27 | Domestic Wire Recvd | WIRE IN #01263647 BY FWR#018429 ORG= NOAH A LASKO REF: INBE CAP, FUNDS A | 2,000,000.00 |

### Interest Credited

| Date | Description | Amount |
|---|---|---|
| 04-30 | Interest | 83.88 |

TNTC00000898

Member FDIC                    Equal Housing Lender

 **NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 2 of 2

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                    **Account Number:** ▮▮▮▮3494

### Other Items Paid

| Date | Description | | Amount |
|------|-------------|---|--------|
| 04-10 | Domestic Wire Sent | WIRE OUT#00957043 BY FWR#006345 BNP= PACIFIC 9 TRANSPORTATION, | 5,500.00 |
| 04-10 | Domestic Wire Sent | WIRE OUT#00956739 BY FWR#006272 BNP= RBC CAPITAL MARKETS CORP | 9,520.00 |
| 04-19 | Domestic Wire Sent | WIRE OUT#01145976 BY FWR#007702 BNP= 14930 SAN PEDRO STREET LLC | 3,351.70 |
| 04-24 | Domestic Wire Sent | WIRE OUT#01059718 BY FWR#004927 BNP= CLEARWATER PREMIERE | 250,000.00 |
| 04-24 | Domestic Wire Sent | WIRE OUT#01058748 BY FWR#005165 BNP= SAHARA LAS VEGAS CORP 878703701 | 500,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01098313 BY FWR#005664 BNP= DANIELLE MARTIN 881252301 | 20,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01103693 BY FWR#005686 BNP= RONALD GALL 881260201 | 30,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01099765 BY FWR#005670 BNP= TRAVIS CHATWIN 881253401 | 50,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01101046 BY FWR#005677 BNP= MOUNTAIN MINES, LLC 881257601 | 55,000.00 |
| 04-28 | Domestic Wire Sent | WIRE OUT#01410499 BY FWR#011508 BNP= DRIBBLE DUNK LLC 892991701 | 55,572.02 |
| 04-30 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 83.88 |

### Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 04-01 | 13,262.65 | 04-21 | 1,013,910.95 | 04-27 | 2,808,910.95 |
| 04-03 | 32,282.65 | 04-24 | 263,910.95 | 04-28 | 2,753,338.93 |
| 04-10 | 17,262.65 | 04-25 | 108,910.95 | 04-30 | 2,753,338.93 |
| 04-19 | 13,910.95 | 04-26 | 808,910.95 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.

TNTC00000699

Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender 🏠

 NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
outside US & Canada **312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**05/01/23 through 05/31/23**

## Interest Checking

**Account Number:** ▮▮▮▮8494

| | |
|---|---:|
| Beginning Balance on May 1, 2023 | 2,753,338.93 |
| Deposits and Credits | 22,234.00 |
| Interest Credited | 144.84 |
| Checks and Other Items Paid | (2,515,866.61 ) |
| Ending Balance on May 31, 2023 | 259,851.16 |
| Average Collected Balance | 874,553.00 |

### Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---:|
| 05-03 | Domestic Wire Recvd | WIRE IN #01196826 BY FWR#001350 ORG= RELAW APC | 22,234.00 |

### Interest Credited

| Date | Description | Amount |
|---|---|---:|
| 05-31 | Interest | 144.84 |

### Other Items Paid

| Date | Description | | Amount |
|---|---|---|---:|
| 05-01 | Domestic Wire Sent | WIRE OUT#01149455 BY FWR#009606 BNP= MOUNTAIN MINES LLC 896895801 | 25,000.00 |

Member FDIC

TNTC00000700

Equal Housing Lender 🏠


## NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 2 of 3

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                    **Account Number:** ▉▉▉494

| | Other Items Paid | | |
|---|---|---|---|
| Date | Description | | Amount |
| 05-01 | Domestic Wire Sent | WIRE OUT#01149967 BY FWR#009607 BNP= TRAVIS CHATWIN 896888401 | 50,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01150273 BY FWR#009803 BNP= DANIEL CHARTRAW 896897401 | 75,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01154064 BY FWR#009702 BNP= TODD A OWEN 896899101 | 75,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01153826 BY FWR#009699 BNP= CLEARWATER PREMIERE | 150,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01176725 BY FWR#010019 BNP= DRIBBLE DUNK LLC 898180301 | 400,000.00 |
| 05-03 | Debit Transfer | FUND TRF#01117247 INTERN | 300,590.77 |
| 05-08 | Domestic Wire Sent | WIRE OUT#01221709 BY FWR#006908 BNP= BLOOMBERG FINANCE LP 910886101 | 12,120.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01454129 BY FWR#008567 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01453917 BY FWR#008517 BNP= ISIN INTERNATIONAL LLC | 11,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442448 BY FWR#008404 BNP= DANIELLE MARTIN 917288601 | 15,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01454073 BY FWR#008523 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442483 BY FWR#008591 BNP= DANIEL CHARTRAW 917289501 | 50,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442552 BY FWR#008416 BNP= TODD A OWEN 917285701 | 60,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442364 BY FWR#008610 BNP= TRAVIS CHATWIN 917287301 | 125,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01453760 BY FWR#008513 BNP= BROWNSTEIN HYATT FARBER SCHRECK | 155,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01316306 BY FWR#008746 BNP= ERIC SMITH 921628101 | 10,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01369286 BY FWR#008358 BNP= WORLD BUDDHISM ASSOCIATION | 50,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01431373 BY FWR#008557 BNP= VALLEY BANK OF NEVADA 921840301 | 904,777.00 |
| 05-22 | Domestic Wire Sent | WIRE OUT#01336332 BY FWR#007961 BNP= GREENFIELD LLP PROFESSIONAL | 25,000.00 |
| 05-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 144.84 |

TNTC00000701

Member FDIC

Equal Housing Lender

 **NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 3 of 3

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                    **Account Number:** ▮▮▮8494

### Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 05-01 | 1,978,338.93 | 05-11 | 1,249,628.16 | 05-31 | 259,851.16 |
| 05-03 | 1,699,982.16 | 05-15 | 284,851.16 | | |
| 05-08 | 1,687,862.16 | 05-22 | 259,851.16 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.

Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

## NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**06/01/23 through 06/30/23**

---

### Interest Checking                    Account Number: ███████ 3494

| | |
|---|---:|
| Beginning Balance on June 1, 2023 | 259,851.16 |
| Deposits and Credits | 5,867,234.00 |
| Interest Credited | 132.63 |
| Checks and Other Items Paid | (1,919,782.70 ) |
| Ending Balance on June 30, 2023 | 4,207,435.09 |
| Average Collected Balance | 827,497.00 |

### Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---:|
| 06-05 | Domestic Wire Recvd | WIRE IN #01589608 BY FWR#001425 ORG= RELAW APC | 22,234.00 |
| 06-08 | Domestic Wire Recvd | WIRE IN #01190600 BY FWR#000191 ORG= CARDINAL INVESTMENTS LLC | 500,000.00 |
| 06-13 | Domestic Wire Recvd | WIRE IN #00944448 BY FWR#006558 ORG= SCOTT SIMONS | 700,000.00 |
| 06-22 | Domestic Wire Recvd | WIRE IN #01272686 BY FWR#000138 ORG= COTTONWOOD HOSPITALITY LLC | 845,000.00 |
| 06-23 | Domestic Wire Recvd | WIRE IN #00996382 BY FWR#011719 ORG= MULJIBHAI CHAUDHARI | 300,000.00 |
| 06-29 | Domestic Wire Recvd | WIRE IN #00912317 BY FWR#011381 ORG= ABBSON LLC 1325 AVENUE OF THE | 3,500,000.00 |

### Interest Credited

| Date | Description | Amount |
|---|---|---:|
| 06-30 | Interest | 132.63 |

TNTC00000703

Member FDIC

Equal Housing Lender

 **NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 2 of 3

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**    **Account Number:** ████ 8494

### Other Items Paid

| Date | Description | | Amount |
|------|-------------|---|--------|
| 06-01 | Domestic Wire Sent | WIRE OUT#01380781 BY FWR#008645 BNP= TODD A. OWEN | 20,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380782 BY FWR#008650 BNP= DANIELLE MARTIN | 25,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380784 BY FWR#008649 BNP= TRAVIS CHATWIN | 25,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380785 BY FWR#008808 BNP= DANIEL CHARTRAW | 45,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380780 BY FWR#009292 BNP= SAHARA LAS VEGAS CORP. | 100,000.00 |
| 06-12 | Domestic Wire Sent | WIRE OUT#01252281 BY FWR#006867 BNP= CCLO BMO HARRIS BANK N.A. LOAN IQ | 500,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023434 BY FWR#006834 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023453 BY FWR#005647 BNP= CLEARWATER PREMIER PERPETUAL | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023454 BY FWR#005646 BNP= CLEARWATER PREMIER PERPETUAL | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023456 BY FWR#005648 BNP= INBE-CLEAR CAPITAL GROUP | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023457 BY FWR#005649 BNP= INBE-CLEAR CAPITAL GROUP | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01054824 BY FWR#006081 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023452 BY FWR#005645 BNP= KELLER NORTH AMERICA, INC. | 20,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023444 BY FWR#005641 BNP= TODD A. OWEN | 25,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023451 BY FWR#005644 BNP= DRIBBLE DUNK, LLC | 30,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023443 BY FWR#006889 BNP= DANIEL CHARTRAW | 100,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023450 BY FWR#005643 BNP= WHISKEY COWBOYS, LLC | 100,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023445 BY FWR#005642 BNP= LAWRENCE M LONGO TRUSTEE AELINA J | 120,000.00 |
| 06-26 | Domestic Wire Sent | WIRE OUT#01285485 BY FWR#007235 BNP= DRIBBLE DUNK, LLC | 59,966.07 |
| 06-26 | Domestic Wire Sent | WIRE OUT#01285478 BY FWR#007241 BNP= SAHARA LAS VEGAS CORP. | 600,000.00 |
| 06-27 | Debit Transfer | FUND TRF#01298687 INTERN | 28,950.00 |
| 06-30 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 38,500.00 |

Member FDIC

TNTC00000704

Equal Housing Lender



**NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 3 of 3

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                    **Account Number:** ▮▮▮▮8494

### Other Items Paid

| Date | Description | | Amount |
|------|-------------|---|--------|
| 06-30 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 132.63 |

### Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 06-01 | 44,851.16 | 06-13 | 767,085.16 | 06-26 | 774,885.09 |
| 06-05 | 67,085.16 | 06-20 | 289,851.16 | 06-27 | 745,935.09 |
| 06-08 | 567,085.16 | 06-22 | 1,134,851.16 | 06-29 | 4,245,935.09 |
| 06-12 | 67,085.16 | 06-23 | 1,434,851.16 | 06-30 | 4,207,435.09 |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL
NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR
AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS.
USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING
MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542
IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.

TNTC00000705

Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

 **NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**07/01/23 through 07/31/23**

---

## Interest Checking

**Account Number:** ███████3494

| | |
|---|---:|
| Beginning Balance on July 1, 2023 | 4,207,435.09 |
| Deposits and Credits | 722,592.85 |
| Interest Credited | 129.49 |
| Checks and Other Items Paid | (4,914,001.69 ) |
| Ending Balance on July 31, 2023 | 16,155.74 |
| Average Collected Balance | 781,900.00 |

### Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---:|
| 07-05 | Domestic Wire Recvd | WIRE IN #01069694 BY FWR#001004 ORG= RELAW APC | 22,234.00 |
| 07-07 | Domestic Wire Recvd | WIRE IN #01120220 BY FWR#016810 ORG= MASTER SYSTEMS INTERGRATORS LLC | 700,000.00 |
| 07-20 | Phone Trnsfer Credit | PRVT PASSPORT TRF FROM xxxxxx0534 | 358.85 |

