Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01707-KAS

KOSHER EATS LLC,
EMERALD CONSULTING PARTNERS LLC,
ABBSON LLC,
MSC COMPANIES, LLC, and
HOMEPEOPLE CORPORATION,

      Plaintiffs,

vs.

MESSNER REEVES LLP,
DANIEL CHARTRAW,
TODD OWEN, and
CLEARWATER PREMIERE PERPETUAL MASTER LLC,

      Defendants.

---

## DECLARATION OF NOAH LASKO

---

I, Noah Lasko, declare as follows:

1.      I have personal knowledge of the matters stated in this declaration and would testify competently to them in court.

2.      I submit this declaration in support of Plaintiffs' motion for preliminary injunction and motion for prejudgment writ of attachment.

3.      I am the President of Plaintiff Kosher Eats LLC.

### Kosher Eats and the BELOC

4.      My family has been involved in the kosher food industry for 30 years.

5.      Kosher Eats is a kosher food distribution and catering business specializing in high-quality kosher meals for corporate clients, institutions, and retail consumers.

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

6.      In January 2023, Kosher Eats acquired its business operations. As part of the acquisition, Kosher Eats planned to expand by building a new commissary and distribution center to scale its business.

7.      To fund this expansion, Kosher Eats sought financing. In April 2023, Kosher Eats was presented with a BELOC drafted by Messner. Under the BELOC, Kosher Eats would receive an $8,000,000 loan at 6 percent interest, with no personal guarantee or real estate collateral.

8.      The BELOC required Kosher Eats to deposit $2,000,000 into escrow with Messner, a national law firm acting as the Trustee and escrow holder.

9.      Kosher Eats proceeded and deposited $2,000,000 with Messner only because of the faith and trust it placed in Messner's reputation as a national law firm with over 100 attorneys, more than 70 partners, and 10 offices across the country.

10.     Before entering the transaction, I analyzed Messner and was satisfied that the firm was trustworthy based on its public statements.

11.     I understood that the loan might not fund. I did not understand that the deposit itself could be transferred away before funding.

12.     The BELOC and FAQ contained representations about the safety of the deposit. The documents stated that the ICA deposit would remain in the Trustee's sole possession and control, that the funds would be held by a nominated Trustee attorney, that the funds would remain with the Trustee until the loan was delivered, that the money would be fully insured, and that the borrower would not be exposed to the risk of losing the escrow deposit.

13.     I understood that the loan might not fund. I did not understand that the deposit itself could be transferred away before funding. I would not have authorized that risk.

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

14.    Had I known that Daniel Chartraw was involved in the BELOC transaction in any capacity, Kosher Eats would not have entered into the transaction or deposited any money with Messner. I would not have approved the transaction if I had known that Chartraw was involved, whether directly, through Clearwater, or through any other person or entity.

15.    On April 27, 2023, Kosher Eats wired $2,000,000 in deposit funds to Messner's Northern Trust account.

16.    The loan never funded. The first disbursement was due within 90 days, by July 27, 2023, but Kosher Eats received no part of the promised loan and no refund.

**Lulling statements and delay**

17.    After the July 27, 2023 funding deadline passed, Messner, directly and through its representatives and agents, gave delays, misdirection, contradictory explanations, and broken commitments regarding disbursement of the loan and return of Kosher Eats' $2,000,000 deposit.

18.    The recurring excuses involved logistics, transfer protocols, bankers, approvals, additional documentation, alleged aggregation or monetization, banking procedures, regulatory hurdles, and supposed compliance limits on proof of wire transfers.

19.    On August 17, 2023, Welch claimed that bankers were waiting for additional approvals, that AML documents had been submitted, that all remained routine, and that he anticipated additional news the next day.

20.    On August 17, 2023, in response to an email from my former counsel, Welch stated that he would keep us informed on funds clearing into U.S. accounts, that there were three banks working on that side, and that funds would be deployable by the end of the next week if clearance occurred.

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

21. On August 18, 2023, Welch stated that he had discussed the move with the bankers and that initial messages had been sent for final transfers.

22. On August 22, 2023, Welch stated that the matter remained on track, subject only to banking procedures and time frames.

23. On August 24, 2023, Welch stated that bankers were still working through transfer protocols and clearance of the funds and that he remained hopeful funds would clear and deposit the next day.

24. On August 25, 2023, Welch claimed that funds were still in process into the INBE account for disbursement.

25. On August 28, 2023, Welch refused to produce the bankers for a call and stated that the funds had been moved to aggregate into a larger amount for monetization and that Messner remained in control of those funds.

26. On September 7, 2023, Martin Hale emailed me, copying Welch and others, and stated that the money for my loan would be proceeds from an investment trade, that the trade had not happened as quickly as expected, and that Torben and Danny were working diligently to remedy the issue.

