Electronically Filed by Superior Court of California, County of Orange, 02/13/2024 08:00:00 AM.
30-2024-01378580-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By K. Climer, Deputy Clerk.

**EXHIBIT**

**G**

Kenneth E. Chase (SBN 326307)
CHASE LAW & ASSOCIATES, P.A.
1141 71st Street
Miami Beach, FL 33141
Telephone: (305) 402-9800
Facsimile: (305) 402-2725
Email: kchase@chaselaw.com

*Attorney for Plaintiff*
*Emerald Consulting Partners LLC*

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ORANGE
UNLIMITED CIVIL

**Assigned for All Purposes**

| | |
|---|---|
| EMERALD CONSULTING PARTNERS LLC, a Florida limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> MESSNER REEVES, LLP, a Colorado limited liability partnership, and INBE CAPITAL LLC, a Wyoming limited liability company, <br><br> Defendants. | CASE NO. Judge Thomas S McConville 30-2024-01378580-CU-BC-CJC <br><br> COMPLAINT FOR: <br><br> 1. BREACH OF CONTRACT <br> 2. NEGLIGENCE <br> 3. BREACH OF FIDUCIARY DUTY <br> 4. RESTITUTION AND UNJUST ENRICHMENT <br> 5. BREACH OF CONTRACT <br> 6. RESTITUTION AND UNJUST ENRICHMENT <br> 7. RESCISSION |

Plaintiff Emerald Consulting Partners LLC brings this action against Defendants Messner Reeves, LLP ("Messner") and INBE Capital LLC ("INBE") stating as follows.

## PARTIES

1.     Plaintiff is a Florida limited liability company with a principal place of business at 3810 Round Table Court, Land O Lakes, FL 34638.

2.     Defendant Messner is a Colorado limited liability partnership with a principal place of business at 1550 Wewatta Street, Suite 710, Denver, CO 80202. Messner is a law firm with 129 attorneys, 41 of whom practice in Messner's two California offices with 33

- 1 -
COMPLAINT

attorneys practicing in Messner's Orange County office located at 650 Town Center Drive Suite 700, Costa Mesa, CA 92626.

3. Defendant INBE is a Wyoming limited liability company with a principal place of business at 30 N. Gould Street, Sheridan, WY, 82801.

## JURISDICTION AND VENUE

4. Defendant Messner is subject to general personal jurisdiction in California because Messner's contacts with this forum state, including the operation of two California offices with 41 attorneys, are continuous and pervasive such that it is fair to subject Messner to personal jurisdiction in California for all purposes.

5. Defendant INBE is subject to specific personal jurisdiction in California because INBE purposefully availed itself of the forum state's benefits, this controversy is related to or arises out of INBE's contacts with the forum state, particularly as it relates to actions involving Messner, and the exercise of personal jurisdiction over INBE would comport with fair play and substantial justice.

6. Material events and circumstances which are the subject of this lawsuit occurred in Orange County, California.

7. The amount in controversy exceeds $700,000.

8. Venue is appropriate in this court.

## FACTUAL ALLEGATIONS

9. Plaintiff is a financing consultant with expertise in small business loans.

10. Defendant Messner is a law firm with 129 attorneys in 11 offices and 20 practice groups, including banking and financial services.

11. Defendant INBE is a venture capital lender and investor.

12. On or about June 12, 2023, INBE entered into a Business Expansion Line of Credit Agreement ("BELOC") with Plaintiff's client, Hard AF Seltzer, LLC ("Hard AF"), with INBE as the lender and Hard AF as the borrower. Ex. A.

13. Per the BELOC, INBE agreed to loan Hard AF the amount of $2,800,000, pursuant to an asset backed line of credit loan (the "LOC").

14.	Per the BELOC, prior to INBE's funding of the LOC, Hard AF agreed to effectuate payment of $700,000 to INBE, in care of Messner, which was referred to as the Interest Credit Account Payment (the "ICA Payment").

15.	The BELOC further provided that the $700,000 ICA Payment was to be made to, and "held" in escrow by INBE's "nominated Trustee (Attorney)" who was designated as "Messner Reeves, LLP."

16.	The BELOC contained Messner's bank account information at Northern Trust Company, with a specific account number, and the BELOC terms confirmed that the $700,000 ICA Payment "shall be in Trustee [Messner]'s sole possession and control."

17.	Messner agreed to, consented to, approved, and ratified the escrow agreement, as applied to Plaintiff as discussed herein, and Messner undertook the duties and responsibilities of an escrow holder.

18.	INBE expressly "represented and warranted" its ability to fund the LOC per Section 10.12, entitled Lender's Ability to Fund: "Lender [INBE] hereby represents and warrants to Borrower [Hard AF] that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount."

19.	INBE also confirmed that it "covenants and agrees that it shall fully and timely fund" the LOC.

20.	The relevant timeliness provision requires INBE to fund the first LOC advance to the borrower within 90 days from the date of receipt of the ICA Payment.

21.	INBE's website at the relevant time, https://theinbegroup.com/capital/, contained the following answer to this question: "Where do the [BELOC] funds come from? These are our funds. They do not come from any other investor or wholesale lender. INBE Capital LLC has the financial capacity and resources to fund a range of projects… We have a strong capital base and maintain appropriate levels of liquidity to ensure our ability to fund."

22.	The BELOC further provided that if INBE is "unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee" and "should Trustee [Messner] fail to return the ICA

COMPLAINT

Advance Fee per his [sic] contractual obligations with the Lender… INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days." *Id*.

23. INBE stated in Article 7.1 that "the first Advance will be funded no later than ninety (90) calendar days (inclusive of underwriting period) following confirmation of receipt by the Lender of the ICA Payment."

24. On or about June 12, 2023, Plaintiff and Hard AF entered into a Secured Promissory Note, pursuant to which Plaintiff loaned $700,000 to Hard AF to fund the ICA Payment, payable to INBE in care of Messner as the escrow/trustee. Ex. B.

25. On or about June 12, 2023, Plaintiff, INBE, and Hard AF entered into a Funding Directive Letter, pursuant to which the parties agreed that if the LOC is not funded, then "INBE agrees to immediately forward and return the Deposit amount (i.e., US $700,000.00) to BRIDGE LENDER [Plaintiff] via wire transfer, without deduction of any kind. If INBE fails to forward and return the Deposit amount as required within one (1) business day of BORROWER [Hard AF]'s written request, INBE agrees that BORROWER [Hard AF] may, and is hereby authorized by INBE to, instruct Escrow Agent [Messner] to forward and refund the Deposit directly to BRIDGE LENDER [Plaintiff]." Ex. C.

26. INBE further agreed to draft the loan documents such that the ICA Payment shall be immediately paid to the Plaintiff if the LOC is not funded within 90 days after Plaintiff's deposit of the $700,000 ICA Payment.

27. On June 13, 2023, Plaintiff effectuated the deposit of $700,000 to INBE in care of Messner as the escrow/trustee with a $700,000 wire to Messner's Northern Trust bank account number as reflected in the BELOC.

28. On June 13, 2023, a Messner partner named Torben Welch sent a text message to Plaintiff's CEO confirming Messner's receipt of the $700,000 wire on June 13, 2023 into Messner's Northern Trust account.

29. On June 13, 2023, Plaintiff's principal sent the following email to INBE's principal: "[a] deposit has been made to the escrow at Messner in the amount of $700,000 on

behalf of Hard AF Seltzer. The wire date is 6/13/2023. As per the contract, the first funding date will be 90 calendar days after, which is no later than 9/11/2023."

30. On June 20, 2023, INBE's Chief Funding Officer, Jonathan Wright, replied to Plaintiff's June 13, 2023 email, stating as follows, "confirmed we got it. I confirmed it came on Friday."

31. As of August 23, 2023, 19 days before the 90-day deadline of September 11, 2023 for INBE to fund the LOC, the LOC had not been funded.

32. Messner and INBE struggled to provide credible explanations for the delays and INBE's failure to fund the LOC, particularly given that INBE specifically represented that INBE "has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount" and the $700,000 ICA Payment was made 71 days earlier on June 13, 2023.

33. On August 23, 2023, with this backdrop, Messner circulated an Attorney Comfort Letter, provided to Plaintiff, signed by Welch, in which Messner stated, "[w]e serve as outside counsel to INBE Capital, LLC and its affiliates and partners ('INBE'). It is our understanding that you are exploring a potential business relationship with INBE for the receipt of a business expansion line of credit (a 'BELOC') from INBE. The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC." Ex. D.

34. The assertion in Messner's August 23, 2023 Attorney Comfort Letter that "INBE stands ready, willing and able to proceed with the financing" was false.

35. The September 11, 2023 funding deadline passed and INBE failed to fund the LOC.

36. Throughout September and October 2023, Plaintiff followed up with INBE and Messner numerous times to ascertain the status and the reason for INBE's failure to fund the LOC. INBE and Messner failed to provide substantive or logical answers.

- 5 -
COMPLAINT

37.    On September 21, 2023, Messner partner Welch texted Plaintiff's CEO in response to an inquiry on the status and timing of INBE's funding of the LOC, and Welch represented to Plaintiff, "I haven't heard anything concrete at this point. Reaching out now to get an update. I am dependent on info from INBE to pass on. I will let you know as soon as I have an update."

38.    Welch failed to explain why on August 23, 2023 Messner "confirm[ed] that INBE stands ready, willing and able to proceed with the financing," yet 29 days later on September 21, 2023, after the funding deadline passed, Messner had not "heard anything concrete at this point."

39.    Despite Welch's representation to Plaintiff's CEO that Welch would inform Plaintiff "as soon as" Welch had an update, Welch failed to provide any update to Plaintiff's CEO.

40.    Not only did Welch fail to provide Plaintiff's CEO with an update "as soon as" Welch had "information from INBE to pass on," Welch also failed to respond to all subsequent text messages from Plaintiff's CEO including texts on September 21, 2023, September 22, 2023, and October 27, 2023, in which Plaintiff continued to seek accurate information regarding the whereabouts and security of the missing $700,000.

41.    As of October 30, 2023, INBE still had not funded the LOC, and had defaulted 49 days earlier on September 11, 2023, Plaintiff's CEO sent the following email to Messner, "[w]e are done chasing for answers and seeking clarity on what happened to our funds. Your immediate attention to this matter is requested. We are seeking clear and accurate communication as to the whereabouts of our interest reserve funds."

42.    In response, Messner told Plaintiff to speak to a person named Martin Hale at Latham Funding.

43.    The Latham Funding website at that time, and continuing through today, references Messner as one of Latham Funding's "affiliates" and the Latham Funding website contains a link with Messner's logo where visitors of Latham Funding's website could click

- 6 -

COMPLAINT

directly to Messner's law firm website as an apparent form of advertising (visited February 12, 2024).

44.    Latham Funding's Hale failed to provide clarity on the status and whereabouts of Plaintiff's $700,000 which disappeared while in Messner's care, custody, and control.

45.    Latham Funding's Hale referred Plaintiff to a person named Daniel Chartraw at a company named Clearwater. However, Chartraw is a convicted felon, who was previously sentenced in federal court to four years and nine months in prison for wire fraud in Chartraw's theft of $2.8 million of investors' money from escrow accounts.

46.    Latham Funding or Clearwater retained an attorney, who made various representations to Plaintiff about Latham Funding or Clearwater's purported possession of Plaintiff's $700,000 ICA Payment.

47.    Neither Plaintiff nor Hard AF ever authorized INBE or Messner to transfer Plaintiff's $700,000 ICA Payment to Latham Funding, Clearwater, or any other recipient.

48.    To the contrary, Plaintiff and Hard AF both depended on the reliability, security, and integrity of Messner as a national law firm to safeguard Plaintiff's $700,000 ICA Payment in escrow at Messner's IOLTA trust account at Northern Trust bank.

49.    Moreover, Messner's August 23, 2023 Attorney Comfort Letter induced Plaintiff's abstention from action that that time, as the letter had the intended effect of easing and reducing concern about INBE and the funds.

50.    After representations from Latham Funding and Clearwater became increasingly illogical and contradictory, including weekly broken promises that Plaintiff's $700,000 was supposedly "on the way," Plaintiff reached back out to Messner.

51.    On November 21, 2023, Plaintiff's counsel sent a letter to Messner, demanding the return of the missing $700,000 by December 1, 2023. Ex. E.

52.    On December 1, 2023, Messner replied with a letter in which Messner proclaimed that Messner does "not represent INBE related to these matters at this time." Ex. F.

- 7 -

COMPLAINT

53. Messner's December 1, 2023 denial of representation of INBE conflicts with Messner's representation on August 23, 2023 when Messner said, "[w]e serve as outside counsel to INBE Capital, LLC and its affiliates and partners."

54. In Messner's December 1, 2023 letter, Messner attempted to obfuscate and minimize Messner's role in the disappearance of Plaintiff's money, as Messner stated that it had purportedly "served only as the Paymaster and recipient of the ICA Payment under the Agreement… Again, we are not representing INBE on its performance under the Agreement."

55. Despite Messner's assertion in its December 1, 2023 letter that Messner supposedly does not represent INBE, Messner provided no contact information for INBE.

56. Despite Messner's sudden denial of representation of INBE, Messner dodged its own escrow responsibilities by unilaterally proclaiming on INBE's behalf that, "[u]ntil such termination notice is received INBE is under no obligation to facilitate the return of the ICA Payment."

57. Messner further stated in the December 1, 2023 letter that upon receipt of a notarized Termination Notice, "**we** can then process the same and issue a return of the ICA Payment … as soon as possible after receipt of the Termination Notice." (Emphasis added).

58. Messner failed to identify who "we" refers to, given its preceding denial of representation of INBE.

59. In making the conflicting representations, Messner failed to explain what would be involved in "processing" the return of Plaintiff's $700,000 ICA Payment.

