Electronically Filed
3/22/2024 12:04 AM
Steven D. Grierson
CLERK OF THE COURT

EXHIBIT
I

**COMPB**
Gregory A. Gordillo (NSBN 13342)
THE GORDILLO LAW FIRM
5940 S Rainbow Blvd, Suite 4011
Las Vegas, NV 89118
702-802-6845
greg@gordillolawfirm.com

Jay R. Carson, Esq. (*Pro Hac Vice* to be filed)
Ohio Bar No. 68526
Wegman Hessler Valore
6055 Rockside Woods Blvd Suite 200
Cleveland, Ohio 44131
216-642-3342
jrcarson@wegmanlaw.com

Attorneys for Plaintiff

CASE NO: A-24-889648-B
Department 16

## DISTRICT COURT

## CLARK COUNTY, NEVADA

**HOMEPEOPLE CORPORATION, dba Romio**

    Plaintiff(s),

  vs.

**MESSNER REEVES LLP**

    Defendant(s).

Case No.:
Dept. No.:

**COMPLAINT FOR MONEY DAMAGES**
**(BUSINESS COURT REQUESTED)**
Date of Hearing:  N/A
Time of Hearing:  N/A

For its Complaint, Plaintiff HomePeople Corporation, dba Romio states as follows:

///

///

Page 1 of 9

Case Number: A-24-889648-B

## PARTIES

1.     Plaintiff HomePeople Corporation, dba Romio ("Romio") is a New York corporation with its principal place of business in New York City. Romio is engaged in the business of operating a services marketplace.

2.     Defendant Messner Reeves ("Messner") is a law firm serving as an escrow agent relating to certain funds placed on deposit for the benefit of non-party INBE Capital, LLC ("INBE"), with offices located in Las Vegas, Nevada.

## FACTUAL BACKGROUND AND NATURE OF THE DISPUTE

3.     On March 14, 2023, Romio, through its CEO, Tarik Sansal, entered into a Business Expansion Line of Credit Agreement with INBE under which would loan funds to Romio through a line of credit within a certain period of time.  ("the Agreement"). A copy of the Agreement is attached as Exhibit A.

4.     Under the Agreement with INBE, Romio to borrow Four Million Dollars ($4,000,000.00) through a line of credit to fund company expansion.

5.     Under the Agreement, INBE agreed to fund the loan in three tranches.  The first, from which certain INBE fees would be deducted was to be delivered no less than 90 days from underwriting completion. (Agreement at Exhibit B).

6.     In the Agreement, INBE expressly warranted that it had the ability to fund the loan within the Agreement's timetable:

Section 10.12 Lender's Ability to Fund. Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fully fund the LOC in the full amount of the Maximum Amount. Lender covenants and agrees that it shall fully and timely fund each Advance requested by Borrower so long as no Event of Default has occurred and is continuing at the time of such Advance and subject to satisfaction by

Borrower of the requirements of Article 4 hereof with respect to each Advance. (Agreement at 10.2).

7.      The schedule for the advances was expressly established in the Agreement:

Section 10.13. <u>Timing of Lender Funding</u>. Lender will provide Advances as defined in the Payment Schedule within Exhibit B.

8.      These representations were material to the Agreement, and Romio relied upon them when entering into the Agreement.

9.      Moreover, the availability and payment of the loaned funds pursuant to the Agreement's schedule was material to the Agreement because the timely finding of the loans would allow Romio to take advantage of certain time-sensitive business opportunities.

10.      The Agreement obligated INBE to deliver the second tranche of funding to Romio no less than 60 days after the first tranche, or  July 3, 2023.

11.       In addition to repaying the loans as set forth in the Agreement, Romio agreed to provide INBE with an advance payment of One Million dollars ($1,000,000.00) ("the ICA payment").

12.      The Agreement also required Romio to pay an "Establishment Cost" of $360,000.00, which was deducted from the first tranche and paid directly to INBE.

13.      The ICA payment, on the other hand, was to be held in escrow by a Trustee—in this case, Messner—for the payment of interest as it accrued. (Agreement at Exhibit H).

