Electronically Filed by Superior Court of California, County of Orange, 06/13/2025 08:00:00 AM.
30-2025-01490036-CU-BT-CXC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By G. Ramirez, Deputy Clerk.

Assigned for All Purposes

Judge William Claster

CX-101

EXHIBIT

**M**

Kenneth E. Chase (SBN 326307)
kchase@chaselaw.com
CHASE LAW & ASSOCIATES, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Telephone: (305) 402-9800

*Attorney for Plaintiffs Kosher Eats LLC,*
*Emerald Consulting Partners LLC Abbson LLC,*
*MSC Companies, LLC, and HomePeople Corp.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ORANGE
UNLIMITED CIVIL

| | |
|---|---|
| KOSHER EATS LLC, a Florida limited liability company, EMERALD CONSULTING PARTNERS LLC, a Florida limited liability company, ABBSON LLC, a New York limited liability company, MSC COMPANIES, LLC, a Utah limited liability company, and HOMEPEOPLE CORPORATION, a New York corporation,<br><br>        Plaintiffs,<br><br>      v.<br><br>MESSNER REEVES LLP, a Colorado limited liability partnership, TORBEN WELCH, an individual, and DANIEL CHARTRAW, an individual, and CLEARWATER PREMIERE PERPETUAL MASTER LLC, a Wyoming limited liability company,<br><br>        Defendants. | Case No.:  30-2025-01490036-CU-BT-CXC<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br><br>1. CIVIL THEFT (PENAL CODE § 496)<br>2. CONVERSION<br>3. FRAUD (FALSE PROMISE)<br>4. FRAUD (CONCEALMENT)<br>5. UNFAIR BUSINESS PRACTICES § 17200<br>6. NEGLIGENCE<br>7. NEGLIGENT MISREPRESENTTION<br>8. BREACH OF FIDUCIARY DUTY<br>9. INTENTIONAL INTERFERENCE<br>10. NEGLIGENT INTERFERENCE<br>11. RESTITUTION BASED ON QUASI-CONTRACT AND UNJUST ENRICHMENT<br>12. CIVIL CONSPIRACY<br>13. AIDING AND ABETTING |

## TABLE OF CONTENTS

1. INTRODUCTION ..................................................................................................3

2. PARTIES ............................................................................................................4

3. JURISDICTION AND VENUE ...........................................................................4

4. FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS .............................5

    4.1.    Overview of Defendants' BELOC Advance Fee Scam.................................6

    4.2    The All Net Project and its History of Fraud.....................................8

    4.3    Messner and Welch's Unusual Representation of Clearwater, Chartraw, Dribble Dunk, Robinson, and INBE...............................................9

    4.4    Chartraw's Prior Criminal Schemes Match the Crimes in this Case...........10

    4.5    Messner, Clearwater, and the Fraudulent $60 Billion Bond Scheme..........12

    4.6    Messner's False Representations to the Las Vegas Zoning Commission in 2022 ....................................................................................................13

    4.7    Messner Presents a Fake PG Asia Letter to the Zoning Commission.........16

    4.8    The Collapse of the Bond Narrative and Shift to BELOC Fraud................18

    4.9    Messner's Orchestration of the BELOC Scheme .....................................20

    4.10    INBE's Role as Sham Lender...............................................................24

    4.11    Misrepresentations Regarding Escrow and "Sole Possession and Control" ...........................................................................................27

    4.12    Use of Trust Account to Steal ICA Deposit Money ..................................31

    4.13    The Cover-Up and Continuing Lies ......................................................36

5. INDIVIDUAL PLAINTIFFS' ALLEGATIONS ....................................................40

    5.1    Kosher Eats LLC ...............................................................................40

    5.2    Emerald Consulting Partners LLC........................................................42

    5.3    MSC Companies LLC .........................................................................43

    5.4    Abbson LLC ......................................................................................44

    5.5    HomePeople Corporation ...................................................................45

6. CAUSES OF ACTION ........................................................................................47

    6.1    Civil Theft (Penal Code § 496)............................................................47

    6.2    Conversion .......................................................................................48

    6.3    Fraud (False Promise)........................................................................49

    6.4    Fraud (Concealment) ........................................................................50

    6.5    Unfair Business Practices § 17200 .....................................................51

    6.6    Negligence .......................................................................................52

    6.7    Negligent Misrepresentation...............................................................53

    6.8    Breach Of Fiduciary Duty....................................................................54

    6.9    Intentional Interference with Prospective Economic Advantage ...............56

    6.10    Negligent Interference with Prospective Economic Advantage..................56

    6.11    Action for Restitution Based on Quasi-Contract and Unjust Enrichment...57

    6.12    Civil Conspiracy ...............................................................................58

    6.13    Aiding and Abetting Fraud, Conversion, and Breach of Fiduciary Duty....59

7. PRAYER FOR RELIEF .......................................................................................59

Plaintiffs Kosher Eats LLC ("Kosher Eats"), Emerald Consulting Partners LLC ("Emerald"), Abbson LLC ("Abbson"), MSC Companies LLC ("MSC"), and HomePeople Corporation ("HomePeople") file this action against Defendants Messner Reeves LLP ("Messner"), Torben Welch, Daniel Chartraw, and Clearwater Premiere Perpetual Master LLC ("Clearwater").

## 1. INTRODUCTION

1.    A law firm and its managing partner conspired with a convicted felon and the felon's shell company to perpetrate an advance-fee fraud scheme targeting small businesses. Plaintiffs were induced to deposit $8,345,000 into what was represented as a secure attorney trust account maintained by Messner. Defendants used fraudulent business loan agreements, labeled "BELOCs," to promise that Messner would retain "sole possession and control" of the escrowed funds until the loans funded. But the loans never funded. Messner and Welch stole Plaintiffs' money from the firm's trust account and repeatedly lied about it, flouting the Rules of Professional Conduct.

2.    The scheme was orchestrated by Welch, a managing partner at Messner, and Chartraw, a notorious convicted felon who was recently indicted again for wire fraud and is currently out on bail. The two acted in concert with Clearwater, a sham entity controlled by Chartraw. Welch drafted the BELOC using a template obtained from another fraudster now facing federal charges for a similar scheme. Under Welch's version, Messner would serve as the escrow agent, leveraging the firm's reputation to convince victims their funds were secure.

3.    After stealing the funds, Defendants subjected Plaintiffs to a long string of lies and delays. At various times, Defendants blamed unnamed "bankers," claimed the funds were held in a Wyoming "IOLTA" account created by Welch, or said the money was being returned via a "national bank partner." Clearwater's counsel falsely assured Plaintiffs that disbursements were imminent, but the funds never arrived.

4.    Throughout this period, Messner denied that the funds were missing and repeatedly promised their return. After a year of stonewalling, in February 2025, Messner finally admitted the truth: the money was gone. Plaintiffs seek $8.3 million in principal

damages, plus consequential damages, treble damages, punitive damages, and attorneys' fees for the egregious misconduct of a corrupted law firm acting in league with a career criminal.

## 2. PARTIES

5.      Plaintiff Kosher Eats is a Florida limited liability company with its principal place of business in Broward County, Florida.

6.      Plaintiff Emerald is a Florida limited liability company with its principal place of business in Pasco County, Florida.

7.      Plaintiff Abbson is a New York limited liability company with its principal place of business in New York County, New York.

8.      Plaintiff MSC is a Utah limited liability company with its principal place of business in Salt Lake County, Utah.

9.      Plaintiff HomePeople is a New York corporation with its principal place of business in Pasco County, Florida.

10.      Defendant Messner is a Colorado limited liability partnership with its principal place of business in Denver County, Colorado. Messner has 43 full-time attorneys working in California, including 34 full-time attorneys, in addition to staff, in its Orange County office. On May 16, 2025, Messner publicly announced that its Orange County office was ranked 36th on the Orange County Business Journal's 2025 List of Law Firms, which ranks firms based on the number of Orange County-based attorneys.

11.      Defendant Welch is a natural person residing in Utah. His corporate form, Torben M. Welch, P.C., is a member of Messner.

12.      Defendant Chartraw is a resident and citizen of California.

13.      Defendant Clearwater is a Wyoming limited liability company with its principal place of business in California.

## 3. JURISDICTION AND VENUE

14.      Defendant Messner is subject to general personal jurisdiction in California because its operations in California are continuous, systematic, and substantial. Messner maintains two offices in the state, employs over 40 attorneys here, and ranks among the top

COMPLAINT

law firms in Orange County by attorney headcount. Its presence justifies the exercise of general jurisdiction for all purposes.

15.    Defendant Chartraw is subject to general personal jurisdiction in California because he is a citizen of California.

16.    Defendant Clearwater is subject to general personal jurisdiction in California because Clearwater's principal place of business is in California and Clearwater is a citizen of California.

17.    All Defendants are subject to specific personal jurisdiction in California because they purposefully directed activities into this forum in connection with the events giving rise to this lawsuit. Their conduct was undertaken in material part in coordination with one another in meetings and actions that took place in California, and the claims asserted arise from and relate to their forum-based conduct. The exercise of jurisdiction over these Defendants comports with traditional notions of fair play and substantial justice.

18.    Material events and circumstances giving rise to this action occurred in Orange County, California and/or Los Angeles County, California.

19.    The amount in controversy exceeds $50,000.

20.    Venue is proper in this Court under California Code of Civil Procedure §§ 395 and 395.5. Messner maintains an office in Orange County, and substantial acts, omissions, and misrepresentations occurred in this County.

21.    Jurisdiction is proper under California Code of Civil Procedure § 410.10.

22.    All conditions precedent to bringing this action, if any, have occurred, been excused, or waived.

## 4. FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS

23.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

24.    Defendant Daniel "Danny" Chartraw is a notorious advance-fee fraudster who was indicted on 18 counts of felony wire fraud before fleeing to Mexico, where he used the alias James Murphy. Chartraw has used numerous aliases, including in connection with this

matter. After his extradition, he pled guilty to wire fraud in 2013 and was sentenced to 57 months in federal prison. *See* United States v. Chartraw, No. 2:12-cr-00184 (E.D. Cal.).

25.    In 2014, Chartraw also pled guilty to multiple state crimes including felony grand theft, embezzlement, and domestic violence, resulting in a concurrent seven-year state prison sentence.

26.    After his release, in November 2024, Chartraw was again indicted and arrested for wire fraud. *See* United States v. Chartraw, No. 2:24-cv-00311 (E.D. Cal.).

27.    He remains out on bond and has not satisfied a $17 million civil judgment entered against him in 2010.

28.    Defendant Clearwater is a Wyoming LLC formed in 2022 and operated by Chartraw.

29.    Messner is an insurance-defense law firm that recently expanded to 123 attorneys across nine offices in six states. Although Messner advertises that it has 66 partners (and 71 according to U.S. News and World Report), the firm has insisted that 80% of its so-called "partners" are not partners.

30.    Welch, head of Messner's Utah office, falsely claims to have negotiated and closed a 10-figure financing deal for a Las Vegas sports and hospitality project called All Net / Dribble Dunk. In reality, the project was a financial failure that ended in massive debt, judgments, and no legitimate financing activity.

### 4.1. Overview of Defendants' BELOC Advance Fee Scam

31.    By August 2022, Messner and Welch were acting as "project counsel" for the All Net project, and Welch oversaw the supposed financing. The project had stalled, it was saddled with a $17 million unpaid paving bill, and it had again run out of money.

32.    Welch and Messner claim to have represented Chartraw and Clearwater. Welch and Chartraw falsely asserted that Clearwater had assets to finance the $5 billion All Net project.

COMPLAINT

33. In November 2022, Welch directed a Messner associate to appear before the Las Vegas Zoning Commission with a forged PG Asia Bank letter. The letter falsely claimed that Clearwater had secured a $5 billion credit line from the Malaysian bank to fund All Net.

34. PG Asia promptly issued a fraud alert, disclaiming any involvement with Clearwater, Messner, or the project.

35. By early 2023, with the project still stalled, Welch and Chartraw devised a new advance-fee scheme.

36. On April 20, 2023, they obtained a copy of a fraudulent loan agreement used by Prime Capital Ventures, LLC—a company whose owner was indicted for wire fraud and whose COO pled guilty in May 2025. *See* United States v. Roglieri, No. 1:24-CR-261; United States v. Snyder, No. 1:25-CR-195 (N.D.N.Y.).