### Interest Credited

| Date | Description | Amount |
|---|---|---:|
| 07-31 | Interest | 129.49 |

TNTC00000706

Member FDIC

Equal Housing Lender

NORTHERN TRUST

**Statement of Account**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

Page 2 of 3

COLORADO LAWYER TRUST ACCOUNT FOUNDATION

| Interest Checking | Account Number: | ████494 |
|---|---|---|

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 07-03 | Domestic Wire Sent | WIRE OUT#01174668 BY FWR#008120 BNP= DKTOHOME, LLC | 1.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174671 BY FWR#008121 BNP= TODD A. OWEN | 50,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824521 BY FWR#003573 BNP= PHOENIX CG LLC | 68,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824524 BY FWR#003732 BNP= DRIBBLE DUNK, LLC | 207,500.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174670 BY FWR#008327 BNP= DANIEL CHARTRAW | 218,998.99 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174672 BY FWR#008122 BNP= WYATT AUFDERMAUR LLC, IOLTA | 600,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824523 BY FWR#003723 BNP= HOMEPEOPLE CORP | 973,333.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824522 BY FWR#003338 BNP= MASTER SYSTEMS INTEGRATORS LLC | 1,274,000.00 |
| 07-07 | Domestic Wire Sent | WIRE OUT#01252298 BY FWR#009078 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 07-10 | Domestic Wire Sent | WIRE OUT#01096493 BY FWR#005373 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 07-11 | Domestic Wire Sent | WIRE OUT#01105678 BY FWR#006052 BNP= KELLER NORTH AMERICA, INC. | 40,000.00 |
| 07-12 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 10,500.00 |
| 07-12 | Domestic Wire Sent | WIRE OUT#01164555 BY FWR#006814 BNP= BRANDON L KNOWLDEN | 175,000.00 |
| 07-13 | Domestic Wire Sent | WIRE OUT#01134167 BY FWR#006898 BNP= DRIBBLE DUNK, LLC | 4,000.00 |
| 07-13 | Domestic Wire Sent | WIRE OUT#01134164 BY FWR#007179 BNP= SAHARA LAS VEGAS CORP. | 600,000.00 |
| 07-17 | Domestic Wire Sent | WIRE OUT#00999500 BY FWR#005051 BNP= HOEHN JLR INC. | 264,832.04 |
| 07-18 | Domestic Wire Sent | WIRE OUT#01096362 BY FWR#006205 BNP= AUTONATION CHRYSLER DODGE | 80,242.36 |
| 07-18 | Domestic Wire Sent | WIRE OUT#00982871 BY FWR#004461 BNP= HOEHN JLR INC. | 149,872.96 |
| 07-18 | Domestic Wire Sent | WIRE OUT#00982872 BY FWR#004462 BNP= TODD A. OWEN | 150,000.00 |
| 07-20 | ACH Debit | ACH DEBIT Northern Trust Transfer PP #xxxxxx8494 07/20 7418258 PPD | 358.85 |
| 07-28 | Domestic Wire Sent | WIRE OUT#01037608 BY FWR#006919 BNP= DKTOHOME, LLC | 24,999.00 |
| 07-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 129.49 |

TNTC00000707

Member FDIC

Equal Housing Lender



## NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 3 of 3

### COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                                    **Account Number:** ████ 8494

### Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 07-01 | 4,207,435.09 | 07-11 | 1,475,602.10 | 07-20 | 41,154.74 |
| 07-03 | 815,602.10 | 07-12 | 1,290,102.10 | 07-28 | 16,155.74 |
| 07-05 | 837,836.10 | 07-13 | 686,102.10 | 07-31 | 16,155.74 |
| 07-07 | 1,531,336.10 | 07-17 | 421,270.06 | | |
| 07-10 | 1,515,602.10 | 07-18 | 41,154.74 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.

TNTC00000708

Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender



**NORTHERN TRUST**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 1 of 2

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**08/01/23 through 08/31/23**

---

## Interest Checking                                      Account Number: ███████3494

| | |
|---|---:|
| Beginning Balance on August 1, 2023 | 16,155.74 |
| Deposits and Credits | 325,750.00 |
| Interest Credited | 8.14 |
| Checks and Other Items Paid | (326,508.14  ) |
| Ending Balance on August 31, 2023 | 15,405.74 |
| Average Collected Balance | 49,161.00 |

### Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---:|
| 08-01 | Domestic Wire Recvd | WIRE IN #01164826 BY FWR#019091 ORG= MSL FBO JOSEPH V BARNES PYMT REF | 325,000.00 |
| 08-09 | Domestic Wire Recvd | WIRE IN #00641199 BY FWR#000631 ORG= ELECTRO VENTURE HOLDINGS PTY LTD | 750.00 |

### Interest Credited

| Date | Description | Amount |
|---|---|---:|
| 08-31 | Interest | 8.14 |

### Other Items Paid

| Date | Description | | Amount |
|---|---|---|---:|
| 08-02 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 6,750.00 |

TNTC00000709

Member FDIC

Equal Housing Lender



NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

*Statement of Account*

Page 2 of 2

## COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking**                                    **Account Number:** ███████3494

### Other Items Paid

| Date | Description | | Amount |
|------|-------------|---|--------|
| 08-02 | Domestic Wire Sent | WIRE OUT#01106671 BY FWR#006540 BNP= JAVIER REYNA | 10,000.00 |
| 08-02 | Domestic Wire Sent | WIRE OUT#01127565 BY FWR#006929 BNP= LAW OFFICES OF FRANK J. LONGO | 25,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993326 BY FWR#005194 BNP= TODD A. OWEN | 50,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993327 BY FWR#005256 BNP= DANIEL CHARTRAW | 50,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993325 BY FWR#005195 BNP= DKTOHOME, LLC | 100,000.00 |
| 08-07 | Domestic Wire Sent | WIRE OUT#01122365 BY FWR#005899 BNP= DANIELLE MARTIN | 10,000.00 |
| 08-07 | ACH Settlement | ACH SETTLEMENT DEBIT | 12,120.00 |
| 08-07 | Domestic Wire Sent | WIRE OUT#01122366 BY FWR#005900 BNP= ALISON M ROMERO | 20,000.00 |
| 08-09 | Domestic Wire Sent | WIRE OUT#01009309 BY FWR#006405 BNP= JAVIER REYNA | 40,000.00 |
| 08-14 | Domestic Wire Sent | WIRE OUT#01054425 BY FWR#006537 BNP= ELECTRO VENTURE HOLDINGS PTY LTD | 750.00 |
| 08-16 | Domestic Wire Sent | WIRE OUT#01128061 BY FWR#007097 BNP= DRIBBLE DUNK, LLC | 1,880.00 |
| 08-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 8.14 |

### Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 08-01 | 341,155.74 | 08-07 | 57,285.74 | 08-16 | 15,405.74 |
| 08-02 | 299,405.74 | 08-09 | 18,035.74 | 08-31 | 15,405.74 |
| 08-03 | 99,405.74 | 08-14 | 17,285.74 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL
NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR
AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS.
USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING
MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542
IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.

TNTC00000710

Equal Housing Lender

Member FDIC
00NNNNNNN2333NNXXXXXX

# EXHIBIT 60

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br> *1617 JFK Blvd, Suite 520* <br> *Philadelphia, PA 19103* <br>       **Plaintiff,** <br>    v. <br><br> **SHAHNAWAZ MATHIAS,** <br>  **a/k/a Shah Mathias,** <br> *3255 Cape Horn Road, Apt. 163* <br> *Red Lion, PA 17356* <br><br> **AMERI METRO, INC.,** <br> *2575 Eastern Boulevard* <br> *York, PA 17402* <br><br> **PENNDEL LAND DEVELOPMENT CO., and** <br> *2575 Eastern Boulevard* <br> *York, PA 17402* <br><br> **HSRF TRUST,** <br> *2575 Eastern Boulevard* <br> *York, PA 17402* <br>       **Defendants.** | **CIVIL ACTION NO.: 1:25-cv-02313** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Complaint against Defendants Shahnawaz Mathias a/k/a "Shah" Mathias ("Mathias"), Ameri Metro, Inc. ("Ameri Metro"), Penndel Land Development Co. ("Penndel"), and HSRF Trust ("HSRF"), and alleges as follows:

## SUMMARY

1. From at least July 2020 until at least April 2024 (the "Relevant Time"), Mathias, and others acting at his direction, offered for sale and sold approximately $2.4 million worth of Ameri Metro shares through Penndel and HSRF by making false and misleading material statements (including those misleading by omission) about Ameri Metro's operations,

acquisitions, and valuation in its public reports filed with the Commission.  The offers and sales of these securities were not covered by a registration statement or applicable exemption from registration.

2.        Since its inception, Ameri Metro, under Mathias's control, filed dozens of current reports on Form 8-K and several annual reports on Form 10-K with the Commission describing transactions with other Mathias-owned and controlled companies that purportedly were working on large-scale projects.  Although many of these filings involve seemingly baseless speculation about future activities, at least three of these 8-Ks, and two of the Forms 10-K, included material misrepresentations.

3.        Three separate Forms 8-K filed by Mathias and Ameri Metro contained false and misleading statements that Ameri Metro and/or its subsidiaries had acquired: (1) "an easement consisting of 1,000 acres for development of an inland port" in Pennsylvania valued at $260 million; (2) "easements and other rights that relate to certain real property consisting of 4,443 single-family building lots, two golf courses, 30 acres of commercial mixed-use land, 20 acres for development of public schools, 20 acres for construction of civic buildings, and land for construction of sewer treatment facilities" located in San Bernadino, California, with a purchase price of $541,369,000; and (3) a company that had "historically generated approximately $85.0 million in profits from its $1.0B in annual revenues . . . ."

4.        Mathias also signed two misleading Forms 10-K on behalf of Ameri Metro for fiscal years ending July 31, 2022 and 2023, and filed in April of 2024, which, among other things, contained the false and misleading statement that Ameri Metro "has solidified funding of approximately $950,000,000,000 from large financial institutions."

2

5.    In reality, neither Ameri Metro nor its subsidiaries had acquired the easements, rights, or the profitable company, nor had they secured $950,000,000,000 in funding.  As the control person of the entities on both sides of these transactions, Mathias knew or was reckless in not knowing that the statements in the above filings were materially false and misleading.

6.    By engaging in the conduct described herein, Defendants violated, and unless enjoined will continue to violate Sections 5(a) and (c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c); 15 U.S.C. § 77q(a)], and Sections 10(b),  13(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b), 15 U.S.C. § 78m(a), and 15 U.S.C. § 78t(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. § 240.10b-5, and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

8.    The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants transact business in this district and violations of the securities laws alleged in this Complaint occurred within this district, including the filing of false and misleading documents with the Commission.

9.    In addition, this Court has jurisdiction because some or all of the Defendants engaged in conduct within the United States that constituted significant steps in furtherance of the violations of the federal securities laws alleged in this Complaint.

10.    In connection with the conduct alleged in this Complaint, Defendants, directly

3

or indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

## DEFENDANTS

11.     **Mathias**, age 65, is a resident of Red Lion, PA.  He is the founder, CEO, Chairman, and majority shareholder of Ameri Metro.  Mathias is the founder and sole owner of Penndel and HSRF.

12.     **Ameri Metro** is a Delaware corporation with a principal place of business in York, PA.  Ameri Metro purports to develop, and then coordinate and supervise the financing, construction and development of, large-scale construction projects, such as ports, real estate developments, toll roads, and high-speed railway cars and lines, by bringing together the resources, plans, financing, approvals, and technology needed to complete such massive and complex undertakings.  In June of 2013, Ameri Metro filed its initial registration statement with the Commission which created a class of securities pursuant to Exchange Act Section 12(g). That filing noted that Ameri Metro was the result of a merger between "Ameri Metro 2010" and "Yellowwood Acquisition Corporation" in June of 2012.

13.     **Penndel** is a Delaware corporation that was founded in 2002 as a real estate company with a principal place of business in York, PA.  Penndel is wholly owned by Mathias who also serves as its CEO and sole officer.  Penndel had no employees.

14.     **HSRF** is an unincorporated entity created and controlled by Mathias with a principal place of business in York, PA.

4

## RELATED ENTITIES

15.    **Ameri Metro 2010** is described in a filing with the Commission as the original, pre-merger version of "Ameri Metro, Inc.", which was incorporated in Delaware on April 13, 2010.  That filing noted, "Ameri Metro 2010 was a development-stage company designed to engage in the development of efficient transportation systems, primarily high-speed rail networks for passenger and freight and the development of a certain toll road in the State of Alabama." According to that filing, Ameri Metro 2010 reported merging with Yellowwood Acquisition Corporation, a public company, on June 12, 2012, and "Yellowwood Acquisition Corporation, the surviving entity, changed its name to Ameri Metro, Inc."  Ameri Metro 2010 was owned and controlled by Mathias.  It was a development stage company with no operating history.

16.    **Yellowwood Acquisition Corporation** ("Yellowwood") was a Delaware corporation formed on September 21, 2011, and was a public reporting company that registered a class of securities with the Commission on November 9, 2011.  The Registration Statement filed with the Commission noted, "Yellowwood had no ongoing business or operations and was established for the purpose of completing mergers and acquisitions with a target company, such as the former Ameri Metro 2010."  After the merger in June of 2012, described *supra*, Yellowwood changed its name to Ameri Metro, Inc. (Ameri Metro).

17.    **HSR Logistics, Inc.** ("HSR Logistics") is a Wyoming corporation that was formed in 2010 with a principal place of business in York, PA.  HSR Logistics is owned and controlled by Mathias.  HSR Logistics had no employees or revenue.  In filings with the Commission and marketing materials describing Ameri Metro's planned projects (e.g., airports, rail systems, highways, housing), it is noted that HSR Logistics is, "Designed to handle all purchasing functions."

5

18.     **Jewel's Real Estate 1086 Master LLLP** ("Jewel's Real Estate") is a Pennsylvania limited partnership formed in 1997 with its principal place of business in Red Lion, PA. Jewel's Real Estate is controlled by Mathias and, according to filings with the Commission, owned by Mathias and two relatives. Jewel's Real Estate had no employees and did not generate any revenue.

19.     **Ameri Metro, Infrastructure Cryptocurrency Inc.** ("Ameri Metro Cryptocurrency") is a Delaware corporation formed in 2021 with its principal place of business in York, PA. Ameri Metro Cryptocurrency purports to be the developer of two consumptive use tokens created under the laws of Wyoming. Ameri Metro Cryptocurrency is owned and controlled by Mathias. It had no employees or revenue.