27. In October 2023, Hale repeatedly referenced Danny, whom I later understood to be Daniel Chartraw, and instructed me not to call Torben. Hale told me he would speak to Danny and come back to me.

28. On October 11, 2023, I requested proof of a wire transfer. Hale told me I would never get proof of a wire due to compliance purposes.

29. On December 15, 2023, Jason Aufdermaur stated that he was working with Messner and Clearwater so that Clearwater funds would be disbursed to several parties, with funds

4

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

supposedly available no later than December 22, 2023. Clearwater never sent any money to Kosher Eats.

30.    On February 8, 2024, Hale claimed that the money was in their banks but not released and that Messner was expecting a call at any time saying funds were free to move.

31.    On February 15, 2024, Welch sent a letter on Messner letterhead stating that the funds had and continued to be under the control of the firm and were held in a firm trust account at Titan Financial, LLC. He also stated that movement from Titan required a correspondent bank and that Messner was working with JPMorgan Chase and the Chase Treasury Department.

32.    On March 11, 2024, Welch stated that everything remained on schedule.

33.    On March 20, 2024, Welch stated that a national bank partner was handling the last path of the ICA deposits and believed it would deploy the funds that week.

34.    On March 22, 2024, I texted Hale that I was out of time, that there was no proof any money was here, and that every avenue had failed and then another new one had started.

35.    On March 25, 2024, I emailed Welch asking whether documents would be sent and money returned that day or whether he was still using the national bank partner excuse. Welch did not respond.

### Other statements and lack of authorization

36.    On August 31, 2023, Welch told my former counsel that he logged into a purported bank called FIDES and saw $70 billion in an account allegedly held by Clearwater, which was supposedly going to pay back my escrow deposit.

37.    On January 25, 2024, Welch provided a document purporting to be a printout from Titan Private Bank, LLC reflecting an IOLTA account of Messner Reeves, LTD purportedly

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

containing $10,300,000, which supposedly included the Kosher Eats escrow deposit and other deposits.

38.     Messner repeatedly changed its story regarding the missing escrow funds. First, Welch claimed the funds were safe and awaiting clearance. Then he claimed the funds were at Titan Financial. Then Messner referred to Clearwater, associated with Chartraw, as the entity that would return Plaintiffs' deposit money.

39.     I never authorized Messner to transfer $2,000,000 to Chartraw, Clearwater, Sahara Las Vegas Corp., Owen, Dribble Dunk, Construction Testing Services, Harris Bank, any of those parties' creditors or attorneys, car dealerships, loan repayments, Titan Financial, or any other person or entity. I authorized only the deposit into Messner's trust account under the BELOC terms.

40.     I did not consent to my funds being moved, aggregated, monetized, transferred to Titan, transferred to Clearwater, or used for any trade or project.

41.     Despite numerous demands, Messner refuses to return the funds or provide a truthful accounting.

42.     I have not received any accounting identifying where $2,000,000 went, who received it, why it was transferred, what authority supposedly allowed the transfer, or where any traceable proceeds are now located.

43.     I have requested and demanded the return of Kosher Eats's ICA deposit from Messner numerous times, both directly and through counsel, including on June 4, 2026, through a communication sent to Messner's counsel at Gordon Rees and directed to Messner's highest-ranking personnel, including its President, Chief Executive Officer, Chief Operating Officer, and five managing partners. In response, my understanding is that Messner replied through counsel on June 9, 2026, disputing that it was obligated to provide an accounting to me as a non-client

6

Docusign Envelope ID: 0EDEC4AD-DD25-8E86-8312-EF084E3451EA

depositor. I also understand from counsel that INBE, Messner's former client, asked Messner for an accounting and Messner refused.

44.     Had I known Messner would transfer Kosher Eats' deposit away before funding, Kosher Eats would not have entered the transaction.

### Irreparable harm

45.     The loss of Kosher Eats' $2,000,000 escrow deposit devastated the company and caused severe financial distress.

46.     Kosher Eats defaulted on other loan obligations and had to take additional loans on unfavorable terms to sustain business operations.

47.     Kosher Eats incurred $480,000 in interest payments to hold off creditor actions.

48.     Kosher Eats could not execute its expansion plans or build a new commissary.

49.     Kosher Eats failed to meet supplier demands and suffered serious reputational harm.

50.     There is an imminent risk of insolvency and closure due to mounting debt and unpaid obligations.

51.     Without court intervention, Kosher Eats faces an imminent risk of not surviving long enough to recover the money.

52.     The harm to Kosher Eats has grown progressively worse since Messner failed to return the escrow funds. If the missing escrow funds entrusted to Messner are not returned, that circumstance will likely cause Kosher Eats to fail. The harm is imminent and irreparable in nature.

7

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 6/25/2026

By: Noah Lasko
05A8600F1667459...
Noah Lasko
President, Kosher Eats LLC

8