60. Given that Messner is an escrow agent, entrusted with an escrow agent's responsibilities, in addition to the rules governing attorneys, the only "processing" necessary to return escrow funds would be for Messner to send a domestic bank wire to Plaintiff from the same Northern Trust account that received Plaintiff's money on June 13, 2023.

61. Seeking a conclusion to this bizarre drama and the missing $700,000 in funds escrowed with Messner, on January 24, 2024, Plaintiff's counsel emailed Messner the notarized Termination Notice from Hard AF directed to INBE, dated January 19, 2024, which was also sent via certified mail. Ex. G.

COMPLAINT

62.     On January 24, 2024, Plaintiff's counsel also emailed Messner the June 12, 2023 Funding Directive Letter, Plaintiff's wire instructions, and another demand for the return of the $700,000 ICA Payment that Messner received. Ex. H.

63.     On January 25, 2024, Messner responded by email to Plaintiff's counsel, mustering that "there are some additional items to resolve… our clients are working to ensure a release of funds very quickly and will have more information on that tomorrow." Ex. I.

64.     In the January 25, 2024 email, Messner failed to identify the identities of its "clients."

65.     Messner actively and affirmatively participated in the concealment of the identity of the party or parties who possess, or possessed, Plaintiff's escrow money.

66.     In the January 25, 2024 email, Messner represented, for the first time, that "the funds [including Plaintiff's $700,000] remain part of the escrow under our control at Titan Financial, LLC [not Northern Trust] – a copy of that statement evidencing the same is attached hereto as of today's date (please note that your clients $700k is co-mingled with other funds)."

67.     The attachment to Messner's January 25, 2024 email consisted of a printout from a purported "IOLTA" account in the name "Messner Reeves, LTD" at an institution named Titan Private Bank, LLC. Ex. J.

68.     The amount reflected in the Titan Private Bank, LLC account in the name in the name "Messner Reeves, LTD," not Messner Reeves, LP, is $10,300,000.

69.     Messner failed to explain the inconsistency between Messner's December 1, 2023 letter when Messner referred to its unnamed "clients" who are supposedly "working to ensure a release of funds very quickly" and Messner's January 25, 2024 email in which Messner represented that "the funds remain part of the escrow under our control at Titan Financial, LLC."

70.     Given Messner's continuing failure to return Plaintiff's $700,000 in escrow money, Messner's January 25, 2024 email is also confounding because the purported $10.3 million balance in the account "under [Messner's] control" contains more then enough funds

COMPLAINT

to return Plaintiff's $700,000, which reflects less than 7% of the $10.3 million in the Titan account "under [Messner's] control" and in the name of an apparent Messner affiliate.

71. Messner provided no explanation regarding what "additional items" need to be "resolved" or why Messner's "clients" would supposedly be "working to ensure a release of funds" if those funds are already in an account "under [Messner's] control" with more than enough funds to return Plaintiff's money.

72. On January 25, 2024, Messner also represented that it "will have more information on that tomorrow," but multiple weeks passed and Messner never corresponded back with Plaintiff's counsel with an update despite its January 25, 2024 statement that it "will have more information on that tomorrow."

73. Messner and INBE continue in their failure to return Plaintiff's $700,000 in escrow which Messner received eight months ago.

74. Messner and INBE are in default. Pursuant to the BELOC, the Default Rate of interest is 24% "[u]ntil cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed."

75. Messner and INBE owe Plaintiff's attorneys' fees. The BELOC contains a fee-shifting provision, which is bilaterally applied.

76. Plaintiff has been forced to engage counsel and has agreed to pay reasonable attorneys' fees.

## COUNT ONE – BREACH OF CONTRACT

### (against Messner)

77. Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

78. A valid and binding contract between Plaintiff and Messner exists whereby Messner is an escrow holder and Messner is obligated to comply with the instructions of the parties privy to the escrow agreement.

- 10 -

COMPLAINT

79.    An escrow holder's failure to comply with the escrow agreement renders the escrow holder liable to the parties for breach of contract.

80.    Upon the escrow holder's breach of an instruction that it has contracted to perform or an implied promise arising out of the agreement, the injured party acquires a cause of action for breach of contract.

81.    Messner was required to "hold" Plaintiff's $700,000 as INBE's "nominated Trustee (Attorney)" who was designated as "Messner Reeves, LLP."

82.    The BELOC specified Messner's banking information at Northern Trust, under a specific account number, and confirmed that the $700,000 ICA Payment made by Plaintiff "shall be in Trustee [Messner]'s sole possession and control."

83.    Messner was obligated to keep Plaintiff's $700,000 ICA Payment in its "sole possession and control."

84.    Plaintiff performed all its contractual obligations.

85.    All conditions precedent occurred or have been waived.

86.    Messner breached the contract by failing to "hold" Plaintiff's $700,000 ICA Payment in its "sole possession and control."

87.    Instead of holding Plaintiff's $700,000 ICA funds in Messner's sole possession and control, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

88.    Messner's breach of contract caused the damages that Plaintiff sustained.

89.    Plaintiff sustained incidental damages of $700,000.

90.    Plaintiff also sustained consequential damages.

91.    Plaintiff is entitled to recover costs and prejudgment interest.

92.    Plaintiff is entitled to recover attorneys' fees.

## COUNT TWO – NEGLIGENCE

### (against Messner)

93.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

94.     In the escrow context, an escrow holder is obligated to use the ordinary standard of skill, care, and diligence in carrying out its duties.

95.     Moreover, an escrow holder is impliedly obligated to undertake all obligations normally undertaken by an escrow holder unless expressly excluded under the escrow agreement and the escrow holder must use ordinary skill and diligence in carrying out these tasks.

96.     If the escrow holder negligently breaches its duty of care pursuant to the escrow agreement, the escrow holder is liable for any foreseeable loss arising from its negligence.

97.     Loss of Plaintiff's money was the foreseeable result of Messner's failure to hold Plaintiff's money in its trust account in Messner's "sole possession and control."

98.     Even if the escrow holder's liability is not the sole cause of the damages suffered, the escrow holder may still be held liable for negligence if the escrow holder's breach was a substantial factor in the harm experienced. Messner's negligence was a substantial factor in the harm that Plaintiff suffered.

99.     Messner owed Plaintiff a duty of care as an escrow holder. That duty of care consisted of the obligation to "hold" Plaintiff's $700,000 in Messner's "sole possession and control."

100.    Messner breached the duty of care by failing to "hold" Plaintiff's $700,000 in Messner's "sole possession and control."

101.    Instead of holding Plaintiff's $700,000 ICA funds in Messner's sole possession and control, Messner transferred Plaintiff's money out of its sole possession and control in an unknown and unauthorized manner.

102.    Messner's breach of contract caused the damages that Plaintiff sustained.

103.    Plaintiff sustained incidental damages of $700,000.

104.    Plaintiff also sustained consequential damages.

105.    Plaintiff is entitled to recover costs and prejudgment interest.

COMPLAINT

106. Plaintiff reserves the right to develop additional evidence supporting punitive damages, to be proven by clear and convincing evidence of fraud, malice, oppression or otherwise pursuant to California Civil Code § 3294.

## COUNT THREE – BREACH OF FIDUCIARY DUTY

### (against Messner)

107. Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

108. An escrow holder's fiduciary duties include ensuring strict compliance with the terms of the escrow agreement and the instructions contained therein.

109. Messner was an escrow holder, attorney, trustee, and Messner had a fiduciary relationship with Plaintiff.

110. Messner was duty bound to act with the utmost good faith for the benefit of Plaintiff given that confidence was reposed in Messner and Messner voluntarily accepted or assumed to accept that confidence.

111. Messner is precluded from taking advantage of its acts relating to the interest of Plaintiff without Plaintiff's knowledge and consent.

112. Messner knowingly undertook to act on behalf and for the benefit of another, and Messner entered into the escrow relationship as a matter of law.

113. Messner had a fiduciary duty of care to ensure that it adhered to the instruction to "hold" Plaintiff's $700,000 ICA Payment in Messner's "sole possession and control."

114. Messner also had a fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $700,000 ICA Payment in Messner's "sole possession and control."

115. Upon information and belief, Messner had an interest in the transaction, and therefore, Messner was obligated to disclose that interest to Plaintiff before becoming an escrow agent for the parties.

116. Messner had an additional fiduciary duty to ensure that INBE did not violate Plaintiff's rights.

- 13 -
COMPLAINT

117.    Messner breached the fiduciary duty of care by filing to adhere to the instruction to "hold" Plaintiff's $700,000 ICA Payment in Messner's "sole possession and control."

118.    Messner breached the fiduciary duty to disclose to Plaintiff if Messner intended to deviate from the instruction to "hold" Plaintiff's $700,000 ICA Payment in Messner's "sole possession and control."

119.    Messner breached its fiduciary duties by failing to disclose its interest in the transaction to Plaintiff before becoming an escrow agent for the parties.

120.    Messner also breached its fiduciary duties by failing to ensure that INBE did not violate Plaintiff's rights.

121.    As a result of Messner's breaches of its fiduciary duties, Plaintiff sustained damages.

122.    Plaintiff sustained incidental damages of $700,000.

123.    Plaintiff also sustained consequential damages.

124.    Plaintiff is entitled to recover costs and prejudgment interest.

125.    Plaintiff is entitled to recover attorneys' fees.

**COUNT FOUR – ACTION FOR RESTITUTION
BASED ON QUASI-CONTRACT AND UNJUST ENRICHMENT**

**(against Messner)**

126.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

127.    This count is pled in the alternative to Plaintiff's claim for breach of contract against Messner.

128.    Plaintiff conferred benefits on Messner, who had knowledge thereof. The benefits include, but are not limited to, the use, arrogation, and usurpation of Plaintiff's $700,000.

129.    Defendant voluntarily appreciated, accepted, and retained the benefits conferred.

- 14 -

COMPLAINT

130. The circumstances are such that it would be unjust for Defendant to retain the benefit at the expense of Plaintiff without paying the value thereof to Plaintiff.

131. Plaintiff can recover in quasi-contract for restitution based on Messner's unjust enrichment.

132. The purpose of a quasi-contract claim is to restore Plaintiff, the aggrieved parties, to its former position through the return of the wrongfully obtained property or equivalent in money.

133. The unjust enrichment which Defendant obtained should be returned to Plaintiff.

134. Plaintiff's funds apparently sit in an account in Messner's name or the name of a Messner affiliate at a bank named Titan Private Bank, LLC.

135. As a result of Defendant's unjust enrichment, Plaintiff sustained damages of $700,000 which should be paid by Messner.

## COUNT FIVE – BREACH OF CONTRACT

### (against INBE)

136. Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

137. A valid and binding contract between Plaintiff and INBE exists as set forth in the fully executed Funding Directive Letter.

138. Per the Funding Directive Letter, because the LOC was not funded and independently because Hard AF delivered a Termination Notice, INBE is obligated to return the $700,000 Deposit money to Plaintiff via wire transfer "within one (1) business day" of Plaintiff's written request.

139. Per the Funding Directive Letter, INBE was also obligated to effectuate the immediate return of the $700,000 ICA Payment to Plaintiff because the LOC was not funded within 90 days of the June 13, 2023 deposit, by September 11, 2023.

COMPLAINT

140.    Moreover, INBE pledged in the BELOC that "should Trustee [Messner] fail to return the ICA Advance Fee per his contractual obligations with the Lender… INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days."

141.    Plaintiff performed all its contractual obligations.

142.    All conditions precedent occurred or have been waived.

143.    INBE breached the contract by failing to return Plaintiff's $700,000 Deposit money to Plaintiff via wire transfer "within one (1) business day" of Plaintiff's written request, which occurred months ago.

144.    INBE breached the contract by failing to effectuate the immediate return of the $700,000 ICA Payment to Plaintiff because the LOC was not funded within 90 days of the June 13, 2023 deposit, by September 11, 2023.

145.    Plaintiff sustained incidental damages of $700,000.

146.    Plaintiff also sustained consequential damages.

147.    Plaintiff is entitled to recover costs and prejudgment interest.

## COUNT SIX – ACTION FOR RESTITUTION
## BASED ON QUASI-CONTRACT AND UNJUST ENRICHMENT

### (against INBE)

148.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

149.    This count is pled in the alternative to Plaintiff's claim for breach of contract.

150.    Plaintiff conferred benefits on Defendant INBE, who had knowledge thereof. The benefits include, but are not limited to, the use, arrogation, and usurpation of Plaintiff's $700,000.

151.    Defendant voluntarily appreciated, accepted, and retained the benefits conferred.

152.    The circumstances are such that it would be unjust for Defendant to retain the benefit at the expense of Plaintiff without paying the value thereof to Plaintiff.

- 16 -

COMPLAINT

153. Plaintiff can recover in quasi-contract for restitution based on INBE's unjust enrichment.

154. The purpose of a quasi-contract claim is to restore Plaintiff, the aggrieved parties, to its former position through the return of the wrongfully obtained property or equivalent in money.

155. The unjust enrichment which Defendant obtained should be returned to Plaintiff.

156. As a result of Defendant's unjust enrichment, Plaintiff sustained damages of $700,000.

## COUNT SEVEN – RESCISSION

### (against both Defendants)

157. Plaintiff incorporates by reference all the allegations in Paragraphs 1-76 of the Complaint as if fully set out herein.

158. This claim is pled in the alternative.

159. This is a claim for rescission of any and all contractual agreements between Plaintiff and Defendants and a refund of all money, property, and value that Plaintiff conferred to Defendants.

160. Any contractual agreements between Plaintiff and Defendants are subject to rescission due to fraud and the Defendants' failure to fulfill their obligations.

161. INBE failed to timely fund the LOC and Messner failed to discharge its obligations as an escrow agent by holding Plaintiff's $700,000 in deposit funds in Messner's "sole possession and control."

162. Plaintiff notified Defendants of its intent to cancel and rescind the agreement multiple times in the fall of 2023 and in January 2024.

163. Plaintiff seeks to restore the status quo ex ante and seek the return its $700,000 in deposit money which was wrongfully retained by Defendants.