14.      The Agreement further provided that:

In the event that Lender is unable to arrange for the issuance of funding as per this agreement, the lender contractually agrees to reimburse the Borrower the amount of their ICA Advance Fee. Such agreement is contractual in nature, and is not collateralized in any manner with any funds other than the ICA Advance Fee, which

shall be in Trustee's sole possession and control. The Lender agrees none of the Indemnitees shall be liable in any manner should Trustee fail to return the ICA Advance Fee per his contractual obligations with the Lender, although the Lender does agree to use its best efforts, including legal efforts, to recover the ICA Advance Fee should Trustee fail to return it per his contractual agreement with the Lender. For avoidance of doubt, in the event we're unsuccessful at recovering ICA Funds from the Trustee, INBE Capital LLC will step in and reimburse the Borrower the full amount of ICA Funds within 90 days.

(Id.)

15.     Immediately following the execution of the Agreement, Romio wired the ICA payment to the purported escrow Trustee.  The ICA payment, however, was then sent to Messner, which, on information and belief, continues to serve as the escrow Trustee.

16.     The holding of the ICA funds in escrow by the trustee was a material term of the Agreement and was a material inducement for Romio to enter into it.

17.     If Romio had been aware that the ICA funds would not actually be held in escrow, it would not have entered into the Agreement.

18.     On July 3, 2023, INBE provided Romio with its first tranche of funding of $972,000, which represented the first tranche (one third of the four million dollar line of credit) minus the $360,000 Establishment Cost.

19.     Per the Agreement, INBE was to release the second tranche of funds to Romio 60 days later, or, on or before September 3, 2023.

20.     INBE has failed to provide the funds by the date set forth in the Agreement.

21. Romio reached out to INBE on multiple occasions, by phone and email, demanding that it fund the loan as promised.

22. The promised funding, however, never came. As a result, Romio was forced to seek other funding elsewhere and to forgo some of the business expansion plans that relied on the timely receipt of the INBE loan proceeds.

23. On or about October 20, 2023, after repeated requests from Romio, INBE agreed to waive the Establishment Cost, but did not refund it to Romio.

24. On October 24, 2023, seven weeks after the second tranche was due to be transmitted, Romio demanded that Messner return or account for the whereabouts of the ICA funds.

25. On information and belief, INBE is insolvent.

26. Upon information and belief, Messner has either transferred the ICA funds to a third-party or has encumbered the ICA funds and is thus unable or unwilling to release them.

27. On October 24, 2023, Romio, along with several other INBE borrowers, sent correspondence to Messner demanding that in light of INBE's material breach by failure to provide the second tranche pursuant to the Agreement's schedule,

28. On November 22, 2023, Romio, through counsel, sent a letter to Messner demanding confirmation that it was holding the ICA amount in escrow, or in the alternative an explanation of where the ICA amount was being held, and under what authority.

29. The letter asked Messner to respond by November 30, 2023.

30. Messner responded that Romio could terminate the contract and then seek refund of the ICA funds within 90 days, but did not confirm the existence or availability of the funds.

31. After inquiries, a Messner representative indicated that Messner could provide some of the funds, and provided a statement showing that funds were held in a private bank.

32. In numerous communications with Messner, a Messner representative continued to promise that some of the ICA funds would be released shortly, and that return of the money was imminent.

33. After months of promises, however, Romio has not received any of its ICA funds or fees back from Messner.

**COUNT ONE: BREACH OF CONTRACT**
**AND COMMON LAW AGENCY CLAIM AGAINST MESSNER**

34. Romio restates the allegations of paragraphs 1 through 33 and incorporates them here as if fully re-written.

35. Messner contracted with the parties, including Romio, to serve as escrow Trustee.

36. In the alternative, Messner agreed to serve as Romio's agent for the purposes of holding the ICA funds in escrow and paying them in accordance with the parties Agreement.

37. Accordingly, Messner had a duty Romio to hold the ICA funds in escrow, and not to transfer them with authorization or as set forth in the Agreement.

38. At the bare minimum, Messner had a duty to inform Romio regarding the status and whereabouts of the funds.

39. On information and belief, Messner, without authority, improperly transferred the funds to a third party, putting them outside of Romio's reach and putting those funds in jeopardy of being lost.

40. Under contract and common law agency principles, Messner is required to account for the $1 million ICA funds that it had been holding in escrow.

41. Messner is therefore liable for returning the ICA funds to a legitimate escrow account, or to the extent that the funds are not recoverable, is required to compensate Romio to the extent that the funds were lost.