37. Prime operated a classic advance-fee scam: victims were promised large future loans in exchange for upfront "interest reserve" deposits. Once the funds were wired, the perpetrators either vanished or offered more false excuses.

38. Welch and Chartraw adopted the same model. They offered seven-figure and eight-figure loans with no personal guarantees, no collateral, and no credit checks. Repayment terms were deceptively favorable—6% interest-only for 10 years, with a balloon payment at maturity.

39. These terms were so lopsided that any rational borrower could accept the loan, close the business, and walk away. The lender would have no recourse.

40. The catch was that borrowers first had to wire 25% of the loan amount to Messner's trust account as an "Interest Credit Account" or ICA deposit.

41. Welch rebranded the Prime agreement as a "Business Expansion Line of Credit" (BELOC), naming Messner as the designated "Trustee" and escrow agent. The BELOC promised that Messner would hold the ICA deposits in its "sole possession and control" until the loan funded.

42. Welch, in coordination with Chartraw, drafted the BELOC to include repeated assurances about the safety of the deposits.

7

COMPLAINT

43.    The BELOC and its attachments stated that Messner would retain sole possession and control of the ICA funds, protect them from loss, and promptly refund them in full if the loan failed to fund.

44.    To execute the scheme, Defendants used a shell entity called INBE, a Wyoming LLC created in late 2022 with no capital, no operations, and no license. INBE was designated as Messner's client and the purported lender.

45.    Plaintiffs were induced to rely on Messner's reputation and the perceived sanctity of its law firm trust account. That trust was grossly abused.

### 4.2. The All Net Project and its History of Fraud

46.    The All Net project was founded by Jackie Robinson, a former college basketball player who briefly played in the NBA. In 2012, Robinson filed for bankruptcy twice and then announced plans to build a large sports and entertainment resort in Las Vegas, known as the All Net Resort & Arena ("All Net").

47.    From the outset in 2013, Robinson repeatedly misrepresented the project's financing. He initially claimed to have secured over $1 billion through bank loans and EB-5 investments, but no documentation was ever made public. By 2015, he still had not finalized a development agreement with the county. That same year, he and a prospective lender became embroiled in litigation over conflicting claims to a $300 million funding commitment.

48.    Despite a ceremonial groundbreaking in 2014, construction never began. In 2017, Robinson publicly stated that Credit Suisse had committed full financing and that the project's scope had expanded to $2.7 billion. However, no lender confirmations or site work followed.

49.    In 2019, Robinson gave contradictory explanations to Clark County officials. At various points, he claimed that $3 billion had been secured from banks in Qatar, Zurich, and Frankfurt. He promised to produce supporting bank records within a week but never did.

50.    In early 2022, Robinson's team announced yet another funding arrangement, this time for $4.7 billion, allegedly backed by a firm called Active Capital Holdings. Robinson later admitted that the announcement was premature. Again, no actual financing materialized.

COMPLAINT

51.    By 2022, the All Net project had burned through at least $37 million in reported capital. Some estimates suggest the true figure was far higher. Little or no construction had occurred. Creditors had filed numerous lawsuits, and the property was burdened by judgments, mechanic's liens, and arrearages in rent. In May 2022, All Net agreed to pay $17 million in past-due excavation costs but could not do so. *See* Las Vegas Paving Corp. v. All Net Land Development, LLC, Clark County District Court, Case No. A-18-771361-B.

52.    Over time, the project's budget projections grew increasingly inflated—from $1.3 billion in 2014 to $3 billion in 2019, then $4 billion in 2021, and $4.9 billion by 2022.

53.    All Net's lease required monthly payments of $100,000 plus utilities, along with an option to purchase the land for $400 million. That option could be extended for an additional $250,000 per month.

54.    By 2022, All Net claimed to have invested $40 million in the project while owing more than $20 million in debts. The company had fallen behind on lease payments and failed to exercise the purchase option. All realistic paths to financing had been exhausted.

55.    It was under these circumstances that Defendants became involved with the All Net project in 2022.

### 4.3. Messner and Welch's Unusual Representation of Clearwater, Chartraw, Dribble Dunk, Robinson, and INBE

56.    Throughout the events at issue, Welch and Messner simultaneously claimed to represent multiple parties on all sides of the transactions. These included:

- Clearwater and its principals, including Chartraw

- All Net / Dribble Dunk and its principals

- INBE (Welch drafted the BELOC on April 20, 2023, announced representation on August 23, 2023, and later denied it on December 1, 2023)

- Titan Financial LLC

57.    Messner has at times suggested that any of the above entities might have held the missing escrow funds or bore responsibility for their disappearance.

58.     If Clearwater had truly been providing financing to Dribble Dunk, basic legal practice would have required separate counsel for each party. Yet there are no known transaction documents reflecting such representation.

59.     Welch was fully aware of Chartraw's criminal background and took steps to obscure his central role. He misrepresented Chartraw's status in Clearwater by referring to Todd Owen—Chartraw's accomplice and business partner—as its principal. Welch refused to produce his communications with Chartraw. In privilege logs, Messner even identified Chartraw by an alias: "Leon Chartue."

60.     Welch, Chartraw, and others communicated using Signal, an encrypted messaging app that does not store messages on a cloud and allows them to disappear.

61.     During the initial communications with Plaintiffs and other victims, Chartraw used the name "Leon."

62.     One victim, however, had an app that displayed the real name behind incoming calls. When "Leon" called, the app identified the caller as Daniel Chartraw.

63.     Only then did Plaintiffs realize that they had been interacting with a known and prolific advance-fee fraudster.

### 4.4. Chartraw's Prior Criminal Schemes Match the Crimes in this Case

64.     In 2012, while Robinson was repeatedly filing for bankruptcy, Chartraw—also a client of Welch—was engaged in a series of advance-fee fraud schemes. He developed a consistent set of tactics that were later used to steal Plaintiffs' funds.

65.     Chartraw's criminal history includes multiple fraudulent operations that closely resemble the structure of the BELOC scam. In each scheme, he promised victims access to large funding sources in exchange for advance payments. He used forged documents, manipulated escrow accounts, and diverted funds for personal use.

66.     In several cases, Chartraw falsely claimed to control offshore banks or certificates of deposit. He solicited deposits based on fictional collateral and nonexistent "trading programs." For instance, in the Dairy Financing Fraud Scheme, he promised a $250 million loan in exchange for a $200,000 upfront fee, supposedly secured by a $1.5 billion CD

COMPLAINT

from Cascabel Bank. Similarly, in the Gold Refinery Fraud Scheme, he induced a $100,000 payment using the same fictitious CD and never delivered any funding. In both cases, he used fabricated banking documents and spent the funds personally.

67.     In the Dore Bar Fraud Scheme, Chartraw claimed to be an officer at a gold company. He persuaded a victim to wire $1 million to an escrow account that he secretly controlled. He falsely claimed the account was managed by a neutral escrow agent and used a forged attestation letter from an attorney to support the fraud. That attorney was later sued for his role.

68.     Chartraw's other schemes followed the same pattern. He defrauded victims seeking funds for a trading platform, gold refining equipment, and even a film production—always offering nonexistent capital backed by fabricated financial instruments. None of the promised loans or investments materialized.

69.     In each instance, Chartraw used the stolen money for personal expenses.

70.     Six months before his arrest in Mexico under the alias James Murphy, Chartraw was facing three open criminal cases in Monterey County Superior Court involving grand theft, embezzlement, and domestic violence.

71.     On September 12, 2013, after being extradited and held without bond, Chartraw pled guilty to wire fraud and received a sentence of four years and nine months in federal prison.

72.     On September 22, 2014, he also pled guilty in state court to assaulting his estranged wife—breaking her nose in front of five children after a baseball game in May 2011.

73.     That incident also resulted in a charge for violating a restraining order tied to a prior 2009 domestic violence conviction in El Dorado County. Chartraw was sentenced to seven years in state prison, to run concurrently with his federal sentence.

74.     Upon release, Chartraw remained subject to multiple civil judgments, including a $17,277,524 judgment entered on March 25, 2010, which remains unsatisfied.

75.     Welch, Chartraw, Robinson, and Owen all had documented histories of fraud and misrepresentation, which they brought into this scheme.

COMPLAINT

**4.5. Messner, Clearwater, and the Fraudulent $60 Billion Bond Scheme**

76.    By August 2022, the All Net project still had no legitimate financing. Thus, Defendants concocted a bond scheme and presented it as a solution.

77.    On August 2, 2022, Welch signed a letter on Messner letterhead confirming that he and the firm represented Clearwater and related entities, including Clearwater Premiere Perpetual Master Trust, Global Infrastructure Finance & Development Authority, Inc. ("GIFDA"), and GIFDA's controlling shareholder, Shah Mathias.

78.    On September 8, 2022, Welch issued another letter on Messner letterhead, this time confirming representation of Ameri-Metro, Inc., a company controlled by Mathias whose previous counsel had been disbarred. The letter, verified by metadata, stated that Clearwater owned a $60 billion bond.

79.    Welch claimed the bond was acquired via a March 29, 2022 "Transfer Agreement" with GIFDA. That document is publicly available on the SEC's website. [*See* https://www.sec.gov/Archives/edgar/data/1534155/000089109222001164/ex99-5.htm.]

80.    However, the referenced transfer agreement predates the legal formation of Clearwater by nearly two months. Clearwater was not incorporated until May 26, 2022. The only "consideration" it provided was a promise to monetize the asset—essentially a right to try to sell the bond on consignment without registration or capital.

81.    The so-called bond was backed by 23 shell companies controlled by Mathias, each with no revenue or operations. Mathias executed sham contracts between his entities, signed on both sides, and used this circular trail to assign the bogus bond a fictional value of $459.5 billion. These false documents were the basis on which Clearwater and Messner claimed the bond was real and marketable.

82.    Defendants repackaged the scheme as a legitimate financing structure. They promoted the Clearwater bond as a last-ditch solution to All Net's mounting financial problems.

COMPLAINT

83.     But the underlying fraud had already been exposed. On July 13, 2022, the Delaware Court of Chancery ruled that Ameri-Metro and its affiliates had no operations or income. *See* Lentz v. Mathias, et al., Case No. 2022-0374-JTL.

84.     Despite this, Ameri-Metro filed a fraudulent Form 10-K, claiming $510 billion in construction contracts and $6.9 trillion in "comprehensive income," based on fabricated gains from "available-for-sale securities."

85.     Around the same time, Mathias distributed a fake tender offer to Ameri-Metro's shareholders. The offer, supposedly from Owen on behalf of Clearwater, assigned the company a valuation of $20.24 trillion.

86.     This valuation exceeded the GDP of the European Union and rivaled that of the United States. It was based entirely on fictional assets and self-dealing agreements between non-operational entities.

87.     The Delaware court described the Ameri-Metro scheme as a "classic Ponzi scheme."

88.     Under a written agreement between Clearwater and Ameri-Metro—both Messner clients—Clearwater was entitled to 50% of any funds raised through bond monetization. Welch and Messner facilitated this deal despite knowing it was baseless.

89.     While Owen was publicly listed as Clearwater's officer, Chartraw controlled its operations and engineered the fraudulent bond transactions with Welch and Mathias. Messner contributed by issuing bogus legal opinion letters identifying Clearwater as a legitimate bondholder and project funder.

**4.6. Messner's False Representations to the Las Vegas Zoning Commission in 2022**

90.     As the All Net project neared collapse, Messner, Welch, Clearwater, and Chartraw turned to deception. Their shared goal was to mislead the Las Vegas Zoning Commission into granting another one-year extension of All Net's construction deadline. By securing the extension, they could continue soliciting funds from investors for another year without beginning actual construction.

91.     The Commission meeting and vote were scheduled for November 16, 2022.

COMPLAINT

92.     On October 12, 2022, at Welch's direction, Jake Brigham, a then-associate at Messner, entered false bond data into a Bloomberg terminal. The listing referenced shell entities and included a fabricated bond maturity date of June 30, 2052.[1]

93.     The objective was to create the illusion that Clearwater controlled a credible bond asset. Relying on this fabricated entry, Clearwater falsely claimed it had secured $5 billion in financing for the All Net project.