20.     **Malibu Homes, Inc.** ("Malibu Homes") is a Pennsylvania corporation formed in 2013 with its principal place of business in York, PA. It is owned and controlled by Mathias. It had no employees or revenue. In filings with the Commission and marketing materials describing Ameri Metro's planned projects (e.g., airports, rail systems, highways, housing), it is noted that Malibu Homes is, "Designed to establish residential home building services."

## FACTS

**A.     Background and the Offer and Sale of Unregistered Securities.**

21.     A 10-K annual report filed with the Commission in April of 2024, authorized by Mathias, noted that as of January 31, 2024, Ameri Metro had approximately 4.6 billion shares of stock outstanding, ranging from preferred stock to Classes A through D of Common Stock, all listed with a par value of $0.000001.

22.     Transfer agent records reflect that Mathias and entities he controlled owned the majority of the outstanding shares of Ameri Metro during the Relevant Time.

6

23.     Because Ameri Metro had a class of securities registered pursuant to Section 12(g) of the Exchange Act during the Relevant Time, it was required to make periodic public filings with the Commission.  Among other things, Ameri Metro was required to file annual reports on Form 10-K to provide a comprehensive overview of its business and financial condition along with audited financial statements. 17 C.F.R § 240.13a-1.  In addition, for each of the first three quarters of its fiscal year, Ameri Metro was required to file a quarterly report on Form 10-Q that included unaudited financial statements and provided a continuing view of the company's financial posture during the year.  17 C.F.R § 240.13a-13.  And Ameri Metro was also required to file Forms 8-K to report material events on an ongoing basis.  17 C.F.R § 240.13a-11.  These reports are filed with the Commission, posted on the Commission's website, and thereby made available to the investing public.

24.     Ameri Metro made dozens of filings with the Commission claiming to have entered into contracts (almost exclusively with other Mathias-created and controlled entities) to develop a long list of projects, although it never actually developed any such projects.

25.     During the Relevant Time, Ameri Metro also had a public website (http://buystock.ameri-metro.com/Home) ("Ameri Metro's website") which stated that Ameri Metro and a wholly owned subsidiary were:

> … pioneers of "PPP" Private Public Partnership, of infrastructure projects and transportation projects.  The Company is a "conduit" to "facilitate", "general contracting" services for infrastructure projects and transportation projects collectively called infrastructure projects nationally.

26.     Ameri Metro transferred its securities to other Mathias-owned entities, including Penndel and HSRF, purportedly as part of the contracts to develop the projects described on Ameri Metro's website and in filings with the Commission.

7

27.     At Mathias's direction, Penndel and HSRF, in turn, sold the Ameri Metro securities to investors for approximately $1 to $2 per share.

28.     The proceeds from these sales were commingled in the various bank accounts of Penndel, HSRF, Ameri Metro, and Mathias.  Mathias was the signatory on all of those accounts.

29.     Ameri Metro shares owned by Penndel and HSRF were securities that were publicly offered or sold by general solicitation or general advertising, specifically by posting an advertisement, article, notice or other communication via the Ameri Metro website, which included a "Buy Shares Now" tab, as depicted in this screen capture of an archived version of the top of Ameri Metro's website from August 9, 2020:



30.     Ameri Metro employees also solicited investors through phone calls and personal meetings.

31.     During the Relevant Time, Defendants offered for sale and sold shares of Ameri Metro to over 150 investors.  Those investors entered into sales agreements with, and received Ameri Metro shares from, either Penndel or HSRF.  These sales generated a total of approximately $2.4 million in proceeds.

32.     Ameri Metro failed to register the offer and sale of the Ameri Metro securities by HSRF and Penndel during the Relevant Time.

8

33.      The offers and sales did not qualify for an exemption from filing a registration statement with the Commission.

34.      While a Form D, "Notice of Exemption Offering of Securities," was filed on May 28, 2020, which cited Rule 506(b) as an exemption from the requirement to register, that filing did not exempt the shares sold during the Relevant Time.

35.      No exemption applies because, at Mathias's direction, Ameri Metro shares were offered or sold during the Relevant Time by general solicitation or general advertising, specifically by posting an advertisement, article, notice or other communication via the internet, that is, offering shares for sale on Ameri Metro's website.

**B.      Defendants Made Misrepresentations in Filings with the Commission.**

36.      During the Relevant Time, at least three Forms 8-K filed with the Commission included an untrue statement of material fact and/or omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which the statement(s) were made, not misleading, about Ameri Metro and its existing operations.  These documents were later attached as exhibits to certain Forms 10-Q and 10-K filed by Ameri Metro, in an effort to continue raising investor funds.

37.      In April 2024, Mathias signed two additional Forms 10-K on behalf of Ameri Metro which included an untrue statement of material fact and/or omitted to state a material fact necessary to make the statement(s) made, in light of the circumstances under which the statement(s) were made, not misleading, about $950 billion in funding purportedly available to Ameri Metro.

**1.    July 22, 2020 False Filing: the $1 Billion "Port Trajan" Project.**

38.    On July 22, 2020, Mathias caused Ameri Metro to file a Form 8-K which falsely claimed that HSR Logistics had "acquired an easement consisting of 1,000 acres for development of an inland port" from Jewel's Real Estate.  The filing further noted, "Based on the value of the land, with 4 million square feet of fully developed warehousing space the estimate overall value of the easement is $260,000,000."

39.    Jewel's Real Estate did not own the easement it was supposedly selling.

40.    Further, neither Jewel's Real Estate, Mathias, nor any entity Mathias owned or controlled, had sufficient assets to acquire the easement from the actual landowner(s).

41.    The Form 8-K attached a document which provided additional detail regarding this purported project, which was referred to as "Port Trajan Development" and had an estimated cost of $1 billion.  Port Trajan was described as "a transportation multimodal hub and logistics center" located in Antrim Township, Greencastle, Pennsylvania.  The document stated that Ameri Metro planned to provide a "distribution center consisting of terminals with rail connections to NS and CSX facilities."

42.    At the time of the 2020 filing, Mathias knew or was reckless in not knowing that there was no ongoing viable Port Trajan project.

43.    Both NS (Norfolk Southern Corp.) and CSX (CSX Transportation) are rail transportation providers with facilities in the geographic area described in the filing.  Neither company has any record of any communication with Defendants or entities referenced in the filings related to Defendants.

44.    Antrim Township officials confirmed that individuals working for and with Antrim Township held meetings with Mathias in 2013 regarding a purported rail and easement

10

related project that was similar to Port Trajan as described in the Form 8-K filed in July of 2020.

However, after a second meeting in the summer of 2013 between officials with Antrim

Township and Mathias, it was clear that Antrim Township officials could not enter into the

agreement(s) Mathias proposed. There was no deal as no agreement was reached. Antrim

Township considered the matter closed.

45.     This false and misleading Form 8-K was included as an exhibit to Ameri Metro's

subsequent Form 10-K for fiscal year ended July 31, 2021, which was filed with the Commission

on October 27, 2021. It was also included as an exhibit to Ameri Metro's Form 10-Q for the

quarter ended October 31, 2020, which was filed with the Commission on December 21, 2020.

**2.   September 4, 2020 False Filing: $915 Billion Valuation Report.**

46.     On September 4, 2020, Mathias and Ameri Metro made materially false and

misleading claims regarding the company's success and value in a Form 8-K which it labeled as

an Item 7.01 Regulation FD Disclosure and attached a document entitled "Valuation Report

Prepared by Ameri Metro, Inc. Management assisted by NorAsia Consulting & Advisory to the

Board of Directors" (the "Valuation Report") which was dated August 31, 2020.

47.     The Valuation Report stated that as of August 31, 2020, the "adjusted book value"

of Ameri Metro based on its 25% ownership interest in several related companies (Mathias

owned the remaining 75% interest in these related companies) was over $915 billion, despite the

fact that that those companies never had any operations or assets.

48.     The Valuation Report read, in pertinent part:

The Company has no historical earnings but with [sic] recent acquisition of
profitable companies, such as Marfin Investment Group which has historically
generated approximately $85.0 million in profits from its $1.0B in annual
revenues these acquisitions will provide historical and proven earnings to Ameri
Metro.

11

49.     This statement was false, as neither Ameri Metro nor Mathias acquired or held any ownership interest in Marfin Investment Group.  Marfin Investment Group is the former name of MIG Holdings S.A., based in Athens, the Hellenic Republic, and is a real estate investment and holding company.

50.     MIG Holdings S.A. has confirmed that Ameri Metro and Mathias did not control a percentage equal to or greater than 5%, which would require public disclosure.  Further, MIG Holdings S.A. indicated that, to the best of their knowledge, Ameri Metro and Mathias "do not, in any way, participate in our Company or in any of our Company's subsidiaries, all of which are 100% controlled by our Company."

51.     Mathias knew or was reckless in not knowing that Ameri Metro had not acquired Marfin Investment Group, and that Ameri Metro also had not ever acquired other "profitable companies" that had "historical and proven earnings" sufficient to justify a $915 billion valuation.

52.     The Valuation Report containing this same misrepresentation about Marfin was included as an exhibit to several subsequent periodic filings by Ameri Metro, including its Form 10-K for the fiscal year ended July 31, 2022, as well as its Form 10-K for the fiscal year ended July 31, 2023, which were both signed by Mathias and filed with the Commission on April 23, 2024.

**3.   November 5, 2021 False Filing: $722 Million Real Estate Development.**

53.     On November 5, 2021, Mathias caused Ameri Metro to file a materially false and misleading Form 8-K which described a purported real estate development deal that involved Jewel's Real Estate and Ameri Metro Cryptocurrency, jointly defined as "Seller," and Ameri

Metro, defined as "Buyer," with a purchase price of $541,369,000.  The property that was
purportedly involved in this deal was located in San Bernadino, CA.

54.    The filing provided the following details regarding this purported transaction:

Seller provided Buyer all rights to develop and acquire easements and other rights
that relate to certain real property consisting of 4,443 single-family building lots,
two golf courses, 30 acres of commercial mixed-use land, 20 acres for
development of public schools, 20 acres for construction of civic buildings, and
land for construction of sewer treatment facilities, located in California (the
"Property").

55.    In a second transaction, Ameri Metro, the "Buyer," purportedly assigned all of
"its right, title and interest, together with all of its obligations and duties" to Malibu Homes for
$722,738,000, to be paid in consumptive use tokens called "Ameri Coin" which were developed
by Ameri Metro Cryptocurrency.

56.    The Form 8-K attached agreements documenting these purported transactions.

57.    Despite representations to the contrary, neither Ameri Metro, Mathias, or any of
the entities controlled by Mathias referenced in the Form 8-K detailing this real estate project
owned a single parcel of property in San Bernadino County.  Moreover, Ameri Metro had almost
no cash or other assets at the time – certainly not assets worth anything close to $541,369,000 to
make this acquisition.  Nor did the company have any arrangements for financing that would
have covered that purchase price.

4.    **April 2024 False Filings: $950 Billion Financing Arrangement with
"Large Financial Institutions"**

58.    In April 2024, Mathias signed two false and misleading Forms 10-K on behalf of
Ameri Metro for the fiscal years ending July 31, 2022 and 2023, which, among other things,
falsely stated that Ameri Metro "has solidified funding of approximately $950,000,000,000 from
large financial institutions."

59.     At no time did Ameri Metro receive $950,000,000,000 in funding from any financial institutions.  There is no record of any deposit greater than $200,000 into the identified corporate bank accounts of Ameri Metro, Penndel, and HSRF.

**C.      Ameri Metro's Registration is Revoked.**

60.     Ameri Metro filed a Form 10-Q with the Commission in March of 2022 which covered the quarterly period that ended January 31, 2022.  Thereafter, Ameri Metro failed to timely file required Form 10-Qs.

61.     On September 12, 2023, the Commission issued an order instituting proceedings against Ameri Metro to determine whether it was appropriate to suspend or revoke the registration of Ameri Metro securities based on failure to file timely and accurate information in its periodic reports pursuant to Section 12(j) of the Exchange Act.

62.     In April of 2024, Ameri Metro filed a number of Forms 10-Q and 10-K with the Commission.  The filing did not contain required current financial statements or other disclosures, but did include prior filings as attachments.

63.     On January 17, 2025, the Commission entered an order by consent revoking Ameri Metro's registration pursuant to Exchange Act Section 12(j), effective as of January 21, 2025.

<div align="center">

**UNREGISTERED SALE OF SECURITIES**

</div>

64.     Sections 5(a) and 5(c) of the Securities Act require that an issuer register the offer or sale of securities with the SEC absent an applicable exemption from registration.  Mathias controlled all aspects of the management of Ameri Metro, Penndel and HSRF, including their offer and sale of securities.

65.    Defendants offered and sold securities in the form of Ameri Metro stock to investors through Penndel and HSRF without first having filed a registration statement with the Commission for the offering and without any applicable exemption from registration.

66.    While Ameri Metro had filed registration statements in the past, none of those filings registered the offer and sale of securities during the Relevant Time.