164.    Plaintiff has not waived his claim to the relief claimed herein. If any such waiver is alleged to exist, such purported waiver was obtained by Defendants through fraud and other wrongful conduct as described herein.

**WHEREFORE**, Plaintiff prays that this Court enter a judgment against Defendants, jointly and severally, as follows:

A.    Money damages in an amount in excess of $700,000, inclusive of incidental and consequential damages;

B.    Costs and prejudgment interest;

C.    Attorneys' fees; and,

D.    Such other and further relief that the Court finds just and proper.

CHASE LAW & ASSOCIATES, P.A.

By: _____
Kenneth E. Chase
Attorney for Plaintiff
EMERALD
CONSULTING PARTNERS LLC

COMPLAINT

# EXHIBIT A

Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY53IEHGYDWF1PW62Q0ED1MK

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

## – CONFIDENTIAL & PRIVATE, NOT FOR PUBLIC USE –

Among

### INBE Capital LLC

as Lender

&

Hard AF Seltzer, LLC

As Borrower

Dated as of

Jun 08 2023



# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made and entered as of   Jun 08 2023

between INBE Capital LLC (the "Lender")

, and

 a                                                        Company ("Borrower").

## RECITALS

A.    The Borrower desires to obtain from Lender an asset backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.    The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion (as more fully described on Exhibit I attached hereto the "Project").

C.    Secured assets will be described on Exhibit C attached hereto (the "Property").

D.    The Borrower has agreed to pay a loan application fee of   N/A Waived
to the Lender, within fourteen (14) Calendar days after the Lender receives the Borrower's fully executed counterparts of the LOC Documents.

E.     The Borrower has agreed to pay, pursuant to Section 3.6 hereof, of
 seven hundred thousand dollars                              $700,000

,(the "ICA Payment"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

F.   Lender has agreed to make the LOC to Borrower in an aggregate amount, according to Exhibit I, not to exceed the Maximum Amount for the purposes set forth in these recitals and in the Promissory Note (as hereinafter defined) and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:



# ARTICLE 1 - DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

"Advance(s)" means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"Applicable Interest Rate" means the fixed interest rate specified in the Promissory Note.

"Borrower" means that term as defined in the first paragraph of this Agreement.

"Business Expansion" means any transaction that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"Closing Date" means the last date of signed execution of this Agreement by Lender and Borrower.

"Collateral" means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

"Event of Default" means any event or condition that shall constitute an event of default as described in Article 12 of this Agreement.

"ICA" means the Interest Control Account.

"ICA Payment" means the amount remitted pursuant to Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHOOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

"Interest Reserve" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from or on behalf of the Borrower, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"Interest Reserve Account" means funds retained to cover the contractual payment obligations.

"Lender" means that term as defined in the first paragraph of this Agreement.

"LOC" means the Line of Credit provided to the Borrower by the Lender as defined in Exhibit I of this Agreement.

"LOC Disbursement Account" means that term as defined in Section 3.12 hereof.

"LOC Document(s)" means, collectively, this Agreement, the Promissory Note and each   Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"Maximum Amount" means an amount equal to the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and Regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

"Project" means that term as defined in Recital B of this Agreement.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

"Project Costs" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project, as more specifically set forth in the project  budget set forth on Exhibit B attached hereto).

"Project LOC Amount" means as defined in Exhibit I attached hereto.

"Property" means that term as defined in Exhibit C of this Agreement.

"Promissory Note" means the Promissory Note, in the form attached hereto as Exhibit A.

"Security Agreement" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as Exhibit D.

"Security Document" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"Scheduled Maturity Date" means the  10  year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"Subsidiary" means any other entity in which the Company controls, directly or indirectly, at least 50% of the equity or which is under the direct control or management of the Company or Company's owners.

"Taxes" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"Term Sheet" means that document(s) attached hereto as Exhibit I, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.



Zoho Sign Document ID: 2B0A4254-FVUYAKIFCHCOGWFC0YRMY33IEHGYDWF1PW62Q0ED1MK

"Tranche Schedule" means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto in the Term Sheet: Exhibit I; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Project LOC Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

# ARTICLE 2 - THE CREDIT

Section 2.1. Line of Credit Amount. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

Section 2.2. Line of Credit Documents. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and it's counsel.

    a.   Promissory Note.

    a.   this Agreement; and

    a.   each Security Document.

# ARTICLE 3 - TERM, INTEREST AND PAYMENTS

Section 3.1. Initial Term. The initial term of the LOC is ten years 10 years and shall commence on the Closing Date. This Agreement will initially expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full on the Scheduled Maturity Date.

Section 3.2. Extended Term. As of the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "Extended Term"; collectively, the "Extended Terms"). In connection with Lender's granting of each Extended Term,



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

(a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees.

Section 3.3. Applicable Interest Period. The interest period with respect to each Advance  under the LOC shall be the period commencing on the date such Advance was made to Borrower  by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full; provided, however, that, no interest period may end later than the Scheduled Maturity Date.

Section 3.4. Interest Rate Calculation. Interest shall be calculated on the basis of a 365- day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "Maximum Interest Rate"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to fees or other amounts due to lender, then to the unpaid principal balance outstanding under the Promissory Note, then, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. Interest Payments. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA  until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. Reserves. Following the signing of this Agreement, the Borrower shall remit
 seven hundred thousand dollars                                                          $700,000

as the ICA Payment, in accordance with the terms and time period set forth in Exhibit I. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and become non-refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.  The ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds, and may be utilized by Lender.

Section 3.7. Prepayment. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC. Upon a full prepayment of all outstanding principal of the LOC, Lender must, within ninety (90) calendar days from the date of that full prepayment, pay Borrower an amount equal to any credit balance of the ICA.



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHCOOWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

<u>Section 3.8. Interest Credit Account</u>. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit in the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable. Where the Lender has agreed to a payment holiday, as specified within Exhibit I, the interest payments shall first be drawn from the ICA for the duration of the payment holiday, thereafter the Borrower shall make interest payments monthly.

<u>Section 3.9. Fees</u>. LOC Establishment Fee. Out of the initial Advance, the Borrower shall pay Lender a non-refundable fee for the LOC in an aggregate amount equal to    nine percent    % of the Loan Value, being:   two hundred fifty-two thousand dollars    $252,000

(the "Establishment Fee"). The Establishment Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

<u>Section 3.10. Line of Credit Extension Fees</u>. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a non-refundable LOC extension fee for each extension in an aggregate amount equal to six percent (6%) multiplied by the Project LOC Amount.

<u>Section 3.11. Legal and Incidental Fees</u>. Charges and Costs. Borrower shall pay all reasonable out of pocket legal, recording and filing fees, documentary stamps, taxes, service charges, credit reports, reasonable search costs, title company and escrow fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or an adversary proceeding) or judicial or non-judicial proceeding, through appeal. Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or wilful misconduct.

<u>Section 3.12. Line of Credit Disbursement Account</u>. The proceeds of each Advance under the LOC shall be advanced into the account with Lender to be used by Borrower for payment of the Borrower's Project Costs (the "LOC Disbursement Account"), solely for the purposes and in the manner set forth in this Agreement.



Zoho Sign Document ID: 2B0A4254-PVOYAKIFCHOOGWFC0YRMY53IEHGNDWP1PW62Q0ED1MK

The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights to the LOC Disbursement Account.

Section 3.13. Taxes.

a. All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

b. Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of  any such failure.

c. The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4 - CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing (the same to be considered representations of Borrower upon Closing):

Section 4.1. Delivery of the LOC Documents.

a. As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

b. The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Deposit Account and Security Account (as each term is defined in the Security Agreement) maintained by the Borrower.



Zoho Sign Document ID: 2B0A4254-FVUYAKIFCHOOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

<u>Section 4.2. Authority</u>. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, and (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

<u>Section 4.3. Liens</u>. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of security searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) security termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender, such permission not to be unreasonably withheld.

<u>Section 4.4. Litigation</u>. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

<u>Section 4.5. Events of Default</u>. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

<u>Section 4.6. Purchase and Agreement Contracts</u>. Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

<u>Section 4.7. Compliance with Certain Requirements</u>. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable local, state, federal and international laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) and all local, state, federal and international laws, regulations, ordinances, conditions, reservations and restrictions applicable to the Project.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

Section 4.8. Evidence of Insurance.

    a.    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders 'loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of the size and character of the business of the Borrower, and shall furnish Lender with the satisfactory evidence of such insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

    b.    Borrower shall always maintain a life insurance policy on the life of   N/A Waived

, as permitted under applicable local, state, federal and international law in an amount agreed to by Lender. The Borrower shall have provided to Lender (directly or through the issuer of such life insurance policy) an assignment of each such life insurance policy, in form and substance satisfactory to Lender, on or before the date of the funding of the first Advance under the Tranche Schedule. In connection with such policy(ies), the Borrower shall cause the insurer to agree to provide in writing to Lender any notice of cancellation or non-renewal at least thirty (30) days prior to such event. In the event  N/A Waived

cannot qualify for a keyman policy, Borrower shall submit proof of application and denial of coverage. Upon submission of proof of denial, Lender may thereafter waive the requirement in writing.

Section 4.9. Financial Statements. Lender shall have received all financial reports required by Section 8.6 hereof.

Section 4.10. Business Pro Forma. Lender shall receive a pro forma income and expense statement quarterly in connection with the Project.

Section 4.11. Management Plan. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of business.

Section 4.12. Material Change. Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

Section 4.13. Non-Subordination. Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

Section 4.14. Securitization. Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or due diligence required by the insurer in a timely manner.

# ARTICLE 5 - USE OF LINE OF CREDIT PROCEEDS

Section 5.1. Business Expansion Costs.

a.  Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached Exhibit B, updated yearly by Borrower.

b.  The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

# ARTICLE 6 - INSPECTIONS

Section 6.1. Project Inspection. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days 'prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

Section 6.2. Books and Records. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project and the Borrower and to make extracts therefrom or copies thereof.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWF1PW62Q0ED1MK

<u>Section 6.3. Force Majeure Event Inspection Right</u>. In the event of a Force Majeure Event which actually interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project for a period of time beyond ninety (90) days, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project.

# ARTICLE 7 - ADVANCE OF FUNDS

<u>Section 7.1. Timing and Advances to Payee</u>. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than ninety (90) calendar days (inclusive of underwriting period) following confirmation of receipt by the Lender of the ICA Payment.

<u>Section 7.2. Conditions Precedent to Advance of Funds</u>. Lender's obligation to make Advances hereunder shall be conditioned upon fulfilment of the terms set forth in Article 4 hereof to Lender's satisfaction.

<u>Section 7.3. Unpaid Lien Claims</u>. If Lender receives notice of non-payment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred fifty percent (150%) of the lien amount claimed from future advances .

<u>Section 7.4. Mandatory Advances</u>. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOCWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

# ARTICLE 8 - BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion):

Section 8.1. Project. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project. Borrower shall submit and update its business plan which shall include the scope of the Project. Lender agrees that all affiliates, joint venture partners and subsidiaries described in the business plan are a part of the Project and the Project LOC Amount may be used within such entities. This Section 8.1prevails over Section 5.1(b), and additional approval from Lender is not required.

Section 8.2. Compliance with Laws. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. Compliance with Documents. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. Books and Records. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. Payment of Obligations. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. Financial Reports. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within fifteen (15) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within sixty (60) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHCOOWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

Section 8.7. Notification to Lender. Promptly after learning thereof, notify Lender of:

    a.    the details of any material action, proceeding, investigation or claim against or affecting the Borrower or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

Section 8.8. Partnership/Corporate Existence. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

# ARTICLE 9 - BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing (such consent to be withheld in Lender's sole discretion) Borrower shall not:

Section 9.1. Liquidation, Merger and Sale of Assets. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

Section 9.2. Liens. Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such Liens, shall not be increased).

Section 9.3.    Intentionally Omitted.

**INBE CAPITAL**

Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

Section 9.4. Investments, Loans and Guaranties. (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind, without prior written approval of the Lender.

Section 9.5. Acquisitions. Without prior written approval of the Lender the Borrower may not enter into any transaction or series of related transactions for the  purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another  Person by a merger, amalgamation or consolidation or any other combination with such Person.

Section 9.6. Organizational Documents. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state,  province or other jurisdiction of organization, or its form of organization.

Section 9.7. Project and Project Documents. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a Major Decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

a.  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance  of a material obligation by any other Person under, any contracts or agreements (A) related to the   Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the  development, construction, operation and maintenance of the Project, in each case that would have    an adverse effect on the Lender; or

b.  sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project.

# ARTICLE 10 - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 10.1. Validity of Agreement. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents.



The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms.

The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than as permitted by this document) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. Existing Defaults. As of the date of execution of the LOC Documents, Borrower is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower is a party or by which it, or any of its properties, may be bound.

Section 10.3. No Default in Other Agreements. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a
party or by which it or any of its properties may be bound or result in the violation by it of any law, order, rule, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties.

Section 10.4. No Consents. No consent, approval, authorization, or other acknowledgment  of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. Litigation. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to its knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOOWFC0YRMY53IEHGYDWF1PW62Q0ED1MK

<u>Section 10.6. Financial Statements</u>. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

<u>Section 10.7. Legal Requirements</u>. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

<u>Section 10.8. Taxes</u>. The Borrower has filed all tax returns and reports required of it, has paid all Taxes which are due and payable, and has provided adequate reserves for payment of any Tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of Taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any Taxes except as otherwise previously disclosed to the Lender in writing.

<u>Section 10.9. Organization</u>. The Borrower is a duly formed or organized and validly existing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement.

<u>Section 10.10. Insurance</u>. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

<u>Section 10.11. Accurate and Complete Statements</u>. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

<u>Section 10.12 Lender's Ability to Fund</u>. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by Borrower of the requirements of Article 4 hereof with respect to each Advance.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMYJ3IERGYDWP1PW62Q0ED1MK

Section 10.13. Timing of Lender Funding. Lender will provide Advances as defined in the Payment Schedule within Exhibit I.