///

## COUNT TWO: FRAUD

42. Romio restates the allegations of paragraphs 1 through 41 and incorporates them here as if fully re-written.

43. INBE made numerous knowingly false representations to Romio to induce it into entering into the Agreement. Those misrepresentations include, but are not limited to, (1) the representation that INBE had the ability to fund the loan, (2) that the loan would be paid pursuant to the Agreement's schedule, and (3) that the ICA funds would be held in escrow.

44. INBE and Messner knew that these representations were false when they were made.

45. Specifically, Messner and INBE both knew that the funds would not actually be held in escrow but would be moved or encumbered in such a way to fund or secure other loans, leaving Romio with no way to recover the ICA if INBE defaulted.

46. Romio reasonably relied on these representations.

47. Further, as escrow trustee, Messner knew that had a duty to Romio to notify it that the funds had been moved, encumbered, or were otherwise unavailable.

48. In addition, Messner knew that Romio had relied on the representations that the funds would be held in escrow and had a duty to tell Romio that the funds were not actually being held in escrow, but have been moved or encumbered.

49. Messner has continued to make false representations to Romio that it has the funds, but when pressed for proof, such as a bank statement, escrow agreement, deposit receipt, or other evidence, it has failed to provide any.

50. Romio has been damaged by its reliance on these misrepresentations. Specifically, Romio has entered into an Agreement under which it has paid out $1,360,000.00 (the ICA plus the Establishment Cost) to receive only $972,000.00 of a promised $4 million line of credit.

51.     Romio has also incurred additional costs to obtain financing and has lost significant business opportunities because of INBE's and Messner's fraud.

## COUNT THREE: REQUEST FOR PRELIMINARY RELIEF
## IN THE FORM OF A WRIT FOR PREJUDGMENT ATTACHMENT

52.     Romio restates the allegations of paragraphs 1 through 51 and incorporates them here as if fully re-written.

53.     N.R.S. 31.013 allows a court, after notice and a hearing, to order the clerk to issue a writ of attachment "[i]n an action upon a judgment or upon a contract, express or implied, for the direct payment of money  (a) if the judgment is not a lien upon or the contract is not secured by mortgage, lien or pledge upon real or personal property situated in this state; or in  "[i]n any other case where the court finds that extraordinary circumstances exist which will make it improbable for the plaintiff to reach the property of the defendant by execution after the judgment has been entered."

54.     In this case, Messner is under a duty as trustee/escrow agent to keep Romio's ICA deposit safe and available.

55.     Multiple other suits have been filed against Messner in other jurisdictions, all alleging that Messner has lost, misplaced, moved, or encumbered the ICA of various INBE clients.

56.     As trustee/escrow agent, Messner has an absolute duty to keep the funds safe.

57.     Based on the experiences related from other claimants, Messner's inability to release any funds, or even give a good answer as to their whereabouts, Romio reasonably believes that the funds may be moved beyond this court's reach.

58.     Further, on information and belief and to the extent that Romio has been able to get any information regarding the status and location of the funds, the funds are being held outside of this state.

59.    To the extent that Messner may argue it is not required to return the funds yet, attaching the funds will not harm Messner and will protect Romio.

60.    Romio intends to file a motion for attachment and affidavit setting forth in greater detail the reasons supporting a prejudgment writ of attachment.

WHEREFORE, Romio demands the following relief:

(1) Money damages, in the amount of the ICA and Establishment Cost, plus interest;

(2) Damages for lost profits and lost business opportunity, and additional financing in an amount to be proven at trial,

(3) Punitive and exemplary damages,

(4) Upon the filing of a motion and affidavit, and hearing and notice pursuant to N.R.S. 31.013, a writ of prejudgment attachment preventing Messner from moving or encumbering Romio's ICA funds.

(5) Costs and Attorneys' fees.

DATED this 21st day of March 2024.

/s/ Gregory A Gordillo
Gregory A. Gordillo (NSBN 13342)
5940 S Rainbow Blvd, Suite 4011
Las Vegas, Nevada 89118
702-802-6845
greg@gordillolawfirm.com

Jay R. Carson, Esq.  (*Pro Hac Vice* to be filed)
Ohio Bar No. 68526
Wegman Hessler Valore
6055 Rockside Woods Blvd Suite 200
Cleveland, Ohio 44131
216-642-3342
jrcarson@wegmanlaw.com

*Attorneys for Plaintiff*