94.     On October 19, 2022, Robinson, Owen (on behalf of Clearwater), and Welch (on behalf of Messner) held a public press conference to promote the claimed $5 billion in funding.



95.     Video footage shows Defendant Chartraw seated in the front row. During the event, Owen alluded to Chartraw as a member of Clearwater's "team."

          

Leon "Danny" Chartue                  Dan Chartraw

LinkedIn          October 19, 2022          Facebook

---

[1] *Messner and Clearwater are not registered broker-dealers. Welch, Chartraw, and Brigham are not licensed to engage in securities brokerage or trading. Their conduct was unlawful and fraudulent.*

14

COMPLAINT

96.    At the press conference, Robinson stated: "When you're talking about billions... we had to bring things on, add things on according to the financing and also the feasibility."

97.    Owen added: "The financing before always came to a stall because of the actual assets. We are bringing the assets. Clearwater is bringing them to the table to be able to put the financing together, finally."

98.    Welch followed with: "Over the last year, the inflation numbers have kind of changed the numbers a little bit, so that made the sell a little more difficult, and construction issues did that, but we were able to find somebody that was able to oversee those and say, 'Hey, this is gonna work this time.'"

99.    After the press conference, Owen and Welch were interviewed together. Owen declared: "We're bringing the missing piece of this puzzle to the table, which is assets."



100.    On November 16, 2022, Brigham appeared before the Commission at Welch's instruction and falsely stated that financing had been secured. He referenced a letter signed by Welch on November 7, 2022, in which Welch claimed that Clearwater had extended a $7 billion line of credit to All Net—both Messner clients.

101.    At the same hearing, Brigham falsely told the Commission: "Between Clearwater and Dribble Dunk, the funds are fully available."

102.    In reality, Clearwater was controlled by Chartraw and Dribble Dunk was operated by Robinson. By publicly endorsing these entities as legitimate funders, Messner gave credibility to two fraudulent operations that had no assets, no ability to fund the project, and no legitimate business structure.

103.    As later events showed, Messner continued to move money—hundreds of thousands of dollars—from its Northern Trust COLTAF account, which held Plaintiffs' escrow funds, to Dribble Dunk. These transfers were made without Plaintiffs' knowledge or consent and in violation of the BELOC terms. They occurred while Welch and Chartraw continued coordinating from California, with Chartraw operating under the alias "Leon." The unauthorized diversion of escrowed funds to an insider further confirmed Messner's complicity in the fraud.

### 4.7. Messner Presents a Fake PG Asia Letter to the Zoning Commission

104.    At the November 16, 2022 hearing before the Las Vegas Zoning Commission, Brigham falsely stated that Clearwater's bonds had been placed with a Malaysian financial institution, PG Asia Investment Bank Ltd. He claimed PG Asia had issued a funding commitment letter confirming $5 billion in financing for Clearwater.

105.    Referring to the November 15, 2022 letter, Brigham told the Commission, "I want to let the Board know that it's signed by the Financial Director of the bank. It's printed on bank letterhead and is as good as cash."

106. In reality, the letter was a blatant forgery, intended to convince the Commission that financing had been secured.

107. PG Asia quickly and publicly denied any involvement with Clearwater, All Net, or Messner. In a fraud alert published on its website, PG Asia stated:

> It has come to our attention that PG Asia Investment Bank Ltd's logo and email has been used by unauthorised third parties without our prior knowledge nor approval for various correspondences including but not limited to the issuance of bank comfort letters, confirmation of bank accounts opening and other documents. These documents may be targeted at misleading and/or deceiving the public…
>
> PG Asia Investment Bank Ltd is not in any way associated or involved in the financing of the All Net Resort & Arena project in Las Vegas, United States of America (the "Project"). We have neither approved nor issued any financial instrument/s to support any institution/s involved in the Project.

https://www.pgaib.com/ (visited June 13, 2025).

108. Even a cursory review of the document reveals its fraudulent nature.

109. The letter was signed by "William Murphy," identified as PG Asia's Financial Director and CFO. That name closely resembled "James Murphy," the alias Chartraw used while evading law enforcement in Mexico. As in his prior schemes, the fraud involved a fictional offshore bank.

110. There is no public record of anyone named William Murphy serving as an officer of PG Asia. An online search yielded no indication that this individual had any affiliation with the bank or authority to issue a $5 billion commitment.

111. The letter listed a phone number, (631) 375-0701, which is a New York-based mobile number associated with a small, unrelated business. When called, the line plays a generic voicemail message: "The wireless customer you are trying to reach is not available." [*See* William Murphy Inc., https://fedlinks.com/profile/William-Murphy-Inc--Amityville-NY, visited June 13, 2025.]

112.    The letter also listed a U.S. office address, 233 S. Wacker Drive, 67th Floor, Chicago, IL, which corresponds to The Metropolitan, a private social club with no known connection to PG Asia.

113.    At the same hearing, Robinson falsely claimed that the bonds listed by Welch on Bloomberg were backed by the federal government.

114.    These misrepresentations, including the forged PG Asia letter, achieved their purpose. Misled into believing that $5 billion in financing had been secured, the Commission voted 4 to 3 to grant All Net another one-year extension.

### 4.8. The Collapse of the Bond Narrative and Shift to BELOC Fraud

115.    Beginning around November 17, 2022, Messner, Welch, Chartraw, and Clearwater distributed fraudulent bond-related documents to brokers and financial intermediaries across multiple states. These efforts were part of a coordinated campaign to market the Clearwater–Ameri-Metro bonds, despite knowing they were worthless.

116.    By December 6, 2022, Defendants had disseminated at least eight bond-related documents to brokers and other third parties. These included prospective lenders and potential participants in what Defendants portrayed as a legitimate financing arrangement for the All Net project, which in reality had no funding.

117.    The following documents were circulated to brokers, with instructions to pass them along to others:

- **CUSIP Global Services CL Malibu ($60 billion), dated August 2, 2022** – A letter from Welch on Messner letterhead, in which he purported to serve as bond counsel and "bookrunner" for Clearwater, GIFDA, and Shah Mathias. The letter falsely asserted that the bonds satisfied CUSIP and ISIN registration requirements.

- **Executive Summary – January 2022** – A promotional overview of the All Net project.

- **ALL NET_ProForma Financial Model.11-447.v05.xlsx** – A financial projection spreadsheet last modified on November 30, 2022.

18

- **Phoenix Project Intake Form, dated November 17, 2022**
- **Borrower Resume, dated December 2, 2022**
- **ANLD DD Reinstatement LWOP, dated August 26, 2022** – Confirmed that All Net's lease and purchase option had expired. The document also disclosed $1.3 million in unpaid rent, $350,000 in legal fees, and six pages of liens, judgments, and lis pendens encumbering the property.
- **$500 Million Use of Funds** – A proposed schedule for disbursing the first $500 million in purported financing, dated November 30, 2022.
- **$60 Billion GIFDA–Clearwater Bond Package** – A 233-page file dated September 8, 2022, stripped of metadata and styled as a bond prospectus for the "Malibu Homes Master Trust Indenture," but filled with misrepresentations.

118. Welch's legal opinion letter endorsing the bond package lacked any credible basis. It was issued solely to advance the fraudulent scheme.

119. For example, the "Transfer Agreement" between GIFDA and Clearwater, both supposedly represented by Messner, claimed that the transferred asset was worth $459.5 billion.

120. Welch and Messner, who were actively seeking financing for the All Net project, circulated these materials with the intent to deceive. They did so without a valid prospectus, required disclosures, or meaningful due diligence.

121. On February 10, 2023, Brigham emailed one broker a link to a virtual data room containing the bond documents. Welch was copied on the message.

122. Three days later, on February 13, 2023, Shah Mathias—on behalf of Ameri-Metro and its affiliated shell entities—issued a termination letter to Chartraw, who was acting on behalf of Clearwater. The letter formally terminated all agreements between Ameri-Metro and Clearwater.

123. The letter explicitly revoked all rights and assignments related to the bond, including Clearwater's ability to market or monetize it.

124. The termination further eliminated any possible claim that Messner or Welch had a continuing legal basis to promote the bond.

125. Nevertheless, Messner and Welch continued to market the bonds as if nothing had changed.

126. On February 20, 2023, just one week after the termination, Welch emailed two brokers, copying Brigham and Owen, with a new link to the bond materials. The fraudulent promotion continued.

127. That email also included several misleading attachments:

- **TODD KYC CIS, dated November 3, 2022** – A Know Your Customer sheet addressed anonymously to a "Trade Authority / Program Manager," claiming that Messner was safeguarding $60 billion in bond assets for Clearwater. It included no source of funds or identifying bond information.

- **CIS 9-21-2022, dated November 3, 2022** – Contained personal and financial information about Todd Owen.

- **USCG Intake Form – Clearwater Bond Monetization, dated February 20, 2023** – A cover sheet related to efforts to monetize the worthless bond.

128. Welch sent these materials knowing that Clearwater and Owen no longer had any legal rights to the bond, and that the asset was both worthless and fraudulent.

129. He intended for brokers to act as intermediaries and distribute the materials to additional victims.

130. These same brokers were later enlisted to help promote the BELOC scheme described in the sections that follow.

#### 4.9. Messner's Orchestration of the BELOC Scheme

131. On September 26, 2022, INBE was formed in Wyoming using the same generic mail drop address—30 North Gould Street, Sheridan, Wyoming 82801—that Clearwater used. Welch later used the same address to register other entities involved in the fraud, including INBE-Clear Capital, LLC in April 2023 and Titan Financial, LLC in November 2023.

132.    Like Clearwater and the other entities involved in the scheme, INBE was represented by Messner and Welch. These entities included All Net, Dribble Dunk, Ameri-Metro, and Titan Financial.

133.    By March 2023, Defendants were under even more financial pressure. The PG Asia letter had been exposed as a forgery, the bond scheme had collapsed, and the All Net project still lacked funding. Messner was owed significant legal fees.

134.    In response, Messner, Welch, Clearwater, and Chartraw conspired—meeting in California and coordinating across state lines—to implement a fraudulent advance-fee scheme. Their goal was to create the appearance of progress on the All Net project and obtain money from new victims under false pretenses.

135.    Messner faced significant financial and ethical conflicts. While serving as escrow agent, the firm also acted as counsel to virtually every party involved, including All Net, Robinson, INBE, and Clearwater. Messner stood to benefit financially from any infusion of funds, as it had outstanding invoices from nearly all of them.

136.    At least ten separate engagements illustrate how Messner used overlapping representations to further the fraud:

| Date | Messner's Client(s) | Description |
| --- | --- | --- |
| 8/2/2022 | Clearwater, Todd Owen, GIFDA, Shah Mathias | Bond counsel and bookrunner |
| 8/26/2022 | Clearwater, Ameri-Metro, Todd Owen | Counsel for Lenders re: Dribble Dunk |
| 11/16/2022 | All Net / Dribble Dunk | Bond counsel, bookrunner, and project counsel |
| 4/10/2023 | INBE-Clear Capital Group LLC | Manager appointment resolution |
| 6/1//2023 | INBE-Clear Capital Group LLC | Welch obtains Axos Bank account |
| 6/2//2023 | INBE Capital LLC | Revised BELOC agreement |
| 8/23/2023 | INBE Capital LLC | Outside counsel representation |
| 11/21/2023 | All Net / Dribble Dunk | Outside business counsel |
| 12/1/2023 | INBE Capital LLC | Repudiation of scope of prior representation |
| 12/5/2023 | Clearwater, Todd Owen | Legal representation confirmation |
| 12/26/2023 | Titan Financial LLC | Legal representation confirmation |

137.    Messner remained outside counsel to All Net through at least September 2024.

138.    Clearwater, to the extent it had any business purpose beyond serving the fraud, had a direct financial interest in keeping All Net alive. Any movement on the project increased its chance of recouping fees or investments, while failure risked exposure and litigation.

139.    None of Messner's clients in these arrangements had operating businesses or sufficient capital to pay for legal services. Messner therefore had a strong incentive to extract funds through other means.