67.    From July 2020 to April 2024, Defendants, directly and indirectly, offered for sale and sold securities – shares of Ameri Metro – to over 150 investors, through Penndel and HSRF. These sales generated a total of approximately $2.4 million in proceeds.

68.    Ameri Metro offered securities for sale in interstate commerce, specifically on the internet through Ameri Metro's website.  In addition, the offers of securities used interstate facilities or the mails and interstate commerce, specifically the internet, including Ameri Metro's website, and the Commission's website, to circulate information about the securities.

69.    Defendants engaged one or more stock transfer agent(s) that in turn used means of interstate commerce, including the mails, to send and receive agreements and certificates with investors.

70.    Penndel and HSRF directly offered and sold Ameri Metro stock to the public without registration or an applicable exemption.

71.    Mathias played an integral role in the offer and sale of Ameri Metro shares.  For example, Mathias actively promoted the sale of Ameri Metro shares, actively recruited investors to purchase Ameri Metro shares by making periodic telephone calls to investors, maintained the scheme by participating in periodic conference calls with investors to provide updates, and directly sold Ameri Metro shares to investors.

15

**DEFENDANTS VIOLATED THE ANTIFRAUD PROVISIONS**

72.     Defendants knew, or were reckless in not knowing, that the disclosures in the three Forms 8-K and two Forms 10-K, and later filings that incorporated them, contained false and misleading statements (including those rendered misleading due to omissions) regarding Ameri Metro's operations, acquisitions, and valuation.

73.     Defendants knew, or were reckless in not knowing, that shares of Ameri Metro sold after those public filings with the Commission were based on fraudulent disclosures. Defendants' conduct presented a danger of misleading buyers or sellers that was either known to Defendants or was so obvious that Defendants must have been aware of it.

74.     The misstatements (or misstatements misleading by omission) were made by Mathias and Ameri Metro in Ameri Metro's filings with the Commission, over which Mathias exercised ultimate authority and control.

75.     Mathias controlled Ameri Metro, Penndel and HSRF, and directed the actions of Ameri Metro, Penndel, and HSRF, in the furtherance of the scheme to defraud investors.

76.     The misstatements (or misstatements misleading by omission) were material as there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  These material misstatements describe real estate acquisitions purportedly worth hundreds of millions of dollars and the acquisition of a company generating $85 million in annual profits from $1 billion in revenue when, in reality, Ameri Metro had no operations or revenue.  The misstatements were made repeatedly in reports filed with the Commission and were publicly available to investors both on the sec.gov website and links to those filings on Ameri Metro's website when making their decision to buy Ameri Metro shares.

77.    Mathias also engaged in deceptive conduct by creating agreements between his entities, none of which had any operations, purporting to transfer valuable property rights when those entities did not actually own the purported rights.  He attached those agreements to SEC filings to support his claims.

78.    Mathias perpetrated his fraudulent scheme with a years-long course of conduct involving false filings and agreements amongst his entities that gave the investors the false impression that Ameri Metro was a thriving business.

79.    The fraudulent conduct occurred in connection with the purchase and sale of Ameri Metro securities since the sales occurred during the Relevant Time, after the filings with the Commission that contained materially false and misleading statements.

80.    Mathias, and by extension the entities he owned and controlled, acted with scienter.  Mathias knew that his entities did not actually own either the easement or land in the Pennsylvania and California transactions.  And Mathias knew that none of his companies had any actual operations or assets, yet he publicly claimed in a Form 8-K filed with the Commission that he had acquired a business with over $1 billion in revenue and millions in profits.  He also knew or was reckless in not knowing that Ameri Metro had not secured $950 billion in funding from large financial institutions, but signed two Forms 10-K containing that statement.

81.    Defendants received money from the sale of Ameri Metro shares when the proceeds of those sales were commingled amongst their bank accounts, all of which were controlled by Mathias.  Mathias, Penndel and HSRF used the misstatements in Ameri Metro's filings to obtain money from the sale of shares to investors.

17

82.     Defendants further knew, or were reckless in not knowing, that they were engaged in a scheme to defraud investors and further engaged in practices that operated as a fraud or deceit upon those investors by selling Ameri Metro shares based on fraudulent disclosures.

**FALSE AND MISLEADING STATEMENTS IN PUBLIC FILINGS**

83.     Ameri Metro, as an issuer with securities registered under Section 12 of the Exchange Act, is required under Section 13(a) of the Exchange Act and Rules 13a-1, and 13a-11 thereunder to file annual, and current reports with the Commission containing such information as the Commission's rules prescribe.  In addition, Rule 12b-20 requires that reports contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

84.     Ameri Metro violated Section 13(a) and Rule 13a-11 thereunder in connection with its false and misleading statements and half-truths in its Forms 8-K related to: (1) its purported agreements concerning the Port Trajan project in Pennsylvania (filed July 22, 2020); (2) the book value of Ameri Metro and its stock, and its acquisition of Marfin, a purportedly profitable business (filed September 4, 2020, with an attached Valuation Report); and (3) a purported agreement concerning a California real estate development (filed November 5, 2021).

85.     In violation of Section 13(a) and Rules 12b-20 and 13a-1, Ameri Metro falsely claimed to have solidified funding of $950 billion from large financial institutions in its Forms 10-K for the fiscal years ending July 31, 2022 and 2023 (filed April 23, 2024).

86.     Mathias aided and abetted Ameri Metro's violations because he provided substantial assistance to Ameri Metro in committing these violations by providing information about the underlying transactions, and participating in the drafting, review, and approval of each of the relevant filings discussed above.

87.    Since the disclosures in these filings involved transactions with related entities owned and controlled by Mathias, he provided the misleading information concerning the transactions and had direct knowledge of whether the filings were accurately describing the transactions.

88.    Mathias aided and abetted Ameri Metro's violations because he also signed the Forms 10-K for the fiscal years ended July 31, 2022 and 2023, both of which falsely stated that Ameri Metro had secured $950 billion in funding from large financial institutions.

89.    The misleading statements in public filings were made in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, along with the specific Exchange Act Rules summarized in the following table:

| Summary of Misleading Statements in Public Filings | | | |
| --- | --- | --- | --- |
| **Filing Date** | **Filing** | **Misrepresentation** | **Rules Violations** |
| July 22, 2020 | 8-K | PA easement acquisition | 13a-11 |
| Sept 4, 2020 | 8-K | Valuation Report listing Marfin acquisition | 13a-11 |
| Nov 5, 2021 | 8-K | CA development | 13a-11 |
| Apr 23, 2024 | 10-K FY 22 | $950 billion in secured funding | 13a-1; 12b-20 |
| Apr 23, 2024 | 10-K FY 23 | $950 billion in secured funding | 13a-1; 12b-20 |

**FIRST CLAIM FOR RELIEF**
**Unregistered Offers and Sales of Securities in Violation of**
**Sections 5(a) and 5(c) of the Securities Act**
**(Against All Defendants)**

90.    The Commission repeats and realleges Paragraphs 1 through 89 of its Complaint.

91.    The offer and sale of Ameri Metro's shares was an offer and sale of securities.

92.    Defendants directly or indirectly, singly or in concert,

19

     (a)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

     (b)     for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and/or

     (c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

93. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**<u>SECOND CLAIM FOR RELIEF</u>**
**Fraud in Violation of Section 17(a) of the Securities Act**
**(Against All Defendants)**

94. The Commission repeats and realleges Paragraphs 1 through 89 of its Complaint.

95. By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently,

     (a)     employed one or more devices, schemes or artifices to defraud;

(b)    obtained money or property by means of one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in one or more transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

96.    By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act**
**(Against Mathias and Ameri Metro)**

97.    The Commission repeats and realleges Paragraphs 1 through 89 of its Complaint.

98.    Mathias and Ameri Metro directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly,

(a)    employed one or more devices, schemes, or artifices to defraud;

(b)    made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

21

99.    By reason of the foregoing, Mathias and Ameri Metro violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## FOURTH CLAIM FOR RELIEF
### Fraud in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act
### (Against Penndel and HSRF)

100.    The Commission repeats and realleges Paragraphs 1 through 89 of its Complaint.

101.    Penndel and HSRF directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly,

(a)    employed one or more devices, schemes, or artifices to defraud; and/or

(b)    engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

102.    By reason of the foregoing, Penndel and HSRF violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a), (c)] thereunder.

## FIFTH CLAIM FOR RELIEF
### Periodic Reporting Violations in Violation of Exchange Act Section 13(a) and
### Rules 12b-20, 13a-1, and 13a-11 Thereunder
### (Against Ameri Metro)

103.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 89 as if they were fully set forth herein.

104.    By engaging in the conduct alleged above, Ameri Metro, an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading

22

current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the Commission that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by making material misstatements in Form 8-Ks filed with the Commission on July 22, 2020, September 4, 2020, and November 5, 2021, in violation of Section 13(a) of the Exchange Act and Rule 13a-11, and in Forms 10-K for the fiscal years ending July 31, 2022 and 2023, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-1.

105.    By engaging in the conduct alleged above, Ameri Metro violated, and, unless enjoined, will again violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

### SIXTH CLAIM FOR RELIEF
**Periodic Reporting Violations-Aiding and Abetting Ameri Metro's
Violation of Exchange Act Section 13(a) and
Rules 12b-20, 13a-1, and 13a-11 Thereunder
(Against Mathias)**

106.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 89 as if they were fully set forth herein.

107.    By engaging in the conduct alleged above, Mathias knowingly or recklessly provided substantial assistance to Ameri Metro, an issuer of securities registered pursuant to Section 12 of the Exchange Act, which filed materially false and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the Commission that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

23

under which they were made, not misleading, by making material misstatements in Form 8-Ks filed with the Commission on July 22, 2020, September 4, 2020, and November 5, 2021, in violation of Section 13(a) of the Exchange Act and Rule 13a-11 thereunder, and in Forms 10-K for the fiscal years ending July 31, 2022 and 2023, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-1 thereunder.  Mathias aided and abetted these violations because he participated in the drafting, review, and approval of these filings.

108.    By engaging in the conduct alleged above, Mathias aided and abetted Ameri Metro's violations of, and, unless enjoined, will again aid and abet violations of, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**Control Person Liability for Ameri Metro's, Penndel's,**
**and HSRF's Violations of the Exchange Act**
**(Against Mathias)**

</div>

109.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 89 as if they were fully set forth herein.

110.    Section 20(a) of the Exchange Act provides that every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

111.    As alleged above, Defendant Ameri Metro violated Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5 and 12b-20, 13a-1, and 13a-11 thereunder, and Defendants

Penndel and HSRF violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

112.    At all relevant times, Mathias was a control person of Ameri Metro, Penndel, and HSRF for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

113.    At all relevant times, Mathias was a culpable participant in, and directly or indirectly induced the acts constituting Ameri Metro's, Penndel's, and HSRF's violations of the Exchange Act, and did not act in good faith.

114.    As a control person of Ameri Metro, Penndel, and HSRF, Mathias is jointly and severally liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for each of Ameri Metro's, Penndel's, and HSRF's violations of the Exchange Act.

115.    By engaging in the conduct described above, Mathias violated, and unless restrained and enjoined, will continue to violate, Sections 10(b) [15 U.S.C. § 78j(b)] and 13(a) [15 U.S.C. § 78m(a)] and of the Exchange Act and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11] thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

<div align="center">I.</div>

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of them from violating, directly or indirectly, the federal securities laws alleged in this Complaint;

II.

Permanently restraining and enjoining Mathias from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in any issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section 21(d) (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)].

IV.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], permanently prohibiting Mathias from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

VI.

Granting any other and further relief this Court may deem just and proper.

VII.

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and Defendants in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VIII.

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: July 18, 2025                    Respectfully submitted,

                                        */s/ Gregory R. Bockin*
                                        Gregory R. Bockin (DC Bar No. 450885)
                                        Judson T. Mihok
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Philadelphia Regional Office
                                        1617 JFK Boulevard, Suite 520
                                        Philadelphia, PA 19103
                                        Phone: 215-597-6500
                                        Fax: 215-597-2740
                                        Email: bocking@sec.gov

27

# EXHIBIT 61

Docusign Envelope ID: 99D83F3E-63ED-8F46-8144-9EEB3A200519

June 4, 2026

Messner Reeves LLP
James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner
c/o Troy Rackham
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

*Via email to trackham@spencerfane.com*

> Re:    *Demand for Return of Escrow Funds and for Accounting of*
> *Disbursements for Messner Reeves LLP's COLTAF Account*

Dear Messner Reeves LLP:

On behalf of Abbson LLC, I have made repeated demands for the return of my $3,500,000 in escrow funds that were wired to Messner Reeves LLP's Northern Trust COLTAF account 8494 on June 29, 2023. I have also made repeated demands to Messner Reeves LLP for a written accounting regarding the disbursements and whereabouts of the escrow funds which belong to me. As you know, I did not authorize any disbursement of those funds. I reiterate my demand for the immediate return of my escrow funds and for a written accounting.

Signed by:

*Chad Abbott*

EAA1235ABD1F4DD...