# ARTICLE 11 - NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. Generally. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for an representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

# ARTICLE 12 - EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

Section 12.1. Non-payment. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower (such thirty (30) day notice to be given once during each twelve (120 month period of the Term; thereafter, no such notice is required).

Section 12.2. Other Covenants and Agreements. Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected within twenty (20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. Representations and Warranties. If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

Section 12.4. Security. If any lien granted in this Agreement or any other LOC Document favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days

INBECAPITAL

Zoho Sign Document ID: 2B0A4254-FVUYAKIFCHOOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

from the date of such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. Validity of LOC Documents. If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. Petition for Bankruptcy, Insolvency. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; commencement of a sale for the benefit of creditors; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

Section 12.7. Material Litigation. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, or the Project of the disclosed litigation.

# ARTICLE 13 - REMEDIES

Section 13.1. General. Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable;



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

(b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13.

If an Event of Default referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Section 13.2. Right of Remedial Action. At the sole direction of Lender should the Lender assess and deem it necessary due to negative trending performance or upon the occurrence of an Event of Default hereunder, Borrower shall place the Project and business into a late state incubator operated by the Lender or by agent for the purposes of providing remedial management and guidance.

Furthermore, upon the occurrence of an Event of Default hereunder Lender shall have the right,  in person or by agent, in addition to all other rights and remedies available to Lender hereunder or  under the LOC Documents, to enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender  in so doing, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured  by the LOC Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

For the purpose of allowing the Lender to exercise its rights and remedies provided hereunder following the occurrence of an Event of Default, the Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

   a.  to enter and endorse all agreements, instruments, and documents in connection therewith.

   b.  to use any unadvanced proceeds of the LOC for the purpose of completing,  operating, or maintaining the Project.



c.  to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

d.  to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

e.  to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security  satisfactory to the Lender has been provided.

f.  to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

g.  to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

h.  to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable, (A) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (B) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. Curing of Defaults by Advances. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which  Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right (but not the obligation) to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

<u>Section 13.4. Remedies Are Cumulative</u>. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

<u>Section 13.5. Offsets</u>. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC Documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all deposit (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

<u>Section 13.6. Collateral</u>. The Lender shall at all times have the rights and remedies of a secured party, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Document executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC Documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IERGNDWP1PW62Q0ED1MK

The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC Document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC Documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than seven (7) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC Documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC Documents, the cost of which shall be paid by Borrower.

<u>Section 13.7. Default by Lender and Borrower's Sole Remedy</u>.

a.   If Lender fails to provide the first (1st) Advance when due, pursuant to the Payment Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Upon receipt of such notice, Lender shall have ninety (90) calendar days from the date of receipt within which to return the ICA Payment to Borrower.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

b.  If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized termination letter, a copy of which Termination Letter is attached hereto as Exhibit E, to Lender by certified mail. Within ninety (90)  calendar days from the date of receipt of such notice by Lender, the Lender must (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) terminate Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person,  Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC Documents.

c.  Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC Documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

Section 13.8 Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming USA, before a single arbitrator  using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the  JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.

The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming USA. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

# ARTICLE 14 - GENERAL PROVISIONS

Section 14.1. Disclaimer of Liability. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith.



Section 14.2. Publicity. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and it's financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

Section 14.3. Confidentiality. Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC Documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place except to any officers or shareholders in the Borrower or the Borrower's advisors or as required by law. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

Section 14.4. Responsibility for Application of Funds. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or wilful misconduct (in each case as determined by a court of competent jurisdiction in a final and non- appealable decision).

Section 14.5. Notices. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the Lenders portal using the Borrower's Portal account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two calendar days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:        Hard AF Seltzer, LLC
                    CEO
                    9221 Highway 290 West
                    Austin, TX. 78736

To Lender:          INBE Capital LLC
Attention:          Chief Funding Officer
                    30 N Gould St Sheridan, WY 82801



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IERGYDWP1PW62Q0ED1MK

Section 14.6. Applicable Law. This Agreement and, unless otherwise specifically provided for therein, each other LOC Document, shall be governed by and construed in accordance with the laws of the State of Wyoming.

Section 14.7. Successors and Assigns. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.8. Severability. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition.

Section 14.9. Amendments. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

Section 14.10. Headings; Attachments. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 14.11. No Third-Party Rights. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

Section 14.12. Indemnification. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IEHGNDWP1PW62Q0ED1MK

The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfil all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Lender's default of its obligations under this Agreement.

Section 14.13. General Limitation of Liability. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; or  the making or administration of the Advances, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability theories,"  or any covenants, agreements, duties or obligations set forth in the Loan Documents, (or any actions or omissions of any of the Lender Parties and/or the Lenders' Affiliates in connection with the initiation or continuing exercise of any right or remedy contained in the Loan Documents or at law or in equity, or  lost profits, or loss of business opportunity, or increased financing costs, or increased legal or other administrative fees, or damages to business reputation. ; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage.

Section 14.14. Entire Agreement. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.



<u>Section 14.15. Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

<u>Section 14.16. Legal Representation of the Parties</u>. The LOC Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

<u>Section 14.17. JURY TRIAL WAIVER</u>. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**[Remainder of page intentionally left blank; Signatures follow]**



IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:**         INBE Capital LLC

By:

Name:

Title:

**BORROWER:**    Hard AF Seltzer,
LLC

By:

Name:          Ross Patterson

Title:          CEO

By:

Name:

Title:



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IEFGYDWP1PW62Q0ED1MK

# EXHIBIT A: PROMISSORY NOTE

**two million eight hundred thousand dollars**                                    **$2,800,000**

FOR VALUE RECEIVED,   Hard AF Seltzer, LLC
, a   USA
corporation (the "Maker"),
hereby promises to pay to INBE Capital LLC or any subsequent holder of this Master Promissory Note (the "Payee"), at such place as Payee may designate, the principal sum of

two million eight hundred thousand dollars                                    $2,800,000

or the aggregate unpaid principal amount of all Advances, as defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is less, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below,  payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

    a.    Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "Note") as follows:

        i.    simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to;

        •  six percent                 ( 6%            % )  per annum for years one to ten (1-10).

Interest payments  shall be due and payable to Payee monthly in arrears, on the first (1st) day of each month of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

    a.    Except for the payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

    a.    All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.



Zoho Sign Document ID: 2B0A4264-PVUYAKIFCHCOGWFC0YRMY53IEHGNDWP1PW62Q0ED1MK

All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker   shall make each payment hereunder to the Payee without any deduction, offset, abatement,  recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank.

d.   Maker shall pay all amounts due under this Note to INBE Capital LLC, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

d.   All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the "Obligation" of Maker.

In addition, the following provisions shall govern this Note:

1.   LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.  This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the document entitled "Business Expansion Line of Credit Agreement" dated on or about the date of this Note between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "LOC Agreement"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.   LATE CHARGES. If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the "Late Charges") shall be added to the delinquent payment in an amount equal to ten percent (10.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges   are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

DEFAULT, CROSS-DEFAULT AND ACCELERATION. Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC



Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, then this Note shall be in default. Upon default, Payee shall provide written notice to Maker specifying the nature of the default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon default, the interest rate provided for in this Note shall immediately increase to twenty four percent (24%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in Hard AF Seltzer, LLC and the project – Hard AF Seltzer, LLC To INBE Capital LLC.

3.  COSTS, FEES AND COMPENSATION. Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

4.  WAIVER. Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

5.  SUCCESSOR AND ASSIGNS. The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

6.  CUMULATIVE REMEDIES. Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

7.  GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY. This Note shall be governed by and construed in accordance with the laws of the State of Wyoming, United States of America.



BINDING ARBITRATION: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules"). The parties consent and required that the JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules shall apply. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-Calendar days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of Western Australia. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

JURY TRIAL WAIVER. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

8.   AUTHORIZATION. To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:



a. That the undersigned is the authorized representative of Maker and has the authority to bind Maker.

b. That Maker is duly organized and validly existing under the laws of the State of its formation, and duly qualified to transact business where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

c. That upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

9. ATTORNEY FEES AND COSTS OF COLLECTION. Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

10. MISCELLANEOUS PROVISIONS.

a. No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

b. The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

c. This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHCOOWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

d.   This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

e.   Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

**[Remainder of page intentionally left blank; Signature page follows]**



IN WITNESS WHEREOF, the Maker has duly executed and delivered this Master Promissory Note as of the date first set forth above.

**MAKER:**    Hard AF Seltzer, LLC

By:

Name:    Ross Patterson

Title:    CEO

Address:    9221 Highway 290 West
Austin, Texas 78736

**PAYEE:**    INBE Capital LLC

By:

Name:

Title:

Address:



# EXHIBIT B: PROJECT COSTS

This loan agreement pertains to the direct funding for  Hard AF Seltzer, LLC

which is set out in the Term Sheet attached herein Exhibit I and executed by INBE Capital LLC and
 Hard AF Seltzer, LLC

This agreement pertains to the loan of   two million eight hundred thousand dollars

$2,800,000



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

# EXHIBIT C: THE PROPERTY – SECURED ASSETS

TO SECURE THE PAYMENT OF THE BUSINESS EXPANSION LOC AND ALL OTHER OBLIGATIONS OF BORROWER TO LENDER, ITS SUCCESSORS AND ASSIGNS, HOWEVER CREATED, WHETHER DIRECT OR INDIRECT, ABSOLUTE OR CONTINGENT, OR NOW OR LATER EXISTING, BORROWER GRANTS TO LENDER A SECURITY INTEREST IN THE FOLLOWING PROPERTY AND ANY REPLACEMENTS THEREOF:

a.  all fixtures and Company property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment),  documents (including, if applicable, electronic documents), instruments, promissory notes,  chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights  (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

b.  all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing,  and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

c.  all plant and equipment

d.  all computer equipment and electronic data stored therein

e.  all Intellectual Property rights

f.  all inventory

g.  all motor vehicles

h.  all goodwill

i.  all brand names

j.  all real estate and land

k.  all accessories, parts, and equipment now or later affixed to the same

l.  to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOGWFC0YRMY33IEHGYDWF1PW62Q0ED1MK

# EXHIBIT D: SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of   Jun 08 2023
(as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "Agreement"), is made by   Hard AF Seltzer, LLC
(the "Grantor"), in favor of INBE Capital LLC (the "Secured Party").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "LOC Agreement").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure  the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being  executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.   Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. For purposes of this Agreement, the following terms shall have the following meanings:

"Collateral" has the meaning set forth in Section 2 hereof.

"Control Agreement" means (a) with respect to a deposit account, each Deposit Account Control Agreement (or similar agreement with respect to a Deposit Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and  (b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"Deposit Account" means a deposit account. "Event of Default" has the meaning set forth in the LOC Agreement.

"First Priority" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

"Proceeds" means all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOOWFC0YRMY33IERGYDWP1PW62Q0ED1MK

"Secured Obligations" has the meaning set forth in Section 3 hereof.

"Securities Account" means a securities account.

2.   <u>Grant of Security Interest</u>. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following,  wherever located, whether now existing or hereafter from time to time arising or acquired and any replacements thereof (collectively, the "Collateral"):

   a.   all fixtures and property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment),  documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

   b.   all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing. And

   c.   all plant and equipment
   d.   all computer equipment and electronic data stored therein
   e.   all Intellectual Property rights
   f.   all inventory
   g.   all motor vehicles
   h.   all goodwill
   i.   all brand names
   j.   all real estate and land
   k.   all accessories, parts, and equipment now or later affixed to the same
   l.   to further secure the payment of this note, secured party shall have a lien on and recourse to any property belonging to debtor that now or later is in the possession or control of secured party, such property shall be in this agreement collectively referred to as "collateral."



3. <u>Secured Obligations</u>. The Collateral secures the due and prompt payment and performance of:

    a.    the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

    b.    all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "Secured Obligations").

4. <u>Perfection of Security Interest and Further Assurances</u>.

    a.    The Grantor shall, from time to time, as may be required by the Secured Party with    respect to all Collateral, promptly take all actions as may be requested by the Secured Party  to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party, including filing of a UCC-1 statement. All the foregoing shall be at the sole cost and expense of the Grantor.



b.  The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by applicable law  of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

c.  The Grantor hereby further authorizes the Secured Party to file with relevant governmental authorities or agencies this Agreement and other documents for the purpose of perfecting, confirming,

d.  continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

e.  If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

f.  If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

g.  The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

5.   <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

a.   (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement. The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable law and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

b.   At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

c.   The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

d.   Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

e.   Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

f.   No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.



g.  The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

h.  The Grantor has taken all action required on its part for control to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to applicable law. No person other than the Secured Party has control or possession of all or any part of the Collateral.

i.  Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Deposit Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or Securities Intermediary, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

j.  Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6.  Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.  Covenants. The Grantor covenants as follows:

a.  The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.



Zoho Sign Document ID: 2B0A4264-PVUYAKIFCHCOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

b.   The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

c.   The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

d.   The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

e.   The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

f.   The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

g.   The Grantor will continue to operate its business in compliance with all applicable provisions of applicable law dealing with the control, shipment, storage or disposal of hazardous materials or substances.

h.   The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Deposit Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Deposit Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

i.  The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

j.  At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.  <u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOOWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

9. <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. <u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. <u>Remedies Upon Default</u>. If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice.    So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IERGYDWP1PW62Q0ED1MK

The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

a.  If any Event of Default shall have occurred and be continuing, any cash held by the   Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

b.  If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.  <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

13. <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

   a. any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

   b. any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

   c. any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

   d. any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

   e. any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

   f. any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

   g. any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHCOOWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

15. <u>Addresses for Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16. <u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. <u>GOVERNING LAW</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of  the State of Wyoming, United States of America.