140.    Although Clearwater was nominally positioned as an equity partner, it had no operations, assets, or personnel—only fraudsters Owen and Chartraw.

141.    At all relevant times, Chartraw controlled Clearwater from within California.

142.    He worked closely with Welch to design and implement the fraudulent structure. His prior experience with wire fraud enabled the scheme's execution.

143.    Acting through intermediaries, Welch, Chartraw, and Clearwater directed others to make false statements to Plaintiffs about the status and security of their funds. These misrepresentations were part of a coordinated campaign, including in-person meetings in and around Los Angeles County and Orange County, California.

144.    On March 22, 2023, Messner prepared a "Memorandum of Cooperation" between Clearwater and INBE.

145.    On March 31, 2023, Messner prepared a "Memorandum of Understanding" formalizing the arrangement between Clearwater and INBE.

146.    These documents confirmed the joint nature of the fraudulent enterprise led by Welch, Messner, Chartraw, and Clearwater.

147.    INBE never had the capacity or intent to fund any loans. It later admitted that it had no capital and no lending capability.

148.    No legitimate lender would offer the terms described in the BELOC: ten-year, interest-only repayment at 6 percent, no real estate collateral, and no personal guarantee. Even under ideal repayment conditions, the return would be negligible.

22

COMPLAINT

149.    The only purpose of these favorable terms was to lure borrowers into wiring substantial ICA deposits, which would then be misappropriated. Despite this, Welch drafted the BELOC documents to assure borrowers that their funds would remain protected.

150.    Because INBE never intended to fund the loans, it conducted no underwriting or credit review of any kind.

151.    Defendants used INBE's name purely as a facade to convince borrowers to send their funds to Messner's trust account.

152.    Plaintiffs were led to believe that their deposits would be held securely by a law firm and released only upon disbursement of the loan. In reality, Defendants moved quickly to withdraw and misuse the funds.

153.    On April 10, 2023, Welch filed formation documents for INBE-Clear Capital Group LLC using the same mail drop address previously used for INBE and Clearwater.

154.    He signed the documents using an email linked to his assistant at Messner. To hide the connection, he later filed articles of dissolution on March 29, 2024.

155.    Also on April 10, 2023, Messner prepared a Manager Appointment Resolution for INBE-Clear Capital.

156.    That same day, Messner obtained an EIN for the entity.

157.    On April 18, 2023, Messner drafted its Operating Agreement.

158.    Plaintiffs were never informed of INBE-Clear Capital's existence.

159.    These steps contradicted the BELOC's representations about the independence of the parties involved.

160.    On April 20, 2023, Welch finalized a revised version of the BELOC.

161.    This version closely mirrored the Prime Capital document, including the same misleading language about escrow protection.

162.    On April 23, 2023, Messner prepared a joint venture agreement between Clearwater and INBE, further entrenching their coordinated roles in the fraud.

COMPLAINT

163.    Defendants inserted language into the BELOC promising that ICA deposits would remain in Messner's "sole possession and control." In truth, they never intended to protect the funds.

164.    The structure of the fraud mirrored Chartraw's earlier schemes, such as the Dairy Financing and Gold Refinery scams, where victims paid advance fees based on false promises of funding.

165.    As in those prior cases, no loan was ever issued. The victims' funds were simply stolen.

166.    The Dore Bar Fraud Scheme was similarly structured, using a sham escrow account to facilitate misappropriation.

167.    The Gold Refining Equipment Scheme followed the same model, using fake collateral and financing terms to extract upfront payments.

168.    In the Movie Production Fraud Scheme, Chartraw again relied on fictional funding sources to induce large deposits.

169.    While this scheme followed the blueprint of Chartraw's past frauds, it was even more insidious. Victims believed their funds were safe because Messner, a national law firm, had explicitly promised that their money would remain in its sole possession and control.

### 4.10. INBE'S Role as Sham Lender

170.    As part of the broader scheme, Defendants used INBE as a front. They portrayed INBE as an independent and well-capitalized lender, when in fact it was a shell company with no assets, operations, or licensing authority. Messner drafted the BELOC and related documents on INBE's behalf, while simultaneously representing Clearwater, Chartraw, and All Net.

171.    The BELOC agreement was a deceptive instrument, designed to induce borrowers to deposit large sums of money into escrow based on knowingly false assurances.

172.    To support this deception, Defendants created a website for INBE and filled it with fabricated claims intended to mislead prospective borrowers.

COMPLAINT

173.    Defendants expected that victims would review the website before wiring funds, and they knew the false representations would influence those decisions.

174.    The site described INBE as a sophisticated lending institution with robust financial backing. These claims were entirely false but were used to manufacture credibility and facilitate the extraction of escrow deposits.

175.    Although INBE was formed only in September 2022 and had no real operations, it falsely claimed by December 2022 to manage a $13.36 billion global investment pipeline.

176.    The website further claimed that INBE had the capacity to fund up to $50 billion per transaction, despite having no capital, lending history, or regulatory compliance.

177.    If INBE had truly possessed such resources, it could have funded the All Net project directly, without soliciting deposits from unrelated small businesses. The structure of the transactions made clear that the entire operation was a fraud.

178.    The use of INBE to solicit advance fees from outside borrowers, rather than fund All Net directly, underscored the fraudulent purpose of the scheme.

179.    Plaintiffs were told that if the BELOC terms turned out to be too good to be true, their ICA deposits would simply be refunded. The BELOC stated that funds would remain in Messner's sole possession and control for 90 days. This representation was critical to each Plaintiff's decision to proceed.

180.    Plaintiffs were deceived precisely because they trusted Messner as a national law firm subject to legal and ethical obligations.

181.    The INBE website listed supposed clients but made no mention of Plaintiffs or any of the other victims. This omission indicated that the site was designed to conceal the true nature of the operation and to mislead outsiders.

182.    Between March and June 2023, INBE's claimed pipeline increased from $13.36 billion to $35.72 billion. In reality, there were no clients, assets, or actual transactions.

COMPLAINT

March 23, 2023, INBE website   |   June 3, 2023, INBE website

183. No legitimate financial institution triples its lending pipeline in ten weeks without public announcements, filings, or market activity. INBE had none.

184. INBE's two listed principals were Jonathan Wright, who was linked to a small brewing company in Virginia, and Craig Boddington, an unlicensed consultant based in Florida. Neither had the capacity or credentials to operate a real lending institution.

185. In sworn statements made in May 2024, INBE confirmed that it had not received any of the ICA funds and had not authorized any disbursements. It stated that it believed the funds remained with Messner.

186. INBE also confirmed under oath that it had no capitalization table, financial records, contribution or distribution history, or any contracts with Clearwater, Titan Financial, or Messner, aside from the BELOC template drafted by Messner.

187. Plaintiffs Kosher Eats, Emerald, Abbson, MSC, and HomePeople were among the primary victims of the scheme. Of the roughly $10 million stolen, $8.345 million belonged to these five companies.

188.    INBE served no legitimate business function. It had no operations, assets, or revenue. Its only purpose was to serve as a facade through which Messner and the other Defendants solicited and misappropriated funds.

189.    Welch and Chartraw both knew the INBE website was false and misleading. They created it as part of the overall fraud.

190.    Since then, INBE has disappeared. Its website was taken offline and now redirects to a different business. Its purported principals have removed all references to INBE from their public profiles. The entity that Messner publicly endorsed as a credible lender, with agreements drafted by Welch, has vanished without explanation.

**4.11. Misrepresentations Regarding Escrow and "Sole Possession and Control"**

191.    By April 20, 2023, Welch and Messner were actively representing INBE and fully aware that it was insolvent. INBE served only as a sham entity, used to deceive borrowers.

192.    On that date, Welch revised the BELOC agreement, modifying the version used by Prime Capital Ventures to implement the fraudulent scheme he had designed with his co-conspirators.

193.    Welch made two critical changes to the Prime template: he removed the requirement for real estate collateral and inserted language designating Messner as "Trustee" with "sole possession and control" of the borrower's escrowed deposit, referred to as the Interest Credit Account or ICA.

194.    The revised BELOC promised multimillion-dollar loans with no personal guarantees, no collateral, and no obligation to repay principal for ten years. The agreement also omitted any credit check. Welch knew these terms were not legitimate.

195.    The BELOC stated that the loans would fund within 90 days of the borrower deposit of 25% of the loan amount into Messner's trust account.

196.    These changes made the BELOC more attractive than the Prime version by falsely enhancing the appearance of security. The inclusion of Messner as escrow agent reassured borrowers that their deposits would be protected.

27

COMPLAINT

197.    Several Plaintiffs initially considered the Prime version but chose Messner's BELOC instead, based on representations that Messner would safeguard the funds. This assurance was decisive in their decision to proceed.

198.    Unlike the Prime version, the revised BELOC included specific provisions stating that a national law firm would hold the ICA deposit in trust, with exclusive control, unless and until the loan funded.

199.    Defendants falsely represented that the ICA deposit would remain in Messner's sole possession and control and would be promptly refunded if the loan failed to fund.

200.    Welch knew that INBE lacked any lending capability and that the escrow deposits would not be protected. He personally oversaw the transfer of more than $10 million from Messner's COLTAF trust account, even as he continued soliciting additional deposits based on false assurances.

201.    By transmitting the BELOC to borrowers through agents and intermediaries, Welch committed multiple acts of wire fraud. Acting through INBE and affiliated brokers, he distributed the BELOC to victims across the country, including Plaintiffs, with the intent to induce escrow payments that would be misappropriated.

202.    Welch understood that small businesses seeking growth capital would be drawn in by the BELOC's favorable terms and reassured by the involvement of a law firm.

203.    Defendants also circulated a document titled Capital Options Expanded FAQ alongside the BELOC. Plaintiffs signed this FAQ, which contained numerous false assurances, including:

- "Funds remain with the Trustee [Messner Reeves] until we've delivered the loan."
- "We contractually agree to reimburse the Borrower the amount of their ICA Advance Cost."
- "We keep insurance on all funds held by our trustees."
- "You are never exposed to any risk of loss."
- "The most important issue for us is the safety of your capital."

28

COMPLAINT

- "We even pay for your money to be fully insured."

- "If your funds are not from illicit sources and clear compliance, then you're good to go."

204.    The BELOC itself contained at least nine additional misrepresentations, including:

- That the ICA deposit was a "Reserve."

- That INBE had the financial ability and resources to fund each loan.

- That INBE would fully and timely fund each advance.

- That the BELOC omitted no material facts.

- That no third party had rights under the agreement.

- That the ICA deposit would be held by a designated trustee attorney.

- That the ICA would remain under Messner's exclusive control.

- That the ICA deposit would be promptly refunded if the loan did not fund.

- That INBE or its agent would step in and reimburse the borrower.

205.    Together, the BELOC and FAQ contained over 20 material falsehoods, each designed to mislead Plaintiffs and cause them to wire escrow funds to Messner's account.

206.    Each Plaintiff received and relied on these documents before wiring their ICA deposits.

207.    The BELOC stated unequivocally that the ICA deposit would be held in Messner's COLTAF trust account and remain under Messner's exclusive control until the loan was issued.

208.    Plaintiffs wired their deposits—typically on the same day or shortly after receiving the documents—directly to the Northern Trust account designated by Messner.

209.    At all relevant times, Welch and Chartraw were acting in concert. Their coordinated fraud schemes dated back to at least August 2, 2022, when Welch first announced his representation of Clearwater in connection with the phony bond arrangement.

COMPLAINT

210. The forged PG Asia letter that Messner presented to the Las Vegas Zoning Commission in November 2022 was a product of the same conspiracy involving Welch, Messner, Chartraw, and Clearwater.

211. On April 24, 2023, in furtherance of the scheme, Welch directed INBE to transmit the BELOC and FAQ to Kosher Eats. As directed by Welch and Chartraw, INBE sent the documents using Zoho Sign.

212. The BELOC promised Kosher Eats an $8 million loan at 6 percent interest only, for ten years, with no personal guarantee or real estate collateral, in exchange for a $2 million ICA deposit with Messner.

213. Kosher Eats wired its $2 million escrow deposit to Messner on April 27, 2023, in reliance on these false representations.