Chad Abbott
on behalf of Abbson LLC

Docusign Envelope ID: 43C5F46F-CE24-8C4B-83A6-A23F5C3268C7

June 4, 2026

Messner Reeves LLP
James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner
c/o Troy Rackham
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

*Via email to trackham@spencerfane.com*

> Re:   *Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account*

Dear Messner Reeves LLP:

On behalf of Emerald Consulting Partners LLC, I have made repeated demands for the return of my $700,000 in escrow funds that were wired to Messner Reeves LLP's Northern Trust COLTAF account 8494 on June 13, 2023. I have also made repeated demands to Messner Reeves LLP for a written accounting regarding the disbursements and whereabouts of the escrow funds which belong to me. As you know, I did not authorize any disbursement of those funds. I reiterate my demand for the immediate return of my escrow funds and for a written accounting.

Signed by:

Jon Fodera
805557169DAD4D4...

Jonathan Fodera
on behalf of Emerald Consulting Partners LLC

Docusign Envelope ID: 32CCBD25-9FF2-8EF5-83A3-8854A958744C

June 4, 2026

Messner Reeves LLP
James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner
c/o Troy Rackham
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

*Via email to trackham@spencerfane.com*

> Re:    *Demand for Return of Escrow Funds and for Accounting of*
> *Disbursements for Messner Reeves LLP's COLTAF Account*

Dear Messner Reeves LLP:

On behalf of HomePeople Corp., I have made repeated demands for the return of my $1,000,000 in escrow funds that were wired to Messner Reeves LLP's Northern Trust COLTAF account 8494 on April 21, 2023. I have also made repeated demands to Messner Reeves LLP for a written accounting regarding the disbursements and whereabouts of the escrow funds which belong to me. As you know, I did not authorize any disbursement of those funds. I reiterate my demand for the immediate return of my escrow funds and for a written accounting.

Signed by:

Tarik Sansal
8D3F98271D62402...

Tarik Sansal
on behalf of HomePeople Corp.

Docusign Envelope ID: 54CF8DBE-2878-8F75-8192-FB588181CF69

June 4, 2026

Messner Reeves LLP
James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner
c/o Troy Rackham
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

*Via email to trackham@spencerfane.com*

> Re:    *Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account*

Dear Messner Reeves LLP:

On behalf of Kosher Eats LLC, I have made repeated demands for the return of my $2,000,000 in escrow funds that were wired to Messner Reeves LLP's Northern Trust COLTAF account 8494 on April 27, 2023. I have also made repeated demands to Messner Reeves LLP for a written accounting regarding the disbursements and whereabouts of the escrow funds which belong to me. As you know, I did not authorize any disbursement of those funds. I reiterate my demand for the immediate return of my escrow funds and for a written accounting.

DocuSigned by:

*Noah Lasko*

05A8600F1667459...

Noah Lasko
on behalf of Kosher Eats LLC

Docusign Envelope ID: 2677195C-CA9D-815F-81F8-DB67F548F20F

June 4, 2026

Messner Reeves LLP
James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner
c/o Troy Rackham
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203

*Via email to trackham@spencerfane.com*

> Re:    *Demand for Return of Escrow Funds and for Accounting of*
> *Disbursements for Messner Reeves LLP's COLTAF Account*

Dear Messner Reeves LLP:

On behalf of MSC Companies LLC, I have made repeated demands for the return of my $1,145,000 in escrow funds that were wired to Messner Reeves LLP's Northern Trust COLTAF account 8494 on June 22, 2023 and June 23, 2023. I have also made repeated demands to Messner Reeves LLP for a written accounting regarding the disbursements and whereabouts of the escrow funds which belong to me. As you know, I did not authorize any disbursement of those funds. I reiterate my demand for the immediate return of my escrow funds and for a written accounting.

Signed by:
Nimesh Chaudhari
C24BB852742E4E2...

Nimesh Chaudhari
on behalf of MSC Companies LLC

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | "Rackham, Troy" |
| **Cc:** | "Hannah Brown Goehring"; "John Palmeri"; Darren D. Sturges |
| **Subject:** | Abbson LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Friday, June 5, 2026 9:13:00 AM |
| **Attachments:** | Messner - Abbson Letter re Funds 6.4.2026.pdf |
| | image001.png |

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | Rackham, Troy |
| **Cc:** | Hannah Brown Goehring; John Palmeri; Darren D. Sturges |
| **Subject:** | Emerald Consulting Partners LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Thursday, June 4, 2026 5:08:00 PM |
| **Attachments:** | Messner - Emerald Letter re Funds 6.4.2026.pdf |
| | image001.png |

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | Rackham, Troy |
| **Cc:** | Hannah Brown Goehring; John Palmeri; Darren D. Sturges |
| **Subject:** | HomePeople Corp., Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Friday, June 5, 2026 1:41:00 PM |
| **Attachments:** | Messner - HomePeople Letter re Funds 6.4.2026.pdf |
| | image001.png |

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | Rackham, Troy |
| **Cc:** | Hannah Brown Goehring; John Palmeri; Darren D. Sturges |
| **Subject:** | Kosher Eats LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Thursday, June 4, 2026 2:34:00 PM |
| **Attachments:** | Messner - Kosher Eats Letter re Funds 6.4.2026.pdf<br>image001.png |

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

| | |
|---|---|
| **From:** | Kenneth E. Chase |
| **To:** | "Rackham, Troy" |
| **Cc:** | "Hannah Brown Goehring"; "John Palmeri"; Darren D. Sturges |
| **Subject:** | MSC Companies LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Thursday, June 4, 2026 5:10:00 PM |
| **Attachments:** | Messner - MSC Letter re Funds 6.4.2026.pdf |
| | image001.png |

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

# EXHIBIT 62



**JOHN M. PALMERI**
jpalmeri@grsm.com
Direct (303) 534-5145

555 Seventeenth Street, Suite 3400
Denver, CO  80202
www.grsm.com

June 9, 2026

**VIA ELECTRONIC MAIL**

Kenneth Chase
Darren Sturges
Chase Law & Associates P.A.
kchase@chaselaw.com
dsturges@chaselaw.com

Counsel:

This will acknowledge receipt of your correspondence dated June 4 and 5, 2026 demanding return of funds and an accounting relating to Messner Reeves LLP's trust account. This matter is in suit and governed by the Federal Rules of Civil Procedure. We will comply with the rules as they relate to discovery in the lawsuit. As discussed during your June 2, 2026 Zoom meeting with Troy Rackham and Hannah Goehring, if you have legal authority supporting your contention that Messner must provide an accounting to non-clients, please provide that legal authority and we will evaluate it. We also received your June 2, 2026 e-mail summary of the Zoom meeting. Your characterization of that meeting is not accurate. Messner will not be producing documents by June 9 as you request. Again, this matter is in suit and governed by the Federal Rules of Civil Procedure. We will comply with the rules as they relate to discovery in the lawsuit.

Very truly yours,

John M. Palmeri

| | |
|---|---|
| **From:** | John Palmeri |
| **To:** | Kenneth E. Chase; Darren D. Sturges |
| **Cc:** | Rackham, Troy; Call, Keith |
| **Subject:** | RE: Kosher Eats LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Tuesday, June 9, 2026 12:57:04 PM |
| **Attachments:** | image001.png<br>2026.06.09   Chase_Sturges.ltr - Response to OC ltr.(155102066.1).pdf |

Counsel,

Please see attached.

John M. Palmeri

Gordon Rees Scully Mansukhani LLP

555 Seventeenth Street, Suite 3400

Denver, Colorado 80202

Direct Dial: (303) 534-5145

Email: jpalmeri@grsm.com

Website: http://www.grsm.com

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Thursday, June 4, 2026 12:34 PM
**To:** Rackham, Troy <TRackham@spencerfane.com>
**Cc:** Hannah Brown Goehring <hbrown@grsm.com>; John Palmeri <jpalmeri@grsm.com>; Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** Kosher Eats LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800

[kchase@chaselaw.com](mailto:kchase@chaselaw.com)

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

[www.chaselaw.com](http://www.chaselaw.com)



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
[www.grsm.com](http://www.grsm.com)

| | |
|---|---|
| **From:** | John Palmeri |
| **To:** | Kenneth E. Chase; Darren D. Sturges |
| **Cc:** | Rackham, Troy; Call, Keith |
| **Subject:** | RE: Abbson LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Tuesday, June 9, 2026 12:57:13 PM |
| **Attachments:** | image001.png |
| | 2026.06.09    Chase_Sturges.ltr - Response to OC ltr.(155102066.1).pdf |

Counsel,

Please see attached.

John M. Palmeri

Gordon Rees Scully Mansukhani LLP

555 Seventeenth Street, Suite 3400

Denver, Colorado 80202

Direct Dial: (303) 534-5145

Email: jpalmeri@grsm.com

Website: http://www.grsm.com

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Friday, June 5, 2026 7:13 AM
**To:** Rackham, Troy <TRackham@spencerfane.com>
**Cc:** Hannah Brown Goehring <hbrown@grsm.com>; John Palmeri <jpalmeri@grsm.com>; Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** Abbson LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

    James Smith, President
    Caleb Smith, CEO
    Michelle Harden, COO
    David Reeves, Managing Partner
    Mikhail Shah, Managing Partner
    Katherine Turpen, Managing Partner
    Karie Wilson, Managing Partner
    Torben Welch, Managing Partner

**Kenneth E. Chase**

Chase Law & Associates, P.A.

t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

| | |
|---|---|
| **From:** | John Palmeri |
| **To:** | Kenneth E. Chase; Darren D. Sturges |
| **Cc:** | Rackham, Troy; Call, Keith |
| **Subject:** | RE: Emerald Consulting Partners LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Tuesday, June 9, 2026 12:57:05 PM |
| **Attachments:** | image001.png |
| | 2026.06.09   Chase_Sturges.ltr - Response to OC ltr.(155102066.1).pdf |

---

Counsel,

Please see attached.

John M. Palmeri

Gordon Rees Scully Mansukhani LLP

555 Seventeenth Street, Suite 3400

Denver, Colorado 80202

Direct Dial: (303) 534-5145

Email: jpalmeri@grsm.com

Website: http://www.grsm.com

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Thursday, June 4, 2026 3:08 PM
**To:** Rackham, Troy <TRackham@spencerfane.com>
**Cc:** Hannah Brown Goehring <hbrown@grsm.com>; John Palmeri <jpalmeri@grsm.com>; Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** Emerald Consulting Partners LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

> James Smith, President
> Caleb Smith, CEO
> Michelle Harden, COO
> David Reeves, Managing Partner
> Mikhail Shah, Managing Partner
> Katherine Turpen, Managing Partner
> Karie Wilson, Managing Partner
> Torben Welch, Managing Partner

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

| From: | John Palmeri |
|---|---|
| To: | Kenneth E. Chase; Darren D. Sturges |
| Cc: | Rackham, Troy; Call, Keith |
| Subject: | RE: HomePeople Corp., Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| Date: | Tuesday, June 9, 2026 1:06:21 PM |
| Attachments: | image001.png |
| | 2026.06.09   Chase_Sturges.ltr - Response to OC ltr.(155102066.1).pdf |

Counsel,

Please see attached.

John M. Palmeri

Gordon Rees Scully Mansukhani LLP

555 Seventeenth Street, Suite 3400

Denver, Colorado 80202

Direct Dial: (303) 534-5145

Email: jpalmeri@grsm.com

Website: http://www.grsm.com

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Friday, June 5, 2026 11:41 AM
**To:** Rackham, Troy <TRackham@spencerfane.com>
**Cc:** Hannah Brown Goehring <hbrown@grsm.com>; John Palmeri <jpalmeri@grsm.com>; Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** HomePeople Corp., Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

James Smith, President
Caleb Smith, CEO
Michelle Harden, COO
David Reeves, Managing Partner
Mikhail Shah, Managing Partner
Katherine Turpen, Managing Partner
Karie Wilson, Managing Partner
Torben Welch, Managing Partner

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

| | |
|---|---|
| **From:** | John Palmeri |
| **To:** | Kenneth E. Chase; Darren D. Sturges |
| **Cc:** | Rackham, Troy; Call, Keith |
| **Subject:** | RE: MSC Companies LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account |
| **Date:** | Tuesday, June 9, 2026 12:57:07 PM |
| **Attachments:** | image001.png |
| | 2026.06.09   Chase_Sturges.ltr - Response to OC ltr.(155102066.1).pdf |

Counsel,

Please see attached.