19. <u>Binding Arbitration</u>. Except for any rights to self-help or possession of the collateral under state law. any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the State of Wyoming, before a single arbitrator using  the current JAMS Comprehensive Arbitration Rules and Procedures ("Arbitration Rules").  The parties consent and required that the  JAMS Expedited Procedures under Rule 16.1 of the Arbitration Rules  shall apply.  The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the Arbitration Rules.



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY33IERGYDWP1PW62Q0ED1MK

Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections.   No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Wyoming, United States of America. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20.  <u>JURY TRIAL WAIVER</u>. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

21.  <u>Counterparts</u>. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

**[Remainder of page intentionally left blank; Signature page follows]**



IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR:** Hard AF Seltzer, LLC

By:

Name:    Ross Patterson

Title:    CEO

**SECURED PARTY:** INBE Capital LLC

By:

Name:

Title:



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWF1PW62Q0ED1MK

# EXHIBIT E: FORM TERMINATION LETTER

INBE Capital LLC

ATTENTION: Craig Boddington

30 N Gould Street,

Sheridan, Wyoming, 82801

Re:    Hard AF Seltzer, LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated   Jun 08 2023

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER:

By:

Name:

Title:

By:

Name:

Title:

SUBSCRIBED AND SWORN TO BEFORE ME on this day:

NOTARY PUBLIC

In and for the State of

My Commission Expires:



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHOOGWFC0YRM53IEHGYDWP1PW62Q0ED1MK

# EXHIBIT F: WIRE & JOINT INSTRUCTIONS

I instruct the BORROWER to fund the sum of  $700,000

(the "ICA"),

to be initially wired to INBE Capital LLC or one of its nominated administrative agents for aggregation before being forwarded & held by a nominated Trustee (Attorney) for the purpose of arranging for the issuance of a Loan (Line of Credit). The Trustee will be nominated and confirmed via electronic communication during final underwriting. Best efforts are made to select The Trustee based on a suitably negotiated escrow holding term per funding cycle. Typically, a 90 day escrow term applies. However, upon successful negotiation of a shorter escrow term, we're then able to facilitate tranche 1 delivery faster than our standard 90 day allowance. Whilst this cannot be guaranteed, we will always apply best efforts to shorten the overall payment schedule so we consistently deliver your funding quickly and seamlessly. Expect regular communication as we move through the remaining stages of the process. As well as ongoing open access to your appointed INBE representatives.

**Contractual Guarantee on ICA Advance Fee:**

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

**WIRE INSTRUCTIONS:**

| | |
|---|---|
| Account Name: | Messner Reeves, LLP – COLTAF Paymaster |
| Bank Name: | The Northern Trust Company |
| Account Address: | 50 S LaSalle, Chicago, IL |
| Account No.: | ████████ |
| ACH Transfers: | N/A |
| ABA: | ██████ |
| Swift (US Currency): | ██████ |
| Swift (Foreign Currency) | |
| Payment Reference: | INBE CAP |

Mandatory KYC/AML Required Message on all wire transfers:

All transfer instructions shall state: **"Funds are clean and clear of non-criminal origin and are for immediate credit – same day value / instant cash upon receipt."**

**IMPORTANT: All transfers must be accompanied by proof of wire to frb@inbe.capital**



**Re: Joint Instructions regarding Deposit Amount**

The purpose of these joint instructions ("Instructions") is to document the agreement of the parties regarding the Deposit Amount described below.

As background, (The Borrower) has obtained a loan commitment from INBE Capital LLC for the total amount of:

(the "Loan Amount") from INBE Capital LLC ("The Lender") To fund their proposed project and business activities as further set forth in Exhibit B, Exhibit H, & Exhibit I.

In connection with the Proposed Transaction, INBE Capital LLC, requires the borrower remit to INBE Capital LLC the Interest Credit Deposit Amount of:

(the "Deposit Amount"), which Lender requires as a deposit for the funding of the Proposed Loan, care of the "WIRE INSTRUCTIONS" stipulated within this Exhibit – Exhibit F (the "Escrow Account").

These  Instructions are provided to clarify what happens with the Deposit Amount and when the Deposit Amount may be returned to The Borrower. Specifically:

- The administrative agent will remit the Deposit Amount to Lender where it will remain in Escrow until the Lender funds the Proposed Loan specified in Exhibit I.
- If the Proposed Transaction does not complete pursuant to the execution of definitive agreements and the payment of the BELOC Loan to The Borrower, then INBE Capital LLC or one of it's nominated agents will wire return the Deposit Amount to The Borrower promptly.
- If Lender cancels the Proposed Loan pursuant to the terms of the Business Expansion Line of Credit to be entered into between The Borrower and Lender, or if the Proposed Loan commitment expires, then INBE Capital LLC will promptly wire return the Deposit Amount to The Borrower.

All signers of these Instructions agree to strictly comply with the terms hereof.

INBE Capital LLC may update or supplement these Instructions at any time in writing signed by all parties. If there is a conflict between these Instructions and the Proposed Loan, these Instructions control.

The parties agree to the use of email for the purpose of delivering notices under these Instructions, as follows:

If these Instructions are acceptable, please acknowledge below.

**The Borrower**                                                    **INBE Capital LLC**


_____                    _____



Zoho Sign Document ID: 2B0A4254-PVUYAKIPCHCOGWFC0YRMY33IEHGYDWP1PW62Q0ED1MK

# EXHIBIT G: KYC & AML

In order to satisfy Know Your Customer (KYC) and Anti Money Laundering compliance all clients must complete the following Client Information Form and upload verification information:

## STEP 1 – COMPLETE KYC & AML FORM

## GO HERE – Link to online Client information form

or Scan QR Code:



## STEP 2 – DECLARATION

We may take up such references and make such enquiries about your company as we consider necessary, and we may use credit scoring and may search the files of credit reference  agencies. The fact a search had been made will be recorded by each credit reference agency used and the data supplied will be available to other lenders and others authorized  to search  the  credit reference agencies files, for purpose such as credit assessment of your company and occasionally for debtor tracing and fraud prevention. If your application for finance is accepted then details about your company and the conduct of your account may be passed to credit reference agencies and these details will be used for similar purposes.

We may also disclose information about your company and the conduct of your account to credit industry fraud avoidance networks and to tracing and debt collection agencies and our solicitors.

Data Protection Your company information will be treated as confidential and will only be disclosed:
a) at your request;
b) to our agents in connection with running accounts;
c) in the public interest; or
d) to prevent fraud or legal compulsion; or
e) taking up of references.

The Data Protection Act gives you a right to a copy of your company records held on our files on payment of a fee.

*Signatures Follow on Next Page*



Zoho Sign Document ID: 2B0A4254-PVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

**1. Signatures(s)** ................................................................................................ **Date:** .................................................... Jun 12 2023

**Name .** ........................................................................................................... Ross Patterson

**2. Signatures(s)** .......................................................................................... **Date:** ....................................................

**Name .** ...........................................................................................................

**3. Signatures(s)** .......................................................................................... **Date:** ....................................................

**Name** ...........................................................................................................



Zoho Sign Document ID: 2B0A4254-FVUYAKIFCHOOGWFC0YRMY53IEHGYDWP1PW62Q0ED1MK

# EXHIBIT H: TERM SHEET

[intentionally left blank; Executed Term Sheet follows]

# EXHIBIT I: THE PROJECT

The Borrower desires to obtain the LOC from Lender for the purposes detailed below;

[intentionally left blank; Project Summary follows Term Sheet]



# EXHIBIT B

EXECUTION COPY

## SECURED PROMISSORY NOTE

**Principal Amount: US $700,000.00**                                                      **June 5, 2023**

**Tampa, Florida**

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Emerald Consulting Partners, a Florida limited liability company (the "**Borrower**"), hereby unconditionally promises to pay to the order of [], a [] limited liability company, or its assigns (the "**Bridge Lender**"; and together with the Borrower, the "**Parties**"), the principal sum of SEVEN HUNDRED THOUSAND DOLLARS (US $700,000.00) (the "**Principal Amount**"), together with interest as provided in this Secured Promissory Note (as amended, modified, renewed, extended or substituted from time to time, this "**Note**").

## R E C I T A L S

A.  **WHEREAS**, the Borrower has represented and warranted to the Bridge Lender that:

    i.  INBE Capital LLC, a Wyoming limited liability company ("**INBE**"), has approved HARD AF Seltzer, LLC ("**Hard AF**") for a line of credit facility (the "**LOC Facility**"), which is to be provided by INBE to pursuant to a certain Business Expansion Line of Credit Agreement (the "**LOC Agreement**"), dated on or about May 5, 2023 (the "**Effective Date**"), between INBE and Hard AF;

    ii.  Under the LOC Facility, INBE is requiring that Hard AF prepay to INBE, on or about the Effective Date and as a credit against interest that is or will become due and payable by Hard AF under the LOC, the sum stated in Recital E in the LOC Agreement (the "**LOC Interest Credit**");

    iii.  Hard AF lacks immediately available funds in an amount sufficient to permit the Hard AF to pay the amount of the LOC Interest Credit to INBE and has agreed to borrow the LOC Interest Credit from Borrower;

    iv.  The Borrower has resolved to borrow from Bridge Lender the Principal Amount upon the terms and conditions of this Note (the "**Loan**") for purposes of lending funds to HARD AF for the LOC Interest Credit; and

    v.  The Borrower has disclosed to Bridge Lender, in writing, all material facts and circumstances relating to the LOC Agreement, and has not omitted to state or disclose any material fact or facts necessary in order to make the disclosures made, in light of the circumstances under which they were made, not misleading.

Doc ID: f861f03a614d3e57fdfd865384fb8d8dd875ed7e

B.   **WHEREAS**, in reliance upon the Borrower's representations and warranties, Bridge Lender has agreed to lend the Principal Amount to the Borrower.

**NOW, THEREFORE**, in consideration of the representations and warranties and mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.   **Certain Definitions; Interpretation**.  For all purposes of this Note: (i) the words "include," "includes," and "including," shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; and (iii) the words "herein," "hereof," "hereby," "hereto," and "hereunder," shall refer to this Note as a whole.  The definitions given for any defined terms in this Note shall apply equally to both the singular and plural forms of the term(s) defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  Unless the context otherwise requires, references herein to any agreement, instrument, or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof.  This Note shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

2.   **Loan Disbursement Mechanics**.  The Bridge Lender shall fund the Loan being made under this Note by transferring the Principal Amount to INBE, on or about the date of the Note, such transfer to INBE conclusively being deemed to be for the benefit of the Borrower.  The Bridge Lender shall have no obligation whatsoever under this Note other than to transfer the Principal Amount to INBE, as provided herein.

3.   **Repayment of the Loan**.  There are two possible mutually exclusive scenarios under which the repayment of the Loan may occur, the key difference between them being whether INBE "funds" the LOC Facility according to the Tranche Schedule ("**LOC Facility Tranche Schedule**"), as as defined in Article 1 of the LOC Facility (the "**Bridge Settlement Date**").  For all purposes hereunder, the LOC Facility shall be deemed to have been funded (the "**LOC Is Funded**") if and when any financial benefit of any kind, in any amount, is conferred upon Hard AF by INBE, whether as a direct or indirect result or consequence of the making of the LOC Agreement or otherwise.  The manner of repayment of the Loan shall be determined solely by whether the LOC Is Funded or whether the LOC Is Not Funded by the Bridge Settlement Date, as follows:

3.1   If the LOC Is Funded.  Borrower agrees to irrevocably instruct INBE, in writing, pursuant to the LOC Agreement, to transfer and pay directly to the Lender, when and as the LOC Is Funded, the Principal Amount (US $700,000.00) (the "**Payment From Funding**"), in satisfaction of the Loan amount then due hereunder, and the Bridge Lender agrees to accept such Payment From Funding in satisfaction of the Loan amount then due; provided however, that the Borrower shall remain liable to repay to Borrower the Loan amount due, if and to the extent that INBE fails to do so, the aggregate Loan amount due, in all such cases (where the LOC Is Funded) being the sum of Seven Hundred Thousand Dollars (US $700,000), plus an agreed upon interest payment of Forty Two Thousand (US $42,000).

3.2   If the LOC Is Not Funded.  The Borrower hereby agrees to irrevocably instruct INBE, in writing, pursuant to the LOC Agreement, to return, transfer and pay the Principal Amount immediately and directly to the Bridge Lender, if the LOC Is Not Funded on or before the Bridge Settlement Date; provided additionally, that, in such scenario: (i) the Borrower shall remain liable to repay to Borrower the Loan amount due, if and to the extent that INBE fails to do so, the aggregate

2

Doc ID: f861f03a614d3e577dfd865384fb8d8dd875ed7e

Loan amount due, in such case, being the return of the Principal Amount <mark>If Hard AF does not instruct INBE in writing, pursuant to the LOC Agreement within 15 days after the LOC Facility Tranche Schedule funding date, Bridge Lender will submit the Form Termination Letter, as described in Section 13.7 of the LOC Facility, that has been executed by HARD AF and provided to Bridge Lender.</mark>

3.3     Final Repayment Date.  Notwithstanding any other provision or provisions of this Note, Borrower shall ensure that the full amount of the Loan due and payable to Lender hereunder, whether under Section 3.1 or under Section 3.2 (whichever is applicable), shall be paid in full by Borrower to Lender not later than Bridge Settlement Date (the "**Final Repayment Date**");

4.  **Default**.  Any failure of repayment to Lender of the Loan as required under Section 3.1 or under Section 3.2 (whichever is applicable), and in accordance with Section 3.3, shall constitute an event of default (an "**Event of Default**").  Additionally, each and all of the following shall constitute an Event of Default hereunder: the Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or an involuntary petition is filed against the Borrower (unless such petition is dismissed or discharged within sixty (60) days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody, or control of any property of the Borrower).

5.  **Interest**.

5.1     Default Interest.  Upon the occurrence and continuation of any Event of Default, all amounts past due shall bear interest at the default interest rate of Twelve Percent (12%) per annum (the "**Default Rate**") and shall continue to bear interest at the Default Rate until payment in full of the Loan plus all accrued interest.