214. Welch knew that INBE had no capital and no intent or ability to fund any loan.

215. The funds were deposited into Messner's COLTAF trust account at Welch's direction.

216. The other Plaintiffs were defrauded in a similar fashion. As stated herein, no Plaintiff received a loan or a refund of its escrow deposit.

217. At Defendants' direction, the BELOC and FAQ were distributed across state lines. Plaintiffs relied on them and wired millions of dollars to Messner. No loans were ever funded.

218. The following table summarizes the transactions:

| Fraudulent Act | Date of BELOC | Date of Wire | Wire Amount | Victim | Receiving Account |
|---|---|---|---|---|---|
| 1 | April 24, 2023 | April 27, 2023 | $2,000,000 | Kosher Eats | Messner Reeves Northern Trust COLTAF |
| 2 | June 12, 2023 | June 13, 2023 | $700,000 | Emerald | Messner Reeves Northern Trust COLTAF |
| 3 | May 9, 2023 | June 22, 2023 | $1,145,000 | MSC | Messner Reeves Northern Trust COLTAF |
| 4 | June 21, 2023 | June 29, 2023 | $3,500,000 | Abbson | Messner Reeves Northern Trust COLTAF |
| 5 | March 13, 2023 | April 20, 2023 | $1,000,000 | Home People | Messner Reeves Northern Trust COLTAF |

COMPLAINT

219.    After receiving a total of $8,345,000 in ICA deposits, Defendants removed the funds from the trust account, in direct violation of their assurances to Plaintiffs.

220.    Defendants had no legal or contractual right to disburse the escrowed funds absent the funding of a law. Defendants' actions not only constitute felony theft, those acts violate multiple ethical and fiduciary duties, resulting in a complete betrayal of the Plaintiffs' trust.

### 4.12. Use of Trust Account to Steal ICA Deposit Money

221.    As discussed herein, five Plaintiffs wired a combined total of $8,345,000 in ICA deposits to Messner's trust account between April and June 2023. Each Plaintiff was fraudulently induced to do so by representations in the BELOC stating that the funds would remain in Messner's sole possession and control unless and until a corresponding loan was funded. In reality, the deposits were misappropriated. There were five victims, five acts of fraud, five acts of theft, and a pattern of ongoing lies and concealment.

222.    Four of the five Plaintiffs never received even an initial disbursement (the "first tranche") of the promised loan. Under the BELOC, the first tranche—equal to one-third of the total loan—was required to fund within 90 days of deposit.

| Name | ICA Deposit | Date of ICA deposit | Due date of first tranche | First tranche amount | Total loan amount | Amount of loan funded | ICA Deposit return |
|---|---|---|---|---|---|---|---|
| Kosher Eats | $2,000,000 | 4/27/2023 | 7/26/2023 | $2,666,667 | $8,000,000 | $0 | $0 |
| Emerald | $700,000 | 6/13/2023 | 9/11/2023 | $933,333 | $2,800,000 | $0 | $0 |
| MSC | $1,145,000 | 6/22/2023 | 9/20/2023 | $1,526,667 | $4,580,000 | $0 | $0 |
| Abbson | $3,500,000 | 6/29/2023 | 9/27/2023 | $4,666,667 | $14,000,000 | $0 | $0 |

223.    Because Welch knew that INBE had no capital, Welch operated a Ponzi scheme through the COLTAF account. He directed the disbursement of escrow funds to select recipients and falsely described them as legitimate loan payments from INBE.

224.    Welch took further steps to create the illusion of active lending. He paid a commission to one broker using escrowed funds, further evidencing that he was using the law firm's COLTAF account to perpetuate a Ponzi scheme.

31

COMPLAINT

225.    These disbursements were not based on eligibility or any loan criteria. Their purpose was to create the false appearance of performance and to induce more deposits from other victims.

226.    On July 3, 2023, Welch caused Messner to wire funds to two borrowers and misrepresented those payments as initial disbursements of BELOC loans. These transfers were not funded by INBE but instead drawn from ICA deposits held in trust for other victims.

227.    These staged transfers were intended to show that the BELOC program was functioning. No second tranche was ever issued, and no actual lending occurred.

228.    The chart below summarizes all eight known BELOC victims, including those outside this case:

| Name | ICA Deposit | Date of ICA deposit | Due date of first tranche | First tranche amount | Total loan amount | Purported loan proceeds received (7/3/2023) | ICA return |
|---|---|---|---|---|---|---|---|
| Home-People | $1,000,000 | 4/20/2023 | 7/19/2023 | $1,333,333 | $4,000,000 | $973,000 | $0 |
| MSI | $700,000 | 4/26/2023 | 7/25/2023 | $1,274,000 | $2,800,000 | $1,274,000 | $0 |
| Kosher Eats | $2,000,000 | 4/27/2023 | 7/26/2023 | $2,666,667 | $8,000,000 | $0 | $0 |
| Emerald[2] | $700,000 | 6/13/2023 | 9/11/2023 | $933,333 | $2,800,000 | $0 | $0 |
| MSC | $1,145,000 | 6/22/2023 | 9/20/2023 | $1,526,667 | $4,580,000 | $0 | $0 |
| Abbson | $3,500,000 | 6/29/2023 | 9/27/2023 | $4,666,667 | $14,000,000 | $0 | $0 |
| DVA | $700,000 | 7/7/2023 | 10/5/2023 | $933,333 | $2,800,000 | $0 | $0 |
| Konala | $325,000 | 8/1/2023 | 10/30/2023 | $433,333 | $1,300,000 | $0 | $0 |

229.    All eight victims lost their deposits. The only payments received were the staged transfers on July 3, 2023, funded with money stolen from others.

230.    Even the two recipients of partial payments—HomePeople and MSI—never received the required second tranche. No full loan was ever funded.

---

[2] Emerald is a bridge lender that was damaged as it remitted $700,000 directly to Messner in reliance on false statements that Messner made through INBE to Emerald on June 12, 2023 and which incorporated the corresponding fraudulent BELOC by reference.

COMPLAINT

231.    In addition to using trust funds to operate a Ponzi scheme, Welch directed that money be sent directly to Dribble Dunk, Messner's client, from the COLTAF account containing Plaintiffs' deposits.

232.    The following chart reflects inbound ICA deposits and outbound transfers to Dribble Dunk:

| Date | Inbound Wire (Plaintiffs) | Outbound Wire (Dribble Dunk) |
|---|---|---|
| 4/20/2023 | $1,000,000.00 | |
| 4/27/2023 | $2,000,000.00 | |
| 4/28/2023 | | $55,572.02 |
| 5/01/2023 | | $400,000.00 |
| 6/13/2023 | $700,000.00 | |
| 6/20/2023 | | $30,000.00 |
| 6/22/2023 | $1,145,000.00 | |
| 6/26/2023 | | $59,966.07 |
| 6/29/2023 | $3,500,000.00 | |
| 7/03/2023 | | $207,500.00 |
| | | |
| Total | $8,345,000.00 | $753,038.09 |

233.    Plaintiffs were never informed that their funds would be transferred to Dribble Dunk. The BELOC did not authorize such payments, and none of the Plaintiffs gave consent.

234.    These transactions had no legal basis. They reflect a systematic misuse of escrowed funds for unauthorized purposes, similar to the conduct seen in Chartraw's prior acts of wire fraud.

235.    The transfers described above represent only a portion of the funds misappropriated from the trust account.

236.    Messner has never provided documentation, justification, or any explanation for these transfers. The BELOC explicitly barred disbursement of escrowed funds to third parties without loan approval or borrower consent.

237.    Within just ten weeks in 2023, Messner transferred more than $750,000 to Dribble Dunk. These payments were not related to any funded loan or legitimate expense.

238.    The transfers were not incidental. They were a central component of the scheme to divert Plaintiffs' funds for use on the All Net project.

239.    On November 21, 2023, during a hearing before the Las Vegas Zoning Commission, an attorney representing All Net (whose firm now represents Messner) claimed that $6 million had been spent on construction in the past year encompassing 2023.

240.    That attorney also stated that $3.3 million had been paid to Las Vegas Paving to maintain its lien on the project and prevent foreclosure.

241.    At that same hearing, Welch falsely told the Commission:

That partner is Clearwater Premier Perpetual Master, LLC, and they're an equity partner in this project. They have secured financing on behalf of All Net and have provided $5 billion in an account, an offshore account, for the purposes of building this project... That financing is in place. It is available to be utilized to secure work on this project and this site, and that has been in place since early September.

242.    None of Welch's statements were true.

243.    And Welch went even further, stating:

This is a bank statement evidencing the account number [Redacted] that is in the name of Dribble Dunk. This is an account that is controlled entirely by Dribble Dunk. Mr. Robinson is the sole controller over it, and it's $5 billion... This was funded by their partner, Clearwater, on August 25, [2023] and as we sit here today, it remains at that amount.

244.    Welch's statements about offshore accounts and phantom construction loans were demonstrably false. No other funding source was referenced.

245.    The $8.3 million stolen from Plaintiffs, and the $10 million in total ICA deposits collected, is a close match to the $9.3 million in unaccounted-for spending referenced during that hearing.

246.    As All Net's permits approached expiration, Messner had a clear motive to funnel escrowed funds to Dribble Dunk. These payments gave the appearance of progress at the project site.

COMPLAINT

247. Welch's close relationship with Chartraw brought the criminal experience necessary to execute a fraudulent scheme in plain sight.

248. As discussed herein, Messner repeatedly lied about the status of the funds, changed its story multiple times, and has still not accounted for the money.

249. Messner and Welch were financially motivated to keep All Net afloat. The BELOC program was never intended to help small businesses secure funding, as INBE had no capital, and Messner knew it.

250. The true purpose was to lure borrowers with unrealistic loan offers, induce them to wire escrow deposits, and divert those funds to pay All Net's expenses.

251. As of early 2023, All Net was insolvent and unable to pay its contractors. It also faced a $17 million judgment in favor of Las Vegas Paving, with interest accruing.

252. By late 2023, All Net had accrued at least $2.4 million in unpaid rent.

253. The property owner, who praised All Net at the November 2023 hearing, later admitted to receiving rent payments from a Messner trust account.

254. With All Net no longer able to pay Messner's legal fees, the firm had a direct financial interest in obtaining money through improper means.

255. Welch also stood to benefit personally. A proposed $500 million disbursement schedule for All Net allocated $8.75 million per month in "developer fees" and $500,000 per month in "consulting fees"—more than $35 million in four months. Welch reportedly negotiated the right to control all concession stands in the proposed arena.

256. Between March and June 2023, Messner and Welch laid the foundation for the scheme by forming new entities, drafting fraudulent documents, and soliciting millions in deposits.

257. Over the following year, they repeatedly misled Plaintiffs, claiming the funds would be returned soon. They then claimed the funds were held at Titan Financial, an entity Welch created weeks earlier that never operated as a licensed bank.

COMPLAINT

## 4.13. The Cover-Up and Continuing Lies

258.    As Plaintiffs began requesting refunds in mid-2023, Defendants undertook a coordinated campaign of deception. Between July 2023 and March 2024, they repeatedly made false statements designed to delay legal action and conceal the fact that Plaintiffs' escrow funds had already been misappropriated.

259.    On August 23, 2023, Welch issued an "attorney comfort letter" falsely stating that INBE was "ready, willing, and able" to fund the loans. At the time, he knew that INBE had no capital and no ability to perform. When a Plaintiff's representative challenged the letter, noting that the 90-day deadline had already expired, Welch responded dismissively, calling it a generic form and stating, "Your comment that it 'isn't accurate' needs to be tempered a lot. Nonsense like that does a disservice here."

260.    Throughout the fall of 2023, Defendants issued similarly vague and misleading statements. They cited compliance issues, banking logistics, and unnamed third-party partners. None of these explanations were true. INBE had no capital, and the escrow funds had already been diverted.

261.    On November 7, 2023, Welch formed Titan Financial LLC. Plaintiffs had never heard of Titan, and no BELOC agreement referenced it. Nevertheless, Welch began invoking Titan as the alleged custodian of Plaintiffs' escrowed funds, falsely referring to the Wyoming shell LLC as a "bank" purportedly housing an IOLTA account.