John M. Palmeri

Gordon Rees Scully Mansukhani LLP

555 Seventeenth Street, Suite 3400

Denver, Colorado 80202

Direct Dial: (303) 534-5145

Email: jpalmeri@grsm.com

Website: http://www.grsm.com

---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Thursday, June 4, 2026 3:10 PM
**To:** Rackham, Troy <TRackham@spencerfane.com>
**Cc:** Hannah Brown Goehring <hbrown@grsm.com>; John Palmeri <jpalmeri@grsm.com>; Darren D. Sturges <dsturges@chaselaw.com>
**Subject:** MSC Companies LLC, Demand for Return of Escrow Funds and for Accounting of Disbursements for Messner Reeves LLP's COLTAF Account

Counsel, please confirm in writing that the attached letter has been provided to the following persons at Messner Reeves LLP:

  James Smith, President
  Caleb Smith, CEO
  Michelle Harden, COO
  David Reeves, Managing Partner
  Mikhail Shah, Managing Partner
  Katherine Turpen, Managing Partner
  Karie Wilson, Managing Partner
  Torben Welch, Managing Partner

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800

kchase@chaselaw.com

**Boca Raton Office**

951 Yamato Road, Suite 280

Boca Raton, FL 33431

FLORIDA | CALIFORNIA

WASHINGTON, DC | NEW YORK

MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON REES SCULLY MANSUKHANI, LLP**
**YOUR 50 STATE LAW FIRM™**
www.grsm.com

# EXHIBIT 63

**Alfred A. Day\***
**William J. Durkin\***
**Jeffrey S. Olshan\*\***
**Dahlia Rin\***
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Boston Regional Office**
**33 Arch Street, 24th Floor**
**Boston, MA 02110**
**617-573-8955 (Olshan direct)**
**OlshanJ@sec.gov**

**\*Not admitted in the Southern District of New York**
**\*\*Motion to appear** *pro hac vice* **pending**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>              **Plaintiff,**<br><br>    **v.**<br><br>**CHARLES J. COLE,**<br>**TORBEN M. WELCH,**<br>**BEACON HEART, LLC,**<br>**HEART OF HUMANITY, LLC, and**<br>**AVRANOC, LLC,**<br><br>              **Defendants,**<br><br>**and**<br><br>**THE INDIGENOUS NATIONS' BANK,**<br>**DEREK A. THIESS, and**<br>**BARRY R. TAYLOR,**<br><br>          **Relief Defendants.** | **COMPLAINT**<br><br>**1:26-cv-4945**<br><br><br>**JURY TRIAL DEMANDED** |

       Plaintiff, the United States Securities and Exchange Commission (the "Commission"), for

its Complaint against Defendants Charles J. Cole ("Cole"), Torben M. Welch ("Welch"), Beacon

Heart, LLC ("Beacon Heart"), Heart of Humanity, LLC ("Heart of Humanity"), and Avranoc,

LLC ("Avranoc") (collectively, "Defendants") and Relief Defendants The indigenous Nations' Bank ("TiNB"), Derek A. Thiess ("Thiess"), and Barry R. Taylor ("Taylor") (collectively, "Relief Defendants"), alleges as follows:

## SUMMARY

1. This is a securities fraud case involving a scheme perpetrated by Cole and his attorney, Welch, to fraudulently amass hundreds of millions of shares in a private company— Infinite Reality, Inc., now known as Napster Corp. ("Infinite Reality")—in exchange for falsely promising to invest up to $3.36 billion in Infinite Reality.  Cole, with Welch's assistance, then used the fraudulently obtained shares in Infinite Reality to secure a $1 million loan from a private third-party lender (the "Lending Institution") that he never repaid.

2. As part of the fraud, Cole and Welch falsely told Infinite Reality that Cole and/or Avranoc, a limited liability company Cole owned, had at least $55 billion in cash—a sum that would make Cole one of the wealthiest people in the world.  But that money did not exist.  Instead, Cole and Welch used fabricated documents and repeatedly lied to Infinite Reality and others about Cole's wealth and capacity to fund enormous investments.

3. Based on Cole's numerous false representations to Infinite Reality, repeated and amplified by Welch, Infinite Reality issued over 239 million shares to Cole and two shell entities that Cole controlled, Beacon Heart and Heart of Humanity, in late 2024 and early 2025.  This amounted to approximately 25% of Infinite Reality's outstanding shares.  To date, Infinite Reality has never received any money from Cole despite his promise to invest $3.36 billion.

4. After fraudulently obtaining Infinite Reality's stock, in May 2025, Cole pledged nearly 45 million shares as collateral to obtain a $1 million loan from the Lending Institution, and to date has not repaid any portion of the loan, which is currently in default.  Welch was an essential participant in obtaining the $1 million loan: Welch drafted the loan agreement between

Cole and the Lending Institution, purported to verify Cole's assets with forged documents, and provided misleading and false assurances to the Lending Institution through email correspondence and letters that he authored.

5.    Cole benefitted from his fraud by retaining at least $552,800 of the $1 million loan described above, while the Relief Defendants received a portion of the remainder.

## VIOLATIONS

6.    As a result of the foregoing conduct and as alleged further herein, Cole violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Beacon Heart, Heart of Humanity, and Avranoc violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)]; and Welch violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and aided and abetted Cole's violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

7.    Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

8.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9.    The Commission seeks a final judgment: (i) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated;

3

(ii) enjoining Cole from directly or indirectly, including, but not limited to, through any entity owned or controlled by Cole, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Cole from purchasing or selling securities listed on a national securities exchange for his own personal account; (iii) ordering Cole, Beacon Heart, Heart of Humanity, and Avranoc to disgorge ill-gotten gains they received as a result of the unlawful conduct alleged in this Complaint, together with prejudgment interest; (iv) ordering Cole and Welch to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; (v) ordering Relief Defendants to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched; and (vi) ordering such other relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa], and 28 U.S.C. § 1331.

11. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and transactions and courses of business alleged in this Complaint occurred within this district, including those set forth in Paragraphs 23, 57, and 59.

4

## DEFENDANTS

13.    **Cole**, age 57, resides in Mooresville, North Carolina.

14.    **Welch**, age 51, is an attorney residing in Draper, Utah.  He is licensed to practice law in Utah, Colorado, and New York.  He is a partner at a law firm with various offices throughout the United States and is the head of the law firm's Utah office.

15.    **Beacon Heart** is a Wyoming limited liability company.  Beacon Heart was formed on September 24, 2024, with Cole as its sole member.

16.    **Heart of Humanity** is a Wyoming limited liability company.  Heart of Humanity was formed on September 24, 2024, with Cole as its sole member.

17.    **Avranoc** is a Delaware limited liability company.  Avranoc was formed on May 23, 2022, with Cole as its sole member.

## RELIEF DEFENDANTS

18.    **TiNB** describes itself as an international bank organized as a "sovereign confederated financial institution" under the laws of the KiKiallus Nation, who describe themselves as "nomadic sovereign people indigenous to the Pacific North West."

19.    **Thiess**, age 45, resides in Fort Ripley, Minnesota, and purports to be the Chief Managing Director of TiNB.

20.    **Taylor**, age 63, resides in Norfolk, Virginia, and purports to be both the Legal Director of TiNB and the Attorney General of the KiKiallus Nation.

## OTHER RELEVANT ENTITIES

21.    **Infinite Reality** (now known as Napster) is a Delaware corporation with its principal place of business in Boca Raton, Florida.  Infinite Reality has approximately 1,700 investors, with multiple investors residing in this district.

22.     The **Lending Institution** is a Kansas corporation with its principal place of business in Leawood, Kansas.

## THE FRAUDULENT SCHEME

### A.     Origins of the Scheme and Cole's Purported Wealth

23.     In late August 2024, Cole was introduced to Infinite Reality through a New York-based broker that had an existing relationship with Infinite Reality.  Infinite Reality was told that Cole could assist with its efforts to sell a bond that it had obtained (and physically took possession of within this district) from another investor associated with Cole.  Shortly after his introduction to the company, Cole offered to invest billions of dollars in Infinite Reality.

24.     Specifically, in September 2024, Cole, Beacon Heart, and Heart of Humanity entered into subscription agreements to acquire shares of Infinite Reality's stock in exchange for $500 million of Cole's own funds, plus $350 million in cash from Beacon Heart, and a $2.5 billion bond allegedly held by Heart of Humanity.  Cole had formed both entities days before entering into the agreements with Infinite Reality, and Cole signed the Beacon Heart and Heart of Humanity subscription agreements on behalf of those entities.  Neither entity had any operations, and both entities appear to have been formed solely for the purpose of executing agreements with and receiving shares from Infinite Reality.  While the terms of the "deal" went through several iterations, the basic tenets remained the same: Cole and his entities would invest billions of dollars in exchange for hundreds of millions of shares.  In fact, neither Cole nor his companies ever had possession of or access to the large sums of money they claimed they would invest in Infinite Reality.

25.     As part of the fraudulent scheme, Cole and Welch had to convince Infinite Reality that Cole had sufficient funds to make the investments.  To achieve this, Cole and Welch

6

provided fabricated and misleading documents to Infinite Reality that purported to validate

Cole's non-existent assets and the sources of his purported funds.

26.    For example, on September 20, 2024, through an associate of Cole's broker,

Infinite Reality received a letter dated that same day claiming that Cole had 49 billion Euro

available to him in "immediately spendable cash" at what purported to be an asset management

firm in Sweden.  That letter, and those funds, were a fabrication: Cole participated in the creation

of the letter earlier that day.

27.    Infinite Reality received additional fabricated and misleading documents in

November 2024, when it received a letter signed by Welch dated June 22, 2024, and a July 2024

video featuring Welch that purported to validate funds at Cole's disposal.

28.    June 22, 2024 letter.  Welch prepared a letter on his law firm's letterhead

asserting that Cole, through Avranoc, controlled "approximately $55 billion."  Welch attached to

his letter "supporting documentation."

29.    In the June 22, 2024 letter, Welch represented that he had validated and traced the

$55 billion and asserted that the funds were derived from the sale of what the attached

documents describe as a $459.5 billion collection of "Master Trust Indenture" bonds.  However,

the "supporting documentation" was fabricated, and none of the institutions identified appear to

be legitimate.

30.    For example, Welch attached a letter from the "Special Intelligence Service,"

which does not appear to be a real entity; the letter lists an address that in fact belongs to a large

Masonic temple in Washington, DC.  This letter purported to trace the source of funds later

transferred to an account controlled by Cole, through Avranoc.

7

31.     Cole knew or recklessly disregarded that the representations in the June 22, 2024 letter and documentation attached thereto were false, as he in fact had few assets—certainly not assets worth tens of billions of dollars—to his name.

32.     Welch knew, or was reckless in not knowing, that these representations were false.  In signing the letter, Welch did not verify the accuracy of the financial statements, account information, or other sources he claimed to have relied upon, even though Cole's purported extraordinary wealth depended on a complex web of foreign institutions and unconventional transactions.

33.     July 30, 2024 "Titan Financial" video.  At Cole's direction, Welch recorded a video of himself logging into a website for "Titan Financial" to substantiate Cole's wealth.  The video shows Welch saying there was a "balance of 55 billion dollars" in an account in the name of Charles Cole and Avranoc and displays a "Current Balance" of "USD 55,000,000,000.00 available."  Welch's video was misleading; the "Titan Financial" website he visited was not associated with any legitimate financial institution, and the account balance he displayed was fictitious.

34.     At the time he recorded the video, Welch knew, or was reckless in not knowing, that Cole did not own or control an account at Titan Financial holding $55 billion in cash. Welch later claimed in sworn investigative testimony before Commission staff that the figure displayed in his video was not a cash balance; Welch therefore knew that the video was misleading at the time he created it because a $55 billion balance was shown in the purported account without indicating that the balance was not cash.  Likewise, Welch stated in the video that the account "shows a current balance of 55 billion dollars" without indicating that this was not a cash balance.

8

35.      Welch's supposed validation of Cole's wealth and status of funds transfers, and

Welch's imprimatur as Cole's attorney, were central to Infinite Reality's decision to issue the

shares to Cole, Beacon Heart, and Heart of Humanity as set forth in Paragraph 42.

**B.      Cole's Purported Transfer of Investment Funds to a Malaysian Investment Bank**

36.      Cole (and his entities) did not timely deliver the funds under the subscription

agreements executed in September 2024, so Infinite Reality escalated its efforts to compel Cole

to perform his obligations.

37.      In response, in November 2024, Cole told Infinite Reality that he had over $11

billion in an account at a Malaysian investment bank (the "Malaysian Investment Bank").  Cole

further represented that he intended to use those funds to invest in Infinite Reality, but that the

Malaysian Investment Bank was unable to make an international transfer to Infinite Reality's

domestic bank account.  Instead, Cole told Infinite Reality that he would help open an account at

the Malaysian Investment Bank in Infinite Reality's name and then transfer the money directly to

that account.

38.      Cole's representations regarding his assets at the Malaysian Investment Bank

were false.  Although the Malaysian Investment Bank exists, neither Cole nor any person or

entity he controlled ever had an account there.  Infinite Reality also never had an account there.

Instead, Cole impersonated the Malaysian Investment Bank with fake websites, fake email

addresses purporting to be associated with the Malaysian Investment Bank, and forged "bank

confirmation letters."

39.      For example, on November 9, 2024, Cole, through his broker, sent Infinite Reality

a letter appearing to be on the letterhead of the Malaysian Investment Bank, which stated that

9

Cole was both a client of the Malaysian Investment Bank and had over $11 billion in cash available to him.  The letter was a fabrication that Cole created earlier that day.

40.    Cole knew or recklessly disregarded that the representations regarding his assets at the Malaysian Investment Bank were false, as he never had an account at the Malaysian Investment Bank, much less $11 billion in any account or combination of accounts, at any time.