5.2     Interest Rate Limitation.  If at any time and for any reason whatsoever the amount of interest charged hereunder exceed the maximum rate of interest permitted under applicable law, then the Parties desire that such interest amount or rate shall be reduced automatically to coincide with the maximum rate of interest permitted to be charged under applicable law.

6.  **Conditions Precedent to Bridge Lender's Obligations Hereunder**.  Hard AF and INBE shall have executed and delivered to each other the final LOC Agreement and shall have delivered to Bridge Lender a complete copy thereof, together with all exhibits, schedules, and side letters corresponding thereto;

7.  **Certain Additional Representations and Warranties of Borrower**. The Borrower further represents and warrants to the Bridge Lender as follows:

7.1     Existence; Power and Authority; Compliance with Laws. The Borrower is a limited liability company duly registered, validly existing and in good standing under the laws of the State of Florida, and has the requisite power and authority and the legal right to own, lease and operate its properties and assets and to conduct its business as it is now being conducted, to execute and deliver this Note, and to perform its obligations hereunder;

7.2     Authorization; Execution and Delivery.  The execution and delivery of this Note by the Borrower and the performance of its obligations hereunder have been duly authorized by all requisite corporate action in accordance with all applicable laws.

3

7.3    Commercial Purpose.  Borrower is obtaining the Loan and shall use the proceeds therefrom exclusively for lending to Hard AF for purposes of the LOC  Interest Credit.

7.4    Authorized Signatory.  As of the Effective Date, Jonathan Fodera is the duly appointed and currently serving President and Chief Executive Officer of the Borrower, and is duly authorized to execute and deliver this Note on behalf of the Borrower.

7.5    No Consents Required.  No consent, approval, permit, authorization, license, order, registration, declaration, filing with, or notice (collectively, "Consents") is required to be obtained, made or given by or on behalf of the Borrower in connection with the execution and delivery of this Note by the Borrower or the performance by the Borrower of its obligations hereunder.

7.6    No Conflicts.  The execution, delivery and performance by the Borrower of this Note and the consummation of the transactions contemplated hereby on part of the Borrower do not and shall not conflict with or result in: (i) any violation of the provisions of the Articles of Formation of Borrower or its Bylaws or any statute or any order, rule or regulation of any governmental authority having jurisdiction over Borrower or over any of its properties or assets; or (ii) any breach or violation of any of the terms or provisions of, or constitute a default under, any material contract to which the Borrower is a party or by which the Borrower or any of its properties or assets are bound.

8.    **Security Agreement—Borrower's Obligations Under this Note are Secured by the Borrower's Assets**.  As security for the payment and performance of all of the Borrower's obligations to Bridge Lender under this Note, Borrower hereby grants to Bridge Lender a continuing security interest ("**Security Interest**") in all of the assets and properties of the Borrower, whether now or hereafter existing or acquired, and regardless of where such assets may be located.  Borrower hereby irrevocably authorizes Bridge Lender at any time, and from time to time, to file in any jurisdiction any financing statement(s) and amendment(s) thereto identifying the collateral to which the Security Interest is attached as "all assets of the Company" or "the collateral described in the security agreement (i.e., Section 8 of the Note)," or words of similar effect, regardless of whether any particular asset comprising such collateral is actually within the scope of Article 9 of the Uniform Commercial Code as adopted in the jurisdiction where such financing statement or amendment is filed.

9.    **General Provisions**.

9.1    Notices.

(a)  All notices, requests, or other communications required or permitted to be delivered hereunder shall be delivered in writing, in each case to the address specified below or to such other address as such Party may from time to time specify in writing in compliance with this provision:

(i)    If to the Borrower:

Emerald Consulting Partners
[Address] 210 Crystal Grove Blvd
[Address] Lutz Florida 33548
Attn: Jonathan Fodera
Email: jonathan@integratedbusinessfinancing.com

(ii)    If to Bridge Lender:

4

Doc ID: f861f03a614d3e577dfd865384fb8d8dd875ed7e

[Company Name] Hard AF Seltzer LLC
[Address] 9221 Highway 290 West
[Address] Austin, TX 78736
[Attn:] Ross Patterson
[Email: ] rossangeles3000@hotmail.com

(b)  Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and/or (ii) sent by email shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email, or other written acknowledgment).

9.2    Governing Law.  This Note shall be construed and governed under and in accordance with the laws of the State of Florida concerning contracts entered into, delivered, and to be performed, within Florida.  The Parties agree that exclusive venue for any legal action hereunder shall lie in Tampa, Florda, and that personal jurisdiction and in rem jurisdiction to hear any and all disputes arising out of or in connection with this Note shall be concurrently vested in the courts of general jurisdiction of Tampa, Florida, and in the United States District Court for the District of Florida, but in no other court.  As part of the consideration for this Note, Borrower waives and agrees not to contest the venue set forth herein and not to contest the exercise of jurisdiction over Borrower or over the subject matter of this Note by any of the foregoing courts.  Final judgment against the Borrower in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

9.3    Waiver of Jury Trial. THE BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

9.4    Integration. This Note constitutes the entire contract between the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

9.5    Amendments and Waivers. No term of this Note may be waived, modified, or amended except by an instrument in writing signed by both of the Parties.  Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

9.6    Headings. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

9.7    Electronic Execution. This Note may be executed by any electronic means in regular commercial us, including DocuSign.

9.8    Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

5

9.9      Attorneys' Fees.  In the event any litigation or controversy between the Parties hereto arises out of or relating in any manner to this Note, the prevailing Party in such litigation or controversy shall be entitled to recover from the other Party all reasonable attorneys' fees, expenses and costs of suit, including, without limitation, those associated with any appellate proceedings or any post-judgment collection proceedings.

[SIGNATURE PAGE FOLLOWS]

6

Doc ID: f861f03a614d3e577dfd865384fb8d8dd875ed7e

IN WITNESS WHEREOF, the Borrower has executed and delivered this Secured Promissory Note as of the Effective Date.

Emerald Consulting Partners, LLC

By_____          06 / 12 / 2023
Name: Jonathan Fodera
Title: President and Chief Executive Officer

ACKNOWLEDGED AND AGREED:

[Bridge Lender]

By_____          06 / 12 / 2023
Name: Ross Patterson

[SIGNATURE PAGE – PROMISSORY NOTE –CAPPED OUT MEDIA (ANVIL BRIDGE)]

Doc ID: f861f03a614d3e577dfd865384fb8d8dd875ed7e

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Secured Promissory Note - 700K.docx |
| **Document ID** | f861f03a614d3e577dfd865384fb8d8dd875ed7e |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **06 / 12 / 2023** 15:38:15 UTC | Sent for signature to Ross Patterson (rossangeles3000@hotmail.com) and Jonathan Fodera (jonathan@integratedbusinessfinancing.com) from jonathan@integratedbusinessfinancing.com IP: 35.141.202.165 |
| VIEWED | **06 / 12 / 2023** 15:41:44 UTC | Viewed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| SIGNED | **06 / 12 / 2023** 15:43:12 UTC | Signed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| VIEWED | **06 / 12 / 2023** 16:22:46 UTC | Viewed by Jonathan Fodera (jonathan@integratedbusinessfinancing.com) IP: 35.141.202.165 |

Powered by **Dropbox** Sign

**Dropbox Sign**                                             Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Secured Promissory Note - 700K.docx |
| **Document ID** | f861f03a614d3e577dfd865384fb8d8dd875ed7e |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SIGNED**   **06 / 12 / 2023**   Signed by Jonathan Fodera
16:26:15 UTC   (jonathan@integratedbusinessfinancing.com)
IP: 35.141.202.165

**COMPLETED**   **06 / 12 / 2023**   The document has been completed.
16:26:15 UTC

# EXHIBIT C

**HARD AF SELTZER, LLC**
**9221 Highway 290 West, Austin, TX, 78736**

June 6, 2023

INBE Capital LLC
30 N Gould St
Sheridan, WY 82801

**RE: Agreement re INBE Capital Ventures, LLC Loan to Hard AF Seltzer, LLC**

Dear Ladies & Gentlemen:

You have provided HARD AF SELTZER, LLC a Texas limited liability company ("BORROWER"), with a Business Expansion Line of Credit Agreement dated on or about the first date above, which I have executed on behalf of BORROWER and returned to you. The Business Expansion Line of Credit Agreement provides for a line of credit from INBE Capital LLC, a Wyoming limited liability company ("INBE"), to BORROWER, in the principal amount of $2,800,000 (the "LOC").

This Agreement is made and given for good and valuable consideration coupled with an interest, the existence and sufficiency of which are acknowledged by the parties hereto, and it cannot be revoked or changed in any manner without an amendment in writing executed by Emerald Consulting Partners, LLC, a Florida limited liability company (the "BRIDGE LENDER").

This letter is intended to create an enforceable agreement (the "Agreement") among the parties hereto with respect to BORROWER's instructions to INBE, as memorialized herein, regarding the disposition of certain funds loaned by or deposited with INBE under the LOC documents.

BRIDGE LENDER has deposited with INBE, for the benefit of BORROWER, the sum of SEVEN HUNDRED THOUSAND DOLLARS (US $700,000.00) (the "Deposit"), as more particularly specified in that certain Secured Promissory Note dated on or about the first date above, between BORROWER and BRIDGE LENDER, an executed copy of which is attached hereto and incorporated herein by this reference (the "Note"). Such deposit has been made pursuant to that LOC of approximate even date herewith between BORROWER, INBE, and Messner Reeves, LLP, as escrow agent ("Escrow Agent").

Pursuant to the LOC, BORROWER hereby draws SEVEN HUNDRED THOUSAND DOLLARS (US $700,000.00) (the "First Draw Amount") in principal amount under the LOC and instructs INBE to immediately wire transfer the First Draw Amount in full to BRIDGE LENDER for the benefit of BORROWER, in accordance with and in satisfaction of the Note; and INBE agrees to wire transfer the First Draw Amount to BRIDGE LENDER as provided herein and otherwise as provided under the Note subject only to the condition that the "LOC Is Funded" as defined in Section 3 of the Note. If the First Draw Amount is less than Tranche 1, as defined in the LOC, the residual will be sent in Tranche 2.

In the event a determination is made by INBE that the "LOC Is Not Funded," as defined in

*Jonathan Wright*
Doc ID: 62790a09e6ad52d802506901abd9327e14616f89

Section 3 of the Note, or in the event that Ross Patterson, CEO of BORROWER, directs INBE to cease working on the LOC, INBE agrees to immediately forward and return the Deposit amount (i.e., US $700,000.00) to BRIDGE LENDER via wire transfer, without deduction of any kind. If INBE fails to forward and return the Deposit amount as required within one (1) business day of BORROWER's written request, INBE agrees that BORROWER may, and is hereby authorized by INBE to, instruct Escrow Agent to forward and refund the Deposit directly to BRIDGE LENDER.

INBE is directed to make no expenditures of funds from the LOC other than the payment of the First Draw Amount to BRIDGE LENDER (or the refund to BRIDGE LENDER of the Deposit), prior to making any other payments from the BORROWER'S LOC proceeds. For clarity, and to remove all doubt, if the LOC Is Funded (as defined in the Note) within ninety (90) days after the date of this Agreement, then INBE agrees to pay directly to the BRIDGE LENDER, via a wire transfer, the First Draw Amount on the date of Closing and Funding of the LOC's Tranche 1 and Tranche 2, such that the Deposit has been paid back; otherwise, it shall be deemed that the LOC Is Not Funded and INBE agrees to return the Deposit to BRIDGE LENDER.

By executing this Agreement, BORROWER and INBE further agrees to provide to Jonathan Fodera, President and CEO of the BRIDGE LENDER, the executed Loan Agreement, Promissory Note, Loan Closing Statement, Disposition of Proceeds, and other loan documents to be signed by BORROWER and to provide to the BRIDGE LENDER the Closing Agreement between INBE and BORROWER for the LOC closing.

INBE further agrees to draft the loan documents such that the Deposit shall be immediately paid to the BRIDGE LENDER if the LOC Is Not Funded within ninety (90) days after BRIDGE LENDER's Deposit with INBE.

INBE is herewith put on notice that BRIDGE LENDER has a security interest in all of the assets of BORROWER, including, without limitation, the Deposit.

If you should have any questions or require additional information, you are herewith directed to correspond with the undersigned by email, with a copy to Jonathan Fodera at jonathan@integratedbusinessfinancing.com on each and every item of correspondence with respect to the LOC.