262.    On November 21, 2023, Welch falsely told the Las Vegas Zoning Commission that Clearwater had prepaid $5 billion into a Dribble Dunk account. He supported this statement with a forged bank statement from a purported Mexican financial institution.



263.    On December 1, 2023, Welch told Plaintiffs that the funds could be returned upon receipt of a notarized termination notice. Plaintiffs complied, but Messner failed to return the funds.

264.    On December 15, 2023, Clearwater's counsel told Plaintiffs that the funds would be disbursed by December 22 through his IOLTA account. This deadline passed without any distribution.

265.    On January 25, 2024, Welch emailed Plaintiffs, stating that the funds remained under Messner's control at Titan Financial.

**USER DETAILS**

| | |
|---|---|
| COMPANY NAME | Messner Reeves, LTD |
| USERNAME | Messner |
| FULL NAME | Messner Reeves LTD |
| MAILING ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah, 8402 |
| PHYSICAL ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah, 8402 |

**ACCOUNT DETAILS**

| | |
|---|---|
| NUMBER | ▇▇▇▇▇ |
| TYPE | IOLTA |
| CURRENCY | USD |
| AVAILABLE BALANCE | 10,300,000.00 |
| CURRENT BALANCE | 10,300,000.00 |
| STATUS | Active |

| Date | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| 01/25/2024 14:52 | 73 | TBU/Messner Reeves Account | 10,300,000.00 | 10,300,000.00 |

37

COMPLAINT

266.    Welch reiterated this bizarre claim on February 15, 2024, writing, "The funds continue to be under the control of our firm. They are held in a firm trust account at the delivery institution, Titan Financial, LLC."

267.    On February 22, 2024, Messner issued a public statement insisting that the escrowed funds "had not disappeared or become lost."

268.    On March 20, 2024, Welch again assured Plaintiffs that disbursement was imminent and that he had spoken with the "national bank partner" handling the funds. He claimed that the final approval was forthcoming.

269.    A year passed and Messner took to stonewalling. Then on February 20, 2025, Messner changed its story again and this time stated that all escrow funds were released on an unnamed date prior to July 2024. This admission directly contradicted every previous statement made to Plaintiffs, regulators, and the public.

270.    Messner attempted to justify the disbursements by claiming that INBE had authorized four transfers totaling "$2,490,33 [sic]." If this was a typo and the intended amount was $2,490,330, that amount represented less than 30 percent of the $8,345,000 in escrow deposits. No explanation was provided for the remaining $5.85 million.

271.    Messner offered no substantive justification, documentation, or even acknowledgement of its extensive misrepresentations. This law firm failed to explain why it claimed to hold the funds for nearly a year, why it directed Plaintiffs to submit termination notices, or why it falsely invoked Titan Financial as custodian if the funds were gone the whole time.

272.    The timeline below summarizes key events and shifting representations by Defendants:

38

COMPLAINT

| Date | ICA Deposit | Outbound Wire to Dribble Dunk | Defendants' Statements and Actions |
|---|---|---|---|
| 3/31/2023 | | | Messner drafts memorandum of understanding between Clearwater and INBE |
| 4/18/2023 | | | Messner drafts operating agreement of INBE-Clear Capital |
| 4/20/2023 | $1,000,000 | | Welch revises BELOC for INBE |
| 4/23/2023 | | | Messner drafts joint venture partnership agreement with Clearwater and INBE |
| 4/27/2023 | $2,000,000 | | |
| 4/28/2023 | | $55,572 | |
| 5/1/2023 | | $400,000 | |
| 6/2/2023 | | | Messner opens Axos Bank account for INBE-Clear Capital |
| 6/6/2023 | | | Satisfaction filed regarding $1,147,000 judgment owed by All Net to CTS |
| 6/13/2023 | $700,000 | | |
| 6/20/2023 | | $30,000 | |
| 6/22/2023 | $1,145,000 | | |
| 6/26/2023 | | $59,966 | |
| 6/29/2023 | $3,500,000 | | |
| 6/29/2023 | | | Welch sends email to Chartraw at Clearwater |
| 7/5/2023 | | | Welch sends email to Chartraw and Owen at Clearwater |
| 8/23/2023 | | | Welch letter: we serve as outside counsel to INBE and INBE "stands ready, willing and able" to issue BELOC financing |
| 9/21/2023 | | | Welch sends email to Chartraw and INBE |
| 10/27/2023 | | | Welch sends email to Chartraw at Clearwater |
| 11/21/2023 | | | All Net's attorney (now Messner's counsel) claims $6 million has been paid in construction costs since November 2022 and Welch falsely claims All Net received $5 billion in phantom funding. |
| 12/1/2023 | | | Welch claims Messner no longer represents INBE and acted only as "Paymaster." Welch says the ICA funds can be returned upon receipt of a notarized termination notice. The notarized termination notice is given, but Messner fails to return the ICA funds. |
| 12/15/2023 | | | Clearwater's counsel states that his firm will disburse Plaintiffs' escrow money pursuant to the "INBE Capital Issue" through his trust account by December 22, 2023. |

COMPLAINT

| | | | |
|---|---|---|---|
| 1/25/2024 | | | Welch states that "the funds remain part of the escrow under our control at Titan Financial, LLC." |
| 2/15/2024 | | | Welch states that the "Funds continue to be under the control of our firm and are held at Titan Financial, LLC." |
| 2/22/2024 | | | Messner website: "At no time have the funds... disappeared or become lost..." |
| 3/20/2024 | | | Welch states: "I have spoken with the national bank partner this morning that is handling the last path of the ICA deposits" and "We should have that approved and funds moving very shortly." |
| 2/20/2025 | | | Messner admits: "Funds were fully disbursed by July 25, 2024" because "INBE provided authorizations to Messner Reeves to disburse funds at its direction and benefit on 4 separate occasions totaling $2,490,33 [sic] from the account holding its [$10 million in] funds." |
| Total | $8,345,000 | $753,038 | |

## 5. INDIVIDUAL PLAINTIFFS' ALLEGATIONS

### 5.1 Kosher Eats LLC

### $2,000,000 wired to Messner on April 27, 2023

273.    Kosher Eats is a kosher food distribution and catering company serving corporate, institutional, and retail clients. In January 2023, it acquired operations and began

274.    To finance this expansion, Kosher Eats was introduced to a BELOC drafted by Messner. The BELOC promised an $8 million loan at 6 percent interest-only for ten years, with no personal guarantee or real estate collateral.

275.    Under the BELOC, Kosher Eats was required to deposit $2 million, 25% of the loan amount, into Messner's COLTAF escrow account. The BELOC and accompanying FAQ stated that the funds would be held in Messner's sole possession and control and would be returned in full if the loan did not fund

276.    As described in paragraph 43, Kosher Eats relied on Messner's promise to safeguard the ICA deposit.

277.    Before wiring the funds, Kosher Eats reviewed the BELOC, the FAQ, and other materials drafted by Welch. The decision to proceed was based on the assurance that the deposit would be secure and refundable.

40

COMPLAINT

278.     On April 27, 2023, Kosher Eats wired $2 million to Messner's Northern Trust COLTAF account. No disbursement was ever made.

279.     After the 90-day deadline passed, Kosher Eats sought updates. Defendants responded with shifting explanations, including vague references to compliance checks, banking delays, monetization processes, and wiring issues—all of which were false.

280.     Between July 2023 and March 2024, Welch and others sent dozens of messages stating that the funds were still intact and disbursement was imminent. They mentioned Titan Financial, JPMorgan, and unnamed banking partners.

281.     Examples of these false assurances include:

- August 17, 2023: Welch wrote, "Bankers are waiting for additional approvals... anticipate additional news tomorrow."

- February 15, 2024: Welch stated that the funds remained "under the control of our firm" at Titan Financial.

- March 20, 2024: Welch claimed that national banking partners expected disbursement "this week."

282.     These statements were knowingly false. In February 2025, Messner admitted that Kosher Eats' funds had already been disbursed without authorization and were never returned.

283.     As a result of Defendants' conduct, Kosher Eats suffered substantial harm. The company defaulted on financial obligations, lost key clients and suppliers, incurred $480,000 in emergency financing costs, and entered a state of operational distress.

284.     The BELOC and FAQ included more than 20 material misrepresentations, including assurances that the ICA deposit would be held in trust and returned if the loan did not fund. Kosher Eats relied on these statements to its detriment.

285.     Kosher Eats never received any loan proceeds or return of its $2 million deposit and now faces the risk of business failure.

COMPLAINT

286.    Kosher Eats incorporates by reference the allegations in Sections 4.8 through 4.11, including the fraudulent scheme, materially identical misrepresentations, and the unlawful transfer of escrow funds. This conduct directly caused Kosher Eats' damages.

### 5.2 Emerald Consulting Partners, LLC

### $700,000 wired to Messner on June 13, 2023

287.    Emerald is a financial advisory firm formed in 2023 to assist small businesses in obtaining growth capital. One of its early clients, Hard AF Seltzer LLC, was presented with a BELOC agreement drafted by Messner.

288.    The BELOC promised a $2.8 million loan at 6 percent interest-only for ten years and required a $700,000 Interest Credit Account (ICA) deposit into Messner's COLTAF trust account.

289.    On June 12, 2023, Emerald agreed to act as a bridge lender and wired $700,000 to Messner on Hard AF's behalf. A side letter, executed the same day between Emerald, Hard AF, and INBE, confirmed that if the loan failed to fund within 90 days, the deposit would be returned directly to Emerald. Welch confirmed receipt of the wire on June 13, 2023.

290.    The BELOC and FAQ stated that the ICA funds would remain in Messner's sole possession and control and would be promptly returned if the loan did not fund. Emerald relied on these representations and on Messner's stature as a national law firm

291.    As described in paragraph 43, Emerald's decision to proceed was based on Messner's written assurance that it would safeguard the ICA deposit.

292.    The 90-day loan funding deadline expired on September 11, 2023. No disbursement occurred. Inquiries from Emerald were met with vague excuses referencing unnamed bankers, internal processing issues, and general delays attributed to INBE.

293.    Defendants never disclosed that the funds had been removed from escrow. To the contrary, on September 21, 2023, Welch texted, "I haven't heard anything concrete... Reaching out now to get an update."

294.    INBE later stated under oath that it had never received the ICA funds and had no knowledge of what happened to them.

295.    On October 27 and again on November 21, 2023, Emerald formally demanded return of the funds. Hard AF also submitted a notarized termination letter at Messner's request. The funds were not returned.

296.    In response to Emerald's first lawsuit, Messner claimed publicly that it was "legally prohibited" from returning the deposit but failed to identify any legal basis for that position. Meanwhile, INBE disclaimed receipt of the funds and denied that a lending agreement remained in effect.

297.    Emerald's $700,000 deposit was never refunded. As a result, Emerald suffered reputational harm, disruption of operations, diminished investor and client confidence, and impairment of its ability to attract new clients.

298.    Emerald incorporates by reference the allegations in Sections 4.8 through 4.11, including the shared fraudulent scheme, materially identical misrepresentations, and misuse of escrowed funds. These acts directly caused Emerald's damages.

### 5.3 MSC Companies, LLC

### $1,145,000 wired to Messner on June 22, 2023

299.    MSC is a hospitality consulting and hotel management firm based in Utah. It operated 27 properties under major national franchise brands across several states.

300.    In mid-2023, MSC was induced to enter into a BELOC agreement drafted by Messner. The agreement promised a $4.58 million loan at 6 percent interest-only for ten years, with no personal guarantee or collateral required. It also required a $1,145,000 ICA deposit to be wired to Messner's COLTAF trust account.

301.    MSC relied on the same assurances described above—that Messner would hold the ICA deposit in its sole possession and control and return the funds if the loan did not fund.

302.    On June 22, 2023, MSC wired the deposit to Messner. As described in paragraph 43, MSC relied specifically on the trust account provisions in the BELOC agreement and FAQ.

303.    The first tranche of the loan was due by September 20, 2023. No funds were disbursed. When MSC followed up, Messner and its agents offered evasive responses,

including vague references to banking delays, wiring complications, and compliance issues. No specific explanation was ever given.