41.    On November 20, 2024, Infinite Reality received an email that appeared to come from the Malaysian Investment Bank.  The email welcomed Infinite Reality as a client of the Malaysian Investment Bank, and contained a link to a website login page, a username, and the request to reply to the email to receive a password.  However, the site was not the Malaysian Investment Bank's genuine website, but a fraudulent imitation.  The welcome email did not come from the Malaysian Investment Bank; Cole wrote it earlier that day, and it was sent to Infinite Reality from an email address that was not associated with the Malaysian Investment Bank.  Infinite Reality was never a client of the Malaysian Investment Bank.

C.    **Cole and His Entities Obtain Infinite Reality Shares for the First Time**

42.    By mid-December 2024, Infinite Reality had received Welch's June 22, 2024 letter, Welch's July 30, 2024 video, and other false and misleading communications and documents from Cole and Welch over a period of months.  These misrepresentations culminated in false assurances that Cole had transferred $860 million into Infinite Reality's non-existent account at the Malaysian Investment Bank, that the rest of the money Cole promised to invest was en route to that account, and that Welch would shortly provide Infinite Reality with a letter confirming these transfers in writing.  Based on these false assurances, and the months of false and misleading communications from Cole and Welch that preceded them, Infinite Reality issued Cole and his entities 187,932,429 shares of stock in mid-December 2024: 44,824,142 shares to Cole, 44,871,794 shares to Beacon Heart, and 98,236,493 shares to Heart of Humanity.

10

These numbers of shares collectively represented over 20% of Infinite Reality's outstanding shares at that time.

43.    Infinite Reality received a letter from Welch, dated December 18, 2024, that was written on behalf of Cole and Avranoc with the subject "Infinite Reality Inc. Deposits." In the letter, Welch falsely confirmed that prior to December 17, 2024, Cole and Avranoc caused $860 million to be deposited in Infinite Reality's (non-existent) account at the Malaysian Investment Bank. Welch further represented, also falsely, that Cole had directed an additional $1.64 billion to be deposited in Infinite Reality's purported account at the Malaysian Investment Bank, for a total of $2.5 billion. The letter further falsely stated that Cole "agreed to transfer an additional $860 million to [Infinite Reality's] designated accounts in the United States, specifically JP Morgan Chase or Bank of America."

44.    None of this was true. Welch knew, or was reckless in not knowing, that neither Cole nor Infinite Reality had any account at the Malaysian Investment Bank. In fact, Welch had never communicated with anyone at the Malaysian Investment Bank and did not independently verify that Cole's and Infinite Reality's accounts existed or that Cole's purported transfers were in process. Indeed, he could not have, because the money was not real.

45.    Infinite Reality's issuance of stock to Cole, Beacon Heart, and Heart of Humanity was the culmination of a fraudulent scheme by Cole, Welch, and Cole's entities intended to induce Infinite Reality to believe that Cole possessed considerable wealth, that an account had been opened for Infinite Reality at the Malaysian Investment Bank, and that vast sums of money had been transferred into that account. In reality, it was all a sham.

**D.    Cole and Welch Continue to Deceive Infinite Reality to Obtain More Shares**

46.    The scheme did not end there: Cole and Welch continued to make false statements to Infinite Reality in order to obtain more shares of its stock.

11

47.    February 5, 2025 email purporting to verify funds transfers. On February 5, 2025, Cole emailed Infinite Reality, copying Welch. In that message, Cole falsely said, among other things, that he had made three transfers to an escrow account at Welch's law firm. He further claimed that he had transferred additional funds to several domestic banks that "exceed the total investment in [Infinite Reality] in the aggregate." Welch replied all to the message, "This is correct."

48.    Welch knew, or was reckless in not knowing, that his verification of Cole's representations was false. Welch did not independently confirm that Cole had in fact made the transfers to domestic banks, so he had no basis to say that it was "correct" that those transfers had occurred. Regarding the three purported transfers to Welch's escrow account, Welch was in the best position to know whether Cole sent funds to the account because Welch, and/or his firm, controlled it. Cole never transferred funds to Welch's escrow account at any time, so Welch knew or was reckless in not knowing that Cole's representation was false.

49.    February 25, 2025 email confirming transfers to Infinite Reality. On February 25, 2025, Cole asked Welch, in an email to Infinite Reality, to confirm that he had $3 billion "in various stages of transfer" with $860 million slated for Infinite Reality. Welch replied, "yes, I can confirm that the amount of funds Charles [Cole] mentioned below is in process—we are waiting on the formal confirmation/documentation from the institutions and will forward immediately upon receipt."

50.    No transfers were in process and none were ever made. Cole knew this, because he had no such funds to transfer. Welch knew, or was reckless in not knowing, that all of the purported transactions were a sham. Indeed, Welch had to have known that his statement that he "confirmed the amount of funds" was false because there were no such funds to "confirm."

12

51.   After the promised $860 million transfer to Infinite Reality's domestic bank accounts did not materialize, Infinite Reality agreed to have the purported $860 million transferred to its non-existent account at the Malaysian Investment Bank.

52.   Cole told Infinite Reality he made this transfer on March 10, 2025, and showed Infinite Reality a screenshot of the Malaysian Investment Bank account, purportedly in Infinite Reality's name, reflecting a deposit transaction of $860 million.  The screenshot depicts the same fraudulent imitation of the Malaysian Investment Bank website that Cole had previously utilized when purporting to assist Infinite Reality in opening an account at the Malaysian Investment Bank.  Cole knew or recklessly disregarded that this transfer was a sham because he had no such funds to transfer, and because this screenshot depicted the same fake website that he had previously utilized in his scheme to obtain Infinite Reality securities.

53.   Heart of Humanity then executed another subscription agreement with Infinite Reality, effective March 10, 2025, to purchase another 51,212,973 shares.  Cole signed the agreement on behalf of Heart of Humanity.  In April 2025, Infinite Reality issued Heart of Humanity the additional 51,212,973 shares under that agreement, bringing Cole's total holdings to 239,145,402 shares.  The amount represented approximately 25% of Infinite Reality's then-outstanding shares.

54.   To date, Infinite Reality has not received any funds from Cole or his entities.

**E.   Cole Obtains Cash Using His Fraudulently Obtained Infinite Reality Shares**

55.   In May 2025, Cole obtained $1 million from the Lending Institution. Specifically, Cole pledged nearly 45 million of his fraudulently obtained Infinite Reality shares as collateral for a $1 million loan.

56.   Welch represented Cole in the transaction, including drafting the lending agreement.  Cole and Welch provided the Lending Institution with many of the same fabricated

documents they had given to Infinite Reality, which purported to demonstrate Cole's wealth and ability to repay the loan.

57.    The Lending Institution wired $1 million to an escrow account held by Welch's law firm.  Welch then disbursed the funds, at Cole's direction, as follows: $552,800 to Cole ($6,500 of which Cole then transferred to Avranoc), $22,200 to Taylor, and $200,000 to a crypto-asset platform to be converted to crypto assets and deposited into an account controlled by Thiess in the name of TiNB.

58.    To the Commission's knowledge, none of TiNB, Thiess, or Taylor provided any goods or legitimate services in exchange for the cash they received or otherwise have any legitimate claim to the money.

59.    Welch and Cole made and caused the wire transfers to Cole and to the crypto-asset platform identified in Paragraph 57 to be made using the means or instrumentalities of communication in interstate commerce, and the transfers occurred through and to this district through the Federal Reserve Bank of New York's Fedwire service; the transfers to Cole's account occurred through his correspondent bank, which is located in this district, and the transfers to the crypto-asset platform for the benefit of TiNB's account controlled by Thiess occurred through the same correspondent bank in this district utilized by Cole.

60.    Cole defaulted on the loan and made no payments.

### FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
by Cole and Welch)**

61.    Paragraphs 1 through 60 above are re-alleged and incorporated by reference as if fully set forth here.

62.    Through the conduct described above, Cole and Welch, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

14

interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material fact(s) necessary to make the statements made, in light of the circumstances in which they were made, not misleading; or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

63.     Through the conduct described above, Cole and Welch violated, and will continue to violate unless enjoined, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder by Beacon Heart, Heart of Humanity, and Avranoc)

64.     Paragraphs 1 through 60 above are re-alleged and incorporated by reference as if fully set forth here.

65.     Through the conduct described above, Beacon Heart, Heart of Humanity, and Avranoc directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed one or more devices, schemes, or artifices to defraud; or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.     Through the conduct described above, Beacon Heart, Heart of Humanity violated, and will continue to violate unless enjoined, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

**THIRD CLAIM FOR RELIEF**

**(Violations of Section 17(a) of the Securities Act by Cole)**

67.     Paragraphs 1 through 60 above are re-alleged and incorporated by reference as fully set forth here.

68.     Through the conduct described above, Cole, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud; (ii) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

69.     Through the conduct described above, Cole violated, and will continue to violate unless enjoined, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**FOURTH CLAIM FOR RELIEF**

**(Violations of Section 17(a)(1) and (3) of the Securities Act by Welch)**

70.     Paragraphs 1 through 60 above are re-alleged and incorporated by reference as fully set forth here.

71.     Through the conduct described above, Welch, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud; or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

16

72.     Through the conduct described above, Welch violated, and will continue to violate unless enjoined, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §77q(a)(1) and (3)].

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act by Welch)

73.     Paragraphs 1 through 60 above are re-alleged and incorporated by reference as fully set forth here.

74.     As alleged above, Cole violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

75.     Welch knowingly or recklessly provided substantial assistance to Cole with respect to its violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

76.     By reason of the foregoing, Welch is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Cole's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Welch will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Relief Defendants)

77.     Paragraphs 1 through 60 above are re-alleged and incorporated by reference as if fully set forth here.

78.     Each Relief Defendant received ill-gotten gains that are proceeds of the unlawful activity alleged above.

79.     Each Relief Defendant has no legitimate claim to these ill-gotten gains.

80.     Each Relief Defendant obtained the funds under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.

81.     Each Relief Defendant has therefore been unjustly enriched.

17

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

A.      Permanently restraining and enjoining Cole and those persons in active concert or participation with him from violating, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

B.      Permanently restraining and enjoining Beacon Heart, Heart of Humanity and Avranoc, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

C.      Permanently restraining and enjoining Welch and those persons in active concert or participation with him from violating, or aiding and abetting violations of, directly or indirectly, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

D.      Permanently restraining and enjoining Cole from directly or indirectly, including, but not limited to, through an entity owned or controlled by Cole, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Cole from purchasing or selling securities listed on a national securities exchange for his own personal account;

E.      Ordering Cole, Beacon Heart, Heart of Humanity, and Avranoc to disgorge, on a joint and several basis, all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

18

F.      Ordering Cole and Welch to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

G.      Ordering Relief Defendants to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

H.      Granting such other relief as the Court may deem appropriate.

## JURY DEMAND

The Commission demands a trial by jury.


DATED: June 11, 2026                    Respectfully submitted,


/s/ *Jeffrey S. Olshan*
Alfred A. Day, MA BBO No. 654436*
William J. Durkin, MA BBO No. 678403*
Jeffrey S. Olshan, MA BBO No. 693337**
Dahlia Rin, MA BBO No. 674137*
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: 617-573-8955 (Olshan direct)
Email: OlshanJ@sec.gov
Fax: 617-573-4590

*Not admitted in the Southern District of New York
**Motion to appear *pro hac vice* pending

# EXHIBIT 64

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 26 Cr. ___ |
| CHARLES COLE, | |
| Defendant. | |

26 CRIM 0242

## COUNT ONE
### (Wire Fraud)

The Grand Jury charges:

1.     From at least in or about June 2024 through in or about March 2026, CHARLES COLE, the defendant, perpetrated a scheme to fraudulently obtain at least 239 million shares from Infinite Reality, Inc. ("Infinite Reality"), now known as Napster, which he then used as collateral to induce financial institutions to lend him money. As part of that scheme, COLE, and others acting at his direction, repeatedly lied to Infinite Reality about his ability to pay for the shares—fabricating bank records, creating sham correspondence, and establishing a fake website to mirror that of a foreign bank—to deceive Infinite Reality into believing that COLE had billions of dollars that he was prepared to invest in the company. Based on those misrepresentations, Infinite Reality issued shares to COLE and entities he controlled. But COLE, who had no intention of paying for the shares, never invested in Infinite Reality. Instead, he used his fraudulently obtained shares as collateral to obtain or try to obtain loans from third parties, fabricated bank records to acquire still more shares of Infinite Reality based on further misrepresentations, and persisted in his efforts to deceive Infinite Reality until it ultimately rescinded the shares it had issued to COLE and his entities.

<u>COLE Defrauds Infinite Reality to Obtain the Company's Shares</u>

2.      Infinite Reality is a Florida-based technology company that advertises itself as specializing in applications of spatial computing, extended reality, and artificial intelligence. Infinite Reality has raised capital through private placement offerings to outside investors.