Very Truly Yours,

06 / 12 / 2023

Ross Patterson,

HARD AF SELTZER, LLC

2

Doc ID: 62790a09e6ad52d802506901abd9327e14616f89

ACKNOWLEDGED AND AGREED (AS OF THE FIRST DATE ABOVE) BY:

INBE CAPITAL, LLC, a Wyoming limited liability company

By: *Jonathan Wright*                     06 / 12 / 2023

       Its Authorized Representative


EMERALD CONSULTING PARTNERS, a FLORIDA limited liability company

By:                                       06 / 12 / 2023

       Jonathan Fodera, Authorized Agent

3

Doc ID: 62790a09e6ad52d802506901abd9327e14616f89

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Final - Hard AF R...ction - 700K.docx |
| **Document ID** | 62790a09e6ad52d802506901abd9327e14616f89 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **06 / 12 / 2023** 15:27:00 UTC | Sent for signature to Ross Patterson (rossangeles3000@hotmail.com), Jonathan Fodera (jonathan@integratedbusinessfinancing.com) and Jonathan Wright (jonathan@theinbegroup.com) from jonathan@integratedbusinessfinancing.com IP: 35.141.202.165 |
| VIEWED | **06 / 12 / 2023** 15:31:27 UTC | Viewed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| SIGNED | **06 / 12 / 2023** 15:31:59 UTC | Signed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| VIEWED | **06 / 12 / 2023** 15:49:52 UTC | Viewed by Jonathan Fodera (jonathan@integratedbusinessfinancing.com) IP: 35.141.202.165 |

**Dropbox Sign**                                                    Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Final - Hard AF R...ction - 700K.docx |
| **Document ID** | 62790a09e6ad52d802506901abd9327e14616f89 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SIGNED** | **06 / 12 / 2023**<br>15:53:17 UTC | Signed by Jonathan Fodera<br>(jonathan@integratedbusinessfinancing.com)<br>IP: 35.141.202.165 |
| **VIEWED** | **06 / 12 / 2023**<br>16:28:58 UTC | Viewed by Jonathan Wright (jonathan@theinbegroup.com)<br>IP: 73.216.186.68 |
| **SIGNED** | **06 / 12 / 2023**<br>17:58:16 UTC | Signed by Jonathan Wright (jonathan@theinbegroup.com)<br>IP: 73.216.186.68 |
| **COMPLETED** | **06 / 12 / 2023**<br>17:58:16 UTC | The document has been completed. |

Powered by **Dropbox Sign**

# EXHIBIT D

# MESSNER REEVES LLP

DENVER, LAS VEGAS, ORANGE COUNTY, PHOENIX, SALT LAKE CITY, SILICON VALLEY, RENO, COLORADO SPRINGS, CHEYENNE, NEW YORK CITY

TORBEN M. WELCH
twelch@messner.com
Licensed in UT, CO & NY

DIRECT DIAL:
(801) 683-2021

August 23, 2023

> Re:    *INBE CAPITAL, LLC and its affiliates ("INBE")*

To Whom It May Concern:

We serve as outside counsel to INBE Capital, LLC and its affiliates and partners ("INBE"). It is our understanding that you are exploring a potential business relationship with INBE for the receipt of a business expansion line of credit (a "BELOC") from INBE. The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC.

We look forward to proceeding with this transaction and working with you and your company moving forward.

Should you have any questions or concerns, please contact me directly to discuss.

Very truly yours,

MESSNER REEVES LLP

Torben M. Welch

65 East Wadsworth Park Drive | Suite 110 | Draper, UT 84020 | 303 623 1800 *main* | 303 623 0552 *fax*

# EXHIBIT E



November 21, 2023

Kenneth E. Chase
Chase Law & Associates, P.A
1141 71st Street
Miami Beach, FL 33141
t 305.402.9800
kchase@chaselaw.com
www.chaselaw.com

Torben Welch, Caleb Meyer
Jim Smith, Max Harker
Messner Reeves LLP
65 East Wadsworth Park Drive, Suite 300
Draper, UT 84020

*Via Fedex and email to twelch@messner.com, cmeyer@messner.com, jsmith@messner.com, and mharker@messner.com*

>   Re:   *December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 Litigation Hold Notice*

Dear Mr. Welsh, Mr. Meyer, Mr. Smith, and Mr. Harker:

I am counsel for Emerald Consulting Partners LLC. I understand that your firm is holding $700,000 of my client's funds ostensibly on behalf of your client, INBE Capital LLC and that the Business Expansion Line of Credit for Hard AF Seltzer, LLC has not funded. This is unacceptable.

## Final Demand for Prompt Funding of Business Expansion Line of Credit to Hard AF Seltzer, LLC or Return of $700,000 by December 1, 2023

By December 1, 2023, the Business Expansion Line of Credit to Hard AF Seltzer, LLC must fund or my client's $700,000 must be returned. In the absence of compliance, my client will file suit against your firm.

## Litigation Hold Notice

Each recipient of this letter is identified as a party likely to possess, control, or have access to discoverable evidence pursuant to forthcoming litigation. Parties likely to have discoverable evidence are under a legal duty to maintain, preserve, retain, protect, and not destroy any documents or data, both electronic and hard copy, that may be relevant to any claims in litigation. Any failure to preserve and retain the electronic data and evidence outlined in this notice may constitute spoliation of evidence which may have serious consequences. This notice applies to you, as well as any of your agents, employees, affiliates, or assigns. This litigation hold notice also pertains to



documents or communications pursuant to which you, or your client, may later attempt to assert a privilege.

Page 2

You should anticipate that certain electronically stored information ("ESI"), including but not limited to emails, text messages, spreadsheets and databases, will be sought in the native form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, you must retain and preserve all electronic devices containing the ESI, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means. It is requested that you immediately identify and modify or suspend features of any information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. You must refrain from deleting any potentially relevant emails, text messages, or other communications. This letter applies to all electronic devices, including but not limited to office workstations and servers and any home or portable systems that may contain potentially relevant data, including smart phones, tablets, laptop computers, and desktop computers.

### **Demand for Certification of Compliance**

We intend to work with you for confirmation of acceptable protocols and procedures for forensically sound preservation and we can supply a suitable protocol if you furnish an inventory of the systems, electronic devices, and media to be preserved. Upon the commencement of discovery, we will request a prompt disclosure of the preservation protocols that you have employed. Please immediately certify in writing your intent to comply in return correspondence.

Very truly yours,

Kenneth E. Chase

# EXHIBIT F

# MESSNER REEVES LLP

Torben M. Welch
twelch@messner.com

TELEPHONE
(801) 683-2021

Licensed in CO, UT and NY

December 1, 2023

VIA EMAIL (kchase@chaselaw.com)

Kenneth E. Chase, Esq.
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141

**Re:    Hard AF Seltzer – INBE Business Expansion Line of Credit**

Mr. Chase:

We are writing to respond your letter dated November 21, 2023 related to that certain Business Expansion Line of Credit Agreement (the "Agreement") between INBE Capital, LLC ("INBE") and your clients Emerald Consulting, LLC / Hard AF Seltzer, LLC ("Client").   To clarify the issue, we do not represent INBE related to these matters at this time.  Messner Reeves LLP (the "Firm") served only as the Paymaster and recipient of the ICA Payment under the Agreement.  Allegations have been made by you and your client that the Firm has somehow performed in a manner inconsistent with the Agreement.  This is false.

Pursuant to Section 3.6 of the Agreement, Scott Simons (apparently on behalf of your client) did send an ICA Payment to INBE which was received by the Firm on or about July 13, 2023.  In accordance with Section 3.6 of the Agreement, "the ICA Payment or account need not be segregated by Lender, may be comingled with other Lender funds and may be utilized by Lender."  *See* Agreement at Section 3.6.

Should Lender make the first tranche under the terms of the Agreement, the ICA Payment is non-refundable to your Client after the first advance under the Agreement.  *See* Agreement at Section 3.6.  In this case, it is our understanding, based upon your communication and communications from Mr. Fedora dated October 27, 2023 and October 30, 2023, INBE has not performed under the Agreement or delivered the first tranche timely.  Again, we are not representing INBE on its performance under the Agreement.  Any claim related to their non-performance should be directed to INBE.

In the event of default by INBE, the Agreement at Exhibit F notes that if "Lender is unable to arrange for the issuance of the funding . . . the *Lender* agrees to reimburse the Borrower the amount under the ICA Advance Fee."  Lender in this case is INBE.  All of the allegations in your letter related to a default by INBE, no one else.

Pursuant to Section 13.7, in the event INBE, as Lender, fails to make the first Advance, "Borrower has the option to terminate this Agreement and request a full refund of the ICA Payment

65 East Wadsworth Park Drive, Suite 300, Draper, Utah 84020 Telephone:  801-623-2021

Page 2

. . . Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which . . . is attached hereto as Exhibit E, to Lender by certified mail." *See* Agreement at Section 13.7.

Upon information and belief, INBE has not received (and your Client has not delivered) a notarized termination notice by certified mail in accordance with Section.  If this has occurred, please provide it as soon as possible.  Until such termination notice is received INBE is under no obligation to facilitate the return of the ICA Payment in accordance with the terms and conditions of Section 13.7(a) of the Agreement, wherein INBE shall return (or instruct the Firm to return) the ICA Payment to your client.  Note that it is not deemed a lender default under the Agreement until 90 days have elapsed after receipt of the Notice.

Because of the requirements under Section 13.7(a), the Firm is not in a position to materially and unilateral alter the obligations of the Parties.  This is something I am sure you can appreciate.  Although we received your letter, it does not include any specific termination notice as required under the Agreement.  Absent termination of the Agreement, there is no ability for the ICA Payment to be returned under the Agreement as currently written.

*To that end, please deliver to us a notarized Termination Notice via certified mail and we can then process the same and issue a return of the ICA Payment under the terms of the Agreement. Although the obligation under the Agreement is 90 days, we will issue the return as soon as possible after receipt of the Termination Notice.  We will also require a waiver and release that we will provide as soon as we receive the Termination Notice.*

That said, the misrepresentations and allegations of wrongdoing against the Firm are misplaced.  Any action taken beyond the contractual requirements for which your client is bound will be addressed promptly and directly through all applicable defenses, counterclaims and related actions.  The threats of "misconduct" are not only false, but in direct contradiction to the terms, conditions and intent of the parties (related to an Agreement for which only your client and INBE, but not the Firm) executed.  Please take note that we will pursue all avenues necessary to protect against any such threats.

Sincerely,

MESSNER REEVES LLP

Torben M Welch

# EXHIBIT G

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801

Re:    Hard AF Seltzer, LLC

To Whom it May Concern:

The undersigned Borrower has not received any advances or other funding under the above referenced transaction and has therefore decided to exercise its rights to terminate such transaction pursuant to the terms of the LOC Agreement dated June 8, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement, which Borrower understands is $0.00.

Per various representations, Borrower understands that that the amount of the ICA payment is on deposit with Messner Reeves. This notice will also serve as direction to Messner Reeves to immediately return the ICA payment per the LOC Agreement and/or any other agreement among Borrower, Lender, and/or any third party.

This notice should not be deemed to be a waiver or relinquishment of any of Borrower's rights, all of which are expressly reserved.

BORROWER:  HARD AF SELTZER, LLC

By:_____

Name: Ross Patterson

Title: Managing Member

SUBSCRIBED AND SWORN TO BEFORE ME on this day:__January  19th, 2024__

_____

NOTARY PUBLIC

In and for the State of Texas

My Commission Expires:



# EXHIBIT H



January 24, 2024

Kenneth E. Chase
Chase Law & Associates, P.A
1141 71st Street
Miami Beach, FL 33141
t 305.402.9800
kchase@chaselaw.com
www.chaselaw.com

Torben Welch
Messner Reeves LLP
65 East Wadsworth Park Drive, Suite 300
Draper, UT 84020

*Via Fedex and email to twelch@messner.com, cmeyer@messner.com, jsmith@messner.com, and mharker@messner.com*

  *Re: Second and Final Demand for Return of $700,000*

Dear Mr. Welsh:

  I am counsel for Emerald Consulting Partners LLC, as you know from my November 21, 2023 letter. My understanding is that your firm is still holding $700,000 of my client's funds ostensibly on behalf of your client, INBE Capital LLC, and that the Business Expansion Line of Credit for Hard AF Seltzer, LLC has not funded.

  Attached to this letter as Ex. A is a notarized termination notice from Hard AF to INBE. In your December 1, 2023 letter, you stated, "INBE has not received (and your Client has not delivered) a notarized termination notice by certified mail in accordance with Section [sic]." The termination notice has been delivered by certified mail. There is no basis for the failure to return my client's funds.

  Attached hereto as Ex. B is the June 12, 2023 funding directive letter in which the parties agreed that "in the event that Ross Patterson, CEO of BORROWER, directs INBE to cease working on the LOC, INBE agrees to immediately forward and return the Deposit amount (i.e., US $700,000.00) to BRIDGE LENDER via wire transfer, without deduction of any kind. If INBE fails to forward and return the Deposit amount as required within one (1) business day of BORROWER's written request, INBE agrees that BORROWER may, and is hereby authorized by INBE to, instruct Escrow Agent to forward and refund the Deposit directly to BRIDGE LENDER."



CHASE LAW
& ASSOCIATES, P.A.

For this additional reason, as my client is the bridge lender, the $700,000 must be immediately returned to my client. Attached as Ex. C are my client's wire instructions. All rights are reserved. Kindly reply in writing, emailed to kchase@chaselaw.com, within one (1) business day with a wire confirmation for the return of the $700,000.

Page 2

Very truly yours,

Kenneth E. Chase

# EXHIBIT A

INBE Capital LLC
ATTENTION: Craig Boddington
30 N Gould Street,
Sheridan, Wyoming, 82801

Re:    Hard AF Seltzer, LLC

To Whom it May Concern:

The undersigned Borrower has not received any advances or other funding under the above referenced transaction and has therefore decided to exercise its rights to terminate such transaction pursuant to the terms of the LOC Agreement dated June 8, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement, which Borrower understands is $0.00.

Per various representations, Borrower understands that that the amount of the ICA payment is on deposit with Messner Reeves. This notice will also serve as direction to Messner Reeves to immediately return the ICA payment per the LOC Agreement and/or any other agreement among Borrower, Lender, and/or any third party.

This notice should not be deemed to be a waiver or relinquishment of any of Borrower's rights, all of which are expressly reserved.

BORROWER:  HARD AF SELTZER, LLC

By:_____

Name: Ross Patterson

Title: Managing Member

SUBSCRIBED AND SWORN TO BEFORE ME on this day:___January    19th, 2024___

_____

NOTARY PUBLIC

In and for the State of Texas

My Commission Expires:



# EXHIBIT B

**HARD AF SELTZER, LLC**
**9221 Highway 290 West, Austin, TX, 78736**

June 6, 2023

INBE Capital LLC
30 N Gould St
Sheridan, WY 82801

**RE: Agreement re INBE Capital Ventures, LLC Loan to Hard AF Seltzer, LLC**

Dear Ladies & Gentlemen:

You have provided HARD AF SELTZER, LLC a Texas limited liability company ("BORROWER"), with a Business Expansion Line of Credit Agreement dated on or about the first date above, which I have executed on behalf of BORROWER and returned to you. The Business Expansion Line of Credit Agreement provides for a line of credit from INBE Capital LLC, a Wyoming limited liability company ("INBE"), to BORROWER, in the principal amount of $2,800,000 (the "LOC").