304.    Welch did not communicate directly with MSC's principal. Instead, he used intermediaries such as Jason Aufdermaur, who falsely assured MSC that disbursement was imminent. INBE later stated under oath that it had never received MSC's ICA deposit and did not know what happened to the funds.

305.    MSC's $1,145,000 deposit was never returned. As a result, the company was forced to secure emergency financing at high interest rates, abandon two property acquisitions, and dilute ownership equity to stay afloat. The firm also suffered reputational harm and strained relationships with lenders and franchise partners.

306.    MSC incorporates by reference the allegations in Sections 4.8 through 4.11, including the fraudulent representations, misuse of Messner's trust account, and efforts to conceal the theft. This conduct directly caused MSC's damages.

### 5.4 Abbson, LLC

### $3,500,000 wired to Messner on June 29, 2023

307.    Abbson is a digital marketing and content production company with offices in Los Angeles, New York, and Washington, D.C.

308.    In June 2023, Abbson was induced to enter into a BELOC agreement with INBE, structured and presented by Messner. The agreement promised a $14 million loan on favorable terms, requiring a $3.5 million ICA deposit into Messner's COLTAF trust account.

309.    On June 29, 2023, Abbson wired the $3.5 million deposit. As described in paragraph 43, Abbson relied on Messner's promise to safeguard the funds in trust and return them if the loan did not fund.

310.    The 90-day loan deadline passed without disbursement. Instead of returning the funds, Messner and its agents gave a series of contradictory updates. These included fabricated claims about bank compliance reviews, processing delays, and third-party approvals. At that point, Abbson was introduced to Clearwater, a previously unknown entity,

COMPLAINT

and began receiving communications from its liaisons. Those representatives referred to Welch and Chartraw as the individuals overseeing loan operations.

311.   Abbson's $3.5 million deposit was never returned. As a result, Abbson was forced to cease operations, lay off all employees, close multiple offices, and default on key contracts. The company lost its expansion pipeline, client base, goodwill, and market presence.

312.   Abbson incorporates by reference the allegations in Sections 4.8 through 4.11, including Defendants' fraudulent conduct, misuse of the trust account, and pattern of concealment. These acts directly caused the complete destruction of Abbson's business.

### 5.5 HomePeople Corporation

### $1,000,000 wired to Messner on April 20, 2023

313.   HomePeople operates "Romio," a social commerce platform that facilitates local referrals for services. In early 2023, HomePeople sought funding to complete its product launch.

314.   HomePeople entered into a BELOC agreement with INBE, which promised a $4 million loan on favorable terms. The agreement required a $1 million ICA deposit.

315.   HomePeople initially wired the ICA deposit to a different law firm. On April 20, 2023, at Defendants' request, it authorized the transfer of the $1 million deposit to Messner's COLTAF trust account. As described in paragraph 43, HomePeople relied on Messner's assurances that it would hold the funds in its sole possession and control pending disbursement.

316.   The BELOC promised that the deposit would be returned in full if no loan funded. HomePeople reasonably relied on this representation.

317.   On July 3, 2023, HomePeople received a payment of $973,000, purportedly as the first tranche of its BELOC loan. However, this money was not funded by INBE and did not come from a lending institution. Instead, it was drawn from ICA deposits belonging to other victims. No second tranche was ever issued, and Messner never returned the remaining balance of the deposit.

318. In the following months, Welch and his agents continued issuing false and shifting explanations. They blamed banking delays, wire issues, and third-party intermediaries, including Titan Financial, JPMorgan, and unnamed international institutions.

319. Because of the failure to fund the loan or return the deposit, HomePeople was forced to suspend its product launch. It lost strategic marketing partnerships, defaulted on critical obligations, and suffered long-term reputational and financial damage. Millions in investment, goodwill, and growth opportunities were lost.

320. HomePeople incorporates by reference the allegations in Sections 4.8 through 4.11, including Defendants' uniform misrepresentations, misuse of the trust account, and coordinated efforts to conceal the theft. These acts directly caused HomePeople's collapse.

321. At all relevant times, Welch was a managing partner of Messner and acted within the scope of his authority as an officer, agent, and representative of the firm. Messner is therefore liable for his actions under principles of respondeat superior and agency.

322. Messner ratified, authorized, and failed to prevent Welch's conduct despite having knowledge of his role in the transactions at issue.

323. Chartraw acted on behalf of Clearwater and was its actual and ostensible agent. Clearwater is liable for his conduct under agency principles.

324. At all relevant times, each Defendant was the agent, partner, employee, or co-conspirator of the others and acted within the course and scope of such relationships.

325. Accordingly, each Defendant is jointly and severally liable for the conduct alleged herein under principles of agency, respondeat superior, and conspiracy.

## 6. CAUSES OF ACTION

### Count One – Civil Theft (Penal Code § 496)

### (Against Messner)

326. Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

327. California Penal Code § 496(a), any person who receives, conceals, withholds, or assists in concealing or withholding property from its rightful owner, knowing it was stolen or obtained unlawfully, is guilty of a felony when the property's value exceeds $950.

328. Each Plaintiff rightfully owned its respective ICA deposit

- Kosher Eats – $2,000,000
- Emerald – $700,000
- MSC – $1,145,000
- Abbson – $3,500,000
- HomePeople – $1,000,000

329. Each Plaintiff transferred its ICA deposit to Messner under the express condition that the funds would remain in Messner's sole possession and control, held in escrow pending loan disbursement. No loans were ever issued.

330. The deposits remained the property of the respective Plaintiffs and constitute property subject to theft under California Penal Code § 484. The losses are actionable under § 496(c).

331. Messner knowingly accepted these deposits while aware that (1) the loans would not fund, and (2) the funds were not Messner's to retain or disburse. Messner lacked authority to release the deposits from trust.

332. As described in paragraph 43, Plaintiffs relied on Messner's representations that the funds would be held in trust. These representations were knowingly false and intended to induce the transfers.

333. After the loan deadlines passed, and despite Plaintiffs' demands for return of their deposits, Messner transferred the funds out of trust and concealed their location and use. Plaintiffs had revoked any authorization, yet Messner withheld the funds.

COMPLAINT

334.    Messner knew the ICA deposits belonged to Plaintiffs—not to INBE, Clearwater, or any related entity. Nonetheless, it disbursed the funds to third parties, including Dribble Dunk, while offering inconsistent and misleading explanations.

335.    Messner's conduct meets the statutory definition of theft and constitutes receipt and concealment of stolen property under Penal Code § 496(a).

336.    As a direct and proximate result of Messner's theft, Plaintiffs suffered actual damages totaling $8,345,000, as well as consequential damages, including lost business opportunities, reputational harm, increased financing costs, and operational disruption.

337.    Pursuant to Penal Code § 496(c), each Plaintiff is entitled to recover treble damages, plus reasonable attorneys' fees and costs.

338.    Plaintiffs therefore seek compensatory damages of $8,345,000, trebled to $25,035,000, along with consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

## Count Two – Conversion

### (Against Messner)

339.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

340.    claim for conversion under California law requires (1) ownership or the right to possess specific property, (2) wrongful exercise of dominion or control over that property, and (3) resulting damages.

341.    Each Plaintiff owned and retained the right to possess its respective ICA deposit. The deposits were transferred to Messner to be held in escrow, under the express condition that they would remain in Messner's sole possession and control unless and until a loan funded.

342.    No loan was ever funded. Messner had no right to retain or transfer the deposits after the expiration of the 90-day escrow period or following Plaintiffs' termination notices and demands for return.

COMPLAINT

343.    Despite these demands, Messner exercised unauthorized control over the funds, disbursing them without consent and in violation of the BELOC terms. Messner refused to return the funds and instead gave shifting and false explanations about their location and status.

344.    Messner's conduct deprived Plaintiffs of their rightful property and caused them to suffer financial and business harm, including the loss of the full value of their ICA deposits.

345.    Plaintiffs seek compensatory damages of $8,345,000, along with consequential damages, attorneys' fees, costs, and prejudgment interest.

## Count Three – Fraud (False Promise)

### (Against All Defendants)

346.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

347.    Defendants made specific promises to Plaintiffs, both in the BELOC agreements and in the accompanying materials, including that:

- Messner would retain exclusive custody and control over Plaintiffs' ICA deposits;
- The deposits would be held in trust and refunded in full if the loans did not fund;
- INBE had the financial capability to fund the promised loans;
- The loans would be disbursed within 90 days of deposit.

348.    These promises were knowingly false when made. Defendants had no intent to fund the loans, safeguard the deposits, or return the funds. INBE lacked capital and the ability to perform, and Messner intended to disburse the escrowed funds without consent.

349.    Defendants made these promises to induce Plaintiffs to wire substantial ICA deposits into Messner's COLTAF trust account.

350.    Plaintiffs reasonably relied on these representations, including Messner's involvement as escrow agent and the firm's written assurances regarding control, safekeeping, and refundability.

351.    As described in paragraph 43, Plaintiffs relied on these promises in entering into the BELOC agreements and wiring their deposits. They believed that a national law firm

COMPLAINT

would honor its written representations and comply with professional and fiduciary obligations.

352. Had Plaintiffs known that Defendants never intended to fund the loans or safeguard the deposits, they would not have entered into the BELOC agreements or transferred any funds.

353. Defendants' false promises were a substantial factor in causing Plaintiffs' harm. As a result, Plaintiffs lost their escrowed funds and suffered additional damages, including reputational harm, lost business opportunities, financing costs, and operational setbacks.

354. Defendants' conduct was willful, fraudulent, and malicious. Plaintiffs are entitled to compensatory and consequential damages, as well as punitive damages under California Civil Code § 3294.

355. Plaintiffs seek an award of actual damages, consequential damages, punitive damages, and all other relief deemed just and proper, including attorneys' fees, costs of suit, and prejudgment interest.

**Count Four – Fraud (Concealment)**

**(Against All Defendants)**

356. Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

357. Defendants concealed material facts from Plaintiffs, including that:

- INBE lacked capital and had no ability or intent to fund the loans;

- The BELOC structure had been copied from a known fraudulent scheme;

- The ICA deposits were not being safeguarded, but were being misappropriated;

- The "first tranche" disbursements were staged, using other victims' funds;

- Messner did not intend to hold the deposits in trust or return them;

- Titan Financial was a shell entity formed after the deposits had been diverted.

358. Defendants had a duty to disclose these facts. Messner, as a law firm acting as escrow agent and trustee, owed fiduciary and professional obligations to Plaintiffs. The

remaining Defendants were parties to a commercial transaction involving known material risks.

359.    Defendants intentionally concealed these facts to induce Plaintiffs to deposit funds into Messner's trust account. They knew the funds would not be used for legitimate loans and that Plaintiffs would not proceed if the truth were disclosed.

360.    Plaintiffs reasonably relied on Defendants' silence and incomplete disclosures. Defendants repeatedly assured Plaintiffs that the funds remained intact, would be refunded if necessary, and were safely held in escrow.

361.    Defendants' concealment was a substantial factor in causing Plaintiffs' damages. Plaintiffs wired millions in escrow funds under the false belief that those funds were protected and would be returned if no loans funded.

362.    Had Plaintiffs known the concealed facts—that INBE had no capacity to perform, that Messner intended to disburse the funds without consent, and that there were no legitimate lending operations—they would not have transferred their deposits.

363.    Defendants acted with malice, fraud, and oppression. Plaintiffs are entitled to compensatory damages, consequential damages, and punitive damages under California Civil Code § 3294.

364.    Plaintiffs seek an award of actual damages, consequential and punitive damages, and all other relief deemed just and proper, including attorneys' fees, costs of suit, and prejudgment interest.

**Count Five – Unfair Business Practices (Bus. & Prof. Code § 17200)**

**(Against All Defendants)**

365.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

366.    California Business and Professions Code § 17200 prohibits unlawful, unfair, and fraudulent business acts and practices.

367.    Defendants engaged in a course of conduct that was unlawful, unfair, and fraudulent within the meaning of the statute, including but not limited to:

- Soliciting ICA deposits through false pretenses;

- Concealing the lack of legitimate loan funding;

- Misrepresenting the safety, control, and refundability of escrowed funds;

- Misusing and diverting escrow funds for unauthorized purposes;

- Operating a scheme that functioned as a civil theft and advance-fee fraud;

- Making false public and private statements about the status of Plaintiffs' deposits.