3.      Beginning in or around mid-2024, Infinite Reality sought to raise approximately $350 million in new finance and engaged a Long Island-based broker dealer ("Broker-1") to help identify prospective investors. In or around August 2024, Broker-1 introduced Infinite Reality to CHARLES COLE, the defendant, and certain of his associates as individuals who supposedly could facilitate an investment in Infinite Reality. COLE and his associates initially proposed transferring a $1 billion bond—purportedly held by a company in which COLE previously had a membership interest—to Infinite Reality as consideration for $350 million in Infinite Reality's shares. In or about August 2024, Infinite Reality collected the bond in Manhattan, New York.

4.      In the weeks that followed, CHARLES COLE, the defendant, made various efforts to try to monetize the bond, all of which proved unsuccessful. COLE then told Infinite Reality that he was interested in acquiring billions of dollars' worth of Infinite Reality's shares through direct investment, and provided Infinite Reality with false information about his access to capital to fund such a transaction. Among other things, COLE submitted a document to Infinite Reality that falsely listed a yearly income of $50 million and net worth of $800 million, and another document, signed under penalty of perjury, falsely claiming that he had $33 billion available for his proposed investments in Infinite Reality. Based on COLE's misrepresentations, on or about September 4, 2024, COLE and Infinite Reality entered into a subscription agreement wherein COLE agreed to purchase approximately 45 million shares of Infinite Reality for $500 million.

5.      CHARLES COLE, the defendant, continued his fraudulent scheme to acquire more shares of Infinite Reality through lies and fabricated documents designed to create the false

2

impression that he had access to billions of dollars. For example, to deceive Infinite Reality into believing he had billions of dollars at a foreign bank, COLE fabricated a bank confirmation letter bearing the letterhead and purported signature of the founder of a foreign financial institution based in Sweden ("Foreign Bank-1"), falsely stating that COLE's entity, Avranoc, LLC ("Avranoc"), "has been a client in good standing with us" and had €49 billion of "immediately spendable cash" in its account at Foreign Bank-1. In truth, COLE had no money at Foreign Bank-1. On September 25, 2024, shortly after COLE sent the fabricated bank confirmation letter to Infinite Reality, COLE executed a subscription agreement wherein Beacon Heart LLC, a company COLE owned and controlled, agreed to purchase approximately 45 million shares of Infinite Reality for $350 million. Then, on or about September 27, 2024, COLE executed a second subscription agreement with Infinite Reality wherein Heart of Humanity LLC, a second company COLE owned and controlled, agreed to purchase a to-be-determined number of Infinite Reality shares in exchange for a bond in the amount of $2.5 billion.

6.     CHARLES COLE, the defendant, had no intention of paying Infinite Reality any of the money owed under the September 2024 subscription agreements and, in fact, did not pay as promised. When Infinite Reality executives pressed COLE about the overdue payments, COLE responded with a series of false excuses as to why the money had not been transferred. To sustain the deception, COLE convinced Infinite Reality that he held billions of dollars at another foreign bank based in Malaysia ("Foreign Bank-2") and had opened an account in Infinite Reality's name to hold the funds. In furtherance of that false claim, COLE and his coconspirators drafted fake confirmation letters purportedly from Foreign Bank-2 and caused them to be transmitted to Infinite Reality. The first, sent on or about November 9, 2024, falsely claimed that COLE and Avranoc had over $11 billion available at Foreign Bank-2 and that COLE was "Ready Willing and Able to fully fund the transfer of **$3,360,000,000.00 . . . as soon as Monday November 11th, 2024." A

3

second letter followed less than one week later, claiming that COLE had approximately $9 billion at Foreign Bank-2 following two transfers of approximately $860 million, that one transfer directed to Infinite Reality was temporarily on hold "following routine server maintenance and upgrades," and that Foreign Bank-2 was opening an account for Infinite Reality to receive the funds.

7.    The account at Foreign Bank-2, however, was a fiction. Unbeknownst to Infinite Reality, CHARLES COLE, the defendant, and his coconspirator had established offshore servers to host a fake website that mirrored the actual website of Foreign Bank-2 and permitted users with approved credentials to "log in" to fabricated accounts. COLE repeatedly asked a coconspirator about the status of the servers, asking whether the server with the Foreign Bank-2 "mirror" was "up and running so that we can add an account" and go "live." Once the fake website was operational, COLE caused Infinite Reality to receive a fake welcome email—drafted by COLE and sent from a fake Foreign Bank-2 administrative account—with a link to Infinite Reality's purported new account. Executives from Infinite Reality logged in and observed what appeared to be a funded account. The deception worked. On or about November 20, 2024, COLE and Infinite Reality executed an amendment to the Heart of Humanity subscription agreement under which Heart of Humanity agreed to purchase approximately 98 million additional Infinite Reality shares for $1.65 billion. Approximately one month later, Infinite Reality, believing COLE had funded its Foreign Bank-2 account, issued the shares contemplated by all outstanding subscription agreements.

COLE Attempts to Monetize the Fraudulently Obtained Shares

8.    Having induced Infinite Reality to issue the shares, CHARLES COLE, the defendant, and others acting at his direction, continued the fraud by stringing Infinite Reality along with additional false assurances about outstanding payments due while simultaneously attempting

4

to profit from the fraudulently obtained shares.

9.      After fabricating the initial Foreign Bank-2 account balance, CHARLES COLE, the defendant, and his coconspirators continued transmitting fake bank correspondence to Infinite Reality. For example, on or about February 14, 2025, a coconspirator posing as a representative of Foreign Bank-2 sent Infinite Reality a fabricated "Confirmation of Funds" letter falsely stating that Foreign Bank-2 held $2.5 billion in an account for Infinite Reality. A few days later, COLE himself emailed Infinite Reality executives falsely claiming that he had transferred $2.5 billion to Infinite Reality's account at Foreign Bank-2 and that "[a]n additional 860 million USD [was] in process for deposit" with $100 million "scheduled for release later today." None of that was true. Based on these and prior misrepresentations, Infinite Reality executed another subscription agreement on or about March 10, 2025, pursuant to which Heart of Humanity agreed to purchase approximately 51 million additional shares for $860 million.

10.      At the same time, CHARLES COLE, the defendant, took steps to monetize his fraudulently obtained shares. In or around March 2025, COLE unsuccessfully attempted to obtain a line of credit from a U.S. financial institution ("U.S. Bank-1"), offering to pledge his shares of Infinite Reality as collateral while misrepresenting that he had substantial wealth overseas. On or about May 2, 2025, based on similar misrepresentations, another U.S.-based financial institution ("U.S. Lender-1"), loaned $1 million to Beacon Heart against approximately $45 million of the fraudulently obtained shares. The proceeds were deposited into an IOLTA account held by COLE's then-attorney, from which approximately $552,000 was subsequently wired to COLE's bank account in Manhattan. COLE withdrew approximately $280,000 and wired the remainder to other individuals, including coconspirators.

<u>COLE Continued to Try to Acquire More Shares of Infinite Reality</u>

11.      Even as Infinite Reality pressed him for outstanding payments due, CHARLES

COLE, the defendant, moved to acquire more Infinite Reality shares. On or about May 15, 2025, COLE signed a letter of intent to purchase additional Infinite Reality shares through a tender offer. When Infinite Reality, through its counsel, demanded proof that COLE was in fact transferring the funds to pay for the previously issued shares and had the money to back his proposed tender offer, COLE fabricated additional records purporting to show his ability to pay for the shares. For example, COLE transmitted to Infinite Reality's counsel a screenshot purporting to show a balance of over $11 billion in a U.S. Bank-1 account that did not exist. For further example, COLE told Infinite Reality executives that he had moved funds to another U.S. financial institution ("U.S. Bank-2") that was preparing to process the $3.36 billion payment when, in truth, he had made no such arrangements. Meanwhile, COLE took care to ensure his fictitious paper trail held together, personally directing a coconspirator to fix mismatched account number formatting on fabricated statements so the documents would "match all the others."

12.    Throughout 2025, executives at Infinite Reality continued to press CHARLES COLE, the defendant, for payment for the shares that Infinite Reality had previously issued, and COLE continued to offer false explanations and new agreements intended to prevent Infinite Reality from attempting to rescind the shares. COLE, however, never transferred any funds. The scheme ultimately unraveled in March 2026 when Infinite Reality rescinded all the shares it previously issued to COLE and his entities.

<div align="center">Statutory Allegations</div>

13.    From at least in or about June 2024, up to and including in or about March 2026, in the Southern District of New York and elsewhere, CHARLES COLE, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate

<div align="center">6</div>

and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, COLE devised and participated in a scheme to obtain money and property by providing false and misleading representations and promises, including through the use of interstate wires, to induce Infinite Reality to sell and transfer at least 239 million of the company's shares to COLE and his entities and then using the shares to induce U.S. Bank-1 and U.S. Lender-1 to lend money.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

14.    The allegations contained in paragraphs 1 through 12 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

15.    From at least in or about June 2024, up to and including in or about March 2026, in the Southern District of New York and elsewhere, CHARLES COLE, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

16.    It was a part and an object of the conspiracy that CHARLES COLE, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, COLE agreed with others to devise

7

and participate in a scheme to obtain money and property by providing false and misleading representations and promises, including through the use of interstate wires, to induce Infinite Reality to sell and transfer at least 239 million of the company's shares to COLE and his entities, and then using the shares to induce U.S. Bank-1 and U.S. Lender-1 to lend money.

(Title 18, United States Code, Section 1349.)

## Count Three
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

17.    The allegations contained in paragraphs 1 through 12 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

18.    From at least in or about June 2024, up to and including in or about March 2026, in the Southern District of New York and elsewhere, CHARLES COLE, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

19.    It was a part and an object of the conspiracy that CHARLES COLE, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security registered on a national securities exchange and a security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in

8

order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, COLE agreed with others to devise and participate in a scheme to obtain money and property by providing false and misleading representations and promises, including through the use of interstate wires, to induce Infinite Reality to sell and transfer at least 239 million of the company's shares to COLE and his entities.

Overt Acts

20.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.    In or about August 2024, coconspirators of CHARLES COLE, the defendant, arranged to have Infinite Reality come to Manhattan, New York to collect the bond that was purportedly worth $1 billion and used as consideration for the agreement to obtain $350 million of Infinite Reality's shares.

b.    In or about November 2024, CHARLES COLE, the defendant, and others acting at his direction, created and transmitted fake bank records and correspondence to executives of Infinite Reality that claimed that COLE had billions of dollars in an account at Foreign Bank-2 and that COLE had directed the transfer of $3.36 billion.

c.    In or about November 2024, CHARLES COLE, the defendant, worked with a coconspirator to create a website portal that was made to look like that of Foreign Bank-2 and which purported to show that Infinite Reality had billions of dollars in an account at Foreign Bank-2.

d.    In or about May 2025, CHARLES COLE, the defendant, pledged his

9

fraudulently obtained shares of Infinite Reality as collateral for a loan, and caused proceeds of that loan to be transmitted to his bank account in the Southern District of New York.

## FORFEITURE ALLEGATIONS

21.    As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, CHARLES COLE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## Substitute Assets Provision

22.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

Grand Jury Foreperson

_Jay Clayton /s_
JAY CLAYTON
United States Attorney

10

# EXHIBIT 65

**United States District Court**
**Eastern District of California**
Before the Honorable **WILLIAM B. SHUBB, SENIOR JUDGE**

**CRIMINAL TRIAL MINUTES**

| | |
|---|---|
| UNITED STATES OF AMERICA | **Time in Court:   0:40** |
| vs | CASE #:  2:24cr00311-WBS |
| | DATE:   6/18/2026 |
| **DANIEL CHARTRAW** | Courtroom Deputy: Karen Kirksey Smith |
| | Court Reporter:   Abigail Torres |

**Appearance(s)  for Government:**

Jessica Delaney
Joseph Harman

**Appearance(s) for Defendant(s):**

Counsel: Andrew Flier, Retained

Deft:  Present/Out of Custody

**JURY TRIAL (DAY 8):**

| | |
|---|---|
| 9:30 a.m. | Trial resumes.  Jury returns.  Court instructs jury. |
| 9:54 a.m. | Bailiff sworn.  Jury retires.  Alternates excused and ordered to remain on call. |
| 10:00 a.m. | Court recessed. |
| 2:20 p.m. | Filed Jury Note #1 |
| 2:40 p.m. | Trial resumes.  Jury returns.   VERDICT RETURNED, READ AND FILED as follows:  Defendant found **GUILTY AS TO COUNTS 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12.**  Jury polled upon request of Defendant. |
| 2:46 p.m. | Jury and Alternates are excused from this action.  MATTER IS REFERRED to the US PROBATION OFFICE, and Sentencing is set for **9/28/2026 at 10:00 Am**i n Courtroom 5 (WBS) before Judge William B. Shubb.   Defendant shall remain on pretrial release under the same terms and conditions as previously ordered.   Defendant ordered to return on said date and time. |
| 2:50 p.m. | Court Adjourned.  Case continued to **September 28, 2026 at 10:00 a.m.** for Judgment and Sentence. |

**Other:**       Filed Exhibit Lists, Witness Lists, Jury Instructions, Verdict Form.
(All exhibit binders returned to counsel.)

1