This Agreement is made and given for good and valuable consideration coupled with an interest, the existence and sufficiency of which are acknowledged by the parties hereto, and it cannot be revoked or changed in any manner without an amendment in writing executed by Emerald Consulting Partners, LLC, a Florida limited liability company (the "BRIDGE LENDER").

This letter is intended to create an enforceable agreement (the "Agreement") among the parties hereto with respect to BORROWER's instructions to INBE, as memorialized herein, regarding the disposition of certain funds loaned by or deposited with INBE under the LOC documents.

BRIDGE LENDER has deposited with INBE, for the benefit of BORROWER, the sum of SEVEN HUNDRED THOUSAND DOLLARS (US $700,000.00) (the "Deposit"), as more particularly specified in that certain Secured Promissory Note dated on or about the first date above, between BORROWER and BRIDGE LENDER, an executed copy of which is attached hereto and incorporated herein by this reference (the "Note"). Such deposit has been made pursuant to that LOC of approximate even date herewith between BORROWER, INBE, and Messner Reeves, LLP, as escrow agent ("Escrow Agent").

Pursuant to the LOC, BORROWER hereby draws SEVEN HUNDRED THOUSAND DOLLARS (US $700,000.00) (the "First Draw Amount") in principal amount under the LOC and instructs INBE to immediately wire transfer the First Draw Amount in full to BRIDGE LENDER for the benefit of BORROWER, in accordance with and in satisfaction of the Note; and INBE agrees to wire transfer the First Draw Amount to BRIDGE LENDER as provided herein and otherwise as provided under the Note subject only to the condition that the "LOC Is Funded" as defined in Section 3 of the Note. If the First Draw Amount is less than Tranche 1, as defined in the LOC, the residual will be sent in Tranche 2.

In the event a determination is made by INBE that the "LOC Is Not Funded," as defined in

*Jonathan Wright*
Doc ID: 62790a09e6ad52d802506901abd9327e14616f89

Section 3 of the Note, or in the event that Ross Patterson, CEO of BORROWER, directs INBE to cease working on the LOC, INBE agrees to immediately forward and return the Deposit amount (i.e., US $700,000.00) to BRIDGE LENDER via wire transfer, without deduction of any kind. If INBE fails to forward and return the Deposit amount as required within one (1) business day of BORROWER's written request, INBE agrees that BORROWER may, and is hereby authorized by INBE to, instruct Escrow Agent to forward and refund the Deposit directly to BRIDGE LENDER.

INBE is directed to make no expenditures of funds from the LOC other than the payment of the First Draw Amount to BRIDGE LENDER (or the refund to BRIDGE LENDER of the Deposit), prior to making any other payments from the BORROWER'S LOC proceeds. For clarity, and to remove all doubt, if the LOC Is Funded (as defined in the Note) within ninety (90) days after the date of this Agreement, then INBE agrees to pay directly to the BRIDGE LENDER, via a wire transfer, the First Draw Amount on the date of Closing and Funding of the LOC's Tranche 1 and Tranche 2, such that the Deposit has been paid back; otherwise, it shall be deemed that the LOC Is Not Funded and INBE agrees to return the Deposit to BRIDGE LENDER.

By executing this Agreement, BORROWER and INBE further agrees to provide to Jonathan Fodera, President and CEO of the BRIDGE LENDER, the executed Loan Agreement, Promissory Note, Loan Closing Statement, Disposition of Proceeds, and other loan documents to be signed by BORROWER and to provide to the BRIDGE LENDER the Closing Agreement between INBE and BORROWER for the LOC closing.

INBE further agrees to draft the loan documents such that the Deposit shall be immediately paid to the BRIDGE LENDER if the LOC Is Not Funded within ninety (90) days after BRIDGE LENDER's Deposit with INBE.

INBE is herewith put on notice that BRIDGE LENDER has a security interest in all of the assets of BORROWER, including, without limitation, the Deposit.

If you should have any questions or require additional information, you are herewith directed to correspond with the undersigned by email, with a copy to Jonathan Fodera at jonathan@integratedbusinessfinancing.com  on each and every item of correspondence with respect to the LOC.

Very Truly Yours,

06 / 12 / 2023

Ross Patterson,

HARD AF SELTZER, LLC

2

ACKNOWLEDGED AND AGREED (AS OF THE FIRST DATE ABOVE) BY:

INBE CAPITAL, LLC, a Wyoming limited liability company

By: *Jonathan Wright*                    06 / 12 / 2023

      Its Authorized Representative

EMERALD CONSULTING PARTNERS, a FLORIDA limited liability company

By: _____     06 / 12 / 2023

      Jonathan Fodera, Authorized Agent

3

Doc ID: 62790a09e6ad52d802506901abd9327e14616f89

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Final - Hard AF R...ction - 700K.docx |
| **Document ID** | 62790a09e6ad52d802506901abd9327e14616f89 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| ⌲ **SENT** | **06 / 12 / 2023** 15:27:00 UTC | Sent for signature to Ross Patterson (rossangeles3000@hotmail.com), Jonathan Fodera (jonathan@integratedbusinessfinancing.com) and Jonathan Wright (jonathan@theinbegroup.com) from jonathan@integratedbusinessfinancing.com IP: 35.141.202.165 |
| ◉ **VIEWED** | **06 / 12 / 2023** 15:31:27 UTC | Viewed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| ⌇ **SIGNED** | **06 / 12 / 2023** 15:31:59 UTC | Signed by Ross Patterson (rossangeles3000@hotmail.com) IP: 184.92.232.78 |
| ◉ **VIEWED** | **06 / 12 / 2023** 15:49:52 UTC | Viewed by Jonathan Fodera (jonathan@integratedbusinessfinancing.com) IP: 35.141.202.165 |

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Please complete |
| **File name** | Final - Hard AF R...ction - 700K.docx |
| **Document ID** | 62790a09e6ad52d802506901abd9327e14616f89 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SIGNED**
**06 / 12 / 2023**
15:53:17 UTC
Signed by Jonathan Fodera
(jonathan@integratedbusinessfinancing.com)
IP: 35.141.202.165

**VIEWED**
**06 / 12 / 2023**
16:28:58 UTC
Viewed by Jonathan Wright (jonathan@theinbegroup.com)
IP: 73.216.186.68

**SIGNED**
**06 / 12 / 2023**
17:58:16 UTC
Signed by Jonathan Wright (jonathan@theinbegroup.com)
IP: 73.216.186.68

**COMPLETED**
**06 / 12 / 2023**
17:58:16 UTC
The document has been completed.

Powered by **Dropbox** Sign

# EXHIBIT C



October 3, 2023

EMERALD CONSULTING PARTNERS LLC - Incoming Wire Instructions

Account Name: EMERALD CONSULTING PARTNERS LLC

Account Number: ███████

Routing Number for **wires**: ███████

Routing Number for **ACH**: ███████

SWIFT Code for International Wires: ██████

Branch Address: 7674 Dr. Phillips Blvd, Orlando, FL 32819

Please reach out if there's any questions.

Best,

Mo Khan

Business Relationship Manager

███████

7674 Dr. Phillips Blvd

Orlando, FL 32819

# EXHIBIT I

## Kenneth E. Chase

| | |
|---|---|
| **From:** | Torben Welch <twelch@messner.com> |
| **Sent:** | Thursday, January 25, 2024 5:24 PM |
| **To:** | Kenneth E. Chase |
| **Cc:** | Craig Boddington; Jason C Aufdermaur |
| **Subject:** | RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC |
| **Attachments:** | MessnerReeves_ 01_25_2024-13_53[1].pdf |

Mr. Chase:

We have received your letter.  Please note that while we understand your client's timing, the timing is as noted under the contract.  That is not to say that the funds will not be released prior to the 90 day period, but there are some additional items to resolve as predicated by the contract.  This makes delivery under the deadline given not realistic, however, our clients are working to ensure a release of funds very quickly and will have more information on that tomorrow.  We'll reach out once that is received.  In the meantime, the funds remain part of the escrow under our control at Titan Financial, LLC – a copy of that statement evidencing the same is attached hereto as of today's date (please note that your clients $700k is co-mingled with other funds).

Thanks,


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020


---

**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Wednesday, January 24, 2024 11:28 AM
**To:** Torben Welch <twelch@messner.com>
**Cc:** Jim Smith <jsmith@messner.com>; Craig Boddington <craig@theinbegroup.com>
**Subject:** RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC

## [ EXTERNAL EMAIL ]

---

Please see attached.  As stated in the letter, please provide written confirmation and a Fed Reference number within one business day confirming the return of the $700,000.


**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

1

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

**From:** Torben Welch <twelch@messner.com>
**Sent:** Friday, December 1, 2023 6:19 PM
**To:** Kenneth E. Chase <kchase@chaselaw.com>
**Cc:** Jim Smith <jsmith@messner.com>; Craig Boddington <craig@theinbegroup.com>
**Subject:** RE: December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC

Mr. Chase – please see attached communication.  As the Firm is not a party to the agreement, there are pre-requisites required to return the ICA.  If INBE has not funded the BELOC (which is your first request), then please the attached for steps to take to begin the ICA return process.

Thanks,


**TORBEN M. WELCH**
Partner
*Licensed in UT, NY, and CO*
**Messner Reeves LLP**
**D:** 801.683.2021 **O:** 303.623.1800 **E:** twelch@messner.com
65 East Wadsworth Park Drive, Suite 110, Draper, UT 84020


**From:** Kenneth E. Chase <kchase@chaselaw.com>
**Sent:** Tuesday, November 21, 2023 1:04 PM
**To:** Torben Welch <twelch@messner.com>; Caleb Meyer <cmeyer@messner.com>; Jim Smith <jsmith@messner.com>; Max Harker <mharker@messner.com>
**Subject:** December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 to Emerald Consulting Partners LLC

**[ EXTERNAL EMAIL ]**

November 21, 2023

Torben Welch, Caleb Meyer
Jim Smith, Max Harker

2

Messner Reeves LLP
65 East Wadsworth Park Drive, Suite 300
Draper, UT 84020

*Via Fedex and email to twelch@messner.com, cmeyer@messner.com, jsmith@messner.com, and mharker@messner.com*

      *Re:    December 1, 2023 Deadline to Fund Business Expansion Line of Credit for Hard AF Seltzer, LLC or Return $700,000 Litigation Hold Notice*

Dear Mr. Welsh, Mr. Meyer, Mr. Smith, and Mr. Harker:

      I am counsel for Emerald Consulting Partners LLC. I understand that your firm is holding $700,000 of my client's funds ostensibly on behalf of your client, INBE Capital LLC and that the Business Expansion Line of Credit for Hard AF Seltzer, LLC has not funded. This is unacceptable.

### Final Demand for Prompt Funding of Business Expansion Line of Credit to Hard AF Seltzer, LLC or Return of $700,000 by December 1, 2023

      By December 1, 2023, the Business Expansion Line of Credit to Hard AF Seltzer, LLC must fund or my client's $700,000 must be returned. In the absence of compliance, my client will file suit against your firm.

### Litigation Hold Notice

      Each recipient of this letter is identified as a party likely to possess, control, or have access to discoverable evidence pursuant to forthcoming litigation. Parties likely to have discoverable evidence are under a legal duty to maintain, preserve, retain, protect, and not destroy any documents or data, both electronic and hard copy, that may be relevant to any claims in litigation. Any failure to preserve and retain the electronic data and evidence outlined in this notice may constitute spoliation of evidence which may have serious consequences. This notice applies to you, as well as any of your agents, employees, affiliates, or assigns. This litigation hold notice also pertains to documents or communications pursuant to which you, or your client, may later attempt to assert a privilege.

      You should anticipate that certain electronically stored information ("ESI"), including but not limited to emails, text messages, spreadsheets and databases, will be sought in the native form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, you must retain and preserve all electronic devices containing the ESI, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means. It is requested that you immediately identify and modify or suspend features of any information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. You must refrain from deleting any potentially relevant emails, text messages, or other communications. This letter applies to all electronic devices, including but not limited to office workstations and servers and any home or portable systems that may contain potentially relevant data, including smart phones, tablets, laptop computers, and desktop computers.

### Demand for Certification of Compliance

      We intend to work with you for confirmation of acceptable protocols and procedures for forensically sound preservation and we can supply a suitable protocol if you furnish an inventory of the systems, electronic devices, and media to be preserved. Upon the commencement of discovery, we will request a prompt disclosure of the preservation protocols that you have employed. Please immediately certify in writing your intent to comply in return correspondence.

      Very truly yours,

Kenneth E. Chase

**Kenneth E. Chase**
Chase Law & Associates, P.A.
t 305.402.9800
kchase@chaselaw.com

**Miami Office**
1141 71st Street
Miami Beach, FL 33141

FLORIDA | CALIFORNIA
WASHINGTON, DC | NEW YORK
MASSACHUSETTS | MARYLAND | TEXAS

www.chaselaw.com



*This electronic communication contains information from the law firm of Chase Law & Associates, P.A. The contents and attachments may be privileged and confidential and are intended only for the named recipients. If you are not an intended recipient, please note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you received this communication in error, please contact me. Thank you for your assistance.*

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT J

**USER DETAILS**

| | |
|---|---|
| COMPANY NAME | Messner Reeves, LTD |
| USERNAME | Messner |
| FULL NAME | Messner Reeves LTD |
| MAILING ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |
| PHYSICAL ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah,  8402 |

**ACCOUNT DETAILS**

| | |
|---|---|
| NUMBER | ▮▮▮▮▮▮▮ |
| TYPE | IOLTA |
| CURRENCY | USD |
| AVAILABLE BALANCE | 10,300,000.00 |
| CURRENT BALANCE | 10,300,000.00 |
| STATUS | Active |

**Date**

| | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| 01/25/2024 14:52 | 73 | TBU/Messner Reeves Account | 10,300,000.00 | 10,300,000.00 |

Titan Private Bank, LLC

1/1