368. Defendants' conduct was also unlawful in that it violated California Penal Code §§ 484 and 496 (theft and receipt of stolen property), common law fiduciary duties, the California Rules of Professional Conduct, and other legal duties arising from their roles as escrow agent, lender, and legal counsel.

369. The unfair and fraudulent business practices described above were ongoing, systematic, and directed at multiple small businesses. Defendants sought to create the appearance of legitimate transactions while diverting escrow funds for other uses.

370. Plaintiffs have suffered economic injury in fact as a result of Defendants' conduct, including the loss of their ICA deposits, increased borrowing costs, business disruption, and loss of reputation and goodwill.

371. Plaintiffs are entitled to restitution, injunctive relief, and all other remedies available under Business and Professions Code § 17203.

372. Plaintiffs seek an order awarding restitution of the $8,345,000 in escrowed funds, as well as any other equitable relief the Court deems just and proper.

**Count Six – Negligence**

**(Against Messner and Welch)**

373. Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

374. As escrow agent and trustee, Messner owed Plaintiffs a duty of care to safeguard their funds, comply with the BELOC terms, and refrain from disbursing funds without proper authorization.

375.    Welch, as a licensed attorney and managing partner of Messner, also owed a duty of care to Plaintiffs. He participated in drafting the BELOC and structuring the transactions and was directly responsible for overseeing the handling of Plaintiffs' funds.

376.    Defendants breached their duties by:

- Disbursing escrow funds without loan disbursement;

- Transferring funds to insiders and third parties without consent;

- Failing to return funds following Plaintiffs' termination notices;

- Providing false information about the status and location of escrowed funds;

- Creating entities such as INBE and Titan Financial to obscure accountability;

- Ignoring known risks and acting in conflict with their fiduciary obligations.

377.    Plaintiffs reasonably relied on Defendants' representations and entrusted them with millions of dollars in escrowed deposits. Defendants' carelessness and misconduct caused the total loss of those funds.

378.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered economic damages, including loss of their ICA deposits, business disruption, emergency borrowing costs, reputational harm, and lost opportunities.

379.    Plaintiffs seek compensatory damages, consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

**Count Seven – Negligent Misrepresentation**

**(Against Messner and Welch)**

380.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

381.    Defendants, through the BELOC agreements, FAQs, and other communications, made material representations to Plaintiffs concerning:

- The safekeeping and refundability of the ICA deposits;

- Messner's role as trustee and escrow agent;

- INBE's ability to fund the promised loans;

- The disbursement schedule and loan terms;

COMPLAINT

- The existence of third-party banking partners and compliance processes.

382. These representations were false. At the time they were made, INBE lacked capital, Messner intended to disburse funds without consent, and Defendants had no ability or intent to fund the loans.

383. Defendants made these representations without reasonable grounds for believing they were true. They failed to exercise reasonable care or competence in obtaining or communicating the information provided to Plaintiffs.

384. Plaintiffs reasonably relied on these misrepresentations in entering the BELOC agreements and wiring their ICA deposits. They did so in good faith, based on Messner's legal status and the written representations concerning control of funds.

385. Defendants' negligent misrepresentations were a substantial factor in causing Plaintiffs' losses. Plaintiffs suffered the loss of their deposits and related financial and reputational harm.

386. Plaintiffs seek compensatory and consequential damages, attorneys' fees, costs of suit, and prejudgment interest

## Count Eight – Breach of Fiduciary Duty

### (Against Messner and Welch)

387. Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

388. As escrow agent and trustee under the BELOC agreements, Messner owed fiduciary duties to each Plaintiff. These duties included loyalty, candor, the duty to act in the best interest of the principal, and the obligation to preserve and safeguard entrusted funds.

389. Welch, as a managing partner of Messner and a licensed attorney responsible for overseeing the BELOC transactions, also owed fiduciary duties to Plaintiffs. He actively participated in structuring the transactions and supervising the handling of escrowed funds.

390. Under Rule 1.15(a) of the California Rules of Professional Conduct, a lawyer must hold funds of clients or other persons received in the course of legal representation

separate from the lawyer's own property, maintain such funds in a trust account, and not commingle or misuse the funds for any purpose not expressly authorized.

391.    Rule 1.15(d)(1) further provides that upon receiving funds in which a client or third person has an interest, a lawyer must promptly notify the client or third person, and deliver the funds to which the client or third person is entitled. These duties applied equally to Plaintiffs, who were entitled to the return of their ICA deposits when the loans failed to fund within the agreed timeframe.

392.    Defendants breached their fiduciary duties by:

- Disbursing ICA funds without loan disbursement or borrower consent;

- Transferring escrow funds to insiders, including Dribble Dunk;

- Refusing to return funds after receiving notarized termination notices;

- Misrepresenting the status, location, and disposition of funds;

- Failing to maintain escrow funds in trust as contractually and ethically required;

- Using the trust account as a vehicle to finance unrelated projects and cover outstanding liabilities.

393.    Defendants' conduct was not the result of inadvertence or administrative error. It was calculated, knowing, and inconsistent with the duties imposed on fiduciaries, especially attorneys handling client funds.

394.    Plaintiffs relied on Messner's role as a law firm and escrow agent, expecting adherence to basic fiduciary and professional obligations. That reliance was reasonable and foreseeable.

395.    As a result of Defendants' breach, Plaintiffs lost their ICA deposits and suffered consequential harm, including reputational injury, operational disruption, and financial loss.

396.    Plaintiffs seek compensatory damages, consequential damages, and punitive damages to the extent permitted by law, along with attorneys' fees, costs, and prejudgment interest.

**Count Nine – Intentional Interference with Prospective Economic Advantage**

**(Against All Defendants)**

397.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

398.    Each Plaintiff had an existing and identifiable economic relationship with INBE in the form of a confirmed BELOC agreement. That relationship created a reasonable expectation of economic benefit, specifically in the form of a substantial business loan.

399.    Defendants knew of these relationships and the importance of the expected funding to each Plaintiff's operations.

400.    Defendants intentionally engaged in conduct designed to disrupt those economic relationships. This included falsely assuring Plaintiffs that INBE could and would fund the loans, while secretly misappropriating the ICA deposits and undermining any possibility of loan disbursement.

401.    Defendants' conduct was independently wrongful, including acts of fraud, breach of fiduciary duty, and violations of trust obligations and professional standards.

402.    Plaintiffs reasonably relied on the existence and performance of the BELOC agreements and made financial and operational decisions in anticipation of receiving the loan funds.

403.    Defendants' interference caused the breakdown of Plaintiffs' business expectations and directly led to financial losses, reputational harm, and lost business opportunities.

404.    Plaintiffs seek compensatory and consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

**Count Ten – Negligent Interference with Prospective Economic Advantage**

**(Against All Defendants)**

405.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

COMPLAINT

406.    Each Plaintiff had a valid and identifiable economic relationship with INBE under the BELOC agreements. These relationships carried a reasonable probability of future economic benefit, including access to multi-million dollar business loans.

407.    Defendants knew or should have known about these relationships and the material importance of the loan funding to each Plaintiff's business plans and operations.

408.    Defendants engaged in conduct that disrupted these economic relationships, including the dissemination of false information about the safety and returnability of ICA deposits, the viability of INBE, and the status of loan disbursements.

409.    This conduct was negligent. Defendants failed to exercise reasonable care in managing client funds, making representations about the BELOC structure, and fulfilling their responsibilities as fiduciaries, escrow agents, and legal counsel.

410.    Defendants' interference caused the loss of substantial business opportunities for Plaintiffs and the collapse of the loan transactions that were critical to their operations.

411.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered financial losses, reputational harm, and operational setbacks.

412.    Plaintiffs seek compensatory damages, consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

**Count Eleven – Restitution Based on Quasi-Contract and Unjust Enrichment**

**(Against All Defendants)**

413.    Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

414.    Plaintiffs conferred a substantial benefit on Defendants by wiring a total of $8,345,000 in ICA deposits to Messner's trust account. These funds were intended to be held in escrow and returned if the loans failed to fund.

415.    Defendants knowingly accepted and retained these funds, or otherwise benefited from them directly or indirectly, without providing the promised loans or returning the deposits.

COMPLAINT

416.     Defendants' retention and use of the ICA deposits was inequitable. The funds were misused to pay third parties, settle unrelated debts, and finance other business ventures, none of which benefited Plaintiffs.

417.     Plaintiffs did not receive the benefit of their bargain, nor did they receive a refund or any consideration. It would be unjust for Defendants to retain these funds.

418.     Plaintiffs seek restitution of the $8,345,000 in ICA deposits and any other amounts by which Defendants were unjustly enriched, along with all other relief the Court deems just and proper.

## Count Twelve – Civil Conspiracy

### (Against All Defendants)

419.     Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

420.     Defendants agreed and conspired to implement a fraudulent scheme involving the solicitation of ICA deposits through false representations and the subsequent misappropriation of those funds.

421.     Each Defendant had knowledge of the common objective: to induce Plaintiffs and other victims to wire funds to Messner's trust account under the false pretense of receiving business loans.

422.     Defendants took overt acts in furtherance of the conspiracy, including:

- Drafting and circulating fraudulent BELOC agreements and FAQs;
- Creating and maintaining a deceptive INBE website;
- Coordinating wire transfers and communicating false updates;
- Transferring escrowed funds to unauthorized recipients;
- Concealing the misuse of funds and delaying disclosure.

423.     Plaintiffs were harmed by these acts. They lost their ICA deposits and suffered business disruptions, reputational damage, and financial losses as a direct and foreseeable result of Defendants' concerted actions.

COMPLAINT

424. Defendants are jointly and severally liable for all damages arising from the conspiracy, including compensatory and consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

### Count Thirteen – Aiding and Abetting

### (Against All Defendants)

425. Plaintiffs incorporate by reference the factual allegations set forth in Paragraphs 1 through 325.

426. Each Defendant knew that the other Defendants were engaging in unlawful conduct, including fraud, conversion, breach of fiduciary duty, and civil theft.

427. Despite this knowledge, each Defendant provided substantial assistance and encouragement to the others in executing the scheme. This included:

428. Defendants' conduct enabled and supported the primary violations that caused Plaintiffs' harm.

429. As a direct and proximate result, Plaintiffs suffered economic injury, including the loss of their escrowed deposits and additional consequential damages.

430. Each Defendant is liable for aiding and abetting the misconduct of the others and is jointly and severally responsible for all resulting damages.

431. Plaintiffs seek compensatory and consequential damages, attorneys' fees, costs of suit, and prejudgment interest.

### 7. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies LLC, and HomePeople Corporation respectfully request that the Court enter judgment in their favor and against Defendants Messner Reeves LLP, Torben Welch, Daniel Chartraw, and Clearwater Premiere Perpetual Master LLC, jointly and severally, and award the following relief:

COMPLAINT

1. Compensatory damages in an amount no less than $8,345,000;

2. Treble damages pursuant to California Penal Code § 496(c);

3. Restitution and disgorgement of funds wrongfully retained by Defendants;

4. Consequential damages, including business losses, reputational harm, and increased borrowing costs;

5. Punitive damages based on Defendants' willful, malicious, and fraudulent conduct;

6. Injunctive relief including the following: (a) Imposing a constructive trust over all funds traceable to Plaintiffs' escrow deposits; (b) Freezing and restraining further disbursement, concealment, or transfer of such funds; (c) Requiring preservation of all related financial and communications records; and, (d) Requiring disclosure of the location of any transferred funds, including the recipient bank, transferee details, amounts, and transfer dates;

7. Relief pursuant to CCP § 572, requiring Defendants to deposit Plaintiffs' escrow funds into the court's custody;

8. Prejudgment interest at the legal rate from the date of loss;

9. Attorneys' fees and costs of suit pursuant to statute and applicable law; and

10. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:  */s/ Kenneth E. Chase*
Kenneth E. Chase (SBN 326307)

*Attorneys for Plaintiffs*
*Kosher Eats LLC, Emerald Consulting*
*Partners LLC, Abbson LLC, MSC*
*Companies, LLC, and HomePeople Corp.*

COMPLAINT